```
 1                IN THE UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF DELAWARE

 3                          -  -  -

 4    AVENTIS PHARMACEUTICALS INC.   :     Civil Action
      and SANOFI-AVENTIS US LLC,     :
 5                                    :
                  Plaintiffs,        :
 6                                    :
           v.                        :
 7                                    :
      BARR LABORATORIES, INC.,       :
 8                                    :
                  Defendants.        :     No. 06-286-GMS
 9                          -  -  -

10                     Wilmington, Delaware
11                     Monday, May 19, 2008
                          11:00 a.m.
12                          -  -  -

13
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
14
      APPEARANCES:
15
                  JOHN G. DAY, ESQ.
16                Ashby & Geddes
                       -and-
17                PAUL H. BERGHOFF, ESQ.,
                  JOSHUA R. RICH, ESQ.,
18                JEREMY E. NOE, ESQ.,
                  ANDREW WILLIAMS, ESQ., and
19                ALLISON BALDWIN, ESQ.
                  McDonnell Boehnen Hulbert & Berghoff LLP
20                (Chicago, Illinois)

21                              Counsel for Plaintiffs

22

23

24

25
```

```
1    APPEARANCES CONTINUED:

2            KAREN L. PASCALE, ESQ.
             Young Conaway Stargatt & Taylor, LLP
3                -and-
             JAMES HURST, ESQ.,
4            MAUREEN L. RURKA, ESQ.,
             TARAS GRACEY, ESQ.,
5            RENEE SOTOS, ESQ., and
             JULIA JOHNSON, ESQ.
6            Winston & Strawn LLP
             (Chicago, Illinois)
7
                      Counsel for Defendant
8

9                     -  -  -

10

11

12

13

14           THE COURT:  Good morning.  Please be seated.

15   Let's start with a round of reintroductions.

16           MR. DAY:  Good morning, Your Honor.

17           THE COURT:  Good morning.

18           MR. DAY:  On behalf of the plaintiffs, we have

19   John Day from Ashby & Geddes locally.  At counsel table Paul

20   Berghoff, Joshua Rich and Jeremy Noe.

21           In our second row, Your Honor, also from

22   McDonnell Boehnen, Allison Baldwin, and the senior director

23   of global patent litigation for Sanofi-Aventis, Peter Dolan.

24           Providing our technical support, Eric Pubins,

25   next to him is Andrew Williams, also from McDonnell Boehnen.
```

```
 1    And finally, back of the well, from McDonnell Boehnen, Aaron

 2    Barkoff, Scott Miller, Nicole Lammers, and Rory Shea

 3    (phonetic).

 4              THE COURT:  Good morning.

 5              MR. DAY:  Thank you.

 6              THE COURT:  Counsel.

 7              MS. PASCALE:  Good morning, Your Honor.  Karen

 8    Pascale from Young Conaway for Defendant Barr Laboratories.

 9    I will introduce my trial team from Winston & Strawn.  Jim

10    Hurst.  Maureen Rurka.  Taras Gracey.  Also in the courtroom

11    Julia Johnson and Renee Sofos.

12              THE COURT:  Good morning.

13              MS .PASCALE:  Thank you, Your Honor.

14              THE COURT:  Thank you.  All right.

15              Counsel, I would benefit probably from a small

16    opening.  You don't need to do a jury speech.

17              MR. BERGHOFF:  Thank you, Your Honor.  That is

18    what I had in our mind, just a small laying-the-groundwork

19    opening statement.

20              If we could pull up the slides there.

21              The case is about Nasacort AQ, what is in this

22    little box that the patient would get, more importantly,

23    what's in the bottle and the bottle itself, working as a

24    unit to deliver the intranasal spray to a patient's nose,

25    where it's indicated to treat allergic rhinitis, among other
```

1    conditions.

2              Just a few basics about Nasacort AQ.  It is an

3    aqueous intranasal spray.  That is more or less a term of

4    art in the area.  It distinguishes it from sprays that are

5    solutions and, in fact, it's used to indicate that the spray

6    is a suspension.  And we will talk a little bit more about

7    that in the opening, and certainly quite a bit about that

8    during the trial.

9              It is indicated for the treatment of nasal

10   symptoms of both seasonal and perennial allergic rhinitis.

11   I just think of it as allergies.  I think that is probably a

12   good enough approximation, although we will have some

13   testimony from physicians shedding a little more light as

14   needed on that portion of the case.

15             The active ingredient is a steroid, particularly

16   a corticosteroid.

17             This one is called tramcinolone acetonide.  I

18   believe that we will be able to refer throughout this trial

19   to that active ingredient simply as TAA.  That's going to be

20   my plan, because two out of three times I trip when I try to

21   pronounce the full name.

22             Anyway, Nasacort AQ is a very successful drug

23   for Sanofi-Aventis.

24             I should stop and say that sometimes people

25   pronounce that Sa-no-fa.  I say Sa-no-fee.  I am not sure

1    who is right.  It's a French name.  It's probably somewhere

2    in between.  I cannot correctly pronounce it anyway.  It is

3    a very successful drug for Sanofi-Aventis.  Probably 300

4    million dollars in U.S. sales every year, and has sold over

5    2 billion dollars to date in the U.S., all for the treatment

6    of nasal allergies.

7              Now, some of the relevant properties of Nasacort

8    AQ that we will be discussing through trial and our

9    witnesses will be, hopefully, providing help to Your Honor,

10   is listed on this slide.

11             The first is, I have already mentioned, it is a

12   suspension.  A suspension is really nothing more, as I

13   understand it, than particles that are suspended in a

14   liquid.  In other words, they don't settle out to the

15   bottom.  But they are still particles.  It's not like sugar

16   dissolved in our water.

17             That's a solution.  This is actually with the

18   particles that are staying in place in the liquid.  Not

19   settling out.

20             The property of the suspension of Nasacort AQ is

21   important to its stability.

22             If the particles settle out to the bottom of

23   bottle, we now have a dosing problem, because there might be

24   very little medicine up top.  It all might be sitting on the

25   bottom.  Maybe it will get redistributed when the patient

1    shakes it, if they follow the directions.  But it's

2    important to have that suspension be stable at all times,

3    because the particles that are suspended are the active

4    ingredient, the TAA.

5            Another important feature of Nasacort AQ, like

6    it being a suspension, is the subject of the claims that we

7    will be discussing, is, as Your Honor may appreciate from

8    our Markman hearing, is its thixotropy, or the fact that

9    Nasacort AQ is thixotropic.  Thixotropy -- I will leave that

10   for the experts to discuss that in more detail -- but in the

11   context of this case it simply means that the liquid and

12   particles are thick when they are allowed to rest, or when

13   they are in an unstressed state.

14           I will give you an example of what stress would

15   be (indicating).  That would be stress.  But in an

16   unstressed state --

17           THE COURT:  You were shaking it.

18           MR. BERGHOFF:  If I left the bottle sit, or in

19   the nose, it would be relatively thick.

20           In a stressed state, though, whenever I do

21   anything to it that's going to disturb it, of any

22   significance, shaking, stirring, pouring, you name it,

23   adding stress to it, a thixotropic liquid of this type will

24   get thinner.  It will get less viscous.  And in terms of

25   numerical measurements, the viscosity of the suspension, the

1    liquid and the particles, will actually go down.  Then when

2    the stress is removed, the viscosity, the thickness, will

3    return.  Not immediately.  In fact, that is actually part of

4    the understanding of what it means to be a thixotropic

5    composition.  The viscosity returns over time.

6           We will hear more about that.

7           Nasacort AQ, as defined in the claims, has a

8    specific viscosity profile.  It's referred to in the claims

9    as thixotropic properties.  We will talk much more about

10   this during the case.  In general, it goes from a relatively

11   high viscosity, when measured according to the patent, to a

12   relatively low or thinner viscosity, when it's subject to

13   shearing or shaking, and then returns to that relatively

14   high viscosity.

15          The relatively high viscosities are referred in

16   the patent as the setting viscosity, because the material

17   has a chance to set up, maybe not a hundred percent, but it

18   gets back enough that it is able to hold all those particles

19   in suspension and be a thicker material, which has some

20   significance for the application of the drug to the nasal

21   mucosa, to the nasal surfaces.

22          The specific viscosity profile is laid out in

23   the claims in the patent.  In the claims that we have

24   narrowed the case to -- and I think Your Honor may be happy

25   to hear that we have focused this trial down to just two

1    claims, one claim from each patent, and I will walk through

2    those in a little detail in just a moment.

3              Just as a note, we did that narrowing of claims,

4    selection of claims, based on Your Honor's Markman ruling.

5    And should things change and we be back down here again with

6    a different construction, rumor has it that could happen,

7    just in theory, Your Honor, we may have a different set of

8    claims based on that construction.

9              But for now, we are cutting it down to just the

10   two.

11             In the claims that we are presenting at this

12   trial, the setting viscosity is defined as being 400 and 800

13   centipoise.  We will hear from the experts what that means.

14   But that is the measurement for viscosity.  And the shear

15   viscosity is set at a lower level of 50 to 200.

16             Odorlessness is one of the features of one of

17   our claims that we are asserting, that the product is

18   odorless.  That has been defined by agreement between the

19   parties as, I have the quotes up on the slide, odors that

20   cause the user discomfort are absent.

21             So it is not a hyper-technical definition of

22   odorless.  I have been told nothing is truly odorless.

23   Everything has a little odor.

24             What we are talking about in the claim, in the

25   invention here, is odors that cause user discomfort.  And

1    Nasacort doesn't have those.

2              The reason it doesn't have it, as will be clear

3    from the evidence, it doesn't have a compound called phenyl

4    ethyl alcohol.  Phenyl ethyl alcohol was used in prior

5    aqueous nasal suspensions in the prior art and has a

6    significant smell that many patients find unpleasant, and

7    that causes burning and irritation because it's an alcohol.

8              Nasacort does not use phenyl ethyl alcohol.  And

9    we believe the evidence will show that was a significant

10   advance in the art.  Now, Nasacort AQ is covered by two

11   patents.  The '573 patent, I think that is how the parties

12   will be referring to that one, we have marked that as

13   Plaintiffs' Trial Exhibit PTX-1, and the second patent is

14   the '329 patent, this one issued later.  Both have the

15   identical text, except for the claims, of course.

16             My plan is, when I am looking at the text of the

17   patents, to just refer to the earlier one, PTX-1, the '527

18   patent.

19             Both patents, of course, because they have

20   identical text, disclose the exact formulation for Nasacort

21   AQ.  It is right there in Example 1.  It's described as a

22   preferred pharmaceutical composition.  But, in fact, that is

23   an exact recipe for Nasacort AQ.

24             And the evidence, we believe, will show, Your

25   Honor, that Barr's ANDA product which we are accusing of

1    infringement in this case is an exact copy of, take your

2    pick, Nasacort AQ and Example 1 in our patent.  It has the

3    exact formulation.  There is one ingredient that varies by

4    one in the fourth decimal point.  That's how close it is.

5    It is an absolute virtual copy.

6          The history of the accused product will be

7    presented to Your Honor in the form of exhibits that may be

8    cited in the posttrial briefing, deposition testimony, which

9    Your Honor will review as directed in the posttrial

10    briefing, and some witness testimony.  But because we aren't

11    going to hear a full explication of this live, I did want to

12    spend just a little time on the history of the accused

13    product.

14          It began with a company named Agis, and Agis in

15    the 1997-'98 time frame began working on developing a

16    generic version of Nasacort AQ, of the formulation.  And

17    skipping forward to Agis as related to this case, in August

18    of 2003, Barr signed an agreement with Agis by which Barr

19    obtained the rights to file an Abbreviated New Drug

20    Application with the FDA, based on Agis's Nasacort generic

21    formulation and to market that formulation.

22          So that's the relationship of Agis and Barr.

23          Beginning, the documents and deposition

24    testimony show us, beginning in 1997 and '98, Agis spent at

25    least 14 months attempting to reverse engineer Nasacort AQ

1    and to validate a generic version of that formulation, to

2    get it ready for possible filing by somebody to the FDA.

3              And what do I mean by reverse engineering?

4    Well, they obtained lots of these bottles and analyzed it

5    and repeatedly tried to make recipes, formulations, that

6    were as close as possible, if not identical, to Nasacort AQ.

7              And what they ended up with, after this 14-month

8    effort on their part, was not an exact copy.  It was close.

9    It was close.  But there were some differences in the

10   formulation, especially in the amounts of a couple of the

11   ingredients.

12             They got, let's say, 94 percent of the way there

13   with their reverse-engineering effort.

14             Agis then took this close copy, made three

15   fairly large-scale batches, and then -- and you would make

16   large-scale batches like this for submission to a regulatory

17   agency like the FDA, and then they simply stopped

18   development of the product.  And it lay fallow, the

19   documents and testimony show, for about three years.

20             And then Barr comes into the picture, signs the

21   deal in 2003 with Agis, and then in late 2003, after Agis

22   had now begun again to look at its copied formulation, Agis

23   and Barr actually abandoned the reverse-engineering efforts

24   that they had undertaken, that had gotten them close but not

25   exactly the same as Nasacort AQ, and just made an exact copy

1    of Nasacort AQ, taking the formulation directly from the

2    patent, directly from Example 1.  It was actually the second

3    patent, I believe, the '329 patent.  But it's the same

4    thing.

5           So a lot of effort to reverse engineer it,

6    followed by eventual, just dead-copying of the patented

7    formulation.

8           As I had mentioned before, Your Honor, we have

9    two claims at issue.  Claim 6 of the '573 patent and Claim

10   26 of the '329 patent.  I will put the language up in just a

11   moment, and we can see where the disputes lie as to

12   infringement.

13          But the parties, I think, have done a good job

14   in trying to minimize the number of words in the claim that

15   are going to be in dispute for infringement.

16          This is Claim 6 of the '573 patent.  Maybe the

17   bolding doesn't show up quite as clearly as I had hoped.

18   But the bolded words are what are in dispute.  They relate

19   to the thixotropic properties.  And they relate in general

20   terms to how the product deposits on the nose.

21          So we are going to have testimony certainly

22   during our case-in-chief that is going to focus on the

23   thixotropic properties of the compositions at issue here, as

24   well as how the product, how Nasacort AQ, deposits on the

25   nose.  And specifically, there will be a lot of focus on how

1    it deposits in one part of the nose, called the frontal

2    sinus.  We will have testimony that will guide all of us, I

3    am sure, on understanding some nasal anatomy, so we can see

4    what is at issue on the issue of deposition or not.

5            If we go to the next claim, this is Claim 26

6    from the '329 patent.  Many, not quite all, but many of the

7    same issues that were in dispute with Claim 6 will be in

8    dispute with Claim 26 of the '329 patent.

9            But there are at least significant chunks of the

10    claim that the parties agree are there.  And we won't have

11    to introduce proof on them.

12            We believe that the evidence will show that

13    Barr's ANDA product meets every element that is contested of

14    these two claims, including the specific thixotropic

15    properties.  We will introduce evidence to show that.  We

16    think it's clear that it is odorless.  It's the same

17    formation as Nasacort.  Nasacort is odorless.

18            We think it will be clear from the evidence that

19    it does, in fact, deposit on the frontal sinus.  This is the

20    one area of the nose that is in dispute.  And it is retained

21    on the frontal sinus for a sufficient period of time as

22    called for by the claim.  And the claims require that it

23    resist mucociliary clearance.

24            Let me just talk about those last two just for a

25    moment.

1         The issue is that Barr says, when Nasacort is

2    sprayed into a patient's nose, it doesn't make it to the

3    frontal sinus.  We have evidence it does.  Barr says when

4    Nasacort is sprayed into the patient's nose, it doesn't stay

5    on the frontal sinus long enough.  We have evidence that

6    shows it does.  And that same evidence that shows that it

7    stays on the frontal sinus is the same evidence that will

8    show that it is, in fact, resisting mucociliary clearance,

9    which, in the absence of a viscous formulation, clears

10   things out very promptly, sometimes on the order of 10 to 15

11   minutes.

12        We have evidence that this formulation,

13   Nasacort, and therefore Barr's copy, stay on the frontal

14   sinus deposited there for an hour or more, certainly enough

15   to constitute resisting mucociliary clearance.

16        We have testimony that will show Barr's ANDA

17   product has the properties of the claims.  Dr. Lockhead

18   actually tested Barr's product and Nasacort.  And Dr.

19   Prud'homme -- both of these are experts in viscosity -- the

20   fancy word is rheology, but for our purposes they are

21   experts in viscosity.  Dr. Prud'homme will then link Dr.

22   Lockhead's testing to the language of the claims, to

23   establish that, indeed, Barr's product meets those

24   limitations.

25        As to the odorless feature, Dr. Meltzer, a

1    physician, expert in allergies, will testify that Barr's

2    product, just like Nasacort, is odorless in that it doesn't

3    have odors that cause patient discomfort.

4              Dr. Berridge, who is an expert in positron

5    testing of the nose, PET testing, very cool stuff, very

6    high-tech stuff, will be here to describe the tests that he

7    did on the deposition pattern, where Nasacort deposits in

8    the nose.  And that testing will clearly show that it

9    deposes in the frontal sinus and is retained there for a

10   sufficient time, such that it resists the naturally

11   occurring mucociliary clearance process that is in

12   everybody's nose, trying to clear particles out as quickly

13   as possible.

14             Dr. Berridge's evidence will show that, in fact,

15   Nasacort AQ and therefore Barr's copy makes it to the

16   frontal sinus and is retained there.  And therefore, since

17   Nasacort does it, although we don't have testing of Barr's

18   product by PET, if Nasacort does it, Barr's product will do

19   it, too, because it's a dead-copy.

20             And because it resists mucociliary clearance, it

21   is really going to be Dr. Berridge's evidence as well,

22   because if it stays on the frontal sinus, as his testing

23   shows, well, that means it is resisting mucociliary

24   clearance.

25             If it stays around for a period of time longer

1    than the normal clearance time, it's resisting clearance.

2         And then Dr. Meltzer will summarize, just so

3    it's all in one place, Your Honor, that, indeed, Barr's ANDA

4    product has all of the elements of the claim, all of the

5    disputed elements.  And we believe that we will easily meet

6    our burden of proof by a preponderance of evidence on the

7    infringement issue.

8         I do want to turn to invalidity, but just very

9    briefly, because I am not a hundred-percent sure of the case

10   we will see on invalidity and I don't necessarily want to

11   address issues that aren't going to be addressed.

12        I will just address it shortly at a very high

13   level, that I am confident, regardless of how the evidence

14   comes in, my comments will be meaningful.  At least that's

15   my hope.

16        The patent, of course, presumed valid.  The

17   burden is on Barr, clear and convincing evidence.

18        An issue that Barr is arguing in this case is

19   that our Phase 3 clinical trials, the clinical trials by

20   Sanofi-Aventis -- it was actually a predecessor company of

21   Sanofi-Aventis, Sanofi has gone through a number ever

22   mergers, but it is the same company coming forward with

23   different names -- that those clinical trials were not a

24   public use.

25        We believe that the evidence will be clear that

1    these clinical trials were conducted in confidence, that the

2    patients who engaged in the clinical trials were given very

3    limited information about the product they were testing.  It

4    was Nasacort AQ, but all they knew was, possibly, was the

5    identity of the active ingredient.  They didn't know

6    anything about the formulation.  Nothing.

7            And they were given very small amounts, just

8    what they needed, to conduct the test.  And those samples

9    had to be returned under Federal law and accounted for.

10           So very tight controls were maintained by the

11   predecessor company, whose name you will hear from time to

12   time in the case was Rhone-Poulenc Rorer.  And we will

13   shorten that to RPR.  But RPR maintained very tight control

14   over the clinical trials at all times.

15           And there was absolutely no commercial

16   exploitation going on.  These were Phase 3 clinical trials.

17           So we believe when the evidence is all received

18   into evidence, and viewed under the totality of the

19   circumstances standard for public use, that all of the

20   factors, all of that, will point towards it not being a

21   public use.

22           We believe that the prior intranasal sprays that

23   Barr is relying on as prior art do not render the patent

24   claims obvious.

25           There is no anticipation issue in this case,

1    Your Honor.  It's all just about obviousness.

2              And we believe that, and this is not a full

3    list, but we believe that at least these prior art sprays

4    lack important claim properties:

5              Odorlessness.  As I mentioned, the prior art,

6    aqueous and intranasal sprays were decidedly not odor-free.

7    And they also lack the specific viscosity properties called

8    for by the claims:  the specific, the unique viscosity

9    profile.

10             We believe there will be evidence on the

11   obviousness issue of objective indicia of nonobviousness,

12   so-called secondary considerations, of course, and we will

13   have quite a number of them listed hereto:

14             Copying by others.  We already talked a little

15   bit about the copying by Agis, but there are other examples

16   of that.

17             Failure of others, long-felt need.  Nasacort AQ

18   provided unexpected results, going against the grain of

19   conventional wisdom.  And,

20             Commercial success.  You already saw our sales

21   numbers but there certainly will be evidence tying those

22   sales to the claimed properties of Nasacort AQ.  And we

23   believe that Barr will not carry the entire burden of proof

24   on invalidity.

25             I will check with Eric.  Is that my last slide,

1    Eric?  Yes, it is.  Thank you, Your Honor.

2              THE COURT:  Thank you.  We're going to work this

3    afternoon until about ten minutes to 1:00 and then we'll

4    come back.  We'll take an hour break and then come back.

5              Counsel.

6              MR. HURST:  Thank you, Your Honor.  Just

7    briefly, Your Honor, in our introductions we neglected to

8    introduce our client who is here from Barr Laboratories:

9    Azeen James, who is the Vice President of Intellectual

10   Properties; and Bridget Cooney, who is an in-house

11   litigation lawyer as well.

12             THE COURT:  Okay.

13             MR. HURST:  I want to, Your Honor, talk about

14   and focus on the issues that are going to be decided by Your

15   Honor.  And we have four defenses:  non-infringement,

16   enablement, obviousness and anticipation based on prior

17   public use.

18             And I'd like to start just with noninfringement.

19   There are multiple reasons our product does not infringe,

20   but I want to start with the fact that Barr's product does

21   not reach the frontal sinus as required by the claims.  This

22   I imagine was one of the claim construction issues that

23   counsel referred to; but in the only two asserted claims,

24   there is the phrase "the mucosal surfaces of the nasal

25   cavity" which has been construed to include the frontal

1     sinus.  Claim 26, one of the two claims asserted actually

2     says it expressly:  a method for delivering the nasal spray

3     to the frontal sinus.

4              Now, let me tell you what you are looking at

5     here on this slide.  We're going to have a medical doctor

6     and a surgeon, Dr. MacKay explain this in some detail, but

7     just briefly.  He has actually conducted countless frontal

8     sinus surgeries so he has seen it firsthand.

9              Here is the important point, Your Honor.  There

10    is not a straight shot from the opening of the nose to this

11    isolated cavity up here which is the frontal sinus.  The

12    pathway to the frontal sinus is meandering.  It's somewhat

13    tortured.  To get to that frontal sinus, you have to go

14    through this little hole right here.  This is the turbinate.

15    This is the turbinate.  Go through there.  And when you are

16    behind there, this is what is behind the turbinate.  This is

17    an x-ray scan.  There is a pathway right here.  Right there.

18    And then after that pathway, there is something called the

19    frontal ethmoidal recess, and then you get to the frontal

20    sinus.

21              Now, here is the important point.  And this is

22    what we think the evidence is going to show.  These nasal

23    sprays, they stay where they spray.  That is the Nasacort

24    marketing pitch:  They stay where they spray.  And that's

25    true.  The spray droplets, they're not marbles or beads.

1    They don't bounce around the nose.  They hit where they

2    stick.  Wherever they hit, they stick.  And so what happens

3    is the spray is expelled fairly rapidly from the bottle, and

4    wherever the spray droplets hit, that is where they stay.

5              For a spray droplet to get to the frontal sinus,

6    it would have to do this.  It would have to go through here,

7    to go through that little hole I mentioned from the

8    turbinate, which isn't shown here, this direction; would

9    have to make a U-turn, go up this pathway.

10              Now, remember, the people that are using the

11   nasal spray, they're stuffed up.  They're congested.

12   They're inflamed.  So that pathway is going to be narrower

13   than it is.  This is a healthy person so it's going to be

14   narrower.  And there is cilia there, nasal cilia.  There are

15   protrusions that aren't shown.  So the spray droplet,

16   without hitting any surfaces, would have to make this

17   U-turn, get all the way up that pathway, through the frontal

18   ethmoidal recess -- again, without hitting a surface;

19   because it hits, it sticks -- and then get to the frontal

20   sinus.  And we think the evidence is going to show that that

21   is not possible.  It's just not possible.  And it's not

22   realistic.

23              Now, you really don't have to rely on -- just

24   looking at the structure of the frontal sinus probably tells

25   you as much as you need to know.  But you can also look at

1    Aventis's testing.  Aventis's testing shows that the spray

2    droplets don't do the gymnastics required in this U-turn in

3    the air without hitting surfaces that is required to get to

4    the frontal sinus.  Aventis did testing in 2002, this

5    PET-scanning testing, and they showed that in the frontal

6    sinus they detected literally zero deposit with their

7    product, Nasacort.  Literally zero deposit.  Nothing.  No

8    uptake was observed in the frontal sinus.  A bunch of other

9    places where the drug was observed but zero in the frontal

10   sinus.  So that is before the litigation.

11          Now, during the litigation, they have

12   reconstructed a series of three studies to make the

13   following argument:

14          Of the 14 patients who were studied -- in 1996,

15   1998 and 2002, of the 14 patients that were studied, one of

16   Aventis's experts is going to say, well, we found trace

17   amounts in the frontal sinus, the gymnastics occurred that I

18   was talking about, for 6 of the 14 patients.

19          Now, we do think that the argument is based on:

20   Number one, a flawed study design.  Number two, just mere

21   background noise.  Nothing is perfect.  There is background

22   noise with these studies.  So there was no frontal deposit.

23   I mean you know that from the anatomy itself.  But they're

24   going to argue that 6 of 14 patients showed some trace

25   amounts of deposit in the isolated frontal sinus cavity.

1          Now, let's assume that that is true.  Remember,

2     Aventis's burden for infringement is to prove that we

3     actually infringe.  There is no direct infringement.  Right?

4     Because Barr doesn't actually deliver its product to

5     anybody's frontal sinus.  We just sell a nasal spray.  That

6     is what we plan to do, we hope to do:  sell a nasal spray.

7          There would be no contributory infringement,

8     right?  Because our nasal spray has a substantially

9     noninfringing use even according to Aventis's best argument.

10    Over half the people do not show any evidence of frontal

11    sinus deposit.  So there is no contributory infringement.

12    No direct, no contributory.

13         And there certainly is no inducement to

14    infringe, right?  Inducement requires that Barr intends to

15    induce people to use this product in a way that it hits the

16    frontal sinus.  I mean we don't even believe it happens,

17    okay?  There is no document, there is no testimony, there is

18    no evidence.

19         And to what end?  Even if a trace amount got in

20    the frontal sinus somehow someway without hitting any other

21    surfaces on the way, what medical benefit would there be?

22    There is no evidence there is any medical benefit to trace

23    amounts of drug in the frontal sinus.

24         The reality, Your Honor, is that when people

25    have inflammation in the frontal sinus, I mean it's painful.

1    It's painful stuff.  And they get treated with antibiotics

2    that they take in their mouth.  And if it's bad enough, they

3    get surgery.  That is what Dr. MacKay is going to explain.

4    If somebody could make a nasal spray to get drug into the

5    frontal sinus, they could print money.  And nobody has ever

6    done it, and I imagine maybe nobody ever will because of the

7    gymnastics required.  And certainly Aventis hasn't done it.

8    So there is certainly no frontal sinus deposit at all.

9            Now, that alone should end the case because both

10   claims require frontal sinus deposit.  I want to skip ahead.

11   I want to focus on two of our noninfringement defenses but I

12   want to skip ahead to enablement, Your Honor.  And the

13   reason I want to do that is because the lack of enablement

14   defense is a mirror image of our non-infringement defense on

15   frontal nasal, frontal sinus deposit.

16           You are going to hear from Dr. Maureen Donovan.

17   She has 20 years experience in pharmaceutical formulation

18   with a special expertise in nasal sprays, and she has read

19   the patent.  And the opinion you are going to hear from her

20   is this patent just teaches standard nasal sprays.  It's

21   Nasal Spray 101.  It doesn't teach somebody to make a

22   special nasal spray that creates droplets that do the U-turn

23   and gymnastics required to get to the frontal sinus.  And

24   she is in this business.  I mean she knows nasal sprays.  It

25   didn't happen in the prior art and it certainly didn't

1    happen with a breakthrough in this patent.  It's just the

2    standard nasal spray.

3              Now, she is a pharmaceutical formulator.  This

4    patent is a pharmaceutical formulation patent.  It's a

5    nasal spray formulation patent.  Aventis is bringing nine

6    witnesses to this proceeding, multiple experts; not one

7    pharmaceutical formulator.  None.  We're the only party

8    bringing pharmaceutical formulators to Your Honor to address

9    the pharmaceutical formulation issues.

10             Here is just one point on enablement, Your

11   Honor.  You have to teach an ordinary, ordinarily-skilled

12   scientist how to practice not a little sliver of the claims

13   range, of your claims but the full scope of your claim.

14             Now, here is what the claims talk about:  This

15   viscosity that counsel talked about, it comes from the

16   thixotropic properties.  It comes from a mixture -- I'm

17   going to say it.  I'm going to call it MCC and CMC.  It's

18   just that mixture that creates the viscosity profiles.

19             Well, the claims in the patent are fairly broad.

20   We cover any nasal spray with the range where that mixture

21   makes up anywhere from one percent to five percent of the

22   total formulation.  And, further, we claim a mix between the

23   MCC and the CMC where that ratio between the two, the MCC is

24   anywhere from 85-to-95 percent of the mixture of the two

25   where the remainder would be CMC.  Okay?  So that is the

1    range.

2              The testing that occurred with Nasacort is a

3    little thin slice.  It's two percent and it's 85 percent.

4    And they have one of the --

5              MR. BERGHOFF:  Your Honor, I obviously hesitate

6    to stand up during counsel's presentation but this is a

7    brand new argument we never heard of before in the case.  So

8    I would just like to lodge an objection to this argument

9    being made.

10             THE COURT:  Counsel, do you want to address

11    that?

12             MR. HURST:  We've been, throughout the case,

13    arguing a lack of any enablement for any portion of the

14    claims.  So this is the argument we've been making

15    throughout the case.

16             MR. BERGHOFF:  The only argument they actually

17    have made is the one that counsel has stated before about

18    frontal sinus.  And there is no reference to this in --

19             THE COURT:  Speak up, counsel.

20             MR. BERGHOFF:  There is no reference to this in

21    any of their prior interrogatory answers.

22             THE COURT:  Well, when you say?

23             MR. BERGHOFF:  Or in the pretrial order either,

24    Your Honor.

25             MR. HURST:  It is throughout our ...

1                    THE COURT:  Could you just show me where?

2                    MR. HURST:  Yes.  Our expert's opinion is that

3        the patent teaches.

4                    THE COURT:  He has just referenced one thing

5        that I think is readily obtainable, and that is the pretrial

6        order.

7                    MR. HURST:  The pretrial order?

8                    THE COURT:  Yes.  The point being if the

9        arguments were made, they certainly would appear there.

10                   MR. HURST:  Yes.

11                   (Pause.)

12                   MR. HURST:  I'll move on so we don't take up

13       Your Honor's time.

14                   THE COURT:  All right.  We'll looking for it as

15       well.

16                   MR. HURST:  I skipped ahead to enablement

17       because of the frontal deposit argument so let's go back to

18       non-infringement.  I just want to focus on two of the

19       noninfringement defenses because I think they're fairly

20       clear and straightforward.

21                   The first is frontal sinus.  The second is

22       Barr's product doesn't match the requirement for deposited

23       viscosity, Your Honor.  Here is what I mean by that.  The

24       claims require that after the spray, after the spray is

25       introduced into the nose, that thickens up.  When you

1    shake it and spray it, it thins up.  And then when you put

2    it in the nose, the claim requires that the viscosity of

3    the composition thickens up back to its setting 400-to-800

4    centipoise; and that is for the both of the asserted claims

5    based on your Markman ruling.

6              And so here is the question that you need to

7    ask:  When Barr's product is sprayed up the nose, does it

8    return to its setting viscosity?  Well, you first have to

9    ask how long is it in there?  How long is Barr's product in

10   the nose?  Does it have enough time to return to its setting

11   viscosity?

12             The patent tells you that the nasal cavity is

13   very efficient at removing things.  The patent says things

14   are removed within 10-to-30 minutes.  Let's take 30 minutes

15   just for the sake of argument.  So now the question is, is

16   that enough time for Barr's product to return to setting

17   viscosity while in the nose?  It's not enough time, Your

18   Honor, according to Aventis's own testing to return to

19   setting viscosity even on tabletop.

20             Here is Aventis's testing.  They tested their

21   own product and said to themselves, okay.  We shake it up.

22   How long will it take to return to setting viscosity?  It

23   takes hours and days -- literally, days.  Literally, days.

24   And that might seem surprising but it's not when you know

25   how all of this works.

1           The viscosity of a material is from its

2    molecular structure.  It builds a structure within the

3    confines of the liquid to make it firm.  And that's what

4    gives it its thickness when it builds this structure.  When

5    you stir it or shake it or pour it, that structure breaks

6    apart, it shatters.  And so for it to return to its thicker

7    setting viscosity, the molecular structure has to rebuild

8    itself.  And it can take an awful long time, depending on

9    the composition at issue.  Some compositions return more

10   quickly than others.  But the compositions that we're

11   talking about, Nasacort, literally after five days, still

12   had not returned to setting viscosity.  It starts to return

13   but it doesn't get anywhere near its setting viscosity for

14   an awfully long time.  So it certainly doesn't happen in

15   30 minutes, Your Honor.

16           But here is a point where I think there is a

17   complete absence of evidence on this.  Regardless of what

18   happens on the tabletop -- and Barr's product will not

19   return to setting viscosity within 30 minutes on the

20   tabletop, but certainly it's not going to return to setting

21   viscosity in a nasal environment.  And that is what is at

22   issue because that is what the claims require.

23           Here is the standard from the Federal Circuit,

24   just for some context:

25           Evidence of in vitro testing, out of the body on

1    the tabletop, is irrelevant absent that the in vitro system

2    is a good model of actual in vivo in the body behavior.

3              So to prove up infringement, what Aventis had

4    to do was show that in the nasal environment -- you could

5    create a model or something -- that in the nasal

6    environment, Barr's product would return to setting

7    viscosity within the 30 minutes that remained in the nasal

8    cavity.  And they didn't conduct any such testing; a

9    complete absence of testing.

10             Look, it's very different.  The nasal cavity is

11   body temperature, 98.6 degrees, about 30 degrees higher than

12   room temperature.  Higher temperatures make things less

13   viscous, thinner, not thicker as required by the patent.

14             Number two, on the tabletop, there is no

15   dilution at all.  The material, nothing is added to the

16   material.  In the nasal cavity, the nasal cavity secretes

17   fluids all the time and they get mixed in with the material.

18   And it would make it again thinner, less viscous, not

19   thicker as the patent requires.  And, moreover, in the nasal

20   cavity, there are cilia.  They beat a thousand times a

21   minute -- a thousand times a minute.  Their role is to share

22   mucous and yank it back out of the nasal cavity.  The body

23   is producing constantly producing mucous.  It has to be

24   shared and moved.  That same cilia action would make

25   material that is thrown up the nose less viscous, not more

1    viscous as the patent requires.

2              You have to remember on the tabletop, you are

3    just talking about still air.  In the nasal passages, you

4    are sniffing, sneezing, breathing, coughing.  You are moving

5    around.  It's a more turbulent environment.  So the notion

6    that if it takes literally hours and days to return to

7    setting viscosity on the tabletop, then in this environment,

8    Barr's product would return to setting viscosity in the nose

9    in only 30 minutes.  There is no evidence, a complete

10   absence of evidence on the in vivo recovery rate of Barr's

11   product, complete absence of evidence.

12             Let me turn to obviousness, Your Honor.

13             Now, for our obviousness defense you are going

14   to hear from Dr. Thomas Needham.  He is a pharmaceutical

15   formulator with 40 years of experience both in industry and

16   teaching at the University of Rhode Island.  This is what he

17   does for a living.  He is a pharmaceutical formulator and he

18   is going to talk to you about the fact that the prior art

19   renders these claimed nasal sprays obvious.

20             You will not hear from Aventis.  You will not

21   hear from a pharmaceutical formulator from Aventis to talk

22   about the obviousness issues.  Only Barr has brought a

23   pharmaceutical formulator to the courtroom.

24             Now, just briefly for some context.

25             THE COURT:  Counsel, bear with me just a moment.

1                    MR. HURST:  Take your time.

2                    (Pause.)

3                    THE COURT:  Thank you, counsel.  Go ahead.  I

4      should advise you that we're unable to detect where, going

5      back to your earlier argument -- well, maybe you have found

6      something that we haven't.

7                    MR. HURST:  And, you know, actually, I have to

8      look at it, Your Honor.

9                    THE COURT:  Okay.

10                   MR. HURST:  Just to be totally clear, all I'm

11     doing is our expert -- did we not have a lack of enablement?

12                   MS. RURKA:  It's right here.

13                   MR. HURST:  Yes.

14                   THE COURT:  Why don't you finish your thoughts

15     and then return.

16                   MR. HURST:  Good idea, Your Honor.  Thank you.

17                   Now for obviousness.  I just want to put a

18     little context.  I'm well familiar with the fact you know

19     KSR, Your Honor.

20                   THE COURT:  Yes.

21                   MR. HURST:  I just want to identify one

22     principle I think is important in this case from KSR.  What

23     the Supreme Court said is if there is a design need or

24     market pressure to solve a problem and a finite number of

25     identified, predictable solutions, the invention is likely

1    obvious.  That is what they said.  And that is the case

2    here.  There was a problem and a predictable solution.  Here

3    was the problem.

4              In the prior art, in the early 80s, nasal sprays

5    were made with aerosols:  CFC-propelled aerosols.  CFCs,

6    chloro -- I'm not even going to try.  CFCs provide

7    environmental problems and they were going to be banned.

8    There was discussion of banning CFCs, and they were

9    gradually being banned in various areas because they caused

10   an environmental problem.  So beginning in the late 80s, the

11   pharmaceutical and other industries began searching for

12   alternatives, and that included nasal sprays.

13             Schering Plough had a CFC-based aerosol:

14   Vancenase.  They converted to Vancenase AQ.

15             GlaxoSmithKline had Beconase, CFC-based, that

16   they converted to Beconase AQ.  And then they came up with

17   an additional aqueous formulation, Flonase.

18             Aventis comes along and follows the same path,

19   by now a well-worn path.  They make Nasacort which was

20   originally a CFC-based aerosol and they converted it to

21   Nasacort AQ.

22             Now, why am I listing Nasacort AQ with a list of

23   prior art products?  It's because Nasacort AQ itself was in

24   the prior art.  And here is why.  Those clinical trials that

25   you heard about, the results were published on more than a

1    year before the application was filed.  The results of those

2    clinical trials informed people that there was an aqueous

3    formation of TAA, that it worked, that it was given to 600

4    patients and the specific dosing that was used, that is in

5    the prior art.

6            So why are we here?  Aventis's argument, Your

7    Honor, is that even though the product itself was reported

8    in that literature, the ingredient list was not.  The

9    ingredient list was not.  It was only the product itself.

10   So they say our invention is the formulation.  So the

11   formulation is what makes our invention special.  So the

12   ingredient list they're saying wasn't public.

13           Well, Dr. Needham will explain to you that what

14   an ordinarily skilled pharmaceutical formulator would do

15   under these circumstances, if they wanted to make a TAA

16   aqueous-based formulation as reported in the literature, all

17   they would do is literally pick up the Physicians' Desk

18   Reference and look up Vancenase and look up Beconase and see

19   what their formulations were and just use their

20   formulations.  And, Your Honor, that is exactly what Aventis

21   did.

22           Now, counsel spent a lot of time talking about

23   Barr and Agis copying the Nasacort formulation.  We're a

24   generic drug company.  We are a Congressionally-authorized

25   encouraged industry.  We, in fact, do copy brand products

1    when we believe -- when patents expire or we believe they're

2    not legitimately protected by patents.  That is what generic

3    companies do.  And we copy as closely as we can to get

4    expedited FDA approval.  So that's what we do.

5              But we are not the only party in this courtroom

6    to copy a competitor's formulation.  This was written by

7    Aventis's inventor.  As a starting point, he said, the

8    qualitative formulation for Beconase AQ was used.  And that

9    is exactly what happened.

10             This is Nasacort in the left-hand column.  That

11   is Example 1 of the patent.  And here are the three prior

12   art formulations.  They match up to the T, almost.

13             The top line, they're all glucocorticosteroids.

14   To a pharmaceutical formulator, what that means is they have

15   the same physiochemical properties and you can swap them

16   out between formulations.  So if you have a prior art

17   formulation of that same drug category and you want to make

18   TAA, you just swap out the TAA because you know it will work

19   because it works with others in the same category.  And that

20   is exactly what Aventis did.  You go right down the list and

21   it matches up, matches up, matches up.

22             Here is one difference they're relying on.  They

23   say they switched out EDTA for phenylethyl alcohol.  All

24   right?  So that is one of the things that they're saying,

25   well, that is an invention.

1                    Just a little context here.  This benzalkonium

2       chloride is a preservative.  It keeps the bugs out of the

3       juice.  It kills the microbes.  That is what phenylethyl

4       alcohol is to do.  They work together in tandem to make sure

5       there is no microbes growing in the nasal spray.  That is

6       exactly what EDTA and phenylethyl alcohol do together.  It's

7       just a different preservative system.  That is all it is.

8                    And, in fact, when Aventis said this is our

9       invention, we switched out EDTA for phenylethyl alcohol, we

10      looked in the prior art.  We picked up the Physicians' Desk

11      Reference.  And it is such a common preservative system, we

12      found eight nasal sprays.  We limited ourselves to nasal

13      sprays.  This combination is all over the Physicians' Desk

14      Reference.  But it's a really common combination for

15      preservatives, EDTA with benzalkonium chloride.  It's not an

16      invention to use such a common preservative, especially when

17      it's used in a bunch of other nasal sprays.

18                   Now, to a pharmaceutical formulator, judge, this

19      is really kind of basic stuff.  You can pick what is called

20      The Handbook of Pharmaceutical Excipients.  And I know you

21      have done a lot of Hatch-Waxman cases.  Pharmaceutical

22      formulators have this handbook in their offices.  Any time

23      they want to look up an ingredient and see its properties,

24      they just pick it up.  It's on the shelves.  Dr. Needham has

25      one, Dr. Donovan.  Everybody has one.  But plaintiffs'

1    expert on obviousness, he doesn't have a copy of the

2    handbook because he doesn't do this for a living so it is

3    not familiar to him maybe.

4              But if you look up benzalkonium chloride, it

5    will tell you that you can use either phenylethyl alcohol or

6    EDTA.  Both are fine to create this preservative.  If you

7    look up EDTA, you will see right here, it tells you it's

8    frequently used with benzalkonium chloride.  So this is the

9    difference in the formulation.  And the handbook itself

10   tells you, hey, here is one easy alternative.

11             Now, one of the things counsel said is, well,

12   ours is odorless.  EDTA is odorless and phenylethyl alcohol

13   has an odor.  That's true, it has a rose scent.  How did

14   they pick that?  Why did they switch out to avoid the rose

15   scent?

16             This is a quote from the inventor, Dr. Kim, who

17   I understand will not be coming to testify, Your Honor.  He

18   says:  Marketing suggested this.  And there is nobody from

19   Marketing listed on the patent.  So the inventor, Dr. Kim

20   writes a memo saying Marketing would like to eliminate

21   phenylethyl alcohol, one of the two preservatives, because

22   it has a distinctive or odor.  And it does.  It smells like

23   a rose.

24             Now, is that an invention?  Well, one point is

25   both phenylethyl alcohol and EDTA are odorless under the

1    agreed construction which actually came from Aventis of

2    odorless:  odors which cause the user discomfort are absent.

3              Aventis is asking you to find that a rose

4    scent -- phenylethyl alcohol is what makes a rose smell.

5    Aventis is saying, Your Honor, that you should find that the

6    rose scent causes users discomfort, which probably would

7    shock the billion dollar rose industry in this country, I

8    would think.  A rose by any other name would smell as sweet.

9    Shakespeare.  So this has been a subtle issue for quite

10   awhile.

11             Phenylethyl alcohol does not cause people

12   discomfort as evidenced further by the fact that Flonase,

13   which has this rose scent, has dominated the market, until

14   it was genericized, from 1996 to 2006.  So it apparently

15   isn't causing users discomfort.  Nasacort has never been

16   higher than number three.  So if it was causing people

17   discomfort, it wouldn't be leading the market, I guess is my

18   point.

19             Next, Aventis says, well, we have this special

20   mixture of MCC and CMC.  This is the suspension mixture that

21   causes the viscosity.  Well, here is what the claims says.

22   The claims required a mixture of those two ingredients of

23   about 85-to-95 percent MCC with the other 15 percent or

24   10 percent being CMC.

25             Now, all the other prior art has the same

1    mixture of ingredients and Aventis's argument is our mixture

2    is special.  Right?  Because it gives this viscosity

3    profile.  The setting versus unsheared profile.  That is the

4    argument.  So the first question is:  Did Aventis invent

5    that claimed ratio which produces the special viscosity

6    profile?

7                Your Honor, they actually just purchased

8    off-the-shelf products, literally.  They wanted Nasacort to

9    be thixotropic just like all the prior art formulations.

10    And in order to get that ratio of CMC and MCC, they

11    literally called FMC, a major pharmaceutical supply-house

12    and said:  Do you have a premixture for us?  And FMC said,

13    sure, we have two that might work, 591 and 611.  Both of

14    those pre-mixtures meet the claimed ratio.  They both have

15    85-to-95 percent of MCC.

16                So then Aventis, Dr. Kim, tested up different

17    formulations of both of those off-the-shelf products.  And

18    what they found is that both products actually gave this

19    claimed viscosity profile that is set forth in the claims.

20    They both did.  They both did just fine.

21                Now, Aventis ultimately chose to use 611.

22    Flonase we know in the prior art, they actually chose 591.

23    So they chose a different one.

24                We tested Flonase.  We tested the shear and

25    setting viscosity.  It matches up perfectly with the claims,

1    which agrees with Aventis prelitigation testing.  That is

2    what they found, too, when they used 591.  But Aventis, when

3    they tested Flonase, they said okay, it matches the setting

4    viscosity but it has a higher shear viscosity.  That is the

5    argument.

6              This testing is subject to variability,

7    batch-to-batch, the temperature in the room, how long you

8    wait after you shear it to measure it.  There is a thousand

9    different things that can cause slightly different results.

10   So this difference is immaterial.

11             To come up with a patent and say this is my

12   distinction, this is the prior art, I claim a different

13   shear viscosity, and that's my invention, well, the law, of

14   course, is if you are going to work with a known prior art

15   range, with a prior art range and you are just going to

16   adjust the range, you have to come up with something new and

17   unexpected.  Something that gives you a difference in kind,

18   not merely in degree.  And absent that, it's not a valid

19   patent.

20             That's the rule on obviousness.

21             So they say, well, I slightly adjusted this

22   range.  And they say it's going to give me something

23   special.  But their own testing showed it didn't give them

24   anything special.

25             It is our position that Flonase and Nasacort,

1    they are exactly the same when they get sprayed up the nose.

2    No difference at all.  This is what their expert, he did

3    this testing before the litigation, he said, you know, we

4    did the testing, and what we found is that most regions

5    showed quantitative deposition that was very similar between

6    the two formulations, Nasacort and prior art Flonase, to the

7    extent that the difference would be unlikely to be

8    functionally detectable.  Meaning if there is any

9    difference, it won't mean any difference medically to the

10    patients using these nasal sprays.

11            Even they didn't find that this special

12    viscosity that they got from the off-the-shelf product made

13    any difference.

14            By the way, they even said, no statistically

15    significant difference.  So there is really no difference at

16    all between the prior art formulations and the current

17    formations.  It is really just cookie-cutter stuff, picking

18    up the PDR and copying the formulation.

19            Last defense, anticipation, this is prior public

20    use, which I know you know about.  Just briefly for some

21    context here.  The law is pretty simple on this.  Public use

22    includes any use of the claimed invention by a person under

23    the inventors who has no confidentiality obligation.

24            And the idea, obviously, is, if your invention

25    is ready to the point where you are letting others use it

1    without a confidentiality obligation, a clock starts.  You

2    have got one year when you do that to get to the Patent

3    Office, because they don't want you delaying.  When it is

4    ready and letting others use it, you have to get to the

5    Patent Office so you don't artificially extend your patent

6    monopoly.  The later you go to the Patent Office the later

7    your patent monopoly goes.

8            It doesn't matter whether the user knows

9    anything about the product.  All that matters is do they

10   have a confidentiality obligation, and, number two, did they

11   use it.  So they could use this product in a closed room

12   with the shades down and know its inner working for its

13   ingredients and that would trigger anyway that one-year

14   clock.  That's the law.

15           There is a way around that, this experimental

16   use exception, that only applies if that third-party use is

17   necessary to prove that your product works, that it's a

18   worthy product you can run to the Patent Office about.  So

19   they give you a kind of break, if you have to let third

20   parties use your product to prove it will work and reduce it

21   to practice.

22           That experimental use exception is no longer

23   relevant in this case because of your ruling from Friday,

24   Your Honor.

25           Here is why.  It doesn't apply after reduction

1    to practice.  Aventis throughout this case has asserted that

2    they reduced this claim formulation to practice no later

3    than May 1st, 1991.  So did they go to the manufacturers

4    when they did that?  No.  Instead, they ran a 600-person

5    clinical trial.  These folks had no confidentiality

6    obligation.  They could use the nasal spray at work, on the

7    streets, at home, anywhere they wanted to.

8            As far as Aventis knew, these were

9    pharmaceutical formulators in that group somewhere, or their

10   brothers or sisters or parents were pharmaceutical

11   formulators.  They let it out into the public in huge

12   amounts.

13           Here is when the clock started.  December 19th,

14   1992, when they first let a person use their invention with

15   no confidentiality obligation.  And all they had to do if

16   they really thought they had an invention with this

17   formulation is get a patent application on file by December

18   19th, 1993, and then they would be fine.  But they didn't do

19   that.

20           They ran the clinical trials.  And then they

21   published them, they trumpeted these clinical trials in two

22   different articles, and told the world we gave this product

23   to 600 different people.  Even then they didn't get to the

24   Patent Office within a year.  They waited the entire, over

25   four years from reduction to practice until they went to the

1    Patent Office and filed a patent application.

2            When you are talking about 600 people with no

3    confidentiality obligation, using a product, our view is

4    that is the definition of prior public use, Your Honor.

5            Thank you for your attention.

6            THE COURT:  Did you want to address the other

7    defense?

8            MR. HURST:  Yes.  The lack of enablement goes

9    from 348 of our pretrial order to, it goes many, many pages.

10   In particular, if you look at Paragraph 353, we say, but the

11   patent contains only one formulation example.

12           THE COURT:  You are talking about 353 of your

13   proposed findings?

14           MR. HURST:  Yes, Your Honor.

15           THE COURT:  The patent contains only formulas,

16   for example, Nasacort AQ as described in Example 1, which

17   does not reach the frontal sinus.

18           MR. HURST:  Yes.

19           MR. BERGHOFF:  That is the argument we agree is

20   in the case, Your Honor.  Clearly, the other one, about --

21           THE COURT:  Would you go back to that other

22   slide.

23           MR. BERGHOFF:  -- is not.

24           THE COURT:  That's what counsel is complaining

25   about.

1          MR. HURST:  This is the precise argument we are

2     making.  We are saying the only evidence that they suggest

3     to show that they have taught a formulation that goes to the

4     frontal sinus is in that Nasacort AQ.  That is the point we

5     are making.

6               So they haven't suggested anywhere that they

7     have taught the full scope of the claims, as required for

8     the enablement, under 112.  That's the argument.

9          MR. BERGHOFF:  May I put up -- can we turn the

10    Elmo on?  Is that possible?

11         THE COURT:  Yes.

12         MR. BERGHOFF:  This is just the agreed statement

13    of contested issues of fact and law.  C is the 112 section.

14    And both of these are talking about depositing on all

15    regions of the nasal cavity includes specifically the

16    frontal sinuses.

17              That is what the issue is.  That is what we

18    fairly believed was the issue we were here to meet, not an

19    argument that Nasacort is not a specific, the specific

20    formula for Nasacort is not a specific enablement for the

21    range of the claims on composition.

22         MR. HURST:  I think counsel has misunderstood my

23    argument.

24              No.  This is all about frontal sinus.

25              All we are saying is, they didn't teach anyone

1       how to make any, any pharmaceutical formulation that reaches

2       the frontal sinus.  The point we were making in our pretrial

3       order and the point I am trying to make now is the only

4       example that they even say could reach the frontal sinus is

5       only a sliver of the claims.  And that doesn't teach the

6       full scope of the claims.  That is our position.

7                   THE COURT:  I understand.  I think we are okay.

8                   MR. BERGHOFF:  If it is tied to the frontal

9       sinus.

10                  MR. HURST:  It is totally tied to the frontal

11      sinus.  And I apologize if I didn't say that.

12                  THE COURT:  Let's get our first witness sworn.

13                  ... GEORGE GEORGES, having been duly sworn

14          as a witness, was examined and testified as follows...

15                  MR. HURST:  Dr. Georges is testifying on

16      noninfringement issues by agreement of the parties.  We

17      talked about the order of the trial in advance, infringement

18      from Aventis, infringement and invalidity from Barr, and

19      then the rebuttal from Aventis.

20                  But there is traveling issues here.  I hope this

21      is not a concession that all of the witnesses can testify on

22      validity issues.  We are just making the accommodation for

23      Dr. Georges' schedule.

24                  THE COURT:  That's fine.

25                              DIRECT EXAMINATION

Georges - direct

1    BY MR. BERGHOFF:

2    Q.    Dr. Georges, could you please state your name?

3    A.    George Georges.  Same name, with an "s" at the end.

4    Q.    Are you a medical doctor?

5    A.    That's correct.

6    Q.    Could you briefly describe your education for us?

7    A.    Certainly.  I have acquired my Bachelor degree in

8    biology at the American University of Beirut in 1986.  That

9    was followed by an M.D. at the same university, School of

10   Medicine.  I emigrated to the United States in '91, and then

11   completed a residency in internal medicine at the University

12   Hospital in Cleveland, followed by a three-year fellowship

13   in pulmonary and clinical care medicine at the University of

14   Colorado.  I passed my board certification in internal

15   medicine, pulmonary medicine, as well as critical care

16   medicine.

17   Q.    Following your fellowship, what was your first

18   position, Dr. George?

19   A.    My first position was assistant medical director at a

20   company in Collegeville, Pennsylvania, named Rhone-Poulenc

21   Rorer, RPR.

22   Q.    And that is a predecessor company to the plaintiffs in

23   this case?

24   A.    Yes.  RPR history goes way back, through a series of

25   mergers and acquisitions.  It became known as Aventis, after

1    it merged with Hoechst Marian Roussel, late 1999, following

2    that, through a merger of Aventis and Sanofi-Synthelabo, it

3    became known as Sanofi-Aventis in 2004, late 2004.

4    Q.    Could we put up what we have marked as Plaintiffs'

5    Demonstrative Exhibit 205.

6             MR. BERGHOFF:  Your Honor, I am sorry.  With the

7    first witness I always forget the booklet.

8             THE COURT:  You may approach.

9             MR. BERGHOFF:  Thank you, Your Honor.

10   BY MR. BERGHOFF:

11   Q.    This is a demonstrative exhibit that you helped us

12   prepare, Dr. Georges?

13   A.    That's correct.  That's the complicated genealogical

14   tree of Sanofi-Aventis, as it is known today.

15   Q.    We see RPR where you started towards the middle of the

16   chart and Sanofi-Aventis near the bottom?

17   A.    That's correct.

18   Q.    As far as you know, is this an accurate representation

19   of the corporate history?

20   A.    Yes, sir.

21            MR. BERGHOFF:  Your Honor, what is your pleasure

22   on demonstrative exhibits, marking them?

23            THE COURT:  No.  We don't need to mark them.

24   They are just that, demonstrative exhibits.

25            MR. BERGHOFF:  Demonstrative exhibits, okay.

Georges - direct

1    BY MR. BERGHOFF:

2    Q.    Dr. Georges, could you tell us about the positions

3    that you have held at RPR starting in, I believe it was

4    1997?

5    A.    Indeed.  On August 1st, 1997, I joined RPR as an

6    assistant medical director of respiratory U.S. in medical

7    affairs.  Then shortly after that, the following year, I was

8    promoted to associate medical doctor in the same department.

9             Then right following the merger of RPR and HMR

10   to form Aventis, in April of 2000, I was promoted to medical

11   director of respiratory in U.S. medical affairs.

12            I remained in that position until approximately

13   mid-December of 2004, when, right, following the merger of

14   Aventis with Synthelabo, I accepted a different position in

15   the clinical operations outside the department, where I

16   remained as a senior medical director from the middle of

17   December 2004 until end of December of 2006.

18            And since October of 2006, I am back as a senior

19   medical director of the respiratory, allergy and

20   anti-infective in U.S. medical affairs at Sanofi-Aventis.

21   Q.    I assume you are familiar with Nasacort AQ, the

22   product at issue in this case?

23   A.    I am.

24   Q.    What was your first involvement with Nasacort AQ?

25   A.    I became involved in Nasacort AQ in 2000, when I

Georges - direct

1    became in charge of the respiratory department in the U.S.

2    medical affairs division at Aventis.

3    Q.      How long did you remain in contact, in your job with

4    Nasacort AQ?

5    A.      Until middle of December 2004.

6    Q.      How about today, Dr. Georges?  Is Nasacort AQ part of

7    your responsibility?

8    A.      Yes.  Beginning October 2006, I regained that

9    responsibility, effective today.

10   Q.      Briefly, what is Nasacort?

11   A.      Nasacort AQ is a triamcinolone acetonide in an

12   aqueous.  It is formulated in the bottle.  It is indicated

13   for the treatment of symptoms of seasonal and personal

14   allergy rhinitis in children 6 to 12 and adolescents 12 to

15   18 and in adults 18 and older.

16   Q.      So if you are 6 and up, Nasacort AQ might be for you?

17   A.      Correct.

18   Q.      What type of product is it?  Is it a suspension, a

19   solution?

20   A.      It is a suspension.

21   Q.      Of what in what?

22   A.      Many things.  It is a suspension mainly of TAA, as we

23   are referring to it now, in aqueous formulation.  It does

24   contain a number of preservatives.  It is unscented.  It has

25   got thixotropic properties.  It is formulated without phenyl

Georges - direct

1    ethyl alcohol, as you have summarized.

2    Q.    Now, as medical director responsible for Nasacort AQ,

3    did you have a group reporting to you?

4    A.    Yes, I did.  We started very small and we grew up to a

5    relatively good sized group in early 2000.  So I did have an

6    individual who was full-time responsible for that product.

7    Q.    And what were the responsibilities of you and your

8    group with respect to Nasacort AQ in this time frame from

9    2000 to 2004?

10   A.    My responsibilities spanned mainly three areas.  One

11   is being responsible for medical information about the

12   product, as well as the accuracy of all medical data points

13   and results concerning advertising and promotion.  The last

14   one, at least the design and implementation and publication

15   of Phase 3B and Phase 4 clinical trials.

16   Q.    The first item I think was medical information.  For

17   whom?

18   A.    For anybody who asked questions on Nasacort AQ, mostly

19   health care providers.

20   Q.    And advertising materials, you have reviewed those

21   before they went out the door?

22   A.    That's correct.

23   Q.    And then we will talk a little bit about Phase 4

24   clinical trials.

25            What is a Phase 4 clinical trial?

Georges - direct

1    A.    A Phase 4 clinical trial is clinical trials that are

2    conducted post-approval and while the drug is being

3    marketed.  They are mainly indented to further correct the

4    efficacy, safety, as well as additional outcomes on a

5    particular product.

6    Q.    Were there any Phase 4 clinical trials for Phase 4?

7    A.    There were indeed many Phase 4 clinical trials

8    conducted.

9    Q.    Can you give us a rough estimate of the number?

10   A.    It would be around, between ten to 20 in that period.

11   Q.    What were the purposes of these Phase 4 clinical

12   trials for Nasacort AQ?

13   A.    As I said, various things.  Furthering the

14   understanding of comparative efficacy versus existing

15   products of similar class, as well as furthering the

16   understanding of the safety of this product using innovative

17   or novel measures of safety.  Looking at different shading

18   factors, such as sensory attributes, quality of life,

19   patient preference, projected compliance with the product,

20   things like that.

21   Q.    Let's focus on the sensory attributes.  Describe what

22   that might be, a Phase 4 clinical trial on sensory

23   attributes?

24   A.    Yes.  That is a trial that is aimed at investigating

25   the patient's perception of the product's sensory attributes

Georges - direct

1    when it's sprayed in their nose.  That's something I could

2    come up with.

3    Q.    That's fine.  Do these studies just involve Nasacort

4    AQ or were there other products that were involved?

5    A.    There were other products involved.  Those were

6    comparative studies, comparing Nasacort AQ to other similar

7    products in the market.

8    Q.    What were some of those products that were compared

9    for the sensory attributes, the patient perception?

10   A.    We compared Nasacort AQ to Beconase AQ, to Flonase, as

11   well as to Nasonex.

12   Q.    Was it common in the industry, as far as you know, to

13   conduct Phase 4 clinical studies at this time on sensory

14   attributes, patient perception of sensory attributes?

15   A.    I believe we were the first to sort of pave that road,

16   in terms of research, because, obviously, these type of

17   compounds were all, became available in the late eighties,

18   mid-nineties.  So there was very little known about that

19   topic, as concerning enter intranasal steroids.

20        So I think we started doing that type of study

21   to better understand the differentiation between Nasacort AQ

22   and other compounds .

23        With this particular class of products, it's

24   extremely difficult to differentiate based on mere efficacy

25   outcomes or safety outcomes.

Georges - direct

```
 1              Numerous studies have been conducted that showed
 2      that the efficacy and the safety of these compounds are very
 3      similar, very close.
 4              So we were trying to identify different aspects
 5      of differentiation for Nasacort AQ.  And we decided, based
 6      on the profile, that that is something that patients may be
 7      able to perceive as different.  And that's why we conducted
 8      these studies.
 9      Q.    What sensory attributes did these Phase 4 clinical
10      trials look at?
11      A.    We looked at taste, aftertaste, strength of taste,
12      liking of taste, same thing for odor, strength of odor,
13      liking of odor.  We looked at amount of runoff.  We looked
14      at overall like.  We looked at moistness feeling.  And we
15      looked at a projected patient preference based on the
16      overall liking of the sensory attributes.
17      Q.    What is Nasacort AQ's property with respect to odor?
18      A.    With respect to odor, as the package insert states, it
19      is unscented.
20      Q.    As far as you know, was it the first unscented aqueous
21      intranasal spray?
22      A.    As far as I know, it was the first.
23      Q.    What makes it unscented?  Why is it unscented?
24      A.    I believe it's the absence of phenyl ethyl alcohol,
25      which inherently smells like rose petals.
```

Georges - direct

1    Q.    You were here, I think, for Barr's counsel's opening

2    statement about how sweet a rose smells.  Why could that be

3    an issue?

4    A.    I do buy roses for my wife on all the occasions.  I

5    know she likes them.  I think some people enjoy the smell of

6    fragrance or perfumes.  And other people just don't.

7              It is a matter of preference.  Some people

8    prefer certain scents over other scents.  Some prefer no

9    scent over scent.  That is where we are.

10   Q.    The removal of phenyl ethyl alcohol in the Nasacort QT

11   formulation, did that have any other benefits related to

12   patient sensory attributes?

13             MR. HURST:  Objection, Your Honor.  The witness

14   is beginning to testify as if he is an expert.  We didn't

15   have an expert report from Dr. Georges.  He was not actually

16   offered as one.

17             THE COURT:  I will sustain the objection.

18             MR. BERGHOFF:  That was probably an inartful

19   question.  I do mean to ask him to describe these Phase 4

20   clinical trials that he was in charge of.  Let me try again,

21   Your Honor.

22   BY MR. BERGHOFF:

23   Q.    Does the absence, as far as you know, in your

24   knowledge of Nasacort AQ, from having coordinated the Phase

25   4 clinical trials, is there any connection between the

Georges - direct

1    absence of phenyl ethyl alcohol and any of the other sensory

2    attributes that you had part of the, directed in part of the

3    Phase 4 clinical trials?

4                    MR. HURST:  Same objection, Your Honor.

5                    THE COURT:  You don't believe this is venturing

6    off into the area of expert testimony?

7                    MR. BERGHOFF:  No, Your Honor.  This is his own

8    personal knowledge of these Phase 4 clinical trials.  He is

9    a medical doctor.

10                   MR. HURST:  He is now testifying about his

11   interpretation of data from Phase 4 clinical trials.  We

12   actually asked him about this at his deposition, and he

13   answered mostly that he is not an expert in this area.

14                   THE COURT:  I won't let him do what counsel has

15   just described he believes he is doing.  With that proviso,

16   why don't you rephrase your question.

17   BY MR. BERGHOFF:

18   Q.    Do you have an understanding of the connection of the

19   absence of phenyl ethyl alcohol from Nasacort AQ and any

20   other properties of Nasacort AQ?

21   A.    Based on what I read in the literature, that scent is

22   essentially phenyl ethyl alcohol.  That is public knowledge.

23   That is published literature.

24   Q.    Did the results of the Phase 4 clinical trials that

25   you have discussed that you were responsible for while

Georges - direct

```
 1   medical director, were they published in medical journals?

 2   A.    Yes.

 3   Q.    How many publications?

 4   A.    About six or seven publications.

 5              MR. BERGHOFF:  Your Honor, these are in

 6   evidence.  I am certainly not going to walk Dr. Georges

 7   through all of them.  I did want to just put one up on the

 8   screen.

 9              THE COURT:  Okay.

10   BY MR. BERGHOFF:

11   Q.    If we could look at Plaintiffs' Trial Exhibit 409.

12   The second page, is this one of the publications of a Phase

13   4 clinical trial on sensory attributes?

14   A.    Yes.

15   Q.    What is the subject of this publication?

16   A.    The objective was to compare patient assessments of

17   sensory attributes of three intranasal corticosteroid

18   sprays, TAA, FP, and MR, which is Nasacort AQ, Flonase and

19   Nasonex.

20   Q.    What was Aventis's role in connection with this study?

21   A.    We provided funding, as well as input to the protocol

22   and publication.

23   Q.    Did Aventis or Sanofi-Aventis actually conduct the

24   study?

25   A.    No.  The study was conducted by investigators in three
```

Georges - direct

1    countries, in Norway, Germany, and Switzerland.

2    Q.    What journal was this published in?

3    A.    The Annals of Allergy, Asthma, and Immunology.

4    Q.    What type of journal is that?

5    A.    It's a peer-reviewed journal.

6    Q.    Respected?

7    A.    Yes.  Widely read by allergists and people interested

8    in that field.

9    Q.    Could we just look at the -- could we actually go to

10    the results and conclusion section on the first page.

11            Is it your understanding, Dr. Georges, that this

12    paper describes the results of this particular Phase 4

13    clinical study, comparing Nasacort AQ to competitive

14    products?

15    A.    It describes at least some of the results, yes.

16    Q.    And what is your understanding of the results of the

17    study?

18            MR. HURST:  Objection, Your Honor.  This is

19    obviously expert testimony.

20            THE COURT:  Overruled.  Go ahead.

21            THE WITNESS:  Could you repeat the question?

22    BY MR. BERGHOFF:

23    Q.    What is your understanding of the results of this

24    particular Phase 4 clinical study?

25    A.    My understanding is exactly as they read.  The results

Georges - direct

1    report that the TAA was rated as having significantly better

2    comfort during administration, less irritation, less odor

3    strength, preferred odor, more moistness of nose and throat,

4    a moderate taste, it had a P value that was statistically

5    significant, it also had a preferred taste.  That is in

6    comparison to Nasonex.

7              And there is another paragraph comparing it to

8    Flonase that also shows that it was rated as having less

9    odor strength, preferred odor, more moistness of nose and

10   throat, a moderate taste versus Flonase.

11             That was immediately following administration.

12             Then there are results reported two minutes

13   after administration that comment that TAA was rated as

14   having less aftertaste than Flonase or Nasonex.

15   Q.    Do you have any understanding of the results of this

16   particular study with respect to patient preference or

17   compliance?

18   A.    The questionnaire used in this study queried patients

19   about their projected compliance based on their answers.

20   And more patients indicated that they would be more

21   compliant with treatment if given a prescription of TAA, or

22   of Nasacort AQ, at about 67.4 percent than if given a

23   prescription with Flonase about at 55 percent, or Nasonex at

24   50 percent.

25   Q.    Thank you.  Could I ask you to turn in your book,

Georges - direct

1    perhaps we could put up on the screen the first page of

2    Plaintiffs' Trial Exhibit 313.

3                    Do you recognize this document, or at least set

4    of pages?

5    A.    Yes.

6    Q.    What is it?

7    A.    It's a, I think it's a booklet that summarizes the

8    product attributes of Nasacort AQ as it pertains to its

9    efficacy, profile, it's safety and tolerability, as well as

10   patient preference and compliance review.

11                   There is also full prescribing information

12   included here, as well as letters to, a sample of a letter

13   to physicians as well as to patients from a managed care

14   organization.

15   Q.    Is this, or am I wrong, is this advertising material

16   related to Nasacort AQ?

17   A.    It would be considered as such, yes.

18   Q.    And is this something that your group would have

19   reviewed for accuracy between 2002 and 2004?

20   A.    Yes, sir.

21   Q.    What was the purpose, when your group reviewed

22   advertising materials, what was the purpose of the review?

23   A.    Our goal as medical reviewer of advertising and

24   promotion is to ensure the medical accuracy, relevance, and

25   fair balances of the information provided.

Georges - direct

1    Q.    Could you turn to -- I am sorry, these pages are not

2    numbered in a convenient fashion.  It's just the Bates

3    numbers.  The last three digits are 920.  Maybe we can put

4    it on the screen.

5              It's a little further in.

6              THE COURT:  Perhaps this would be a good time --

7    we are close to the time I need to pause.  We will resume at

8    2:00.

9              (Luncheon recess taken.)

10             THE COURT:  Please be seated.

11             You may proceed.

12   BY MR. BERGHOFF:

13   Q.    Dr. Georges, I believe we left off, we had PTX-313 up

14   on the screen.  And just to reorient us, is this an example

15   of advertising material for Nasacort AQ that you and your

16   group reviewed in the time period between 2000 and 2004?

17   A.    Yes.

18   Q.    And were materials like this, did they ever get to the

19   FDA?

20   A.    Yes, we submit all advertising and promotional

21   material to DDMAC, which is a division of FDA.

22             MR. BERGHOFF:  Okay.  We have up on the screen,

23   Page 920, and if we could just look at the section from

24   "favorably," what is the word there, "favorably rated," down

25   to "no fragrance?"  Eric, if we could pull that up?  A

Georges - direct

1    little higher.  There we go.

2    BY MR. BERGHOFF:

3    Q.    What does this portion of the advertising material

4    state, Dr. Georges?

5    A.    It states:  Favorably rated by patients on the basis

6    of odor, taste and overall comfort.

7              And it cites two references, number four and

8    five, which four is the Bachert study that you showed

9    earlier and five is the study by Dr. Gerson and colleagues

10   in the Journal Sensory Studies.

11   Q.    And those are both publications of phase IV clinical

12   trials?

13   A.    Yes.

14   Q.    What else does this advertising material state?

15   A.    It says:  More patients would definitely comply with a

16   prescription for Nasacort AQ, at 67.4 percent.  Then for

17   Flonase, 55 percent, or Nasonex at 50 percent.  And that is

18   a direct pickup from the Bachert publication that you showed

19   earlier.

20   Q.    And the last two points for us, Dr. Georges?

21   A.    There is one that says no irritating alcohol.  And

22   there is one that says no fragrance or unpleasant taste.

23   Q.    And what is the reference to no irritating alcohol

24   refer to in this advertisement?

25   A.    I believe that is from the package insert.  We don't

Georges - direct

1    have, there is no alcohol in the formulation of Nasacort AQ.

2    Q.    And who is the intended audience for this particular

3    page in this exhibit?

4    A.    It's mostly healthcare professionals.  So it's

5    professionals.

6    Q.    Physicians?

7    A.    Physicians, nurses.

8    Q.    And let's just turn to the Page 929.  Is this also

9    advertising material for Nasacort that your group reviewed?

10    A.    Yes.

11    Q.    And who is the intended audience for this particular

12    page?

13    A.    My understanding is organization patients, so patients

14    belonging to managed care or covered by managed care

15    organizations.

16    Q.    Would that be an HMO?

17    A.    You can refer it to as such, yes.

18    Q.    And there is a sentence highlighted on the page.  What

19    does this convey in this advertising piece?

20    A.    It reads:  In addition, Nasacort AQ has no unpleasant

21    taste, no fragrance and no irritating alcohol.

22          This is a description of the sensory attributes

23    of Nasacort AQ taken from the results of the studies in

24    Bachert as well as the package insert.

25    Q.    Thank you.

Georges - cross

```
1                MR. BERGHOFF:  No further questions, Your Honor.

2                THE COURT:  Counsel, you may cross-examination.

3                MR. HURST:  Thank you, Your Honor.

4                THE COURT:  Counsel, for your convenience, I

5     meant to mention this earlier, you can turn the lectern.

6                MR. HURST:  This works fine.

7                          CROSS-EXAMINATION

8     BY MR. HURST:

9     Q.    Dr. Georges, we haven't met before.  My name is James

10    Hurst, and I represent Barr Laboratories.

11    A.    Good afternoon.

12    Q.    I just want to ask you a few questions about the

13    patient preference studies that you testified about.  These

14    were studies designed to help support marketing claims.

15    Correct?

16    A.    They are designed to understand the attributes of the

17    product as it compares to Flonase and Nasacort and Beconase.

18    Q.    And they were actually, though, designed to help or at

19    least they were used -- will you agree they were actually

20    used to support marketing claims?

21    A.    That's correct.

22    Q.    Okay.  And these patient preference studies that you

23    talked about, they were sponsored by Aventis.  Correct?

24    A.    That's correct.

25    Q.    And the protocols in terms of deciding what questions
```

Georges - cross

1      to ask and how to ask the questions to compare Flonase

2      versus Aventis, that was also something Aventis itself

3      participated in doing.  Correct?

4      A.    The questionnaires were developed jointly by

5      Dr. Bachert and Aventis.

6      Q.    But Aventis had a role in deciding how to ask the

7      questions in terms of comparing patient preferences for

8      Nasacort versus Flonase.  Correct?

9      A.    We did input into the protocol, if that is what you

10     are asking, yes.

11     Q.    And why don't we take a look at Plaintiffs'

12     Exhibit 409.  This is one of the documents you talked about

13     with counsel.  Correct?

14     A.    Yes.

15            MR. HURST:  If you take a look at the second

16     page.  Why don't you highlight the names, if you could, for

17     me of the two authors.

18     BY MR. HURST:

19     Q.    The senior author there, he actually is an Aventis

20     employee.  Correct?

21     A.    You mean the first or the second?

22     Q.    Dr. El-Akkad, he is Aventis employee.  Correct?

23     A.    Correct.

24     Q.    So an Aventis employee played a role in developing the

25     protocols for this comparison with respect to patient

Georges - cross

1    preferences.  Correct?

2    A.    That's right.

3    Q.    Now, I would like to show you some advertising that

4    Aventis actually used or cited these.  You looked at some

5    yourself with counsel.  Right?  Some of the advertising that

6    cites these studies that Aventis conducted?

7    A.    Yes.

8              MR. HURST:  I would like to take a look at

9    Defendant's Exhibit 114.

10   BY MR. HURST:

11   Q.    And you recognize this is a Nasacort advertisement?

12   A.    Yes.

13             MR. HURST:  Take a look at the second page.

14             MR. BERGHOFF:  Your Honor, I don't know what

15   protocol would be.  Do you have a copy?

16             MR. HURST:  I'm sorry.

17             MR. BERGHOFF:  No, no.  That's fine.  That's

18   fine.

19             THE COURT:  You haven't seen this?

20             MR. BERGHOFF:  I won't represent I have never

21   seen it.

22             MR. HURST:  Yes.

23             THE COURT:  That would be the protocol.

24             MR. HURST:  Yes.  I apologize, Your Honor.

25             May I approach, Your Honor, the witness?

Georges - cross

```
1              THE COURT:  Yes, you may approach freely.

2              MR. HURST:  Is it protocol to ask permission for

3    each approach?

4              THE COURT:  No.  Once you ask for the witness,

5    you have leave to approach the witness freely.

6              MR. HURST:  Thank you, Your Honor.

7              And if I can hand up for Your Honor?

8              THE COURT:  Sure.

9              (Documents passed forward.)

10   BY MR. HURST:

11   Q.    Okay.  You recognize this is an advertisement for

12   Nasacort?

13   A.    Yes.

14             MR. HURST:  If you go to the second page.

15   BY MR. HURST:

16   Q.    You will see at the top, it says preferred by twice as

17   many patients over Flonase and Nasonex.  Do you see that?

18   A.    Yes.

19   Q.    And there is a footnote, and if you can just check,

20   that actually cites one of Aventis's patient preference

21   studies.  Right?  It's the last page.

22   A.    Yes, it's the Bachert study.

23   Q.    And that study was also a study that Dr. Akkad from

24   Aventis.  He was the senior author on the paper?

25   A.    El-Akkad, yes.
```

Georges - cross

1    Q.    El-Akkad.  My apologies.  Now, what this advertisement

2    says is that patients preferred by, preferred by twice --

3    strike that.  Nasacort is preferred by twice as many

4    patients over Flonase and Nasonex.  Right?

5    A.    Yes.

6    Q.    But in terms of their purchasing decisions, that

7    didn't really bear out, did it?

8    A.    I'm not sure I understand the purchasing decision.

9    Q.    In fact, Flonase, until it was genericized, had

10   approximately three times the sales of Nasacort.  Right?

11   A.    I'm not in sales and marketing so I don't know the

12   exact figures.  I guess Flonase was the market leader at

13   that time.

14   Q.    Does that sound about right?  About three times the

15   sales, that neighborhood?

16   A.    I don't know the exact figures.

17   Q.    Would you agree with respect to purchasing decisions,

18   more patients seemed to prefer Flonase than Nasacort with

19   respect to purchasing decision?

20   A.    I don't know if purchasing is based on preference or

21   based on -- it could be based on the fact that their doctors

22   are prescribing them that product so it's not strictly

23   decided by patient preference.  It's what the doctor

24   prescribes.

25   Q.    So it might be a patient preference and a doctor

Georges - cross

1    preference leading to the higher sales for Flonase?

2    A.    It could be both.

3    Q.    Okay.  Now, I'd like to turn to the last page.

4    Actually, can we do this?  You were here for opening

5    statements.  Correct?

6    A.    Yes.

7    Q.    And did you hear counsel for Aventis talk about these

8    clinical studies that were conducted in 1993 and 1994?

9    A.    Yes.

10   Q.    And counsel for Aventis indicated that they were not

11   run for any commercial purpose.  Did you hear that?

12   A.    I recall, yes.

13   Q.    But, in fact, those two clinical studies from 1993 and

14   1994 were in fact used to support marketing claims.  Isn't

15   that true?

16   A.    Which studies are you referring to exactly?

17   Q.    The Settipane study and the Kobayashi study?

18   A.    Those are studies that eventually used to support

19   marketing claims.

20   Q.    And here if you take a look at Defendant's Exhibit 114

21   at Page 5, at the top there, you will see it provides fast

22   effective first-day nasal allergy relief.  Do you see that?

23   A.    Yes.

24   Q.    And if you take a look at the footnote to that, on the

25   very last page, 009, if you highlight the footnotes 2 and 3,

Georges - redirect

1    you understand these are the two studies that I and your

2    Aventis counsel discussed in connection with this public use

3    defense that we were talking about.  Right?

4    A.    Yes.

5              MR. HURST:  I have no further questions.

6              THE COURT:  Redirect, counsel.

7              MR. BERGHOFF:  Yes, one point.

8                   REDIRECT EXAMINATION

9    BY MR. BERGHOFF:

10   Q.    Do you still have the exhibit counsel handed you in

11   front of you?  Can you tell us its date and perhaps from the

12   references cited?  It would be the last page.  I'm sorry,

13   Dr. Georges.  I should have been clearer.

14   A.    Can you tell me the date of the advertisement, please?

15   Q.    Yes.

16   A.    I don't see it readily.

17   Q.    Is it at least some time after 2002?  What is the date

18   of the Bachert study?

19   A.    Yes.  It has to be after the date of the most recent

20   reference, so I would assume it is after August 2002.

21   Q.    And you were not in charge of reviewing advertising

22   materials as of 2002 for Nasacort?

23   A.    I had a direct report that was a full-time job that

24   was on this product.  I wasn't the primary person.

25              MR. BERGHOFF:  No further questions.

Kaliner - direct

1              THE COURT:  Thank you, sir.

2              THE WITNESS:  Thank you, all.

3              MR. BERGHOFF:  Mr. Rich will handle our next

4    witness, Your Honor.

5              THE COURT:  All right.

6              MR. RICH:  I will call Dr. Michael Kaliner.

7                        - - -

8                   PLAINTIFFS' TESTIMONY

9         ... DR. MICHAEL KALINER, having been placed

10            under oath at 2:15 p.m. as a witness, was

11               examined and testified as follows ....

12                       - - -

13             MR. RICH:  Your Honor, may I approach the

14   witness?

15             THE COURT:  You may.

16             (Documents passed forward.)

17                  DIRECT EXAMINATION

18   BY MR. RICH:

19   Q.    Dr. Kaliner, can you tell us your full name?

20   A.    Michael Allen Kaliner.

21   Q.    And I know you know these answers pretty much by heart

22   but the rest of us could use looking at your CV.  If you

23   could pull that up.  What is your educational background,

24   Dr. Kaliner?

25   A.    I started college at Duke for a year; then transferred

Kaliner - direct

1    to the University of Maryland, where I graduated with a BS;

2    and then I got my medical degree at the University of

3    Maryland.

4    Q.    And after you completed your MD, did you do any

5    further training in medicine.

6    A.    Yes.  I did internal medicine, finishing at the

7    University of California at San Francisco; and then did my

8    allergy training at Harvard Hospital in Boston.

9    Q.    What is your primary practice?

10   A.    I'm trained in both internal medicine but I practice

11   primarily in allergy and immunology.

12   Q.    Are you board certified in anything?

13   A.    I am board certified in internal medicine and allergy

14   and immunology.

15   Q.    Have you had any other relationship with the Board for

16   Allergy and Asthma?

17   A.    I have had the opportunity to serve on the Board of

18   Allergy and Immunology, which is the board that certifies

19   physicians trained in allergy as to whether they can be then

20   certified in allergy.

21        So we regulated all those processes.  And I was

22   chairman of the board in 1986 to '87.

23   Q.    Over the course of your career, how many patients have

24   you treated for allergies?

25   A.    It's a hard number to come up with, but 10 to 20,000.

Kaliner - direct

1    Q.    Would you characterize those patients in any way among

2    the allergy group?

3    A.    I am, as Dr. Meltzer will be, I am an allergist's

4    allergist.   I get the referral of all the difficult cases in

5    the Washington area from allergy, ENT, and primary care

6    doctors.

7    Q.    Would it be fair to say through your treatment of

8    patients that you have become familiar with intranasal

9    steroid sprays?

10   A.    Yes, I am very familiar where intranasal steroids.

11   Q.    What are the intranasal steroid sprays you are

12   prescribing today?

13   A.    Today I am still prescribing Nasacort AQ and Nasonex.

14   Those are the primary ones I use.   But there others on the

15   market.

16   Q.    One we have heard about is Nasonex and studies of

17   Nasonex.   Has Nasonex always had the same formulation?

18   A.    No.   Nasonex was formulated with a phenyl ethyl

19   alcohol and had a smell to it.   So they reformulated to get

20   rid of that smell about four or five years ago.

21   Q.    Where do you practice today?

22   A.    I have a state-of-the-art center in, near Washington,

23   D.C.   One office is in Chevy Chase and one is in Wheaton,

24   Maryland.

25   Q.    I would like to go back to the start of your career

Kaliner - direct

1    now to give some background in terms of your practice.

2    After your fellowship, where did you begin practicing?

3    A.    After I finished my fellowship, I was in the military

4    at the time of Vietnam, and so I served two years in the Air

5    Force.  And then when I finished the Air Force, I went to

6    the National Institutes of Health and continued my training

7    and research there.

8    Q.    Looking at that page of your CV, the entries for the

9    National Institutes of Health, it discusses NIAND.  What is

10   that?

11   A.    The NIH is a consortium of institutes, one of them is

12   the National Institutes of Allergy and Infectious Diseases,

13   which is where allergy, immunology and all the infectious

14   diseases are studied.  That is where I was housed.  I was

15   the head of the allergic diseases section, which meant that

16   I was directly responsible for allergy research for the NIH.

17   Q.    Did you have any responsibility for training or

18   patient care at NIAID?

19   A.    I ran the allergy training program for 18 years, and

20   trained approximately a hundred fellows that were practicing

21   mainly in the United States and worldwide.

22   Q.    And I think you said you had some responsibilities

23   relating to a laboratory at NIAID?

24   A.    Well, I was head of a laboratory where we had anywhere

25   from 10 to 30 people who would work with me, doing research.

Kaliner - direct

1    And I also was the director of the outpatient program at the

2    NIH, where I was responsible for the research done, the

3    clinical research done within the NIAID, not just allergy

4    but infectious disease as well.

5    Q.    As part of your work at NIH, did you consult with any

6    governmental agencies?

7    A.    Yes, I consulted regularly with Health and Human

8    Services and Walter Reed.  And anything dealing with allergy

9    and immunology, they came to me.

10   Q.    Back to today, do you have any academic appointments?

11   A.    Yes.  I am currently professor at George Washington

12   University Medical School.  I actually direct the training

13   program at the Washington Hospital Center, which is the

14   largest hospital in Washington.

15   Q.    In your career, have you been involved with any

16   professional organizations?

17   A.    I was fortunate enough to be part of the American

18   Academy of Allergy, Asthma and Immunology, which is the

19   largest professional society of allergists in the United

20   States, and I was fortunate enough to be president ten years

21   ago.  And then subsequently, I have gotten associated with

22   the World Allergy Organization, which is a federation of

23   allergy societies, and there are 74 societies, 35,000

24   members, and I am the immediate past president.

25   Q.    I know you talked about your service at the Air Force

Kaliner - direct

1   Base, Keesler Air Force Base.  Did you perform any other

2   military service?

3   A.    When I came to the NIH, I was in the Public Health

4   Service, and I spent 10 years in the military.  I retired in

5   '93 as an 06.

6   Q.    Have you authored any publications on allergy and

7   asthma topics?

8   A.    I have published about 500 articles, manuscripts,

9   reviews, journals, in my career.

10  Q.    Those are listed in your CV?

11  A.    They are in my CV.

12  Q.    We won't walk through them one by one.

13        Have you been involved in any clinical trials?

14  A.    We did clinical trials at the NIH within protocols.

15  So they were restricted trials.  We had to actually have

16  approval for trials we created ourselves.  But when we set

17  up the Institute for Asthma and Allergy, which is where I

18  currently work, it was set up as a state-of-the-art referral

19  center for very difficult patients, which is who I see all

20  the time.

21        But we also set aside a part of our practice for

22  research.  And about 30 percent of our resources are devoted

23  to research.  And we do somewhere between 16 and 30 studies

24  a year, and in total have done about 500 clinical trials.

25  Q.    Have you invented anything related to allergy or

Kaliner - direct

1    asthma?

2    A.    I have a couple of patents, yes.

3            MR. RICH:  At this point, Your Honor, we would

4    like to submit that Dr. Kaliner is qualified as an expert in

5    allergy, nasal anatomy and physiology.

6            MR. GRACEY:  No objection.

7            THE COURT:  He is accepted as such.

8    BY MR. RICH:

9    Q.    I would like to turn to the substance of your

10   testimony.  We have a diagram of the nose.

11           You have a laser pointer with you that will

12   hopefully HELP to walk through this.  Can you tell me how

13   air enters the nose?

14   A.    When you breathe in, air comes in through the

15   vestibule right here, the nares.  And that goes through this

16   vestibule, and then goes on a flow back to the pharynx, and

17   then it's breathed into the lungs.

18   Q.    In terms of the vestibule, what kind of cells form the

19   surface of the vestibule?

20   A.    Well, the outer surface of the body is covered with a

21   squamous epithelium on which there is a carotin layer.  When

22   it gets to the nose, the squamous epithelium persists inside

23   the vestibule.  Right at the valve right here, there is a

24   transition from the skin's epithelium, the squamous, to the

25   pseudo-stratified epithelium that makes up the mucous

Kaliner - direct

1    membranes.

2    Q.    Are there cilia on the cells that are in the nasal

3    vestibule?

4    A.    No, squamous cells are non-ciliated.

5    Q.    Are there any other structures that would help trap or

6    prevent the flow of --

7    A.    Well, there is hairs, depending on who you are, lots

8    of them.  And that traps air as it goes through, it helps

9    filter.

10   Q.    There is a label there for the nasal valve.  What is

11   the nasal valve?

12   A.    That is the narrowest part of the nose.  So air comes

13   in in a stream, and it is narrowed down at this juncture,

14   and then spreads out and comes into the nose, where it then

15   flows.  We can talk about the flow.  I think we have another

16   diagram that might do better than this one.

17   Q.    We will turn to another diagram.

18   A.    When you breathe in, the idea is to get the air to the

19   pharynx.  But you want air to be cleaned of everything that

20   is removable, all particles.  It needs to be at body

21   temperature and fully humidified with water.  In a tenth of

22   a second it takes to go from here to here, because of the

23   way the nose works, this air is clean, humidified and

24   filtered and warmed.

25            What happens is the air hits the turbinates,

Kaliner - direct

1    these inferior and middle turbinates, and then swirls in

2    here, and then as it comes to the back of the turbinates it

3    becomes laminar and flows to the lungs.

4              There is a second process I wanted to mention,

5    as long as the slide is here.  That is sniffing.  If you

6    just focus, everybody here focuses on breathing through your

7    nose, you can feel the air flows this way.  When you sniff,

8    you are actually directing air directly up to where the

9    olfactory epithelium is here, so it is a whole different

10   direction of flow when you sniff versus when you breathe.

11   And I will come back to that later.

12   Q.   I have one more question with regard to before the

13   nasal valve.  Particles that are deposited before the nasal

14   valve, are they cleared to the back of the throat?

15   A.   I don't think so.  I think the valve is outflow and

16   beyond the valve is inflow.

17   Q.   So they are cleared forward in some manner?

18   A.   Right.

19   Q.   If we could go back to the previous diagram, just to

20   get an idea of the overall structure of the nose.

21              What are the boundaries of the nasal cavity?

22   A.   Well, the top is the kalvarium, the bottom of the

23   brain.  And the bottom is the hard pallet, top of the mouth.

24   Posterially, it is the pharynx.  In the front would be the

25   nose, the outer structure of the nose.  Laterally would be

Kaliner - direct

1    the turbinates, and the lateral wall of the sinuses, which

2    you can't see in this cutaway picture, there is a septum

3    that separates left and right.

4    Q.    You mentioned the turbinates.  I think you testified

5    earlier that they make the air turbulent?

6    A.    That's correct.  These are console-shaped, C-shaped

7    bones here, here and here.  And their purpose, at least in

8    part, is to make the air turbulent, which is why they are

9    named turbinates, and they occupy a fair amount of space in

10    the nose.  But they also serve the purpose of secreting

11    mucous and protecting the structures underneath of them.

12    Q.    What are the spaces between the turbinates called?

13    A.    So this space right here between the -- underneath the

14    inferior turbinate would be the inferior meatus, this space

15    here would be the middle meatus, you have to kind of curl

16    your hand underneath that to get to that.  Here is the

17    superior meatus.

18    Q.    We have another diagram that would show this a little

19    more easily.  You can tell me if it is clear.  Which meatus

20    does most of the airflow through the nose go?

21    A.    This is a picture as we look in the nose with an

22    anterior otoscope, spreading the nose and then looking

23    inside.  What you see is the nasal septum on this left side

24    here and the inferior turbinate, which is the largest of the

25    turbinates.  And it blocks 40 percent, give or take, of the

Kaliner - direct

1    nasal passage.  And then behind it and also at a 45-degree

2    angle is the middle turbinate, often looking at a slightly

3    different color.  Between them they take about 50 percent of

4    the open space, so air has to hit these two turbinates as it

5    flows into the nose.  And that's why they are so effective.

6    Q.    I guess I wasn't quite clear.  Between which

7    turbinates or which surfaces does air flow through the nose?

8    A.    When you breathe it in, it's going to impact on the

9    anterior aspects of these turbinates, but it will hit all

10   the surface of the turbinates.

11   Q.    Can you tell me, first of all, what this slide

12   depicts?

13   A.    It's the same as the first picture, except the

14   inferior and middle turbinates have been removed so you

15   could see what's underneath of them.  This is the

16   nasolacrimal duct, which is why your nose runs if you cry,

17   because tears come through here.  So that's under the

18   inferior turbinate.  Under the middle turbinate is this

19   groove, this semi-linear hiatus, into which the frontal

20   sinus recess drains.  So the frontal sinus actually comes

21   right down to this spot right at the anterior aspect of the

22   middle turbinate.

23          This area right in here is the maxillary sinus

24   and the drainage is right there.  And then these are ethmoid

25   sinus ostea.

Kaliner - direct

1  Q.    You talked about the, I guess, four different sinuses.

2  Can you show us where the sinuses are located?

3  A.    Well, they are around the eyes.  And so the sinuses

4  are hollowed cavities in the skull around the eyes.  So in

5  your cheeks is the maxillary sinus.  Then above the eye is

6  the frontal sinus.  Between the eye is the ethmoid sinus.

7  Behind the eyes the sphenoid sinus.  Here is the sphenoid

8  and here is the frontal.  You can't see it because they are

9  closed with bone.  But the maxillary would be right here and

10 the ethnoid air cells would be right along here.

11 Q.    This diagram shows a problem to the frontal sinus?

12 A.    Right.

13 Q.    It looks like a less complex route to the frontal

14 sinus than the statements and the slides in the opening from

15 Barr.  Do you have any reason to believe that this diagram

16 is incorrect?

17 A.    No.  I mean, I don't have any reason to think that the

18 frontal sinus drainage is all that complex.  It is a recess

19 right through here, it is relatively close.  It's assisted

20 by gravity.  And clinically, I take care of literally tens

21 of thousands of patients with difficult-to-manage sinus

22 disease.  Yes, we do have some patients with frontal

23 disease.  But relatively speaking, we see far more people

24 with ethmoid and maxillary sinus than we see with frontal

25 sinus disease.

Kaliner - direct

1              So they must be able to communicate pretty

2      easily when the other sinuses have problems.

3      Q.     Just to be clear, do you believe that airflow reaches

4      the frontal sinus?

5              MR. GRACEY:  Objection, Your Honor.  This is

6      beyond the scope of Dr. Kaliner's opening expert report.

7              MR. RICH:  Your Honor, it is not beyond the

8      scope.  He first submitted to talk about anatomy.  His

9      report talks about the anatomy.  In fact, it talks about the

10     anatomy of the pathway to the frontal sinus.

11             MR. GRACEY:  Your Honor, Dr. Kaliner's opening

12     expert report does not talk about airflow into the frontal

13     sinus.

14             THE COURT:  Let's see counsel at sidebar.

15             (The following took place at sidebar.)

16             THE COURT:  Why don't you point out where you

17     say it does talk about the issue at hand.

18             MR. RICH:  Your Honor, he said he would talk

19     about the peri-nasal sinuses.  This was an opening report.

20     The rebuttal to his report wasn't served until the next

21     round.  We weren't entitled to a third round of reports.

22     Dr. MacKay, who was talking about --

23             THE COURT:  Is there a report that has not been

24     objected to?

25             MR. RICH:  There are so few reports that haven't

Kaliner - direct

1    been objected to.  This exact language is in a report that

2    hasn't been objected to.

3              MR. GRACEY:  Your Honor, if I may, they have the

4    burden on infringement.  If he was going to opine on Barr's

5    product Nasacort in the frontal sinus, it should have been

6    in the opening report.  If he wants to respond to Dr.

7    MacKay's statement on this in the rebuttal case, that is

8    fine.

9              THE COURT:  I will sustain that objection.

10             (End of sidebar conference.)

11   BY MR. RICH:

12   Q.    Back to anatomy, I would like to ask about the point

13   where it says opening to maxillary sinus.  Can you tell me

14   if that opening in your expert opinion is more or less

15   accessible than the opening to the frontal sinus?

16   A.    I think it's less accessible.  It is very, within a

17   semi-linear hiatus underneath what is oftentimes a very

18   large swelling of this ethmoid bullous, which is often quite

19   large.  And its tucked underneath what's missing here, the

20   middle turbinate.

21             So I think it's less accessible than this

22   anterior aspect of the middle meatus, which has direct

23   airflow that would impact on I would think every breath.

24   Q.    Now, I would like to look at the entire nose.  What is

25   the covering of the nasal cavity once you get past the nasal

Kaliner - direct

1    valve?

2    A.    It's a pseudo-stratified polymer epithelium with

3    cilia.

4    Q.    We have a diagram here.  Can you point out to me what

5    the cells on the surface are and the various features of

6    this diagram?

7    A.    So this is, in contrast to the squamous epithelium,

8    which is flattened cells, these are elongated epithelial

9    cells, each of which has on the surface a number of cilia.

10   Then interspersed amongst the epithelial cells are goblet

11   cells that contribute to the mucous blanket.  And there is a

12   copious amount of submucous glands, and I think I will show

13   you a picture in a moment, that gives you an idea how

14   thickly endowed the mucous membranes are with submucous

15   glands that produce the majority of the mucous.

16   Q.    Is the mucous on the top layer of the nasal mucosa?

17   A.    It is not as simple as it looks.  The cilia are tiny

18   hair-like fibers that beat, they beat in an aqueous layer.

19   This is called the peri-ciliary layer, it is actually

20   aqueous.  Then the mucous, which is a mucopolysaccharide,

21   floats on the surface of this aqueous layer, and moves

22   caudet, towards your pharynx.

23              THE COURT:  Moves what?

24              THE WITNESS:  Moves back, caudet, it's back.

25   BY MR. RICH:

Kaliner - direct

1    Q.    How big is the aqueous layer?

2    A.    Well, we have measured it.  It is only a couple

3    hundred microliters for the entire nose, because this is a

4    very thin layer of cilia.  It is a very thin, widespread,

5    totally spread layer.

6    Q.    What, in terms of this diagram, is cleared through

7    mucociliary clearance?

8    A.    Right.  This mucous blanket is constantly moving from

9    the front of the turbinate to the back of the pharynx.

10            The amazing thing is you are producing two

11   quarts of mucous a day.  So you're constantly swallowing

12   this mucous blanket.  You are just not aware of it.  And

13   things that are trapped, everything that is particulate is

14   trapped, stopped in those, it goes on the mucous blanket, is

15   swept in the pharynx, swallowed, and destroyed by acid and

16   hydrolysis in the stomach.

17            You are swallowing all day long.  The aqueous

18   layer is quite different, though.

19            This is a post-events layer.  When you

20   impregnate this with lots of molecules to keep you from

21   getting infected with bacteria, and has iGG and iGA in it,

22   it is rather stagnant.  So this does not move at all.  It is

23   just the mucous blanket that moves.

24   Q.    One of the things we heard during Barr's opening is

25   that the cilia shear the mucous.  To your knowledge, does

Kaliner - direct

1    that occur?

2    A.    Well, I am going to say that I don't know what he

3    means by shear the mucous.  But the answer is no.  What

4    happens to this mucous, it is intact and it goes from front

5    to back.  The bottom layer is moved by the very tip of the

6    cilia touching the bottom of the mucous and it just moves

7    the blanket back.

8    Q.    What is the mucous made of?

9    A.    It is a mixture of things.  The mucous itself is a

10   mucopolysaccharide.  There are a lot of things imbedded

11   within the mucous, including trapped marker molecules.  It

12   is a complex mixture.  We identified 15 or 20 different

13   components to it.

14   Q.    Is the mucous hydrophilic or hydrophobic?

15           MR. GRACEY:  I'll object.  That again is beyond

16   the scope of his opening expert report.

17           THE COURT:  Are you saying this area?

18           MR. RICH:  We can discuss it later.  It won't

19   change in the meantime.

20           THE COURT:  Objection sustained.

21   BY MR. RICH:

22   Q.    You talked about showing us a diagram that shows how

23   many submucosa glands there are.  I guess we would like to

24   see the next slide.

25   A.    So when you go home tonight, you can say you see what

Kaliner - direct

1     the nose looks like.  This is a human turbinate.  This is

2     the part of your nose that, if you tried to reach your

3     throat, would stop you.  It's the part of your child's nose

4     that he reaches with his little finger.

5             I think it's kind of interesting.  This is the

6     epithelium and the base of the membrane.  And this rich

7     thick layer here, this is the mucous producing glands.  You

8     can see how copious it is.  And then this inner part is why

9     the nose can get swollen fairly readily.  These are venous

10    sinusoids.  And it's one of the only parts -- that and

11    genital areas are the only parts of the body that have this

12    venous sinusoidal system.  So you can engorge this area by

13    putting blood into your -- and it's one of the two

14    mechanisms for getting congested.  So the nose, to me, it's

15    fascinating.  I spent a lot of time studying it.  There is a

16    lot of inflammatory cells in this area, but this is what

17    your nose looks like, microscopically.

18    Q.    Can you show us where the glands are?

19    A.    These are the glands.  This very thick area right

20    here.  It's why you can make so much mucous so quickly.

21    Q.    Now, I believe we have a video of a mucociliary area.

22    Can you explain what is going on as we watch this?

23    A.    First of all, these are the cilia and they're beating

24    very rapidly.  You can see they're moving things along.  And

25    these are some coli-particles (phonetic) put on the nose and

Kaliner - direct

1    you are looking at the movement of mucous across the surface

2    of the epithelium.  You can see how quickly it moves.

3    Q.    Is more information on these issues available in the

4    articles incorporated into your expert report:  How and Why

5    the Nose Runs, Human Nasal Host Offense in Sinusitis, and

6    Mediators of Allergic Rhinitis?  They're in your binder as

7    Exhibits 356, 357, and 358.

8    A.    Yes.  And then, of course, there is much more in the

9    rest of the CV as well.  Yes, they cover many of these

10   areas.

11   Q.    I would just like to turn very quickly to the topic of

12   generally the administration of nasal sprays.

13   A.    Right.

14   Q.    And you have in front of you a brand new bottle of

15   Nasacort AQ.  And if you could just demonstrate how, when

16   using a nasal spray like Nasacort AQ -- you don't actually

17   have to use it -- you would use it.

18              MR. GRACEY:  Your Honor, if I could object

19   again.  Same objection.  Outside the scope of his expert

20   report as far as this particular product.

21              MR. RICH:  Your Honor, we're not suggesting that

22   it's product specific.  I'm just having him show how one

23   uses a nasal spray.

24              THE COURT:  The objection is overruled.

25              THE WITNESS:  So I can do this?

Kaliner - direct

1           MR. RICH:  Yes.

2           THE WITNESS:  So these nasal sprays, we do this

3   all the time because we want to make sure the patient does

4   it correctly.  You know, shake it up.  I think, I heard

5   today that changes the viscosity, but we just shake it up so

6   it's all mixed up.  And you put this nozzle into the nose,

7   past the vestibule, aim it up and out to the inner corner of

8   the eye, which sprays it directly at the place you want it

9   to go for distribution throughout the nose.  And we usually

10  instruct the patients to take a short sniff when they spray.

11  And so it's simple procedure.  If done properly, it works

12  very effectively.

13  BY MR. RICH:

14  Q.    There are a couple things that came up in the opening

15  that actually I don't think appeared in the expert reports.

16  If I could just have you respond to them.  One of the

17  concerns that I seem to see that Barr has is that when you

18  sprayed a nasal spray into your nose, there is a strong

19  spray that creates a laminar flow.  Do you have any

20  experience with that?

21          MR. GRACEY:  Your Honor, again, I'll have to

22  object again.  This is nowhere in any of his expert reports.

23          THE COURT:  Overruled.

24          THE WITNESS:  Okay.  So the spray comes out with

25  some velocity.  I don't know the velocity.  And you are

Kaliner - direct

1    sniffing.  So it does have -- and it only has to go a very

2    small distance before it hits the mucous membranes.  And so

3    it's probably laminar until it hits the mucous membrane, but

4    it's a wide plume.

5                THE COURT:  If it's "laminar," doctor, meaning?

6                THE WITNESS:  Laminar is like an airplane, if

7    you look at the flow of air over a wing, it's smooth, versus

8    turbulent.  So it would probably go back in a wide -- the

9    plume, actually, you can see it.  This is nothing different

10   than any other spray.  The plume is fairly wide, so it

11   spreads out.  It should cover much of the surface.  But the

12   way we aim it, it's aimed so it goes up to the top or middle

13   part of the nose, preferentially.

14   BY MR. RICH:

15   Q.    One of the other concerns we heard in Barr's opening

16   that actually doesn't appear in the expert reports for any

17   expert was that congestion in rhinitis patients might have

18   an impact on the distribution of Nasacort AQ in the nose.

19   Do you believe that such congestion would prevent Nasacort

20   AQ from reaching the frontal sinus?

21               MR. GRACEY:  Your Honor, if I could object.

22               THE COURT:  Overruled.

23               MR. GRACEY:  This is not the frontal sinus.

24               THE WITNESS:  I think the congestion, if

25   anything, would help getting deposition in the anterior part

Kaliner - cross

1    of the nose at the entrance of the frontal sinus because you

2    would have less airflow to the back of the nose which is not

3    where the frontal sinus is.  So if you are asking me would

4    congestion stop it, I would say it's the opposite.  It would

5    most likely enhance the deposition of the product at the

6    area of interest.

7    BY MR. RICH:

8    Q.    And if the patient continues to take Nasacort AQ

9    hopefully in compliance with the doctor's prescription,

10   would that affect congestion in any way?

11   A.    Yes, of course.  That's why you use the product.  This

12   is the best product on the market to reduce congestion.  So

13   over the course of one or two days, congestion would largely

14   disappear.

15              MR. RICH:  Thank you, doctor.

16              Your Honor, I have no further questions.

17              THE COURT:  Counsel, you may cross-examine.

18                       CROSS-EXAMINATION

19   BY MR. GRACEY:

20   Q.    Good afternoon, Dr. Kaliner.

21   A.    Nice to see you again.

22   Q.    Nice to see you as well.  Taras Gracey.  As you may

23   recall, I took your deposition earlier this year.  I just

24   want to establish a few things about your expertise and

25   start out with a little bit about what you have done.

Kaliner - cross

1    First, you are not a chemist.  Correct?

2    A.    I'm not a chemist.

3    Q.    Or a molecular biologist?

4    A.    I know something about molecular biology.

5    Q.    Do you have a Ph.D. in molecular biology?

6    A.    No.  But as part of the research, it's all molecular

7    biology.

8    Q.    And you are not a pharmaceutical scientist.  Right?

9    A.    I'm not a pharmaceutical scientist.

10   Q.    And you are not a radiochemist?

11   A.    No, I'm not a radiochemist.

12   Q.    Or a radiologist?

13   A.    Nor a radiologist.

14   Q.    You, in fact, never designed a pharmaceutical

15   formulation?

16   A.    Well, I did discover Nasal Atrovent and gave it to

17   Rorer Ingelheim, so I guess that counts to an extent.

18   Q.    Did you ever design a nasal spray?

19   A.    Nasal Atrovent is a nasal spray.  We didn't design the

20   spray.  We designed the chemistry of the product, itself.

21   Q.    Okay.  You have never used a PET scan in all of your

22   years of treating patients?

23   A.    I have never seen a PET scan used.

24   Q.    And you don't do surgery either, do you?

25   A.    I don't do surgery.  I see many surgical patients.

Kaliner - cross

1    Q.    You've never designed a co-solvent system, have you?

2    A.    I don't know exactly what that is.

3    Q.    Okay.  And along the same lines, you don't know what

4    Avosil 591 is?

5    A.    I do now.  The answer is yes, I do know.

6    Q.    And that is part of this case?

7    A.    I didn't know until a few months ago.

8    Q.    Same with regard to Avosil 611.  Prior to this case,

9    you didn't know what Avosil 611 was?

10   A.    That's true.

11   Q.    Now, Dr. Kaliner, you are obviously here as an expert

12   witness for Aventis.  Correct?

13   A.    That's correct.

14   Q.    And you are being paid for your time today at about

15   $500 an hour.  Right?

16   A.    While I'm here in Wilmington I am.

17   Q.    But this isn't really the first time you have

18   consulted with Aventis, is it?

19   A.    No, I have a very long relationship with Aventis and

20   many other companies.

21   Q.    In fact, we saw a chart that Dr. Georges talked about

22   in his testimony that showed the various predecessors.  And

23   it's true that you have done various consulting for those

24   various predecessors over the last 25 years.  Right?

25   A.    That's correct.

Kaliner - cross

1    Q.    Now, Dr. Kaliner, nowhere in your expert report do you

2    state that Nasacort AQ enters the frontal sinus, do you?

3    A.    You asked about what is in my expert report.  I'm

4    certain I said that it's sprayed on to the area of the

5    frontal sinus but you just asked the question -- can you

6    repeat?

7    Q.    Sure.  Nowhere in your opening expert report do you

8    state that Nasacort AQ enters the frontal sinus, do you?

9    A.    And I'm sure I said that it enters the area of the

10   ostium frontal sinus.

11   Q.    Let me just say it one more time.  And you have your

12   report there.  It's parts of your binder.  You're free to

13   look at it.  It's only seven or eight pages, I believe.

14   Nowhere in that report do you state that Nasacort AQ enters

15   the frontal sinus?

16   A.    That's right.  And I have no way of knowing that

17   answer, but the answer is I didn't say that.

18   Q.    Right.  Okay.  Thank you.  In fact, nowhere in your

19   expert report do you state that Barr's proposed ANDA product

20   at this point enters or would enter the frontal sinus, do

21   you.

22   A.    I'm sure I didn't say that.

23   Q.    All right.

24              MR. RICH:  Your Honor, if I may?

25              THE COURT:  Yes.

Kaliner - cross

1                    MR. RICH:  On redirect, I believe the door has

2        been opened to ask the questions that I had wished to ask

3        with regard to entrance to the frontal sinus.

4                    THE COURT:  Okay.

5                    MR. RICH:  Thank you, Your Honor.

6                    MR. GRACEY:  Your Honor -- well, that's fine.

7        BY MR. GRACEY:

8        Q.    Dr. Kaliner, nowhere in your expert report do you

9        state that Barr's ANDA product infringes the patent claims

10       at issue, do you?

11       A.    I don't think I said anything about Barr's ANDA

12       product in any context.

13       Q.    And just so the record is clear, you are not a patent

14       lawyer, are you?

15       A.    I'm not a patent lawyer.

16       Q.    Now, you have tried to treat patients with frontal

17       sinusitis with a nasal solution, haven't you?

18       A.    I've used off-label nasal solutions in the treatment

19       of sinusitis frequently.

20       Q.    Yes.  And a nasal solution is something different than

21       an aqueous nasal spray such as Nasacort AQ that is at issue

22       in this case.  Is that right?

23       A.    That's correct.

24       Q.    All right.  Now, in using that nasal solution, you

25       have the patient literally upside down; isn't that right?

Kaliner - cross

1    A.    That's correct.

2    Q.    Okay.  And you put the patient upside down to reverse

3    gravity, to use your words.  Isn't that right?

4    A.    Yes, that's correct.

5    Q.    In fact, I think what we heard you say a little bit

6    earlier, but you certainly stated at your deposition, that

7    it's your belief that the frontal sinus is relatively

8    infrequently -- infrequently affected because the drainage

9    is assisted by gravity.  Isn't that right?

10   A.    Yes, I think that is part of the reason it doesn't get

11   infected.

12   Q.    Okay.  And you put the patient upside down in an

13   effort to reach the frontal sinus.  Right?

14   A.    I think you are misconstruing.  We were talking about

15   primarily treating ethmoid and maxillary sinus disease

16   because frontal sinus is relatively infrequent, and I don't

17   aim that therapy at the frontal sinus, I aim it at the

18   ethmoid and maxillary sinuses.  It's slightly off.  They're

19   not quite the same way of treating.

20             MR. GRACEY:  Okay.  Let's take a look at your

21   deposition.  Can we have Page 109, Line 18.

22             Permission to approach, Your Honor?

23             THE COURT:  Yes.

24             (Documents passed forward.)

25             MR. GRACEY:  He is going to play you the clip.

Kaliner - cross

1            THE COURT:  What page that is, counsel?

2            MR. GRACEY:  This is Page 109, Your Honor.  And

3    we're going to see the video clip here.

4            (Audio not working, just deposition page placed

5    on screen.)

6            MR. GRACEY:  I'll read it.

7    BY MR. GRACEY:

8            "Question:  All right.  Why is it that you need

9    to put the patient horizontal to the ground as opposed to

10   being supine?

11           "Answer:  The frontal sinus is relatively

12   infrequently affected because the drainage is assisted by

13   gravity.

14           "Question:  So you want to reverse?

15           "Answer:  So you're reversing gravity."

16           Do you recall saying that, Dr. Kaliner?

17   A.    Yes.

18   Q.    Now, let's talk a little bit about putting the patient

19   upside down and why you did it.  Do you recall that at your

20   deposition I asked you if you had tried to treat a patient

21   suffering from frontal sinusitis?  Do you recall that?

22   A.    Well, if you say so.  But I mean the answer is that in

23   real life, I use this to treat maxillary and ethmoid

24   diseases.

25   Q.    Let's take a look at your deposition again, at Page

Kaliner - cross

1    102 this time.  All right.  The question I asked was:

2              "Question:  Have you had patients who, when you

3    have taken the proper history, done the proper test, whether

4    it's the light and/or tap test, you determine that there's

5    possible or likely inflammation in the frontal sinus?  Have

6    you had any patients like that?"

7    A.    Oh, sure.

8    Q.    Your answer was:

9              "Answer:  Yes.

10             "Question:  All right.  Have you done any

11   therapeutical trials with those patients?

12             "Answer:  A clinical trial.  You mean trials of

13   experimental approaches?

14             "Question:  Yes.

15             "Answer:  And the answer is yes, with some.  We

16   have treated patients with solutions of corticosteroids and

17   using postural positioning of the head in such a way that we

18   try to get materials into the frontal sinus with some

19   success."

20             And then my next question was:

21             "Question:  Explain what you mean by putting

22   them in a postural positioning.

23             "Answer:  Having the patients fill the top of

24   their nose while their head is in an upside position so

25   they're 90 degrees to the floor.

Kaliner - cross

1          "Question:  All right.  Head to the floor, feet

2    to the ceiling?

3          "Answer:  Well, feet doesn't have to be to the

4    ceiling.  But the head is to the floor."

5          All right.  So again, Dr. Kaliner, I ask you,

6    you have attempted to treat patients suffering from frontal

7    sinusitis by turning them upside down on their head and

8    floating the nose with the nasal solution.  Isn't that

9    right?

10   A.    That's correct.

11   Q.    Now, it's a little more than that, isn't it?  In fact,

12   once you have the patient upside down, you actually take a

13   catheter --

14          THE COURT:  You can take that down.

15          MR. GRACEY:  Take it down.

16   BY MR. GRACEY:

17   Q.    You actually add a catheter to the process.  Isn't

18   that right?

19   A.    Well, that is how you introduce the solution into the

20   nose.

21   Q.    All right.  And you do that in an attempt to flood the

22   nose with the nasal solution.  Right?

23   A.    The patients are upside down so it's the only way they

24   can administer something to the nose is through a

25   syringe-and-catheter arrangement.

Kaliner - cross

1    Q.    And you are attempting to flood the nose.  Isn't that

2    right?

3    A.    Well, no.  We already are putting in 10 milliliters.

4    The nose holds considerable more than that so we're not

5    flooding it.  We certainly are putting in solution to try to

6    get it in primarily to the ethmoid and maxillary sinuses.

7    Q.    All right.  Let me turn your attention to Page 106 of

8    your deposition.  Again, I'll read this to you.  If we can

9    have 106, Line 13 please.

10                "Question:  Okay.  And I think you anticipated

11    in answer to my next question but just so I'm clear.  What

12    is the theoretical basis -- yeah.  What is the theoretical

13    basis that makes it more likely to get into the frontal

14    sinus than a nasal spray?

15                "Answer:  A nasal spray is a small volume.  So

16    you're putting 100 microliters or 50 microliters.

17                THE COURT:  Counsel, hold on.  You are going

18    kind of fast.  You have court reporters here.

19                MR. GRACEY:  You're right.

20                THE COURT:  Please, let your IT guy get it up on

21    the screen.

22                MR. GRACEY:  I'm sorry, Your Honor.

23    BY MR. GRACEY:

24    Q.    All right.  I'll read the answer a little slower.

25                "Answer:  A nasal spray is a small volume so you

Kaliner - cross

1    are putting 100 microliters or 50 microliters, depending on

2    the spray.  And where I'm using 4 ounces to 120 milliliters

3    of material, and I actually fill the top of the nose, and

4    I'm pretty sure that the ostia is going to be underwater,

5    level of liquid."

6              Do you see that?

7              So you are attempting to fill --

8              THE COURT:  You have to say yes or no.

9              THE WITNESS:  Yes, yes.  I see that.

10   BY MR. GRACEY:

11   Q.    So you are attempting to fill the nose.  Isn't that

12   right?

13   A.    The top of the nose, that's correct.

14   Q.    But even then, even using that posturing, if you will,

15   the putting the patient upside down on their head, using a

16   nasal solution, not spray like we have here, and flooding

17   the nose, even then, you don't know for a fact that that

18   corticosteroid reached the frontal sinus, do you?

19   A.    I've never, I've never done a visualization system but

20   I can tell you clinically it usually works and the patients

21   get better.

22   Q.    All right.  I'll just ask you one more time.  You

23   don't know for a fact that the nasal solution, again not

24   spray, is actually reaching the frontal sinus even taking

25   all the steps that you described?

Kaliner - cross

1    A.    That's correct.  I never visualized it.

2    Q.    And you don't know that for a fact.  Isn't that right?

3    A.    That's correct.

4    Q.    Okay.  Thank you.  Now, this procedure that you

5    described for me at your deposition, this is not something

6    that an ordinary clinician would even be aware of, is it?

7    A.    No.  We, as I said before, we take care of very

8    difficult patients, and we are not only doing typical

9    treatment plans.

10   Q.    And it's not something that an ordinary clinician

11   would even have done.  Isn't that right?

12   A.    That's correct.

13   Q.    All right.  Now, we talked about your attempts of

14   getting to frontal sinus with the nasal solution but you

15   haven't tried, have not tried to treat a patient suffering

16   from frontal sinusitis, which, I think we can agree on, is

17   inflammation of the frontal sinus.  Right?

18   A.    Yes.

19   Q.    With an aqueous nasal spray such as Nasacort AQ; isn't

20   that right?

21   A.    No, it's wrong.  We used aqueous nasal sprays as the

22   initial treatment in all patients that have sinusitis, every

23   one of them.

24   Q.    I think you misunderstood my question.  You haven't

25   taken a patient, made them stand on their head and put a

Kaliner - cross

1    nasal spray in their nose in an attempt to treat the frontal

2    sinus?

3    A.     No, and I probably won't.

4    Q.     And that is because -- right?  That is because the

5    nasal spray is a small volume of material compared to the

6    amount used in the nasal solution.  Isn't that right?

7    A.     Well, that is one of the many reasons why I wouldn't

8    do what you are suggesting.

9              MR. RICH:  In fact, if we can, Jeremy, put that

10   Page 106 we just had up there, Lines 13 to 22.  Actually, if

11   we go up to Line 7.

12             Now, this is in the context of asking if you

13   haven't done it with a nasal spray.

14   BY MR. GRACEY:

15             "Question:  You haven't done it.  Okay.  Why

16   haven't you done it?

17             "Answer:  Because we've been using this liquid

18   formulation that theoretically -- to me, it is a more

19   theoretical basis of actually getting into the sinuses

20   because there's more volume."

21             And you continue on in the next answer, when you

22   say:

23             "Answer:  A nasal spray is a small volume.

24             So I come back to my question, Dr. Kaliner.  The

25   reason you don't put patients on their head and have them

Kaliner - cross

1    put a spray in is because of the small volume and you don't

2    believe that will hit the frontal sinus, do you?

3    A.    Let me explain.  You are talking about patients that

4    come to me with difficult to manage sinus diseases, have

5    been through surgery.  We're dealing here primarily with

6    allergic rhinitis.  Only a small percentage of those

7    patients have problems with their sinuses so it's a whole

8    different context.

9          You're really changing everything we talked

10   about in a way that I don't think is quite kosher.  I am

11   treating sinus disease, trying to get -- and then patients

12   who have failed nasal sprays, not just Nasacort but the

13   whole range of nasal sprays, because they don't work

14   adequately in those patients.  And I try things that are

15   quite adventuresome and aggressive and oftentimes effective.

16   Q.    But isn't that the point?  Isn't that the exact point

17   is that the nasal sprays don't work and then they come to

18   you?  The tough patients come to you and that's when you

19   invert them on their head?

20   A.    These are patients who have already had surgery and

21   multiple antibiotics and they are have disease sinuses.

22   And, yes, in those patients, we do use nasal sprays as part

23   of the treatment, but they have not been adequate so we have

24   to find another way to get the steroids into the sinuses.

25   And, again, overwhelmingly it is ethmoid and maxillary and

1    not frontal.

2    Q.    However, as we have looked at your deposition here

3    today, when you do have a patient with a frontal sinus

4    problem and they come to you, it's clear that they are

5    coming to you because the spray isn't working, that's when

6    you invert them.  Isn't that right?

7    A.    That would be right.

8    Q.    Now, Dr. Kaliner, have you ever looked at the

9    prescribing information for Nasacort AQ?

10   A.    The package insert?

11   Q.    The package insert.

12   A.    Yes, I have.

13   Q.    Does it say anywhere that a patient should stand on

14   their head when administering Nasacort AQ?

15   A.    No, it doesn't say.  Outside of my office and maybe

16   100 specialists in the United States that I know of, in

17   Europe as well, nobody does this.

18   Q.    Okay.  All right.  Now, you have stated that you

19   believe -- you say that here today and say at your

20   deposition, I believe, that you believe that the frontal

21   sinus is actually more accessible than the maxillary sinus.

22   Do you recall saying that here today?

23   A.    Yes.  The entrance to the frontal sinus is more

24   readily accessible to sprays than would be the maxillary

25   ostium.

Kaliner - cross

1    Q.    Now, Dr. Kaliner, do you know Dr. Berridge?

2    A.    Yes.

3    Q.    And you know he is going to be testifying here today

4    on behalf of Aventis?

5    A.    (Nodding yes.)

6    Q.    Is that a yes?

7    A.    Yes.

8    Q.    And you are familiar that he had done, I think

9    Aventis's counsel and Barr's counsel had mentioned some PET

10   studies he had done regarding Nasacort AQ and where it

11   deposits.  Right?

12   A.    That's correct.

13   Q.    All right.  Now, as of your deposition, you hadn't

14   reviewed Dr. Berridge's data, had you?

15   A.    No, I hadn't.

16   Q.    And I think you stated to me that you believe that if

17   that data showed that there was more deposition of Nasacort

18   AQ on the maxillary sinus than on the frontal sinus, then it

19   is easier to reach the maxillary sinus than the frontal

20   sinus.  Do you recall telling that?

21   A.    I have to admit I don't.

22   Q.    If you look at Page 419 of your deposition.

23           MR. GRACEY:  Let's start with, let's put up,

24   start at Line 14 and we'll go down from there.  This is 415.

25   Maybe 419.  Right there.  Okay.

Kaliner - cross

1    BY MR. GRACEY:

2    Q.    And I ask:

3              "Question:  Did you review the Berridge

4    deposition data on the maxillary and frontal sinuses?

5              After objections, you said:

6              "Answer:  It's an easy answer.  No.

7              And I asked you:

8              "Question:  Okay.  If that data showed there was

9    more deposition on the maxillary sinus than on the frontal

10   sinus, which sinus would be, in your opinion, easier to

11   reach?

12             Again, there are more objections.  And you

13   stated:

14             "Answer:  I always tell everybody data is data.

15   If the data says that -- whatever the data says is what it

16   is.  If they showed more deposition on the maxillary, then

17   it's easier to get in that model to the maxillary.

18             "Question:  Then the frontal side?"

19             I don't know if that was a transcription error,

20   my misstatement but it was a "frontal sinus" and you

21   answered:

22             "Answer:  Then the frontal."

23             All right.  Now, do you recall testifying to

24   that?

25   A.    As you will see, this is the last comment of a

Kaliner - cross

1    four-hour deposition.  And now that you pointed it out, I

2    assume I said that.

3    Q.    Okay.

4    A.    The answer is no, I don't remember it.

5    Q.    Do you deny you said it?  Let's put it that way.

6    A.    I'm sure I said it.

7    Q.    Okay.  Thank you.  Now, I would like to show you --

8              MR. GRACEY:  If I may approach, Your Honor?

9              THE COURT:  You may.

10             (Documents passed forward.)

11   BY MR. GRACEY:

12   Q.    All right.  If you will look up with me at DX-5, this

13   is Dr. Berridge's, one of his reports.  Do you see that, the

14   cover of the page?

15   A.    Yes.

16             MR. GRACEY:  All right.  Now, if you'll look at

17   Page 12?  And if we can focus on the bottom.  And if we can

18   highlight maxillary and frontal for Nasacort.

19   BY MR. GRACEY:

20   Q.    All right.  Bearing in mind, Dr. Kaliner, what you

21   just stated, it's the data is the data.  You would agree

22   with me here that it identifies for Nasacort AQ 1.67 under

23   maxillary and zero under frontal sinus.  Do you see that?

24   A.    I do see that.

25   Q.    At the risk of asking a sophomore question, 1.67 is

Kaliner - redirect

1    greater than zero.  Isn't that right?

2    A.    I think so.

3              MR. GRACEY:  Thank you, Dr. Kaliner.

4              THE COURT:  Any redirect?

5              MR. RICH:  Hopefully just a few, Your Honor.

6              THE COURT:  All right.

7                        REDIRECT EXAMINATION

8    BY MR. RICH:

9    Q.    If I could start with where we just left off and ask

10   have you ever reviewed this final report before?

11   A.    No, I have never seen it before.

12   Q.    Is this within your specialty?

13   A.    No, I don't know anything about this report.  I could

14   comment on 1.67 and zero, though.  That's it.

15   Q.    Fair enough.  I'm glad the answer came out right on

16   that one.

17             THE COURT:  When you say "this report," do you

18   want to identify the report?

19             MR. RICH:  Yes.  Thank you very much, Your

20   Honor.  It's Defendant's Exhibit 5, The PET study of the

21   Distribution and Kinetics of Nasacort AQ and Flonase.

22   BY MR. RICH:

23   Q.    And Barr's counsel actually solicited this already,

24   but you're not an expert in PET studies, are you?

25   A.    I have never done a PET study in my life.

Kaliner - redirect

1    Q.    I want to turn to another of the subjects that Barr's

2    counsel inquired into and he spent quite a bit of time on,

3    which is sinusitis.  Now, is Nasacort AQ indicated, approved

4    by the FDA for sinusitis?

5    A.    No, Nasacort AQ is only approved for seasonal and

6    perennial allergic rhinitis.

7    Q.    Are they the same condition?

8    A.    Not at all.

9    Q.    Can you tell me some of the differences between the

10   two?

11   A.    Well, allergic rhinitis is inflammation of the nose

12   and the sinusitis is inflammation of the sinuses.  They're

13   contiguous but they're very different diseases with a whole

14   different spectrum of symptoms and the treatment is entirely

15   different between one and the other.  They're not at all the

16   same.

17   Q.    One of the other things he asked you about with regard

18   to sinusitis and this whole postural issue and flooding the

19   nose with the solution.  He asked you if you knew for a fact

20   that the steroid definitely got there.  In your mind, is it

21   more likely than not that in your treatments for sinusitis

22   that the steroids get to the frontal sinus?

23   A.    I know they have to get to the entrance to the frontal

24   sinus but I can't go past that.  They certainly get to the

25   entrance, and I believe the frontal sinus is ventilated with

Kaliner - redirect

 1    every breath and so air is going into the frontal sinus and

 2    you're sniffing it and directing it at the frontal sinus and

 3    so I would be surprised if some of it doesn't get into the

 4    frontal sinus.

 5              MR. RICH:  If we could bring up the slide with

 6    the nose with the turbinates?

 7              Back a couple.  Actually, I guess that is the

 8    turbinates.  So it should have been there.  I apologize.

 9    This picture.

10    BY MR. RICH:

11    Q.    Now, I asked you before about the pathway to the

12    frontal sinus.  Do you have an opinion as to whether there

13    is air exchange with the frontal sinus?

14    A.    The frontal sinus is, in you and me and you, sir, is

15    om open communication to the air right now.  And so as you

16    are breathing, there is open communication.  It may be a

17    small tract but it's open and you can breathe.  There is

18    ventilation that goes on right now, every single breath

19    we're taking.

20    Q.    Do you have any real life example that would

21    demonstrate that?

22    A.    Well, most of us have flown.  We might have trouble

23    popping our ears because the eustachian tube is a closed

24    space, but none of us have ever had to pop our sinuses.

25    They're in open communication.  When it changes pressure, it

Kaliner - redirect

1    equilibrates just as an open space would equilibrate.  There

2    isn't a single person in this room who doesn't have

3    sinusitis as the only circumstance that ever had problems

4    with their frontal sinus when they fly.

5    Q.    One last set of questions.  I won't promise one last

6    question because that would be dishonest.  You were asked

7    about consulting for Sanofi-Aventis or RPR.  Correct?

8    A.    Correct.

9    Q.    Have you consulted for anyone else in the allergy

10   asthma field?

11   A.    I believe I have consulted with every single company

12   that makes any product dealing with allergies and asthma

13   over my 35-year career; and so, you know, I'm familiar with

14   every single company from the inside.

15            MR. RICH:  That's all I have, Your Honor.

16            THE COURT:  All right.  Thank you, doctor.  You

17   may step down.  Let's take a short stretch break.

18            (Recess taken.)

19            THE COURT:  Please be seated.  Your next

20   witness.

21            MR. RICH:  Your Honor, Allison Baldwin will be

22   presenting the next witness.

23            THE COURT:  All right, counsel.

24            MS. BALDWIN:  Good afternoon.  Plaintiffs call

25   Dr.  Mark Berridge.

Kaliner - redirect

1              ... MARK BERRIDGE, having been duly sworn as a

2     witness, was examined and testified as follows ...

3              MS. BALDWIN:  Your Honor, may I approach?

4                   DIRECT EXAMINATION

5              THE COURT:  You may.

6     BY MS. BALDWIN:

7     Q.    Good afternoon, Dr. Berridge.

8     A.    Good afternoon.

9     Q.    Could you provide us with just a brief description of

10    your educational background?

11    A.    Certainly.  I got a Bachelor's degree in chemistry

12    from Carnegie Mellon University.  After that, I went to

13    Washington University in St. Louis for graduate school.  It

14    turned out that was one of the three places in the United

15    States that were doing PET scanning at the time.  I got my

16    Ph.D doing radiopharmaceutical chemistry and positron

17    tomography.

18              After that I went for a postdoctoral stint for

19    two years at the Atomic Energy Commission Marseilles, which

20    was one of the world's leading facilities in PET research at

21    the time.

22    Q.    What is your current position, Dr. Berridge?

23    A.    I am president of a small company, 3D Imaging in

24    Little Rock, Arkansas, that does imaging research,

25    specifically PET, for drug development research.  And I am

115

Berridge - direct

1   also a professor at the University of Arkansas Medical

2   Sciences.  I am professor of radiology in the medical

3   school.  And I am also professor of pharmaceutical sciences

4   in the School of Pharmacy.

5   Q.    Where were you employed prior to joining the

6   University of Arkansas?

7   A.    Then I was in Cleveland where I was also president of

8   a similar small company for drug development research, using

9   positron tomography.  And I was also professor of radiology

10  and chemistry at Case Western Reserve University.

11  Q.    Dr. Berridge, as you have already heard from the

12  openings and the witnesses before you, PET is of primary

13  interest in this case.  Could you explain to us your

14  background with PET?  How long have you worked in the field?

15  A.    Well, I started working with PET when I was a graduate

16  student.  So that is over 30 years ago.

17  Q.    Are you involved in any research organizations or

18  professional organizations in the field of PET?

19  A.    Yes.  I suppose primarily would be the Society of

20  Nuclear Medicine.  I have been a member for almost all of

21  that 30 years.  I have been heavily involved in the society.

22  I have been involved in the leadership of the society, and

23  served on several committees, including a PET committee and

24  a Pharmacopeia committee.

25                I have also been involved in the Society for

Berridge - direct

1    Non-Invasive Imaging and Drug Development, which is now part

2    of the Academy of Molecular Imaging.  I am involved in the

3    leadership of both groups.  I am a member of the Board of

4    directors of SNIDD, as we call it, and the secretary of that

5    organization as well.

6    Q.    Dr. Berridge, I caution you to not turn away from the

7    microphone because your voice is very soft.  It helps us all

8    to be able to hear you.

9    A.    I am sorry.  I will try to remember to keep this up.

10   Q.    What amount of your time is spent in using PET in

11   research?

12   A.    Essentially all of it.  I have a small amount of

13   administrative functions.  But I spend most of my time in

14   PET research.

15   Q.    What type of research do you conduct using PET

16   imaging?

17   A.    The object of our company is drug development

18   research, and that is where I spend most of my time.  I also

19   have an academic mission supporting other research

20   investigators at the University of Arkansas Medical Center.

21   Q.    How long have you been using PET imaging in design and

22   development?

23   A.    The first PET study that I ran began was in 1990.  I

24   was actually doing radiochemistry for drug development even

25   before that.

Berridge - direct

1    Q.    Were you the first in your field to use PET in nasal

2    and pulmonary inhaled drug studies?

3    A.    I believe this type of study, we were definitely the

4    first to do that.  And as far as I know, we are still the

5    only laboratory that is doing this sort of research.

6           MS. BALDWIN:  Your Honor, plaintiffs tender Mark

7    Berridge as an expert in the field of Positron Emission

8    Tomography.

9           THE COURT:  Any objection?

10          MS. RURKA:  No objection.

11          THE COURT:  He is accepted as an expert.

12   BY MS. BALDWIN:

13   Q.    Dr. Berridge, do you know why you have been asked to

14   testify here today?

15   A.    Yes.  I believe I am a fact witness for the

16   experiments I performed in 1996 and '98, 2002, and also an

17   expert witness for this type of positron tomography.

18   Q.    As part of your role as an expert witness in this

19   case, did you prepare any reports outlining your testimony

20   for today?

21   A.    Yes.  I prepared two reports.

22   Q.    Before we start discussing the PET studies that you

23   conducted on Nasacort AQ, could you first provide the Court

24   with a brief background explanation on what PET is?

25   A.    PET is fairly complex.  We actually have a video that

Berridge - direct

1    was prepared by Rhone-Poulenc Rorer after the first study,

2    and an excerpt of that does a pretty good job of explaining

3    the technique.

4    Q.    Could you pull up P demo 140 for us, please.

5    A.    This video begins showing the drug molecule, which

6    actually triamcinolone acetonide.  We can focus on that

7    carbon in the upper right corner.  You can go ahead and roll

8    the video.

9           That carbon is where the carbon 11 radiolabel is

10   placed.  It does not change the drug molecule at all.  So we

11   are looking at the active ingredient of the drug.

12   Q.    The active ingredient of --

13   A.    Stop that again.

14   Q.    The active ingredient you are looking at here is the

15   active ingredient of Nasacort AQ.  Correct?

16   A.    Triamcinolone acetonide is the active ingredient of

17   Nasacort AQ, yes, it is.  The nucleus of carbon 11 is

18   unstable, it is radioactive.

19          Go ahead and run it.

20          It decays by emitting a positron.  A positron

21   goes a short distance across space and encounters an

22   electron.  It is something right out of Star Trek, the two

23   annihilate and they produce two gamma rays that come out in

24   opposite directions, which is a fine point of physics,

25   perhaps, but it is the feature that makes PET work as well

Berridge - direct

1     as it does and gives us quantification.

2                  If we go ahead and roll.

3                  The detector in the PET camera is a ring around

4     a patient.  They impinge on both sides, and the camera

5     detects that the event occurred along the line between those

6     two detectors.

7                  A few million counts later you end up with an

8     image of the radioactivity distribution that was present in

9     the body that was placed in the camera, in this case, a

10    cloud that represents the distribution of Nasacort AQ in the

11    sinus cavity -- in the nasal cavity.

12    Q.    What we are looking at right here, and is that an

13    actual PET image?

14    A.    That is an image taken from one of the PET studies, I

15    believe a 2002 study.

16    Q.    So every point in that image corresponds to what?

17    A.    Well, each point in the image represents -- it's a

18    number, actually, in the computer.  It represents the amount

19    of drug that was present at that point in space at that

20    time.

21    Q.    So is this image just one time?

22    A.    This is one time point.  The intensity of every point

23    in that image represents the quantity of drugs.  So where it

24    looks brighter, there is more drug deposited, and where it

25    looks dimmer, there is less drug.

Berridge - direct

1    Q.    How does PET measure how the drug distribution changes

2    over time then?

3    A.    Similar to still photography and movie photography,

4    you have a frame, as we call it, which is a single image

5    like this.  Now, that can be acquired in as short as a few

6    seconds or as long as many minutes.  That frame gives you

7    one picture.  If you put those frames back-to-back, as we

8    do, you get a series of still pictures, which can be put

9    together to give you a time-lapse view of it and can

10   actually be put together to form a movie of the distribution

11   over time.

12   Q.    Let's talk about the first PET study you did on

13   Nasacort AQ.  When was that study conducted?

14   A.    We ended that in 1996.

15   Q.    If you look in that binder placed in front of you at

16   PTX-528, do you recognize that document?

17   A.    Yes, I do.  That is the final report from that study

18   submitted to Rhone-Poulenc Rorer.

19   Q.    That is the report of the data from your 1996 PET

20   study of Nasacort AQ?

21   A.    That is correct, yes, it is.

22   Q.    Dr. Berridge, could you walk us through how you

23   actually conducted the 1996 PET study of Nasacort AQ?

24   A.    Absolutely.  Actually, there is another video that

25   Rhone-Poulenc made at the time that helps very much in that.

Berridge - direct

1    Q.    So this is actually you conducting the 1996 PET study?

2    A.    Yes.    These are not actors.    That's me right there.

3    The technician that you see is the technician who performs

4    the studies.    The study nurse, you will see, is the study

5    nurse who was involved in all of these studies.

6              That shows the PET counter that we used, and the

7    apparatus that was used for holding the volunteer.

8    Q.    It's a little hard for us to see on this big screen.

9    If you could point out for the Court, it's hard to actually

10   see, the volunteer might be easier for you to see on your

11   screen.

12   A.    The volunteer just shows up much better on the small

13   screen.    The head of the volunteer is down here.    You can

14   see this head holder.    It's black.    And then it's being held

15   by these large Plexiglass, essentially, poles, and a rigid

16   apparatus which is bolted to the scan bed.

17   Q.    Is this normally the way a PET study is conducted?

18   A.    No.    This is something we invented for this study

19   alone.

20   Q.    Why?

21   A.    Well, we didn't know, as we began this study, whether

22   you were going to observe that the drug is very fluid, or

23   whether it would stay exactly where it was sprayed, as they

24   would like to claim.

25              We wanted to know accurately whether that was

Berridge - direct

1    the case.

2              If you were to perform this study with someone

3    laying on their back, the gravity factor is pushing

4    backwards.  Normally, when you take in the gravity factors,

5    it's facing downwards.  And we did not want to have an

6    artificial enhancement of the study results by the fact that

7    the person was on their back and might increase the apparent

8    deposition of the drug back into those turbinate regions.

9              So we wanted to scan them with their head

10   face-up.

11             So we had to develop this apparatus to hold

12   them, support their weight, and keep them immobile in space

13   during the scanning, because it's like time-lapse

14   photography.

15             If you roll that, the volunteer is being put

16   into place.  The head goes back against that rigid head

17   holder.  There is a thermoplastic face mask which is being

18   applied to the volunteer.  When it is worn, it is very

19   flexible.  It is the same material that is used to make

20   casts for broken bones sometimes.

21             That face mask then hardens on the volunteer.

22   We left out some time there while it did so.  That is part

23   of the support and positioning structure of the apparatus,

24   as well as that chin strap that can be seen.  The volunteer

25   is also supported on the chest against the side of a PET

Berridge - direct

1    counter, and they are sitting on a bicycle seat, which can't

2    be seen.

3            Now what you are looking at there is the drug

4    administration by the study nurse, because the volunteer has

5    no use of their hands, and they practiced and coordinated

6    that administration according to package insert

7    instructions.

8    Q.    What is that red line in the picture?

9    A.    Yes, there are actually three positioning lasers, one

10   from each side of the camera and another one that was

11   mounted to the wall during those studies.  Those just

12   provide a little bit of laser light that doesn't move.  We

13   use that to mark the volunteer's face and the mask, and to

14   ensure throughout the study that there isn't any motion or

15   if any small motion occurs, to correct for that motion and

16   put them back where they belong.

17   Q.    Dr. Berridge, how long was someone stuck in this

18   position?

19   A.    Well, it looks much more difficult than it is.  I have

20   hung in that thing myself.  But I can't call it comfortable.

21   If there are any Catholics in the room, they might have

22   experienced that.

23           But it is a kneeling position.  You can tolerate

24   it actually for quite a long time.  We had one volunteer go

25   about two hours.  But most of them could tolerate only 40

Berridge - direct

 1    minutes to an hour.

 2    Q.    What happened after that?

 3    A.    Well, they were given the opportunity to tell us when

 4    they no longer wanted to stay in that position.  This is

 5    part of normal protocol for any kind of research study.  So

 6    they were able to tell us that they wanted to get up.  When

 7    they did, at the end of that frame, we would move them, take

 8    that apparatus off the bed and place them back on the bed in

 9    the supine position, facing upward, and put them back in the

10    scanner and continue with the scan from that point.

11            That all took about no more than about 45

12    seconds to accomplish.  And we corrected the data

13    acquisition, the data analysis for that loss of time.

14    Q.    So after you completed this PET scan, is there any

15    other data that you need in order to analyze the data

16    actually collected during the scan?

17    A.    Yes, absolutely, because as you might have noticed

18    when you looked at that image, you don't see a lot of

19    anatomy in that PET scan.  What we needed to do was align

20    that with an anatomic image.  So we took a magnetic

21    resonance image, an MRI scan, to get the anatomy.

22    Q.    How does the MRI scan help you get the anatomy for

23    that PET scan?

24    A.    We overlay that with the PET scan and then use the MRI

25    anatomy to help us define the regions that are of interest

Berridge - direct

1    in the PET scan.

2              We have an image to show for that.

3    Q.    Could you pull that up, it's PTX-510.

4              Am I correct, this is actually in your 1996

5    study report?

6    A.    This was part of the report, yes.  On the top there,

7    you can see, this is the MRI scan.  It's a three-dimensional

8    data set, just like the PET scan.  But these are three

9    different slices in different planes through the image.

10   This is the PET scan in this row, in those same three

11   slices.  This is a different scan, a different scan, a

12   different subject, than the previous one.

13             On the bottom you can see the result after they

14   have been superimposed, showing the overlay of the PET scan

15   with the anatomy.

16             The process of superimposition involves more

17   than what we can just see here.

18   Q.    Who actually does the superimposing of the images?

19   A.    There was a trained data analyst who spent his life

20   doing this sort of thing and did all of that, actually

21   created some of the software to do it.

22   Q.    Am I right, Dr. Berridge, that the alignment technique

23   that was developed here has actually been awarded honors by

24   your peers?

25   A.    After that software was created, yes, it was used and

Berridge - direct

1    applied to a clinical situation with prostate cancer.  And

2    the use of that technique and superimposition with anatomy

3    won us the 2000 Society of Nuclear Medicine Image of the

4    Year designation.

5    Q.    Is this standard in the software now?

6    A.    It has now become a part of the package of software on

7    every commercial PET scanner.

8    Q.    Once you have completed the scan and overlaid the

9    images, how do you determine the actual amount of

10   radioactive Nasacort AQ deposited in the nasal cavity of the

11   volunteer?

12   A.    Well, that was done by creating regions of interest on

13   the PET scan, so that we could localize the individual areas

14   that were interesting to us, and divide that image up into

15   the amount of drug that was deposited in the various

16   regions.  We can show you how that worked as well.

17   Q.    What are we looking at here, Dr. Berridge?

18   A.    It looks a little messy.  It is a screen shot taken

19   from one of the computers being used at the time.  We have

20   drawn, just for ease of showing it, a little bit of the

21   outlines of the anatomy on these scans, to show where the

22   skull is and where the eyeballs are.  This is the MRI scan

23   from one of the volunteers.

24   Q.    So the PET, you don't see the PET scan on this?

25   A.    There is no PET data on this at all.

Berridge - direct

1   Q.      How do you determine what the regions of interest

2   were?

3   A.      Well, we are looking for anatomic localization.  So at

4   this point we don't need the PET scan.  We define the images

5   on the MRI.

6               In fact, they are just cubicle regions that we

7   used for this study.  We were somewhat limited in our

8   computer capacity at the time.

9               So this is the array of cubes that was used to

10  be studied.

11  Q.      I guess I am a little unclear.  These boxes are the

12  cubes, are these the regions of interest?

13  A.      These are the initial regions that we used.  Many of

14  these small cubes -- the cubes, of course, are stacked, like

15  a child's blocks would be.  And these are the slices, the

16  two-dimensional slices through the three-dimensional array,

17  always remembering this is a three-dimensional data set.

18              When you cut through a cube, you get a square.

19  And this is how they were initially aligned.  That grid of

20  squares, or cubes, was positioned.  Now, bear in mind, of

21  course, the data analyst didn't have to look at just three

22  of these slices.  The data analyst could scroll through the

23  whole three-dimensional set and look at any plane through

24  here.  And they positioned the cube so that they would be

25  best useful for the study.

Berridge - direct

1    Q.   Now, how do you assign a cube to an anatomical region?

2    A.   Well, that was the task at the time.  And what we did

3    was we went through all of the cubes one by one.  The data

4    analyst for this portion of the procedure had a certified

5    nuclear medicine physician who came down to assist, who was

6    part of the study just for that purpose.  And that nuclear

7    medicine physician and the analyst went through cube by cube

8    throughout the entire data set and decided which region each

9    one of those cubes should be assigned to.

10   Q.   How did you handle a cube that overlapped more than

11   one region?

12   A.   Well, that happened to some extent, of course.  In

13   fact, if you look down there, you will see these regions out

14   the front, they overlap into the front of the nose, but they

15   also contain some region of dead space.  Then back in here,

16   through the turbinates, we weren't really able to separate

17   out those anatomic structures that we saw previously, where

18   you can have the three different turbinates.  We simply

19   divided it into superior and inferior.  Remember that

20   through the study, we weren't really worried about specific

21   anatomy as much as we were worried about what the

22   distribution and extent of the drug was going to be.

23        As long as we were consistent, it gave us good

24   data we could analyze.

25        So we assigned those regions.  Bear in mind,

Berridge - direct

1    also, that in that cloud, the intensity doesn't change very

2    much as you go across space.  So a little bit of overlap

3    through that region didn't have a large effect on the

4    result, and again, as long as we were consistent.  But the

5    other areas that it became more important was in the

6    sinuses.  The sinus back there, you have the frontal sinus,

7    then out to the sides, which don't really show on any of

8    these images, you have the maxillary sinus.

9            In that case, as we began the study, we didn't

10   really expect to see uptake in the sinuses.  We didn't know,

11   but we had no reason to expect it necessarily.

12           In any case, we expected it would be small.

13           So we had to be very careful about that.  We

14   couldn't put a region and assign it to a sinus if that

15   region had a chance of including data from a region that was

16   going to clearly have drug deposition in it.

17           So we could only assign a region, and we have

18   been talking about frontal sinus up here, we could only

19   assign exactly that one cube, because we had to avoid any

20   cubes that might overlap with other regions.

21   Q.   Using this method, were you able to account for all of

22   the administered dose of the radioactive Nasacort AQ?

23   A.   That was another question, as we began the study, a

24   serious question as to whether we would see everything and

25   account for it.  And, yes, we did.  We showed that we were

Berridge - direct

1    seeing all of it.

2    Q.    Now, once you gathered all this data from all the

3    cubes, all the time points, all the volunteers, how do you

4    analyze and draw conclusions from it?

5    A.    It is a lot of data.  If you approach that data set

6    raw, you really have a very hard time wrapping your head

7    around it.

8          What you need to do is display it in different

9    ways for different purposes.  So you can display it

10   graphically -- first off, maybe tabular.  You can just

11   separate out the regions and show how much deposited in each

12   region.  You can do that for selected time points.

13         You can take all of the time points and put them

14   together for each region and you can show a graph of the

15   distribution over time.

16         You can look at the images, which gives you a

17   completely different way of understanding the data, and has

18   different information than the tabular data does.

19         Lastly, you could put it together in a

20   time-lapse movie and show the distribution over time that

21   way.

22   Q.    Dr. Berridge, you talked about graphing it.  Is there

23   a certain shape of the graph that you expect from this type

24   of data?

25   A.    From almost all types of PET studies, there is a basic

Berridge - direct

1    curve shape that you tend to see.

2    Q.    Did you prepare a graph to show us that general curve

3    shape?

4    A.    We do have some examples here of standardized curves

5    to show you pretty much what to expect and what to look for

6    in the data when you see the data.

7         The blue curve that you see there is a more

8    simple case.  In all cases you have an uptake phase, where

9    the drug is being administered.  And that's usually quite

10   rapid.  In this case it is a single inhalation.  That

11   deposits the material very quickly into the region, and

12   usually stabilizes, and you get to a peak.

13        After that peak, you have a washout.  That

14   washout can be very simple.  If there is only one mechanism

15   that causes it to leave the region, it can be a

16   mono-exponential curve, such as this blue curve shown here,

17   which is what you might expect in this context if you had

18   mucociliary clearance acting and only that.

19        If you have other things acting, you have more

20   complex curves, where you have different rates of washout

21   happening at the same time.  So you have perhaps a faster

22   rate for part of the material that shows you the initial,

23   that you see initially.  When that portion of the material

24   has washed out, then you see the components of it that has a

25   slower washout rate.

Berridge - direct

1          There could be two, there could be three, there

2     could be four compartments in the data.  And you can see

3     them as different exponentials that come out of the data.

4     Q.     Let's talk more specifically about the data that you

5     actually obtained during the 1996 study.  Did that data show

6     this typical curve shape that you were expecting?

7     A.     It did.  All of it fit this same general family of

8     curves.

9     Q.     Could we look at the anterior regions of the nose,

10    which in 1996 I think you referred to as the frontal cavity?

11    A.     Yes, that's what we called it then.  This graph shows

12    Nasacort AQ from that 1996 study.

13    Q.     Why are there three lines?

14    A.     That is the data from the three different volunteers,

15    each one shown individually.  There is some variation in the

16    amount of uptake that was left in that cavity, as you can

17    see.  And then they each show this initial phase.  It is not

18    quite as severe as what was shown in the stylized curve.

19    And then they show a more prolonged retention or slower

20    washout phase after that.

21    Q.     So does this graph of the data from the frontal cavity

22    in the 1996 volunteers show deposition on Nasacort AQ in the

23    frontal cavity?

24    A.     You can see clearly that there is Nasacort AQ in the

25    frontal cavity, yes.

Berridge - direct

1    Q.    Does it shows that Nasacort AQ is retained for about

2    an hour in the frontal cavity of these volunteers?

3    A.    Yes, those curves stay well above the bench line, all

4    the way out past an hour.

5    Q.    How about the turbinate regions?

6    A.    That would be the other end of the cavity and we can

7    show that.  These came a little closer together.  This again

8    is the same study, the same three volunteers.  This is just

9    the entire turbinate regions combined.  Again, we have the

10   same curve shape.  We have a peak at a fairly large amount

11   of the administered dose, applying the turbinate.  We see

12   that biphasic washout again.  And we see retention well out

13   past an hour.

14   Q.    So does this graph show that Nasacort AQ is deposited

15   in the turbinate regions for the volunteers in 1996?

16   A.    It certainly does, yes.

17   Q.    Is it there for about an hour?

18   A.    Absolutely.

19   Q.    How about the maxillary sinus?

20   A.    This one, again, is sort of a cross between the

21   previous two in terms of agreement.  We have the same curve

22   shape.  We see a very rapid deposition phase.  And we see a

23   biphasic washout.

24   Q.    So do you believe that this graphs shows deposition of

25   Nasacort AQ in the maxillary sinuses for the 1996

1    volunteers?

2    A.    Yes.  It's a lower percentage, of course, but there is

3    definitely deposition there.

4    Q.    Do you believe that it was retained for about an hour

5    in those volunteers?

6    A.    Yes.  The curves are still decreasing after an hour.

7    They are still level, no noise yet, or relatively little

8    noise.

9    Q.    And I guess the question of the day is, did you see it

10   in the frontal sinus?

11   A.    We have curves at the frontal sinus as well.

12   Q.    So this is the three volunteers from 1996 study,

13   deposition of the frontal sinus?

14   A.    This is the actual data for the three volunteers from

15   that study.  We see very similar data for the maxillary

16   sinuses.  The uptake values are similar.  Again, that rapid

17   uptake.  Again, a portion of it is washed out fairly

18   rapidly, and another portion of it is washed out much more

19   slowly.  It's retained past an hour.

20   Q.    Dr. Berridge, how do you know that this data past an

21   hour is real data and not just an artifact?

22   A.    Well, there is probably many things you can think of.

23   But if you simply look at the curve, you see how the lines

24   are relatively flat.  When data has problems with it, you

25   have noise in the data, and the data points bounce all over

Berridge - direct

1    the place generally.  Sometimes toward the end of the

2    activity, when the activity gets very low; the data

3    corrections that are being done as part of the whole

4    procedure, we didn't go into depth; cause the values to

5    deviate wildly.  This is staying very well behaved.  The

6    curve has the plastic-curved shape that you would expect.

7    There is only one point that deviates away from the normal,

8    which is really very good for PET data.  And the decrease

9    stays nice and well behaved.  It has all the hallmarks of

10   real PET data, just like every other region we had in the

11   study.

12   Q.   Okay.  Let's talk about your second study now.

13            MS. BALDWIN:  You can take that down, Eric?

14   BY MS. BALDWIN:

15   Q.   When was the second PET study conducted?

16   A.   1998 is when I finished.

17   Q.   And what was the purpose of your 1998 PET study of

18   Nasacort AQ?

19   A.   Well, it changed as we went along, actually.  The

20   actual purpose of the study was to look at a competitor's

21   product because we had Nasacort AQ data and the competitor

22   product was Flonase.  It was chosen because of the marketing

23   aspect basically, I think, but they wanted to know how it

24   behaved relative to Flonase.  So we started out to do a

25   study of Flonase.  We were asked to radiolabel the active

Berridge - direct

1    ingredient and do that formulation.

2    Q.    And when did Nasacort AQ come into the study?

3    A.    Very quickly, actually, because we started to see that

4    the results that we were getting from the Flonase

5    distribution in volunteers seemed to be different from that

6    of what we had seen with the Nasacort AQ in the first study.

7    And so it became of immediate interest to do a crossover

8    study to try to get more data in those same volunteers of

9    Nasacort AQ so that they could do it a direct comparison in

10   a crossover design.

11   Q.    Now, did you conduct that 1998 study in the same way

12   you just described the 1996 study for us?

13   A.    Yes, we did.

14   Q.    So it was conducted with the same protocol they used

15   in 1996?

16   A.    Yes, it was the same protocol.

17   Q.    Same PET scanner?

18   A.    Same PET scanner, same institution, all the same

19   personnel even.

20   Q.    Same method of data analysis?

21   A.    Well, we did change the data analysis.  Most of the

22   data analysis was the same, yes.

23   Q.    Which part was the same?

24   A.    All of the alignment.  The initial treatment of the

25   images was all the same.  The only thing that was different

Berridge - direct

1    was the regions of interest.

2    Q.    What regions of interest did you use in 1988?

3    A.    We had some better computer power.  We had a couple

4    more years to write software.  And since we were pioneering

5    these studies, we were developing tools as we went along.

6    And we wanted to get regions that would more exactly

7    correspond to the anatomic regions for purposes of

8    discussion.

9    Q.    Could you show us what the regions of interest looked

10   like in the 1998 study?

11   A.    Yes.  You almost have to see them, it's very difficult

12   to describe.  We have an image to show.

13              What you are seeing there, the translucent part

14   is an MRI image in just low intensity of one of the

15   volunteers in the study.  Actually, I believe the volunteer

16   is from the 2002 study.  But it's a volunteer.

17              And then the regions are shown on that in

18   different colors as we created them.  They're

19   three-dimensional images.  They're three-dimensional

20   regions.  They're irregular in space because they conform

21   with the outlines of the structures as those structures are

22   identified on the MRI scan.

23              So you can see down here is what we call the

24   mouth-throat region.  It's the nontarget region.

25              Here is the frontal cavity.  The nose is divided

Berridge - direct

1    into two regions, superior and inferior.  We can see the

2    turbinate regions behind there, at least some of them.  We

3    have the maxillary sinuses over there and the frontal sinus

4    way up here by itself.

5    Q.    You have never seen a nose in so much different ways,

6    have you.  Dr. Berridge, could you look at PTX-567 in your

7    binder there?

8    A.    Yes, ma'am.

9    Q.    And what is that document?

10   A.    That is tabular data from this study that we submitted

11   to Aventis at the time.

12   Q.    So that's the raw data that you get from the PET

13   study?

14   A.    Yes, it is.  It's broken down actually into much

15   smaller regions that were then grouped together into the

16   regions that were recorded.

17   Q.    And were the results of this 1998 study published?

18   A.    Yes, they were.  We published them in a paper that

19   appeared in the Journal of Nuclear Medicine.  I'm sorry.

20   That was the first study.  I misspoke.  We published them in

21   an abstract for this study that appeared, that went to the

22   International Society For Aerosol Medicine.

23   Q.    Is PTX-569 in your binder there, is that the abstract

24   you are referring to?

25   A.    That is indeed the exact display that we used for that

Berridge - direct

1    presentation.

2    Q.    Were the results of the 1998 study consistent with

3    those that you had seen in 1996?

4    A.    Yes, they were consistent with 1996 results.

5            MS. BALDWIN:  If we could pull up the graphs

6    there?  Thank you.

7    BY MS. BALDWIN:

8    Q.    So these are the graphs of Nasacort distribution and

9    kinetics from the 1998 study?

10   A.    Yes, they are.  We were trying to show pretty much all

11   the data in the study in a limited space so it's rather

12   busy, but that shows the average uptake at each time point

13   as an average of volunteers in that study.

14   Q.    Did this study show deposition of Nasacort AQ and

15   retention for about an hour in the frontal cavity of the

16   1998 volunteers?

17   A.    Yes.  That is on the lower graph, those curves are

18   there, and that shows clearly there is deposition.

19   Q.    They show deposition and retention for about an hour

20   in the turbinate regions for the 1998 volunteers?

21   A.    Yes, they did.  Definitely.

22   Q.    How about the maxillary sinus?

23   A.    Yes, that would be the upper panel.  And we see

24   uptake, we see deposition into the maxillary sinus, and we

25   see retention past an hour.

Berridge - direct

1    Q.    How about the frontal sinus?

2    A.    Yes, we do also see it in the frontal sinus.

3    Q.    Did you see it in the frontal sinus for all the

4    volunteers for 1998?

5    A.    No.  Actually, we did not.  We saw it in three of the

6    volunteers out of the five.

7    Q.    Could you show us your graph of the volunteers from

8    1998?

9    A.    We prepared a graph of that data.  This shows the

10    frontal sinus curve of each volunteer from that study

11    separately.

12    Q.    And how do you know that this is real data and not

13    just an artifact?

14    A.    Well, actually one of the nice features of this that

15    helps us to decide that is that most of the ways that one

16    could think of that could give you an artifact involve data

17    spilling in from one of the other regions that have a lot of

18    activity in it.  A little spillover sometimes happen in PET.

19    We were very careful, of course, in defining our regions in

20    all of the studies to try to avoid that.  Well, if that were

21    to happen, you would see uptake in every volunteer because

22    it would show you uptake even when there isn't any.  You

23    would not be able to measure the fact there is no uptake.

24           But these two volunteers had no uptake.  In

25    these other volunteers, we see the nice curves shapes as we

Berridge - direct

1    did in the previous study.  It's the exact same sort of

2    data, behaves exactly the same way and, in my mind, it's

3    perfectly trustworthy.

4              MS. BALDWIN:  You can take that down, Eric.

5    BY MS. BALDWIN:

6    Q.    Now, you conducted yet a third PET study of Nasacort

7    AQ.  Is that correct, Dr. Berridge?

8    A.    We did indeed, yes.

9    Q.    Was that PET study consistent with what we have seen

10   for 1996 and 1998?

11   A.    It was in the main consistent with all the conclusions

12   we have made, yes.

13   Q.    Did you see any differences in that study?

14   A.    There was one difference with that study, really.

15   Q.    And what was that?

16   A.    That was the frontal sinus.  In that study, we did not

17   observe uptake into the frontal sinus in any of the

18   volunteers.

19   Q.    Did you observe any other differences in that study?

20   A.    Well, the uptake patterns in general were pretty much

21   the same but we had major problems with that study.  We had

22   very noisy data.  We had inconsistent data.  The data was

23   erratic.  It was a very problematic study for me.

24   Q.    Dr. Berridge, as part of your work as an expert in

25   this case, have you formed any opinions as to whether or not

Berridge - direct

1    Barr's ANDA product would behave in the same manner as we

2    saw in your 1996 and 1998 PET studies on Nasacort AQ?

3    A.    Yes, I did form those opinions.

4    Q.    And what was your opinion?

5    A.    That the Barr product would behave the same as the

6    Nasacort AQ does.

7    Q.    What is the basis of that opinion?

8    A.    Well, I reviewed all of the data that we had in all of

9    these materials on the Barr product:  the chemistry,

10   manufacturing and controls information, the package insert

11   information.  And it's clear that all of the ingredients are

12   the same, quantities are the same, the methods are the same.

13   The instructions to the volunteers are the same, and the

14   pump spray is the same.  It has to behave the same.

15   Q.    Dr. Berridge, if you could look at PTX-1 and PTX-3 in

16   your binder in front of you.

17   A.    Okay.  I have that.

18   Q.    Do you recognize those documents?

19   A.    Yes, I recognize those.

20   Q.    And what are they?

21   A.    Well, number one is the patent that I was asked to

22   look at, 5,976,573.

23   Q.    And what was PTX-3?

24   A.    And PTX-3 is the other of the two patents that I was

25   asked to look at.  This one is 6 -- my eyes are going

Berridge - direct

1    funny -- 143,329.

2    Q.    Dr. Berridge, were you asked to compare the claim

3    limitation related to deposition and retention of the

4    claimed formulation with Nasacort AQ?

5    A.    Yes, I did.

6    Q.    Did you compare those claim limitations related to

7    deposition or retention with the results of your 1996 study?

8    A.    Yes, I did with that, too.

9    Q.    Were you also asked to compare those same claim

10   limitations of the patents in suit with the Barr ANDA

11   product?

12   A.    Yes, I compared those with the Barr ANDA product as

13   well.

14              THE COURT:  Doctor, please keep your voice up.

15              THE WITNESS:  Thank you.

16              THE COURT:  Because people in the back of the

17   courtroom need to hear you, too.

18              THE WITNESS:  I'm sorry.  I'm getting a little

19   dry.

20              MS. BALDWIN:  Dr. Berridge, there is a water

21   right there.

22              THE WITNESS:  I'll be okay.

23   BY MS. BALDWIN:

24   Q.    Can we look at Claim 5 of the '573 patent.

25              And the phrase is:  Deposit on the mucosal

Berridge - direct

1    surfaces of the nasal cavity.  Was that one of the claim

2    limitations that you have formed an opinion about,

3    Dr. Berridge?

4    A.    Yes, it was.

5    Q.    Is it your understanding that pursuant to this Court's

6    instruction that the term "nasal cavity" includes the

7    anterior regions of the nose, the frontal cavity, turbinates

8    which overlie the concha, maxillary sinuses and the frontal

9    sinuses?

10   A.    Yes, I was given that definition, and I used it.

11   Q.    Did you form an opinion as to whether or not Nasacort

12   AQ would meet this claim limitation?

13   A.    Yes, I did.

14   Q.    And what is that opinion?

15   A.    That it does meet that claim limitation.

16   Q.    And what is the basis of your opinion?

17   A.    All of the data that we have just showed.  That it

18   does -- the data that I have from my own experiments show

19   that it does deposit in each of those portions of the nasal

20   cavity.

21   Q.    Would Barr's ANDA product also deposit on the mucosal

22   surfaces of the nasal cavity as defined by this Court?

23   A.    I haven't been able to do the experiment, but I have

24   to believe that it would because it's identical.

25                MS. BALDWIN:  If we could look at Claim 25 of

Berridge - direct

1    the '329 patent.

2    BY MS. BALDWIN:

3    Q.    Here you see the claim limitations:  Each of the

4    mucosal surfaces of the anterior region of the nose, the

5    frontal sinus and the maxillary sinuses and on each of the

6    mucosal surfaces which overlie the turbinates covering the

7    conchas.

8              Did you form an opinion as to whether Nasacort

9    AQ meets that claim limitation, Dr. Berridge?

10   A.    Yes, I did.

11   Q.    What was that opinion?

12   A.    That it does meet that claim limitation.

13   Q.    Did you also form an opinion as to whether Barr's ANDA

14   product would also meet that limitation?

15   A.    Yes, similar to what we just said.  Because it's

16   identical to Nasacort AQ, I have to believe that it will.

17   Q.    Let's also look at another portion of Claim 5, and

18   this wording is also found in Claim 25 of the '329 patent,

19   so we can treat them together.

20             And the limitation is resisting being cleared

21   from the mucosal surfaces by the inherent mucociliary forces

22   which are present in the nasal cavity.

23             Did you form an opinion as to whether or not

24   Nasacort AQ would meet that claim limitation of Claim 5 of

25   the '573 and Claim 25 of the '329 patent?

Berridge - direct

1    A.    Yes, I did form that opinion.

2    Q.    And what is that opinion?

3    A.    That it does meet that claim limitation.

4    Q.    And what is the basis of that opinion?

5    A.    Again, these are experiments that I performed myself.

6    I was asked specifically by Rhone Poulenc Rorer essentially

7    to evaluate this because what they wanted to know in the

8    first place is whether their formulation resisted

9    mucociliary clearance, whether it caused the drug to stay

10   where the drug was sprayed as they put it to me.  So that is

11   what the study was designed to show us.

12   Q.    How did the study show us that?

13   A.    Because we knew going in that mucociliary clearance

14   clears materials from the nose very rapidly and that it

15   removes them from 10 to at the very most 30 minutes.  So

16   what we were looking for was a retention in the nose that

17   was longer than that and would be longer than that probably

18   from a clinical standpoint.  So we weren't looking for small

19   differences, we were looking for a large increase.  So we

20   were looking for increases for retention that might persist

21   toward an hour, and we measured that.  We saw that retention

22   and, therefore, I have to conclude that that it does resist

23   clearance by mucociliary action.

24   Q.    Did you also form an opinion as to whether Barr's ANDA

25   product would meet this limitation?

Berridge - cross

1   A.    Yes, similar to my other opinions.  That because it's

2   identical to Nasacort AQ, it will behave the same way.

3          MS. BALDWIN:  Thank you, Dr. Berridge.  I have

4   no further questions.

5          THE COURT:  You may cross-examine.

6                    CROSS-EXAMINATION

7   BY MS. RURKA:

8   Q.    Good afternoon, Dr. Berridge.

9   A.    Good afternoon, ma'am.

10  Q.    How are you?

11  A.    Quite well.

12  Q.    So, Dr. Berridge, for the three studies in which you

13  administered radiolabeled triamcinolone acetonide in the

14  form of Nasacort AQ to 14 healthy subjects, how many of

15  those -- eight of those subjects did not show uptake in the

16  frontal sinus; correct?

17  A.    That's a bad way to put it but, yes, that's correct.

18  Q.    So Nasacort AQ does not always deposit in the frontal

19  sinus?

20  A.    It does not always deposit on the frontal sinus.

21  Q.    Dr. Berridge, you are not an expert in nasal anatomy,

22  are you?

23  A.    I know something of it but, no, I don't call myself an

24  expert.

25  Q.    I guess you know something of it so let me ask you

Berridge - cross

1   this.  Is everyone's frontal sinus the same size?

2   A.    I'm pretty sure there are significance variations in

3   frontal sinuses, yes.

4   Q.    And they're located in different areas from person to

5   person in relation to the other nasal structures; right?

6   A.    I could not tell you how much, no.

7   Q.    But they are located in different areas, located in

8   different areas in relation to the other nasal structures

9   from person to person?

10  A.    I'm not sufficiently expert to answer that.

11  Q.    So you don't know?

12  A.    No.

13  Q.    Let's talk about the most recent study you conducted.

14  That was the 2002 study.  That was a randomized crossover

15  study using Nasacort AQ and Flonase?

16  A.    It was.

17  Q.    That means that Flonase and Nasacort AQ were

18  administered to the same six patients over a few days span?

19  A.    Well, actually no.  It was over more than just a few

20  days span.  It was administered to the same six patients,

21  and it means that both were administered to each patient and

22  that it was done in a random order.

23  Q.    Okay.  Let me ask you this:  Was it done over a few

24  days span?  Was the study, the study from Nasacort AQ to

25  Flonase, each subject done over a few days span?

Berridge - cross

1    A.    I believe it was in two weeks.  I'm not sure exactly

2    of the intervals.

3    Q.    Actually, I've been saying patients.  There were six

4    subjects, healthy subjects.  Correct?

5    A.    They're actually normal volunteers.  Patients is not

6    quite the correct word to use.

7    Q.    So I think you testified that you analyzed the data or

8    maybe you didn't.  You analyzed the data from the 2002 using

9    the contoured regions of interests, not the cubes that you

10   testified about, the 1996 study?

11   A.    Correct.

12   Q.    And then you assigned a region of interest to the

13   frontal sinus using a region as well.  I'm sorry.  The

14   region of interest you used to assign a frontal sinus was

15   shaped like the patient or the subject's frontal sinus.

16   Right?

17   A.    It was shaped like the frontal sinus.  It would have

18   been somewhat larger than the frontal sinus because we were

19   counting again for the that partial volume affect, a little

20   bit of spillover that occurs in PET.

21            MS. RURKA:  Can you pull up Plaintiffs'

22   Exhibit 5, please?

23   BY MS. RURKA:

24   Q.    And these are the results from your 2002 study.  Is

25   that correct?

Berridge - cross

```
 1   A.     This is the front page of the 2002 report, yes.

 2              MS. RURKA:  I'm sorry.  Did you get a copy of

 3   that?  I apologize.

 4              May I approach the witness?

 5              THE COURT:  You may.

 6              (Documents passed forward.)

 7              THE WITNESS:  Thank you.

 8              THE COURT:  I think we have that, don't we?

 9              MS. RURKA:  You might have that.

10              THE COURT:  I think we have that.

11              MS. RURKA:  I'll save you the paper.

12              Pull up Page 12, please, Mr. Young.

13   BY MS. RURKA:

14   Q.     So, Dr. Berridge, you concluded that no uptake was

15   observed in the frontal sinus on any of the six patients you

16   studied in the 2002 study.  Correct?

17   A.     In the 2002 study, yes, that was my conclusion.

18   Q.     I think you also discussed your 1998 study on direct

19   examination.  Right?

20   A.     I did.

21              MS. RURKA:  May I use the Elmo?

22   BY MS. RURKA:

23   Q.     Okay.  Ms. Baldwin put up Plaintiff's Demonstrative

24   Exhibit 181 for you to analyze the data from the 1998 study

25   with respect to frontal sinus.  Do you recognize this?
```

Berridge - cross

1    A.    I recognize that, yes.

2    Q.    Okay.  And that shows that two subjects in the 1998

3    study did not have frontal sinus uptake.  Right?

4    A.    That is my interpretation, yes.

5    Q.    Okay.  And of the three subjects that you observed as

6    having frontal sinus uptake, the highest you got was .5

7    percent of the administered dose.  Is that right?

8    A.    That is correct.

9    Q.    And the other two were under .2 percent.  Right?

10   A.    Also correct.

11   Q.    And do you have any evidence that the less than .5

12   percent that was shown in any of these three subjects had

13   any sort of therapeutic effect for those subjects?

14   A.    My studies were not designed to look at therapeutic

15   effect in any way.  I have no opinions on therapeutic

16   effect.

17   Q.    So you don't know whether or not the .5 that was shown

18   in the one patient had any therapeutic effect on the other?

19   A.    No.

20            THE COURT:  He said he doesn't have an opinion.

21   Counsel, we can move on to the next question.

22            MS. RURKA:  Can we go to the 1996 study?

23   BY MS. RURKA:

24   Q.    You tested three subjects of Nasacort AQ in the 1996

25   study.  Right?

Berridge - cross

1    A.    That's correct.

2    Q.    And that was a pilot study?  That was the first study

3    you did?

4    A.    That was the first study, yes.

5    Q.    And that study was designed to determine the

6    distribution and extent of drug in the regions of interest.

7    Right?

8    A.    Almost.  It was designed to determine the regional

9    deposition and kinetics of the drug.

10   Q.    You reported that in the 1996 study, 2.97 percent to

11   about 3.5 percent deposition of the frontal sinus for the

12   three subjects.  Right?

13   A.    I can't verify those numbers siting right here but it

14   sounds pretty close, yes.

15   Q.    Would you like me to help you?  Would you like to see

16   the study?

17   A.    Okay.

18   Q.    It might be in your binder?

19   A.    Probably yes.

20         MS. RURKA:  And yours, too, Your Honor.

21         So could you pull up the exhibit, Mr. Young?

22   Thank you.

23         And Page 9, Defendants' 6.

24         MS. BALDWIN:  PTX-529, if you can't find it.

25         MS. RURKA:  Yes, that would be PTX-529 in your

Berridge - cross

1    binder.

2                    THE WITNESS:  Okay.  Good.

3    BY MS. RURKA:

4    Q.    And that table shows for each of the volunteers are on

5    the left side.  Right?  And the frontal sinus region shows

6    percent uptake in the frontal sinus.  PDmax would be the

7    percentage uptake in the frontal sinus that you observed,

8    the maximum?

9    A.    Yes, that stands for percent maximum.

10   Q.    So you have 3.5, 3.5 and 2.97.  Right?

11   A.    That's correct.

12   Q.    And I believe you said in the 1998 study, the highest

13   you showed was .5 percent.  Right?

14   A.    That is what we saw, yes.

15   Q.    You published the results of the 1996 study.  Right?

16   A.    We did.

17   Q.    In the Journal of Nuclear Medicine?

18   A.    That's correct.

19   Q.    That is a well regarded journal in the field of

20   positron emission tomography?

21   A.    It's probably the most respected in this sort of work,

22   yes.

23   Q.    So when you published results in the Journal of

24   Nuclear Medicine, it's important that you published accurate

25   results.  Correct?

Berridge - cross

1    A.    I believe so, yes.

2    Q.    I think you testified that you used 1.8 centimeter

3    cubic regions of interest in the 1996 study to assign the

4    radioactivity to the nasal anatomy.  Correct?

5    A.    We did.

6    Q.    And no cubes in the assignment that showed

7    radioactivity were left unassigned.  Right?  To a particular

8    nasal region.

9    A.    No, nothing was left unassigned.  And we accounted for

10   all of the deposited dose.

11   Q.    And you also testified I believe that some of those

12   cubes could overlap from one anatomical region to another.

13   Right?

14   A.    Yes, that's true.

15   Q.    And if you had such an overlap, you could conceivably

16   attribute radioactivity to a region in the nasal anatomy in

17   which there actually was no radioactivity.  Correct?

18   A.    That is a difficult one to say yes or no.

19   Q.    Okay.  Well, Dr. Berridge, when you had an overlap, I

20   think you testified earlier that when you had an overlap

21   between the frontal sinus and an adjacent region, for

22   example, the frontal cavity or the turbinate, that if there

23   was an overlap, that you would assign that to a turbinate

24   region or the adjacent region rather than the frontal sinus

25   region.  Correct?

Berridge - cross

1    A.    That's right.  That's what makes it difficult.  It

2    depends on what regions we're specifically talking about.

3    Q.    Okay.  So in that situation, if the deposit was in

4    fact in the frontal sinus, you would have assigned it to the

5    wrong region.  You would have assigned it to a region where

6    the radioactivity was not in effect?

7    A.    No, you see, because what you do in that situation is

8    that one region -- say that it overlapped with the frontal

9    sinus and with the upper part of the frontal cavity.  You

10   would assign that cube to the frontal cavity and, therefore,

11   you take the risk of assigning frontal sinus data to the

12   frontal cavity region that already had much more but you

13   would avoid the risk of assigning frontal cavity data to the

14   frontal sinus and making it look as if material was there

15   when it was not.

16   Q.    I'm sorry.  Dr. Berridge, maybe you misunderstood.

17   That is exactly what I was saying.  You said that you had,

18   any overlap with the frontal sinus and an adjacent region

19   like the frontal cavity, you would assign whatever activity

20   was in that cube to the frontal cavity even if it was in the

21   frontal sinus; right?

22   A.    If there were dual regions in that case, yes, we would

23   do that.

24   Q.    Okay.  So your results, your frontal sinus results

25   would not be accurate.  They would be understated.  Right?

Berridge - cross

1    A.    Actually, it would be possible, yes.

2    Q.    And your frontal cavity results would be overstated.

3    Right?

4    A.    Well, that's probably not true, no, because the

5    frontal cavity results, the number in the frontal cavity is

6    sufficiently large to spill over from the frontal sinus into

7    it and would be insignificant.

8    Q.    It still would be overstated.  Right?

9    A.    No, it's not right.

10   Q.    The percentage would not be overstated?

11   A.    No.  The amount that would be added to the frontal

12   cavity is so small that it doesn't significantly change that

13   number.  That number hasn't changed, really, at all.  When

14   you do the analysis, you have a certain amount of

15   variability, and you have not changed your final number.  It

16   would not be overstated.

17   Q.    So your testimony is it would never be overstated?

18   A.    In the example we are talking about right now, no, it

19   would not.

20   Q.    Are you saying that you never overstated the

21   assignments in an adjacent region of the frontal sinus in

22   the 1996 results?

23   A.    I am sorry, can you repeat that.

24   Q.    I am sorry.  That was a very badly phrased question.

25         So your testimony -- do you have any of the data

Berridge - cross

1   from the 1996 study showing how you assign these cubic

2   regions of interest?

3   A.    We don't have the -- the assignments, no, did not

4   survive to today.

5   Q.    What we have is your testimony that you assigned these

6   regions carefully to make sure that you weren't reporting

7   results in the frontal sinus that weren't, of course, in the

8   frontal sinus.  Right?

9   A.    We do have that testimony, yes.

10  Q.    And that's the only thing we have.  Right?

11  A.    Well, no, it's not the only thing we have.

12  Q.    It's not reported in your 1997 journal article, is it?

13  A.    Well, to come to that conclusion we also have the data

14  that we just showed.  If that were a systematic problem, if

15  that assignment were happening, then you would always see

16  uptake in the frontal sinus.

17  Q.    That is if you had assigned the cubic regions the way

18  you said you assigned the cubic regions.  Right?

19  A.    Well, of course.

20  Q.    What I am talking about is how you assigned the cubic

21  regions, we don't have any report of how you assigned those

22  regions other than your testimony?

23  A.    No, we don't.

24  Q.    And you didn't put it in your 1997, or the Journal of

25  Nuclear Medicine paper, did you?

Berridge - cross

1    A.    We did describe the regions and how they were done,

2    yes.

3    Q.    You didn't describe how you assigned anything that was

4    overlapping from one region to another to the adjacent

5    region that had higher activity, did you?

6    A.    Actually, without reading the paper, I couldn't tell

7    you for sure.  But I don't believe we did, no.

8    Q.    And you didn't report it in your 1996 final study

9    report, either?

10   A.    No, we really didn't go into all of the logic about

11   the assignment of each region.

12   Q.    Okay.  So you could have understated the frontal sinus

13   deposition in the 1997 Journal of Nuclear Medicine paper, I

14   think it was the 1998 Journal of Nuclear Medicine paper, but

15   no one would know that because it was not recorded how you

16   assigned the regions of interest in the 1996 study.  Right?

17   A.    That's an interesting situation.  Okay, I will say

18   right.

19   Q.    And in the 1998 study, when you got those results, you

20   got two out of the five subjects with, according to your

21   testimony, no frontal sinus uptake.  Right?

22   A.    Yes, that's correct.

23   Q.    When you got those results, you didn't go back and

24   reanalyze the 1996 study results to see if there was some

25   sort of factor contributing to the difference between the

Berridge - cross

1   two studies.  Right?

2   A.    Actually, we did think about it, and we didn't see

3   anything that we thought needed to be altered.

4   Q.    So you didn't think reporting results of three to four

5   percent in a Journal of Nuclear Medicine paper, uptake in

6   the frontal sinus -- I think you testified that you found

7   those results surprising.  Right?  Or unexpected?

8          THE COURT:  Counsel, ask one question.  Okay?

9          MS. RURKA:  Sorry.

10  BY MS. RURKA:

11  Q.    Okay.  You found the results in the 1996 study

12  unexpected.  Right?

13  A.    We were initially surprised to see deposition in the

14  frontal sinus, if that's what you mean.

15  Q.    Right.  And you reported results of three to four

16  percent in the Journal of Nuclear Medicine paper in the 1996

17  study?

18  A.    Yes.  We report what we find.

19  Q.    And you found zero percent in two of the subjects in

20  the 1998 study?

21  A.    That's correct, too.

22  Q.    And that didn't cause you to question whether the

23  results of one of those two studies might be out of whack?

24  A.    Well, no, it didn't.  It more caused me to wonder

25  where the sources of the variability are.

Berridge - cross

1    Q.    Did you report the zero finding in the two subjects in

2    the 1998 study anywhere?

3    A.    I am sorry.  The zero uptake in the 1998?

4    Q.    Yes.  I am sorry.  The zero uptake in the frontal

5    sinus?

6    A.    That was included in the data on the poster.

7    Q.    Was it included that you found two of the five

8    subjects showed no frontal sinus uptake?

9    A.    Probably not.  The frontal sinus was almost an

10   afterthought at that stage in the game.  We were not really

11   concerned with it.

12   Q.    Okay.  I am sorry.  You found it unexpected in the

13   1996 study.  By the 1998 study you weren't concerned about

14   the frontal sinus data anymore?

15   A.    No.  We were reporting the uptake in it.  But we were

16   not concentrating on it.  The regions that were of most

17   interest were the frontal cavity and the turbinates.  So we

18   reported the data, but we didn't go into great detail about

19   the frontal sinus data in those reports.

20   Q.    You didn't report anything on the 2002 study, which

21   showed no uptake in the frontal sinus in any of the six

22   subjects?

23   A.    No.  That work was unpublishable.

24   Q.    Why was it unpublishable?

25   A.    The data was just bad.

Berridge - cross

1    Q.    Okay.  You didn't say anything about the bad data in

2    the 2002 study report, did you?

3    A.    Well, the 2002 study report back to Aventis, which was

4    the sponsor, was a report that I needed to present back to

5    them to fulfill the contract, to report on all the work that

6    was done.  And I reported the bad data to them, yes.

7    Q.    I am sorry.  You reported that the data was bad for

8    Aventis.  Is that what you are saying?

9    A.    I reported in that final report, which you just

10   mentioned, yes, I reported all of that data back to them.

11   But we were unable to draw conclusions from that data.

12   Q.    And you were unable to draw conclusions from that data

13   because of, you think it was bad data?

14   A.    It was highly variable data.  It had some very

15   interesting patterns in it that just didn't really make

16   sense.  It was impossible for me to analyze properly.

17   Q.    But none of that is in your 2002 final study report,

18   is it?

19   A.    I gave that report back to Aventis.  I did the best

20   job I could of presenting them the data and showing them

21   what happened.  It's in there.  You do a study for someone

22   and you report the results to them.  You don't really want

23   to come down on it too hard.  But you report the results as

24   they were.  And they are in there.

25   Q.    But you didn't publish anything on your findings on

Berridge - cross

1    the frontal sinus data in the 2002 study in view of the fact

2    that you reported three to four percent in the 1996 study.

3    Right?

4    A.    Well, again, I was not focused on the frontal sinus.

5    I did report the data, yes.

6    Q.    So your 1996 study showed seriously different data

7    than the 1998 study and 2002 study when it came to frontal

8    sinus uptake.  Right?

9    A.    When it comes to the frontal sinus alone, there are

10   differences between all of the three studies, yes, that's

11   true.

12   Q.    And you did nothing to bring this issue to the

13   attention of the scientific community and submit perhaps

14   another article in the Journal of Nuclear Medicine to

15   explain the differences between the three studies?

16   A.    No, I did not.  The uptake in the frontal sinus of an

17   anti-inflammatory steroid among three PET studies is not an

18   issue of such burning importance that I would think that

19   that paper would get accepted at any journal.

20   Q.    Dr. Berridge, did you say anywhere in your 2002 final

21   study report that the data cannot be trusted?

22   A.    I said I couldn't analyze that data and come up with

23   conclusions.  There were problems with the data.  And I did

24   put that down, yes.

25   Q.    I think you said that -- you did come up with a

Berridge - cross

1    conclusion about frontal sinus data.  Right?

2    A.    I reported there was zero uptake.

3    Q.    So you did have some conclusions about the data in the

4    2002 study?

5    A.    Well, yes, it wasn't totally worthless, no.

6    Q.    Dr. Berridge, you did no studies on Barr's ANDA

7    product.  Right?

8    A.    No.  I have never had a sample of that product.

9    Q.    Can we put up -- you reviewed Dr. Lockhead's viscosity

10   testing results in reaching your conclusions about

11   infringement for Barr's ANDA product.  Right?

12   A.    Yes, I saw viscosity results.

13   Q.    Defendant's Exhibit 25.  I just pulled up some of his

14   data and put it in a usable format.

15         Does this look like the viscosity results that

16   Dr. Lockhead acquired for some of Barr's ANDA product that

17   you reviewed in reaching your infringement opinion?

18         MS. BALDWIN:  Objection, Your Honor.  He doesn't

19   have Dr. Lockhead's data memorized, nor is he an expert in

20   viscosity or rheology.

21         THE COURT:  Counsel, your reaction?

22         MS. RURKA:  I have the actual reports here from

23   Dr. Lockhead.

24         THE COURT:  Has he been asked to analyze this

25   information heretofore?

1           MS. RURKA:  Yes.  It was in his opening expert

2      report.

3           MS. BALDWIN:  Objection, Your Honor.  All he

4      said is he relied upon the opinions of Dr. Lockhead.  He did

5      not analyze this data.  That was beyond the scope of his

6      expertise.

7           MS. RURKA:  Actually, Dr. Berridge reached the

8      conclusion looking at Dr. Lockhead's data that it had the

9      same thixotropic profile and the same viscosity profile.

10     These two properties had the same thixotropic profile and

11     the same viscosity profile based on the data he looked at

12     from Dr. Lockhead.  Dr. Lockhead did not express that

13     opinion.  So Dr. Berridge did analyze these data.

14          THE COURT:  We will see what Dr. Berridge has to

15     say.

16          MS. BALDWIN:  Your Honor, we want to object to

17     the exhibit because it inaccurately reflects the actual

18     shear viscosity for the Barr ANDA product.

19          THE COURT:  You object to the demonstrative?

20          MS. BALDWIN:  Yes.

21          MS. RURKA:  We can just use Dr. Lockhead's

22     report.

23          THE COURT:  You can take that down.

24          MS. RURKA:  If you can pull up Defendant's

25     Exhibit 362.  If you can pull up Page 9 and 10 as well.

Berridge - cross

1    BY MS. RURKA:

2    Q.    Dr. Berridge, are these the data you reviewed in

3    reaching your infringement opinion, the viscosity testing of

4    Barr's product?

5    A.    Yes.  This is his report.  I relied mainly on his

6    conclusions, I must say.

7    Q.    Okay.  Well, I think, actually, it probably would help

8    if you pulled up Defendant's Exhibit 314, which is Dr.

9    Berridge's opening -- no, I am sorry, 313, which is his

10   opening expert report?

11          MS. BALDWIN:  Can I have a copy?

12          MS. RURKA:  Yes.

13   BY MS. RURKA:

14   Q.    Actually, Dr. Berridge, I believe you testified on

15   direct that you thought Barr's ANDA product was identical to

16   Nasacort AQ.  Is that right?

17   A.    Yes, I believe that.

18   Q.    Why don't you go back to 362 at 9 and 10.

19   A.    Okay, I see that.

20   Q.    The data in the left-hand column are the viscosities

21   of Barr's ANDA product.  The first three -- six products are

22   Barr's ANDA products, different batches of Barr's ANDA

23   products.  Right?

24   A.    Yes, that appears to be correct.

25   Q.    Then the last two are Nasacort AQ, setting and shear

Berridge - cross

1    viscosity values?

2    A.    Yes, they are.

3    Q.    So Agis industry Point No. 002 shows apparent

4    viscosity, setting viscosity at the top of 455 through 404.

5    Right?  Centipoise?

6    A.    I am sorry.  I was looking at the torque.  Okay.  Let

7    me see.  Now that I am there, can you say that again.

8    Q.    The top right, the right column at the top, that's

9    Agis Industry, which is Barr labs ANDA product, setting

10   viscosity is from 404 to 455 centipoise.  Right?  It's right

11   up on the screen, too?

12   A.    All right.  But I am looking on the paper and I am

13   seeing a fairly wide range of numbers in that column.

14   Q.    Okay.  Why don't we pull up -- we will do it this way:

15   We will pull up the setting viscosity for No. 002, that's

16   Batch No. 002, Batch No. 003, and Batch No. 004.

17   A.    Yes.

18   Q.    If you look at all three of them.  So you have setting

19   viscosities of -- just the settings, please.

20   A.    Okay, those are shears.

21   Q.    So the setting viscosity for Barr's product ranges

22   anywhere from 404 to 606 centipoise.  Right?

23   A.    Okay.  Yes, it does.  I apologize, I was just getting

24   used to this table, again, because I said I relied on his

25   conclusions, not on his data.

Berridge - cross

1    Q.    There is a lot of numbers in here.  The Nasacort

2    setting is between 405 to 437.  Right?

3    A.    It does appear to be, yes.

4    Q.    Are these numbers identical?

5    A.    They very well could be.  I don't know.

6    Q.    Why don't we pull up the shear -- so it's your opinion

7    that 404 to 606 is identical to 405 to 437?

8    A.    It depends on the sort of normal variability that you

9    get when you do this sort of measurement and what sort of

10   overall range you get among a lot of products.  It could be

11   that there is no significant difference whatsoever between

12   these numbers.  I really -- I think you probably should

13   address this question to him, not to me.

14   Q.    Well, let's just circle, to circle the square --

15              THE COURT:  Let me see counsel at sidebar,

16   please.

17              (The following took place at sidebar.)

18              THE COURT:  You are spending a lot of time in an

19   area where he says that he didn't examine the data.  He said

20   he relied on the conclusions.  Can you tell me why you

21   persist in examining this witness in this regard?

22              MS. RURKA:  I am sorry.  I should have brought

23   this to your attention.  This is Dr. Berridge's report.  He

24   says he had reviewed the analysis conducted by Dr. Lockhead,

25   that they exhibit the same viscosity profile and have the

Berridge - cross

1    same thixotropic property.  Dr. Lockhead does not express an

2    opinion that they have the same viscosity profile or exhibit

3    the same --

4                    THE COURT:  I think you can get to that point a

5    lot quicker than you are doing.  We have only a limited

6    number of days here.

7                    MS. RURKA:  I apologize, Your Honor.

8                    THE COURT:  The other thing.  Counsel should

9    keep in mind that this is a lay court, and while you may be

10   steeped in the technology, I am to an extent, but to the

11   extent that you have educated me.  It is not my background.

12   I don't know if you are a chemist or if you are.  But you

13   might want to keep that in mind.  You have been living this.

14   I have been living a lot of other cases.

15                   (End of sidebar conference.)

16   BY MS. RURKA:

17   Q.    Please pull up Defendant's Exhibit 358 at Page 27.

18                   Why don't you pull up the first page.  This is

19   your opening expert report, Dr. Berridge?

20   A.    Okay.  Yes, thank you.

21   Q.    On Page 27, you state that, under B, that you have

22   reviewed the analysis conducted by Dr. Lockhead, that the

23   accused Barr product exhibits the same thixotropic property

24   as Nasacort AQ.  Right?

25   A.    Yes, I do say that.

Berridge - cross

1    Q.    You also say you reviewed the analysis conducted by

2    Dr. Lockhead that the accused Barr Laboratories product

3    exhibits the same viscosity profile?

4    A.    Yes.

5    Q.    Did Dr. Lockhead actually say that Barr Laboratories'

6    product has the same thixotropic properties as Nasacort AQ

7    in his expert report?

8    A.    One thing I was looking at was No. 15 in his report,

9    which indicated that his viscosity results confirmed his

10   own -- Barr's reports of viscosity results confirmed his own

11   testing and indicate that Barr's proposed ANDA product has

12   viscosities that are within the specific setting of

13   viscosity and shear viscosity ranges set forth in the

14   patents.

15             That, to me, indicates both, that is, when you

16   put the two together, as far as I understand it -- and I

17   readily admit not to being an expert in this area -- that

18   that produces, that comes to the conclusion that the

19   thixotropic properties are also the same.  Plus the fact

20   that I reviewed myself all of the ingredient information,

21   and that the ingredients are identical.  If the ingredients

22   are identical and the testing results are different, then

23   you have to wonder about variability in manufacturing.  Not

24   on differences in the formulation.

25   Q.    You didn't review the manufacturing process for both

Berridge - cross

1    of these products, did you?

2    A.    I saw the CMC information and I saw the package insert

3    information, that the compositions are identical.

4    Q.    You didn't see any manufacturing data or information

5    on the size of the product, did you?

6    A.    I believe that the CMC information is manufacturing

7    data, yes.

8    Q.    It is data on the manufacture of the Barr product?

9    A.    Yes.

10    Q.    You reviewed that?

11    A.     I saw a CMC section at some point, yes.

12    Q.    You don't know whether or not Barr's ANDA product is

13    manufactured in the same way as Nasacort AQ, do you?

14    A.    Techniques of manufacture and types of machines and

15    that sort of thing, no.  But the composition is the same.

16    Q.    So Dr. Lockhead never said anywhere in his expert

17    report that they have the same thixotropic properties.

18    Right?

19    A.    I believe what he has said here is tantamount to the

20    same thing, yes.

21    Q.    He never said same thixotropic property?

22           THE COURT:  He didn't use those words, counsel.

23    But this is the witness' answer.

24    BY MS. RURKA:

25    Q.    He never said anything about the same viscosity

Berridge - cross

1    profile, either, did he?

2    A.    My understanding is that, after I read his report, my

3    understanding was that it has the same thixotropic

4    properties and the same viscosities, which is not surprising

5    if it has the same composition.  And that was what I based

6    my opinion on.

7    Q.    But you don't know whether any of the differences in

8    the viscosity profiles that we were looking at earlier might

9    cause a difference in frontal sinus deposition, do you?

10   A.    I think I would not expect them to cause any

11   difference in frontal sinus deposition.

12   Q.    You don't have any experience in formulating

13   thixotropic suspensions, do you?

14   A.    Well, no.  But I have observed Flonase deposition.

15   Q.    What did Flonase deposition show?

16   A.    There was less Flonase deposition in the frontal

17   sinus, but there was some.

18   Q.    So Flonase did deposit in the frontal sinus?

19   A.    A little bit, in fewer be patients, in fewer subjects.

20   Q.    In two subjects.  Right?

21   A.    Not as successfully, but it did get there.

22   Q.    It is your opinion that it got there in two subjects.

23   Right?

24   A.    I believe that's what the data was, yes.

25   Q.    Out of the, I think, 12 that were studied?

Berridge - cross

1    A.    Well, I discount the data from 2002, with because I

2    don't put that in the same -- I don't believe that is really

3    comparable data, but, yes.

4              MS. RURKA:  I have no further questions.

5              THE COURT:  Redirect.

6                        REDIRECT EXAMINATION

7    BY MS. BALDWIN:

8    Q.    Dr. Berridge, Ms. Rurka spent a lot of time talking

9    about your 2002 study.  Let's talk about that a little bit.

10   First of all, you mentioned that you did tell RPR that you

11   had issues with the data from the 2002 study.  That's what

12   you said.  Correct?

13   A.    Yeah.  I can't recall the specific language.  But,

14   yes.

15   Q.    Well, I will help you out, just assist you.  In

16   PTX-351, it's Berridge 16.

17   A.    That's the final report from that study.

18   Q.    Final report from your 2002 study.  If you look at

19   the -- look at that first sentence under Results Summary.

20   What does that sentence say, Dr. Berridge?

21   A.    The study showed several trends in the data, but due

22   to unusual variations between observations from the

23   individual subjects, the observed differences did not reach

24   statistical significance.

25              I am speculating it could be combined with the

Berridge - redirect

1    previous data.  I was trying to put a happy face on it.

2    Q.    So you didn't bury your concern about the data

3    somewhere in the report, you put it right up there in the

4    very first sentence of the Results Summary, didn't you?

5    A.    Well, yes.

6    Q.    What did you mean by the variability?  First of all,

7    what was the purpose of this 2002 study?

8    A.    Well, you know, I wondered that.  But it was

9    essentially a duplication of the 1998 study.  I was never

10   really told.  In fact, when I was approached and asked to do

11   this study, I responded that we have already done this

12   study.  Are you sure you really want to go ahead and do it?

13   And they said, yes, absolutely, this is what we want to do.

14          My belief is that they wanted to gather more

15   subjects, get more data, try to show more strongly the

16   differences between Nasacort AQ and Flonase.  And that,

17   perhaps thinking that we have more experience now, we will

18   get a better study, we may be more controlled, have

19   better-behaved data, more tightly clustered data, and come

20   up with something that's more striking in terms of measuring

21   the difference between those two products.

22   Q.    So did you conduct this study in the exact same way

23   that you conducted the 1998 study?

24   A.    All our methods really were the same as much as we

25   could make them, yes.

Berridge - redirect

1    Q.    So you used the same protocol as you used in 1998 and

2    1996.  Correct?

3    A.    Same protocol all the way through, yes.

4    Q.    Same alignment procedures used as in your previous two

5    studies?

6    A.    Correct.

7    Q.    Same people conducted the study?

8    A.    Yes.

9    Q.    Did you see the same results?

10    A.    No.

11    Q.    So when you talk about variability in the data, could

12    you please explain to us what you mean by that?  Do you have

13    an example you could show us?

14    A.    You have to see the data to understand that.

15    Variability is a term that people instinctively understand

16    but perhaps in this case -- can we show some of the curves?

17    Q.    Okay.  So this is what we expected to see.  Correct?

18    We talked about this earlier.  This is what you would expect

19    to see from the data.  Correct?

20    A.    That is the stylized ideal curve, yes.

21    Q.    Okay.  And when we talked earlier, is that what you

22    saw in 1998 for, say, the lower frontal cavity?

23    A.    We saw that same general shape in '98 for most of our

24    regions, most of our volunteers, yes.

25    Q.    So this was your data of all the volunteers in 1998.

Berridge - redirect

1   **Correct?**

2   A.    **That is each volunteer, yes, from the 1998 study**

3   **plotted individually.  There is some nice clustering**

4   **agreement among the Nasacort AQ data as far as PET standards**

5   **go at least.  The Flonase is perhaps a little more spread**

6   **out than I would like but it always has been throughout all**

7   **these studies, but it shows the same general curve shape.**

8   **We have two clusters.  It's analyzable data.**

9   Q.    **So what did you say in 2002?**

10  A.    **We'd have to look at it.**

11  Q.    **Wow!  That doesn't look quite the same.**

12  A.    **There is a strange jumping around of data points that**

13  **we have not seen in prior studies which I, to this date,**

14  **don't understand.  The main problem in trying to analyze**

15  **this data, though, is that each of the two drugs broke up**

16  **into two different groups.  If you look at that, you see the**

17  **upper group there and a lower group.  You have Flonase's**

18  **cluster here.  You have a gap.  You have more Flonase coming**

19  **in down here.  You have two groups of subjects with the same**

20  **drug that are behaving differently with no reason that we**

21  **know of behind it.  And then the same thing happened with**

22  **the Nasacort AQ.  Plus all of this random motion around that**

23  **we had not seen previously.**

24  Q.    **Now, is this the only region that you saw this sort of**

25  **variability?**

Berridge - redirect

1    A.    We saw it throughout the study.

2    Q.    Could you show us an example?  We took the lower.

3    Just pick something higher.

4    A.    Yes.  In order to try to get two representative

5    regions and not waste a lot of time, we pick the lower and

6    upper of the ones that make a difference to us.  So this

7    would be the superior turbinates.

8    Q.    So this is 1999 data for the superior turbinate

9    region?

10   A.    This is the 1998 data.  This is part of the motivation

11   why we might want to do it again in 2002.  This is not ideal

12   either.  However, we still have a bit of a group.  We're

13   breaking up even a little bit with the Nasacort AQ.  I was

14   not terribly happy with that, but it got worse in 2002.

15   Q.    And what did the 2002 look like?

16   A.    It looks like noise.  There is the same general curve

17   shaped buried under there, but I have a real hard time

18   trying to come to conclusions with that.  And in Flonase's

19   case, we have several subjects that are way down in the

20   third, even in the superior turbinates, not to mention

21   something like the frontal sinus.  It was just a very

22   difficult data set.

23   Q.    So if you used all the same procedures and the same

24   people conducted in 2002, what was different about this

25   study than your previous ones?

Berridge - redirect

1    A.    Well, there was really only the one difference which

2    caused perhaps several smaller differences.  In this study,

3    we performed the scans offsite.  Previously, when we have

4    done scans, we had a laboratory institution.  We had a PET

5    scanner essentially next-door in the same institution.  And

6    we did the study there.  The volunteers were indoors.

7              In this study, for reasons that probably don't

8    bear going into, the scans were done on mobile PET units:  a

9    regular semitrailer with a PET camera mounted on it.  And

10   this is being done clinically routinely across the country

11   these days.  These scanners were coming in and being used in

12   several hospitals in the area.  And we just got a much

13   better arrangement for scheduling as well as financially

14   with people that had these scanners.  That's why we choose

15   to do them on these units.  So we were shipping the drug

16   offsite from where it was being manufactured, driving it to

17   the site of the truck and then doing the scan on the mobile

18   scanner inside the truck.

19   Q.    So when you are talking about shipping the drug, are

20   you talking about the radiolabeled drug?

21   A.    The radiolabeled material.  Prepared in the canister.

22   The formulated Nasacort canisters and Flonase canisters.

23   Q.    So you prepare it in the lab and then you would ship

24   it to this mobile PET scanner unit?

25   A.    I put it in my trunk and drove.

Berridge - redirect

1    Q.    And drove down the block?

2    A.    It was -- well, one site, it was a 20 to 40 minute

3    drive across town.

4    Q.    And why would that matter?

5    A.    Well, really, at the time we didn't think it would

6    matter at all.  And that's why we designed the study that

7    way.

8            And even after this data came out, I still

9    didn't see anything in that that explained it.  It's really

10    only been this year, it's really only been after receiving

11    Professor Siegel's report and having to think about some of

12    those issues, go back and revisit and try to come up with

13    explanations, it was the end of a long line of reasoning.

14    But I think that was it:  It was cold.  It was the dead of

15    winter in Cleveland.  And the drug got chilled while we were

16    driving there.

17            There is also the fact that the truck was a

18    little different.  The scanner was a different scanner.  The

19    device that we were able to use to hold the volunteer was a

20    little different.  It wasn't that rigid thing we saw in the

21    picture earlier.  It was a more spidery contraption of

22    plastic that we put inside the bore of the camera because we

23    were constrained by space on the truck.

24            The volunteers were more constrained because the

25    beds do not move back any farther.  I don't think, I didn't

Berridge - redirect

1    think we had motion artifacts, but that is perhaps a reason.

2    I don't really believe that.

3                    Also, it was cold.  The volunteers came in cold.

4    And in hindsight, perhaps that has an effect on what goes on

5    up in the nasal anatomy.

6    Q.    Do you remember the patients' reactions to the colder

7    radiolabeled drug?

8    A.    Yes, they noticed it.  Most of the time, we didn't get

9    any feedback from volunteers when they took the drug.  The

10   only thing was that reaction that they've just had a bouquet

11   of roses shoved up their nose when they got the Flonase.

12   That was the only negative comments we got from them

13   generally.  But in this case, they were responding that it

14   was cold.  At least in several cases, they felt that cold go

15   in.  Because of the short half-life of the material, we were

16   more focused on getting the material in and getting the

17   experiment started before the material decayed.  Carbon 11

18   has a 20 minute half-life.  You have to move quickly.  So we

19   didn't think about the fact that maybe we should stop and

20   warm it up first.

21                   I'm not really sure of the causes.  All I really

22   know for sure is that these things were different.  What

23   effect they have, I don't know, but I know I have data that

24   I could not publish.

25   Q.    Just one last question for you, Dr. Berridge.  By your

Berridge - redirect

1   1996 study, now, counsel referred to that as a pilot study.

2   What was the purpose of that 1996 study?

3   A.    Well, RPR came to us and said that they had this

4   formulation and it was meant to cause the drug to stay on

5   the nose longer than mucociliary clearance, and they wanted

6   to know if that would happen.

7           The funding was limited.  We could only do four

8   subjects.  We enrolled four.  One didn't complete, so we

9   have three subjects worth of data.  That usually makes it a

10  pilot study.  When you go to publish it, that is a good

11  thing to put in there to explain why you don't have so many

12  subjects and don't get your paper rejected.

13          Part of the reason why it was limited like that

14  is that the management at RPR had not completely become

15  convinced that PET scanning was going to be a valuable thing

16  to do, and they didn't want to commit to a larger more time

17  consuming, more expensive study.  So that is how we did

18  that.

19  Q.    If you hadn't been limited in volunteers, would you

20  have done anything different in the 1996 study, would you

21  have done it differently if it hadn't been a pilot study

22  limited by volunteers?

23  A.    I might have enrolled more volunteers.  After we saw

24  the data from the first few, though, we were pretty happy

25  with what we were seeing.  We didn't feel we needed any

Berridge - redirect

1    more.  We could not possibly have done anything different

2    from the point of view of our techniques, our procedures.

3    Q.    In fact, those same techniques are what you used in

4    the 1998 and 2002 studies as well.  Correct?

5    A.    All except for how we did the regions, yes.

6                MS. BALDWIN:  No further questions.

7                THE COURT:  Thank you.

8                Thank you, Dr. Berridge.  You are excused.

9                MS. RURKA:  Your Honor.

10               THE COURT:  Counsel, that's it for the day.

11   We'll resume at 9:00 o'clock tomorrow.

12               I want to offer counsel a bit of advice.  In

13   terms of the actual presentation of your expert witnesses

14   who are I'm sure all learned and expert in their fields of

15   endeavor, that it is helpful if you keep in mind how you

16   might present this sometimes technical information -- not so

17   much the last witness.  But just when using terms of art and

18   terms that are not necessarily familiar with someone who has

19   not studied.  For instance, I'm not a medical doctor.  When

20   I interrupted Dr. Kaliner, I believe it was -- I forget the

21   term, but it meant smooth.  When you are preparing your

22   witnesses, I don't blame the experts, I blame the lawyers

23   for not properly preparing the witnesses to testify to a lay

24   court; okay?  Keep that in mind.

25               All right.  We'll see you at 9:00.

Berridge - redirect

1                    **(Proceedings adjourn at 5:00 p.m.)**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25