1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              -   -   -

4    AVENTIS PHARMACEUTICALS INC.   :      Civil Action
     and SANOFI-AVENTIS US LLC,     :
5                                   :
                   Plaintiffs,      :
6                                   :
          v.                        :
7                                   :
     BARR LABORATORIES, INC.,       :
8                                   :
                   Defendant.       :      No. 06-286-GMS
9
                               -   -   -
10
                         Wilmington, Delaware
11                       Tuesday, May 20, 2008
                              9:00 a.m.
12
                               -   -   -
13
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
14
     APPEARANCES:
15
               JOHN G. DAY, ESQ.
16             Ashby & Geddes
                    -and-
17             PAUL H. BERGHOFF, ESQ.,
               JOSHUA R. RICH, ESQ.,
18             JEREMY E. NOE, ESQ.,
               ANDREW WILLIAMS, ESQ., and
19             ALLISON BALDWIN, ESQ.
               McDonnell Boehnen Hulbert & Berghoff LLP
20             (Chicago, Illinois)

21                            Counsel for Plaintiffs

22

23

24

25

```
 1   APPEARANCES CONTINUED:

 2              KAREN L. PASCALE, ESQ.
               Young Conaway Stargatt & Taylor, LLP
 3                   -and-
               JAMES HURST, ESQ.,
 4             MAUREEN L. RURKA, ESQ.,
               TARAS GRACEY, ESQ.,
 5             RENEE SOTOS, ESQ., and
               JULIA JOHNSON, ESQ.
 6             Winston & Strawn LLP
               (Chicago, Illinois)
 7
                             Counsel for Defendant
 8

 9                       -  -  -

10

11

12

13

14             THE COURT:  Good morning.  Please be seated.

15             I understand that my chief deputy has made two

16   calls.  We are trying to do something about the heat.

17             You have some issues.

18             MR. RICH:  We are still trying to work through

19   them.  We hope we will be able to work through the issue of

20   the length of the deposition transcripts.  The parties are

21   working through an issue on the length of the deposition

22   designations that defendant has made.  Hopefully we will be

23   able to work it out through the parties.  But right now --

24             THE COURT:  You are going to have to work it out

25   through the parties because I will not involved myself with
```

Lochhead - direct

1  it.

2           That's the beginning and the end of that.

3           What is the other issue?

4           MR. RICH:  That is the only issue.

5           MR. BERGHOFF:  Your Honor, Mr. Noe will handle

6  our next witness.

7                         - - -

8                  PLAINTIFF'S TESTIMONY

9       ... DR. ROBERT Y. LOCHHEAD, having been placed

10          under oath at 9:08 a.m. as a witness, was

11             examined and testified as follows ....

12                        - - -

13          MR. NOE:  May I approach, Your Honor?

14          THE COURT:  You may.

15          (Documents passed forward.)

16          THE WITNESS:  Thank you.

17                  DIRECT EXAMINATION

18  BY MR. NOE:

19  Q.     Good morning, Dr. Lochhead.  Could you please state

20  your full name for the court reporter?

21  A.     Yes.  My name is Robert Yates Lochhead.

22  Q.     Dr. Lochhead, please describe your educational

23  background?

24  A.     I have a Bachelor of Science, Honors, in Pure

25  Chemistry from the University of Strathclyde in Scotland; a

Lochhead - direct

1      Ph.D. in Physical Chemistry; specifically, Molecular

2      Rheology and Dielectric Relaxation of Polymer Solutions from

3      the same university.

4              And I was a Fulbright Scholar as a post-doctoral

5      fellow at Carnegie-Mellon University in the Department of

6      Chemical Engineering.

7              MR. NOE:  And as we were are going through some

8      of these items off your CV, I'll ask Eric to call up

9      Plaintiff's Trial Exhibit 359.

10     BY MR. NOE:

11     Q.     Dr. Lochhead, how are you currently employed?

12     A.     I'm currently employed as a Professor of Polymer

13     Science; and I'm Chair and Director of the School of

14     Polymers and High Performance Materials; and I'm also

15     Director of Formulations Science at the Institute at the

16     University of Southern Mississippi.

17     Q.     Have you held any other positions at the University

18     of Southern Mississippi?

19     A.     Yes.  I was formerly Dean of the College of Science

20     and Technology.

21     Q.     Did you hold any other faculty positions prior to the

22     University of Southern Mississippi?

23     A.     Yes, I was an adjunct faculty member in the School of

24     Pharmacy at University of Cincinnati before I joined the

25     University of Southern Mississippi and subsequently a few

Lochhead - direct

1    years after I joined, University of Southern Mississippi.

2    Q.    And, Dr. Lochhead, I'd like to remind you to please

3    speak up for the court reporters' convenience.

4            As an adjunct professor at the University of

5    Cincinnati School of Pharmacy, what kind of courses did you

6    teach?

7    A.    I taught a master's course in Formulation and

8    Principles of Formulation.  And I also was on student

9    committees where I did, I oversaw student/graduate student

10   research.

11   Q.    What did you do prior to becoming a professor?

12   A.    I headed up the hydrophilic polymer group at BF

13   Goodrich where I was responsible for polymer synthesis and

14   scaleup.  I was also responsible for heading up the group

15   that looked into the formulation of cosmetics and

16   pharmaceuticals.  That was part of my duties.

17           And prior to that, I worked for a research group

18   in England where I helped formulators understand the

19   physical processes of the behind existing formulations and

20   also helped them to define the criteria required for

21   developing new formulations.

22   Q.    Have you done any consulting work for pharmaceutical

23   companies?

24   A.    Yes.  For example, I've consulted with Johnson &

25   Johnson on skin lotions and also vaginal lubricants.  And

Lochhead - direct

1    I've consulted with Proctor & Gamble where we designed cough

2    syrup that had cough suppressant.  It was designed to stay

3    on the throat for a certain length of time and I helped them

4    design the polymers into that product.

5    Q.    Are you involved in any professional organizations

6    that relate to your work?

7    A.    Yes.  I was President of the Association of

8    Formulation Chemists.  And that organization encompasses, it

9    covers all aspects of formulation including pharmaceutical

10   formulations.  That organization is now matched with the

11   American Chemical Society.

12          I'm also, I was also President of the Society of

13   Cosmetic Chemists.  And I'm currently Vice President Elect

14   of the organization, and I will be President again in 2010.

15          I served on the committee for Scientific Affairs

16   For the Society of Cosmetic Chemists.  And I served on the

17   International Nomenclature Committee of the Personal Care

18   Products Council where I am responsible for naming product

19   ingredients, polymer ingredients.

20   Q.    Dr. Lockhead, how many publications do you have?

21   A.    Oh, I have over 200 publications, dealing with

22   polymers, rheology, formulation, and surfactants, and

23   particles.

24          I also have 18 patents, I am the named inventor

25   on 18 patents.  Some of these patents are directed towards

Lochhead - direct

1    the repair of tears in the retina, where we have designed

2    polymer compositions that are thick so that they can be

3    applied directly into the eye by the surgeon, and then they

4    are thin, so they can be applied, and thicken up after

5    application to repair a retinal tear.

6           I also have a patent for a bioadhesive polymer.

7    That is a polymer that sticks to mucus, and in particular,

8    this one was used for vaginal lubricants.

9    Q.    In your experience, what degree of overlap, if any,

10   exists between cosmetic formulation and pharmaceutical

11   formulation?

12   A.    There is a large overlap between the two.  In fact,

13   people are transferred between cosmetics and pharmaceutical

14   organizations.

15   Q.    To your knowledge, do pharmaceutical companies hire

16   scientists with cosmetic formulating skills?

17   A.    Yes.

18   Q.    Dr. Lockhead, how would you summarize your

19   experience?

20   A.    I have 30 years, more than 30 years experience in

21   evaluating polymer rheology, evaluating rheology of polymer

22   formulations and in testing formulations.

23          I also have a thorough understanding of the

24   concepts and physical principles of formulation, of

25   thixotropy, rheology, and the testing of viscosity.

Lochhead - direct

1          MR. NOE:  Your Honor, plaintiffs offer at this

2     time Dr. Lockhead as an expert in formulations and rheology.

3          MR. HURST:  No objection.

4          THE COURT:  The Doctor is accepted as an expert.

5     BY MR. NOE:

6     Q.    Dr. Lockhead, what were you asked to do in this

7     litigation?

8     A.    I was asked to review the patents in suit in light of

9     the claim construction by the Court and by the parties

10    involved.

11          I was also asked to do some viscosity testing to

12    discern whether Barr's proposed ANDA product met the

13    specification limits, some of the specification limits in

14    the claims in the patents in suit.

15    Q.    In addition to reviewing the patents in suit and the

16    Court's claim construction order, did you review anything

17    else?

18    A.    I reviewed many documents, yes, many, many documents.

19    Q.    Did you conduct viscosity testing of Barr's ANDA

20    product?

21    A.    Yes.  I conducted the viscosity testing of Barr's

22    ANDA product.

23    Q.    Did you conduct viscosity of any other product?

24          THE COURT:  Had you finished your response?

25          THE WITNESS:  Yes, I had finished.

Lochhead - direct

1              THE COURT:  Okay.

2              THE WITNESS:  And I also looked into the

3    viscosity of several other products, particularly for my

4    opening part I tended to the viscosity specifications, and I

5    tested viscosity of Nasacort AQ.

6    Q.    Did you prepare an expert report that describes the

7    results of the viscosity testing that you just described?

8    A.    Yes.  I prepared an opening report.  I wrote an

9    opening report that described the results of my testing of

10   Nasacort AQ and the viscosity testing of Barr's proposed

11   ANDA product.

12   Q.    Dr. Lockhead, are you familiar with the two patents

13   at issue in this litigation?

14   A.    Yes, I am.  The patents describe thixotropic

15   compositions.  And the thixotropic compositions are defined

16   as having a setting viscosity and a shear viscosity.

17   Thixotropic compositions are compositions that are thick at

18   rest and thin when sheared.  And the setting viscosity and

19   shear viscosity define the amount of thickness or thinness

20   in these compositions.

21   Q.    If we could call up 1.7.1, please.

22              Dr. Lockhead, in Column 5 of the '573 patent,

23   from Lines 18 to 24, how is the setting viscosity described

24   as being measured?

25   A.    Well, the setting viscosity is measured by a

Lochhead - direct

1    Brookfield Model LVT Viscometer.  And it's measured by

2    taking the spindle of a Brookfield LVT Viscometer, inserting

3    it in the mixture, mixing for 30 revs per minute for 30

4    seconds, and then taking the viscosity.

5    Q.    Is the LVT Viscometer a common piece of laboratory

6    equipment?

7    A.    Yes.  It is a very common piece of laboratory

8    equipment.  In fact, there is one right there.  You see,

9    that's the dial, with the reading and the torque.  And there

10   is a spindle guard around here.  And the spindle sits inside

11   the spindle guard, and what happens, as the spindle spins,

12   the dial reads the drag that the liquid exerts on the

13   spindle.  That's how we get a reading of viscosity.

14   Q.    In that same section of Column 5 of the '573 patent,

15   how is the shear viscosity described as being measured?

16   A.    The shear viscosity is described as being measured in

17   exactly the same way after the composition has been shaken

18   in a Burrell wrist-action shaker at full speed for five

19   minutes.

20   Q.    Is the Burrell wrist-action shaker a common piece of

21   laboratory equipment as well?

22   A.    Yes, it's very common.

23   Q.    What was the first step that you took in preparing to

24   measure the viscosity of Barr's ANDA product?

25   A.    Well, the first thing I did was, I prepared a written

Lochhead - direct

1    protocol based on the description in the patent, and also

2    based on the Brookfield operation manual, and also based, in

3    part, I know about thixotropic compositions.

4    Q.    Why did you prepare a written protocol?

5    A.    I prepared the written protocol so that I could be

6    absolutely sure that I exactly reproduced the steps that I

7    used when I was doing it.  So I followed the protocol

8    exactly to the letter as I was measuring the viscosities.

9    Q.    Calling up Plaintiffs' Trial Exhibit 366, Dr.

10   Lockhead, is this a copy of the written protocol that you

11   just described?

12   A.    Yes, but this is a truncated version I prepared for

13   the, for my first expert report.  The full written protocol

14   also included descriptions on how to prepare samples for all

15   of the material that I studied.  And some of the samples

16   didn't come in until my second written report.

17   Q.    Turning back to Column 5 of the '573 patent, why did

18   you look to the Brookfield Operating Manual in preparing

19   your written viscosity testing protocol?

20   A.    Because the Brookfield Operating Manual tells one

21   exactly how to operate the Brookfield equipment, and someone

22   who is skilled in the art would, I think, consult the

23   Brookfield manual, or would know the Brookfield manual as I

24   did on how to measure Brookfield viscosity.

25   Q.    Calling up Plaintiffs' Trial Exhibit 363, is this the

Lochhead - direct

1    Brookfield Operating Manual you were referring to?

2    A.    Yes, that is the Brookfield Operating Manual.

3    Q.    Is this one of the documents you reviewed as part of

4    your work in this case?

5    A.    Yes.

6    Q.    What information did you find in the Brookfield

7    Operating Manual that would assist in conducting viscosity

8    measurements according to the method described in the

9    patents in suit?

10   A.    Well, the Brookfield manual tells you the container

11   size that you should use.  It also tells you the working

12   volume of liquid that you should use.  And for this case, it

13   told you, told me that I had to use the guard leg, keep the

14   guard leg attached.  That's that leg on the viscometer

15   there, the little metal underneath it.

16            And these are the container sizes that can be

17   used.  What it says is the container has to have an inside

18   diameter of 3.25 inches and a height of 4.75 inches.  And

19   the container may be larger, but it may not be smaller to

20   get accurate measurements.

21   Q.    According to this Page 16 of the Brookfield Operating

22   Manual, what working volumes should be used with the Model

23   LVT Viscometer?

24   A.    The working volumes should be 500 milliliters for a

25   600 -milliliter low form beaker, if the container is a

Lochhead - direct

1    600-milliliter low-form beaker.

2    Q.    Does the Brookfield Operating Manual indicate which

3    spindle is appropriate to use?

4    A.    Yes.  There are tables in the Brookfield manual that,

5    if you know the target viscosity, and you know the speed at

6    which you have to rotate, you can choose the spindle that

7    would operate in that range.  And so you choose your spindle

8    accordingly.

9    Q.    Turning back to Column 5 of the '573 patent, Dr.

10   Lockhead, I believe you said earlier that the patent's

11   description of the compositions as becoming thixotropic

12   informed your understanding of the viscosity method that is

13   disclosed here.  Is that right?

14   A.    Yes.

15   Q.    How so?

16   A.    Well, what it does is it describes a setting

17   viscosity and a shear viscosity.  Thixotropic liquids

18   recover and thicken up when they are undisturbed.  And they

19   are thin when they are shaken or disturbed or shear is

20   applied to them.  And in this case, the setting viscosity is

21   specified as 400 to 800 centipoises when the liquid is

22   undisturbed.  And the shear viscosity after it's been shaken

23   and in a Burrell reaction shaker at full speed for five

24   minutes is defined to be between 50 and 200 centipoises.

25            The amount of shaking is very important, because

Lochhead - direct

1    you shouldn't -- you should follow with a thixotropic

2    liquid, it's very sensitive to shear.  So any additional

3    shear or any other actions that would put shear into the

4    system would distort results.

5    Q.    Would the patent's description of the compositions as

6    being thixotropic indicate anything else about the Burrell

7    shaking step?

8    A.    Yes.  It would also indicate that you had to use the

9    same container.  Basically, what you need to do is you need

10   to use the same container for the shaking and for the

11   measuring because you don't want to introduce any extra

12   shear by transferring liquids from one container to another.

13   Q.    Dr. Lochhead, in your opinion, do the patents in suit

14   set forth a complete protocol for measuring the setting

15   viscosity and the shear viscosity of the compositions that

16   are described there?

17   A.    Yes.

18   Q.    In your opinion, did your viscosity testing protocol

19   conform with the viscosity measurement method described in

20   the patents in suit?

21   A.    Yes.

22   Q.    Did you record your viscosity testing results in a

23   laboratory notebook?

24   A.    Yes, I recorded them in a bound laboratory notebook.

25              MR. NOE:  Calling up Plaintiffs' Trial

Lochhead - direct

1   Exhibit 484.

2   BY MR. NOE:

3   Q.     Dr. Lochhead, is this a copy of the laboratory

4   notebook you just described?

5   A.     This is the front page of the laboratory notebook

6   that I described.  Yes.

7                  MR. NOE:  We can take that down for now.

8   BY MR. NOE:

9   Q.     How did you prepare examples of Barr's ANDA product

10  for testing?

11  A.     Well, the samples come in small bottles, and I had to

12  get a working volume of 500 milliliters or more, and so

13  what I did was I transferred the content to the sufficient

14  number of small bottles to get the working volume and the

15  Brookfield viscometer into the container that was sealable

16  so we could put a lid on the container so I could do the

17  shaking.  And that's how I prepared the samples.

18                 And then I allowed the samples to sit for

19  48 hours before measuring the setting viscosity.  That

20  48 hours might be a little long but I wanted to get a good

21  measure of setting viscosity, and I thought it was prudent

22  to do that because I wanted to do this just once and do it

23  properly.

24  Q.     And why did you wait for 48 hours before measuring

25  the setting viscosity of the sample?

Lochhead - direct

1    A.       I wanted to make sure that I had an undisturbed

2    sample; as I'd said, I was being prudent; and to make sure

3    that the system was truly at rest.  When you put a

4    viscometer in, you actually introduce shear, and so that was

5    maybe just a little bit excessive but I thought it was

6    prudent to hold it for 48 hours.

7    Q.       Did you calibrate the Brookfield viscometer before

8    conducting viscosity measurements of Barr's ANDA products?

9    A.       Yes, one should always calibrate a viscometer,

10   especially in cases like this where you are relying on the

11   results as we are in trial, to make sure that the

12   measurements you are taking are accurate.  And so I

13   measured -- I calibrated the viscometer with appropriate

14   viscosity samples.

15   Q.       After you calibrated the Brookfield LVT viscometer,

16   how did you measure the setting viscometer of Barr's ANDA

17   product?

18   A.       Well, I took the material of Barr's.  I took one of

19   the samples of the Barr's ANDA product and each sample

20   corresponded to one lot of Barr's material.  So I didn't mix

21   lots.  I took one lot and I inserted the appropriate

22   spindle.  I mixed it at 30 RPM, 30 seconds, and I read the

23   dial reading.  And from there, I calculated the setting

24   viscosity.

25                MR. NOE:  And I think while you are describing

Lochhead - direct

1    your viscosity measurements, let's call back up Column 5 of

2    the '573 patent.

3    BY MR. NOE:

4    Q.    Dr. Lochhead, after you measured the setting

5    viscosity, how did you measure the shear viscosity of Barr's

6    ANDA product?

7    A.    I removed the sample from the Brookfield viscometer

8    and I put it in a Burrell wrist-action shaker, shook at full

9    speed for five minutes and then immediately removed it as

10   quickly as I could, took it to the Brookfield viscometer and

11   measured the Brookfield viscosity after the spindle-head

12   rotated at 30 RPM for 30 seconds.  And then I took two more

13   measurements after that 30 second interval, the setting

14   viscosity.  I took two more measurements after five-minute

15   intervals.

16   Q.    So a total of three setting viscosity and three shear

17   viscosity measurements for each of Barr's ANDA products?

18   A.    Yes.

19   Q.    And did you measure the setting viscosity and shear

20   viscosity for the other lots of Barr's ANDA product that you

21   received?

22   A.    Yes, I measured it in the same way for all three of

23   Barr's ANDA product.

24   Q.    Did you measure the viscosity of Nasacort AQ in the

25   same manner as you did for Barr's ANDA product?

Lochhead - direct

1    A.      Yes, I measured the viscosity of Nasacort AQ in

2    exactly the same way, both the setting and the shear

3    viscosities.

4              MR. NOE:   Calling up Pages 6 and 7 of

5    Plaintiff's Trial Exhibit 484.

6    BY MR. NOE:

7    Q.      Dr. Lochhead, do these pages of your lab notebook

8    record the results of viscosity testing of Barr's ANDA

9    product?

10   A.      Yes, and what they show is here I've got, before the

11   shake is the setting viscosity; after the shake, the shear

12   viscosity.  And what I found was in every case, the setting

13   viscosity was in the range of 400-to-800 centipoise as

14   specified by the claims in the patent as specified by the

15   patent.  And the shear viscosity was in the range of

16   50-to-200 centipoise, as specified by the patent.

17   Q.      Calling up Page 10 of Plaintiff's Trial Exhibit 484.

18   Does this page of your lab notebook record the results of

19   your viscosity test of Nasacort AQ?

20   A.      Yes.  Here are my results from Nasacort AQ, and you

21   see that the viscosity range of Nasacort AQ lies within the

22   range of 400 to 8 00 for the setting viscosity, within the

23   range 50 to 200 for the shear viscosity.  And these results

24   verified that my protocol was indeed correct.

25   Q.      Do you have an understanding whether Nasacort AQ is a

Lochhead - direct

1  commercial embodiment of the patents in suit?

2  A.    Yes, I believe Nasacort AQ is a commercial

3  embodiment.  And I believe that Example 1 of the patent is

4  in fact Nasacort AQ.

5           MR. NOE:  And let's call up Column 9 of the '573

6  patent.

7  BY MR. NOE:

8  Q.    Is this the example you were just referring to?

9  A.    Yes, and it's my belief that this is Nasacort AQ.

10 Q.    Turning to Plaintiffs' Demonstrative Exhibit 65.

11 Dr. Lochhead, what does this exhibit show?

12 A.    This is a table that is prepared to summarize my

13 results.  And what it shows is that Barr's proposed ANDA

14 product falls -- every measurement I took fell within the

15 range of 400-to-800 centipoise for the setting viscosity.

16 That means that it fell within the range that is specified

17 by the patent.  And for the shear viscosity, every

18 measurement I took was within the range of 50-to-200

19 centipoise.  That means it fell within the range of the

20 patent.

21           And also for the setting viscosity of Nasacort,

22 every measurement I took was within the range 400 to 800 for

23 the setting viscosity and 50 to 200 for the shear viscosity.

24 So Nasacort also fell within the range specified by the

25 patent.

Lochhead - cross

1    Q.     Turning to Plaintiffs' Demonstrative Exhibit 64.

2    What does this exhibit show?

3    A.     This is a graphical representation of the same

4    results.  And what you see here, this is the range.  Here is

5    the viscosity on the bottom axis.  And what was showing is

6    the range here for 400 to 800 is the setting viscosity range

7    and you see that Barr's ANDA product falls within that

8    setting viscosity range and so does Nasacort.

9           Here, we have the viscosity range for the shear

10   viscosity of 350-to-200 centipoise.  And here again, you

11   see that the Barr's ANDA product and also the Nasacort fall

12   within that shear viscosity range.

13   Q.     Dr. Lochhead, in your opinion, did all of the

14   viscosity testing you conducted conform to the method

15   described in specification of the patents in suit?

16   A.     Yes, it did fall within the methods of the patents in

17   suit.

18           MR. NOE:  Nothing further at this time, Your

19   Honor.

20           THE COURT:  Counsel you may cross-examine.

21                    CROSS-EXAMINATION

22   BY MR. HURST:

23   Q.     Good morning, Dr. Lochhead.

24   A.     Good morning.

25   Q.     How are you today?

Lochhead - cross

1    A.      Okay.

2    Q.      We met before at your deposition.  Correct?

3    A.      Yes.

4    Q.      Now, counsel offered you as an expert in formulation.

5    Correct?

6    A.      Yes, formulation.

7    Q.      In fact, you are a cosmetic formulator.  That is

8    true.  Correct?

9    A.      I'm a cosmetic formulator but I also have worked with

10   pharmaceutical compositions.

11   Q.      And the patent in this case is about a nasal spray,

12   the formulation of a nasal spray.  Correct?

13   A.      That's correct.

14   Q.      You have never formulated a nasal spray.  True?

15   A.      I've never formulated a nasal spray.

16   Q.      In fact, you have never personally formulated any

17   kind of pharmaceutical formulation.  Correct?

18   A.      No, I've been part of a team that is formulated

19   pharmaceutical formulations, as shown by my patents.  And

20   we took thixotropic formulations and put them in the eye

21   and also bioadhesive polymers that were used as vaginal

22   lubricants.  So I've never personally formulated a whole

23   pharmaceutical, myself but I've been part of a team who

24   designed formulations for pharmaceuticals.

25   Q.      Just to be clear then, you have, yourself, never

204
Lochhead - cross

1   personally formulated a pharmaceutical product.  Correct?

2   A.    I've formulated part of a pharmaceutical product and

3   that is the norm.  People often work in teams.  By myself, I

4   never completely formulated a pharmaceutical product.

5   Q.    Now, you consider yourself an expert in cosmetic

6   formulation, don't you?

7   A.    I consider myself an expert in formulation.  My

8   specialty is cosmetic formulation.

9   Q.    You do not consider yourself to be an expert in

10  pharmaceutical formulation.  Correct?

11  A.    I consider myself to be an expert in formulation.

12  That encompasses pharmaceutical formulation.

13            MR. HURST:  May I approach, Your Honor?

14            THE COURT:  Sure.

15            (Document passed forward.)

16  BY MR. HURST:

17  Q.    You gave your deposition in this case?

18  A.    Yes.

19  Q.    I'm going to ask you to take a look at Page 13 of

20  your deposition.

21  A.    Page what?  I'm sorry.

22  Q.    13.  Dr. Lochhead, if it's easier for you, it's up on

23  the screen.  Whichever way you prefer.

24  A.    Okay.

25  Q.    At your deposition, did you give this answer to this

Lochhead - cross

1    question under oath:

2                "Question:  All right.  Do you consider yourself

3    an expert in pharmaceutical formulation?

4                "Answer:  No.

5    A.    I gave that answer.

6    Q.    That's my only question.

7    A.    When you pressed me, I actually, if you go to Page

8    16, you pressed me, and I said --

9    Q.    That's my only question for now.

10   A.    I said I consider myself an expert in formulations

11   and that would encompass pharmaceutical formulations.

12               THE COURT:  Let me share a thought with you.  We

13   are on cross-examination now.  So he gets to control the

14   questioning, within reason.  I ultimately will make rulings

15   if there are objections that are made by the other side.

16               But be assured that the lawyers from the other

17   side will question you another round and address these

18   subjects with you.

19               I understand your point, there was another point

20   in the deposition that gave more context to your answer.

21   Those lawyers for the plaintiff will get a chance to give me

22   that context.  Okay?

23               THE WITNESS:  Okay.  Thank you.

24   BY MR. HURST:

25   Q.    Let's provide a little bit of context, Dr. Lockhead.

Lochhead - cross

1    You have actually never written an article on pharmaceutical

2    formulation.  Correct?

3    A.    I have never written an article on pharmaceutical

4    formulation because my interaction with pharmaceutical

5    formulation tends to be consulting, and you don't normally

6    write articles there.  But you got patents.

7    Q.    But the short answer is you have never written an

8    article on pharmaceutical formulation?

9    A.    I have never written an article on pharmaceutical

10   formulation.

11   Q.    You heard me mention in opening the Handbook Of

12   Pharmaceutical Excipients, which I described as the bible

13   for pharmaceutical formulation or something along those

14   lines?  You heard me say that.  Correct?

15   A.    Yes.

16   Q.    You have heard of that book.  Right?

17   A.    Yes.

18   Q.    Because I asked you about it at your deposition.

19   Right?

20   A.    Yes.

21   Q.    You do not have a copy of the Handbook of

22   Pharmaceutical Excipients in your office, do you, sir?

23   A.    I don't have a copy in my office.

24   Q.    Thank you.  You are here today to talk about the

25   infringement issues in this case.  Right?

Lochhead - cross

1    A.    Yes.

2    Q.    You have also offered opinions on obviousness which I

3    presume will be addressed on a different day.  For today,

4    it's just infringement.  Right?

5    A.    Yes.

6    Q.    I want to take a look at one of the two claims at

7    issue in this case.  It's Defendant's Exhibit 7.  Why don't

8    we take, I, there is three viscosity measurements in this

9    claim.  Right?

10   A.    Yes.

11   Q.    It talks about the viscosity of the composition in

12   unsheared form is about 400 to about 800.  Correct?

13   A.    I can hardly see this on the screen here.

14   Q.    Can you see it up here?

15   A.    Claim No. 5.

16         Yes.

17   Q.    Is it also blown up on your screen?

18   A.    Yes.

19   Q.    Now, you have conducted testing to address this

20   particular issue.  Correct?

21   A.    Yes.

22   Q.    Now, pull up II.  So that the first one was setting.

23   The second one is shaken or shear viscosity.  Right?

24   A.    Yes.

25   Q.    And that talks about the fact that the composition

Lochhead - cross

1   has to have a viscosity that reduces down to 50 to 200

2   centipoise.  Right?

3   A.      That's right.

4   Q.      Centipoise is a measurement of viscosity.  Right?

5   A.      Yes.

6   Q.      Now, there is a third one -- you tested on this one

7   as well.  Correct?

8   A.      I did.

9   Q.      There is a third one here.  Why don't we pull up the

10  third one.  This one reads, In deposited form on the mucosal

11  surfaces the viscosity of the composition is about 400 to

12  about 800 centipoise.

13          Right?  Do you see that?

14  A.      Yes.

15  Q.      You did not conduct any testing on this third prong

16  of the claim.  Correct?

17  A.      That's right, because it's impossible to get good

18  field viscometers into the nose.  You can't do it.

19  Q.      Well, you could have done relevant testing had you

20  wanted to, couldn't you have?

21          MR. NOE:  Your Honor, I object as beyond the

22  scope of the expert report.  Dr. Lockhead's opening report

23  did not address this third element of the asserted claims.

24          THE COURT:  Is that correct, sir?

25          MR. HURST:  The answer is, he is the only

Lochhead - cross

1    testing expert in this case.  He did no testing on this

2    element.  The expert that follows is relying on Dr.

3    Lockhead's testing.  So he is the witness to cross-examine

4    on this point.

5              THE COURT:  I will overrule the objection.

6    BY MR. HURST:

7    Q.    Now, you could have, had you wanted to -- just to

8    confirm what I told Your Honor, you are, in fact, the only

9    expert, that you are aware of, at least, you are the only

10   expert on Aventis's side who conducted any testing of Barr's

11   product.  Correct?

12   A.    That's correct.

13   Q.    So as far as you know, nobody conducted any testing

14   on this third element of the asserted claim.  Correct?

15   A.    I didn't test the third element, and as far as I

16   know, none of the witnesses did testing for that third

17   element.

18   Q.    What you said to Judge Sleet was, there is no way to

19   do it because you can't put the Brookfield Viscometer up

20   somebody's nose.  Right?

21   A.    That's right.

22   Q.    But you could have, had you wanted to, conducted

23   relevant testing.  Correct?  Let me give you an example.

24   You are hesitating.

25              Can I give you an example?

Lochhead - cross

1    A.    Yes.

2    Q.    You know, for instance, that when Barr's product is

3    deposited in somebody's nasal cavity, it will be cleared in

4    about 30 minutes or so, according to the patent.  Correct?

5              MR. NOE:  Objection, Your Honor.  Again, this is

6    beyond the scope of Dr. Lockhead's expert report.  It does

7    not contain any discussion of mucociliary --

8              THE COURT:  He is using this as an exemplar in

9    order to set up a question that I have already ruled is in

10   order.  So the objection is overruled.

11             THE WITNESS:  Could you repeat the question?

12   BY MR. HURST:

13   Q.    Sure, no problem.  You see from the patent -- you

14   have read the patent.  Right?

15   A.    Yes.

16   Q.    You see in the patent when something gets deposited

17   in the nose, it's gone in ten to 30 minutes, I think the

18   patent says.  Right?

19   A.    I think it says longer than that.  For this

20   particular composition, I think it was longer than that.

21   Q.    Let's take a look at Defendant's Exhibit 7, at 4,

22   Column 10, do you see where it says such forces, referred to

23   as mucociliary clearance, are recognized as being extremely

24   effective in removing particles from the nose in a rapid

25   manner, for example, within ten to 30 minutes from the time

211
Lochhead - cross

1      the particles enter the nose?

2              Do you see that?

3      A.      That's generally, from my reading --

4              THE COURT:  Counsel, he has not opined in this

5      regard, as I understand.

6              MR. HURST:  I am using the question exactly as

7      you said.

8      BY MR. HURST:

9      Q.      Here is my question:  You could have, had you wished,

10     tested Barr's product after letting it rest for 30 minutes

11     to see whether even if on the tabletop it would return to

12     setting viscosity within 30 minutes.  You could have done

13     that.  Right?

14     A.      With a Brookfield Viscometer, which is the instrument

15     that's specified, you are actually putting shear into the

16     mixture as you are measuring it, it's a thixotropic mixture.

17     So on the tabletop, with that amount of volume, you are

18     disrupting the structure as you measure it.

19              I may have been trying to measure that one.

20     Q.      I am asking whether you could have done it.  You had

21     Barr samples in your laboratory.  Right?

22     A.      Yes.

23     Q.      Why don't we look at what you did.

24              Let's pull up Defendant's Exhibit 362.

25              Why don't we just take an Example No. 3.  Pull

Lochhead - cross

1    up No. 3 and blow it up.

2              Agis is Barr's product, as you understand it.

3    Right?

4    A.    Yes.

5    Q.    You measured setting viscosity and shear viscosity.

6    Right?

7    A.    Yes.

8    Q.    Now, what you did when you prepared the samples,

9    before you measured for setting, you actually had to cut

10   open the bottles and pour the material out.  Right?

11   A.    Yes.

12   Q.    And that created shear?

13   A.    Of course.

14   Q.    And then, because you wanted to get at setting

15   viscosity, you had to let it rest before you measured it

16   after you created the shear.  Right?

17   A.    Yes.

18   Q.    And you didn't let it rest merely 30 minutes, did

19   you?

20   A.    No, because I didn't know how much shear I put in and

21   shaken and putting those little bottles out then.  That may

22   have been a very large amount of shear where I disrupted the

23   whole structure.  The structure is just a bunch of

24   particles.  And I wanted to make sure that it was, indeed, a

25   true setting viscosity.  And I may have really disrupted

Lochhead - cross

1    that structure by pouring the bottles out.

2    Q.    And the worry that you had is, after you introduced

3    shear, it might take an awful long time for the product to

4    get back to setting viscosity.  Right?

5    A.    Well, yes, thixotropic materials where the amount of

6    shear you put in, the structure is broken to different

7    extents by different shear.  My concern was --

8    Q.    Your Honor --

9    A.    -- was that I put a lot of shear in there.

10          THE COURT:  Go ahead.

11   BY MR. HURST:

12   Q.    My only question, now Dr. Lockhead, is the -- you

13   waited 48 hours, didn't you?

14   A.    I did.

15   Q.    And the reason you as an expert in viscosity and

16   thixotropic materials waited 48 hours before you measured

17   setting is because it can, in fact, take a really long time

18   after you shear a material for it to return to setting

19   viscosity.  True?

20   A.    If I have completely broken the structure, yes.

21   Q.    So after you waited 48 hours before you measured

22   setting viscosity, you then measured shear viscosity.

23   Right?

24   A.    Yes.

25   Q.    You first did setting and you did three measurements,

Lochhead - cross

1    it went from 606, 600, and 588.  Right?

2    A.    Yes.  That, in fact, shows the effect of shear on the

3    system as I was --

4    Q.    Dr. Lockhead, we have time limits in this case.  If

5    your counsel wants to ask you more, he is perfectly free to

6    do so.

7          So after you did the setting viscosity, then you

8    measured shear.  Right?

9    A.    Yes.

10   Q.    Now, after you sheared it up, and introduced the

11   shear and mixed it, it took a little while before you

12   actually got around to measuring it, right, like anywhere

13   from 30 seconds to a minute?  Correct?

14   A.    About 30 seconds to a minute, yes.

15   Q.    One thing we know is that in 30 seconds or a minute,

16   the material, Barr's material, did not return to its setting

17   viscosity.  Right?

18   A.    As measured by a Brookfield Viscometer.

19   Q.    That's what the patent talks about, sir.  Right?

20   A.    The Brookfield --  measured by a Brookfield

21   Viscometer.

22   Q.    Do you see where it says 98 right here?

23   A.    Yes.

24   Q.    That's one-sixth -- setting viscosity is 600 percent

25   more.  Right?  Six times as high.  True?

Lochhead - cross

1    A.     Yes, the patent says measure the shear viscosity and

2    the setting viscosity.

3    Q.     Okay.  Now, then you waited another 30 seconds.

4    Right?

5    A.     Yes.

6    Q.     And you got a viscosity of 102.  Right?

7    A.     Yes.

8    Q.     So it still didn't return to its setting viscosity.

9    True?

10   A.     That's true in structure build-up, yes.

11   Q.     And then it actually goes down to 96.8.  That's just

12   variability, I take it.  Right?

13   A.     It could be variability.  It could be shear induced

14   by the spindle.

15   Q.     In either event, this is anywhere from a minute and a

16   half to two minutes.  Correct?

17   A.     Yes.

18   Q.     On the third measurement.  So here you take your

19   material, a minute and a half to two minutes later, we are

20   still nowhere near setting viscosity.  Right?

21   A.     Yeah, and I am measuring a very large volume, with

22   the Brookfield.

23   Q.     So, now, one of the things you could have done in

24   this case, and this is what I am asking you about, you could

25   have said, well, how long does the material stay in the

Lochhead - cross

1    nasal cavity, 30 minutes, an hour, whatever it is, and you

2    could have measured Barr's product to see if even on the

3    tabletop it returns to setting viscosity in the same amount

4    of time you would expect it to be in the nasal cavity?  You

5    could have done that.  Right?

6    A.    I could have done that with the Brookfield

7    Viscometer, but I didn't.

8    Q.    You didn't do that.  There was nothing physically

9    stopping you from taking that measurement to try to see how

10   quickly Barr's product returns to setting viscosity.  Right?

11   A.    I would have had to have left the material at rest

12   without disturbing with the Brookfield for a certain length

13   of time.

14   Q.    And you are capable of doing that.  Right?

15   A.    Yes.

16   Q.    Because you did it for 48 hours before you measured

17   setting so you could have let it rest 30 minutes.  Right?

18   A.    On the Brookfield Viscometer, I could have let it

19   rest for 30 minutes.

20   Q.    That's what I am asking about.

21         Then you still had the samples, they were

22   available, you still had the Brookfield Viscometer, there

23   was no reason in the world that you couldn't have just

24   simply measured Barr's product to see if it recovered its

25   setting within --

Lochhead - cross

```
 1              THE COURT:  Counsel, the question is

 2   argumentative.

 3   BY MR. HURST:

 4   Q.    Let me ask you this:  Who made the decision not to do

 5   the testing that determined whether Barr's product returned

 6   to setting in the amount of time Barr's product would be

 7   expected to be in the nasal cavity?

 8              MR. NOE:  Objection, Your Honor.  Lack of

 9   foundation.

10              THE COURT:  Sustained.

11   BY MR. HURST:

12   Q.    Now, let's take a look at Defendant's Exhibit 23 at

13   97.  Now, you have seen this testing as represented in this

14   laboratory notebook page before.  Correct?

15   A.    Yes.

16   Q.    Can we highlight at the very top the subject matter

17   line.  You see, this is about the viscosity of Nasacort

18   versus Beconase.  Do you see that?

19   A.    Yes.

20   Q.    And you see that the purpose is test viscosity of our

21   product versus Beconase and Vancenase, to see if they return

22   to their unshaken state at equal times.

23              Do you see that?

24   A.    Yes.

25   Q.    Now, go to the first line, Unshaken.  See where it
```

Lochhead - cross

1   says Unshaken right here?

2   A.      I think it says that, yes.

3   Q.      You understand these two to be Nasacort.  Right?

4   A.      Yes.

5   Q.      You see this setting viscosity they got, 3460, 3060,

6   3640, 3240?

7   A.      Yes.  And these are very high viscosities.  So I

8   don't know if they were measured the same way as I measured

9   them.

10  Q.      Well, you know these were measured at 6 RPMs and the

11  patent refers to 30 RPMs.  Right?

12  A.      Yes.  And 6 RPM would induce a lot less shear than 30

13  RPM.

14  Q.      There is a conversion you can do, when you do six

15  RPMs versus 30 RPMs, you would just divide those numbers by

16  five to give yourself an estimate of what it would look like

17  at 30 RPMs.  Right?

18  A.      For Newtonian liquids, yes.  But for non-Newtonian

19  liquids, it is not necessarily a linear relationship.  So

20  for thixotropic liquids, you can determine by something

21  different on something we call thixotropic glue, which gives

22  you different viscosities.

23  Q.      In any event, here is the unshaken viscosity or the

24  setting viscosity they got.  Now, let's go to six hours

25  later.  Leave them both up.  See the test at six hours.  And

Lochhead - cross

1    the numbers they get are still one-third of the setting

2    viscosity.  Right?

3    A.      Yes.  But they are much higher than the viscosities

4    as applied in the patent.  So what it shows is that the

5    measurement depends on -- the viscosity you get depends on

6    how the measurement goes.  And here we are running at six

7    RPM, which is a much less disturbing measurement, so you

8    don't disturb the structures.

9    Q.      Just relatively, that is all I am talking about.

10   They were looking at recovery rates, isn't it true that even

11   after six hours, Nasacort was still only one-third of its

12   setting viscosity, according to these experiments?  Is that

13   true?

14   A.      At 6 RPM in a Brookfield Viscometer, those results

15   say that, yes.

16   Q.      Now, let me talk real briefly about your testing

17   protocol.  I am going to move on to a slightly different

18   topic than your testing protocol.

19           Let's talk about the nasal cavity.  Can we go

20   back to III again of Claim 5 of Defendant's Exhibit 7.

21           Now, we were talking about, earlier we were

22   talking about III.  Right?

23   A.      Yes.

24   Q.      In deposited form on the mucosal surfaces.  Right?

25           Now, that is inside the nasal cavity, obviously.

220
Lochhead - cross

1    Right?

2    A.      That's what it says, inside the nasal cavity, yes.

3    Q.      Now, however long it takes for Barr's product to

4    return to its setting viscosity on a tabletop, you would

5    expect it to take even longer inside the nasal cavity.

6    Correct?

7    A.      I don't know.  I am not an expert in the nasal

8    cavity.

9    Q.      You know at least that the nasal cavity is a

10   different environment than sitting on a tabletop.  Right?

11   A.      It probably does.

12   Q.      You know, for instance, that the nasal cavity is

13   going to have a higher temperature than room temperature.

14   Correct?

15   A.      Yes.  I was in court yesterday when you said part of

16   it, the reason, the function of the nasal cavity is to warm

17   the air on the way in.

18   Q.      Now, let me ask you directly, it's true, is it not,

19   that higher temperatures cause material generally to become

20   less viscous, not more viscous, as required by the patent?

21   A.      Not necessarily.  Some polymer solutions get less

22   viscous, some get more viscous, as you raise the

23   temperature.  And here you have got polymer plus particle,

24   and it could go either way.

25   Q.      But you didn't do any testing on Barr's product, did

Lochhead - cross

1    you, to see how it would react at 98.6, did you?

2    A.    No, because I am not an expert in the nasal cavity.

3    Q.    That's fine.  There was nothing physically stopping

4    you, was there, from testing Barr's viscosity at

5    temperatures that would match the temperatures of the

6    mucosal surfaces in the nose as required by the patent.  You

7    could have conducted testing at higher temperatures.  True?

8    A.    I could have conducted bench temperatures at 500

9    milliliters on a Brookfield Viscometer at 37 degrees

10   Celsius, yes.

11   Q.    But you did not do that.  Correct?

12   A.    I didn't do that, because I am not an expert in the

13   nasal cavity.

14   Q.    But you are an expert -- all right.

15         Let me ask you this:  With respect to the

16   composition, Barr's composition, there is a reason to

17   believe that higher temperatures would make it less viscous,

18   not more viscous.  You agree with that.  Right?

19   A.    I am sorry, could you repeat the question?

20   Q.    Sure.  We are talking about Barr's nasal spray, and I

21   asked you how temperature would impact it.  You agree that

22   there is a good reason to believe that higher temperatures

23   would cause Barr's product to become less viscous, not more

24   viscous?

25   A.    No, I don't know that, because a particular

Lochhead - cross

1   dispersion, it could go either way, and I haven't measured

2   it.

3   Q.      Let's go to your deposition, Page 102.  Beginning at

4   Line 5, to Line 14.  At your deposition Dr. Lockhead, did

5   you give this answer to this question:

6             "Question:  Just your general expertise in

7   thixotropic components doesn't allow you to surmise that an

8   increase in temperature would impact viscosity of these

9   claimed fluids one way or another?

10            "Answer:  CMC" -- that's one of the ingredients

11  in Barr's product.  Right?

12  A.      That's correct.

13  Q.       "CMC would lose viscosity, and that's a component of

14  this mixture so you may think you would see a loss in

15  viscosity."

16            Did you give that answer to that question, sir?

17  A.      Yes.  And that's what I have been saying, that's only

18  one component.

19  Q.      Now, another difference between tabletop testing and

20  the nose is nasal secretions.  Right?

21  A.      I guess so.

22  Q.      Nasal fluids can also impact the viscosity of a

23  formulation.  Isn't that true?

24  A.      I don't know.  I haven't measured it.  But I surmise

25  it's true.

Lochhead - cross

1    Q.      Cilia in the nose, you saw the video yesterday, the

2    cilia?

3    A.      Yes.

4    Q.      You understand that cilia, they beat and they

5    actually shear mucus.  Correct?

6    A.      According to Dr. Berridge's --

7                MR. NOE:  Your Honor, I must object again.  This

8    is far beyond the scope of his opening expert report.  None

9    of his material in that report addresses nasal anatomy,

10   ciliary action, dilution by mucus secretion.  We are well

11   beyond the scope here.

12               THE COURT:  Your response?

13               MR. HURST:  Your Honor, they don't have an

14   expert to address the issue of whether Barr's product

15   returns to setting viscosity in the nose.  Dr. Lockhead, I

16   think, is probably the closest we have or perhaps the next

17   witness, Dr. Prud'homme, I think this is fair

18   cross-examination.

19               Dr. Prud'homme and Dr. Lockhead are the only two

20   witnesses, I believe, that are actually testing --

21   testifying about these substantive issues relating to

22   infringement.  So I think this is fair cross.

23               THE COURT:  Do you agree with your opponent's

24   statement as to the status of witnesses who are going to be

25   able to talk about this particular subject?

Lochhead - cross

```
 1                MR. NOE:  Yes, Your Honor.  Dr. Lockhead and Dr.

 2     Prud'homme are two witnesses that are going to discuss

 3     viscosity.

 4                THE COURT:  Well, why would you want the

 5     fact-finder to hear from these witnesses with regard to

 6     their expertise in measuring what is being discussed and

 7     what he is now talking about, these other things, like

 8     cilia, that may impact upon the issue of viscosity and

 9     consequently whether there is infringement or not?  Please.

10                MR. NOE:  Your Honor, in the case of Dr.

11     Lockhead, our position is that it would be speculative in

12     light of the contents of his opening report.

13                THE COURT:  Is it beyond his area of expertise?

14     Testing is I think why you called him, the tests that he

15     performed?

16                MR. NOE:  The testing that he performed is

17     certainly within his expertise.  The effect of the nasal

18     environment on solutions deposited there is beyond his

19     expertise.

20                THE COURT:  Now he is being asked as an expert

21     to discuss how outside elements might impact, or have

22     impacted testing that he did or didn't do.

23                That's not fair game, in your view?

24                MR. NOE:  It is, again, Your Honor, it is

25     speculative in our view.
```

Lochhead - cross

         1          THE COURT:  I am not sure that it is

         2    speculative.  I am going to permit you to continue.

         3          I will overrule the objection.

         4    BY MR. HURST:

         5    Q.    Thank you, Your Honor.

         6          Cilia in the nose, you understand that cilia

         7    have the ability to shear and thin materials in the nose.

         8    Correct?

         9    A.    I listened to the expert testimony yesterday.  And

        10    from that, I understand that there is a viscous layer that

        11    the cilia beat in and the mucus actually lies above that

        12    layer and shears that layer.  And the mucus is a polymer

        13    system, a polymer solution, a polysaccharide, very much like

        14    the big polymers.

        15    Q.    You saw in the video yesterday there was mucus in

        16    some places and no mucus in other places.  So you would

        17    expect the material to interact with the cilia?

        18    A.    I don't know that it does interact or doesn't

        19    interact with the cilia.

        20    Q.    At the very least, though, that kind of movement, a

        21    thousand beats a minute, as an expert in viscosity, will you

        22    at least agree with me that that thousand beats per minute

        23    actually introduces shear, which lowers viscosity?  Will you

        24    agree with that?

        25    A.    It would introduce some shear into the aqueous layer.

Lochhead - cross

1    In the aqueous layer, I don't know if it would decrease the

2    viscosity.

3    Q.    You did no testing one way or another to try to

4    determine how that level of shear would impact the viscosity

5    of nasal formations in the nose.  Correct?

6    A.    No, no.

7    Q.    Now, I just want to put a fine point on this so it is

8    totally clear.

9          Can we go to Claim 5 of the '573 patent again.

10          On this third element of the claims, you have no

11    opinion one way or another about whether Barr's product

12    meets III.  Correct?

13    A.    No, I have no opinion.

14    Q.    Thank you.  I want to talk now briefly about the

15    frontal sinus issue.  You heard yesterday that Dr. Berridge

16    was relying on your testing for some of his testimony.

17    Correct?

18    A.    I think so, yes.

19    Q.    I want to talk to you about that.  Why don't we put

20    up -- let me just make sure this is all in context.  Dr.

21    Berridge, like you, did not do any testing on Barr's

22    product.  Is that true?

23    A.    I did do testing on Barr's products.

24    Q.    My mistake.  I was actually referring, I was thinking

25    about III, I stand corrected.  You tested Barr's product for

Lochhead - cross

1    I and II.  Right?

2    A.    Yes.

3    Q.    My apologies.

4          Dr. Berridge did no testing, as you understand

5    it, on Barr's product?

6    A.    That's correct.

7    Q.    And he only tested Nasacort.  Correct?

8    A.    No.  I think he tested Nasacort and Flonase.

9    Q.    And Flonase, okay.

10         Now, his testimony yesterday was that my testing

11   on Nasacort with respect to this frontal sinus issue is good

12   enough to prove that Barr's product gets to the frontal

13   sinus because the products were, in his words, identical.

14   Do you remember that?

15   A.    Yes.

16   Q.    Now, let's take a look at Plaintiffs' Demonstrative

17   Exhibit 65.  Point 1.

18         Counsel showed you this in direct.  Right?

19   A.    Yes.

20   Q.    Now, when the product is entering the nose, the

21   relevant viscosity measurement we are talking about is not

22   really the setting, but it's the shear viscosity.  Right?

23   A.    Yes.  The shear viscosity of that spray.

24   Q.    So Dr. -- well, you tested Nasacort's shear viscosity

25   and you got numbers 61 to 68.  Right?

Lochhead - cross

1   A.      Yes.

2   Q.      You tested one lot.  Right?

3   A.      Yes.

4   Q.      Do you have any idea whether the material that Dr.

5   Berridge tested in 1996, in 1998, do you have any idea

6   whether it was identical in shear viscosity to the lot that

7   you measured here?

8   A.      It may not be identical.  But you got lot-to-lot

9   variability.

10  Q.      Sure.  Now, with respect to Barr's product, you

11  actually have a much higher shear viscosity than 61 to 68.

12  Right?

13  A.      Yes.  And that again reflects lot-to-lot variability

14  all within the range.

15  Q.      It's actually at least 60 percent higher?

16  A.      Than the one lot that I measured, yes.  But it still

17  falls within the range.  That is why you have ranges,

18  because it is very difficult to get things identical, that

19  you have natural changes in manufacturing, you have changes

20  in materials.  So you put ranges in there.  And it falls,

21  they all fall within the range.

22  Q.      Sure.  That's actually my point.  Even manufacturing

23  from one location to another location could impact the

24  viscosity measurements that you ultimately get in a product.

25  Right?

Lochhead - cross

1    A.       Yes.  You get lot-to-lot variability.

2    Q.       You understand that Barr manufactures its product at

3    a different location than Aventis manufactures its product.

4    Right?

5    A.       I think so.

6    Q.       When you tested, you found that Barr's product, at

7    least the three lots that you tested, had much higher shear

8    viscosity than Nasacort.  Right?

9    A.       They had higher shear viscosity.  But it was still

10   within the limits specified.

11   Q.       The limits specified where, sir?

12   A.       In the patent.

13   Q.       Actually, now I am just focusing on Dr. Berridge's

14   testing.  He didn't test, as far as you know, as far as you

15   know, Dr. Berridge never conducted any tests about whether a

16   product with viscosity at around 100 could reach the frontal

17   sinus?

18   A.       I don't think he did any viscosity testing.

19   Q.       But he tested a product that at least according to

20   your testing is about 60 or so.  Right?  That's what he

21   tested?

22   A.       That one lot was 60.  I don't know if he -- what lot

23   he tested.

24   Q.       He could have tested lots that were even lower than

25   60 as far as you know.  Right?

Lochhead - cross

1    A.      They could be as low as 50, but no more.

2    Q.      So you have no idea, do you, whether a product with

3    the viscosity that you have shown for Barr at around 100 has

4    the capability of getting into the frontal sinus?

5    A.      I have no idea of anything getting into the frontal

6    sinus.  It is not my expertise.  But I don't know whether

7    the lot-to-lot variability would affect that.

8    Q.      And Dr. Berridge, you didn't hear him testify,

9    either, about whether lot-to-lot variability and shear

10   viscosity could impact whether a product gets into the

11   frontal sinus.  Right?  You didn't hear him talking about

12   that?

13   A.      No.

14   Q.      What he did testify about is -- do you remember his

15   2002 studies?

16   A.      Yes.

17   Q.      Where he came up, he tested those, and for 12, I

18   think it's 12 people, he got a zero, zero, zero 12 times,

19   nothing in the frontal sinus.  Do you remember that?

20   A.      Yes.

21   Q.      And he had an explanation.  Right?  Do you remember

22   his explanation?

23   A.      Yes, it was the middle of the winter and he

24   transferred it in his trunk.

25   Q.      Yeah, because temperature can impact viscosity.

Lochhead - cross

1    Right?

2    A.    It can impact viscosity and stability.  You can get

3    freeze-frost stability, which essentially causes a product

4    to separate.

5    Q.    I am on viscosity right now.  Temperature can impact

6    viscosity.  Right?

7    A.    It can impact viscosity.

8    Q.    So it's possible, isn't it, it's possible, that what

9    happened is, he takes a product with 61 to 68 shear

10   viscosity, puts it in his car, it gets kind of cold, and it

11   goes up to a hundred.  And that explains why he got no

12   frontal sinus deposit.  That's possible, isn't it?

13   A.    That's one thing that is possible.  Another

14   possibility, as I said -- I lived in Cleveland.  I know how

15   cold it gets in Cleveland.  In the winter, you can get

16   formulations to freeze.  As soon as you freeze, you can

17   actually get separation.  He could end up with most of it at

18   the range of the spray.

19   Q.    But we have no data about whether the formulations

20   that he tested had viscosities in this range.  Correct?

21   A.    No, we don't have any data.

22   Q.    But we do know that when it got cold, suddenly, and

23   you are surmising that increased the viscosity.  Right?

24   A.    No, no.

25   Q.    He was?

Lochhead - cross

1    A.      I think you are surmising that.

2    Q.      And that's what prevented the frontal sinus deposit?

3    That's what he said prevented the frontal sinus deposit, the

4    higher viscosity.  Right?

5    A.      I don't remember him saying that.  He said the

6    conditions were different and the temperature was different.

7            THE COURT:  Why don't you leave it to me to

8    remember what Dr. Berridge said.

9            MR. HURST:  Fair enough.

10   BY MR. HURST:

11   Q.      I am going to turn to a different topic.  Let's go to

12   protocol real quickly.

13           Can we put that up on the screen.  366.

14           This protocol is three pages long.  Right?  Two

15   and a half, I think, actually?

16   A.      I think so.  I will accept that.

17   Q.      Single-spaced.  Right?

18   A.      Yes.

19   Q.      And you tested both the prior art products and Barr's

20   product using this protocol.  Right?

21   A.      No, a longer protocol I used for, to describe all of

22   the products.  I selected this particle protocol for my

23   opening report.

24   Q.      You have a different protocol for testing the prior

25   art products?

Lockhead - redirect

1    A.      It's the same protocol.

2    Q.      It's longer?

3    A.      They are parts of the same protocol because in my

4    first report I was only dealing with Barr's products and

5    Nasacort.  In my second one I was also dealing with Flonase

6    and Beconase.  So I included them in the second part.

7            I was following the same protocol.

8    Q.      I thought this was going to be my only chance to talk

9    to you about your protocol.  If you are actually going to

10   talk about a different protocol for the prior art products,

11   I will save my cross for that.

12   A.      It wasn't a different protocol.

13   Q.      But it's a little longer, that's all.  Right?

14   A.      It was prepared for the report.

15           MR. HURST:  Your Honor, I have no further

16   questions.

17           THE COURT:  Any redirect?

18           MR. NOE:  Your Honor, just a few questions.

19                    REDIRECT EXAMINATION

20   BY MR. NOE:

21   Q.      Dr. Lockhead, do you recall that Mr. Hurst discussed

22   Page 13 of your transcript from your deposition, where he

23   asked you the question of whether you considered yourself to

24   be an expert in pharmaceutical formulation?

25   A.      Yes, I recall that.

Lockhead - redirect

1    Q.    If we could call up Page 16 from his deposition.  Do

2    you recall that Mr. Hurst asked you that same question

3    again, I believe you were talking about that earlier, at

4    Line 19, beginning at Line 18:

5              "Question:  But you don't consider yourself to

6    be an expert, do you, in pharmaceutical formulations much

7    like thixotropic formulations?"

8              And your answer there was, "I consider myself an

9    expert in formulations and that would encompass

10   pharmaceutical formulations."

11             Is that correct?

12   A.    Yes.

13   Q.    And at Page 102 of your deposition transcript, which

14   Mr. Hurst also discussed with you, on the issue of the

15   possible effect of temperature on viscosity, Mr. Hurst

16   showed you the beginning of the deposition transcript.  I

17   just wanted to discuss with you whether you recall the

18   discussion that continued directly thereafter, and at Line

19   16 Mr. Hurst asked:

20             "Question:  As the temperature rises?"  And your

21   answer there was, "Yes, but it's a complex fluid so you can

22   get a difference in structuring which may give you an

23   increase in viscosity.  In fact, some of these fluids go up

24   and down in viscosity with temperature and pressure."

25             Do you recall that?

Prud'homme - direct

1    A.      Yes, I recall that, and I did say that.  That's what

2    I tried to say today as well.  That's my understanding.

3                MR. NOE:  Thank you, Your Honor.  Nothing

4    further.

5                THE COURT:  All right.  Thank you, Doctor.

6                (Witness excused.)

7                MR. BERGHOFF:  We are ready to call our next

8    witness, Dr. Robert Prud'homme.

9                ... ROBERT KRAFT PRUD'HOMME, having duly sworn

10   as a witness, was examined and testified as follows ...

11               MR. BERGHOFF:  May I approach the witness, Your

12   Honor?

13               THE COURT:  You may.

14               Good morning, Doctor.

15                           DIRECT EXAMINATION

16   BY MR. BERGHOFF:

17   Q.      Dr. Prud'homme, would you repeat your name for us?

18   A.      My name is Robert Kraft Prud'homme.

19   Q.      And briefly summarize your education for us, if you

20   would?

21   A.      I received my Bachelor of Science in chemical

22   engineering from Stanford University.  After a time in the

23   Army, I was in the graduate program in pharmacological

24   science and public policy at Harvard University.  That was

25   following up some of the environmental science problems I

Prud'homme - direct

1    was working on in the military.  Then I decided to return to

2    more technical background and obtained my Ph.D. at the

3    University of Wisconsin.

4    Q.    And when did you obtain your Ph.D.?

5    A.    1978.

6    Q.    And what subject was the Ph.D. in?

7    A.    It was in rheology, the flow of complex fluids.

8    Q.    We have heard the term rheology a few times.  What is

9    rheology, maybe in very simple terms?

10   A.    Rheology is the study of the flow of materials.  So

11   when you put a force on it, how the material moves.

12   Q.    Does that include within it the study of viscosity?

13   A.    Yes.  Viscosity would be one of those ways one would

14   characterize its motion.

15   Q.    Thank you.  Now, could you describe for us your work

16   or professional experience after obtaining your Ph.D.?

17   A.    So I have been a faculty member at Princeton

18   University since that time.  I am the director of the

19   program of engineering biology at Princeton University.  I

20   lead the National Science Foundation Center on nanoparticle

21   formulation, generally directed to drug compositions.

22            I have had sabbatical leaves at Bell Labs and

23   the University of Sidney in Australia.

24   Q.    So you have been at Princeton as a professor from

25   1978 to the current time?

Prud'homme - direct

1    A.    Yes.

2                    THE COURT:  That's what he said, counsel.  You

3    don't need to rehash it.  I am listening.  I really am.

4                    MR. BERGHOFF:  Point taken, Your Honor.

5                    THE COURT:  It may seem at times that I am

6    looking over there.  But I really am listening.

7    BY MR. BERGHOFF:

8    Q.    Do you teach classes as part of being a professor at

9    Princeton?

10    A.    Yes, I do.

11    Q.    Do you teach any classes that relate to

12    pharmaceuticals or pharmaceutical formulations?

13    A.    Yes.  Actually, I just finished and gave my final

14    exam last week on bio-separations to undergraduate chemical

15    engineers.  That course covers the technology of science and

16    engineering issues in pharmaceutical product manufacturing.

17    Q.    Does that include formulations within that?

18    A.    That would be a component of that, yes.

19    Q.    And what level is that?  That's undergraduate?

20    Graduate?

21    A.    That's undergraduate.

22    Q.    You mentioned that you were a director at a

23    nanoscience institute.  Could you expand on that a bit and

24    tell us what that is?

25    A.    This is coming out of our research program, we were

Prud'homme - direct

1    successful in winning a National Science Foundation Center

2    for this technology of making small nanometer-size

3    fractions, diameter of human hair particles, which have

4    particular properties that make them advantageous as

5    carriers for drugs.

6             And at that center, I lead their faculty members

7    at Princeton doing simulations and computer modeling of

8    these processes, professors at the University of Ohio State,

9    doing some flow properties involved in this formation, and

10   some professors at the University of Minnesota doing some of

11   the polymers that are used in these processes.

12   Q.    And is drug formulations, pharmaceutical formations

13   involved in the work of that Nano Institute?

14   A.    The Nano Institute is the scientific base.  Many of

15   the collaborations that come from that, that is, the

16   industrial sponsors, industrial people who come and sort of

17   follow our work are related to drug formulation issues.  So

18   we have sponsorship in a company that is using our

19   technology to look at imaging agents, drug delivery and

20   imaging agents, how you control the release -- another

21   company -- how you control the release of drugs out of

22   nanoparticles.  Merck has sent two of their researchers to

23   study this process.

24   Q.    Do you hold any honorary positions in your field of

25   expertise?

Prud'homme - direct

1   A.     Well, if, by honorary position, I'm the President of

2   the U.S. Society of Rheology.  I have the Excipient National

3   Science Foundation Young Investigator Award, earlier in my

4   career.  And I've been named to several distinguished

5   visiting lectureships.

6   Q.     Do you serve on any executive committees of any

7   organizations, in the scientific areas?

8   A.     I served on the American Institute of Chemical

9   Engineers, Material Science Division as well as earlier on

10  the Executive Committee of the U.S. Society of Rheology.

11  Q.     Do you do any consulting with industry?

12  A.     I do a considerable amount of consulting with

13  industry so I have consulted with major U.S. chemical

14  companies:  Dow, DuPont, Hercules here in Wilmington.   In

15  the energy area, Exxon, Mobil and also considerable

16  consulting in the pharmaceutical industry.  I've consulted

17  with Merck, Bristol-Myers Squibb, Abbott, GlaxoSmithKline,

18  Block Drug Company, Johnson & Johnson.

19              THE COURT:  When did you consult with Hercules?

20              THE WITNESS:  I was there about --

21              THE COURT:  If you remember what year?  Just

22  roughly.

23              THE WITNESS:  My last visit was six months ago,

24  and I began about 20 years ago.

25              THE COURT:  I might have been there.  Okay.  I

Prud'homme - direct

1    just wanted you to know.  We've never worked together.

2              THE WITNESS:  No.

3    BY MR. BERGHOFF:

4    Q.    The work you describe, the consulting work you

5    describe for pharmaceutical companies, did it involve

6    pharmaceutical formulations?

7    A.    Yes it did.  In my expertise in polymers, rheology,

8    complex fluids, it would be addressing issues in that

9    sector of a problem in drug formulation or drug production.

10   Q.    And have you ever taught any courses at any of

11   companies with which you have consulted in the

12   pharmaceutical area?

13   A.    Yes, I have been asked to teach short courses in my

14   area of expertise at Abbott Labs, for example, and at FMC

15   for their formulations group as they sell into the

16   pharmaceutical industry.

17   Q.    Now, you mentioned FMC.  You consulted with them, I

18   take it?

19   A.    Yes.

20   Q.    What was the subject matter of that consultation?

21   A.    Their chief scientific technologist was a person

22   named Wyman Morgan.  He established a high level scientific

23   advisory committee; and he would call us in to address

24   various scientific and engineering challenges they were

25   having and to give them corporate strategic direction.

Prud'homme - direct

1    Q.      Did it relate to any particular products of FMC?

2    A.      The entire spectrum of products.  The particular

3    issue relating to this is we were asked in one occasion to

4    address issues of the processing and structure property

5    relationships for Avicel, that is, how can the process

6    change the material that they make, and another in how uses

7    of Avicel, specifically in pharmaceuticals, how they would

8    increase their market share in that area.

9    Q.      And Avicel is one of the ingredients in both Nasacort

10   and the Barr product?

11   A.      Yes, it is.

12   Q.      You have publications from your research, I assume,

13   Dr. Prud'homme?

14   A.      Yes, I do.  I have over 200 publications.

15           MR. BERGHOFF:  And, Your Honor, Dr. Prud'homme's

16   CV is already in evidence as PTX-377.  And I would offer

17   Dr. Prud'homme at this point as an expert in the properties

18   of viscous compositions and formulations.

19           THE COURT:  Any objection?

20           MR. HURST:  No objection.

21           THE COURT:  The doctor is accepted as an expert

22   in that field.

23   BY MR. BERGHOFF:

24   Q.      And I'll ask because I've save potentially my

25   opposing counsel the time.  Have you ever personally, just

Prud'homme - direct

1    yourself, prepared a pharmaceutical formulation?

2    A.    My answer to that is somewhat indirect.  That is, I

3    don't believe that one person does a pharmaceutical

4    formulation the same way that not one lawyer is doing this

5    case between Barr and Aventis.  There is a team.  Everyone

6    on that team has a function, a purpose, an expertise.

7            I've been involved in providing expertise in the

8    areas of polymers and delivery mechanisms involving polymers

9    in those companies I've consulted for as well as in our

10   research, as I mentioned, with nanoparticles.  Our

11   technology licensed our technology both for forming the

12   nanoparticles to deliver anti-cancer agents and the release

13   of those anti-cancer agents.

14           So have I been involved in pharmaceutical

15   formulation?  I believe the answer to that is yes, but I

16   don't believe myself nor any one individual does the entire

17   job.

18   Q.    Thank you.  Just some technical background questions.

19   First, you told us what rheology is just a moment ago.  What

20   is viscosity in very simple terms?

21   A.    Viscosity is a measure of the thinness or thickness

22   of a fluid.

23   Q.    And can you give us some examples maybe from our

24   common experience of very thick or very thin fluids so that

25   we can get a handle on this?

Prud'homme - direct

1    A.    In these units of centipoise that the trial is

2    talking about, if you add water, that would be one

3    centipoise, so tipping water back and forth.  If you have

4    olive oil, that is about 100 centipoise, tipping that back

5    and forth.  If you have a heavy grade motor oil, that is

6    about 1,000 centipoise, tipping back and forth.  So that is

7    the range of numbers we're discussing here and that is sort

8    of what they look like if you tip them back and forth.

9    Q.    If you could give us an example of a highly viscous

10   material that would be well above the 1,000 centipoise

11   range?

12   A.    Things such as asphalt or chalking adhesives would be

13   much higher than that.

14   Q.    What does it mean to be thixotropic?  Again, just in

15   simple terms.

16   A.    It means that the material will become thin when it's

17   shaken or deformed.  When stress is put on it, you get

18   thinner, less viscous.  When that stress disturbance is

19   removed, it becomes more viscous, and there is some time

20   that it takes to do that transition from more to less

21   viscous.

22   Q.    Could you give us an example again from our everyday

23   experience of viscous composition?

24   A.    An example of one that is viscous and thixotropic

25   would be ketchup.  So in a bottle, if you turn the bottle

Prud'homme - direct

1    upside down, the ketchup may remain in the bottle.  It's in

2    this high viscosity state.  When one shakes the bottle, now

3    one can pour it out because in that process of shaking, one

4    has decreased the viscosity that will flow out.  The

5    structure will rebuild, and that ketchup will stay on top of

6    the french fries or whatever you put it on.

7    Q.    You're familiar with Nasacort AQ from your work on

8    this case, Dr. Prud'homme?

9    A.    Yes, I am.

10   Q.    And is or is not Nasacort AQ thixotropic?

11   A.    It is thixotropic.

12   Q.    And what makes it thixotropic?

13   A.    It's formulated with a polymer-dispersing agent

14   called Avicel 611.

15   Q.    And is that dispersing agent, as you call it, is that

16   sometimes called a suspending agent?

17   A.    Yes, that would be another term for those.

18   Q.    And Avicel's 611, is that made by FMC?  Did you talk

19   about that before?

20   A.    Yes, it is.

21   Q.    What is Avosil 611?

22   A.    Avosil 611 is a single material that is made by

23   intensively by milling or mixing under high intensity

24   microcrystalline cellulose and a polymer called CMC.

25   Q.    And did you prepare a diagram that would help us

Prud'homme - direct

1  understand the structure and characteristics of Avicel?

2  A.     Yes, I did.

3               MR. BERGHOFF:  Let's put up Plaintiffs'

4  Demonstrative Exhibit 51.

5  BY MR. BERGHOFF:

6  Q.     And could you explain to us what is shown here,

7  perhaps panel by panel, starting from the left?

8  A.     On this panel, the stars are to represent what is

9  called microcrystalline cellulose.  And microcrystalline

10  cellulose is cellulose coming from wood.  Wood would be a

11  chunk of material that would have no value.  So one disrupts

12  that wood structure to get down to the very fine

13  microfibrils, which are those star structures.  So they're

14  like tumbleweeds of the cellulose structure, wood structure.

15               If one just had those tumbleweeds, that material

16  would aggregate rapidly, fall to the bottom and have no

17  efficiency or efficacy as a suspending agent or a

18  viscosifying agent.

19               In that processing step, it is, as I said,

20  co-processed with the orange worms in that picture which

21  represent the carboxymethylcellulose.  Again, the cellulose

22  molecules.  Now it has charge groups on it.

23               The processing welds together those

24  negatively-charged carboxymethylcellulose with the

25  tumbleweed microcrystalline cellulose structure.  What

Prud'homme - direct

1    that does is one tunes the sizes of these tumbleweeds and

2    the carboxymethylcellulose is tuning the stickiness of the

3    tumbleweeds.  So therefore even if one gives the same

4    carboxymethylcellulose microcrystalline cellulose

5    composition, that doesn't mean the Avicels are similar.  It

6    depends on the process and how collapsed or open these

7    tumbleweeds are and how tightly bound the carboxymethyl-

8    cellulose is to the tumbleweed.  So one no longer has two

9    different polymers.  Avicel is one subject, one species at

10   this point.

11   Q.     Dr. Prud'homme, let's just stay on the left panel, if

12   we could.  This is labeled unsheared structure.  What does

13   that mean?

14   A.     So this is saying at rest.  The microcrystalline

15   cellulose, the Avosil material is, these tumbleweed

16   structures are bonding together, linking together to form a

17   three-dimensional network, and that three-dimensional

18   network is a gel-like material.  It looks like ketchup at

19   rest.

20            Under shear, those tumbleweeds are broken apart

21   rapidly.  And when they're broken apart -- and the middle

22   structure shows they're free flowing and the viscosity is

23   reduced, much lower.  When one removes the shear, those

24   tumbleweed structures quickly reattach to each other and

25   that structure, that gel-like structure rebuilds quickly.

Prud'homme - direct

1    Q.      So the center panel shows us the structure after some

2    shear has been put on the material?

3    A.      Yes.

4    Q.      And the panel on the right shows what happens as the

5    structure recovers?

6    A.      Yes.

7    Q.      Is the structure, the recovered structure on the

8    right always exactly the same as the original structure on

9    the left?

10   A.      No, it's a random process.  So the viscosity

11   properties will be the same if one measures it

12   appropriately.  However, the details of how they go back

13   together, it's a random process.  You have slightly

14   different microstructures.

15   Q.      Are you familiar with the properties, the viscosity

16   properties, the thixotropic properties of Avicel CL 611, the

17   particular suspending agent used in Nasacort and in Barr's

18   accused product?

19   A.      Yes, I am.

20   Q.      And how quickly does an Avicel CL 611 suspension

21   recover its structure after shear is removed?

22              MR. HURST:  Objection, Your Honor.

23              THE COURT:  Basis.

24              MR. HURST:  This is outside the scope of his

25   expert report.  I can stand to be corrected but this is

Prud'homme - direct

1    something that is not at all familiar to me.

2                THE COURT:  Is he correct, counsel?  I would be

3    actually surprised if it were outside, but go ahead.

4                MR. BERGHOFF:  Your Honor, in Paragraphs 37 and

5    38, he is talking about the measurements in two reports:

6    the Hydan report and the FMC report.  In specifics, we're

7    just doing it in general now, that deals with the recovery

8    properties of the material that include Avicel CL 611.

9                MR. HURST:  This is outside the scope of his

10   report.  The question now is how quickly will Avicel itself

11   return to setting viscosity.  It is not addressed in either

12   of the paragraphs he just cited.

13               MR. BERGHOFF:  I didn't mean Avicel.  It's an

14   Avicel suspension such as Nasacort AQ, such as --

15               THE COURT:  Let me see counsel for a second.

16               (The following took place at sidebar.)

17               THE COURT:  Okay.  Let's see.

18               MR. BERGHOFF:  So this is the easier one.  This

19   is talking about Nasacort AQ which includes the Avicel CL

20   compound.  It says high level.  It indicates that the

21   structure will rebuild quickly after spraying for shear.

22   That is all.  I'm having him say in general, in general

23   terms.

24               MR. HURST:  The question seemed to me --

25               THE COURT:  Was a little more specific?

Prud'homme - direct

1          MR. HURST:  Yes, it was.

2          THE COURT:  So do you understand the import of

3   his objection, why he is objecting to the question?  And if

4   you do, and you disagree, just tell me.

5          MR. BERGHOFF:  I believe that this is just the

6   generalization of what we will cover specifically.

7          MR. HURST:  I'm sorry.

8          THE COURT:  Okay.

9          MR. HURST:  Here is what the witness will say.

10  It sounded like he was asking how quickly will Avicel return

11  to the setting viscosity?  That was the question.  And if he

12  says something like a minute, 30 minutes -- I don't know

13  what he is going to say but that issue itself is nowhere in

14  any of his reports and that seemed to be what the question

15  is designed to elicit.

16         MR. BERGHOFF:  I disagree.

17         THE COURT:  You disagree.  Well, where is it

18  then?

19         MR. BERGHOFF:  That sentence is not -- he is

20  just going to say quickly.  He is not going to put a number.

21         THE COURT:  However quickly he says it, I don't

22  think that is the objection.  It's whether he had a fair

23  notice and fair chance.

24         MR. BERGHOFF:  I'll go through the reports

25  first, and then --

Prud'homme - direct

1          THE COURT:  I don't want to prolong this.  I am

2    going to sustain the objection as I understand the objection

3    to be directed to the specific question that you are asking.

4          MR. BERGHOFF:  Okay.

5          THE COURT:  If you want to go into the more

6    general with him and then at some point?

7          MR. BERGHOFF:  No, I can get to where I need to

8    go by going to the reports.

9          THE COURT:  All right.  That's fine.

10          MR. BERGHOFF:  I can do that.  It may lengthen

11   it.

12          THE COURT:  Okay.  We'll do it.  Well, we have

13   these Rules of Evidence that encompass them.

14          MR. HURST:  Thank you.

15          THE COURT:  All right.

16          MR. BERGHOFF:  I understand.  Thank you.

17          (End of sidebar conference.)

18   BY MR. BERGHOFF:

19   Q.    Let's turn, if we could, Dr. Prud'homme, to PTX-380.

20   And that should be in your binder and we'll put up the front

21   page.

22   A.    Yes.

23   Q.    Could you tell us what this document is?

24   A.    This is a report from FMC evaluating the Nasacort AQ

25   formulation for its rheological properties.

Prud'homme - direct

1    Q.    And for whom was this report generated by FMC?

2    A.    Dale VonBehren.

3    Q.    And what company was it sent to?

4    A.    It was sent to Rhone-Poulenc Rorer.

5    Q.    And just in very general terms, what is the subject

6    of this report?  At what time was FMC testing?

7    A.    Testing the rheology, in particular, the suitability

8    of this formulation to act as a spray application.

9    Q.    And by "this formulation," you mean Nasacort AQ?

10   A.    Nasacort AQ.

11            MR. BERGHOFF:  Let's pull up, if we can, one of

12   the conclusions in this report from FMC.

13   BY MR. BERGHOFF:

14   Q.    Do you see the highlighted sentence, Dr. Prud'homme:

15   the high level of thixotropy indicates that the structure

16   will rebuild quickly after spraying?

17   A.    Yes, I see it.

18   Q.    Could you tell us what that means with respect to the

19   structure of Nasacort AQ?

20   A.    The high level of thixotropy is indicating the high

21   level of network microstructure being broken down by shear

22   as shown in the previous slide, that it easily does that.

23   It's easily broken down and that it rebuilds rapidly back to

24   a gel-like state after shear -- after spraying, after shear

25   has been applied.

Prud'homme - direct

1    Q.      And the Nasacort AQ that has was being tested here by

2    FMC, that includes Avicel CL 611?

3    A.      Yes, it does.

4    Q.      Have you reviewed the data in this report,

5    Dr. Prud'homme, in detail?

6    A.      Yes, I have.

7    Q.      And does the data in this report support the

8    conclusion that FMC reached that the structure will rebuild

9    quickly after spraying?

10   A.      Yes, I believe it does.

11           MR. BERGHOFF:  Let's turn to PTX-365, if we

12   could.

13   BY MR. BERGHOFF:

14   Q.      And do you recognize this document, Dr. Prud'homme?

15   A.      Yes, I do.

16   Q.      And it's entitled Rheological Properties of Nasal

17   Spray Products.  Do you know for whom or by whom this report

18   was generated?

19   A.      I've been told it was generated by Hydan

20   Technologies.  That was the company formulating it or

21   back-engineering the product for Barr.

22   Q.      I'm not sure Barr was on the scene, just to be

23   absolutely correct, yet.  I'm not sure they had signed their

24   agreement with Agis but Agis is the company that eventually

25   licensed the product to Barr.  That is your understanding?

Prud'homme - direct

1    A.    Yes.

2    Q.    And in general terms, what does this report deal

3    with?  What are they testing here?

4    A.    They're testing the rheology, using many different

5    dimensions and parameters of that, and one of the key ones

6    is the time scale for that structure to rebuild the

7    kinetics.

8    Q.    And the time scale for what structure to rebuild?

9    What product?

10   A.    The thixotropic structure in those products that are

11   mentioned in that topic -- table and Nasacort AQ being among

12   them.

13   Q.    And what did the Hydan report show about the recovery

14   of structure of Nasacort AQ after shear is taken away?

15   A.    This report shows structure is recovered very

16   rapidly.

17              MR. BERGHOFF:  Could we look at Figure 2 in the

18   Hydan report?

19   BY MR. BERGHOFF:

20   Q.    And we have a demonstrative exhibit that you helped

21   us prepare for that purpose, Dr. Prud'homme.  Do you see

22   that?

23   A.    Yes.

24   Q.    Is this demonstrative consistent with the actual

25   black-and-white Figure 2 in the Hydan report?

Prud'homme - direct

1    A.    Yes, it is.

2    Q.    And which color line is Nasacort AQ?

3    A.    The orange-colored line, the second from the bottom.

4    Q.    And what does this figure from the Hydan report tell

5    us about the recovery of viscosity by Nasacort AQ, if

6    anything?

7    A.    This experiment is done in what is called a Hokkaido

8    Viscometer, a different instrument than the Brookfield, a

9    different geometry.  And the material is first subjected

10   to a high shear rate, high flow conditions from zero to

11   30 seconds.  And we see there, the viscosity is quite low,

12   indicating the structure was broken down.  And then at

13   30 seconds, suddenly, this fast flow is turned off and the

14   very slow flow is maintained, very low stress condition.

15   And what one sees is the viscosity immediately jumps to a

16   very high level and recovers that lost structure.  It

17   rebuilds, as shown here, extremely rapidly.

18           MR. BERGHOFF:  Your Honor, may I approach the

19   screen, just to be sure I'm following where on the graph we

20   are?

21           THE COURT:  Sure.

22   BY MR. BERGHOFF:

23   Q.    In this portion of the orange line for Nasacort AQ,

24   what is happening here, Dr. Prud'homme?

25           THE COURT:  What portion are you indicating, for

Prud'homme - direct

1    the record?

2                    MR. BERGHOFF:  It's the bottom-most portion on

3    the left.

4                    THE COURT:  So what is that, the X or the Y

5    axis?

6                    MR. BERGHOFF:  It's almost near zero on the Y

7    axis and from zero to 30 on the X axis.  Thank you, Your

8    Honor.

9                    THE WITNESS:  So the Y axis is viscosity.  And

10   we see very low viscosity values under this high shear where

11   all the tumbleweeds have been broken apart and flowing

12   readily.

13   BY MR. BERGHOFF:

14   Q.    So this is high energy, low viscosity?

15   A.    High energy, low viscosity, broken-up tumbleweed

16   structure.

17   Q.    What happens to the orange line at the 30 second

18   mark?

19   A.    At this point, instead of high shear, one goes to a

20   very low shear, very low stresses, which I believe would

21   mimic the as-deposited-low-stress state in the application

22   of the spray onto a surface.  And at that point, the

23   viscosity now jumps up to a level, much higher level and it

24   does that very rapidly.

25   Q.    And by "very rapidly," how rapidly, Dr. Prud'homme?

Prud'homme - direct

1    A.     One can see from that, that the stress is recovered

2    in much less than 30 seconds to 90 percent of the ultimate

3    value it attains in that experiment.

4    Q.     And the Nasacort AQ that was being tested by Hydan

5    for Agis, that, of course, includes the Avicel CL 611?

6    A.     Yes.

7    Q.     Let's turn to the infringement issues.  You have

8    reviewed the patents in suit, Dr. Prud'homme?

9    A.     Yes, I have.

10   Q.     You have reviewed the Court's ruling concerning the

11   meaning of claim terms?

12   A.     Yes, I have.

13   Q.     You're familiar with Barr's ANDA product?

14   A.     Yes, I am.

15   Q.     And do you have an opinion as to whether it's the

16   same as Nasacort AQ or not?

17   A.     I believe the formulation is identical.

18   Q.     And they both contain Avicel CL 611?

19   A.     Yes, they do.

20   Q.     Now, you gave a general definition for us before of

21   thixotropy or what it means to be thixotropic.  Do you

22   understand the Court in this case has defined the meaning of

23   the thixotropic properties in the claims?

24   A.     Yes, I do.

25   Q.     And do you understand that you are to apply that

Prud'homme - direct

1    definition when assessing the issue of infringement?

2    A.    Yes, I do.

3                MR. BERGHOFF:  Can we put up the Court's order?

4    We've marked this as PTX-360.  And we're looking at the

5    second paragraph.

6    BY MR. BERGHOFF:

7    Q.    Is this your understanding of the Court's order

8    concerning thixotropic properties that the Court will limit

9    the term "thixotropic" to refer to those properties

10   described in specific claims or, in the absence of

11   properties described in a specific claim, those properties

12   described in the specification?

13   A.    Yes, it is.

14               MR. BERGHOFF:  Let's turn, if we can, to Claim

15   26 of the '329 patent.

16   BY MR. BERGHOFF:

17   Q.    And I've put up on the screen the words from that

18   claim that relate to thixotropic properties.  They'll have

19   the whole claim up there.  And are these the only words that

20   you will be addressing, Dr. Prud'homme, in the claim?

21   A.    Yes.

22   Q.    Does this claim, Claim 26, describe specific

23   thixotropic properties?

24   A.    Yes, it does.

25   Q.    And where do you see that?

Prud'homme - direct

1              MR. HURST:  Objection, Your Honor.

2              THE COURT:  Yes, sir.  What is your objection?

3              MR. HURST:  It sounds like we're having claim

4     construction argument in terms of what -- if I can explain

5     why?

6              THE COURT:  You will have to do it over here a

7     second.

8              MR. HURST:  Okay.

9              (The following took place at sidebar.)

10             THE COURT:  I'm not sure that I understand your

11     point.

12             MR. HURST:  Yes.  This is your ruling.  Now he

13     is telling the witness to apply your ruling to Claim 26.

14             THE COURT:  Right.

15             MR. HURST:  Claim 26 is dependent on Claim 25.

16     Claim 25 specifies no thixotropic properties, which means

17     that Claim 25 requires, according to your ruling, the

18     thixotropic properties set forth in the specification.

19             THE COURT:  Okay.

20             MR. HURST:  I think the argument that is being

21     made is because Claim 26 depends on Claim 25 that the

22     specification properties are not incorporated into 26.

23             THE COURT:  Is that what you are attempting to

24     adduce, evidence to support an argument consistent with

25     that?

Prud'homme - direct

1          MR. BERGHOFF:  I am making clear what the

2    witness is assuming in terms of his testimony.

3          THE COURT:  You understand it's a claim

4    construction ruling.

5          MR. BERGHOFF:  Yes, I'm not disputing that at

6    all.  No.

7          THE COURT:  I'm just making sure for the record

8    you that you do.

9          Your objection is overruled.

10          MR. HURST:  Thank you, Your Honor.

11          MR. BERGHOFF:  Yes.

12          THE COURT:  Okay.  Fine.

13          (End of sidebar conference.)

14    BY MR. BERGHOFF:

15    Q.     Does this claim describe specific thixotropic

16    properties, Dr. Prud'homme?

17    A.     Yes, it does.

18    Q.     And where are those properties found?

19    A.     In the I and II subsections.

20    Q.     And the first I talks about the viscosity in the

21    unsheared form?

22    A.     Yes.

23    Q.     And the second I talks about it in the sheared or

24    shaken form?

25    A.     Yes.

Prud'homme - direct

1   Q.    Dr. Prud'homme, you were here for Dr. Lochhead's

2   testimony?

3   A.    Yes.

4   Q.    And are you relying on his viscosity testing?

5   A.    Yes, I am.

6          MR. BERGHOFF:  And let's put up Plaintiffs'

7   Demonstrative Exhibit 48.

8   BY MR. BERGHOFF:

9   Q.    Does this slide accurately depict the results of

10  Dr. Lochhead's viscosity testing on the Barr ANDA product

11  and Nasacort AQ?

12  A.    Yes, it does.

13  Q.    And you're relying on that.  So these are the results

14  you are relying on from Dr. Lochhead?

15  A.    Those are the results that I'm relying upon.

16  Q.    And did the viscosity setting, viscosity of Barr's

17  product as tested by Dr. Lochhead fall within the setting

18  viscosity range set forth in Claim 26, in your opinion?

19  A.    Yes, it does.

20  Q.    Same question for the shear viscosity of Barr's ANDA

21  product and the shear viscosity range set forth in Claim 26.

22  A.    Yes, it does.

23  Q.    Let's turn now to Claim 6 of the '573 patent.  Do you

24  recognize, Dr. Prud'homme, that this is the language from

25  that claim that relates to thixotropic properties?

Prud'homme - direct

1    A.    Yes, I do.

2    Q.    And there are specific thixotropic properties laid

3    out in Claim 6?

4    A.    Yes, there are.

5    Q.    And could you identify those for us?

6    A.    Again, the first I is the viscosity of the

7    composition in unsheared form, the next is the composition

8    in the sheared form and the next is in the deposited form.

9    Q.    Let's deal with the first two for the moment.  Is

10   your testimony the same with respect to the Barr ANDA

11   product meeting the limitations of this claim with respect

12   to unsheared form?

13   A.    Yes, it is.

14   Q.    And that's based on Dr. Lochhead's testing that we

15   just saw?

16   A.    Yes, it is.

17   Q.    Is it same answer with respect to the sheared

18   viscosity, which is roman numeral two in this claim?

19   A.    Yes, it is.

20   Q.    And what do you base that conclusion of infringement

21   on?

22   A.    Again, on Dr. Lochhead's rheological measurements.

23            THE COURT:  Counsel, perhaps this would be a

24   good time for everyone, me included, to take a brief

25   stretch.

                              Prud'homme - direct

 1                    (Brief recess taken.)

 2                    THE COURT:  Please be seated.

 3                    Counsel, you may continue.

 4                    MR. BERGHOFF:  Thank you, Your Honor.

 5                    Let's put the claim language back up from Claim

 6    6 of the '573 patent.

 7    BY MR. BERGHOFF:

 8    Q.     And we'll turn our attention to the third clause,

 9    Dr. Prud'homme.

10    A.     Yes.

11    Q.     And do you understand that the Court has a specific

12    construction of the language in the third clause?

13    A.     Yes, I do.

14                    MR. BERGHOFF:  Let's just be sure we have that.

15    Can we put up the Court Order that is 360?  And it's

16    Paragraph 5, I believe.  It continues on.  Yes, there we go.

17    To the next page.

18    BY MR. BERGHOFF:

19    Q.     And that is the definition of this third clause that

20    you are applying, Dr. Prud'homme, in your analysis?

21    A.     Yes, it is.

22    Q.     Now, Dr. Prud'homme, can you, as far as you know,

23    measure the deposited viscosity directly in the nose with a

24    Brookfield viscometer?

25    A.     So in the nose, it cannot be measured.  The

Prud'homme - direct

1    Brookfield viscometer is a physical instrument that

2    certainly can't be applied in the nose.

3    Q.    And why is that?

4    A.    It's physically too large to be inserted into the

5    nose and to have the volumes of fluid that are specified by

6    the Brookfield manual.

7    Q.    Would a person of ordinary skill in the art know

8    that?

9    A.    Yes.

10   Q.    Do you have an opinion as to whether the viscosity of

11   Barr's ANDA product would return to its unsheared viscosity

12   following deposition in the nose?

13   A.    It's my interpretation of what this means is that

14   that the Avicel structure rebuilds that tumbleweed network

15   and it rebuilds it real quickly.  In that rebuilt form, that

16   tumbleweed structure would have the viscosity of 400-to-800

17   centipoise given the only technique that the patent gives

18   for doing the measurement, which is an at rest measurement.

19   Q.    And what is the basis of your opinion that in the

20   nose, in deposited form, the material of Barr's ANDA product

21   would return to this unsheared viscosity range of 400 to

22   800?

23   A.    It comes from my understanding of thixotropic

24   materials in general, the Avicel in particular, my

25   interactions with FMC, the Hydan data that we looked at that

Prud'homme - direct

1    shows the rapid rebuilding of structure and the FMC cover

2    letter as well as data showing that it would very rapidly

3    rebuild.

4              MR. BERGHOFF:  Now, let's just return, if we

5    could, to the Hydan data.  If we could put back up that

6    Figure 2 from the Hydan report that we had up before,

7    Plaintiffs' Demonstrative Exhibit 43.  There we go.  Great.

8    BY MR. BERGHOFF:

9    Q.    Do you have an opinion as to whether the data here

10   relates to what happens to nasal spray when it's deposited

11   in the nose?

12   A.    Yes.  The first part of that experiment, very high

13   shear rates represents the spraying process.  The injection

14   of the liquid out of the aerosol container, the formation of

15   small droplets, all of that happens at high stresses or

16   shear rates when the structure is broken down as shown on

17   the left.

18              And then we see a very rapid regain of that --

19              MR. HURST:  Objection.

20              THE COURT:  Basis, counsel.

21              MR. HURST:  He is going outside the scope of his

22   expert report on the second part, which he is about to go

23   to, which is whether that line relates to which --

24              THE COURT:  Which line?

25              MR. HURST:  The at 30 seconds, when it goes up

Prud'homme - direct

1    to a higher level.  The question --

2              THE COURT:  What color is the line?

3              MR. HURST:  I forget which one is Nasacort.

4              MR. BERGHOFF:  It's the orange one.

5              MR. HURST:  The orange line.

6              THE COURT:  All right.

7              MR. HURST:  The question is whether that relates

8    to what happens in the nasal cavity.  And he has offered to

9    no opinion on that subject, Your Honor.

10             THE COURT:  Is that accurate, counsel?

11             MR. BERGHOFF:  No, I don't believe so.  But

12   let's look at the report.

13             He did talk about -- should we come up here?

14   It's up to you, Your Honor.

15             THE COURT:  Yes.

16             (The following took place at sidebar.)

17             MR. BERGHOFF:  He clearly did express an opinion

18   that in deposited and relatively unstressed form, that is

19   what it is when it's in the nose.  And that is exactly what

20   he has already gone through on the Hydan report.  So I think

21   we're very fair here.

22             MR. HURST:  When he explained what he meant by

23   this, he explained I do not have any expertise in what

24   actually happens.

25             THE COURT:  You may cross-examine him.

Prud'homme - direct

1                    MR. HURST:  Okay.  Fair enough.

2                    (End of sidebar conference.)

3    BY MR. BERGHOFF:

4    Q.    Your explanation was interrupted in midstream.

5    A.    Yes, it was.  Do you want the question read back or

6    would you want --

7                    MR. BERGHOFF:  Let me try it again.

8                    THE COURT:  Okay.

9    BY MR. BERGHOFF:

10   Q.    What about the data on Figure 2 relates to what

11   happens to Nasacort AQ when it is deposited in the nose?

12   A.    So the left hand, from zero to 30 seconds, represents

13   the high stress condition, when the tumbleweed structure is

14   broken down, the viscosity is very low.  Then once

15   deposited, those aerosol droplets landing on a surface, that

16   is a very low stress condition, and that orange curve shows

17   what happens to the viscosity, microstructure of that under

18   that very low stress condition.  It rapidly rebuilds to a

19   much higher level.

20   Q.    Does the patent say anything about what condition the

21   suspension is in when it's deposited in the nose, whether

22   it's stressed, unstressed?

23   A.    It says that it's in a relatively unstressed

24   condition or unstressed conditions.

25                    MR. BERGHOFF:  May we have the exact language

Prud'homme - direct

1  here from PTX-1, Column 4?

2  BY MR. BERGHOFF:

3  Q.    Is this the language you were referring to?

4  A.    Yes, deposited and relatively unstressed form.  So in

5  a deposited form, it's relatively unstressed.

6         MR. BERGHOFF:  And then if we can go back to the

7  Hydan chart.

8  BY MR. BERGHOFF:

9  Q.    What happens to the material when the stress is

10  removed, when it is relatively unstressed in this data?

11  A.    So this tumbleweed network structure rebuilds and the

12  viscosity rebuilds to form a gel-like material.

13  Q.    And how does that support your opinion that the

14  viscosity of the deposited material, Barr's ANDA product,

15  Nasacort AQ in the nose would return to its setting

16  viscosity?

17         THE COURT:  I need to ask counsel a question.

18  Could I see you?

19         (The following took place at sidebar.)

20         THE COURT:  There has been a lot of discussion

21  about the patented formulation of Nasacort.  And I

22  understand that from the standpoint of context and giving me

23  background.  On one of the demonstratives, just before we

24  broke, there were testing results from the Barr product.

25  Below that were testing results from the Nasacort product.

Prud'homme - direct

1    I know I have to understand how infringement is adduced and

2    established, but why is there so much continuing

3    conversation about Nasacort?

4              MR. BERGHOFF:  We can stop that.

5              THE COURT:  I would appreciate it.  I'm going to

6    do my job and compare the claims to the accused product.

7    Okay?

8              I don't know why this isn't enjoying objections.

9    Is there some strategy?  And maybe it's strategic, I don't

10   know.  And I don't want to put you on the spot but it's

11   helpful for a jurist who has to sit here and listen to these

12   complex matters when the lawyer is aware.

13             MR. HURST:  I understand.

14             THE COURT:  Okay.

15             (End of sidebar conference.)

16             MR. BERGHOFF:  May I start again on that

17   question?

18             THE COURT:  Yes.

19             MR. BERGHOFF:  Thank you, Your Honor.

20   BY MR. BERGHOFF:

21   Q.    Dr. Prud'homme, how does the data related to the

22   Hydan report support or relate to your opinion that

23   viscosity of the Barr ANDA product, when deposited in the

24   nose, will return to its setting viscosity of 400-to-800

25   centipoise?

Prud'homme - direct

1    A.      If I'm asked the question what are the properties of

2    the material, and let's say it's in a small vial and I say

3    what is the property of that material, I can measure that

4    material in a different geometry as long as it's the same

5    material and tell you what property of that is in some small

6    vial, if that vial was behind a small screen or something

7    like that.

8            So measuring the properties doesn't necessarily

9    mean you have to do the measurement in that particular vial

10   or container.  So, to me, the distinction is an important

11   one.  We can measure the properties of the material in a

12   viscometer.  And if that material is the same material that

13   is in some other location, I can still measure the

14   properties of that material.  To me, as a scientist, that is

15   legitimate.  That is how I do science.

16   Q.      But you are not here holding yourself out as an

17   expert on the nose or nasal anatomy?

18   A.      No, I'm not.  I'm saying, therefore, this experiment,

19   which is not done in the nose, it's about this material

20   which I believe in the nose would reflect these properties

21   and these kinetics.

22   Q.      Do you have an opinion, Dr. Prud'homme, as to

23   whether, when the Barr ANDA product is deposited in the

24   nose, it would return to a relatively high viscosity?

25   A.      Again, those materials are based on Avicel, the

Prud'homme - cross

1    Avicel material.  This data showing that it returns rapidly

2    to a relatively high value as shown by the orange line; the

3    FMC experiments and conclusions, those researchers who work

4    with Avicel all the time saying it will return to its

5    thixotropic nature means it will return very rapidly to that

6    state; all of those things lead me to believe that in the

7    nose, it will return to this relatively high thixotropic

8    state.

9    Q.    One last question.  Dr. Prud'homme, what is your

10   opinion as to whether the Barr ANDA product, when deposited

11   in the nose, forms a viscous composition?

12   A.    Yes.  All of these materials, as shown in that data,

13   are viscous materials.

14            MR. BERGHOFF:  No further questions.

15            THE COURT:  Thank you, counsel.  You may

16   cross-examine.

17            MR. HURST:  Thank you, Your Honor.

18                    CROSS-EXAMINATION

19   BY MR. HURST:

20   Q.    Good morning, Dr. Prud'homme.  How are you?

21   A.    Good morning.  I'm very fine.

22   Q.    I'd like to start by talking about the claims

23   themselves, in particular to roman numeral three on the

24   claims.

25            MR. HURST:  Can we put up Defendant's Exhibit 7

Prud'homme - cross

1   at 10, Claim 5.

2          Can you put all three roman numerals up just to

3   make it simple and readable?

4   BY MR. HURST:

5   Q.    So, Dr. Prud'homme, you're here to talk about the

6   third element of the claims here, roman numeral three, and

7   whether Barr's product returns to a viscosity of 400-to-800

8   centipoise on the mucosal surfaces.  Right?

9   A.    Part of it, yes.

10  Q.    Now, this claim refers specifically to mucosal

11  surfaces.  Do you see that?

12  A.    Yes, I do.

13  Q.    You are not an expert on mucosal surfaces, are you?

14  A.    I'm not an expert on mucosal surface.

15  Q.    And you are not an expert on the various nasal

16  secretions that occur in the nose.  Correct?

17  A.    No, I benefitted from listening to the deposition

18  yesterday on that topic.

19  Q.    And you have done no analysis on how nasal fluids

20  might impact the viscosity of Barr's product in the nasal

21  cavity.  Correct?

22  A.    Actually, yesterday, I did the calculations back in

23  the court after listening to Michael's calculations.

24  Q.    Can I --

25  A.    So this is --

Prud'homme - cross

1    Q.      If you are going to talk about a calculation you did

2    yesterday, then I'm going to rephrase my question.

3    A.      Okay.  Please do.

4    Q.      Prior to yesterday, is it fair to say that you have

5    done no analysis on how nasal fluids impact the viscosity of

6    Barr's product in deposited form?  You have done no

7    analysis?

8    A.      Prior to yesterday and seeing the data presented by

9    the expert witness yesterday, I had not done any

10   calculations.

11   Q.      Okay.  And you're not an expert on ciliary forces

12   within the nasal cavity either, are you?

13   A.      I am not an expert in that.

14   Q.      And you have done no analysis, have you, on how

15   ciliary forces within the nasal cavity impact the viscosity

16   one way or another of Barr's product.  Correct?

17   A.      After seeing the videos yesterday, I draw conclusions

18   from those videos relating to the area of rheological

19   expertise.

20   Q.      I'm going to rephrase my question.

21   A.      Okay.

22   Q.      Before yesterday, is it true that you conducted no

23   analysis on how ciliary forces within the nasal cavity would

24   impact the viscosity of Barr's product and whether, in fact,

25   it meets roman numeral three?

Prud'homme - cross

1    A.       That is true.

2    Q.       Now, you do understand, of course, that it's hotter

3    in the nasal cavity than it is in typical laboratory

4    settings.  Correct?

5    A.       I learned that yesterday.  And will that be in or out

6    of things I can comment on?

7    Q.       As long as you are going to be offering opinions that

8    are in your expert reports and we've had an opportunity to

9    depose you on, I'm happy to hear them.  But opinions that

10   were developed yesterday, I'd rather not.  Okay?

11            Now, it is true, is it not --

12            THE COURT:  I wonder.  It's an interesting

13   dilemma, because both sides have agreed to permit experts to

14   remain in the courtroom.  A trial is a living, breathing

15   thing, and stuff happens that is unexpected.  We have

16   experts, people who are acknowledged experts within their

17   fields.  Brilliant scientists.  Why should they be precluded

18   from formulating views based upon what they're hearing from

19   other experts?  I don't know.

20            MR. HURST:  That's a fair question, Your Honor.

21   But obviously it would be outside the scope of the expert

22   reports, but more particularly here, this expert has

23   admitted to a lack of expertise on the environment within

24   the nasal cavity and, therefore, it would not necessarily be

25   helpful to the Court in my view.

Prud'homme - cross

1          THE COURT:  Fair enough.

2          MR. BERGHOFF:  Subject to my perhaps revisiting

3    this when it's my turn.

4          THE COURT:  All right.  I think I have opened

5    the box.  Okay.

6    BY MR. HURST:

7    Q.    Let's make clear.  You are not an expert on nasal

8    secretions within the nasal cavity.  Correct?

9    A.    No.  That is why I listened with interest to the

10   expert witness yesterday.

11   Q.    And you are not an expert in ciliary forces within

12   the nasal cavity.  Correct?

13   A.    That's why I found his video so fascinating.

14   Q.    And as far as you know, nobody in this case tested

15   Barr's product in any model that was designed to mimic the

16   conditions within the nasal cavity.  Correct?

17   A.    I believe that the rheological measurements of the

18   structure of the Nasacort AQ are reasonably mimicked in the

19   Brookfield viscosity measurements which is why it's

20   reflected in the claims of the patent.

21   Q.    For instance, it's hotter in the nasal cavity.

22   Right?  It's about 30 degrees hotter than room temperature.

23   Correct?

24   A.    I defer to your expertise.

25   Q.    And there is no testing by anybody from Aventis on

Prud'homme - cross

1    the recovery rate of Barr's product at 98.6 degrees.

2    Correct?

3    A.    That is correct.

4    Q.    And there is no testing from Aventis on the recovery

5    rate here for roman numeral three, Claim 5?  There is no

6    testing from Aventis on the recovery rate and viscosity of

7    Barr's product when nasal fluids are added to it.  Correct?

8    A.    That's correct.

9    Q.    And there is no testing from anybody at Aventis on

10   the recovery rate of Barr's product, looking again at roman

11   numeral three, when ciliary forces are introduced into the

12   mix.  Correct?

13   A.    They have not done that.  I don't believe those

14   forces are significant.

15   Q.    Right.  And the temperature of the testing probably

16   would have been easy to do.  Right?

17   A.    I believe temperature has essentially zero effect on

18   the rheology of these fluids.

19         MR. HURST:  Can we pull up Page 228 of

20   Dr. Prud'homme's deposition?

21         May I approach, Your Honor?

22         THE COURT:  Yes, you may.

23   BY MR. HURST:

24   Q.    Do you need this or is the screen fine?

25   A.    And this point the screen will be fine.  Thank you.

Prud'homme - cross

1    Q.      Okay.  At the top here:

2              "Question:  First, you agree that difference in

3    temperature can have an effect on viscosity?

4              "Answer:  For what material and over what

5    temperature range?

6              "Question:  For the accused Barr product over

7    the temperature range of room temperature to nose

8    temperature?

9              "Answer:  There may be effects due to

10   temperature changes.

11             "Question:  You just don't know one way or the

12   other whether there are any in this case.  Right?

13             "Answer:  I have not seen measurements on

14   materials with different temperatures on the Barr material

15   or the Aventis material."

16             Did you give those answers to those questions,

17   sir?

18   A.      Absolutely correct.

19   Q.      Okay.

20   A.      But I had that experience with vis-a-vis Avicel type

21   materials done at different type of materials and for these

22   type of materials, there is very little temperature

23   dependence on the Avicel material.

24   Q.      In fact, in your expert report, you mentioned none of

25   the temperature-related experiments that you just referred

Prud'homme - cross

1   to.  Correct?

2   A.      That is correct.

3   Q.      Okay.  Now, let's go back to number three.  I want to

4   direct your attention to this particular prong of the

5   claims, and in particular, Barr's product.  And here is my

6   question:

7               Sir, you have no opinion, one way or the other,

8   on whether Barr's nasal spray would return to its unsheared

9   viscosity after being deposited in the nose.  Correct?

10  A.      I'm not an expert in the nose.  I have opinions on

11  whether the material itself would regain structure and under

12  what conditions that would occur.

13  Q.      But my question is you don't know, one way or

14  another, whether Barr's product would return to its

15  unsheared viscosity after being deposited in the nose, do

16  you?

17  A.      My expectation again, as I went through this

18  discussion about if I have a material in one location and I

19  measure the same material in another location, would it be

20  similar or different if there were not forces that changed

21  that material, then my experience would tell me that the

22  Nasacort material will retain or the Barr material will,

23  once again, regain those characteristics of the unsheared

24  material.

25               MR. HURST:  Can we go to your deposition at Page

Prud'homme - cross

1    189, spilling over to 190, Line 18.

2    BY MR. HURST:

3    Q.          "Question:  You agree, though that it would --

4    you don't know one way or the other in the nose whether once

5    applied the shear returns to unsheared for any of the nasal

6    sprays that we are talking about today.  Right?

7               "Answer:  I am not an expert in nasal passages

8    and have no opinion in that area.

9               "Question:  Have you done any analysis or do you

10   have any opinion about whether or not the sheared nasal

11   spray returns to a thicker, more viscous material before the

12   chance of clearing from the nose because of how the nose

13   works?

14              "Answer:  I am not an expert in the nasal part

15   of that question or in clearance rates or anything like

16   that, so I would not know."

17              Did you give those answers to those questions,

18   sir?

19   A.     Absolutely, yes.

20   Q.     Let's take a look now at the two reports that your

21   counsel asked you to review during your direct examination.

22              First let's take a look at Plaintiff's Exhibit

23   380.

24              This is an FMC report relating to testing with

25   Barr's product.  Is that right -- I am sorry, this is with

Prud'homme - cross

1    Nasacort?

2    A.      Yes, it is.

3    Q.      This is not testing with Barr's product.  Correct?

4    A.      This is testing with Nasacort.

5    Q.      Now, the testing in this report, am I correct that

6    there was no effort to try to mimic the conditions in the

7    nasal cavity?  Is that true?

8    A.      That is true.

9    Q.      There was no testing at body temperature in this

10   report.  Correct?

11   A.      It was done at ambient temperature.

12   Q.      And there was no effort to try to introduce fluids

13   into the formulation to mimic the action of nasal fluids

14   being introduced in the system.  Correct?

15   A.      I don't know if nasal fluids would be introduced into

16   the system.

17   Q.      And there was no effort to try and introduce the

18   level of shearing forces that might come from cilia beating

19   a thousand times a minute.  True?

20   A.      Based on discussion yesterday I don't believe those

21   forces would be significant.

22   Q.      But my question is, there is nothing in the FMC

23   report doing any testing on that issue?

24   A.      You were importing the idea of cilia forces.  There

25   is nothing in here that relates to cilia forces.

280

Prud'homme - cross

1    Q.       That's my question.

2            Now, if we go to the Hydan report, which is

3    Defendant's Exhibit 76, it's just another version -- it's

4    the same document, different number, this is another

5    document that you looked up with counsel.  Correct?

6    A.       Yes.

7    Q.       Now, again, this particular testing, this was not

8    testing with Barr's product.  Right?

9    A.       No.  This was testing with other commercial products.

10   Q.       Am I correct, then, that both of the reports that you

11   talked about for your opinion, the FMC report and the Hydan

12   report, they were both testing with Nasacort.  Correct?

13   A.       That is correct.

14   Q.       Not Barr's product.  Right?

15   A.       Barr's product is an identical composition to the

16   Nasacort which was tested, correct.

17   Q.       You did see earlier the viscosity testing that Dr.

18   Lockhead had done, right, to show different sheared

19   viscosities for Nasacort versus Barr?  You saw that.  Right?

20   A.       I saw that data.

21   Q.       Now, on this Hydan report, again -- and I won't

22   belabor it -- but there is no effort when they are testing

23   Nasacort to mimic the conditions in the nasal cavity.

24   Correct?

25   A.       There are no efforts to do that.

Prud'homme - cross

1   Q.      Now, also, for both of these reports that you looked

2   at, I didn't hear you mention the range of 400 to 800

3   centipoise.  Did you?

4   A.      I did not.

5   Q.      Now, let's go back to the claim, Claim 5, III, do you

6   see where it says that the return has to be the 400 to 800

7   centipoise?

8   A.      Yes.

9   Q.      And the reason, when you talked about these two

10  reports, you didn't mention 400 to 800 centipoise is because

11  neither report mentions 400 to 800 centipoise.  Correct?

12  A.      No.

13  Q.      They do not.  Right?

14  A.      They do not mention that.

15  Q.      Now, I just want to spend a little time looking at

16  this.  In the Hydan report, which is Defendant's Exhibit 76,

17  I want to take a look at Page 5 of this exhibit.  Now, this

18  is the exhibit you were relying on to argue that recovery to

19  a setting viscosity happens rapidly.  Right?

20  A.      Part of the evidence, yes.

21  Q.      I just want to make sure that I understand the timing

22  of this.  Okay.  The timing for these tests is actually only

23  120 seconds.  Right?

24  A.      That is true.

25  Q.      And so one of the things, if a product -- this is

Prud'homme - cross

1   pretty violent shearing, from 0 to 30 seconds, that is

2   fairly violent shearing?

3   A.      It is a hundred reciprocal seconds, yes.

4   Q.      As soon as the violent shearing is removed, the

5   viscosity jumps up.  Right?

6   A.      Yes, it does.

7   Q.      But this doesn't mean that the material returned to

8   its at-rest setting viscosity in 30 seconds, does it?

9   A.      I believe it does indicate that.

10  Q.      Let's talk about that.  So your view is that after

11  only 30 seconds, these materials in question return to their

12  setting viscosity?  That's your view?

13  A.      The microstructure -- you have introduced the term

14  setting viscosity.  What I infer from that is the

15  microstructure of this Avicel material returns to a highly

16  structured interconnected state.

17  Q.      I am talking about the viscosity required by the

18  patent, 400 to 800 centipoise.  That is what I am talking

19  about.  Is it your view that in 30 seconds these materials

20  in question return to a viscosity of 400 to 800 centipoise?

21  A.      That number 400 to 800 centipoise is defined by a

22  very specific set of experimental protocols listed in the

23  patent and relied upon by, or conducted by Bob Lockhead.

24  Q.      Let's take a look at Dr. Lockhead's experiments.  Let

25  me put up Dr. Lockhead's report, which is Defense Exhibit

Prud'homme - cross

1    362.  We will go to Page 9.  Why don't we pull out Sample 3.

2           Now, you understand that this testing -- let's

3    orient ourselves here.  This is testing with Barr's actual

4    product.  Right?

5    A.    Yes.

6    Q.    Unlike the Hydan and FMC reports.  Right?

7    A.    Yes.

8    Q.    And the setting viscosity that Dr. Lockhead found was

9    about 600.  Right?

10   A.    Yes.

11   Q.    And then he tests shear viscosity.  Right?

12   A.    Yes.

13   Q.    And he takes three measurements over the course of

14   about two minutes.  Right?

15   A.    Yes.

16   Q.    And at the end of the two minutes, even at the end of

17   the two minutes, am I correct that the -- at the end of the

18   two minutes the reading is 96.8.  Right?

19   A.    Yes.

20   Q.    And the setting viscosity is about 600.  Right?

21   A.    Yes.

22   Q.    So at the end of two minutes, am I correct that the

23   setting viscosity remains about six times as high as the

24   shear viscosity?

25   A.    Approximately correct.

Prud'homme - cross

1    Q.    Now, in terms of measuring how long it takes Barr's

2    product to return to setting viscosity, I just want to set

3    aside the nasal viscosity for one second.  Even on a

4    tabletop, Dr. Lockhead could have measured how long it takes

5    to get back up to 600, or even to 400, as the claims say,

6    just by testing again a half-hour later.  Correct?

7    A.    Not quite.  This measurement is to define two

8    viscosity values the patent lays out.  I have written

9    several patents.  One wants to put in specific tests so one

10   can know whether one is violating the patent or not.

11           They define these two tests with what they have

12   called, I believe in the patent it says for simplicity or

13   for convenience, they are going to define these as two

14   words, setting viscosity and shear viscosity.  That's what

15   those are.  That is what the patent is defining as

16   thixotropy or this is what we patented.

17           There are many other ways to measure the

18   kinetics of re-healing.  I believe the Barr and FMC are

19   better ways of measuring how fast those transitions occur,

20   and that this -- there is nothing in the patent that defines

21   how fast this transition occurs.

22   Q.    Just taking my question for one second.  If we wanted

23   to find out quickly Barr's product returns to its setting

24   viscosity even on the tabletop, without nasal fluids,

25   without ciliary action, just on the tabletop, all Aventis

Prud'homme - cross

1    had to do was test again after 30 minutes.  Right?

2    A.    The Brookfield Viscometer, because of that geometry,

3    and concentrating stress near the spindle, and operating

4    this measurement at a high speed, 30 RPMs, disrupts

5    structure significantly.  It allows you to do this

6    measurement they have defined, but it is not the best

7    measurement to look at how fast something evolves, in my

8    opinion.

9    Q.    All I am saying is they could have let it rest

10   completely for 30 minutes or an hour and then test it again

11   to see if over that entire period Barr's product would

12   return up to 400 to 800 centipoise as required by III.

13   Correct?

14   A.    One could do that experiment.

15   Q.    And nobody decided to do that.  Right?

16   A.    I did no measurements and was not in the decision

17   loop for measurements.

18   Q.    So you did no testing in this case?

19   A.    I did no testing in this case.

20   Q.    Just one more line of examination, a few questions.

21         Can we put up, please, DX-23?  Defendant's

22   Exhibit 23.

23         Can we highlight, please, the first part of

24   this.  I talked to Dr. Lockhead about this testing.  Right?

25   A.    Yes.

Prud'homme - cross

1    Q.      And why don't we just make sure, I don't even want to

2    characterize it, it is viscosity of Nasacort AQ versus

3    Beconase.  Right?

4    A.      Yes.

5    Q.      What Aventis did was test, as they say, the viscosity

6    of their product versus Beconase and Vancenase to see if

7    they return to their unshaken state at equal times.  Right?

8    A.      That's what that says, yes.

9    Q.      So this is testing, the kind of testing that I was

10   talking about, waiting, seeing how long a fluid takes to

11   return to its setting viscosity on the tabletop.  Right?

12   It's that kind of testing?

13   A.      It appears to be, yes.

14   Q.      Now, when you signed your expert report in this case,

15   your opening report on III of that claim, am I correct that

16   you did not consider any of this testing with the Nasacort

17   product and how long it takes to return to its setting

18   viscosity?

19   A.      I would have to look at in what stage of these, my

20   reports and rebuttals this document was considered.  I don't

21   recall when that was.

22   Q.      Why don't we take a look at your opening report,

23   Defendant's Exhibit 366.  If you look at Page 3, if it

24   helps, it's on the screen.

25   A.      Thank you.

Prud'homme - redirect

1    Q.      It spills over to the next couple of pages.  We list

2    a lot of the things that you considered in arriving at your

3    opinion about whether Barr's product returns to 400 to 800

4    centipoise in the half-hour or so it remains in the nasal

5    cavity.  Right?

6    A.      Right.

7    Q.      Now, you didn't consider this Aventis testing that

8    took place over the course of five days in forming your

9    opinion with respect to infringement.  Correct?

10   A.      If that's not listed among here of the things that I

11   have looked at, then I had not looked at that at that point.

12   Q.      You can confirm for yourself, it is a couple of

13   pages.  You are not going to see it there, Doctor.

14   A.      I take your word for it.

15           MR. HURST:  All right.  Thank you, Doctor.  I

16   have no further questions at this stage.

17           THE COURT:  Redirect.

18                    REDIRECT EXAMINATION

19   BY MR. BERGHOFF:

20   Q.      Dr. Prud'homme, if I can just refer to it as the

21   tabletop experiment that Barr's counsel keeps referring to,

22   where we just let I guess some Barr ANDA material sit on the

23   tabletop for a period of time and then we measure it with

24   the Brookfield Viscometer, what's your opinion as to the

25   relevance of that with respect to the viscosity of the Barr

Prud'homme - redirect

1    product after it's deposited in the nose?

2    A.    I believe that the recovery of the microstructure in

3    that sprayed material is very rapid, as shown by the Hydan

4    data, as shown by the FMC report and FMC comments and the

5    fact that FMC anticipated using this as a spray on skin.

6    That's what they thought this test was about.

7            I have been involved with FMC in those sorts of

8    spray applications.  You need something that sticks on the

9    skin, has enough thixotropic structure, doesn't drip off.

10   So you needed something that would rebuild quickly.  That is

11   a fundamental characteristic of Avicel, that it rebuilds

12   structure quickly.  So I believe that this deposit in the

13   nose material rebuilds structure very quickly.

14   Q.    Is it your opinion that the Hydan report and the FMC

15   report are more or less relevant than this hypothetical

16   tabletop experiment?

17   A.    I believe they are much more relevant, because in

18   this tabletop experiment, one is taking this material, and

19   then when one dips the Brookfield Spindle into that, one has

20   concentrated all the stresses in that measurement, and is

21   doing that measurement at a very high stress level.  So the

22   measurement itself is changing the structure.  So the

23   measurement influences the results.

24           I believe in that case that it makes it less

25   germane to the question of the time scales, because the

Prud'homme - redirect

1    measurement is perturbing those time scales, I believe.  And

2    that doesn't occur in the Hydan instrument or in the FMC

3    instrument, which is two very thin gaps.

4            So the stress is uniform in that very small

5    volume, and it's imposing a much more regular stress-energy

6    distribution on those materials.  That occurs when you take

7    that small spindle and put it in the large beaker.

8    Q.   Since you referred to the equipment, perhaps, could

9    we just put up a diagram, just to show the Court, it's

10   Plaintiffs' Demonstrative Exhibit 38.  Did you help prepare

11   this, Dr. Prud'homme?

12   A.   To the left is the Brookfield LVT geometry drawn to

13   scale.  The bottle, this low-form bottle that has been

14   described, it is three and a half inches in diameter, you

15   have a very large volume of liquid.

16           You dip that small disk on a shaft into that and

17   you begin turning.

18           So most of the energy is being put in right near

19   that turning object, and there is very little energy putting

20   in this the greater volume of that liquid.

21           In contrast, the device used in the, geometry

22   used by FMC and Hydan, shown to the right, there you have a,

23   it's actually a very shallow cone and a plate.  The blue

24   liquid is that thin fill of liquid confined between the cone

25   and the plate.  It sees a very uniform stress field as

Prud'homme - redirect

1    opposed to the very un-uniform stress field shown for the

2    Brookfield.

3            Therefore, it is much better for looking at

4    things like kinetics and for looking at things which have

5    very sensitive structures, as this does.

6            However, the Brookfield instrument is a very

7    fine instrument.  It's the instrument that is in all the

8    quality control labs.

9            THE COURT:  Do you have a question?

10           MR. HURST:  Your Honor, this is beyond the scope

11   of cross.  It is a prepared demonstrative exhibit that was

12   obviously prepared in advance.  I did not ask anything about

13   the cone and plate device at all.

14           MR. BERGHOFF:  This is the device in the FMC

15   report and the Hydan report that we have been talking about.

16           THE COURT:  I understand that.  I will give you

17   a little leeway.  But you are beyond the scope of his

18   cross-exam.

19           MR. BERGHOFF:  I am finished.  He mentioned the

20   apparatus.  I just wanted Your Honor to see it, that's all.

21   BY MR. BERGHOFF:

22   Q.    Dr. Prud'homme, I am going to focus my question very

23   pointedly on your opinion as of today, not as of yesterday

24   or two days ago.

25           What is your opinion today as to the effect of

Prud'homme - redirect

1    the cilia in the nose, based on the testimony you heard in

2    court yesterday, on the viscosity of Barr's ANDA product

3    when deposited in the nose?

4              MR. HURST:  Objection.  That's outside the scope

5    of the expert reports.  He could have talked to the same

6    experts.

7              (The following took place at sidebar.)

8              THE COURT:  He could have talked with the same

9    experts.

10             MR. HURST:  He could have talked with the very

11   same experts, they are Aventis's experts, and put all of

12   these opinions in his opening expert report.  I think

13   counsel would acknowledge, these opinions are nowhere in his

14   expert report.  I didn't get to depose him on any of these

15   issues.  I, in fact, have an expert to address how the nasal

16   cavity will impact viscosity and fluids.  The other side did

17   not have one and I should not be forced to --

18             MR. BERGHOFF:  I believe counsel has opened the

19   door several times in this examination to the effect of

20   cilia on the viscosity of material in the deposited nose.  I

21   think this is fair.

22             THE COURT:  Overruled.

23             (End of sidebar conference.)

24   BY MR. BERGHOFF:

25   Q.    Dr. Prud'homme, do you need the question read back,

Prud'homme - redirect

1    or are you still with us?

2    A.      I am still with you.

3            The answer to the question is, yesterday there

4    was a beautiful video presented of the ciliary motion.  And

5    the expert testimony, which I am not an expert in that area,

6    but the testimony was given by Michael, showing that the

7    mucus layer is transported on top of that ciliary motion.

8    And he had a series of marker spheres, dots, on top of that.

9    And they moved uniformly in sort of a marching array across

10   that mucosal layer as it was deposited.

11           The best analogy, I thought about this last

12   night, is of a moving runway at the Philadelphia Airport.

13   So in the moving runway you have lots of wheels underneath

14   that are moving like mad to make the belt move.  When we

15   stand on that belt, our shoes aren't ripped apart moving

16   around.  It is conveying our shoes, conveying us, down the

17   belt, without any disruption of ourselves.

18           So underlying ciliary motion, if it is merely

19   moving that mucosal layer, is not necessarily disrupting the

20   structure Avicel.

21           That expert testimony yesterday would indicate

22   to me the ciliary motion has no effect on the microstructure

23   of Avicel.

24           The other calculation I did yesterday was,

25   because it was brought up by Barr's attorneys, would there

Prud'homme - recross

1    be dilution, that is, would liquid from the mucosal layer

2    dilute the Avicel.  That is the statement they were making.

3    So I then did a calculation, it turns out, a calculation of

4    the tendency of a liquid to draw water in, which is based on

5    osmotic pressure --

6            MR. HURST:  Your Honor --

7            THE COURT:  I will give you another chance at

8    him.  Sit down.

9            THE WITNESS:  So it turns out that the Avicel

10   material has about five percent dextrose.  Dextrose is added

11   as a sugar to make it isotonic, so that it doesn't dry out

12   membranes nor saturate membranes.

13           So it is equivalent osmotic pressure to

14   biological fluids, to the mucosal fluids.  So there is no

15   tendency of that mucosal fluid to want dilute the Avicel

16   because they are both at the same water-loving tendency.

17           Therefore, I would not expect dilution of a

18   material which has a microstructured network and heal

19   stress, is gel-like, like Avicel is.

20           MR. BERGHOFF:  No further questions.

21           THE COURT:  I will give you another round.

22                      RECROSS-EXAMINATION

23   BY MR. HURST:

24   Q.    The calculations that you have just discussed, did

25   you write them down?

Prud'homme - recross

1    A.    Yes, I did.

2    Q.    And did anyone give me those calculations before

3    today, as far as you know?

4    A.    As far as I know, no.

5    Q.    The ciliary action that we have been discussing

6    during this proceeding, we asked you those same questions at

7    your deposition, didn't we?

8    A.    Absolutely.

9    Q.    And these experts yesterday that got up and showed

10   that video of the ciliary action, they were experts from

11   Aventis.  Right?

12   A.    For the Aventis side, correct.

13   Q.    From the Aventis side, yes.

14         Did you make any effort before last night to try

15   to determine in any way, shape or form how the environment

16   of the nasal cavity, the nasal fluids, the ciliary forces,

17   impacted, would impact the viscosity of Barr's product while

18   in the nose?

19   A.    No.  Until seeing that data, that was not my area of

20   expertise.  I have an area of expertise in polymer

21   microstructure.  When I saw that data, it informs what I

22   already know about microstructure.

23   Q.    So this is a brand-new opinion from last night you

24   are talking about?

25   A.    If I had not seen that video, I would not have this

Prud'homme - recross

1    opinion.

2    Q.    Do you know why Aventis attorneys never showed you

3    that video until you saw it in court yesterday?

4    A.    I am not privileged to that information.

5    Q.    Do you know why Aventis attorneys never asked you to

6    run a calculation about the mixing between nasal fluids and

7    Barr's product until last night?

8    A.        They didn't ask me to do this.  I did this sitting

9    in the back of the Court, when I heard a series of questions

10    about wouldn't the mucosal fluid dilute.  I was not asked to

11    do that calculation.  I was sitting having an enjoyable day

12    in the back of the Court.

13    Q.    They actually never asked you to do the analysis?

14    A.        As a scientist, these are things I love to do.

15              THE COURT:  You know who asked him?  You asked

16    him.

17              MR. HURST:  Thank you.  I have no further

18    questions.

19              THE COURT:  Did you have anything further for

20    the witness?

21              MR. BERGHOFF:  No, Your Honor.

22              (Witness excused.)

23              THE COURT:  Indirectly, counsel.  You.

24              MR. HURST:  I know, I understand the ruling.

25              THE COURT:  And I accept your exception to the

Prud'homme - recross

1      ruling.  But the ruling is the ruling.

2              Your next witness.

3              MR. BERGHOFF:  Mr. Rich will handle our next

4      witness, Your Honor.

5              THE COURT:  We will take this until 12:30 and

6      take 45 minutes for lunch.

7              MR. RICH:  Your Honor, if we could beg the

8      Court's indulgence, we would like to move some things around

9      and set up some charts.

10              (Pause.)

11              MR. RICH:  Your Honor, perhaps before we block

12      off the entryway, I can call Dr. Meltzer to the stand.

13              THE COURT:  This is going to block?

14              MR. RICH:  I fear that it might block the easy

15      pathway.

16              THE COURT:  You know, let's just use this as a

17      logical time to take an earlier break than I anticipated.

18      We'll come back at 1:00 o'clock.

19              (Luncheon recess taken.)

20              THE COURT:  Please be seated.

21              All right.  We're ready for our witness.

22              MR. RICH:  Yes, Your Honor.  We'd like to call

23      Dr. Eli Meltzer.

24              THE COURT:  Okay.

25                          - - -

Meltzer - direct

1                    PLAINTIFFS' TESTIMONY

2              ... DR. ELI MELTZER, having been placed

3              under oath at 1:03 p.m. as a witness, was

4                examined and testified as follows ....

5                            - - -

6                     DIRECT EXAMINATION

7      BY MR. RICH:

8      Q.      Good afternoon, Dr. Meltzer.

9      A.      Good afternoon.

10     Q.      You're a physician; correct?

11             THE COURT:  Are the binders here for the doctor?

12             MR. RICH:  Thank you, Your Honor.  Might I

13     approach the witness?

14             THE COURT:  Yes, please.

15             (Binders passed forward.)

16     BY MR. RICH:

17     Q.      Dr. Meltzer, you're a physician?

18     A.      Yes, I am.

19     Q.      Could you describe your practice for us?

20     A.      For the last 40 years, I've been taking care of

21     patients.  I do clinical care.

22             For the last 30 years, I've been doing clinical

23     research, seeing new medications and seeing if we can find

24     better therapies for patients than ones we have.

25             I also have been involved in teaching for many

Meltzer - direct

1    years.  We have students from the university coming over,

2    residents and fellows rotate through the office.  And I've

3    lectured regionally, nationally, internationally for many

4    years, and then I consult.  I do many pharmaceutical

5    consultancies.

6              MR. RICH:  Perhaps it would help to have his CV

7    up, if we could.

8    BY MR. RICH:

9    Q.    And you practice at the Allergy and Asthma Medical

10   Group and Research Center?

11   A.    Correct, in San Diego.

12   Q.    Thank you.  In your clinical work, how many patients

13   have you treated?

14   A.    I've never kept count.  It's thousands.  Many

15   thousands.

16   Q.    Are you board certified in any specialities?

17   A.    I'm board certified in pediatrics and allergy and

18   immunology.

19   Q.    Have you written on the subject of allergies and

20   respiratory diseases?

21   A.    I have roughly 500 publications between abstracts and

22   manuscripts and book chapters.

23   Q.    And those are listed in the CV, which is in your

24   binder as Plaintiffs' Exhibit 369.

25   A.    It's listed.  It's not up-to-date, but it's up to

Meltzer - direct

1    2007, yes.

2    Q.    So it's only incomplete in that you have done more

3    work since then?

4    A.    Correct.

5    Q.    Now, you said teaching and lecturing are part of what

6    you do.  How many speeches or presentations on allergy or

7    respiratory disease have you done?

8    A.    Unrelated to the teaching we do in the clinic, I've

9    had hundreds, probably 500-plus formal presentations in

10   different locations around the world.

11   Q.    And those are also listed in your CV?

12   A.    They are.

13   Q.    You said as well that clinical research is part of

14   what you do.  How many clinical trials for allergy or

15   respiratory disease drugs have you taken part in?

16   A.    600-plus.

17   Q.    And, again, those are listed in your CV?

18   A.    They are.

19   Q.    Now, if you could turn to Clinical Trial No. 554 on

20   your CV.

21   A.    (Witness complies.)

22   Q.    Could you tell me what that clinical trial was?

23   A.    This was a clinical trial, the sponsor was Clay-Park,

24   which I understand is a subsidiary of Perrigo, looking at

25   the bioequivalence of triamcinolone acetonide nasal spray, a

300

Meltzer - direct

1   generic compound, compared with Nasacort, the innovative

2   product in terms of bioequivalence.

3   Q.      You also mentioned consulting work.  For which

4   companies in the allergy field have you consulted?

5   A.      Probably all of them.  The ones I would highlight

6   would the ones that have to do with internasal

7   corticosteroids.  And they include, at different points in

8   time:  AstraZeneca, Murrow (phonetic), which is now no

9   longer in existence, Sanofi-Aventis, Schering-Plough,

10  GlaxoSmithKline.

11  Q.      Are there any internasal corticosteroid drugs that

12  you haven't consulted on?

13  A.      No.

14  Q.      And just to be clear, you're familiar with those

15  drugs from your work treating patients as well?

16  A.      Absolutely.

17  Q.      Can you tell me what your educational background is?

18  A.      I went to the University of Pennsylvania where I

19  received my bachelor of arts degree.

20          And then medical school at Jefferson Medical

21  College.

22          I did my internship in Pediatrics at Michael

23  Reese Hospital in Chicago.

24          My residency was back in Philadelphia at St.

25  Christopher's Hospital for Children.

Meltzer - direct

1              And my fellowship in Allergy Immunology in

2       Denver at the National Jewish Medical and Research Center in

3       the University of Colorado.

4       Q.    And are you on the faculty of any academic

5       institutions?

6       A.    I'm Clinical Professor of Pediatrics at the

7       University of California in San Diego; and Past Chief of the

8       Division of Allergy at Children's Hospital, which is the

9       pediatric affiliate at the university.

10      Q.    Now, have you ever advised the U.S. Food and Drug

11      Administration?

12      A.    I served on the Pulmonary Allergy Advisory Board for

13      several years.  They have invited people.  We rotate in and

14      rotate out after several years.

15      Q.    Have you ever advised the World Health Organization?

16      A.    The World Health Organization develops initiatives

17      and initiatives that I have served on, including what they

18      call the ARIA guidelines, the Allergic Rhinitis Impact on

19      Asthma and Inner Airways.  Those are still ongoing at this

20      point.

21      Q.    Finally, on this topic, have you received honors for

22      your work on allergy and respiratory diseases?

23      A.    I belong to three national societies:  The American

24      Academy of Pediatrics.  I received the Distinguished Service

25      Award.  The American Academy of Allergy Asthma Immunology

Meltzer - direct

1    Distinguished Clinician Award.  The American College of

2    Allergy Asthma Immunology Distinguished Fellow Award.

3              MR. RICH:  Your Honor, at this time, we would

4    like to proffer Dr. Meltzer as an expert in allergies and

5    their treatment, including specifically intranasal and

6    steroid sprays.

7              MR. GRACEY:  No objection.

8              THE COURT:  The doctor is accepted.

9    BY MR. RICH:

10   Q.    I'd like to turn to allergic rhinitis then.  Can you

11   tell me what allergic rhinitis is?  And we have a slide to

12   assist me.

13   A.    Allergic rhinitis is really an abnormal response by

14   people to normal things that we all breathe.  All of us have

15   to breathe.  We need oxygen.  But along with the oxygen

16   comes everything else that floats in the air.  And on this

17   particular diagram, you can see an example which would be

18   pollen.  Ragweed is big in the East, not so much in

19   California.  It could be a cat dander.  It could be a dust

20   particle.

21             And when we breathe in these particles, our

22   immune system processes them.  And we process them through

23   certain immune cells:  lymphocytes, including what we call T

24   lymphocytes.  And if you are predisposed genetically to make

25   an abnormal response to these normal substances, these T

Meltzer - direct

1      cells instruct plasma cells to make an abnormal antibody.

2             All of us make antibodies called G types, A

3      types and D types, but allergic people make the extra

4      antibody called the E antibody.  So what differentiates

5      normal from allergic people is whether you make the E

6      antibody.  What you make the antibody to is what you are

7      allergic to.  And when you meet up with the thing you made

8      the E antibody to, it triggers a reaction and that reaction

9      is called the allergic reaction.  And that releases from

10     cells.  And you can see on the right-hand side this mast

11     cell, certain chemicals.

12            So the E antibody floats into your bloodstream,

13     sits on mast cells.  And then -- if we could have the next

14     slide, Eric -- when you are reexposed to that pollen or that

15     dust mite, these chemicals are released.  Some are

16     preformed.  Histamine is probably the best known but there

17     are others called leukotrienes and bradykinins.  These

18     chemicals get out.  When these chemicals hit the cells in

19     your nose, if they affix themselves to the glands, they

20     cause extra mucus to be produced, giving you a runny nose.

21     If they affix themselves to the nerves, they cause an

22     irritation which gives us an itchy feeling and causes

23     sneezing.  And if they affix themselves to the blood

24     vessels, they cause blood vessels to dilate and leak, so you

25     get swelling around the blood vessels.  We feel that as

Meltzer - direct

```
1    congestion or blockage or a stuffy nose.  So those are the

2    symptoms that people experience and that is what we call the

3    immediate reaction.  So when, boom, you are exposed and,

4    boom, you have a problem usually within the first hour.  You

5    will have symptoms.

6             But most people -- if we could have the next

7    slide -- go on to have continued problems.  And so in

8    addition to those chemicals being released, there is

9    something called cytokines, which you can see on the top

10   left-hand side, and they call in from the blood vessels

11   certain cells:  white blood cells called the acidophils and

12   basophils, and these blood cells get into the tissue and

13   they release toxic proteins and they also release more of

14   the histamines and more of the leukotrienes and you end up

15   having more symptoms, ongoing symptoms, and what we call

16   chronic inflammation.  It's not just something that occurs

17   within an hour like a light switch and then goes off again.

18             It continues, it's persistent.  And in the

19   airway, when it's inflamed, it stays irritable and it stays

20   hyperresponsive.  So it takes very little to keep it going.

21   The allergin doesn't have to be very high.  And you will

22   keep on being symptomatic and you get an irritant response

23   to things like paint and perfume and tobacco smoke.  So your

24   air is unstable and you become hyperresponsive.  So that is

25   the chronic inflammation that we see with allergic disease.
```

Meltzer - direct

1    Q.      Now, is this the same or different from something

2    like mucociliary clearance as a defense for the body?

3    A.      Oh, it's different.   The mucociliary is a process

4    that has to do with anatomical structures.   The little cilia

5    that sit on top, as Dr. Kaliner pointed out yesterday, of

6    our cells.   The epithelium, the top lining of the nose

7    membrane, has the little cilia that move our mucus along.

8    This is immune system that has to do with antibodies that

9    are made or cells that are parts of our system that get into

10   that tissue that create the ongoing inflammation.

11              MR. RICH:   I think we have a slide, if we could,

12   that talks about a lot of the symptoms that you talked

13   about.

14   BY MR. RICH:

15   Q.      The primary systems, is that what you meant about the

16   early phase reaction?

17   A.      Early and late.   We can see nasal symptoms both early

18   and ongoing, people with nasal drainage, forward and

19   backward, are called postnasal drainage.   They can have this

20   repetitive sneezing and spasms.   Itchy nose, a wiggle called

21   rabbit noses and they rub at it.   The nose is blocked.

22   They're stuffy.   That is nasal symptomology.

23              But many people, in addition to the nasal

24   symptoms, have eye symptoms.   They get itchy and watery,

25   itching of their throat, itching of the pallet, itching of

Meltzer - direct

1    the ears.  And people, in addition to having the obvious

2    respiratory symptoms, don't feel well.

3                    Actually, we call allergic rhinitis a disease.

4    And I like that word "disease" because if you break it in

5    half, it's dis-ease.  They just don't feel very well.  And

6    if they don't feel well.  They complain of headaches more

7    often.  They don't sleep well.  There is a recent survey

8    that showed 40 percent of the people with nasal allergies

9    don't sleep well, either have trouble falling asleep or

10   staying asleep or waking up not as refreshed.

11                   And if they don't sleep well, then clearly they

12   don't perform very well at work, or at school for children.

13   We actually have a term for that called presenteeism.

14   People don't feel very well.  They're there but they're

15   compromised.  So we're just not as good as we would be if we

16   didn't have the disease, this allergic rhinitis.

17   Q.    Do you differentiate between allergies based on the

18   type of allergen?

19   A.     There is a standard way of differentiating based on

20   time of year or triggers.  So what are the allergens that

21   typically in places like Wilmington have these seasonality?

22   Where I live in Southern California, it's much more blunted.

23   We don't have snow, we don't have a lot of cold, so we have

24   pollination really year around.  So tree pollen goes in San

25   Diego for five-six months.  Here, it's for a few months.

Meltzer - direct

1    Grass pollen -- and this is what we have at springtime.

2    We'll have tree-and-grass pollination.  And you will have,

3    in the summertime, fallen weed like ragweed or others,

4    sagebrush.

5                And then there are year-round allergens we call

6    perennial allergens people are exposed to primarily inside

7    the house.  Dust mite is probably the most well known.  Mold

8    spores are a common trigger of this allergic mechanism and

9    animal dander is extremely common.  It's said that there is

10    some 85 million cats now in the United States and 75 million

11    dogs.

12                So there is a lot of people who are exposed.

13    And if they have this susceptibility, then they will tend to

14    be allergic year around.  And many people have both seasonal

15    and year-around problems because they're poly-sensitized.

16    They're allergic not just to one thing.  They're allergic

17    usually to many, many allergens.

18    Q.    Is the symptomatology the same between seasonal

19    allergic rhinitis and perennial allergic rhinitis?

20    A.    Close enough.  They end up having a little more

21    problem, depending upon the allergin.  Cat allergin tends to

22    cause a lot of eye symptoms.  Pollen allergin tends to cause

23    a lot of eye symptoms.  Dust mite, not so much, mold, not so

24    much.  There's a little variation, but similar enough that

25    we don't really based on symptomatology.  It's based on what

Meltzer - direct

1    the trigger is.

2    Q.    I would like to turn your attention to

3    corticosteroids, if I could.  Why are corticosteroids used

4    in the treatment of allergic rhinitis?

5    A.    Corticosteroids are really our best

6    anti-inflammation.  Allergic rhinitis is an itis, and the

7    term, the suffix itis really means inflammation, just like

8    tonsillitis or appendicitis or arthritis are inflammatory

9    problems, allergic rhinitis is an inflammation.  If you can

10   reduce that inflammation, that would be very helpful to the

11   patients in terms of feeling better.

12         We know that the corticosteroids either

13   systemically or topically can do a lot of what I pointed out

14   in regard to that mechanism.  So it can take mass cells and

15   lower the numbers.  It can take those cells that came in

16   from the blood stream, the leukocytes, the base cells, and

17   lower those numbers.  We can reduce the cytokines and call

18   them in.  We can reduce the number of chemicals that are

19   released.  These have multi-faceted anti-inflammatory

20   activity.

21         But they have to be taken routinely because if

22   you stop pouring water on the fire and you still have the

23   reason for the trigger causing the symptomatology, people

24   again will become symptomatic.  So you have to keep on

25   keeping on with the medicine to keep the problem under

Meltzer - direct

1    control.

2    Q.     Are these steroid sprays taken topically or

3    systemically?

4    A.     The systemic clearly works, but it has too much

5    baggage.  So long ago, since the sixties and seventies, we

6    tried to develop medicines which are anti-inflammatory that

7    can only target the area where the problem is.  And the

8    intranasal corticosteroids have been a wonderful advance in

9    terms of clinical care for the patients we see.

10          You can see them really divided into two groups,

11   if you will.  There is a group at the bottom, the three you

12   see.  The first two that came to be, actually, are not shown

13   because I don't have a picture of them.  They were Decadron

14   Turbinaire, it was called, and the Beclomethasone

15   Mini-Button.  These were aerosol forms.  And the aerosol has

16   a little unit which is a cannister that is filled with the

17   medicine.  When you squeeze it, it sprays out.  So an

18   aerosol comes out in what we call a dry spray.

19          Subsequently, because those two medicines, and I

20   will talk about that probably again, were problematic,

21   additional aerosols were developed.  But these that are

22   shown are called chloro-fluoro-carbon delivery systems.

23   That is to say, the propellant is called a

24   chloro-fluoro-carbon or a CFC.

25          The world is agreed, as far as I know, on only

Meltzer - direct

1    one thing, and that's to eliminate the CFCs because they

2    affect the ozone layer.  So there is now a Montreal

3    Protocol.  So by the end of this year, 2008, there will be

4    no CFCs at all.  So they are now developing new aerosol

5    formulations, which will have a different propellant, called

6    an HFA, a Hydrofil Alkane, which doesn't affect the ozone

7    layer.  We have these aerosol forms.

8              In addition, there were others that were

9    developed that were a pump spray, a wet spray, if you will.

10   You can see those listed on the top two rows, Declamethasone

11   was one and flunisolide was another.  Tricimdaline

12   (phonetic) was another.  We have a number.  They keep being

13   developed.

14             For example, the one in blue, Veramyst, just

15   came out in 2007.  The one Onerus (phonetic) just came out a

16   month ago.  So we are still developing new models that

17   should be, in fact, can be helpful to people.

18   Q.    You said beclomethasone.  Is that the active

19   ingredient in the Beconase AQ and the Vancenase?

20   A.    Yes.

21   Q.    And you said flunisolide is the next one.  Is that

22   the active ingredient in Nasalide and Nazorel?

23   A.    That is correct.

24   Q.    And then the active ingredient in Nasacort AQ is

25   triamcinolone acetamine?

Meltzer - direct

1    A.       That is correct.

2    Q.       What is the active ingredient in Flonase?

3    A.       Fluticasone propionate.

4    Q.       Nasonex, what is the active ingredient in that one?

5    A.       Mometasone furoate.

6    Q.       What is the mechanism of action that these steroids

7    have?

8    A.       Well, they act to reduce the inflammation, but

9    interestingly enough, we look at them not only to reduce the

10   inflammation but how they work in regard to symptoms.

11          So the rubber meets the road in terms of how

12   well people get.  And even if we have this large survey,

13   it's not quite fast enough, so we have lots of options here.

14   All of them are effective.  All of them are effective in

15   improving symptoms and all of them are effective in terms of

16   reducing the impact on quality of life.

17          But even though they are all

18   pharmaco-dynamically the same, that is to say, they all

19   work, when you look at them pharmacologically, they are

20   pharmacokinetics, that is to say how they are absorbed, how

21   they are distributed, how they are metabolized, that is not

22   quite the same.

23          Actually, Eric, I think we have a slide on that,

24   which is interesting because, you know, they look at these

25   molecules in preclinical work and try to figure out, is this

Meltzer - direct

1    going to be effective.

2            You can see, for example, on the right side, you

3    have mometasone and fluticasone propionate.  And they would

4    look to be better than triamcinolone on the left side in

5    terms of binding affinity.  That is to say when a

6    corticosteroid is sprayed, it has to get into the cell, it

7    has to bind with what is called the receptor.

8            And that complex is then transferred into the

9    nucleus to make the activity that causes the

10   anti-inflammatory process.

11           But it turns out these are not the same.

12           THE COURT:  Yes.

13           MR. GRACEY:  Your Honor, I have an objection

14   about these not being the same.  We are at the infringement

15   part of the case.  If he is going into areas that relate to

16   obviousness or that sort of thing, I don't think that is

17   appropriate.  To give a general background I think is fine.

18   Other issues I think is better for plaintiffs' rebuttal

19   case.

20           MR. RICH:  Your Honor, this is background.

21   Second of all, it was in his opening expert report.

22           THE COURT:  Overruled.

23   BY MR. RICH:

24   Q.    Were you done with the answer?

25   A.    No, no.  It's surprising at some level for me, when

313

Meltzer - direct

1    you look at these pharmacologically, and that's what I kind

2    of hear about, preclinical information, before it gets to

3    the clinic, that you would be able to distinguish.  In fact,

4    we have done studies, for example, on fluticasone and

5    triamcinolone in a comparative study and shown no difference

6    in terms of benefit.  They work equally well.  And they have

7    the same microgram dose.  For example, mometasone, the daily

8    dose for Nasonex is 200 on the right.  The fluticasone is

9    200 a day, and the triamcinolone on the left is 220 a day.

10   So you would think if their affinity, that is how well they

11   bind to the receptor, is so different, you would expect

12   differences in terms of the clinical response and in terms

13   of the dose needed to make it help.  The same the thing

14   happens if you look at this next slide.  Not only is how

15   well does it bind but how long will it stay bound.  If it

16   stays bound, theoretically, it should work longer and

17   better.  It doesn't seem to make a difference.  For example,

18   if you look at the middle one is, ciclesonide, when we

19   studied that one recently, that was just released a month

20   ago, the one on the far are right, Omnaris, that one is

21   really not a very effective agent, even though it looks

22   better than, for example, triamcinolone and it doesn't look

23   much better than fluticasone in terms of safety.

24          You can't always tell from pharmacologic studies

25   what you are going to see clinically.

Meltzer - direct

1    Q.      Can you also differentiate between these products

2    based on systemic adverse effects?

3    A.      That is a very important differential.  We look at

4    efficacy in terms of do they benefit symptomatically.  And

5    then is there any side effect profile.  First of all, we

6    want to make sure we don't have systemic activity because

7    the whole purpose of developing topical agents is so they

8    don't affect any part other than where you are spraying it.

9            We have looked at inhaled corticosteroids.  We

10   have looked at intranasal corticosteroids to see if much is

11   absorbed and much stays in the system to affect other organ

12   systems, like bone growth or eyes.  And I know that there is

13   a study we are going to be looking at of growth that's

14   problematic, which was the Skoner article, that showed when

15   we looked at beclomethasone, which was one of the older

16   molecules, and studied that in children, the kids on that

17   particular molecule didn't grow very well.

18   Q.      If I could ask you to turn to Plaintiffs' Trial

19   Exhibit No. 375.  Is this the Skoner article that you are

20   talking about?

21   A.      Right.  This was a study that a number of us worked

22   on, Dave Skoner from Pittsburgh, Gary Rajeleski (phonetic)

23   from California, Paul Travinsky (phonetic) is from

24   Massachusetts.  We found some hundred children who we were

25   able to study who had chronic nasal allergies.  And half of

Meltzer - direct

1    them went on the beclomethasone nasal sprays, two spray per

2    nostril, twice a day.  And half of them went on a placebo

3    spray, the vehicle basically of the aqueous formulation of

4    beclomethasone.  We found at the end of the study, at the

5    end of the year, there was a growth slowing so that too much

6    beclomethasone had gotten into the system, and because

7    beclomethasone has a relatively high bioavailability

8    compared to some of the newer compounds, it caused some

9    growth change in children.

10              We also saw, interestingly enough, that the

11   first one that I mentioned, we didn't have a picture of,

12   Decadron Turbinaire, the reason that got pulled off the

13   market so quickly is because when it was studied it caused

14   suppression of the adrenal gland's normal output of

15   cortisone.  We make cortisone normally, and you don't want

16   to mess with the body's normal production because it has all

17   kinds of ramifications.  And if it gets into the system, it

18   will suppress your normal production which comes from your

19   adrenal gland.  And that initial product, dexamethasone,

20   slowed production of normal adrenal production, and that is

21   not a good thing, so that was withdrawn from the market.

22   Q.     Getting back to this study that you worked on, the

23   Skoner article, was that an aqueous beclomethasone

24   dipropionate spray or aerosol?

25   A.     That was the aqueous formulation of intranasal

Meltzer - direct

1    beclomethasone dipropionate.

2    Q.    What products, what beclomethasone -- can I call it

3    BDP?

4    A.    Sure.

5    Q.    What aqueous BDP?

6    A.    That would have been Beconase AQ or Vancenase AQ.

7    Q.    Has any study been reported showing the same growth

8    suppressions results from the use of a CFC-propelled

9    Beconase or Vancenase product?

10    A.    No.

11    Q.    You know, I just wanted to confirm, you are saying

12    that there are these systemic effects, that is throughout

13    the body, even though some products -- let me back up and

14    ask it better.  You are saying that some products have

15    demonstrated systemic effects, effects throughout the body,

16    even though they are applied only topically, only on the

17    surface of a nasamucosa?

18    A.    Yes.

19    Q.    I would like, if I could, to turn to the subject of

20    infringement, and if I could beg the Court's indulgence to

21    put the boards up.

22          Now I would like to turn to the issue of

23    comparing Barr's ANDA product to the claims.  If we could

24    get the patent claims up.

25          Which patent claims were you asked to consider?

Meltzer - direct

1    A.    I was asked to look at the patent, the '573 and the

2    '329 for Nasacort.  I was asked to look at the ANDA for

3    Barr's product.  I was asked to look at the package inserts

4    for both Barr's product and the Nasacort product.  And I was

5    asked to look at the claim construction chart and the Court

6    order of terms.

7    Q.    So that was the universe of documents you considered

8    in determining whether -- did you consider any other

9    expert's testimony in relation to the infringement question?

10   A.    I certainly considered the information that I learned

11   from the experts who reported.

12   Q.    And that would be Dr. Kaliner and Dr. Lockhead and

13   Dr. Prud'homme and Dr. Berridge?

14   A.    Yes.

15   Q.    Now, where did you look to determine the attributes

16   of Barr's ANDA product?

17   A.    Well, I looked at the composition of the products.

18   There were a list in the products that we could compare the

19   two Barr products with the Nasacort product, the

20   ingredients, if you will.

21   Q.    I think we have a slide, a demonstrative comparing

22   the Nasacort and the Barr product.

23         You considered the package insert.  Correct?

24   A.    This is the formula comparison I looked at.  The

25   ingredients are listed on the left-hand side and the

Meltzer - direct

1    function of those different ingredients on right-hand side.

2    Basically, I was looking at the columns to see what was the

3    percentage of the different ingredients in the Nasacort AQ

4    compared to Barr's ANDA product.  And they are nearly

5    identical with the exception of benzalkonium chloride, which

6    lists Nasacort as .015, and Barr's ANDA as .0155.  Other

7    than that, I could see really no difference or, they are

8    nearly identical.

9    Q.    The only difference you saw was five parts per

10   million of weight in the benzalkonium chloride?

11   A.    Yes.

12   Q.    Turning to the package insert, was there anything

13   that you learned there in terms of a summary of the product?

14   A.    There was a product statement.  This is the part that

15   I noted particularly, because it had the same wording with

16   the exception of, instead of it saying Nasacort AQ is, it

17   says triamcinolone acetamine nasal spray is.  Then it

18   continues, is an unscented thixotropic water-based meter

19   dose pump stray formulation unit containing a

20   microcrystalline suspension of triamcinolone acetamine in an

21   aqueous medium.

22   Q.    Did you learn anything from the package insert with

23   regard to the method of use instructed by Barr for the ANDA

24   product?

25   A.    They had a package insert, which we see here, again,

319

Meltzer - direct

1    identical to the Nasacort AQ.  So when you look at the two

2    they look the same.  It instructs people how to deliver the

3    medication, which is in the unit, this pump spray that you

4    hold with your thumb on the bottom and your index and middle

5    finger on the top.  You have put it in your nose.  You aim

6    laterally toward the back.  You give a spray.  You give a

7    sniff.  Then you do the other side.  Then you go back and

8    you do the first side and the second side.

9              So there is a standardization of how people are

10   instructed, which is really very important to avoid side

11   effects.  So I appreciate those kinds of instructions.  But

12   they are identical.

13   Q.    Now, did you form an opinion as to the infringement

14   of Claim 6 of the '573 patent and Claim 26 of the '329

15   patent?

16   A.    I did.

17   Q.    And what is that opinion?

18   A.    That Barr's product appears to infringe.

19   Q.    Now, I want to go through element by element, except,

20   thankfully, the parties have been able to agree that many

21   elements are found in Barr's ANDA product.  So I won't cover

22   those with you.  I know you originally considered certain

23   admissions.  But I would prefer if we could just to rely

24   upon the uncontested facts.

25              Did you form an opinion as to whether Barr's

Meltzer - direct

1    product is odorless?

2    A.    I did.

3    Q.    What is that opinion?

4    A.    That it is odorless.  The package insert says

5    unscented.  It's odorless.

6    Q.    Is there anything that you drew from the list of

7    ingredients that led you to that conclusion?

8    A.    Well, it has phenyl ethyl alcohol in it.  And phenyl

9    ethyl alcohol --

10   Q.    It has phenyl ethyl alcohol?

11   A.    Excuse me.  It does not have phenyl ethyl alcohol.  I

12   misspoke.  And the absence of phenyl ethyl alcohol, which

13   usually is the source of the odor or the scent, is not in

14   either Nasacort or the Barr product.

15            MR. RICH:  Your Honor, could I approach the

16   diagram?

17            THE COURT:  Yes.

18   BY MR. RICH:

19   Q.    So could we put a check in the odorless box?

20   A.    Yes.  There is one other reason.  I had the

21   opportunity -- Dr. Prud'homme talked about what he did

22   yesterday.  One of the things I did yesterday was spray it

23   in my nose.  And as a pediatrician, you get used to tasting

24   things that kids are going to have to taste.  And if

25   somebody cares about what people have to experience, I often

                            Meltzer - direct

1    spray the sprays to feel what they feel like.  So I had,

2    last night, an opportunity to spray Barr's product.  And I

3    didn't sense any odor at all.

4    Q.    With regard to the element of imparting to the

5    composition the following thixotropic properties, do you

6    have an opinion on that portion of the claim?

7    A.    I do but I rely on Dr. Prud'homme for that.

8    Q.    So can we put a check in there based on

9    Dr. Prud'homme?

10   A.    Sure.

11   Q.    And the viscosity of the composition in unsheared

12   form is about 400 to about 800 centipoise?

13   A.    My opinion is consistent, but I rely on Dr. Lochhead

14   for that.

15   Q.    And that the composition is subjected to shear or

16   shaken in preparation for spraying, the viscosity of the

17   composition is about 50 to about 200 centipoise?

18   A.    Again, I rely on Dr. Lochhead for that, but I would

19   affirm that.

20   Q.    The limitation is for deposit on the mucosal surfaces

21   of the nasal cavity.  I guess it's the material deposits on

22   the mucosal surfaces of the nasal cavity.

23   A.    Again, I would rely on Dr. Berridge for that.

24   Q.    And that in deposited form on the mucosal surfaces,

25   the viscosity of the composition is about 400 to about 800

Meltzer - direct

1   centipoise.

2   A.      Again, I affirm that, but I rely on Dr. Prud'homme.

3   Q.      Such that it resists being cleared from the mucosal

4   surfaces by the inherent mucociliary forces which are

5   present in the nasal cavity.  Do you have an opinion on that

6   element?

7   A.      I do, and I rely on Dr. Berridge's testimony.

8   Q.      So your opinion is that all the elements of Claim 6

9   of the '573 patent are found in Barr's ANDA product?

10  A.      Yes.

11  Q.      Turning to Claim 26 of the '327 patent.  Can you see

12  that?

13  A.      No, not a chance.  I have a cheat sheet over here.

14  Q.      Do you believe that Barr's ANDA product is

15  thixotropic as required by that claim?

16  A.      I do.  I rely on Dr. Prud'homme for that claim.

17  Q.      Do you have an opinion as to whether the use of

18  Barr's ANDA product is a method for delivering the aqueous

19  thixotropic pharmaceutical composition to each of the

20  mucosal surfaces of the anterior regions of the nose, the

21  frontal sinus and the maxillary sinuses and on each of the

22  mucosal surfaces which overlie the turbinates covering the

23  conches?

24  A.      I rely on Dr. Berridge for that.

25  Q.      Do you have an opinion as to whether the method

Meltzer - direct

1    allows the sprayed composition to deposit on the surfaces?

2    A.    I rely on Dr. Berridge for that.

3    Q.    Do you have an opinion as to whether the method

4    causes it to deposit in the form of a viscous composition?

5    A.    I rely on Dr. Prud'homme on that.

6    Q.    Do you have an opinion as to whether the viscous

7    composition in the method resists being cleared from the

8    mucosal surfaces by the inherent mucociliary forces which

9    are present in the nasal cavity?

10   A.    Dr. Berridge comments.

11   Q.    And do you have an opinion as to whether the

12   suspending agent used in the method imparts to the

13   composition the following thixotropic properties:  that the

14   viscosity of the composition in unsheared form is about 400

15   to about 800 centipoise?

16   A.    Dr. Lochhead's comments.

17   Q.    And as the composition is subjected to shear or

18   shaken in preparation for spraying, the viscosity of the

19   composition is about 50 to about 200 centipoise?

20   A.    Again, Dr. Lochhead.

21   Q.    And so do you have an opinion as to whether the

22   suspending agent imparts to the composition those

23   thixotropic properties?

24   A.    I do.  As per my comments, both Dr. Lochhead and

25   Dr. Prud'homme have commented on those.

Meltzer - cross

1    Q.    So your conclusion with regard to Claim 26 as well is

2    that Barr's ANDA product infringes that claim?

3    A.    Yes.

4              MR. RICH:  Thank you.  I have no further

5    questions, Your Honor.

6              THE COURT:  All right.  Counsel, you may

7    cross-examine.

8                        CROSS-EXAMINATION

9    BY MR. GRACEY:

10   Q.    Good afternoon, Dr. Meltzer.

11   A.    Good afternoon, Mr. Gracey.

12   Q.    We haven't officially met yet or even unofficially,

13   so I'm Taras Gracey.  It is nice to make your acquaintance.

14   I did not have the honor of taking your deposition.  That

15   was my colleague, Ms. Johnson.  But I just wanted to ask you

16   a few questions about your background, and then we're going

17   to talk a little bit about some of your opinions here.

18         You testified that you are here on behalf of

19   Aventis as an expert witness.  Right?

20   A.    Check, yes.

21   Q.    Check.  And you're being compensated for your time?

22   A.    Yes.

23   Q.    Approximately $400-450, whatever it is.

24   A.    Yes.

25   Q.    And I think you also testified that you had done some

Meltzer - cross

1   work for Aventis before amongst many other pharmaceutical

2   companies?

3   A.    Yes.

4   Q.    But you have also done a little more than that for

5   Aventis.  Right?  You actually have been an expert witness

6   for Aventis?

7   A.    Yes.

8   Q.    And I that is I think in the Allegra case?

9   A.    Yes.

10  Q.    That case is still ongoing, I believe?

11  A.    Yes.

12  Q.    And actually that case is against Barr, isn't it?  Or

13  do you know?  Maybe you don't know.  It doesn't matter.

14        Now, you have also received research support in

15  the past from Aventis.  Right?

16  A.    Yes.

17  Q.    Okay.  Now, you have testified about your background

18  and your education and what not.  But I just wanted to

19  clarify a few things.  You have given some opinions here

20  based on relying on others but I just want to clarify you

21  are not an expert in formulation.  Right?

22  A.    Yes, that's correct.

23  Q.    Okay.  And that would also mean you are not an expert

24  in designing pharmaceutical formulations.  Right?

25  A.    That is correct.

Meltzer - cross

1    Q.     And that would also include nasal formulations.

2    Right?

3    A.     That is correct.

4    Q.     Okay.  And indeed, you have never designed any

5    thixotropic compositions?

6    A.     I have not.

7    Q.     Okay.  You are not an expert in rheology?

8    A.     I am not.

9    Q.     All right.  And are you not an expert in positron

10   emission tomography or PET?

11   A.     I am not, but I can say it.

12   Q.     Okay.  I can't.

13          You are not a board certified surgeon.  Right?

14   A.     Correct.

15   Q.     And as such, you are the also not an ENT surgeon?

16   A.     I am not.

17   Q.     We do have an ENT surgeon here.  I believe you know

18   Dr. MacKay?

19   A.     And respect.

20   Q.     Thank you.  We'll be hearing from him in a little

21   bit.  You are also not an expert in viscosity?

22   A.     Correct.

23   Q.     Indeed, you didn't do any viscosity testing on Barr's

24   product.  Right?

25   A.     I did not.

Meltzer - cross

1   Q.      I just want to put this first board back up.

2           MR. GRACEY:  I'm sorry, Your Honor.  May I put

3   the board up?

4           THE COURT:  Yes.

5           MR. GRACEY:  Thank you.  I'm sorry.

6   BY MR. GRACEY:

7   Q.      Okay.  Now, I believe you testified that you don't

8   have any independent opinion on infringement, on the

9   viscosity claims at issue in this case, do you?

10  A.      Correct.

11  Q.      Okay.  And, in fact, I think you said you're

12  completely relying on Dr. Lochhead regarding Barr's

13  viscosity?

14  A.      Correct.

15  Q.      All right.  And then you didn't personally do any

16  analysis to determine if Barr's product is thixotropic as

17  defined in the patent.  Right?

18  A.      Correct.

19  Q.      Indeed, you don't have any independent opinion on

20  infringement for the thixotropic claims at issue in this

21  case.  Right?

22  A.      I do not.

23  Q.      All right.  I think you said you are relying on

24  Dr. Prud'homme for those conclusions.  Correct?

25  A.      That is correct.

Meltzer - cross

1   Q.      All right.  Now, you don't know where specifically

2   Barr's product is delivered, do you?

3   A.      No, my limited experience is one, and end of one,

4   namely me.

5   Q.      You don't know whether therefore Barr's product

6   infringes on the frontal sinus.  Is that right?

7   A.      I do not.

8   Q.      All right.  You didn't do any PET studies of Barr's

9   product to determine whether it deposits on the frontal

10  sinus.  Right?

11  A.      Correct.

12  Q.      In fact, Dr. Berridge didn't do any PET studies on

13  Barr's product to determine whether it deposits on the

14  frontal sinus, did he?

15  A.      I believe that's the way he testified.

16  Q.      Just so the record is clear, you believe he -- let me

17  just ask you.  I want to make sure the record is clear.

18  Dr. Berridge did not do any testing on Barr's product to

19  determine if it entered the frontal sinus.  Isn't that

20  right?

21  A.      I think that is what he testified to.

22  Q.      Thank you.  So it's fair to say that you don't have

23  any independent opinion about whether, in fact, Barr's

24  product enters the frontal sinus, do you?

25  A.      I do not.

Meltzer - redirect

1    Q.    All right.  You are in fact, as we stated, completely

2    relying on Dr. Berridge's PET studies related to Nasacort

3    AQ.  Right?

4    A.    Yes.

5    Q.    All right.  Indeed, prior to your deposition, you

6    have never even spoke to Dr. Berridge, did you?

7    A.    That is correct.  Prior to meeting him here, I have

8    never had a personal conversation with him.

9    Q.    Perfect.

10            MR. GRACEY:  Thank you, judge.  That's all the

11   questions I have.

12            THE COURT:  All right.  Is there anything else?

13            MR. RICH:  Hopefully, I only have one question.

14            THE COURT:  Okay.

15                    REDIRECT EXAMINATION

16   BY MR. RICH:

17   Q.    Before forming your opinion as to infringement, did

18   you view Dr. Berridge's expert report?

19   A.    I did.

20            MR. RICH:  Thank you, Your Honor.

21            THE COURT:  Doctor, thank you.  You may step

22   down.

23            MR. BERGHOFF:  Your Honor, with the only

24   exception being the housekeeping details of submitting our

25   deposition designations to Your Honor, plaintiffs will close

Meltzer - redirect

1    their case-in-chief.

2            THE COURT:  All right.  Are you ready for Barr's

3    case?

4            MR. HURST:  Your Honor?

5            THE COURT:  You need some time to set up?

6            MR. HURST:  No, we do not.  Actually, I was

7    wondering, I would like to make a motion for judgment as a

8    matter of law under Rule 52(c).

9            THE COURT:  Go ahead.

10           MR. HURST:  Yes?

11           THE COURT:  Yes.

12           MR. HURST:  I had two points to make, two claim

13   elements to focus on.

14           The first is deposition in the frontal sinus.

15   It's required by both asserted claims, and the only evidence

16   you have heard from Aventis was Dr. Berridge's PET scan.

17   First, Dr. Berridge's PET scanning was not in the Barr's

18   product.  It was with Nasacort.  Nobody did any PET scanning

19   with Barr's product to determine whether it reached the

20   frontal sinus.  The only testing that was done was with

21   Nasacort.

22           THE COURT:  Is there a departure with regard to?

23   There has been testimony the products are identical.

24           MR. HURST:  Except with respect for viscosity.

25   The testimony you have with respect to shear viscosity,

Meltzer - redirect

1   which is what matters in terms of getting to the frontal

2   sinus, is Dr. Lochhead's testimony.  Dr. Lochhead put

3   Nasacort side by side with Barr's product and he saw that

4   the shear viscosity of Nasacort was from 60 to 68.  He

5   tested Barr's product and the shear viscosity was 100 or

6   more, so you are talking 60 percent increase.

7          There has been no testing at all in this case by

8   anybody, a complete absence of evidence over whether that

9   difference can impact whether or not a product gets to the

10   frontal sinus.  And, if anything, there is evidence to show

11   that it does not.  If you remember, Dr. Berridge said when

12   the product cooled, which actually increases viscosity, in

13   his 2002 test, he got zero frontal sinus deposition.  Well,

14   Barr's product has a higher viscosity than Nasacort.

15          So the point being you really have to test

16   Barr's product which is manufactured at a different plant

17   under different conditions.  Who cares if -- and if the

18   formulation is the same, as Dr. Lochhead acknowledged, you

19   get different viscosities from different manufacturing

20   procedures.

21          So that is of the first point, Your Honor.  No

22   testing of Barr's product which has a different viscosity

23   according to the undisputed evidence in the record.

24          The second point is this:  If you were to accept

25   everything that Aventis says, every single thing, all

332

Meltzer - redirect

```
1    they're saying and arguing is that our testing shows that

2    the product reaches the frontal sinus in 6 of 14 patients, a

3    little less than half the time.  That is the argument

4    Aventis has made with their evidence.  If you accept every

5    word of it, if I accept it, they still lose as a matter of

6    law and here is why.

7              There are only three ways to prove infringement:

8              One is direct infringement.  No evidence that

9    Barr is actually administering a drug to anybody in the

10   frontal sinus so they have to rely on contributory or

11   inducement.

12             With respect to contributory infringement, there

13   is no infringement as a matter of law as long as a product

14   has a substantially non-infringing use, which Aventis has

15   proven.  They have proven up that the product, according to

16   them, if I accept all their evidence, it gets to the frontal

17   sinus less than half the time; which means there is a

18   noninfringing use:  the use of the product in those

19   50 percent or more occasions when it doesn't get to the

20   frontal sinus.  So no direct infringement, no contributory

21   infringement as a matter of law.  And,

22             Finally, certainly no inducement to infringe,

23   which, as you know, is an intent-based infringement.  They

24   have to show intent that Barr is inducing people to use the

25   product to reach the frontal sinus.  And, obviously, we
```

Meltzer - redirect

1    don't believe it happens.  There has been no evidence that

2    we have an intent to induce people to use our product to

3    reach the frontal sinus.

4            So that's frontal sinus issue.  Next we're going

5    to talk about the viscosity of our product in the nose.

6    That is one of the elements of the claim.  That after

7    deposit, the product increases, thickens up to 400-to-800

8    centipoise.  400-to-800 centipoise.

9            You heard no evidence that there was any testing

10   done on Barr's product under the conditions of the nasal

11   cavity.  It just was not done.  The most you have heard from

12   Dr. Prud'homme today is he believes there would be a

13   thickening.  That is what he said.  But what you didn't hear

14   is any evidence at all that that thickening would reach the

15   required 400-to-800 centipoise.  Again, a complete absence

16   of evidence.  And the reality is even his testimony for the

17   thickening, he was relying on reports from FMC and Hydan

18   which was work with Nasacort, not with Barr's product.

19           So for those reasons, Your Honor, we make a

20   motion for judgment as a matter of law under Rule 52(c).

21           THE COURT:  All right.

22           MR. BERGHOFF:  We think the evidence at this

23   stage, viewed by the very high standard that would be on

24   Barr at this point in mid-trial, clearly supports that we

25   are entitled to go forward on our burden of a mere

Meltzer - redirect

1    preponderance of the evidence to show infringement of each

2    element.

3              In terms of deposition on the frontal sinus, Dr.

4    Berridge's testimony is clear.  In the two studies that he

5    did, where he obtained reliable data, six of eight patients

6    saw measurable, noticeable deposition of Nasacort AQ in the

7    frontal sinus, and deposition that lasted well over an hour.

8    It was not an artifact.  It was real data.

9              And the 2002 study, which Barr's counsel

10   argumentatively would like to be discounted, which is

11   inappropriate at this stage, is based on unreliable data.

12   That is, Dr. Berridge's testimony, that that data was

13   unreliable.  Therefore, he didn't publish it.  In fact, he

14   pointedly told Aventis that the data showed unusual

15   variations and could not be relied on.  So that data should

16   be eliminated from the consideration.

17             So the evidence of record shows that Nasacort

18   AQ, which is identical in formulation to Barr's ANDA

19   product, there has been no dispute on that, deposits in the

20   frontal sinus in six of eight patients.  So there is no

21   issue here on whether it happens or not.  It does.  And the

22   use, the intended use of Barr's ANDA product, should it be

23   released to the market, will result in deposition of their

24   product on the frontal sinuses of a substantial number, we

25   believe most, the strong majority of patients who use the

Meltzer - redirect

1    products, and our evidence supports that.

2           So we think their motion is ill-taken on that.

3           In terms of the viscosity in the nose, Dr.

4    Prud'homme was very clear that it was his opinion that the

5    evidence before him leads him to the conclusion, because of

6    his expertise, that Nasacort AQ or Barr's ANDA product, take

7    your pick, they are identical, will result in the original

8    setting viscosity of 400 to 800 after it is deposited in the

9    nose.

10          And he dealt with the counter-arguments from

11   Barr's counsel that they would like you to just adopt at

12   this point, about the cilia and the temperature and the

13   dilution effects in the nose.  He dealt with those and said,

14   in his opinion, they would not change the result.  The

15   result is that Barr's ANDA product will go from its original

16   setting viscosity down, when it's shaken and sprayed, and

17   very quickly recover to its original setting viscosity

18   within the 400 to 800 range.

19          And we believe the evidence clearly supports our

20   position, exceeds by a good margin the preponderance of the

21   evidence.

22          So we would ask Your Honor to deny Barr's

23   motion.

24          THE COURT:  The Court agrees with Aventis that

25   it is premature at best at this point, would be, for the

MacKay - direct

1     Court to rule in Barr's favor.  I will deny the motion.

2     Let's move on.

3                    MR. HURST:  Thank you, Your Honor.  Our first

4     witness will be Dr. MacKay and Mr. Taras Gracey will handle

5     that witness.

6                    ... IAN S. MacKAY, having been doing sworn as a

7     witness, was examined and testified as follows ...

8                         DIRECT EXAMINATION

9     BY MR. GRACEY:

10    Q.     Please state your full name?

11    A.     Ian Stuart MacKay.

12    Q.     I won't be using a binder with Dr. MacKay today.

13           Please state your home address?

14    A.     Home address is 8 Compound Mansion, Part 4, London.

15    Q.     Are you currently employed, Dr. MacKay?

16    A.     I am self-employed in private practice in harvestry.

17    Q.     What kind of doctor are you?

18    A.     I am an otolaryngologist, which is an ear, nose and

19    throat surgeon, also known as an ENT surgeon.

20    Q.     Let me ask you, where do you have privileges today?

21    A.     I have admitting privileges to King Edward VII

22    Hospital in London.

23    Q.     Is that a hospital that treats the Royal Family?

24    A.     It does.

25    Q.     And have you yourself treated the royal family?

MacKay - direct

1    A.     I have.

2    Q.     Let's talk a little bit about your educational

3    background.  Could you, starting with high school, tell the

4    Court a little bit about your background?

5    A.     My undergraduate training was at the Royal Free

6    Hospital in London, which is part of London University.  And

7    then after qualifying in 1968, which is exactly 40 years

8    ago, I did two years of house jobs and senior house officer

9    jobs, before training to be an ear, nose and throat surgeon

10   at the Royal National Throat and Ear Hospital in London.

11   Q.     You used the term house jobs.  I think of that in

12   terms of sweeping a floor.  Can you explain what that means?

13   A.     They are junior posts in the hospital hierarchy.

14   Q.     But they are medical posts?

15   A.     Yes.

16   Q.     Now, did you obtain your -- did you become a Fellow?

17   A.     I became a Fellow of the Royal College of Surgeons of

18   England in 1974.

19   Q.     And then when did you complete your certificate?

20   A.     I completed my certificate of specialist training in

21   1976.

22   Q.     Now, have you or do you do any teaching?

23   A.     I do.  I teach on two courses.  One is the

24   rhinoplastic course and the other is the rhinosinusitis

25   course.

MacKay - direct

1    Q.      Rhinoplastic, what does that mean?

2    A.      That's changing the shape of the nose.  Shape and

3    function.

4    Q.      And the second?

5    A.      Is to do with rhinitis, rhinosinusitis, sinus

6    surgery.

7    Q.      Rhino, does that refer to anything in particular?

8    A.      Rhino, noses, as in rhinoceros.

9    Q.      Approximately how many students have you taught over

10   your career?

11   A.      Well, post-graduate would be probably two and a half

12   to three thousand, something like that.  I also used to

13   teach undergraduate students at Charing Cross Hospital,

14   which is an undergraduate teaching hospital, part of

15   University of the London.

16   Q.      Have you been a visiting professor anywhere?

17   A.      Yes, I was a visiting professor at the Mayo Clinic at

18   Rochester about 12 years ago, in 1996.

19   Q.      Here in the U.S.?

20   A.      Here in the U.S.

21   Q.      Now, let's talk a little bit about the Royal Brompton

22   Hospital.  What did you do there?

23   A.      I set up -- the Royal Brompton is the National Heart

24   and Chest Hospital.  And respiratory diseases and sinus

25   diseases are very similar, which is not surprising, because

MacKay - direct

1    the lining of the nose and sinuses and the lining of the

2    lung is the same sort of tissue.

3                I realized, having been appointed there, quite

4    quickly, that this was quite a unique experience, to see

5    patients with some very interesting nasal and respiratory

6    conditions, and set up what was actually a

7    multi-disciplinary clinic, looking at nasal problems.

8    Q.    You said you established a nose clinic there?

9    A.    That was the nose clinic, yes.

10   Q.    When did you establish that?

11   A.    That was about 1979, probably.

12   Q.    So how many years -- did you run that clinic?

13   A.    Twenty-seven years.

14   Q.    Now, let's talk about your work at Charing Cross

15   Hospital.  What was your position there?

16   A.    Well, eventually I was the head of the department at

17   Charing Cross.

18   Q.    Which department?

19   A.    The ear, nose and throat surgery.

20   Q.    Are you a member of any professional societies?

21   A.    I am a member of the British Association of

22   otorhinolaryngologists, head and neck surgeons, which is the

23   equivalent of the American Academy of Otolaryngology.

24   Q.    Did you hold any posts there?

25   A.    I was the president for three years, starting in

MacKay - direct

1    1999.

2    Q.    Approximately how many members does that association

3    have?

4    A.    A little over a thousand.  About 1100 members.

5    Q.    Approximately how long have you been practicing

6    medicine?

7    A.    Forty years.

8    Q.    Have you ever -- you stated you are a surgeon.

9    Right?

10   A.    I am a surgeon.

11   Q.    Have you ever operated on the nose?

12   A.    I have, strangely.

13   Q.    How many times, approximately, over your career?

14   A.    Yes.  As others have found, it's quite difficult to

15   put a number on this.  Actually, I do have a pretty good

16   idea, because unlike just seeing patients, we do audit our

17   surgery and have done for many years.  And for many, many

18   years, I was doing approximately 400 operations per year,

19   it's not quite as much as that now, because I have slowed

20   down, but it would come to certainly in excess of 10,000

21   operations on the nose.

22   Q.    Now, have you ever operated on the frontal sinus?

23   A.    Indeed.

24   Q.    And approximately how many times have you operated on

25   the frontal sinus?

MacKay - direct

1    A.      In the region of a thousand times.

2    Q.      Now, do you see patients with any nasal problems?

3    A.      Yes.  I am a rhinologist.  I virtually see only

4    patients with nasal problems.

5    Q.      How many of the patients that you have seen over your

6    career have what's been termed allergic rhinitis?

7    A.      We audited that, when I was at the Brompton.  And

8    approximately -- it was just under 25 percent of the

9    patients had allergic rhinitis.  Just over 25 percent had

10   non-allergic rhinitis.  And then the remainder were either

11   rhinosinusitis, which is infection in the sinuses, or nasal

12   polyps, or some other nasal problem, structural problem.

13   Q.      Do you only treat your patients with surgery?

14   A.      I operate on only about one in ten of the patients I

15   see.  So the vast majority of patients with rhinitis are

16   treated with medical treatment, not surgical treatment.

17   Q.      Does the medical treatment include corticosteroids,

18   such as Nasacort AQ and Barr's ANDA product that is at issue

19   in this case?

20   A.      Intranasal steroids are the main treatment, yes.

21   Q.      Approximately how many patients do you believe you

22   have treated with intranasal steroids?

23   A.      Very difficult to tell.  I would say I treat, there

24   are 50 to 75 percent of the patients I see with intranasal

25   steroids, so vast numbers.

MacKay - direct

1    Q.    Now, based on your experience and the surgeries, do
2    you feel that you know the nasal anatomy?
3    A.    I do feel I know the nasal anatomy.  It's very
4    important, if you are operating on somebody's frontal sinus,
5    you need to know the anatomy.
6    Q.    In fact, do you consider yourself an expert in the
7    nasal anatomy?
8    A.    I do.
9          MR. GRACEY:  Your Honor, at this time I would
10   offer Dr. Mackay as an expert in the treatment of rhinitis,
11   treatment, as well as the nasal anatomy.
12         MR. RICH:  No objection.
13         THE COURT:  He is accepted.
14         MR. GRACEY:  Thank you.
15   BY MR. GRACEY:
16   Q.    Dr. MacKay, did we ask you to offer an opinion in
17   this case?
18   A.    You did.
19   Q.    What was the opinion we asked you to offer?
20   A.    You asked me to offer an opinion on deposition of
21   nasal sprays in the frontal sinus.
22   Q.    Briefly, what is your opinion?
23   A.    I think it is extremely unlikely, if not impossible.
24   Q.    Again, briefly, why not?
25   A.    Very briefly, because the pathway from the nose to

343

MacKay - direct

1    the frontal sinus is a very narrow, tortuous route, which

2    goes backwards, and downwards.  And I think it's very

3    unlikely that a spray would be able to get up there.

4    Q.    Now, again, you have sat in the courtroom.  You have

5    heard what a large part of this case is about.  It's whether

6    Barr's ANDA product would, in fact, reach the frontal sinus.

7    Let's talk a little bit more specifically about the frontal

8    sinus.  Did you and I put some demonstratives together to

9    help us?

10   A.    We have.

11   Q.    Do you have your pointer?

12   A.    We do.

13   Q.    If we can see the first demonstrative, please.

14            Please explain for the Court what we are seeing

15   here?

16   A.    Well, this is a very similar drawing to the drawing

17   we saw yesterday of Dr. Kaliner.  And so this is a lateral

18   view, side-view of the nose.  Here is the frontal sinus.

19   This is the brain.  This is the sphenoid sinus.  We have got

20   the hard pallet.  And here is the vestibule of the nose with

21   the head, this would be the inferior turbinate, the middle

22   turbinate, the superior turbinate.

23   Q.    Let me stop you a second so we understand.  What part

24   of the face are we seeing?

25   A.    Well, we have sliced the head down the middle, that

344

MacKay - direct

1   way (indicating).

2   Q.    You are seeing this part --

3   A.    We have removed the left part of the head and we are

4   looking at the right part.  But we are just at the part of

5   the septum that divides the left and the right.  So we are

6   just beyond the septum.  Otherwise, we would just be looking

7   at the septum.

8   Q.    Let's talk a little bit about how a nasal spray, the

9   path that it would take in order -- first, let's talk about

10  a nasal spray and generally the places where it would start

11  to hit?

12  A.    Well, it would first have to go past the nasal valve.

13  But that's usually achieved by putting the nozzle of the

14  spray just inside the nose beyond there.

15         It would then spray onto what I would call the

16  atrium, this area here.  You remember, this area,

17  incidentally, is covered with skin.  So that's squamous

18  epithelium.  That's the vestibule.

19  Q.    So squamous epithelium is just another name for --

20  A.    Pavement cells.  But skin, like everywhere else.

21         The turbinates are covered with ciliated mucus

22  membranes -- sorry, ciliated columnar cells, which we heard

23  about yesterday.  In fact, this area is slightly different,

24  this is actually transitional epithelium and it doesn't have

25  the hairs that the rest of the nose does.

MacKay - direct

1    Q.      You used the word epithelium.  Again, could you just

2    explain what that term means?

3    A.      Designing of the nose, yes, mucus membrane, which is

4    relevant, because a spray going into this area will very

5    likely deposit it in this part of the nose which is

6    sometimes called, in some of these studies it's been called

7    the anterior part of the nose or the front part of the nose,

8    and that's quite relevant because there probably isn't any

9    clearance from that area.

10   Q.      In fact, one of the things be Aventis has claimed in

11   marketing documents and other things is that it stays where

12   it's sprayed when we are talking about Nasacort AQ.

13   Correct?

14   A.      Indeed, absolutely.

15           THE COURT:  Doctor, when you say that area, what

16   you were circling, where there is likely no clearance, what

17   is that area?

18           THE WITNESS:  Well, that's the atrium of the

19   nose or the anterior part of the nose.  And it's quite

20   probable that spray going into that area will just sit

21   there.

22   BY MR. GRACEY:

23   Q.      Do we have another demonstrative that will further

24   explain --

25   A.      Just before we go to that, if we are talking about a

MacKay - direct

1    spray going up into the frontal sinus, the first thing it

2    would have to do is make its way without touching anything,

3    because don't forget, this will stick to whatever it impacts

4    with.

5    Q.    Stays where it's sprayed?

6    A.    So it is going to have to go in between the middle

7    turbinate and the lateral wall of the nose.

8    Q.    So it looks from here like the entrance to the

9    frontal sinus is right there.  Is that not it?

10   A.    Well, no, it's a lot more complicated than that.

11   Q.    But above that?

12   A.    No, there is nothing there, no.

13         This is the middle turbinate.  And if we go to

14   the next picture, this, we have removed the middle turbinate

15   and the interior turbine.  But this is a drawing.  And this

16   is the drawing that Dr. Kaliner showed yesterday.

17         That looks like the opening to the maxillary

18   sinuses.  The maxillary sinuses you may remember are these

19   cheek sinuses here.  So these opening -- that's actually an

20   accessory ostium, a little extra opening, because the

21   natural ostium is just a little bit in front of that.

22         But this is called the bulla, the bulla

23   ethmoidalis.  That is another swelling, and that, if you

24   like, is full of, like a honey come of cells.

25         So between the eyes, here, one has the ethmoid

347

MacKay - direct

1    sinuses, you have got the frontal sinuses, the maxillary

2    sinuses and the ethmoids.  The ethmoids are very much like a

3    honeycomb of air cells, again, lined with ciliated mucus

4    membrane.

5              And in addition to that there is a sphenoid.

6              To get up into the frontal, yesterday, we learnt

7    that the opening is here.  And it's true that perhaps that's

8    the opening to the beginning of what is actually quite a

9    long pathway up into the frontal sinus.  It isn't just a

10   round opening that opens straight into the frontal sinus.

11   We still have got a long way to go.

12             If I may --

13   Q.    Just so the record is clear, we are looking at a

14   diagram?

15   A.    Yes.  Absolutely.  This is a diagram.  So what I

16   would like to do is to look at the real thing.

17   Q.    Next slide, please.

18   A.    This view, when we get it, is going to be a head.

19   Needless to say, the patient is dead.  This is the right

20   eye.  This is the left eye.

21             This is the brain.  This is the septum.  This

22   would be the tongue.  You can see teeth here.

23             These are the turbinates.  Now, normally, the

24   turbinates would be much more swollen than that.  They would

25   be engorged with blood.  And, in fact, they swell up and

MacKay - direct

1    shrink down all the time, depending on the air that we are

2    breathing and whether you drink alcohol and whether you have

3    allergic rhinitis and all those sort of things.

4            But here they are very shrunken.  So normally

5    they would be much more swollen.  So these are the sausage-

6    shaped things going from the front to the back.  So the

7    inferior turbinate and the middle turbinate.  You can't see

8    the superficial turbinate in this.

9            You can see this already, because it is going to

10   have to come to this area.  There is not much flow in this

11   area, because it will bump into that bulla.

12   Q.    When you say it, what are you talking about?

13   A.    Flow of air.  So it is going to have to go between

14   the middle turbinates and the lateral wall of the nose.

15   Q.    If I may, let's go back one side, if we can.  We are

16   also talking about whether a nasal spray would get to the

17   frontal sinus?

18   A.    Absolutely.

19   Q.    It is the same direction that a nasal spray would

20   have to go?

21   A.    Absolutely right.

22   Q.    So we are clear, in this picture, the front of the

23   face has literally been cut off?

24   A.    Absolutely.

25            If we go now to the next picture, this is the

MacKay - direct

1    actual thing, if you like.  We talked before about the

2    diagram.  This is the actual anatomy.  So here is the

3    nostril, with the hairs.  That would be the nasal valve.

4    This is the atrium of the nose, the anterior part, which is

5    smooth.  Here is the frontal sinus, up here.

6            Having gone -- don't forget, the middle

7    turbinate has been removed, so we can see far more easily

8    into this area than you normally would do.  But assuming

9    that you have been able to get the spray to go between the

10   middle turbinate and the lateral wall of the nose, it is

11   going to have to turn around here and come back up.  This is

12   the area that it's going to have to make its way out,

13   through this extremely narrow pathway here.

14           And this is, if you like, the frontal nasal duct

15   although a lot of people don't like the term duct because it

16   is not really a duct.  It is sort of a pathway.  It is not a

17   true duct.

18           From that area, which Dr. Kaliner was talking

19   about yesterday, it's got about one and a half centimeters

20   to go in order to get from that area up to the frontal

21   sinus.

22           It's got to go up.  Not only will it stick to

23   things on the way, and not only did it have to get between

24   the middle turbinate and the laterally wall, but it's also

25   got to make its way up this very, very narrow pathway,

MacKay - direct

1    again, without sticking to anything, against gravity, and

2    also against the ciliary activity.

3             You saw that beautiful demonstration yesterday

4    of the ciliary flow.  That's actually going to be going in

5    the opposite direction, because the flow is downwards, and

6    backwards.

7             So this spray is going to come in, do a

8    turnaround, go up this very narrow airway.

9             Another thing that actually Dr. Kaliner said

10   yesterday, which I thought was interesting, was he was

11   talking about when we come down in an airplane and how many

12   of us have experienced frontal pain, from the airplane

13   descending.  Actually, the reason we get the frontal pain is

14   because the air can't get back out.  Normally, the pressure,

15   when we are flying up high, is, the pressure outside is low

16   so the pressure inside is low.

17            As you come down the pressure builds up on the

18   outside.  So you have a relative vacuum which is why you

19   have to blow to get the air back into your ears.  It is the

20   same, you need to get the air back into your frontal sinus.

21   And the slightest bit of obstruction, whether due to

22   allergy, infection, or cold, or even if you had some

23   alcohol, which causes vasodilatation, it gets blocked.

24   That's why you get the headache when you're coming down.

25   It's because it's so narrow, so tortuous.  And the slightest

MacKay - direct

1   bit of swelling blocks it off.

2   Q.    Dr. MacKay, right here, is this a person who is

3   suffering from inflammation?

4   A.    Well, he is certainly suffering from something.

5   Q.    Because they are dead.  Right?

6   A.    Yes.

7   Q.    Would this pathway be less or more narrow than the

8   person suffering from inflammation?

9   A.    In a cadaver, in a dead body, the tissue is

10  relatively shrunken up.  So it would be more swollen than

11  that.  And it's vascular because it swells up and shrinks

12  down.

13  Q.    Now, Dr. MacKay, the flow of the -- you have also

14  heard this area here is called the frontal sinus drainage

15  pathway.  Correct?

16  A.    Absolutely.

17  Q.    And gravitationally, which way is that flowing?

18  A.    Downwards and backwards.

19  Q.    All right.  Okay.  Now, Nasacort AQ, the drug that is

20  at issue here, is a corticosteroid, I believe you testified?

21  A.    It is.

22  Q.    Let's take a look at the next slide.  Explain to the

23  Court what we are looking at here?

24  A.    Well, this is going back to the same side view that

25  we are getting used to seeing.  And this is a mixture of a

MacKay - direct

1    drawing and a CT scan.  A CT is computerized tomography, but

2    it is basically an x-ray.  This is again the real thing

3    inasmuch as here's is the sphenoid sinus, that one at the

4    back.  This is if frontal sinus, this is what's called the

5    front ethmoidal recess.  And here you can see the pathway.

6    It nicely shows the honeycomb of cells, the ethmoid cells,

7    that surround this pathway.

8    Q.    I think we heard Dr. Kaliner testify yesterday that

9    he believed, I think, that all of this is the frontal sinus.

10   Do you recall hearing that testimony or something similar?

11   A.    I think the impression was that the opening to the

12   frontal sinus was fairly low down and that it went straight

13   into the frontal.  I think that's all.

14   Q.    And if you could explain to the Court, just sort of

15   point out again, where does the frontal -- where is the

16   frontal sinus?

17   A.    That is the end of the frontal sinus there because

18   that's the ostium, from there on, it's not actually the

19   frontal sinus.

20   Q.    Now, plaintiffs have claimed that a nasal spray, that

21   Nasacort AQ, sprayed into the nose, would make it into the

22   frontal sinus.  You are aware of that.  Right?

23   A.    I am.

24   Q.    Do you agree with that opinion?

25   A.    I think it is -- one is terribly tempted to say it is

MacKay - direct

1    impossible.  But I know it is not a very good thing to say

2    anything is impossible.  But it is nigh on impossible.  It

3    is extremely unlikely, to the point where I think it's

4    virtually impossible.

5                MR. GRACEY:  And let's show another slide,

6    another slide, which, actually, if you can get to the next

7    slide.

8    BY MR. GRACEY:

9    Q.    And explain what the arrows here are indicating.

10   A.    Well, these are the pathways, the drainage pathways

11   which drain the mucus down and backwards into the throat.

12   And the whole time, these are draining in the opposite

13   direction to the way you would want to -- the way they would

14   have to go if you are going to get a spray to go back

15   upwards.

16   Q.    So this would be something that would be assisting or

17   making it more difficult?

18   A.    Making it more difficult.

19                MR. GRACEY:  Now, let's see the next slide.

20   BY MR. GRACEY:

21   Q.    Explain for the Court what we're seeing here.

22   A.    Well, this is what happens, what would have to happen

23   for a spray to get into the frontal sinus.

24                MR. GRACEY:  And if you could go to the next

25   slide.

MacKay - direct

1    BY MR. GRACEY:

2    Q.    All right.  Now, what does the green indicate and

3    then the red?

4    A.    Well, the green indicates where it is going and it

5    would normally continue to go around here and downwards.

6    But for it to have to turn around and go against gravity and

7    back on itself and not touch anything either, because if it

8    touches anything on the way it's going to stick and stay

9    there, I just think it's completely impossible.

10   Q.    All right.  Doctor, now how is it that you are so

11   familiar with the frontal sinus?

12   A.    Because I operate on it.

13   Q.    And what are the methods of operating on it?

14   A.    More than that, I actually examine the nose.  I see

15   even now as a semi-retired man, working part-time, I see

16   about 1,500 patients a year.  I'm a clinician, I'm not a

17   scientist.  And I'm at the shop end, literally.  But every

18   single patient I see, I examine their nose with an

19   endoscope.  And I can tell you that you cannot see up into

20   the frontal sinus; certainly not unless you do an awful lot

21   of maneuvers and take a very angled telescope; and even

22   then, you are never absolutely certain.

23   Q.    And is there only one way to operate on the frontal

24   sinus?

25   A.    No.  For the first 10 years of my career, I operated

MacKay - direct

1    on the frontal sinus via what we call an external approach.

2    And in some ways, that is quite a safe approach.  But you

3    make an incision so you are in this area, and you drill a

4    hole into the sinus, and then you might open up the

5    ethmoids.

6    Q.    Dr. MacKay, before you go on, just for the record,

7    can you just describe what you were doing?

8    A.    Absolutely.  You make an incision just underneath the

9    eyebrow, on to the nose, the nasal bridge as it were, and

10   then drill a hole through the bone upwards into that frontal

11   sinus.

12   Q.    All right.  So you have actually seen the frontal

13   sinus with your own eyes?

14   A.    I have.

15   Q.    And is there another way to operate?

16   A.    Yes.  Nowadays, the last 20 years, we've done this,

17   when we can, endoscopically.  You still have to be prepared

18   to do it externally because very often, despite everything

19   we have done, when we operate on this, there is no way of

20   getting up here other than by removing all these ethmoidal

21   cells to get there.  There is no other way of doing it.  You

22   can't just go up here.  So we look up with an endoscope.

23   You take special forceps, and you remove all these little

24   partitions of bone in order to try and get your way up into

25   there.

MacKay - direct

1    Q.      Is it a danger-free operation?

2    A.      No, it certainly isn't.  It's potentially extremely

3    dangerous because you can kill a patient.  You can give them

4    cerebrospinal fluid leak.  That's fluid that bathes around

5    the brain.  You can give them meningitis.  You can make them

6    blind.

7            This is why, if it was possible to treat the

8    frontal sinus with a spray, I'd be very happy.

9            THE COURT:  Those dangers you described, do they

10   result during surgery from the instruments that are used?

11           THE WITNESS:  They do.  It's worth just adding,

12   though, that you could also have those sort of the

13   complications.  I'm putting it rather dramatically, but it

14   does happen from surgery.  The incidents of serious

15   complications from sinus surgery is about 1 in 1,000.

16           THE COURT:  So the cribriform layer is where?

17           THE WITNESS:  The cribriform plate is

18   actually -- if I said here, it's not quite right, because

19   this is not quite where it is, but it's in that area.

20   BY MR. RICH:

21   Q.      And what is that?

22   A.      The cribriform plate is where the olfactory, the

23   nerves that you smell with that come down from the brain

24   into the olfactory part of the nose, which is the part that

25   you smell with, which right up at the top, near the superior

357

MacKay - direct

1  turbinate.

2  Q.    And so if you had your choice about whether to

3  operate on the frontal sinus or use a nasal spray, if you

4  knew it was going to get into the frontal sinus, which would

5  you have chosen?

6  A.    I always try to treat these patients medically in

7  some way if I possibly can.  And, of course, a lot of them

8  one can treat with topical steroids.  I'm not suggesting

9  everybody with frontal rhinosinusitis or chronic frontal

10 sinusitis would be treated this way or indeed surgically.

11 But when medication fails, then we have no option.

12 Q.    And again, you are not saying that you use the

13 medication to treat the frontal sinusitis.  Right?

14 A.    I do use internasal steroids, but I use drops because

15 I don't believe the sprays would get anywhere near there.

16 Q.    Now, Dr. McKay, based on your 40 years of experience

17 as a surgeon and as a treater of rhinitis and considering

18 what you have heard from plaintiffs and their theory about

19 Barr's -- well, Nasacort AQ, first, would deposit on the

20 frontal sinus, do you agree with their theory?

21 A.    No, I don't.  I do not believe that Nasacort AQ would

22 deposit on the frontal sinus.

23 Q.    Okay.  And have you seen any evidence whatsoever that

24 Barr's ANDA product enters on the frontal sinus?

25 A.    No.

MacKay - direct

```
 1                MR. GRACEY:  Your Honor, at this point, we are

 2   doing both our non-infringement and our obviousness case, so

 3   Dr. MacKay is also being tendered to discuss secondary

 4   contributions of nonobviousness, just by way of roadmap.

 5                So if we could have the next slide, please.

 6   BY MR. GRACEY:

 7   Q.     All right.  Dr. MacKay, did we ask you to give us

 8   some opinions on whether Nasacort AQ met a long-felt, unmet

 9   medical need?

10   A.     You do.

11   Q.     And do you believe Nasacort meets any long-felt,

12   unmet medical need?

13   A.     No, I don't.

14   Q.     And why is that?

15   A.     Because we already had at least Flonase.  I should

16   just add at this point that Flonase in the United Kingdom is

17   called Flexonase.  So if I occasionally call it Flexonase,

18   you will know why.

19   Q.     Are they the exact same?

20   A.     It's identical.

21   Q.     All right.

22   A.     It is an identical product, fluticasone propionate,

23   with the same excipients in the same percentages.  But

24   Flonase -- we, in the United Kingdom, we actually had

25   Flonase since 1991.  So it's a long experience with it.
```

MacKay - direct

1    Q.    All right.

2    A.    And it was a once daily dosing.  It was an aqueous

3    suspension.  It was safe.  And it was effective.

4    Q.    Now, one of plaintiffs' theories is that the

5    difference, for instance, between Flonase and Nasacort AQ is

6    Nasacort AQ has no scent and Flonase has a scent.  I think

7    we have heard some testimony that it has a rose scent.  But

8    the agreed construction of what odorless means in this case

9    is odors which causes the user discomfort are absent?

10   A.    Correct.

11   Q.    With that understanding, do you believe Flonase is

12   odorless?

13   A.    No.  I accept that it has a scent, but I have

14   never -- I mean, as I say, I've been prescribing this.

15   Q.    Do you agree that Flonase is odorless, knowing the

16   parties' understanding that lack of an odor which causes the

17   user discomfort is absent?

18   A.    I do.

19   Q.    Okay.  Thank you.  Continue on.

20   A.    Did I not say that?

21   Q.    Go ahead.

22   A.    I think it is odorless by definition, as read by the

23   Court.

24   Q.    And why is that?

25   A.    Because I prescribed literally thousands upon

MacKay - direct

1  thousands of doses of Flonase and nobody has ever complained

2  about the odor or the smell or the scent or any other

3  similar word.

4  Q.    All right.  And are you aware of any greater patient

5  compliance with Nasacort AQ over Flonase?

6  A.    I'm aware of papers that suggest that there may be

7  but there is no evidence that they are.

8  Q.    And from your personal practice, are you aware of any

9  greater compliance with Nasacort AQ than Flonase?

10 A.    No.

11 Q.    All right.  Now you mentioned there are some papers

12 that suggest there may be.  Just generally, do you have any

13 general critiques or criticisms of those papers?

14 A.    I think they're excellent papers, and I have said

15 that.  I know many of the authors and I respect them, but

16 there are some general problems I think with them.  The

17 first one I think is that none of the papers that are being

18 cited use a questionnaire which has been validated.

19 Q.    What does that mean, "validated?"

20 A.    Validated means that it is being investigated to make

21 sure it's reliable, and it's repeatable, and that it doesn't

22 use words that are value laden like "does this smell bad"

23 and things like that.

24 Q.    Okay.  Any other general criticisms?

25 A.    Well, my other criticism is that quite a few of these

361

MacKay - direct

1    studies are done on a single dose basis.  So what is said in

2    the study is I'd like you to try one dose of A, one dose of

3    B, and one dose of C; and then make a judgment as to whether

4    you think it's preferred, more preferred, less preferred.

5    And then on the basis of that, it is claimed that this may

6    affect compliance.

7            Now, I can't see that this is a real life

8    situation because in real life, you would be using these

9    sprays on a regular basis for weeks, possibly months,

10   possibly even years.  And to say that it may affect

11   compliance on that basis I think is unsound.  Added to

12   which, some of these papers go back to 1999, almost

13   10 years, and they have been saying it may affect compliance

14   or it may affect compliance in some patients, but there is

15   not one single follow-up trial to show that it actually

16   does.

17   Q.    Okay.  Thank you, doctor.

18           Now, let's turn to the legal concept we call

19   unexpected results.  And again, responding to some of

20   plaintiffs' claims on secondary consideration, do you

21   believe, whether Nasacort's potency is less potent than

22   Flonase, that it has an unexpected benefit due to its

23   efficaciousness?  Do you believe that is an unexpected

24   benefit?

25   A.    Well, at this point I'm going to say I'm a surgeon,

MacKay - direct

1    not a scientist, and I don't want to get too deeply into

2    this sort of area.  But my understanding is that it's been

3    suggested that what was so surprising is that Nasacort

4    aerosol was changed to the Nasacort aqueous solution and

5    even though the dose was kept identical, it still worked.

6            Now, to my mind, there is nothing unexpected

7    about that.  If you don't change the dose, why would that be

8    unexpected, particularly in view of the fact that exactly

9    the same thing had been done with Beconase?  Beconase went

10   from an aerosol to an aqueous.  And, again, we've had that

11   in the United Kingdom since 1984.  So that goes back more

12   than 20 years.  And it wasn't unexpected because they took

13   exactly the same dose of the aerosol, turned it into a

14   spray, an aqueous spray, kept the dose the same.  Why should

15   it have been unexpected that the results were the same?

16   Q.    Okay.

17   A.    I can't see anything unexpected about it.  But as I

18   say, I'm not a surgeon not a scientist.

19   Q.    Thank you, doctor.  And, lastly, we have eye

20   symptoms.  Plaintiffs claim that Nasacort AQ unexpectedly

21   improved eye symptoms.  Do you believe that that was an

22   unexpected benefit of Nasacort AQ?

23   A.    It wasn't an unexpected benefit of Nasacort AQ, but

24   in some ways it wasn't an unexpected benefit of any of these

25   because, again, the same thing was found with Flonase and

MacKay - Cross

1    that was unexpected because when Flonase first came on the

2    market in 1991, lo and behold, it treated eye symptoms and

3    everybody said why should it treat eye symptoms?  It seems

4    odd because it's not supposed to have any systemic effect,

5    so why does it help the eyes?  But it has been known that

6    fluticasone helped eye symptoms certainly since the early

7    '90s.

8    Q.    And just so we're clear, fluticasone --

9    A.    Sorry.

10   Q.    No, that's fine.  Flonase both in England and America

11   came on the market before or after Nasacort AQ?

12   A.    Before.

13            MR. RICH:  All right.  That's all the questions

14   I have for now.  Thank you, doctor.

15            THE COURT:  All right.  You may cross-examine.

16            MR. RICH:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18   BY MR. RICH:

19   Q.    Good afternoon, Dr. MacKay.

20   A.    Good afternoon, Mr. Rich.

21   Q.    Good to see you again.

22   A.    Yes.  Well, I wonder.  Yes.  You, too.

23            (Laughter.)

24   Q.    We had a good time the last time we saw each other,

25   didn't we?

                          MacKay - Cross

1    A.      I won't forget it.

2            (Laughter.)

3    Q.      Now, I'd like to start where you started in terms of

4    the deposition in the frontal sinus.  And you talked about

5    this diagram.  You didn't have all the arrows on it but it's

6    the same diagram you used?

7    A.      It is.

8    Q.      And you talked about the opening to the maxillary

9    sinus?

10   A.      I did.

11   Q.      You don't dispute that Nasacort AQ gets to the

12   maxillary sinus.  Correct?

13   A.      Well, actually the first thing I might dispute is

14   that isn't the opening to the maxillary sinus where it's

15   labeled.  It's an accessory ostium or because the actuating

16   accessory to the maxillary sinus should be a little bit

17   forward from there and you can't normally see it.  It's

18   underneath what is called the uncinate process.

19   Q.      It's more hidden?

20   A.      It's a little bit more hidden.

21   Q.      But, nonetheless, you believe that Nasacort AQ or

22   nasal sprays get to the maxillary sinus?

23   A.      I think it's more likely that they get to the

24   maxillary sinus than they get to the frontal sinus.

25   Q.      That is not my question.  Wasn't my question at your

MacKay - Cross

1   deposition, one more time, do you believe that nasal sprays

2   get to the maxillary sinus?

3   A.    I think it's possible.

4   Q.    Now, I want to talk about the route to the natural

5   ostium of the maxillary sinus.  And you believe it's

6   possible that it gets there?

7   A.    Yes.

8   Q.    So the nasal spray -- and we're starting at the nasal

9   vestibule.

10  A.    It starts here.

11  Q.    It starts there.  And it enters the nose, goes

12  between the inferior and middle turbinates?

13  A.    Yes.

14  Q.    Which is the same path to the frontal sinus?

15  A.    Yes.

16  Q.    And then goes past the location of where the frontal

17  sinus is, the uncinate process underneath of the bulla

18  ethmoidalis?

19  A.    Actually, it come forwards.  I'm helping you really

20  because I'm saying it's more difficult.

21  Q.    The maxillary sinus, to get to the natural ostium,

22  after being sprayed in the nose, it would have to make a

23  U-turn and then go laterally 90 degrees?

24  A.    Well, it doesn't actually because what happens is it

25  would sink down into this area here.  So the gravity would

MacKay - Cross

1    take it down into a little sulcus, in fact.  So if it did

2    manage to get up here, maxillary activity could bring it

3    down into this sulcus.  I said I think it's actually pretty

4    unlikely it gets into the maxillary sinus but it's not

5    impossible.

6    Q.    No, my question is to get to the maxillary sinus,

7    would it have to be sprayed into the nose, make it in

8    between the interior and the middle turbinates, past the

9    uncinate process, make a U-turn and then turn laterally

10   90 degrees?  That is the pathway it would have to take to

11   get through the natural ostium?

12   A.    Yes.

13   Q.    And despite the 180-degree turn, followed by a

14   90-degree turn, you believe it can get there.  Correct?

15   A.    You keep slightly misquoting me because I mean

16   whatever I may have said at my inquisition, the fact remains

17   that I think it -- we discussed this at length.

18   Q.    Would you like to hear your testimony back?

19   A.    No, I'm quite happy.  But I think all I'm saying now,

20   and I don't think I said anything terribly different then,

21   is I think it probably is unlikely that very much gets in

22   there but I would accept that some does, okay?  Yes, it

23   might.  It might.

24   Q.    Even with that pathway with the U-turn and the

25   lateral?

MacKay - Cross

1    A.     Well --

2    Q.     Correct?

3    A.     Well, one of the explanations could be that there is

4    an accessory ostium, like in this picture here, which occurs

5    in -- actually, I said it might be more than it is, but it's

6    going to occur in sort of between 9 and 25 percent of cases,

7    something like that.

8              MR. RICH:  Actually, if I could approach, Your

9    Honor?

10             THE COURT:  You may.  Are you sure you want to,

11   though?

12             MR. RICH:  We shook hands at the end.

13             THE WITNESS:  No, no.  We're friends, really.

14   We're friends really except when we're doing this.

15             (Laughter.)

16             MR. RICH:  If I could have the Jog article.

17   BY MR. RICH:

18   Q.     Now, this is an article entitled How Frequent Are

19   Accessory Sinus Ostia.  And if you look at the second page,

20   that is exactly the question we're talking about; correct?

21   A.     Yes.

22   Q.     You look at the table down at the bottom, first, the

23   summary I think actually can tell us all we really need to

24   know:

25             The prevalence of accessory sinus ostia was

MacKay - Cross

```
 1    determined in rhinology clinic patients and general ENT

 2    clinic controls.  Overall, accessory sensory ostia occurred

 3    in four percent, seven percent of rhinology patients and two

 4    percent of controls had ASO.

 5              So we're not talking 9 to 25 percent, we're

 6    talking 2 to 7 percent?

 7    A.    You have shown me one paper which you haven't ever

 8    shown me before.  And I actually looked it up in other

 9    places, and I can tell you that it does vary but it varies

10    between about 9 percent and 25 percent, depending on which

11    series you are looking at.  But no one has ever shown me

12    this paper before.

13    Q.    And actually those earlier papers, the speculation in

14    those earlier papers, the estimates, if we look at the first

15    page, that is what prompted this study?

16    A.    Yes.

17    Q.    And that is what prompted them to find far less

18    frequent prevalence of accessory sinus ostia than believed

19    beforehand?

20    A.    Yes.  My only experience is that that is not true

21    actually.  I find it very frequently.  So I would be

22    surprised if that is correct.  It depends on how hard you

23    look for these things.

24    Q.    Do you believe that the Journal of Laryngology and

25    Otology is a respected journal?
```

MacKay - Cross

1    A.    Yes, I was on the editorial board.

2    Q.    And they wouldn't accept it if it were not a quality

3    article?

4    A.    I know.  But it doesn't mean you have to agree with

5    everything you read in journals.

6          I accept that there is going to be, if you look

7    at the papers, because obviously I went back and I looked

8    through all the papers myself to see, because I realized

9    there could be some discussion about this.  The figure I

10   have thought is actually between nine percent and 25

11   percent.  I did say I thought it was 50 percent, which is

12   certainly a lot higher, but that was an impression.

13   Q.    Of course, that was the impression beforehand, and

14   this study came after and showed a far lesser prevalence?

15   A.    If you say so.

16   Q.    If you look at the introduction, that's what it says?

17   A.    Okay.

18   Q.    I want to turn to your testimony on odorlessness.

19   A.    Yes.

20   Q.    Your testimony today was based on your personal

21   experience with patients.  Correct?

22   A.    True.

23   Q.    That's all it was based on today?

24   A.    Yes.

25   Q.    At the time you formed your opinion on odorlessness

MacKay - Cross

1    in relation to this case, with regard to prior art products,

2    you had never asked a patient whether the smell of an

3    intranasal steroid product was causing them discomfort.

4    Correct?

5    A.    Correct.

6    Q.    But you agree that nasal irritation upon use of an

7    INS drug would be user discomfort.  Correct?

8    A.    Yes.

9              MR. GRACEY:  Your Honor, I want to make sure

10   plaintiffs' counsel isn't going to veer from the claim

11   construction.

12             THE COURT:  I don't think either party is going

13   to veer from the claim construction.  By now I would think

14   that should be understood.

15             MR. RICH:  Understood, Your Honor.  My previous

16   question was --

17             THE COURT:  You don't have to.  Please, go

18   ahead.

19   BY MR. RICH:

20   Q.    This is the package insert for Flonase from the

21   Physician's Desk Reference.  Correct?

22   A.    Correct.

23   Q.    If you look at the page entitled A2, you testified

24   that nasal irritation is user discomfort.  Correct?

25   A.    Absolutely.

MacKay - Cross

1   Q.      It says, In general, adverse reactions in clinical

2   studies have been primarily associated with irritation of

3   the nasal mucus membranes?

4   A.      Indeed.

5   Q.      And burning the nose is certainly user discomfort.

6   Correct?

7   A.      Correct.

8   Q.      And if you look at the adverse effects, nasal burning

9   for Flonase has an incidence of three to six percent.

10   A.      Right.

11   Q.      And nasal irritation has an incidence of one to three

12   percent?

13   A.      Right.

14   Q.      And if someone drops out of the clinical trial

15   because of nasal irritation, that's also indicative of user

16   discomfort.  Correct?

17   A.      Correct.

18   Q.      If you look at the top, the last sentence says that

19   less than two percent of patients.  But it doesn't say zero.

20   It says less than two percent of patients in clinical trials

21   discontinued because of adverse events; this rate was

22   similar for vehicle and active comparators.

23   A.      Right.

24   Q.      Now, the vehicle is a placebo.  Correct?

25   A.      Correct.

MacKay - Cross

1    Q.    It's the same formulation except lacking the active

2    pharmaceutical ingredient?

3    A.    Right.

4    Q.    And here, both the vehicle, both the active and

5    vehicle comparators would include phenyl ethyl alcohol.

6    Correct?

7    A.    Correct.

8    Q.    You don't know of any reason that the odor of Flonase

9    would enhance treatment compliance, would you?

10   A.    No, I don't think it would be enhance it.  Nor did I

11   personally find that it interfered with the compliance.

12   Q.    Well, you talked about some articles where they had a

13   prospective questionnaire regarding potential compliance?

14   A.    These are the one-dose studies.

15   Q.    The one-dose studies.  Right?

16   A.    Yes.

17   Q.    And in each of those, the prospective compliance with

18   TAA was recorded, the patient said, I will definitely use

19   triamcinolone acetonide, Nasacort AQ, to a much greater

20   degree than saying I will definitely use Flonase?

21   A.    Okay.

22   Q.    That's correct, that was --

23   A.    Yeah.  But there is no statistical --

24   Q.    My question is whether that was in the article?

25   A.    Yes, that was in the article.

MacKay - Cross

1    Q.    One of your issues with those articles was a lack of

2    validation of the instruments, the surveys.  Right?

3    A.    Yes.

4    Q.    But you have used invalidated instruments.  Right?

5    A.    Well, you said that, and I don't think I have.

6    Q.    Well, you were involved in a study that led to an

7    article by Rojons Usau (phonetic)?

8    A.    Yes, but it didn't involve any questionnaires, where

9    we were measuring symptoms.

10   Q.    I apologize.  It was not a written questionnaire.  It

11   was just oral questions?

12   A.    It was symptoms.  We were measuring symptoms with a

13   visual analog scale, and that's a perfectly acceptable way

14   of doing it.

15   Q.    Not all the symptoms were measured with a visual

16   analog scale, were they?

17   A.    Well, I am under the impression that they were.  But

18   you are probably going to tell me they weren't.

19   Q.    Would it be fair to say that the question of how you

20   are feeling overall --

21   A.    Okay.

22   Q.    -- is not measured on a visual analog scale?

23   A.    I would regard that as a symptom, but fair enough.  I

24   can see where you are going.

25   Q.    And you didn't evaluate that portion of the study?

MacKay - Cross

1    A.    True.

2    Q.    And validation isn't required for data to be useful?

3    A.    It limits one's confidence when interpreting the

4    results.  Would you agree?

5    Q.    But it's more than zero confidence?  You, in fact, do

6    believe that data is useful even if it's not validated?

7    A.    Yes, I do.  May I just finish?  Limiting

8    confidence --

9    Q.    Actually, Doctor, you may have an opportunity with

10   your counsel.  I wasn't asking about how confident you would

11   be.  I am asking whether it has value and is useful.

12   A.    It's less valuable than one that's not validated.

13   But it does have some value.

14   Q.    So it's good but not the best?

15   A.    Absolutely agreed.

16   Q.    Another concern you had was in terms of retrospective

17   surveying of patients to see whether they would comply?

18   A.    Yes.

19   Q.    That you hadn't seen a retrospective survey?

20   A.    I hadn't seen a follow-on, followup.

21   Q.    Let me, hopefully I can assist you with that.

22          This is an article by a Dr. Naclearino

23   (phonetic) and others?

24   A.    Yes.

25   Q.    Could you see that?

MacKay - Cross

1    A.      Naclearino.

2    Q.      Naclearino.  It is entitled Patient and Physician

3    Perspectives on the Attributes of Nasal Allergy Medications.

4    A.      Right.

5    Q.      Are you familiar with the 2006 Allergies in America

6    study?

7    A.      I don't think I am.

8    Q.      Well, if you look at this article, at the page marked

9    S12 at the bottom left, under Methods, it says allergies in

10   America, a survey of adult nasal allergy sufferers.  In that

11   study, over 30,000 households in the United States were

12   screened to obtain a national sample of nasal allergy

13   sufferers.

14   A.      Right.

15   Q.      From those 30,000-plus households, a sample of 2,500

16   adults with symptomatic allergic rhinitis, nasal allergies,

17   or hay fever and who would receive treatment, allergy

18   treatment, were interviewed about their condition?

19   A.      Right.

20   Q.      As we can see here in the same paragraph.

21           Now, if we turn two pages in, two pages further

22   in, to the page marked S14.  If you look in the right-hand

23   column, it says, not the chart but in the column in the text

24   itself, in the right-hand column of the text itself, it

25   says, the majority, 61 percent, of patients with allergic

MacKay - Cross

1    rhinitis reported that they stopped taking a nasal allergy

2    medicine prescribed by their doctor because of an attribute

3    of the medication rather than a change in their condition.

4    A.    Correct.

5    Q.    So 61 percent of patients actually didn't comply with

6    their prescriptions because of some attribute of the

7    medication?

8    A.    Right.

9    Q.    Not just that they got better.  There was some

10   attribute of the medication.

11              Of all patients, a quarter of them, 25 percent,

12   reported stopping their prescription, their prescription

13   nasal allergy medication, like we are talking about in this

14   case, because of bothersome side effects.  Do you have any

15   reason to doubt that?

16   A.    No.

17   Q.    Now, let's talk about what those side effects are.

18              And now we can go back to the chart that's at

19   the top corner.  Just to be clear, these are patient

20   reported side effects of some, most or all of the nasal

21   allergy medications.

22              The most prevalent one is a drying feeling.

23   Burning, which we talked about with Flonase, is on there,

24   too, and bad taste is on there, too.  Right?

25   A.    Right.

MacKay - Cross

1    Q.      Those are sensory attributes?

2    A.      Okay.

3    Q.      Like an odor that causes discomfort.  Right?

4    A.      But it isn't actually one of them.

5    Q.      I understand that scent is not on there.  But phenyl

6    ethyl alcohol is an alcohol, and that can cause drying.

7    Right?

8    A.      Well, if you say so.

9    Q.      Do you have any doubt that phenyl ethyl alcohol

10   causes drying?

11   A.      I am not totally sure about that.  If you tell me it

12   is, that's interesting.  I would be interested to see the

13   evidence for it.

14   Q.      Okay.  We may hear from others who are a little more

15   sure?

16   A.      Right.

17   Q.      Now, in the studies that you have reviewed relating

18   to patient compliance, patient preference, and odorlessness,

19   among the intranasal steroids, the least preferred tasting

20   products of those are phenyl ethyl alcohol.  Right?

21   A.      It isn't something I specifically looked for.  If you

22   say so, I am prepared to accept it.

23   Q.      You don't contest that?

24   A.      No.

25   Q.      And bad taste is the fourth most prevalent reason why

MacKay - Cross

1    people stop using their nasal allergy medications?

2    A.    Yes.  Not scent.

3    Q.    One of the things you said in your expert report was

4    that there are only really four kinds?

5    A.    Five.

6    Q.    You are right.  Maybe you can help walk me through

7    them.  There is salty, sweet, sour, bitter, and is it umammi

8    (phonetic)?

9    A.    Umammi, which is monosodium glutamate.  That is a

10   primary taste.

11   Q.    So burning isn't one of the taste senses?

12   A.    That isn't a taste at all.  It is a sensation.

13   Q.    And the sensation is not taste.  And bad tastes other

14   than those four, that comes from scents.  Correct?

15   A.    Well, that taste -- no, I can't agree with you here.

16   If you are trying to suggest that it's because of the smell

17   that they don't like the taste, I don't agree with you.

18         They mainly complain of a bitter taste.  Now, a

19   bitter taste is a primary taste.  It's got nothing to do

20   with smell.  Flavor has to do with smell.  So if you can

21   tell the difference between lamb and beef, that's smell.

22         Taste is something different.

23   Q.    It's your testimony that the primary complaint in

24   terms of bad taste is bitter taste?

25   A.    Yeah.  I am just giving an example.

MacKay - Cross

1  Q.      In intranasal corticosteroids, is bitter taste a

2  common complaint?

3  A.      Yes.

4  Q.      I would like to show you an article.  This is marked

5  Plaintiffs' Exhibit 393.  This is one of the articles you

6  reviewed.  Correct?

7  A.      Yes, it was.

8  Q.      And if we go and look at the chart that's in here,

9  that's hard to read.  Can we blow it up?  If you look --

10  they have separated bitter taste and light taste here.

11  Correct?

12  A.      Right.

13  Q.      And bitter taste is relatively low on the scale.  Do

14  you see bitter taste there?  Could we highlight bitter

15  taste?

16  A.      Yes.  Just let me look there.

17          Right.

18  Q.      It is 15 for Nasacort AQ and 19 for Flonase?

19  A.      Yes.

20  Q.      But for liking of the taste, there is a statistically

21  significant difference between the liking of the taste

22  between Nasacort AQ and Flonase.  Correct?

23  A.      It says that.

24  Q.      And there is a statistically significant difference

25  in the liking of the odor between Nasacort AQ and Flonase?

MacKay - Cross

1   A.      Yes.  The interesting thing about the odor is that

2   for Flonase, it's called 55.

3   Q.      My question is whether there is a statistically

4   significant difference?

5   A.      Do you not want me to answer --

6   Q.      That is a yes-or-no question.

7   A.      Is it?

8   Q.      Is there a statistically significant difference?

9   A.      It is.

10  Q.      Okay.  And then, if you turn to the end of this

11  article, this is one of the articles you were talking

12  about?

13  A.      Yes.

14  Q.      Where it says, Evaluations such as the one described

15  here provide pharmaceutical manufacturers and clinicians

16  with more information about sensory factors, improving upon

17  patient satisfaction.  With patient satisfaction, improved

18  compliance and improved outcomes can be expected.

19          Do you doubt that?

20  A.      We don't know.  Maybe.  It's yet to be proven.

21  Q.      You testified earlier that Flonase was safe.  Right?

22  A.      It has an equal safety profile to Nasacort AQ.

23  Q.      Including systemic side effects?

24  A.      As far as I know, yes.

25  Q.      But systemic side effects are safety issues.  Right?

MacKay - Cross

1    A.      Yes.

2    Q.      And Nasacort AQ does not have any systemic side

3    effects?

4    A.      Right.

5    Q.      But with Beconase AQ, one of the products we have

6    talked about already, growth is a potential systemic side

7    effect?

8    A.      Potentially one, yes.  Skoner showed it is, but there

9    is plenty of papers that didn't agree with that.

10   Q.      There are plenty of papers?

11   A.      Well, there are papers that disagree with it, because

12   following our discussions, of course, needless to say, I did

13   a considerable amount of research on the subject, and there

14   are certainly papers which would disagree with the Skoner

15   article.

16   Q.      Do you think that there was any problem with the

17   Skoner article?

18   A.      Well, we discussed that as well.  Woodell had

19   suggested, not -- my colleague, Dr. Meltzer, Meltzer had

20   sited Woodell's article.  And Woodell had suggested that

21   they were not age- and sex-matched.  And in the actual

22   article, they are not age- and sex-matched.  But they had

23   tried to make some reparations for that.

24   Q.      But when we spoke earlier, you didn't doubt the

25   correctness of the Skoner article?

MacKay - Cross

1    A.    I do accept that there is a possible question mark

2    over growth in children with beclomethasone.

3    Q.    Let's talk about Tilden and HPA axis.  HPA axis is?

4    A.    Hypothalamic pituitary access.

5    Q.    That is a systemic side effect?

6    A.    Yes.

7    Q.    That is cortisol levels being depressed?

8    A.    Absolutely.

9    Q.    And that's a problem for --

10   A.    Potentially, yes.

11   Q.    A potential problem.  Let me show you an article on

12   this point.  This is another Skoner article.  Correct?

13   A.    Correct.

14   Q.    Now, if you look at the results, I would like to

15   focus on the sentence that's highlighted already, saying, no

16   significant differences in changes in urine

17   cortisol-creatinine ratios were observed between TAA 110

18   micrograms or 220 micrograms and placebo.  In contrast, the

19   change in mean urine cortisol-creatinine ratios, ratio

20   values for FP, and that's Flonase, were significantly lower

21   compared with TAA 2000 micrograms and placebo?

22   A.    Correct.

23   Q.    So that's showing a systemic side effect for

24   fluticasone propionate or Flonase?

25   A.    Correct.

MacKay - Cross

1    Q.      In the conclusions, it says, in contrast to FP, in

2    contrast to Flonase, TAA, Nasacort AQ nasal spray did not

3    significantly affect HPA axis function when used over a

4    two-week interval?

5    A.      Correct.

6    Q.      One more I would like to show you.  This is an

7    article by Wilson and others, entitled Effects of Repeated

8    Once Daily Dosing of Three Intranasal Corticosteroids on

9    Basal and Dynamic Measures of

10   Hypothalmic-Pituitary-Adrenal-Axis Activity.  Correct?

11   A.      Correct.

12   Q.      So if we look at the results section, the results

13   say, for overnight urinary cortical excretion compared with

14   placebo, there was a significant degree of suppression with

15   FP, that's Flonase, but not with TAA, that's Nasacort AQ, or

16   BDP, Beconase AQ.  Correct?

17   A.      Which is odd because you would expect there to be a

18   difference with BDP if there was fluticasone.

19   Q.      But this is a systemic side effect that is being

20   shown with fluticasone propionate?

21   A.      Right.

22   Q.      Flonase in this paper had a systemic side effect?

23   A.      In this particular paper, it would appear to.

24   Q.      And that's a safety issue?

25   A.      Right.

MacKay - redirect

1    Q.      One last line of questions.

2            You talked about Nasacort AQ versus Nasacort and

3    nasal inhaler with regard to Flonase.

4    A.      Yes.

5    Q.      In your mind, there is no distinction in

6    effectiveness between the 220 micrograms per day daily

7    dosage of Nasacort AQ and the 200 micrograms dosage of

8    fluticasone propionate.  Correct?

9    A.      Correct.

10   Q.      And you can't explain that differential in potency

11   between are fluticasone propionate and triamcinolone

12   acetamine and the mere identity of effectiveness of the two

13   drugs?

14   A.      No.

15           MR. RICH:  Thank you.  Nothing further, Your

16   Honor.

17           THE COURT:  Redirect.

18                   REDIRECT EXAMINATION

19   BY MR. GRACEY:

20   Q.      Hello again.

21   A.      Hello.

22   Q.      Take a look at the Skoner article, the 2002 article.

23   Have you reviewed this version of the Skoner article that

24   plaintiffs put in front of you?  It's entitled The Effects

25   of Intranasal TAA?

MacKay - redirect

1  A.      No.

2  Q.      And, in fact, if you will turn to the last page of

3  that article, 61, not the last page, second-to-last page,

4  penultimate page?

5  A.      Right.

6  Q.      If you will look at the acknowledgment, you will see

7  this was a study supported by a grant by RPR?

8  A.      Right.

9  Q.      That is an affiliation of Aventis.  Right?

10  A.      It is.

11  Q.      All right.  He showed you a few other articles about

12  Flonase and its safety.  Right?

13  A.      He did.

14  Q.      And I know you practice in England, but as far as

15  the United States goes, is Flonase still an FDA-approved

16  drug?

17  A.      It is.

18  Q.      It has to be a safe and effective drug to be

19  approved.  Right?

20  A.      It does.

21  Q.      Is it still approved in England?

22          MR. RICH:  Your Honor, this is beyond the scope

23  of cross.

24          THE COURT:  Overruled.

25          THE WITNESS:  The answer is, it is approved in

MacKay - redirect

1    the United Kingdom, yes.

2    BY MR. GRACEY:

3    Q.    Now, he also asked you some questions about

4    odorlessness?

5    A.    Yes.

6    Q.    Odorless is a term of art for this case?

7    A.    I understand.

8    Q.    That, I think you testified earlier, it's an odor

9    that causes patient discomfort is lacking?

10   A.    I understand that.

11   Q.    If we could pull up the PDR, the '95 PDR.  DX-16.

12         Now, plaintiffs have identified nasal

13   burning, and nasal irritation.  Nasal burning is not odor,

14   is it?

15   A.    It is not.

16   Q.    And nasal irritation, is that odor?

17   A.    No.

18   Q.    Is bad taste the equivalent of odor?

19   A.    No.

20   Q.    Now, plaintiffs' counsel asked you some questions

21   about the entrance to the maxillary sinus.  Do you remember

22   that?

23   A.    I do.

24   Q.    And he was quarreling with you about what percentage

25   if it gets into the maxillary and what not.  Even if you

MacKay - redirect

1      take him at his word about the four to seven percent, I

2      think was the number, does that have anything to do with the

3      ability of a drug to get into the frontal sinus?

4      A.      Not at all.

5      Q.      Is it your opinion that it is easier or more

6      difficult to get to the maxillary sinus than the frontal

7      sinus?

8      A.      Well, it's considerably easier for me to get to the

9      maxillary sinus as a surgeon.  But I think if you are

10     talking about a spray, it would definitely be, it would

11     definitely be easier to get to the maxillary than to the

12     frontal by a magnitude of a hundred.

13             MR. GRACEY:  That's all the questions I have,

14     Doctor.

15             THE COURT:  You are excused, Doctor.  We will

16     take a break.

17             (Witness excused.)

18             (Recess taken.)

19             THE COURT:  All right.  Please be seated.

20             Your next witness.

21             MR. HURST:  Your Honor, our next witness is

22     Maureen Donovan.

23             THE COURT:  What is the first name?

24             MR. HURST:  Maureen.  Dr. Maureen Donovan.

25                     - - -

Donovan - direct

1                    DEFENDANT'S TESTIMONY

2          ... DR. MAUREEN DENISE DONOVAN, having been placed

3                under oath at 3:25 p.m. as a witness, was

4                  examined and testified as follows ....

5                            - - -

6              THE COURT:  Good afternoon.

7                      DIRECT EXAMINATION

8    BY MR. HURST:

9    Q.      Dr. Donovan, how are you currently employed?

10   A.      I work at the University of Iowa.  I'm an associate

11   professor there.

12   Q.      Associate professor in what?

13   A.      In the College of Pharmacy is where my primary

14   appointment is.

15   Q.      How long have you been in Iowa?

16   A.      I've been there 19 years.

17   Q.      Just as background, can you describe for Judge Sleet

18   your educational background?

19   A.      I have a Bachelor's Degree in Pharmacy from the

20   University of Minnesota and a Ph.D. in Pharmaceutics from

21   the University of Michigan.

22   Q.      And when did you get the first degree?  What year?

23   A.      In 1983.

24   Q.      Okay.  And when did you receive your Ph.D. from the

25   University of Michigan?

Donovan - direct

1    A.       In 1989.

2    Q.       I apologize.  Both in Pharmaceutics.  Correct?

3    A.       Well, my bachelor's degree in Pharmacy and my Ph.D.

4    in Pharmaceutics.

5    Q.       So after you got your Ph.D. in 1989, where did you go

6    then?

7    A.       I took a position as an assistant professor at the

8    University of Iowa.

9    Q.       As?

10   A.       As assistant professor in the College of Pharmacy.

11   Q.       And you have been there ever since?

12   A.       Yes, I have.

13   Q.       Do you teach courses as a professor at Iowa?

14   A.       I do.  I teach courses to pharmacy students and I

15   teach courses to graduate students in the pharmaceutics

16   program across the campus.

17   Q.       Just generally, what kind of courses do you teach?

18   A.       The courses I teach to our pharmacy students are use

19   of formulations and relative administration of drugs for

20   typical how pharmacy would view them.  So how to treat

21   suspensions and solutions properly, how people need to use

22   tablets or patches, so sort of the gamut of dosage forms

23   and their designs in general and their proper use.

24   Q.       And if you said this, I apologize.  That's both

25   graduate students and undergraduate students?

Donovan - direct

1    A.     My focus is the undergraduate students or

2    professional students for that course.  I have a course in

3    drug delivery systems that I teach graduate students, and

4    that course is more focused on design of delivery systems

5    and various routes of delivery, the limitations at those

6    routes perhaps and the number of the materials you would

7    choose for formulation at one route vs. another route.

8    Q.     Do you conduct research at the University of Iowa?

9    A.     Yes, I have a funded research laboratory that I run

10   at the university.

11   Q.     How long have you been conducting research at Iowa?

12   A.     Again, about 19 years.

13   Q.     Okay.  Generally, what kind of research is this

14   laboratory research?

15   A.     Yes.

16   Q.     What kind of research do you conduct at Iowa and have

17   you been conducting at Iowa?

18   A.     The majority of the time I've been there, I had a

19   research focus on nasal drug absorption, nasal drug

20   delivery, optimization of nasal dosage form.  I look at

21   other routes of delivery, too, but most of the work has been

22   focused on nasal drug formulations.

23   Q.     All right.  Do you publish articles?  Have you

24   published articles?

25   A.     Yes, I have.

Donovan - direct

1    Q.    Approximately, how many?

2    A.    Over 40.

3    Q.    Of the 40 articles that you published, how many

4    actually relate to nasal formulation issues and nasal

5    products?

6    A.    Probably, at least three quarters of them.

7    Q.    We've heard some testimony in the case that

8    pharmaceutical formulators don't, by themselves, create and

9    make pharmaceutical formulations.  Have you heard that?

10   A.    I've heard that, yes.

11   Q.    Are you a pharmaceutical formulator?

12   A.    Yes, I am.

13   Q.    Have you, by yourself, on your own made

14   pharmaceutical formulations?

15   A.    Yes, I actually have.

16   Q.    And how often have you done that?

17   A.    Well, I think I do it a lot, to tell you the truth.

18   Q.    Do you sometimes ask your graduate students to

19   create, by themselves, pharmaceutical formulations?

20   A.    Yes, I do.

21   Q.    Now, how long has your focus as a pharmaceutical

22   formulator been on nasal delivery of drugs?  Delivery of

23   drugs through the nasal passages.

24   A.    It's been longer than the time I've been at the

25   university much Iowa.  So it's approaching 23, 24, 25 years.

Donovan - direct

```
 1    My graduate Ph.D. work was in looking at nasal absorption.

 2    We looked at comparative absorption between the nasal cavity

 3    and the gastrointestinal tract.  And so I started my work in

 4    nasal delivery about the same time or shortly after I

 5    entered the graduate program at the University of Michigan.

 6    Q.    As a pharmaceutical formulator who focuses on nasal

 7    issues, do you study the viscosity of the formulations you

 8    are working with?

 9    A.    Yes, I do.

10    Q.    What kind of study of viscosity do you do?

11    A.    We looked at viscosity probably as one of the

12    significant focuses in my research for at least the last

13    10 years.  And I've been trying to find materials or

14    identify characteristics of materials that will help retain

15    them in the nasal cavity; and viscosity profile being one of

16    the ways, one of the aspects of the materials that I'm

17    looking at.

18    Q.    Okay.  As a pharmaceutical formulator who focuses on

19    nasal formulation, do you also study the pattern of nasal

20    deposition?

21    A.    Yes, I do.

22    Q.    Within the cavity?

23    A.    Yes.

24    Q.    Can you explain for Judge Sleet what kind of work

25    have you done in that area?
```

393

Donovan - direct

1    A.    Sure.  We have done mostly in vitro work in an

2    MRI-derived model.  And so somebody took an MRI of a human,

3    a live human's nasal cavity and that was machined, the

4    measurements and so forth, of the inside of the nasal

5    cavity.  So sort of that complicated structure you saw on

6    some of Dr. MacKay's actual head diagram has been machined

7    through plexiglas into a model, that we then spray materials

8    into to try to see whether those materials go, and not

9    necessarily -- we can look at a little bit about where

10   they're retained, but it's not the best model for looking

11   at.  We can't look at mucociliary clearance, obviously, but

12   we've spent a lot of time looking at formulation issues and

13   device issues that determine where the spray is going.

14   Q.    Over your 20 years in this area, have you gained an

15   understanding of the nasal anatomy?

16   A.    Yes, I have.

17   Q.    Is that important to your work?

18   A.    Yes.  Again, because we're interested in

19   characterizing drug absorption, optimizing drug absorption

20   for the nasal cavity, I need to know, again, how to get the

21   materials to the site I'd like them to go to for their

22   activity.  And so I need to know the aspects of the nasal

23   anatomy that play a role in determining how to get the drug

24   to the site I wanted to.

25   Q.    How specialized is it?  How common is your focus on

Donovan - direct

1    nasal formulation products and research devoted to nasal

2    products?  Is that something that a lot of people do?

3    A.      Not very much.  Maybe 10 people.

4    Q.      Okay.  In the United States or worldwide?

5    A.      That's probably even fair worldwide.  People who have

6    that specific a focus, it's very few.

7    Q.      Okay.  Is one of the other folks who spoke who

8    focuses on nasal formulations in the courtroom?

9    A.      Yes.  As a matter of fact, he is.

10   Q.      Who is that?

11   A.      That is Dr. Needham.

12   Q.      And he is sitting behind Barr's bench?

13   A.      Yes, he is.

14           MR. HURST:  Your Honor, I'd like to proffer

15   Dr. Donovan as an expert in pharmaceutical formulations with

16   special expertise in how drugs are delivered to the nasal

17   passages.

18           THE COURT:  Any objection?

19           MR. BERGHOFF:  No.

20           THE COURT:  The doctor is accepted as such an

21   expert.

22   BY MR. HURST:

23   Q.      Dr. Donovan, yesterday you saw Dr. Kaliner do an

24   in-court demonstration where he sprayed nasal spray in the

25   air and it formed a plume or a cloud?

Donovan - direct

1    A.    Yes, I saw that.

2    Q.    All right.  Is that an accurate representation of

3    what actually happens when a nasal spray is sprayed into the

4    nasal cavity?

5    A.    No, that cloud doesn't form within the nasal cavity.

6              MR. HURST:  Your Honor, with your permission, we

7    wanted to do an entirely low-tech drawing just to help

8    describe what actually happens when a nasal spray goes into

9    the nasal cavity.  So can I ask Dr. Donovan to do a little

10   handwritten drawing on the Elmo?

11             THE COURT:  Sure.

12             THE WITNESS:  If I speak like this, can you hear

13   me?

14             THE COURT:  You're fine.

15             THE WITNESS:  Fine?  All right.

16             THE COURT:  I can tell you are a teacher.

17             THE WITNESS:  What I'm going to draw is, are two

18   nostrils.  And the perspective is if you are looking up

19   someone's nose, okay?

20             So the bridge of your nose is coming down here

21   (indicating).

22   BY MR. HURST:

23   Q.    Take a look up there.

24   A.    Oh.  I needed to sort of step back while I was doing

25   that.

Donovan - direct

1  Q.    Yes.   Now, describe what you are doing.

2  A.    This is one nostril, that being the other nostril.

3  And this part of your nose, basically the tissue part, is in

4  between.

5  Q.    Okay.   And just to help orient, is there like a tube

6  straight back to the nasal cavity from the opening in the

7  bottom of the nose?

8  A.    Not a straight tube.

9  Q.    Okay.

10  A.    What you see, when you look up the nostrils; if it's

11  lit up, you can see a little bit more; but the nostrils are

12  actually a relatively large opening and the airway is

13  narrow.   And we heard about that yesterday actually,

14  Dr. Kaliner talked about the nasal valve which is behind the

15  area where the hairs in the nose are, right where we're

16  getting that transitional epithelium area that Dr. MacKay

17  was just talking about.

18          That nasal valve area, in addition to having

19  some changes in the cell types, is a narrowing in the air

20  space.   Okay?   And so as you look up, you kind of see sort

21  of an oval boot-shaped kind of area.   And that is really the

22  keyhole that the spray is going through.   Okay?   So we put

23  the nozzle into the nasal cavity or into the nostril and

24  actuate it and the spray starts to form this, but it's

25  facing sort of a viaduct.

397

Donovan - direct

1          THE COURT:  "This" meaning going out?

2          THE WITNESS:  Yes.  As we saw the spray

3     yesterday, it formed the nice plume; right?  Well, when it's

4     in your nostril, it starts, it tries, but about a centimeter

5     in front of it or so, depending on how far you have it up

6     your nose, it meets this narrowing area.  So a lot of the

7     spray actually ends up depositing right here.  And just the

8     portion that is in line with this area -- and you can see

9     my hand -- that the X area is that opening nasal valve

10    narrowing opening.  That it's only a fraction of the spray

11    that passes through the keyhole that gets into the nasal

12    cavity and back to the turbinates.

13         THE COURT:  So, counsel, do you want to have her

14    indicate for the record what she just did?

15         MR. HURST:  Just describe?

16         THE COURT:  Well, the marking she just made.

17         MR. HURST:  Thank you.

18         THE WITNESS:  Okay.  Do you want me to label

19    them?  Would it be helpful?

20         THE COURT:  You can orally describe it.

21         MR. HURST:  Orally describe so it appears on the

22    record what you have just drawn.

23         THE WITNESS:  All right.  What I have drawn is

24    an elliptical shape that represents the nostrils.  And then

25    within that, and meant to be in perspective behind that, is

Donovan - direct

1    another sort of elliptical shape that has a smaller

2    dimension, usually maybe half-to-three-quarters of an inch

3    in length and a quarter of an inch in width or so.  That is

4    the nasal valve region.  The airway narrows there.  And so

5    when we're trying to send a spray that is forming a plume

6    into the main nasal cavity, only the part of the plume can

7    go through that inner elliptical shape.  And the material

8    that I have tried to -- that the lines that I have on the

9    outside are actually spray that couldn't get through the

10   keyhole, so it ended up on those tissue surfaces, and only a

11   fraction of the spray went into the nasal cavity.  And --

12                  MR. HURST:  Go ahead.

13                  THE WITNESS:  And then I'm not going to draw

14   this.  And if you need to, we can pull up another visual,

15   but you remember Dr. MacKay talking about the front end of

16   the turbinates.

17                  THE COURT:  I do.

18                  THE WITNESS:  That is where most of the spray

19   ends up after it passes through the nasal valve.

20   BY MR. HURST:

21   Q.    Thank you, Dr. Donovan.

22   A.    (Retakes witness stand.)

23   Q.    While this drawing is still up, is there any more

24   narrow part of the nasal cavity than the nasal valve?

25   A.    No, not for the total airflow going through that, the

Donovan - direct

1    nasal cavity region.

2    Q.      So when the nasal spray goes through this keyhole, as

3    I think you described it, does it reform a plume?

4    A.      No, it does not.

5    Q.      What happens?

6    A.      Now, whatever is traveling through the nasal valve is

7    now suspended in the air stream.  And, again, if it can't

8    curve around the turbinates, if it can't go into the

9    meatuses between the turbinates, well, then it has impacted

10   on to the surface of the turbinates.  So either it's light

11   enough that it can stay floating in the air stream and

12   travel as the air is traveling and through the meatuses

13   again and over turbinates or it hits on the surfaces and

14   stays there.

15   Q.      Well, did the spray droplets from the nasal spray, do

16   they bounce around the inside of the nasal cavity?

17   A.      No, this is sort of line raindrops on the floor.

18   When they hit, they splat and they may spread.  They

19   probably do.  They don't bounce back off.

20   Q.      When they hit, they stick?

21   A.      Yes, when they hit, they stick.

22   Q.      Why don't we take a look at Defendant's Exhibit 5?

23   You have seen this report before?

24   A.      Yes, I have.

25   Q.      This is a PET study that Dr. Berridge did in 2002.

Donovan - direct

1    Correct?

2    A.    Yes.

3              MR. HURST:  Your Honor, my apologies.  I have a

4    binder.  It's not many exhibits.  May I approach?

5              THE COURT:  Yes.

6    BY MR. HURST:

7    Q.    Take a look at, if we can, Page 12 of this exhibit.

8    Now, you have seen this depiction of the results from the

9    2002 study before.  Correct?

10   A.    Yes, I have.

11   Q.    You are not a PET scan expert, are you?

12   A.    No.

13   Q.    My only question for you then, Dr. Donovan, is what

14   is your reaction to this deposition pattern as a person who

15   is skilled in nasal formulations and has studied deposition

16   patterns?

17   A.    It's exactly the deposition pattern I would expect.

18   Q.    Why do you say that?

19   A.    That the area that's referred to as nasal regions is

20   that nasal valve before the turbinate region, again, so

21   that's what I call the anterior region, that's where you

22   expect the highest deposition.  And that's exactly where the

23   highest deposition of this, both Flonase and Nasacort showed

24   up.

25              There is some deposition in the turbinate

Donovan - direct

1    region, it is certainly expected, especially on those

2    anterior surfaces of the turbinates.  And there is

3    absolutely no deposition in the frontal sinus, which is

4    exactly what I would expect.

5    Q.    Now, you have been in the business of making nasal

6    formulations for 20 years.  Today, Dr. Donovan, today, 2008,

7    do you know how to make a nasal formulation that's capable

8    of reaching the frontal sinus?

9    A.    No, I don't.

10   Q.    Well, you did read both the patents that are at issue

11   in this case, did you not?

12   A.    Yes, I did.

13   Q.    Did you study them?

14   A.    I did.

15   Q.    Did they teach you, as a person who focuses on making

16   formulations in this area, how to make a nasal formulation

17   that is capable of reaching the frontal sinus?

18   A.    They did not.  I looked at the example in the

19   patents, and looked at the materials in that, looked at the

20   information about the formulation.  And there is nothing

21   unique about the formulation components, there is nothing

22   unique about the spray device, there is nothing about the

23   spray characteristics that would help me understand that

24   this would be able to deliver something to the frontal

25   sinuses.  So I can't discern anything from the information

Donovan - direct

1    provided in the patent as to how the material is able to

2    deliver drug to the frontal sinus.

3    Q.    Now, you have offered an opinion in this case

4    relating to the enablement issue.  Correct?

5    A.    Yes, I have.

6    Q.    Just very briefly, because we are going to spend some

7    time on it, what is your opinion -- let me ask you this:

8    Did you offer that opinion from your own perspective as a

9    person with 25-plus years in this area, or from the

10    perspective of one of ordinary skill in the art?

11    A.    No.  I was asked to offer that opinion based as

12    someone of ordinary skill in the art at the time of these

13    patents.

14    Q.    So let's --

15            THE COURT:  Have we identified that person of

16    ordinary skill in this record?

17            MR. HURST:  This would be the first time, Your

18    Honor.

19            THE COURT:  She is going to provide that

20    information?

21            MR. HURST:  Yes.

22    BY MR. HURST:

23    Q.    Let's talk about that issue.  What is the general

24    subject matter of the patents?

25    A.    They describe a nasal formulation, a formulation that

Donovan - direct

1    contains a corticosteroid as the active ingredient.  And

2    more specifically about these, these actually describe the

3    reformulation of a nasal steroid.

4    Q.      Why do you say reformulation?

5    A.      Well, because there was a product that was

6    administered, triamcinolone acetonide, prior to these

7    patents.  It was delivered as a propellant-driven aerosol.

8    And these describe an aqueous nasal spray.  So it's a change

9    in formulation but not a change in drug and not a change in

10   route of administration.

11   Q.      Do you have an understanding of the type of education

12   and experience one might have as of 1996 in terms of

13   formulating a nasal spray?

14   A.      Sure.  I know a number of formulators.  I knew them

15   then.  And they have a broad range of experiences.  Usually,

16   they have a Bachelor's degree.

17   Q.      One second.  I want to make sure that you have a

18   foundation for actually describing this.  You were doing

19   this in 1996?

20   A.      Yes, I was.

21   Q.      You were in academia.  Did you have contacts with

22   industry?

23   A.      I did.  I had worked in industry for short periods of

24   time.  I trained students who went out and worked in

25   industry.  I had contracts from people in the industry to

Donovan - direct

1    work on nasal formulations.  So I knew very well the kind of

2    people that were acting and developing nasal formulations

3    and their backgrounds.

4    Q.    Let's take it a step at a time.  How about level of

5    education, for folks who were actually doing nasal

6    formulation work in 1996.  Just level of education?

7    A.    Bachelor's degrees, Masters degrees, Ph.D.

8    Q.    What subject matter of education, what kind of

9    education is most useful in this area?

10   A.    My perspective is the most useful background is, a

11   long time ago it would have been pharmacy.  Now it's turned

12   into pharmaceutical sciences just because of how pharmacy

13   education works.

14          That's most suited, because the individuals know

15   about the materials, they know about the physiology, the

16   biology, and so forth.  There are lots of other backgrounds

17   that people have for formulators, however.  So there are

18   biologists by training, chemists by training, chemical

19   engineers by training, biochemists by training.

20          So there is a fairly broad biomedical or basic

21   science background that formulators have.

22   Q.    Do those folks who don't actually have pharmaceutical

23   sciences degrees, do they need any extra training before

24   they actually do pharmaceutical formulation work?

25   A.    I believe they do.  And the ones I am associated with

Donovan - direct

1    have some sort of training experience in pharmacology and in

2    physiology and in anatomy and in material sciences regarding

3    safe and effective materials to use in pharmaceutical

4    formulations.

5            So it is their way of getting the body of

6    knowledge they didn't get by not being in a pharmaceutical

7    sciences program.

8    Q.    So how many years of experience, of actual

9    pharmaceutical formulation work would be required, in your

10   view, to be an ordinarily skilled pharmaceutical formulator

11   in 1996?

12   A.    Well, if somebody had a Bachelor's degree in any of

13   the areas I talked about in 1996, in addition to that, they

14   probably need maybe three to five years of direct

15   formulation experience and even direct experience

16   formulating nasal dosage forms to be considered skilled in

17   the art and able to independently develop their nasal

18   formulation.

19           If it was somebody with a Master's degree, they

20   would have a little bit more didactic training, so maybe

21   they need a little bit less than experience, three years or

22   so.  Then again a Ph.D.  People who have more training and

23   more scientific background need a little less on-the-job

24   training, perhaps.  But they still would have to become

25   experienced in nasal formulation development in order to be

Donovan - direct

1   able to do this on their own, to the best of their

2   abilities.

3   Q.    Aventis has suggested that one of ordinary skill in

4   the art would actually be a team that included a medical

5   doctor.  Just in your experience with pharmaceutical

6   formulation, is that really part of the definition of one of

7   ordinary skill in the art?

8   A.    For formulation development, no.  Somebody does not

9   have to be a medical doctor or necessarily even interact

10  with somebody who is a medical doctor to formulate a dosage

11  form.

12  Q.    How about in this particular case, where you were

13  working with an active ingredient that was an old active

14  ingredient?

15  A.    Especially in this case, again, this was a

16  reformulation, an agent that had been shown to be effective

17  and safe, and the intent for treatment was the same.  There

18  would be very little role, in fact, probably no role for a

19  trained medical person to do anything regarding the

20  formulation itself.

21  Q.    Okay.  So now, with that definition of one of

22  ordinary skill in the art in mind, what is your opinion with

23  respect to whether or not these patents teach an ordinarily

24  skilled formulator how to make a nasal spray that reaches

25  the frontal sinus?

Donovan - direct

1   A.    I don't think they teach someone of ordinary skill in

2   the art how to reach the frontal sinus.

3   Q.    Why do you say that?

4   A.    Well, as I said before, they don't teach me how to

5   reach the frontal sinus.  In 1996, I was a person of

6   ordinary skill in the art.  And they didn't teach me, they

7   wouldn't have taught me that in 1996.  They don't teach me

8   it now even.

9   Q.    Is there any unique ingredients that are used in a

10  claimed formulation that might make it more likely to reach

11  the frontal sinus?

12  A.    No.  These are ingredients that were used in other

13  nasal formulations.

14  Q.    Such as?

15  A.    Well, again, Beconase AQ, Flonase, use the same

16  ingredients.  And I am not aware that they get to the

17  frontal sinus.  And I don't know how this material, if it

18  gets to the frontal sinus, does it, and there is nothing in

19  the patent that describes how to accomplish that.

20  Q.    After reading the patents, if your assignment was

21  make a nasal formulation that reaches the frontal sinus,

22  would you even know where to begin?

23  A.    No.

24  Q.    Let's take a look at Defendant's Demonstrative

25  Exhibit 15.

Donovan - direct

1              We have looked at this before.  The frontal

2     sinus, we have looked at this so many times, Judge, I am not

3     going to belabor it.  You see the frontal sinus there on the

4     left.

5     A.     Yes, I do.

6     Q.     Is the frontal sinus an area of interest for your

7     average nasal formulator?

8     A.     No.

9     Q.     Why not?

10    A.     Because the average nasal formulator, a person

11    skilled in the art knows that you cannot get to the entrance

12    to the frontal sinus to use that as a pathway into the

13    frontal sinus from the nasal cavity.

14    Q.     Now, in all your years of experience, in this area of

15    study, have you ever heard, have you ever heard of a nasal

16    spray that reliably reached any of the sinuses much less the

17    frontal sinus?

18    A.     No, I haven't.

19    Q.     Do you think, given your area of research and focus,

20    that you would have heard of such a development in the

21    progression of nasal sprays?

22    A.     Yes.  If there was a way to use the nasal cavity to

23    deliver something to the frontal sinus, I would know about

24    it.

25    Q.     Now, outside the context of this particular case --

Donovan - direct

1    let me ask you this:  Are you familiar with Nasacort AQ?

2    A.    Yes, I am.

3    Q.    Have you been familiar with Nasacort AQ even before

4    you got involved in this case?

5    A.    Yes, I was.

6    Q.    Had you heard of anybody claiming that Nasacort AQ

7    could reach the frontal sinus until we approached you in

8    connection with this case?

9    A.    No, I don't recall hearing anything about Nasacort AQ

10   reaching the frontal sinus.

11   Q.    Okay.  Let's take a look to a different issue now.

12   We will finish with enablement and go to an infringement

13   issue.  Claim 5, we are looking at DX-7 at 10, Claim 5.

14            Now, just to orient ourselves, do you see where

15   it says shear viscosity, it's actually shear shaken, II?

16   A.    Yes.

17   Q.    It talks about a viscosity of 50 to about 200

18   centipoise?

19   A.    Yes, I see that.

20   Q.    We asked you, did we not, for your opinion on whether

21   a nasal spray, and in particular Barr's product, would

22   actually go from 50 to 200 centipoise back up to 400 to 800

23   centipoise after being delivered to the nasal cavity.

24   Correct?

25   A.    Yes, you did ask me about that.

Donovan - direct

1    Q.      And what is your opinion on whether or not Barr's

2    product returns to that 400 to 800 viscosity level after

3    being deposited in the nasal cavity?

4    A.      My opinion is that the environment to the nasal

5    cavity is so totally different than the measured value on

6    the bench top that we have been hearing about, and most of

7    the aspects are going to adversely affect its ability to

8    return to 400 to 800, that I don't think it can.  I don't

9    think it can reach 400 to 800 once in deposited form.

10   Q.      Let's take a look at Defendant's Exhibit,

11   Demonstrative Exhibit 54.  This is something that you have

12   worked with to help explain your opinion on this issue?

13   A.      Yes.

14   Q.      First, is there a temperature difference between

15   laboratory testing and the temperature in the nasal cavity?

16   A.      Yes, there is nearly a 30-degree difference.

17   Q.      And can that make any difference with respect to

18   viscosity?

19   A.      Certainly.  And most materials I have worked with,

20   that over a 30 degree span, you see a difference in their

21   viscosity.

22   Q.      Which direction is that?

23   A.      Most materials, the viscosity decreases as the

24   temperature increases.

25   Q.      So we are going the opposite direction?

Donovan - direct

1    A.      Yes, we are.

2    Q.      How about dilution, when you are doing tabletop

3    testing, is there any dilution?

4    A.      No.

5    Q.      How about within the nasal cavity, is dilution

6    occurring?

7    A.      Yes.  Because once that spray enters the nasal cavity

8    and deposits on the surface, it interacts with the mucus

9    that's there and the other secretions.  We heard, there is a

10   lot of secretions, a large volume actually of secretions

11   actually during the day that go through the nasal cavity.

12   So the formulation that you just put in there gets diluted

13   by those secretions.

14   Q.      What does that do to viscosity?

15   A.      Again, it drops -- it's a polymer, the carboxymethyl

16   cellulose, the microcrystal cellulous Avicel is a

17   formulation that induces the viscosity behavior, so that

18   gets diluted out and as a result the viscosity is different

19   and it's less.

20   Q.      Aventis has suggested there won't be any mixing

21   between the nasal spray and the nasal fluids.  You heard

22   that testimony?

23   A.      I heard something to that effect, yes.

24   Q.      Do you agree with that?

25   A.      No, I don't.

Donovan - direct

1    Q.      Why not?

2    A.      Well, I believe that when this formulation enters the

3    nasal cavity, it impacts on the mucus, and may interact with

4    the mucosal surface, and the mucus and the formulation are

5    going to interact and they are going to mix.  And the Avicel

6    polymer system is going to be able to interpolate into the

7    mucus and the water from the mucus is going to be able to

8    enter the formulation.  And the drug that is dissolved in

9    the formulation is going to be able to move within the whole

10   mixture.

11   Q.      So in the formulation itself, is it water-based?

12   A.      Yes.

13   Q.      Is mucus water-based?

14   A.      Yes, it is.

15   Q.      How much mucus is water?

16   A.      Mucus is about 95- to 97-percent water.

17   Q.      So the fact that the formulation is mostly water, the

18   fact that the formulation is aqueous-based and that mucus is

19   mostly water, does that advise you on whether or not there

20   would be a dilution of the formulation once it reaches the

21   nasal cavity?

22   A.      Certainly, I think, you know, the water is free to

23   move between those two materials, starting materials.  It

24   diffuses between, among them.  So, yes.  Being both

25   water-based, being both almost entirely water, really, by

Donovan - direct

1    composition, is going to allow them to easily mix.

2    Q.    Now, have you seen any testing from Aventis to

3    attempt to measure the impact of interaction between mucus

4    and Barr's product with respect to whether or not Barr's

5    product meets III of Claim 5?

6    A.    No.  I see no testing on Barr's product.  I actually

7    see no testing on Aventis's product regarding what its

8    return to -- what its viscosity is in the nasal cavity.

9    Q.    I forgot to mention with temperature, you mentioned

10   there was a difference, potentially a difference in

11   viscosity when you are talking about room temperature versus

12   body temperature.  Right?

13   A.    Yes.

14   Q.    Have you seen any testing in this case relating to

15   whether or not Barr's product would actually, how quickly it

16   would return to setting viscosity, if at all, at 98.6

17   degrees?

18   A.    No, I haven't seen any of those results.

19   Q.    Let's talk a little bit about No. 3, constant

20   ciliary.  Why don't we start on the left.  Is there any

21   disturbance when you are measuring viscosity on the

22   tabletop?

23   A.    Again, as long as you have set the experiment up not

24   to have it disturbed, there is no disturbance, yes.

25   Q.    Is that also true in the nose?

Donovan - direct

1    A.      Absolutely not.

2    Q.      What happens in the nose?

3    A.      Well, numbers of people enjoyed that video yesterday

4    and so did I.  The cilia beating are going to be interacting

5    with the material that they are interfacing with, mucus

6    formulation, and as a result, any formulation that directly

7    interacts with the cilia is going to be sheared by those

8    cilia.  And we know that these formulations shear thin, that

9    it's thixotropic, that it decreases in viscosity under shear

10   forces.  So cilia, if it has a chance to just interact with

11   the formulation, will shear the formulation.

12           The mixed formulation mucus is already a lower

13   viscosity to begin with because it's been diluted.  The

14   cilia are still interacting with that, also shearing, and

15   likely keeping the viscosity low.

16   Q.      We heard earlier today that what really happens is

17   there is that mucus blanket on top of the cilia, and so,

18   sort of like a roller at an airport, I think, where it's a

19   conveyor belt, the mucus is a conveyor belt with a

20   composition that sits on top without interacting.  Did you

21   hear that testimony?

22   A.      I heard that, yes.

23   Q.      Is that an accurate description of what actually

24   happens in the nasal cavity?

25   A.      Not regarding this formulation.

Donovan - direct

1    Q.      Why do you say that?

2    A.      Again, this formulation has the capability of

3    interacting within mucus.  The polymers can interact, the

4    drug can diffuse from the formulation into the mucus.  And

5    so if it was just being escalated out of the nasal cavity,

6    the drug would have no effect, because it has to get to the

7    cells below the mucus blanket and maybe even into other

8    parts of the sub-mucosal tissues to have its effect.  If it

9    is just being transported out, it can't be what's going on.

10   Q.      Let's explain that and expand on that a little bit.

11   If the conveyor belt system was really what was happening,

12   these suspensions, these products, are designed to suspend

13   drug particles.  Right?

14   A.      Yes, they are.

15   Q.      And so if it was a layer like this, the composition

16   on top of mucus blanket, with the cilia providing a conveyor

17   belt, where would the drug particles be going?

18   A.      They wouldn't be going anywhere.  I mean, they would

19   be going out the nasal pharynx along with the mucus blanket.

20   Q.      So if that was the case, if there was just a conveyor

21   belt conveying the drug particles out of the nasal cavity,

22   without any shearing or anything like that from the cilia,

23   what would the effect of the drug be in terms of helping to

24   treat the disease?

25   A.      Again, you would lose almost the entire dose of drug

Donovan - direct

1    that you put in there.  So you would have very little

2    effect, because it was conveyed out by that picture that was

3    painted, just the material would be relatively ineffective,

4    because you have moved most of the drug particles away from

5    their site of activity.

6    Q.    So, then, if it's not a conveyor belt, does the

7    cilia -- how fast does it beat?  We have heard.  A thousand

8    beats a minute.

9          Does the cilia in the nose have a tendency to

10    reduce the viscosity of nasal sprays, in your opinion?

11    A.    In my opinion, yes, those are forces on those

12    materials and they cause them to be reduced in viscosity if

13    they are capable of reducing in viscosity under shear.

14    Q.    Finally, the last one is constant breathing,

15    sniffing, and turbulent air.  Is the nasal environment a

16    static, calm environment?

17    A.    Absolutely not.

18    Q.    Why not?

19    A.    Well, we have heard once you get into that turbinate

20    region, the air flow is turbulent in the turbinates.  It

21    swirls around.  It's trying to contact the mucosal surfaces,

22    basically, so they can do that heat and water exchange

23    physiologically.

24          But just by the air moving, people sniffing,

25    causing greater velocities and so forth, it is not an

Donovan - direct

1    undisturbed surface, particularly likely with somebody with

2    rhinitis who has lots of congestion and is sniffing, it is

3    not going to be undisturbed at all.

4    Q.    Just to sum up, what is your opinion with respect to

5    whether Barr's product would I guess nearly double in

6    viscosity while in the nasal cavity during the time that

7    it's in there?

8    A.    Again, the residence time is so short in the nasal

9    cavity, I do not believe that it is able to return to its

10   setting viscosity while it's there.

11   Q.    And in your review of the evidence in this case, have

12   you seen any testing from Aventis that attempted to mimic

13   all of these factors together, much less even one of them,

14   in trying to prove that Barr's product did, in fact, return

15   to setting viscosity in the nasal cavity?

16   A.    No, I have seen no data that tries to replicate

17   anything that might occur in the nasal cavity to determine

18   what the viscosity in deposited form would be.

19            MR. HURST:  I have no further questions right

20   now.  Thank you, Your Honor.

21            THE COURT:  You may cross-examine.

22            MR. BERGHOFF:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24   BY MR. BERGHOFF:

25   Q.    Dr. Donovan, I apologize.  I have not introduced

418

Donovan - cross

1    myself to you yet in this case.  I am Paul Berghoff.  It's

2    nice to meet you, and I will shake your hand when we are

3    done.

4    A.    It is a pleasure to meet you.

5    Q.    Now, Dr. Donovan, I believe you mentioned in

6    describing your qualifications as an expert that the

7    viscosity of nasal spray formulations is an important part

8    of your research?

9    A.    The viscosity of nasal formulations or components of

10   nasal formulations is an important part of my work, yes.

11   Q.    That is true today and has been true for about how

12   long?

13   A.    At least ten years.

14   Q.    And the goal of your research, as I understood it, as

15   it relates to viscosity, was to understand or to assist the

16   retention of nasal spray formulations on the mucosal

17   surfaces?

18   A.    Well, we are trying to understand the material

19   characteristics that would allow that to happen, that would

20   allow increased residence time in the nasal mucosa.

21   Q.    And in terms of the viscosity characteristics that

22   you studied for nasal formulations, currently and over this

23   decade-plus period, have you looked both at setting

24   viscosities and at sheared viscosities?  And let me just

25   say, you have probably heard, these are loaded terms defined

419

Donovan - cross

1    by the Court.  I am not using them in that sense.  Just in

2    an ordinary sense, setting viscosity or shear viscosity.

3    A.    Setting viscosity and sheared viscosity that we have

4    been dealing with here are not the viscosity

5    characterization techniques that I use to study the

6    materials that I am interested in.

7    Q.    But you do recognize those terms?

8    A.    By the definitions, yes, I do.

9    Q.    And you referred to the shear viscosity formulations,

10   nasal formulations in general in at least your first expert

11   report, did you not?

12   A.    Yes, based on the definitions that were used in the

13   patent.

14   Q.    And it's your view that the shear viscosity of nasal

15   spray formulations is usually more significant than the

16   unsheared viscosity?

17   A.    Yes, that was my opinion.

18   Q.    Now, you testified this afternoon about the issue

19   that we've heard other witnesses on this, what gets to the

20   frontal sinus?

21   A.    Yes.

22   Q.    And it's your view that it's not impossible that some

23   component of a nasal spray may deposit in the frontal sinus.

24   Isn't that correct?

25   A.    Well, similar to Dr. MacKay, I think it's incredibly

Donovan - cross

1    unlikely.  It would have to be a very unique characteristic

2    of a portion of a nasal formulation that could be able to

3    get there.  Again, I'm a scientist so I have a really

4    difficult saying anything is impossible, but I can think of

5    very few aspects of anything that would allow them to get to

6    the frontal sinus via a nasal spray.

7    Q.    And during -- I'm trying to save time rather than go

8    through putting the deposition testimony up.  But during

9    your deposition, you testified you didn't think it was

10   impossible that some component of a nasal spray may deposit

11   on the frontal sinus?

12   A.    That's right.  I said some component may deposit in

13   the frontal sinus, but I thought it was unlikely.

14   Q.    And in the two expert reports that you submitted in

15   this case and in your testimony this afternoon, you have

16   offered no testing of your own concerning deposition in the

17   frontal sinus; is that correct?

18   A.    No.

19   Q.    That's not correct or --

20   A.    No.

21   Q.    -- you offered no testimony?

22   A.    I did no testing of my own.

23   Q.    That was a problem with my question, not your answer.

24   I just wanted to make sure it was clear.

25         Now, Dr. Donovan, you talked about the cilia?

Donovan - cross

1    A.    Yes.

2    Q.    And shearing the nasal spray formulations?

3    A.    Yes.

4    Q.    But it's correct, isn't it, that you are not aware of

5    any data that demonstrates that the cilia altered the

6    viscosity of the deposited nasal product through shear

7    forces?

8    A.    I am not aware of any data, any experiments where

9    people have been able to measure the viscosity of a

10   formulation in a deposited form in the nasal cavity.

11   Q.    And you testified about Avicels, I believe, and my

12   memory is it was during the section of your testimony that

13   you were talking about the supposed dilution of a nasal

14   spray formulation in the nose?

15   A.    Right.  I brought the Avicels in, yes.

16   Q.    In fact, you have not worked with any thixotropic

17   systems based on the use of Avicels, have you?

18   A.    No, I haven't used the particular grade of Avicels

19   that we have been referring to in these formulations.

20   Q.    In fact, you haven't used any grade of Avicel?

21   A.    Not in nasal formulations, no.

22   Q.    Now, Dr. Donovan, on the enablement issue, I believe

23   your testimony was that if you were asked to develop a nasal

24   spray formulation that deposited in the frontal sinus, you

25   wouldn't even know where to begin.  Is that a fair --

Donovan - cross

1    A.       That's fair.

2    Q.       -- a fair summary of what you said?

3            Now, I want you to assume that Dr. Berridge's

4    test data -- and you are aware of Dr. Berridge's test data,

5    aren't you?  You were here when he testified.

6    A.       Right.  In all, I think he completed three tests.  Do

7    you want me to include all of those or is there a specific

8    test you would like?

9    Q.       No.  As Dr. Berridge testified, you can leave the

10   2002 aside.  I'm going to ask a much simpler assumption for

11   you to make just so you don't have to think about all the

12   particular data.  I just want you to assume that

13   Dr. Berridge's conclusion that there is deposition of

14   Nasacort AQ in the frontal sinus is correct.  That's the

15   assumption.

16   A.       Okay.  If I assume that is correct, yes.

17   Q.       So if that is true, then the patents in suit do

18   indeed disclose the exact formulation of a nasal spray

19   product that will deposit in the frontal sinus.  Correct?

20   A.       If I believe that Dr. Berridge's data is correct that

21   Nasacort AQ deposits in the frontal sinus, then, yes, the

22   formulation for Nasacort AQ is disclosed in the patent.

23   Q.       And the patent discloses the type of precompression

24   pump that should be used -- I don't have my bottle, but the

25   type of bottle that should be used with Nasacort AQ?

Donovan - cross

1    A.      All the patent discloses about the pump is that it's

2    a precompression pump, but it gives absolutely no

3    information about the pump and the pump determines a lot

4    about the actual spray that is emitted.  It just discloses a

5    precompression pump.

6    Q.      We'll hold that point for a moment while my

7    colleagues get me a document on that, but we'll continue on

8    this line.

9            With the same assumption that Dr. Berridge's

10   conclusion is correct about deposition of Nasacort AQ in the

11   frontal sinus, the patents in suit tell you what dose of the

12   active to include, tell you that the drug should be given

13   intranasally and it should be given once daily.  Is that

14   correct?

15   A.      I'd appreciate if you could highlight that, but that

16   sounds approximately correct, yes.

17   Q.      We could.  These are noncontroversial points so I

18   will not bother to highlight them.

19           So if Dr. Berridge's conclusion is correct, it's

20   not correct, is it, that a person of ordinary skill in the

21   art wouldn't know where to begin to make such a nasal spray

22   formulation that deposits in the frontal sinus.  They would

23   have all the information in the patents at hand, wouldn't

24   they?

25   A.      Again, if Dr. Berridge's data indicates that

424

Donovan - cross

1    Nasacort's AQ reaches the frontal sinus, then the patent has

2    sufficient information.  But Dr. Berridge didn't study the

3    deposition of Nasacort AQ, he studied the deposition of a

4    radiolabeled position of that formulation.

5    Q.    Now, was that an issue you expressed in either of

6    your opinions, Dr. Donovan?

7    A.    I don't believe it was directly expressed, but it's

8    part of my scientific evaluation of Dr. Berridge's results.

9    Q.    So the carbon 11 atom in TAA made a difference?  That

10   is what you are telling me now?

11   A.    That is what is being measured is the carbon atom in

12   TAA.

13   Q.    Now, your opinion on nonenablement is based on you

14   having seen no data that clearly demonstrates that the

15   formulations described in the patent can be retained in the

16   frontal sinus for at least about an hour?

17   A.    That's correct, yes.

18   Q.    And do you know who bears the burden of proof on the

19   issue of enablement?  Is it Aventis or is it Barr?  And you

20   may not know.

21   A.    I don't specifically know that point of law, no.

22   Q.    That's fair.  That's fair.

23            MR. BERGHOFF:  Let's go to -- and I'm just

24   picking up the point I passed over before about the patent

25   not telling us anything about the pump.  Let's go to Column

Donovan - cross

1    10, Line 28 of PTX-1.

2    BY MR. BERGHOFF:

3    Q.    This is the '573 patent.  Do you have that in front

4    of you, Dr. Donovan?

5    A.    Yes, I do have the patent in front of me.

6    Q.    And, in fact, the patent tells us that the bottle

7    containing the nasal formulation is capped with a metering

8    pump and that the pump is a Valois, VP7/100S pump with a dip

9    tube, an actuator, an overcap and a safety clip.  Do you see

10   that?

11   A.    I see that, yes.

12   Q.    So you weren't correct that the patent doesn't tell

13   us anything about the pump?

14   A.    Well, in the example, it tells which pump was used,

15   but I don't know enough about the Valois VP7/100S to know

16   what factors it had regarding the final deposition of the

17   formulation contained within.  But in the example, it does

18   specify which pump they preferred, apparently.

19   Q.    And you are, as I recall from your testimony, one of

20   10 people in the world who specializes in nasal spray

21   formulation and you are not familiar with this particular

22   pump or its performance characteristics?

23   A.    Again, this is a device.  The pump is the device part

24   of the nasal delivery system.  I specialize in formulation

25   development.  I'm aware of issues with the delivery devices

Donovan - redirect

1    but I don't specialize in the types of delivery devices and

2    their particular specifications.

3    Q.      Well, the particular delivery device used is very

4    important, is it not?

5    A.      Yes, it is.

6    Q.      How the product deposits within the nose?

7    A.      Yes, it is.

8    Q.      And you have no expertise on that to bring to this

9    courtroom?

10   A.      Well, I have expertise in how important the device

11   is, but I don't develop those devices and I don't know all

12   of the information about their characteristics as devices.

13   Q.      And you are unfamiliar with this particular pump?

14   A.      Again, I know the Valois VP7.  I could not begin to

15   tell you anything about the pump specifications about it off

16   the top of my head, but I'm certainly aware it is a commonly

17   used pump system.

18            MR. BERGHOFF:  No more questions, Your Honor.

19   Thank you.

20            THE COURT:  All right.  Redirect, counsel.

21            MR. HURST:  Very briefly.

22                      REDIRECT EXAMINATION

23   BY MR. HURST:

24   Q.      Dr. Donovan, as long as we're engaging in

25   hypotheticals, if we were to assume that Dr. Berridge's data

Donovan - redirect

1    was right and that the Nasacort AQ reaches the frontal

2    sinus -- by the way, you don't agree with that hypothetical,

3    do you?

4    A.    No, I don't.

5    Q.    But just assume in this world that nasal sprays can

6    reach the frontal sinus.  If it was true for Nasacort AQ,

7    can you think of any reason why it wouldn't also be true for

8    Beconase and Flonase and Vancenase and other prior art nasal

9    sprays?

10   A.    Well, if it's true there is something about being

11   able to reach the frontal sinus that I don't understand,

12   then it's very likely that other formulations can access a

13   pathway that I don't understand.

14   Q.    And does Nasacort AQ -- I used the term Nasal Spray

15   101 in opening.  Does the patent teach you anything special

16   about how to make nasal sprays that wasn't already known in

17   the prior art?

18   A.    No, it uses the exact same components that were used

19   by other products containing steroids as nasal sprays.

20              MR. HURST:  Thank you, Dr. Donovan.

21              THE COURT:  Thank you, doctor.

22              THE WITNESS:  Thank you.

23              THE COURT:  Your next witness, counsel.

24              MS. RURKA:  The defendants would like to call

25   Dr. Barry Siegel to the stand.

Siegel - direct

1                    THE COURT:  All right.

2                           - - -

3                    DEFENDANT'S TESTIMONY

4             ... DR. BARRY A. SIEGEL, having been placed

5             under oath at 4:19 p.m. as a witness, was

6                 examined and testified as follows ....

7                           - - -

8             MS. RURKA:  Your Honor, may I approach the

9    witness?

10                   THE COURT:  Yes.

11                   MR. HURST:

12                   DIRECT EXAMINATION

13   BY MS. RURKA:

14   Q.       Good afternoon, Dr. Siegel.

15   A.       Good afternoon.

16   Q.       Could you please state your name for the record?

17   A.       My name is Dr. Barry Allen Siegel.

18   Q.       And what is your area of expertise, Dr. Siegel?

19   A.       I'm a physician; and my specialty is in Radiology and

20   Nuclear Medicine.

21   Q.       And what sort of -- do you do positron emission

22   tomography testing?

23   A.       Yes, absolutely.

24   Q.       Of the kind performed by Dr. Berridge?

25   A.       Well, positron emission tomography.  I have not done

Siegel - direct

1    the specific types of tests that Dr. Berridge performed but

2    it's the same basic technique.

3    Q.    Before we get to your opinions in this case, could

4    you please describe your educational background for the

5    Court?

6    A.    Yes, very easily.  Basically, I've been at Washington

7    University for essentially my entire career.  I started

8    there as an undergraduate in 1962.

9          I then went on to medical school, from which I

10   graduated in 1969.

11         I did my medical internship, followed by a

12   training program in Radiology and Nuclear Medicine.

13         At which point in 1973, I joined the faculty of

14   the Department of Radiology as the Director of Nuclear

15   Medicine and, except for a brief little under two-year stint

16   in the Air Force, have remained at Washington University.

17   Q.    So you're a board certified physician?

18   A.    I am.

19   Q.    And what boards are you certified by?

20   A.    I'm certified in Nuclear Medicine Diagnostic

21   Radiology and the radiology subspecialty known as Nuclear

22   Radiology.

23   Q.    How long have you been involved in PET testing?

24   A.    Approximately 30 years.  PET, as I think we may have

25   heard yesterday, was actually invented in its modern form at

Siegel - direct

1    Washington University by colleagues in my department, and it

2    was happening while I was a resident and when I first became

3    a member of the faculty.  So I watched the early evolution

4    of PET.  My own first involvement with PET from a research

5    point of view was the study that was done in 1976, published

6    in 1977.  So about 30 years.

7    Q.    So is Washington University well known for positron

8    emission tomography testing?

9    A.    Unequivocally, I think Washington University is

10   considered one of the centers of PET research in the world.

11   We have been an extremely well funded radiology department

12   for the last several years.  We've had the highest level of

13   NIH funding of any department in the country and a

14   substantial majority of our funding is related to PET.

15   Q.    Dr. Siegel, what is your specialty in PET?

16   A.    My specific area of expertise in PET relates to the

17   use of PET in cancer for diagnosis staging, restaging and

18   treatment assessment of tumors, developing new

19   radiopharmaceutical probes for evaluating tumors, but I am

20   broadly familiar with all aspects of PET.

21   Q.    How are you broadly familiar with PET?

22   A.    Well, aside from the fact that I perform PET of other

23   parts of the body on a clinical basis, I'm also very heavily

24   involved in the review of PET research in our institution.

25              I've been chairman of our radioactive drug

431

Siegel - direct

1    research committee since it was formed in 1980.  And this

2    committee, which is an FDA-approved committee, is

3    responsible for reviewing all of the PET research performed

4    at the institution.

5              So I would say that over the years, I've

6    reviewed 300-to-400 research protocols involving PET and

7    determined that the science was valid and that the studies

8    were going to be safe and could proceed; and that research

9    has covered the full spectrum of the applications of PET,

10   including cardiac, neurology, oncology and drug development.

11   Q.     Are you a published author?

12   A.     I am, indeed.

13   Q.     Do you publish in PET?

14   A.     I do.

15   Q.     How many articles have you published in PET?

16   A.     About 120 of my total of about 320 publications.

17   Q.     Have you had any experience with editing scientific

18   journals?

19   A.     I have.  Over the years, a number, but I'm currently

20   either an assistant editor or associate editor or on the

21   editorial board of about six journals.  And, specifically,

22   perhaps relevant to this case, I'm an associate editor of

23   the Journal of Nuclear Medicine.

24   Q.     And that's the journal in which Dr. Berridge's 1996

25   study was published?

Siegel - direct

1    A.    That's correct.

2         MS. RURKA:  Your Honor, I'd like to proffer

3    Dr. Siegel as an expert witness in the area of positron

4    emission topography.

5         THE COURT:  Any objection?

6         MS. BALDWIN:  I have no objection.

7         THE COURT:  He is accepted as an expert in that

8    field.

9    BY MS. RURKA:

10   Q.    Were you asked to conduct some analyses by the

11   attorneys for Barr in this case?

12   A.    I was.

13   Q.    What were you asked to do?

14   A.    I was asked to review the studies that were performed

15   by Dr. Berridge, to evaluate the distribution in kinetics of

16   radioactively-labeled steroids in the nasal cavity and then

17   to express some opinions about my reviews.

18   Q.    What do you mean by "distribution in kinetics?"

19   A.    Well, the studies were designed to evaluate where

20   radiolabeled triamcinolone acetonide, TAA, Nasacort AQ was

21   located in the nasal cavity and then also how rapidly, once

22   the drug was deposited, it cleared from various regions in

23   the nasal cavity.  And, similarly, the later studies looked

24   at radiolabeled Flonase.

25   Q.    Did you reach an opinion based on your analysis of

                              Siegel - direct

1    these studies by Dr. Berridge?

2    A.      I did.

3    Q.      What are your opinions?

4    A.      Well, my two principal opinions are that there was no

5    significant difference in the way that Flonase and Nasacort

6    AQ were deposited in the various regions of the nasal cavity

7    and were cleared from the nasal cavity.  And, in addition,

8    my opinion was, is that there is no scientific evidence to

9    support the notion that Nasacort AQ was deposited in the

10   frontal sinus.

11   Q.      You didn't review any PET studies that were done on

12   Barr's ANDA product.  Correct?

13   A.      I did not.

14   Q.      Okay.  And you heard Dr. Berridge testify yesterday

15   about his opinion about Nasacort AQ depositing in the

16   frontal sinus?

17   A.      I did.

18   Q.      Do you agree with him?

19   A.      I do not agree with Dr. Berridge.

20   Q.      Why don't we discuss how Dr. Berridge conducted his

21   studies.  I know the court has heard some of this yesterday,

22   but can you give us an overview of how the studies were

23   conducted?

24            THE WITNESS:  It's late in the day, Your Honor,

25   and I'll try to paint this with a very broad brush.

Siegel - direct

1    THE COURT:  Okay.

2    THE WITNESS:  Very simply.  As I think you've

3    heard, the drug is labeled with a radioactive tracer, either

4    carbon 11 in the case of Nasacort AQ or fluorine 18 in the

5    case of Flonase.  It is then put into the pump along with

6    some of the stable drug.  It's sprayed into the nose.  The

7    subject then goes into the PET scanner for a fairly

8    complicated procedure.  But from a simplest point of view, a

9    series of images are required over about 90 minutes to two

10   hours, depending on the study.  And then when all of that is

11   completed, or sometimes before, the subject has a magnetic

12   imaging scan that is done to look at the anatomy, and then

13   the two data sets are put together, they're fused,

14   registered, aligned, choose your word that you like best,

15   and that information is then analyzed using regions of

16   interest to try to assess where the drug deposits and how

17   quickly it clears from those regions of deposition.

18   Q.    Why would you have to register the PET images with

19   the MRI images?

20   A.    Well, you need the magnetic resonance imaging image

21   to provide the anatomic information about where the drug is

22   located.  Basically, the PET image -- and I think we saw an

23   example of that yesterday -- is a blob of radioactivity

24   sitting in the middle of the face in the nasal cavity, and

25   there are really no anatomical clues on that image.  So it's

Siegel - direct

1    absolutely necessary to register or fuse the PET data with

2    the magnetic resonance data so you can say oh, yes, I see

3    that part of the blob is in the frontal cavity.  This part

4    of the blob is in the turbinate region.

5    Q.    Okay.  Did you prepare a demonstrative exhibit to

6    show how these three studies were conducted?

7    A.    I did.

8              MS. RURKA:  Can we pull up Demonstrative 43?

9              Your Honor, I'm sure you have seen this enough

10   times.

11             THE WITNESS:  In fact, Your Honor, I was going

12   to ask you questions about the anatomy.

13             THE COURT:  I'm ready for your test.

14             (Laughter.)

15   BY MS. RURKA:

16   Q.    Were all three studies conducted in the same manner?

17   A.    No, there is at least one very important different

18   difference between the three studies.

19   Q.    What is the difference?

20   A.    Well, the key difference I believe is that in the

21   1996 study, Dr. Berridge used a cubicle array in order to

22   develop his regions of interest for measurement of the

23   activity in each region whereas in the 1998 and the 2002

24   study, he had more sophisticated software available to him

25   and now he was able to use contoured regions of interest

Siegel - direct

1    that conformed to each anatomical structure from which he

2    wished to measure activity.

3    Q.    So how do you draw regions of interest?  Can you

4    describe the contoured regions of interest first?

5    A.    Sure.  I can try.  If you see now this green outline

6    that has come up -- my laser pointer is just passable here.

7    But this green outline shows a contoured region placed on

8    the frontal sinus and the investigator or the technologist

9    would basically be working at the computer and following the

10   borders seen on the MRI scan to place the region of interest

11   over the frontal sinus so that we can measure all the

12   activity within the frontal sinus.

13   Q.    You said you used the cubic regions of interest in

14   1996.  Could you please describe that?

15   A.    Sure.  If we could have the next.

16          So this is an example, for purposes of

17   illustration, of cubes.  By Dr. Berridge's report, these

18   cubes were about .7 inches on a side, 1.8 centimeters

19   overlay over the entire volume where the radioactivity was.

20   Here, we're looking at the cubic array only in a single

21   plane.  And each cube, in order to make the measurement, the

22   investigators needed to assign the cube to a particular

23   anatomical region.

24   Q.    So is that a more or less accurate way of assigning

25   regions of interest to determine exactly where the drug

Siegel - direct

1    goes?

2    A.    Well, I think it's an inherently less accurate way of

3    making the measurement, and for the simple reason that the

4    anatomical structures we're trying to assess are not cubes.

5    They have curved borders rather than straight borders and,

6    therefore, it's reasonably likely to assume there will be

7    some overlap from one cube, from one region to an adjacent

8    region.  I think we can illustrate that.

9    Q.    Yes.  Could you illustrate the overlap, please?

10   Let's look at the frontal side.

11   A.    So if we look here, you can see there are four cubes

12   that include part of the frontal sinus.  Now, this shows all

13   four of those cubes filled in but notably the lower right

14   cube also includes a tiny little fraction of the upper nasal

15   cavity.

16   Q.    And so what would that mean if you assigned that cube

17   to the frontal sinus?

18   A.    So if you assign this cube to the frontal sinus, then

19   some of the activity in the frontal cavity, which we know is

20   a region that has a lot of the radioactive tracer, would be

21   incorrectly assigned to the frontal sinus.

22   Q.    And that would mean there was deposit, you were

23   registering deposit in the frontal sinus that was not in

24   fact there.  Is that right?

25   A.    That's correct.

Siegel - cross

1          THE COURT:  Remember, this is your witness,

2     counsel.

3          MS. RURKA:  Sorry, Your Honor.

4  Q.     You heard Dr. Berridge testify yesterday that

5     overlapping cubes would, if he reached -- if he had a

6     situation like this, where he a cube that overlapped at the

7     frontal sinus and part of the upper nasal cavity, that he

8     would assign that to the upper nasal cavity rather than the

9     frontal sinus.  Right?

10 A.     I did hear him say that.

11 Q.     Do you agree with Dr. Berridge that that is what

12    happened?

13 A.     The truth of the matter is, I don't know.  These PET

14    data no longer exist.  There are no source documents kept as

15    a result of these experiments that show how the regions of

16    interest were actually assigned, something that I routinely

17    do in my own research when I am assigning regions of

18    interest.  I maintain a separate source document of the

19    regions.  So I don't know whether he actually would have

20    taken this cube and assigned it to the frontal cavity.

21 Q.     Did you review Dr. Berridge's publication in the

22    Journal of Nuclear Medicine, the 1996 study?

23 A.     I did.

24 Q.     Was there anything reported in that publication about

25    how he assigned the cubic regions of interest?

Siegel - cross

1    A.      Only that the cubic regions were assigned to

2    anatomical regions, but no mention about how assignment was

3    made when a particular cube seemed to overlap from one

4    region to another.

5    Q.      And did he report anything about a potential for

6    understating the deposition in the frontal sinus based on

7    this assignment of cubic regions of interest?

8    A.      He did not.

9    Q.      As a scientist would you report these data without

10   addressing the assignment of the regions of interest?

11   A.      I don't think I would.  And for a couple of reasons.

12   First of all, I think it's important to have your

13   methodology described as accurately as possible.  Journals

14   sometimes impose limitations on the number of words you can

15   use.  But there was no limitation on the number of words Dr.

16   Berridge could have used in his study or report that he

17   provided to the Aventis precursor, RPR.

18          But importantly, Dr. Berridge also in the

19   article in the Journal of Nuclear Medicine comments that

20   unexpectedly, we found activity in the frontal sinus.  To

21   wit, we have discovered something that we didn't expect

22   would occur, and therefore, I think as a scientist it was

23   incumbent on him to explain that he took great care to make

24   sure that that measurement was not an artifact of the

25   measurement technique but, in fact, represented activity in

Siegel - cross

1    the frontal sinus.

2    Q.      And you reviewed the 1996 final study report as part

3    of your analysis in this case, did you?

4    A.      I did.

5    Q.      And did you see anything in that study report that

6    described Dr. Berridge's testimony yesterday about how he

7    assigned the frontal sinus regions of interest?

8    A.      I did not.  And I looked many times to try to find

9    the sources.

10   Q.      Are there any other potential sources of error for

11   positron emission product testing that might cause periods

12   of radioactivity in a region where it was in fact not?

13   A.      There are.

14   Q.      What are those?

15   A.      I think we have a demonstrative that will help with

16   this, maybe.

17   Q.      Can you pull up Demonstrative 45?

18   A.      This is simply a list.  What we have already talked

19   about is overlapping regions.  In addition, even if the

20   regions don't overlap, there is a problem that Dr. Berridge

21   mentioned, known as spillover.  There is another problem

22   known as scattered radiation.  And then there is the third

23   problem of misalignment of the PET image with the magnetic

24   resonance imaging.

25   Q.      Can spillover be corrected?

Siegel - cross

1    A.      Spillover is really a fundamental limitation of the

2    PET scanner itself because of its resolution limits, and all

3    one can do to address spillover where you define the borders

4    of your regions, which you can't correct for.

5    Q.      Can scatter be corrected?

6    A.      There are scatter corrections that can be used in PET

7    images.  It's not entirely clear to me whether Dr. Berridge

8    used or did not use scatter corrections in these particular

9    studies.  Scatter, however, provide uniform background --

10   the scatter correction subtracts a uniform background from

11   the PET image.

12            And if you have a very hot region and not far

13   away, a region with essentially no activity in it, the

14   scanner correction will not correct for the fact that there

15   will be scanner into that cold region.  Sorry for that

16   complicated explanation.

17   Q.      And for a region like the frontal cavity that is hot,

18   would the scatter, would you expect the scatter to be fully

19   corrected if it is adjacent to the frontal sinus?

20   A.      No, I would not expect it to be, even if a scatter

21   correction were applied.

22   Q.      Okay.  The last one on the demonstrative.

23            Is misalignment, can you just explain what

24   misalignment is?

25   A.      Well, misalignment would be when, even though we

Siegel - cross

1    think the PET image is aligned with the MRI image, it is, in

2    fact, not aligned.  Although we think that this might be a

3    relatively straightforward thing to do, in actual fact, Dr.

4    Berridge designed a very complicated experiment, albeit an

5    elegant one, in which, by my count, there were at least five

6    separate steps of image alignment that were necessary in

7    order to get these images lined up all the way through the

8    data sequence, and that's even if we discount the

9    possibility that there was patient motion at some point

10   during the procedure, and we know that there was some motion

11   as well that had to be corrected.

12           Every time one would undertake one of these

13   alignment steps, some of which were computer-aided, but some

14   of which were done manually, there is the possibility to

15   introduce human error into the alignment.

16   Q.    Dr. Siegel, let's talk briefly about the three

17   studies that Dr. Berridge performed.  The 2002 study, if you

18   could pull up Defendant's Exhibit 5, at Page 10, the first

19   two lines.

20           Did you hear Dr. Berridge testify yesterday

21   about the due to unusual variations between observations

22   from individual subjects, his testimony that that

23   informed -- that that testimony described the data as being

24   bad from this study?

25   A.    I heard him say that yesterday.

Siegel - cross

1    Q.    Is there anything in this the 2002 study report that

2    actually suggests to you as a scientist that there is bad

3    data that were generated by this study?

4    A.    No.   I see the sentence about unusual variation from

5    subject to subject.   But that could be due to biologic

6    variability.   I did not see anything else in the report that

7    led me to believe that Dr. Berridge said, discount the

8    results of this study because the study was flawed.

9    Q.    And Dr. Berridge also -- did you see any unusual

10   variation in the frontal sinus data in this study?

11   A.    No.   There was no unusual variation in the frontal

12   sinus measurements with both Nasacort AQ and Flonase in this

13   study.   Both were zero.

14   Q.    If you could pull up Page 12?

15            THE COURT:   I think she meant Dr. Siegel.

16            MS. RURKA:   Did I say Dr. Berridge?

17            THE COURT:   That's okay.

18   BY MS. RURKA:

19   Q.    I apologize, Dr. Siegel.

20            And this shows the results that Dr. Berridge --

21   did these show the results that Dr. Berridge achieved?

22   A.    Yes, these are Dr. Berridge's results and conclusions

23   that there was no uptake observed in the frontal sinus.   And

24   as you can see, there was Nasacort AQ, the reported value is

25   0.00, on average during initial distribution.

Siegel - cross

1    Q.      Dr. Siegel, did you analyze the data from the 2002

2    study report in any fashion?

3    A.      I did.  I prepared a graphical display just to show

4    this more clearly.

5    Q.      Could you pull up -- this is Demonstrative Exhibit

6    40.  What is this graph?

7    A.      So this is a graph, the upper graph is what we have

8    got labeled here as the average of the nasal cavity.  I

9    think we have also heard this referred to as the frontal

10   cavity and also heard it referred to as the vestibule.  So

11   choose your term.  But it's showing the percent of

12   administered dose versus time out to about, I think this is

13   80 minutes with about 60 percent initially deposited and

14   then slowly clearing in that space.

15           Then in the frontal sinus, we can see that

16   basically the average result across time is zero percent.

17   Q.      Why did you use the frontal cavity -- or the nasal

18   cavity as it is labeled here and the frontal sinus to

19   compare?

20   A.      Because I thought that the frontal cavity would be

21   the region that would most likely be causing a problem with

22   a frontal sinus measurement if there was overlap, spillover,

23   or scatter, or misalignment, for that matter.

24   Q.      Did you review the 1998 study data?

25   A.      I did.

Siegel - cross

1    Q.      What did you review from the 1998 study?

2    A.      Well, we did not have a complete final report for the

3    1998 study.  And as I have already mentioned, we don't have

4    any raw PET data left for any of these studies.  What I had

5    was a poster that was presented at a meeting from the 1998

6    study results -- Dr. Berridge showed that poster

7    yesterday -- and a spread sheet of data, which were the

8    processed results from that study.

9    Q.      And I think Dr. Berridge, did you hear Dr. Berridge

10   testify yesterday about the most -- I think he testified

11   that only three of the subjects acquired any frontal sinus

12   uptake out of the five subjects that were studied?

13   A.      I believe that's what he said.

14   Q.      Okay.  Did you hear him testify that one of those

15   subjects had .5 in the frontal sinus, .5 percent, one of the

16   subjects, and both of the other subjects had less than .2

17   percent?

18   A.      I believe that's what he said and what his graph

19   showed.

20   Q.      Did you do anything to analyze the data in the 1998

21   study?

22   A.      I did, using the spread sheet data available to me I

23   prepared a similar plot.

24   Q.      And this is Demonstrative Exhibit 39.  What does this

25   graph show?

1    A.    Essentially the same thing for the 1998 study.  The

2    upper graph is the average of the nasal cavity, or the

3    frontal cavity, and the lower graph is the frontal sinus,

4    and once again, about 50 to 60 percent getting initially

5    into the nasal cavity and essentially zero percent

6    throughout the time of, the period of measurement on average

7    in the frontal sinus.

8    Q.    If you compare these two graphs, what do you see, the

9    1998 graph and the 2002 graph?

10    A.    They look very similar, if we put them side by side,

11    I think you can see them here, despite the interruption in

12    the curves here, which is the way Excel plotted them, the

13    shapes of the curves are quite similar and the frontal sinus

14    curves are both zero.

15    Q.    So, in your opinion, Dr. Siegel, did the 1998 study

16    show deposition of TAA on the frontal sinus?

17    A.    I don't think so.

18    Q.    For Dr. Berridge's numbers that he reported

19    yesterday, or he testified to yesterday, do you think there

20    is anything else that could be responsible for those low

21    numbers of frontal sinus deposit?

22    A.    The values of about .5 and less than .2 in three of

23    the five subjects.  Yeah, I think all of the factors that I

24    have already talked about could be contributing.  We don't

25    really have the raw data of the regions of interest to see

Siegel - cross

1    whether there was the possibility of spillover, whether

2    there was a possibility of any degree of overlap, despite

3    the contoured regions or whether scatter could be

4    contributing.  But I think given how low those results are

5    that it seems to me that that is far more likely than actual

6    deposition in the frontal sinus.

7    Q.    And of the three studies, the 1996 study, the 1998

8    study and the 2002 study, which do you view as the most

9    suspect with regard to frontal sinus deposit?

10   A.    I view the 1996 study as most suspect.  The values

11   reported in the frontal sinus are much, much higher.  They

12   are clearly outliers by comparison with the two subsequent

13   studies, and the cubic regions of interest, I think,

14   represent a fundamentally imperfect measurement technique,

15   the limitation of the 1996 study nonetheless, but I think

16   still a flaw.

17   Q.    As a scientist, Dr. Siegel, if you had achieved the

18   results in the 1998 study and the 2002 study that Dr.

19   Berridge achieved, after you had published results from the

20   1996 study, would you do anything to correct or to address

21   the disparity in results between the three studies?

22   A.    Yes, I think I would have.  I have now made a

23   scientific publication that has told the world that

24   something quite unexpected has happened, the tracer, the

25   drug has gotten into the frontal sinus.  I now have two

Siegel - cross

1    subsequent studies that say, hmm, maybe that is not really

2    what's going on.  And I would have done one of three things.

3    I would have gone back to the 1996 study, and reanalyzed the

4    data with the now improved software available to me so that

5    I could use the contoured regions of interest.  Or I would

6    have gone to the sponsor and say, we have got some data here

7    that don't jibe across three studies, we should do some

8    additional study, very carefully controlling whatever

9    potential sources of error we might think might have been

10   involved in these studies, as we look back upon how they

11   were performed.

12              Or, if I thought that the '98 and the 2002 study

13   results made sense, I might at least write a letter to the

14   editor of the Journal of Nuclear Medicine saying, more

15   recent data calls into question our report of this unique,

16   unexpected finding of drug entry into the frontal sinus.

17   Q.    Would that require a full manuscript?

18   A.    No, it wouldn't.  A letter to the editor describing

19   subsequent data would certainly be accepted by virtually

20   any journal as a core addendum.

21   Q.    Having reviewed all the data on frontal sinus deposit

22   from Dr. Berridge's PET studies, what is your opinion about

23   whether or not name Nasacort AQ deposits on the frontal

24   sinus?

25   A.    My opinion is that the substantial majority of the

Siegel - cross

1    scientific evidence indicates that Nasacort AQ does not

2    deposit on the frontal sinus.

3    Q.    You mentioned one other opinion that you had

4    expressed in this case regarding deposition and retention

5    patterns for Nasacort AQ and Flonase?

6    A.    Correct.

7    Q.    Your Honor, this is related to the secondary

8    considerations of nonobviousness case that plaintiffs are

9    going to put forth later in the trial.

10          So you were asked -- where does Flonase deposit

11   for purposes of this case?

12   A.    For purposes of this case, as I understand it,

13   Flonase deposits in the frontal cavity or nasal cavity, in

14   the turbinates, and in the maxillary sinuses.

15   Q.    Just like Nasacort AQ?

16   A.    Just like Nasacort AQ.

17   Q.    In the 2002 study report, Dr. Berridge discusses

18   deposition patterns of Flonase and Nasacort AQ, comparative

19   deposition of those two products.  Is that right?

20   A.    That is correct.

21   Q.    Did you review the portion of his study report?

22   A.    Yes, I did.

23   Q.    What did he conclude?

24   A.    He concluded that there was no statistically

25   significant difference in those deposition patterns.

Siegel - cross

1    Q.    Could you pull up demonstrative -- DX-5, please.

2    2002 study report.

3              This is the first sentence, he says, the

4    observed -- the study showed several trends in the data, but

5    due to unusual variations between observations from

6    individual subjects, the observed differences did not reach

7    statistical significance.

8    A.    That's correct.

9    Q.    He was concluding that deposition pattern, the

10   deposition pattern between the two products would not be

11   statistically significantly different?

12   A.    That's correct.  Or was not statistically

13   significantly different.

14   Q.    If you pull up Page 12, here is a portion where he is

15   talking about initial distribution average results.  What

16   was his conclusion regarding the initial distribution of

17   Nasacort AQ and Flonase?

18   A.    Well, as you can see highlighted here, he said that

19   most regions showed quantitative deposition that was very

20   similar between the two formulations to the extent that the

21   difference would be unlikely to be functionally detectable.

22   Q.    What is your understanding of what he means by that

23   functionally detectable?

24   A.    To be quite honest, I am not absolutely certain, but

25   in my interpretation of that phrase, it is that these

Siegel - cross

1    differences in drug deposition would not likely relate in

2    any way to the safety or effectiveness of these products for

3    their approved indications.

4    Q.    Did Dr. Berridge also reach conclusions about the

5    clearance rate of Flonase versus Nasacort AQ?

6    A.    He did.

7    Q.    Could you pull up Page 10 again.  What did Dr.

8    Berridge conclude about the clearance rates?

9    A.    Okay, as you can see here in yellow, also, the

10   clearance rates of both formulations seem to vary during the

11   course of the experiment with no clear difference being

12   noted.

13              In some subjects, an apparent better retention

14   of Nasacort AQ was noted.  However, others seemed to show

15   the reverse.  The concentration on target tissues towards

16   the end of the observation period were more similar than the

17   initially deposited concentrations.

18   Q.    This 2002 study, how many subjects participated?

19   A.    There were six subjects who participated in the

20   study.

21   Q.    And what were the subjects administered?

22   A.    They were administered carbon 11 labeled

23   triamcinolone acetamine and fluorine 18 labeled fluticasone

24   propionate.

25   Q.    What was the design of the study?

Siegel - cross

1    A.      The design was a fairly standard randomized

2    controlled crossover design, they have an equal distribution

3    of genders, as I recall, in the study.  And the randomized

4    method indicated decided which of the two drugs was given

5    first.

6    Q.      I am sorry.  Does randomized -- what does randomized

7    mean actually?

8    A.      Randomized means in this study that the drug that was

9    going to be given first to a given subject was determined by

10   random selection.

11   Q.      So different subjects got different drugs?

12   A.      As the first drug.

13   Q.      As the first drug?

14   A.      Correct.

15   Q.      And when were the drugs, what was the difference in

16   time between when the two drugs were administered to each

17   subject?

18   A.      My recollection in this study was that they were

19   either one day and the next day, but most of them were

20   within a couple or three days of each other, and the MRI was

21   also performed within that same time frame.

22   Q.      Okay.  Let's move to the 1998 study briefly.  How

23   about the 1998 study, what was the study design in that one?

24   A.      The 1998 study was originally a study designed just

25   to look at the distribution of Flonase.  After that portion

Siegel - cross

1    of the study had been completed, the investigators amended

2    the clinical protocol and then decided to do a crossover

3    comparison, if you will, with Nasacort AQ, and they did that

4    on times ranging from three to six months after the original

5    studies were performed with Flonase.

6    Q.    So when did the subjects first come in for the 1998

7    study to be administered Flonase?

8    A.    The dates and years, do you want that?

9    Q.    Yes.  If you can remember.

10   A.    I think they were, I am going to get this wrong, but

11   they were running up to about December of 1997, as I recall.

12   Q.    And when were they administered, generally

13   administered, the Nasacort AQ?

14   A.    In the May time frame.  I think it was like December

15   through February and then extending up to the May time

16   frame.

17   Q.    So did you see any, prior to this litigation, was

18   there any statistical analysis produced, that, was there any

19   statistical analysis done prior to this litigation that was

20   produced to you to review?

21   A.    For the 1998 study.

22   Q.    For the 1998 study?

23   A.    There was not.  The poster did not contain any

24   statistical analysis of the results.

25   Q.    Did you see any since the litigation began, any

Siegel - cross

 1    statistical analysis, I should say, of the 1998 study?

 2    A.    I did.

 3    Q.    What was that analysis?

 4    A.    Okay.  In Dr. Berridge's rebuttal report, after he

 5    had reviewed my expert report, he went and analyzed the data

 6    from the 1998 study, I believe, for seven regions, comparing

 7    Flonase and Nasacort and shearing.

 8    Q.    Could you pull up DX-358 at Page 28.  Are these the

 9    results you are discussing?

10    A.    That's correct.

11    Q.    Can you just, the statistics are very difficult,

12    could you just explain briefly what this chart is showing?

13    A.    Sure.  So on the left-hand column we have the time of

14    the observation, and above we have each of these seven

15    regions, that I hope we can read.  What the table is

16    actually including is a P value, a statistical significance

17    value, if you will, for the comparison of Flonase versus

18    Nasacort in the six subjects who got Flonase and the five

19    who got Nasacort, in that region at that point in time.  So

20    we have a table with multiple comparisons, where the table

21    entries are blank, the result was not considered to be

22    statistically significant, and where the value was said to

23    be extremely highly statistically significant, Dr. Berridge

24    has entered 0.0000.  Otherwise, the numbers represent the P

25    values.

Siegel - cross

1    Q.      So what would a significant finding be?  What would

2    the number be for it to be a significant finding?

3    A.      So in a traditional test like this, a T test, which

4    is what this is, an un-paired T test, where you are

5    comparing one set of observations with another set of

6    observations, as a single comparison, you would use a cutoff

7    P value of less than 0.05, and what that means is you are

8    setting the threshold so that you won't reach a false

9    conclusion due to chance alone more than one time out of 20.

10   Q.      So if its below .05, what does that mean?

11   A.      It means that you conclude based on your statistical

12   inference assumptions that the changes are not likely due to

13   chance alone, and in fact represent a statistically

14   significant difference in those two sets of measurements.

15   Q.      Did you attempt to replicate any of Dr. Berridge's

16   analysis here?

17   A.      I did.

18   Q.      Can we pull up Demonstrative 38, please.  What did

19   you do here?

20   A.      Okay.  The first thing I did when I saw this report

21   is I looked at the P values, and then I went back and looked

22   at the spread sheet and looked at the raw data, the values

23   he had measured in these regions, and said, this just can't

24   be.  The standard deviations and the means for these

25   different regions just can't be this statistically

456

Siegel - cross

1  significantly different.

2          What I simply did was took a random sample of

3  four of the measurements in the inferior turbinate, that

4  just happened to be the first column, I picked them at

5  random so that the P values that Dr. Berridge calculated

6  covered a wide range of P values, and then I recalculated

7  them myself using a well-documented program for doing an

8  unpaired T test that's available readily on the web.  And I

9  found that none of those four measurements were

10  statistically significant.

11  Q.     Is that because they are all above .05?

12  A.     That's correct.

13  Q.     Is .05 the correct cutoff for data like these?

14  A.     No, that is an additional problem.  So .05 is the

15  cutoff that you use when you are doing one comparison, one

16  set of data versus another set of data.  When you have a big

17  table of data, where you are about to do multiple

18  comparisons, then statisticians tell us that what we need to

19  do is to correct for the fact that when we do multiple

20  comparisons, we are more likely to get false results, and we

21  do a correction.  And the most commonly performed correction

22  is something known as the Bonferoni (phonetic) correction,

23  and that is what I believe Dr. Berridge sort of applied to

24  his analysis.

25          THE COURT:  Counsel, I am going to have to cut

1    you off.  I have a judges' meeting at 5:00.  Was it your

2    plan to have Dr. Siegel remain over until tomorrow or was he

3    returning?

4              MS. RURKA:  If we could have him remain over, I

5    probably have just a few more minutes with him tomorrow.

6              THE COURT:  How long do you think your cross

7    will take, counsel?

8              MS. BALDWIN:  You will probably want to go to

9    your judges' meeting.

10             THE COURT:  I am thinking, my meeting probably

11   is not going to take that long.  If the Doctor had a flight

12   out, I was considering coming back.  If that's not the case

13   and he is going to be here anyway, he is going to be here

14   anyway.

15             MS. RURKA:  He is going to be here.

16             THE COURT:  Fine.  We will recess.

17             (Court recessed at 5:00 p.m.)

18                         -  -  -

19   Reporters:  Kevin Maurer and Brian Gaffigan

20

21

22

23

24

25