1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        -  -  -

4    AVENTIS PHARMACEUTICALS INC.  :     Civil Action
     and SANOFI-AVENTIS US LLC,    :
5                                  :
               Plaintiffs,         :
6                                  :
          v.                       :
7                                  :
     BARR LABORATORIES, INC.,      :
8                                  :
               Defendant.          :     No. 06-286-GMS
9                        -  -  -

10                    Wilmington, Delaware
11               Wednesday, May 21, 2008
                      9:00 a.m.
12                    Day 3

13                       -  -  -

14   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

15   APPEARANCES:

16           JOHN G. DAY, ESQ.
             Ashby & Geddes
17                -and-
             PAUL H. BERGHOFF, ESQ.,
18           JOSHUA R. RICH, ESQ.,
             JEREMY E. NOE, ESQ.,
19           ANDREW WILLIAMS, ESQ., and
             ALLISON BALDWIN, ESQ.
20           McDonnell Boehnen Hulbert & Berghoff LLP
             (Chicago, Illinois)
21
                            Counsel for Plaintiffs
22

23

24

25

```
 1    APPEARANCES CONTINUED:

 2             KAREN L. PASCALE, ESQ.
               Young Conaway Stargatt & Taylor, LLP
 3                  -and-
               JAMES HURST, ESQ.,
 4             MAUREEN L. RURKA, ESQ.,
               TARAS GRACEY, ESQ.,
 5             RENEE SOTOS, ESQ., and
               JULIA JOHNSON, ESQ.
 6             Winston & Strawn LLP
               (Chicago, Illinois)
 7
                                     Counsel for Defendant
 8

 9                           -  -  -

10

11

12             THE COURT:  Good morning.  Please be seated.  I

13    think the witness can resume the stand.

14             MR. HURST:  Your Honor, two quick issues.

15             THE COURT:  Go ahead.

16             MR. HURST:  One is, we are hopeful and almost

17    expected, our side, to get done a little earlier than the

18    time allotted.

19             THE COURT:  I figured that might happen.

20             MR. HURST:  We wondered if there would be

21    opportunity, I don't know what Your Honor's practices are,

22    for short closing statements.

23             THE COURT:  I really don't think I am going to

24    entertain closing statements in this case.  I don't think it

25    is necessary.
```

```
1              MR. HURST:  Thank you, Your Honor.

2              Second quick issue.  This morning Aventis hands

3    to me a new exhibit that is not in the pretrial order.  I

4    just wanted to make two objections to it.

5              THE COURT:  Is it coming up with this witness?

6              MR. HURST:  It's not.

7              THE COURT:  Okay.  Let's hold it.

8              MR. RICH:  Your Honor, if I can make a quick

9    scheduling point.

10             THE COURT:  We are going to break at 11:00.  I

11   have a plea.  Leave your stuff there.  We will have a

12   criminal defendant who will likely be incarcerated.  So I

13   will ask you to vacate counsel table.

14             MR. RICH:  One of our witnesses, Dr. Kaliner, is

15   required to be back in his office to provide medical care to

16   patients tomorrow.

17             We have scheduled him early in the day.  But if

18   for some reason the presentation of evidence goes a little

19   longer, and he is still on the stand at 5:00, would it be

20   possible to go a little longer to make sure his testimony

21   gets in?

22             THE COURT:  Oh, yes.

23             We need to try to do something about the heat

24   again.

25                  ... BARRY SIEGEL, previously sworn as a
```

Siegel - direct

1    witness, was examined and testified further as follows ...

2                    DIRECT EXAMINATION CONTINUED

3    BY MS. RURKA:

4    Q.    Just to refresh the Court's recollection, yesterday we

5    were discussing Dr. Berridge's statistical analysis of the

6    1998 PET data.  Do you recall that?

7    A.    I do.

8    Q.    Will you please pull up Demonstrative 38.

9              I think you goes mentioned there needs to be a

10   correction applied to the P value to get the correct P value

11   cutoff for these types of data, the Bonferoni correction.

12   Is that right?

13   A.    That's correct.

14   Q.    If you applied that correction, what would the correct

15   P value cutoff be?

16   A.    With the table of data he did the comparisons on, the

17   correct P value, instead of being 0.055, would have been

18   about 0.0002.

19   Q.    So if the numbers were above that number, would that

20   show statistically significant differences?

21   A.    Above that number would not be statistically

22   significant.

23   Q.    If you use that correct P value of .0002, your data,

24   your correct analysis or correct numbers would show

25   statistically significant differences?

Siegel - direct

1    A.    They would not.

2    Q.    How about Dr. Berridge's numbers?

3    A.    Many fewer of the numbers which I believe to be

4    incorrect would now be statistically significant.

5    Q.    Statistically significant?

6    A.    Dr. Berridge said that many of the values, comparing

7    many of the comparisons of Flonase and Nasacort AQ were

8    highly significant, with the corrected P value many fewer of

9    them would be statistically significant.  Most of them would

10   not be significant.

11   Q.    Did you reads Dr. Berridge's rebuttal report in this

12   case?

13   A.    I did.

14   Q.    Do you recall him saying in that report that he had

15   analyzed some videos that he prepared on the 2002 study,

16   analyzing Flonase and Nasacort AQ?

17   A.    I do.

18   Q.    What were those videos?

19   A.    These were movies that showed the motion over the

20   course of time of the radioactive tracer in the nasal

21   cavity, and they are designed to depict, with a broad brush,

22   where the tracer goes, initially, then where it moves to

23   over time.

24   Q.    In Dr. Berridge's rebuttal, I think he says that the

25   videos appear to show some qualitative* differences between

Siegel - direct

1    Flonase and Nasacort AQ.  Do you agree with him?

2    A.    Yes, that's what he says.  I agree, to the casual

3    observer, if you just look at those images you might

4    perceive that this looks a little different than that.  But

5    the truth of the matter is, those images are highly

6    processed, they are displayed in a way that actually

7    accentuates differences from one frame of the movie to the

8    next.  And therefore, those images actually can be

9    misleading.  What you need to do is to use those images to

10   generate a hypothesis about what might be going on, and then

11   go to the numbers and the curves to actually evaluate

12   quantitatively what's happening.

13   Q.    So even if the videos looked like Flonase was behaving

14   differently than Nasacort AQ, would you agree that there is

15   any difference between the two, given the data you have

16   looked at?

17   A.    No.

18   Q.    Why not?

19   A.    Because I think the statistical analysis, which is the

20   more reliable approach to the data, shows that there was no

21   statistically significant difference in the deposition or

22   the clearance of Nasacort with AQ and Flonase.

23   Q.    So in your opinion, have you seen any scientific data

24   showing that there is a statistically significant difference

25   between Flonase, the prior art product, and Nasacort AQ, in

Siegel - direct

1    deposition or clearance?

2    A.    No.  The combined data from the 1998 and the 2002

3    study do not show statistically significant differences, in

4    my opinion.

5    Q.    And finally, it was suggested to me that we might need

6    to clarify an issue on the frontal sinus discussion we had.

7            Will you please pull up demonstrative 43.

8            This is the demonstrative we looked at yesterday

9    regarding the 1996 study?

10   A.    Correct.

11   Q.    The lower right-hand cube that is highlighted there is

12   the one we were discussing.

13   A.    Yes.

14   Q.    With the overlap with the frontal cavity?

15   A.    Correct.

16   Q.    Dr. Berridge, I think, testified that he would have

17   assigned that cube to the frontal cavity rather than the

18   frontal sinus in the 1996 study?  Not that cube, but a cube

19   like that?

20   A.    I believe this is what he stated.

21   Q.    If he did that, would his frontal sinus data be

22   accurate?

23   A.    No.  His frontal sinus values would be underestimates

24   of the true activity in the frontal sinus, if any were

25   there.

Siegel - direct

1    Q.    So in the 1996 study that was reported in the Journal

2    of Nuclear Medicine, would the frontal sinus numbers be

3    accurate in that journal article?

4    A.    If he did what he said, then those numbers presented

5    in the journal would be inaccurate, underestimates of the

6    frontal sinus activity.

7    Q.    Okay.  And the frontal cavity data in the Journal of

8    Nuclear Medicine article, would that data be accurate?

9    A.    No.  Those data would also be inaccurate.  They would

10   be slight overestimates of the activity in the frontal

11   cavity.

12   Q.    So given those facts, would you expect such a

13   discrepancy to be described and explained in the article?

14   A.    Yes, I would.

15   Q.    If you could pull up Demonstrative 44.

16         Did we prepare a demonstrative analyzing the

17   data, the frontal sinus data from the three studies?

18   A.    Yes, we did.

19              MS. BALDWIN:  I am sorry.  I have a concern.

20              THE COURT:  Do you have an objection, counsel?

21              MS. BALDWIN:  He was still under oath last

22   night.  If this is the demonstrative --

23              THE COURT:  Counsel, you don't speak to counsel.

24   You address the Court.

25              Let's talk at sidebar.

Siegel - direct

1                    (The following took place at sidebar.)

2                    THE COURT:  Counsel, this is Federal Court.

3                    MS. BALDWIN:  I apologize.

4                    THE COURT:  What is your concern?

5                    MS. BALDWIN:  My concern is, we received a new

6    demonstrative last night which I was not going to object to,

7    except that counsel just made the representation that this

8    was something they had worked on last night and the witness

9    was still under oath.  So I have some concerns if counsel

10   was discussing his testimony with him last night.

11                   THE COURT:  You should.

12                   MS. RURKA:  Your Honor, we were just clarifying

13   a point that we needed to make today during testimony.

14                   THE COURT:  But the witness is under oath.  You

15   are not supposed to discuss the witness' testimony with him

16   or her who is under oath.  It is a fundamental precept of

17   trial practice, regardless of the courtroom you are in.  You

18   are certainly not going to do it in my courtroom.  So what

19   was discussed?

20                   MS. RURKA:  We just discussed the same data that

21   we have been discussing all along.  All we discussed was, we

22   had looked at the data --

23                   THE COURT:  Here is what I am going to do.  I am

24   going to preclude this kind of inquiry.

25                   MS. RURKA:  I apologize, Your Honor.

Siegel - cross

```
 1                  THE COURT:  I am going to give some thought to

 2     this.  Beyond that, you don't need to worry about it.  This

 3     is out.  However else I may address the problem, we will

 4     leave that for another day.

 5                  (End of sidebar conference.)

 6                  THE COURT:  You can take that down.

 7                  MS. RURKA:  We have no further questions.

 8                  THE COURT:  You may cross-examine.

 9                  MS. BALDWIN:  Thank you, Your Honor.

10                       CROSS-EXAMINATION

11     BY MS. BALDWIN:

12     Q.    Good morning, Dr. Siegel.

13     A.    Hi, Allison.  How are you.  I hope you didn't stay up

14     at night thinking of ways to beat me up today.

15     Q.    Of course not.

16                  THE COURT:  Let me see lead counsel and local

17     counsel.

18                  (The following took place at sidebar.)

19                  THE COURT:  Given what I just heard, I've got a

20     real concern.  I have ruled and you have now been told that

21     that testimony is out of order given the admission that

22     there was a conversation with a witness under oath about his

23     testimony.  Do you want to explain yourself?

24                  MR. HURST:  I take full responsibility.  Because

25     he was still on direct and there was point of clarification,
```

1    I thought that that was permissible.

2              THE COURT:  No.  You should have at least

3    inquired of me as to whether I would permit that.  I've had

4    this happen many times where lawyers, they're not sure, and

5    I will tell you that my practice is and local counsel will

6    tell you that you can't.

7              MR. HURST:  I have to explain.  It's completely

8    my fault.  I take full responsibility, Your Honor.

9              THE COURT:  Especially to put a young lawyer in

10   that position.

11             MR. HURST:  I didn't -- it didn't actually occur

12   to me.  That is the truth, it did not occur to me, Your

13   Honor, because he was still on direct.  It literally did not

14   occur to me.  It didn't occur to her either.  I take full

15   responsibility.

16             THE COURT:  That's why I called you up here.

17   After I thought about it, it's not fair for me to come down

18   like a ton of bricks on Ms. Rurka.

19             MR. HURST:  Please, I take full and total

20   responsibility.

21             THE COURT:  We'll talk about it later.

22             MR. HURST:  Thank you, Your Honor.

23             THE COURT:  And you can tell her I don't have a

24   problem with her.

25             MR. HURST:  I appreciate that.  Thank you, Your

Siegel - cross

1    Honor.

2                    (End of sidebar conference.)

3    BY MS. BALDWIN:

4    Q.    So, Dr. Siegel I'd like to start the day talking about

5    what you and Dr. Berridge actually agree upon.

6    A.    Okay.

7    Q.    So you and Dr. Berridge both agree that PET is the

8    best nuclear imaging technique for this type of study when

9    you are trying to detect the amount of drug deposited and

10   retained inside the nasal cavity.  Isn't that correct?

11   A.    Currently available technologies, I think it is the

12   best.

13   Q.    And you guys both agree this is an accepted as an

14   accurate technique for quantitatively measuring the amount

15   of radiotracer in a region.  Is that correct?

16   A.    Yes, I agree with that statement, but, of course, the

17   accuracy of the measurement depends upon applying the method

18   directly when you are doing a particular experiment.

19   Q.    And another folder of things you guys agree on.

20          You guys, you and Dr. Berridge both agree that

21   Nasacort AQ deposited in the frontal cavity in the 1996

22   volunteers and was retained for about an hour.  Correct?

23   A.    Correct.

24   Q.    You and Dr. Berridge both agree that Nasacort AQ

25   deposited in the turbinate regions of the 1996 volunteers

Siegel - cross

1    and was retained for about an hour.  Correct?

2    A.    Correct.

3    Q.    Okay.  And you both agree that Nasacort AQ deposited

4    in the maxillary sinus and was retained for about an hour in

5    the 1996 volunteers.  Correct?

6    A.    That's what I stated, yes.  I just would add the

7    maxillary sinus numbers are rather lower so there

8    potentially could be problems with the maxillary sinus

9    numbers but I did say that.

10   Q.    Are you changing your testimony?

11   A.    No, I'm not.

12   Q.    So your only point of dispute on the 1996 study data

13   is whether or not Nasacort AQ deposited in the frontal sinus

14   of the 1996 volunteers.  Correct?

15   A.    With respect to the '96 data.

16   Q.    '96 data.

17   A.    That's correct.

18   Q.    Okay.  So despite the fact as you just pointed out the

19   maxillary sinus numbers were low, you don't dispute that

20   that shows actually deposition and retention in the

21   maxillary sinus of the 1996 volunteers.  Correct?

22   A.    I think it's a fair statement.  I'm not disputing

23   that.  Although as I stated a moment ago, the potential for

24   problems with the maxillary sinus data would be greater

25   because the numbers are lower.

Siegel - cross

1    Q.    But you are not changing your testimony.  Correct?

2    A.    I am not changing my testimony.

3          MS. BALDWIN:  Could I have P Demo 154, please?

4    BY MS. BALDWIN:

5    Q.    Now, Dr. Berridge prepared this graph which is the

6    1996 data for all of the subjects for both of the frontal

7    sinus and maxillary sinus.  But you don't believe that the

8    frontal sinus data is actual data or the maxillary sinus

9    data in this graph is actual data.  That's your position;

10   right, Dr. Siegel?

11   A.    That's correct.

12         MS. BALDWIN:  Thank you.

13   BY MS. BALDWIN:

14   Q.    Now, you mentioned yesterday that your primary

15   research area in the industry use of PET is in oncology.  Is

16   that correct?

17   A.    That's correct.

18   Q.    In oncology PET work, the radiotracer is normally

19   administered intravenously through a vein.  Correct?

20   A.    That's correct.

21   Q.    It's not administered through inhalation?

22   A.    That's correct.

23   Q.    And you actually never conducted a PET scan on the

24   nasal anatomy in your 30 years of experience in PET.

25   Correct?

Siegel - cross

1    A.    That's correct.

2    Q.    Nor have you conducted a study where you broke apart

3    the regions of interest in as many different regions as

4    Dr. Berridge did in his studies.  Correct?

5    A.    No, that's not correct.  I have done some studies

6    involving cardiac metabolism with several different traces

7    where we decided the myocardium into many different

8    adjoining regions.  It's slightly different type of study

9    but the same basic principle.

10   Q.    You haven't --

11   A.    Those were dynamic data, I would add, as well.

12            THE COURT:  What does that mean?

13            THE WITNESS:  Images not just acquired at one

14   point in time but images acquired over a time sequence to

15   look at the change in activity as a function of time.

16   BY MS. BALDWIN:

17   Q.    That is a little inconsistent with what you told me

18   just a few months ago when I asked you.

19            THE COURT:  Do you want to ask a question and

20   not argue with the witness?

21            MS. BALDWIN:  I'm sorry.

22            THE COURT:  You can make that argument at some

23   point in your brief, certainly.

24            MS. BALDWIN:  Yes, I promise.

25            THE COURT:  Okay.  I'm sure.

Siegel - cross

```
 1                    (Laughter.)

 2                    MS. BALDWIN:  May I approach?

 3                    THE COURT:  Yes, you may.

 4                    THE WITNESS:  Just what I wanted, another copy

 5      of the deposition.

 6                    THE COURT:  Counsel.

 7                    (Court and Ms. Rurka go to sidebar; off record.)

 8      BY MS. BALDWIN:

 9      Q.    Dr. Siegel.

10      A.    Yes.

11                    MS. BALDWIN:  Let's look at Page 74 of his

12      transcript, please.  And let's look at Line 23.  And it goes

13      on to 75, down to Line 5.

14      BY MS. BALDWIN:

15      Q.    Now, you see that, Dr. Siegel?

16      A.    Yes.

17      Q.    Okay.  I asked you a few months ago:

18                    "Question:  Have you ever had to -- have you

19      ever done a study where you broke apart the regions of

20      interest in as many different regions as this study was

21      done?"

22                    You told me:

23                    "Answer:  Personally, no."

24      A.    That's what I'd said.  But I have done, as I just

25      indicated, not as many regions as this one but the cardiac
```

Siegel - cross

1    studies we have done in the past had more than a single

2    region for the entire heart.

3    Q.    Have you ever used cubic regions of interest such as

4    the ones used in this 1996 PET study by Dr. Berridge?

5    A.    I have not.

6    Q.    So you have never actually conducted a PET scan in the

7    exact same manner as Dr. Berridge conducted his 1996 study,

8    have you?

9    A.    That's correct.  As Dr. Berridge testified, he is

10   really the only one that has done a study like this.

11   Q.    Have you ever done a PET study where someone is in a

12   vertical position for part of the study and then is put in a

13   horizontal position?

14   A.    I have not.

15   Q.    As an expert in this case, have you conducted any PET

16   studies of Nasacort AQ?

17   A.    I have not.

18   Q.    Did you conduct any PET studies of Barr's ANDA

19   product?

20   A.    I was not asked to.

21   Q.    So you have no data of your own on whether or not

22   either Nasacort AQ or Barr's ANDA product deposit in the

23   frontal sinus.  Correct?

24   A.    That's correct.

25   Q.    The only data we have is that, that was done by

Siegel - cross

1    **Dr. Berridge?**

2    A.    **That's correct.**

3    Q.    **But you had the capabilities to do so.   Correct?**

4    A.    **If I had been asked to do so, I could have done so.**

5    Q.    **You weren't asked?**

6    A.    **What?**

7    Q.    **You weren't asked?**

8    A.    **I was not asked to do those studies.**

9    Q.    **Since you have never done a PET study using cubic**

10   **regions of interest, you have never actually had to align an**

11   **array of cubes over anatomical regions before.   Correct?**

12   A.    **I've not personally done it but I think I know how I**

13   **would try to do it.**

14   Q.    **But you have never personally done it?**

15   A.    **That's correct.**

16   Q.    **And you don't know whether or not there was any**

17   **overlap between a cube assigned to the frontal sinus and one**

18   **that was assigned to an adjacent region?**

19   A.    **That's correct.  As I indicated, the raw data are gone**

20   **and there are no source documents to show us how those**

21   **regions were actually assigned.**

22   Q.    **If you had been faced with a situation like that, that**

23   **had overlap such as the one shown in your demonstrative,**

24   **would you have adjusted the array of cubes to minimize that**

25   **overlap?**

Siegel - cross

1    A.    I might have done it if it was of concern to me.

2    Q.    And you heard Dr. Berridge testify how the technician

3    could adjust that array of cubes in three dimensions in

4    order to get the alignment as best possible within

5    anatomical regions.  Correct?

6    A.    I heard him say that.

7    Q.    So if you heard Dr. Berridge -- I apologize.

8          If you had taken precautions to minimize the

9    overlap, why do you think that Dr. Berridge would not have

10   done the same?

11   A.    My basis for thinking that he might not have done the

12   same is the fact that he did not report it in either his

13   study report or his scientific publication.  And in a

14   publication where he makes the claim that as an unexpected

15   finding we have found activity in the sinuses, and

16   specifically in the frontal sinus.  And if there was some

17   measurement artifact related to how the cubes, as we just

18   discussed, as to how the cubes were assigned to one region

19   or another, that could have affected the frontal sinus

20   measurement either in a positive or a negative way, I

21   personally believe that that is important enough to disclose

22   to the editor of a journal for public consumption and to

23   disclose to the sponsor of the research so that they would

24   understand what the numbers meant.

25   Q.    Do you remember how many cubes there are for each

Siegel - cross

1    volunteer?

2    A.    There were 104 cubes, as I recall, in the array.    729

3    two-by-two-by-two millimeters, reassembled -- I take that

4    back.   Lots of two-millimeter cubes reassembled into

5    1.8-centimeter cubes, 104 of those.

6    Q.    Your critique of that is for each of the volunteers in

7    the 1996 study, Dr. Berridge did not specify where each of

8    those 106 cubes was located in his 1996 paper?

9    A.    So the answer to that question is, my critique is that

10   there was a special result that came out of that study,

11   which is the purported data in the frontal sinus, he had to

12   make, according to his testimony, a special adjustment in

13   the way he assigned the cubes such that it might lead to

14   underestimation of the activity in the frontal sinus.

15           And I would think that that level of care would

16   require reporting in the scientific literature, since the

17   study result was indeed unexpected, as he said.

18   Q.    But his article was peer-reviewed.   Correct?

19   A.    It was peer-reviewed.

20   Q.    And it was published in a very respected journal?

21   A.    It was published in a respected journal.   But I think,

22   as I told you in my deposition, that doesn't mean that

23   points like this don't slip through the peer-review process.

24   And not everything that is published in a journal, as you

25   know, is correct.   Journal results are retracted sometimes

Siegel - cross

1    because people find that they made mistakes.  And the

2    peer-review process is not perfect.  It's been very

3    carefully studied and shown not to be perfect.

4    Q.    If something is called a surprising result, it seems

5    like it would have alerted the reviewer of the article?

6    A.    Perhaps, yes.  And perhaps, not.  Depending on the

7    type of reviewer.  As I suspect, and I don't know who

8    reviewed that paper, I think as I told you, I did not, if

9    the reviewers were primarily individuals involved in PET

10   imaging just generically, physicists, other chemists, rather

11   than experts in nasal anatomy and nasal sprays, they might

12   not have picked up on the fact that this was an important

13   finding to bring up in the review process.

14        The Journal of Nuclear Medicine back at that

15   point in time was typically using only two peer reviewers

16   for each article.  It might go to additional peer reviewers

17   if there was a conflict between the original two.

18        So depending on the luck of the draw, how the

19   editor picked the reviewers, which of four reviewers might

20   have been invited to review, actually agreed to review the

21   article, you might or might not have that comment.  I can

22   tell you, in my own role as an associate editor, where I am

23   responsible for selecting reviewers and looking at their

24   reviews, I often find widely disagreeing views between

25   individuals who I would have thought would have reached the

Siegel - cross

1    same conclusions.

2              So the process is not perfect.

3    Q.    I understand that, Dr. Siegel.  But despite all of

4    your hypotheses that you have just given, the fact is that

5    it was peer-reviewed and accepted and published.  That's a

6    fact?

7    A.    As a pilot study, that's a fact.

8    Q.    Let's talk about the demonstrative you put up

9    yesterday, talking about potential sources of error for the

10   1996 PET study.

11   A.    Okay.

12   Q.    So alignment we have already kind of touched on about

13   the cubes.  I was surprised to see scatter on your list,

14   because at your deposition, I asked you if the activity seen

15   in the frontal sinus in the 1996 study was due to scatter.

16   And you actually corrected me and said that you didn't

17   believe it was due to scatter.

18              Has your position on that changed, Dr. Siegel?

19              MS. RURKA:  Objection.  Improper.

20              THE COURT:  I will sustain the objection to the

21   form of the question.  Please rephrase, counsel.

22   BY MS. BALDWIN:

23   Q.    We will look at the actual transcript.

24              MS. RURKA:  I am going to object to this.  It is

25   still improper.

Siegel - cross

1                THE COURT:  Are you trying to impeach him with a

2      prior inconsistent statement?  I think there is a way to do

3      that.

4                MS. BALDWIN:  Yes.  I will do it.

5                THE COURT:  All right.

6      BY MS. BALDWIN:

7      Q.    Look at Page 264 of your transcript.

8                THE COURT:  Let's see counsel.

9                (The following took place at sidebar.)

10               THE COURT:  I want Ms. Rurka to state with

11     specificity her objection.

12               MS. RURKA:  I don't think he has made an

13     inconsistent statement at his deposition.  She hasn't

14     established that.

15               THE COURT:  That is her objection.  I am sure

16     you will be able to establish that.

17               (End of sidebar conference.)

18     BY MS. BALDWIN:

19     Q.    My apologies, Dr. Siegel.

20     A.    Thank you.  I had time to read what is on those pages.

21     Q.    So at your deposition, I asked you if your analysis

22     affirmatively told you --

23               MS. RURKA:  Objection.

24               THE COURT:  Sustained.

25     BY MS. BALDWIN:

Siegel - cross

1    Q.    At your deposition, when I asked you about the issue

2    of scatter --

3                MS. RURKA:  Objection, Your Honor.

4                THE COURT:  Here is the point:  In order to

5    query him in this manner, you would have to establish that

6    the statement that you are referring to, that there is some

7    inconsistency in the prior statement and that which he has

8    made today.

9                Maybe you could go back a little ways.

10               MS. BALDWIN:  I sure will.

11               MR. BERGHOFF:  May I approach the questioner?

12               THE COURT:  Yes, you may.

13               (Counsel confer.)

14               THE COURT:  Thank you, counsel.

15   BY MS. BALDWIN:

16   Q.    My apologies, Dr. Siegel.

17   A.    No problem.

18   Q.    Does your analysis of the 1996 frontal sinus data

19   affirmatively tell you that the activity seen in the frontal

20   sinus in 1996 was due to scatter and not to deposition in

21   that region?

22   A.    No.  I don't believe I ever said that.  I think what I

23   said yesterday, and I think what I said in my deposition,

24   was that scatter was another factor that could contribute to

25   misinformation on a PET scan.  When there is scatter,

Siegel - cross

1    activity is put in a place where it is not really there, and

2    you get a false measurement because of scatter.  I think I

3    said in this deposition that I thought with respect to the

4    frontal sinus that overlap of the frontal sinus region with

5    an adjacent region was likely the dominant factor

6    responsible for the problem in the 1996 study, and scatter

7    was potentially an additional contributory factor.

8    Q.    Scatter is an issue with all PET studies.  Correct?

9    A.    That's correct.

10   Q.    So that is a potential source of error across all

11   three of Dr. Berridge's PET studies.  Correct?

12   A.    That's correct.

13   Q.    And so that is a potential source of error that must

14   be considered in the analysis of any PET study, not just the

15   one conducted in 1996.  Correct?

16   A.    That's correct.

17   Q.    You mentioned spillover on that list as well.  Is

18   spillover a potential source of error in all PET studies?

19   A.    Absolutely, as I said yesterday.

20   Q.    So this also is a potential source of error that

21   encompasses all three of the PET studies conducted by Dr.

22   Berridge?

23   A.    Yes.  But I think the spillover effect would be

24   substantially greater with the cubic regions of interest

25   abutted one right next to the other than it would be with

Siegel - cross

1    the contrary regions of interest used in the 1998 and the

2    2002 studies.

3    Q.    But this is a potential source of error that must be

4    taken into consideration when designing any PET study?

5    A.    That's correct.

6    Q.    And someone with 30 years of experience in PET, like

7    you and Dr. Berridge, would know to consider these potential

8    sources of error when designing a PET study.  Correct?

9    A.    One would hope so.  But as I said, we don't have the

10   raw data left remaining to see what really was done in the

11   1996 study.

12   Q.    Dr. Berridge actually did his graduate study work at

13   Washington University in your department.  Correct, Dr.

14   Siegel?

15   A.    In my department.  But Dr. Berridge's graduate work

16   was in radiochemistry, not in actually conducting PET

17   studies.

18   Q.    But we wouldn't doubt his training in PET, would we?

19   A.    He has had experience in PET.  I doubt if he actually

20   had -- let me not say that.  Let me say that I don't know

21   how much actual training in performing PET studies and

22   analyzing PET data he had during the course of his graduate

23   training at Washington University, which was primarily in

24   the preparation and synthesis of radioactively labeled drugs

25   under the tutelage of Dr. Michael Welch, who is a chemist,

Siegel - cross

1    not a PET imager, not a PET physicist.

2    Q.    Let's talk about the 1998 versus -- the 1998 results

3    graph that you put up.  Could I have DX Demo 39.

4             Now, Dr. Siegel, the nasal cavity was the region

5    of highest deposition in the 1998 study.  Correct?

6    A.    Correct.

7    Q.    About 60 percent on this graph?

8    A.    At peak, yes.

9    Q.    And I think we are all in agreement that the frontal

10   sinus was the region of smallest deposition in the 1998

11   study?

12   A.    That's correct.

13   Q.    Now, why did you graph the region of interest with the

14   greatest amount of deposition on the same y axis as the

15   region of interest with the smallest amount of deposition?

16   A.    I think to try to show whether there was any

17   similarity, these curves, because of the potential for

18   overlap, spillover, scatter, the frontal cavity region, the

19   nasal cavity region would likely be the area most likely to

20   be contributing these problems to the frontal sinus.

21   Q.    But if you graph any small value on a large enough

22   scale, it's always going to look like zero, isn't it?

23   A.    That's correct.

24   Q.    We know from Dr. Berridge's graphs on Monday that

25   those points are actually not at the zero line, don't we?

Siegel - cross

1    A.    Well, they are not precisely at zero.  But they are

2    not a whole lot over zero, no.

3    Q.    They are not zero?

4    A.    In the '98 study, they are not precisely zero for

5    three of the five subjects.  For two of the five they are

6    virtually zero.

7    Q.    Aren't zero or not zero?

8    A.    That's a statistical question, rather than just -- we

9    can do first-grade math or we could think about it

10   statistically.  If we have numbers that are varying up and

11   down very close to the zero line, that's zero.  But if you

12   ask me, is .001 different from zero, you know what I would

13   say.  It's different.  But that's first-grade math.

14   Q.    During your testimony, you have relied a great deal on

15   that 2002 study report.  Correct?

16   A.    Correct.

17   Q.    And yesterday you also commented on the statement that

18   Dr. Berridge made.

19            Could you pull up PTX-351 for me, Eric.  Page

20   10.  Highlight that first sentence.

21            We talked a lot about this statement.  This is a

22   contemporaneous statement by Dr. Berridge, isn't it?

23   A.    What do you mean by contemporaneous?

24   Q.    This statement was made at the time of the study.

25   Correct?

Siegel - cross

1    A.    Well, it was made at the time the study report was

2    prepared, which was presumably sometime after the study was

3    completed.

4    Q.    This wasn't a document that was created as part of

5    this litigation?

6    A.    That's correct.

7    Q.    Now, you read this statement when you reviewed the

8    2002 study report?

9    A.    Correct.

10   Q.    Did you specifically test or evaluate any other

11   regions of interest apart from the frontal sinus to

12   determine whether or not there were unusual variations in

13   the data?

14   A.    I relied on the investigator's own statistical

15   analysis of the data that was included in this report.

16         But I focused my observations on the frontal

17   sinus because those were the ones that I was instructed to

18   focus on by counsel and the ones that seemed to be most

19   relevant to the case.

20   Q.    So you did not conduct that same analysis for the

21   other regions of interest, just the frontal sinus?

22   A.    I looked at the data.  Are you asking me if I did a

23   formal statistical analysis?

24   Q.    Did you, for any other regions of interest?

25   A.    I looked, for example, at the frontal cavity regions.

Siegel - cross

1    I looked, for example, at the turbinate regions, and just

2    looking at the general averages and the standard deviations,

3    without doing formal statistical testing, did not think that

4    the 2002 data, when we looked at those kinds of numbers,

5    looks all that different from the 1998 data and from the '96

6    data in those regions.

7    Q.    So you only focused your analysis on the frontal

8    sinus?

9    A.    I focused my analysis on the frontal sinus.

10   Q.    Just a few more questions.  We haven't talked much

11   about the 1998 data but in forming your opinion regarding

12   whether or not Nasacort AQ and Flonase exhibited similar

13   behaviors, you reviewed the 1998 data as well.  Correct?

14   A.    Correct.

15   Q.    And you relied upon that poster that we showed the

16   other day.

17         MS. BALDWIN:  Could you put up PTX-569.

18   A.    Well, I partially relied on the poster and also the

19   spreadsheet of the data that had the actual process results.

20   Q.    But this is part of what you reviewed in forming your

21   opinion.  Correct?

22   A.    Correct.

23         MS. BALDWIN:  If you could highlight the results

24   section there?  Thank you.

25         Would you like a hard copy of this, Your Honor,

Siegel - cross

1    or could you see it?

2              THE COURT:  No, I'm fine.

3    BY MS. BALDWIN:

4    Q.    Dr. Siegel, do you need a hard copy of it?

5    A.    I can see this.

6    Q.    So in reviewing this poster presentation, do you see

7    where it starts the highlight:  You would have read the

8    Flonase deposition in oral cavity regions was higher.  This,

9    with observations below, may indicate a higher fluidity and

10   movement of the product, since oral deposition does not take

11   place directly.

12             And then, at the beginning of the next

13   paragraph, it says:

14             The kinetics showed a very striking feature in

15   the Flonase curves between 45-60 minutes.

16             MS. BALDWIN:  Eric, if you could pull out the

17   graphs for me on the left-hand side on that poster?  Yes,

18   those right there.

19   BY MS. BALDWIN:

20   Q.    In that top graph there, Dr. Siegel, is that the

21   striking feature in the Flonase curves between 45 to

22   60 minutes referred to in that paragraph above?

23   A.    I believe that is what he is referring to.

24   Q.    Do you have any opinion about this striking feature of

25   Flonase?

Siegel - redirect

1    A.    Well, you can look at average curves like this.  You

2    can look at videos but we're missing some important things

3    on these curves.  We're missing the error bars that show

4    what the standard deviation is from subject to subject.  And

5    I think what is more important is analyzing these results in

6    a reliable statistical fashion to ascertain whether there

7    really is or is not a significant difference in these curves

8    despite the apparent difference in their shape.

9    Q.    But you had the raw data these curves were generated

10   from.  Correct?

11   A.    That's correct.

12   Q.    So you could have analyzed that to determine whether

13   or not this striking feature was of significance to you?

14   A.    I could have done but was not asked to.

15   Q.    So since you were not asked, you did not do it?

16   A.    I paid attention to what I was asked to do.

17              MS. BALDWIN:  No further questions.

18              THE COURT:  Redirect.

19              MS. RURKA:  Just briefly, Dr. Siegel.

20                   REDIRECT EXAMINATION

21   BY MS. RURKA:

22   Q.    Do you have sufficient knowledge and experience to

23   analyze Dr. Berridge's data, not having done it yourself?

24   A.    I certainly believe so.

25   Q.    And the article, the 1996 study article, the Journal

Klingenberg - direct

```
 1    of Nuclear Medicine article, would a peer reviewer know how

 2    Dr. Berridge assigned the cubic regions of interest if it

 3    wasn't in his journal manuscript submission?

 4    A.    No.

 5              MS. RURKA:  Thank you.

 6              THE COURT:  All right.  Thank you, doctor.

 7              THE WITNESS:  Thank you.

 8              MS. RURKA:  We call Dr. Daniel Klingenberg to

 9    the stand.

10              THE COURT:  Okay

11                          - - -

12                    DEFENDANT'S TESTIMONY

13        ... DR. DANIEL JOSEPH KLINGENBERG, having been placed

14              under oath at 9:46 a.m. as a witness, was

15                  examined and testified as follows ....

16                          - - -

17              MS. RURKA:  May I approach the witness?

18              THE COURT:  Yes, you may.

19              (Binders passed forward.)

20                    DIRECT EXAMINATION

21    BY MS. RURKA:

22    Q.    Will you please state your name for the record?

23    A.    Daniel Joseph Klingenberg.

24    Q.    And are you testifying today an as expert?

25    A.    That's correct.
```

Klingenberg - direct

1    Q.    What is you're area of expertise?

2    A.    My area of expertise is chemical engineering and

3    rheology.  Rheology suspensions.

4    Q.    Dr. Klingenberg, could you talk a little bit about

5    your educational background?

6    A.    Yes.  I received a B.S. in Chemical Engineering from

7    the University of Missouri; and that was in 1985.  I did a

8    Master's of Chemical Engineering, University of Illinois.

9    That was 1989.  A Ph.D. from the University of Illinois in

10   Chemical Engineering.  That was in 1991, I believe.  And

11   Post-Doc at the University of British Columbia in Pathology

12   and Physics.

13   Q.    What is your current profession?

14   A.    I'm a Professor in the Department of Chemical and

15   Biological Engineering at the University of Wisconsin and

16   I've been there since the end of 1991.

17   Q.    What is your main area of research?

18   A.    My main area of research is suspension rheology.

19   Q.    Does that include viscosity measurements?

20   A.    Yes, that includes things like measuring and

21   interpreting viscosity suspensions.

22   Q.    How much experience do you have in the area of

23   rheology and viscosity measurements?

24   A.    I've been doing this research ever since I've got to

25   the University of Wisconsin, over 16 years ago.  I also did

Klingenberg - direct

1    viscosity testing as a student in college.  So 20 years

2    total.

3    Q.    Do you teach courses at the University of Wisconsin?

4    A.    Yes, I do.

5    Q.    And do you do research there as well?

6    A.    Yes, I do.

7    Q.    Are you a member of any professional associations?

8    A.    Pertinent to this case, I'm a member of the Society of

9    Rheology.  In fact, I'm on the Executive Committee of the

10   U.S. Society of Rheology.  The same group Dr. Prud'homme is

11   in.

12   Q.    Are you a published author?

13   A.    Yes, I am.  I have over 60 publications, mostly in the

14   area of rheology and particulate suspensions.

15           MS. RURKA:  Your Honor, I would like to proffer

16   Dr. Klingenberg as an expert in rheology and viscosities.

17           MR. BERGHOFF:  No objection.

18           THE COURT:  The doctor is accepted as an expert

19   in the area.

20   BY MS. RURKA:

21   Q.    Were you asked to conduct a project in this case?

22   A.    Yes, I was.

23   Q.    What were you ask to do?

24   A.    I was asked to analyze data on the recovery of the

25   viscosity of Nasacort AQ and other nasal spray formulations.

Klingenberg - direct

1    I was also asked to measure viscosities of Flonase to see if

2    the viscosity fell in the ranges stated in these patents.

3    Q.    Okay.  And when you say recovery of viscosity, what do

4    you mean?

5    A.    I mean after a suspension has been sheared or shaken,

6    the viscosity tends to build over time and we're looking at

7    how long it takes for that viscosity to recover back to its

8    unshaken value.

9    Q.    And were those tests done on products discussed in

10   this litigation?

11   A.    Yes.

12   Q.    Did you reach a conclusion about how long it takes a

13   product like Nasacort AQ to recover its setting viscosity?

14   A.    Yes.  After looking at all that data, I concluded that

15   it takes hours todays for the viscosity to recover back to

16   its setting viscosity.

17   Q.    Would the same conclusion apply to Barr Laboratories

18   ANDA product?

19   A.    Yes, I believe so, since they are very similar

20   compositions.

21   Q.    Okay.  What is your conclusion based on?

22   A.    My conclusion is based on analyzing a variety of data

23   that has appeared in this case:  Dr. Lochhead's data, data

24   from Aventis on Nasacort AQ.  And then my own testing on

25   Flonase.

Klingenberg - direct

1              MS. RURKA:  Okay.  Let's discuss Dr. Lochhead's

2     data first.  Could you pull up DX-362 at Page 9?  And could

3     you pull out the shear and setting viscosity numbers for

4     batch number four, please?

5     BY MS. RURKA:

6     Q.    You recognize this data?

7     A.    Yes.

8     Q.    Okay.  Can you explain the numbers for me?

9     A.    Sure.  They're in groups of three.  And so in the

10    rightmost side here, these three numbers are measures of the

11    setting viscosities, the viscosity of this Barr product that

12    has been sitting relatively undisturbed for I believe two

13    days.  And in between each measurement is a five minute rest

14    period I believe.

15              Then the bottom set of numbers here, these are

16    again measures of the viscosity after the sample has been

17    sheared on a, or shaken on a Burrell wrist-action shaker on

18    five minutes at full speed.  And then these measurements are

19    made with I believe 30 seconds of rest in between each

20    measurements.

21    Q.    Okay.  What is the total amount of time between when

22    the product was shaken and when the last shear viscosity

23    measurement was taken here?

24    A.    I believe Dr. Lochhead said that there is about a

25    minute to get that first measurement and figure in the 30

1    second rest time.  I think it's three-to-four minutes total

2    to that last measurement.

3    Q.    Okay.  So the bottom number is the last measurement he

4    took?

5    A.    That's correct.

6    Q.    And has Barr's ANDA product recovered its shear

7    viscosity in the amount of time, the three minutes it took

8    from shaking to doing that last measurement?

9    A.    No, the viscosity has barely changed from the initial

10    value.  It hasn't recovered up to this 600 range.  In fact,

11    it's got about 500 percent to go or six times.  It increases

12    six times to get back to that value.

13    Q.    So what do these numbers suggest to you about the time

14    it might take?  Do these numbers suggest anything to about

15    the time it might take to recover the setting viscosity?

16    A.    It suggests it will take much longer than three to

17    four minutes to recover back to the setting viscosity.

18    Q.    Were these measurements done on a Brookfield

19    viscometer?

20    A.    Yes, they were.

21    Q.    Did you hear Dr. Prud'homme testifying yesterday that

22    a Brookfield viscometer might not be the appropriate way to

23    measure the recovery of the setting viscosity of these

24    products?

25    A.    Yes, I heard that.

Klingenberg - direct

1   Q.    Do you agree with him?

2   A.    I disagree.  I think this is a reasonable way to

3   measure the viscosity as it recovers.

4   Q.    Dr. Prud'homme said that the viscosity measurement

5   itself might disrupt the product so that the viscosity would

6   keep going down every time you did the measurement.  Do you

7   agree this disruption would make enough of a change to make

8   the recovery, the recovery data unreliable?

9            MR. BERGHOFF:  I'll object.  Leading.

10           THE COURT:  Yes.  Sustained.

11           MS. RURKA:  I apologize.

12  BY MS. RURKA:

13  Q.    Could you explain what your understanding of

14  Dr. Prud'homme's testimony was yesterday?

15  A.    My understanding of that testimony was that the actual

16  measurement causes these numbers to be lower than they would

17  have otherwise.  I don't think that is true because if the

18  shear actually caused this number to be that low, then they

19  never would have been able to measure the setting

20  viscosities.  It would have destroyed those numbers as well

21  and the numbers around 600 would have been down around 100.

22  Q.    You also mentioned testing Aventis did.  What was that

23  testing?

24  A.    That was also testing measurements of the viscosity of

25  Nasacort AQ as a function of setting viscosity and then the

Klingenberg - direct

1    recovery as a function of time after material had been

2    shaken.

3            MS. RURKA:  Could you please pull out DX-23 at

4    Page 97?

5    BY MS. RURKA:

6    Q.    Is this the data you are referring to?

7    A.    This is the data.

8    Q.    Was this testing done on Barr's ANDA product?

9    A.    No, this is testing on Nasacort AQ.

10   Q.    And could you just explain what these data are

11   showing?  Could you explain the columns?

12   A.    Sure.  The first column is just time.  And then the

13   second column are the viscosities measured at those various

14   times.  The first row here, this is the -- it says unshaken.

15   And so these are measurements of the viscosity.  It's the

16   setting viscosity material.  The material when it's

17   relatively undisturbed.

18   Q.    What sort of instrument were these measurements taken

19   on?

20   A.    This was taken on a Brookfield Viscometer.

21   Q.    And why are the numbers, the shear viscosity numbers,

22   so high?

23   A.    The shear viscosity here, the setting viscosity up

24   here at the top of about, average of 3500 centipoise for

25   these two measurements are larger than what we see in Dr.

Klingenberg - direct

1    Lockhead's report because these are being measured at a much

2    slower rotation rate.  This is at six revolutions per minute

3    as opposed to 30 revolutions per minute.

4             Knowing what we know about thixotropic fluids,

5    these viscosities should be much higher.

6    Q.    What is the second row?

7    A.    That second row just indicates the material was then

8    shaken after that setting viscosity was measured.

9    Q.    And how about the third row?

10   A.    Then the third row is where they start measuring the

11   viscosity as a function of time.  Here we have at 30 minutes

12   the viscosity average of two measurements is 330 centipoise.

13   Then as time goes on you can see the viscosity increases.

14   By the time you get to 24 hours down here, you can see that

15   it's recovered to about 1500 centipoise, which is quite a

16   bit to go yet to get up to the 3500 centipoise of the

17   setting viscosity.

18   Q.    Dr. Klingenberg, I think you said 30 minutes on that

19   third row.  Is that the right number?  Is it 30 minutes

20   after shear?

21   A.    So this is immediately after shear, the viscosity is

22   330 centipoise.  Down here at 24 hours after being shaken,

23   the viscosity is around 1500 centipoise.

24   Q.    Okay.  How about at the bottom row, what is that

25   showing?

Klingenberg - direct

1    A.    It shows at 120 hours, which is about five days, they

2    are still measuring viscosity below the setting viscosity.

3    So this is about 2100 centipoise or so, which is still not

4    yet two-thirds of the setting viscosity.  It hasn't

5    recovered yet even after five days.

6    Q.    Okay.  You also mentioned that you had conducted some

7    testing on Flonase that supported your opinion that these

8    compounds don't recover their setting viscosity.  What did

9    you do with Flonase?

10   A.    Well, we sheared some Flonase, and then measured the

11   viscosity of that Flonase using a Brookfield Viscometer,

12   running at 30 revolutions per minute for 30 seconds.  We did

13   that measurement at several different times.  And the

14   viscosity after 30 minutes was still less than 50 percent of

15   the setting viscosity.

16   Q.    What does that tell you about Nasacort AQ and Barr's

17   ANDA product?

18   A.    Since these are all fairly similar compositions, this

19   tells me that the viscosity of these products, after

20   shaking, take hours to days to recover to their setting

21   viscosities.

22   Q.    Did you hear Dr. Prud'homme testify about the Hydan

23   report the other day?

24   A.    Yes, I did.

25   Q.    What did you hear him testify about that report?

Klingenberg - direct

1    A.    What I heard, which is consistent with his expert

2    report, was that the Hydan report suggests the viscosity

3    recovers to within 90 percent of its setting viscosity

4    within 30 seconds.

5    Q.    Can we pull up Plaintiffs' Demonstrative 43.1.  Thank

6    you.

7          Can you just describe briefly what we are

8    looking at here?

9    A.    Sure.  This is a plot prepared by the plaintiffs, I

10   believe, of the viscosity on the y axis here, measured as a

11   function of time, for four different formulations.  Nasacort

12   AQ AZ3 is this orange curve here.

13         Now, in this experiment, the material is being

14   sheared pretty hard.  For the first 30 seconds, that is a

15   shear rate of 100 inverse seconds.  Right here at 30 seconds

16   the shear rate is rapidly decreased to one inverse second.

17   Then the viscosity is then continued to be measured as a

18   function of time.

19   Q.    Is this the Hydan report Dr. Prud'homme was talking

20   about?

21   A.    Yes.  This is the Hydan report.

22   Q.    What did Dr. Prud'homme testify about this?  What is

23   your understanding of what he was saying about this data?

24   A.    My understanding is that he said that this data showed

25   the viscosity recovered within 30 seconds, recovered to

Klingenberg - direct

1    within 90 percent of its setting viscosity in 30 seconds.

2    Q.    And what is he relying on in the data to show that?

3    A.    I am actually not sure because I don't think it shows,

4    respectfully, I think it doesn't show that it recovers

5    rapidly, mainly for three reasons.

6          I think undue attention is paid to this jump.

7    This jump, I believe, is not due to recovery but it's due to

8    something else.

9          THE COURT:  Which jump are you talking about?

10         THE WITNESS:  The fact that the viscosity goes

11   from this low number very rapidly up to this higher level,

12   when the shear rate is decreased from 100 to one inverse

13   second.

14         So it is from that level up to that level

15   (indicating).  That is one thing.

16         I think another thing, based on what we know

17   from this other data we just described, recovery goes for a

18   very long time, this experiment is stopped at 120 seconds,

19   90 seconds after the shear rate was stepped down to one

20   inverse second.  This just doesn't go long enough.

21         Also, I think that the magnitude of the

22   viscosities are inconsistent with Dr. Lockhead's results.

23   BY MS. RURKA:

24   Q.    Okay.  So could you explain the jump, why you think

25   the jump is not indicative of recovery, the jump in the data

Klingenberg - direct

1    from the zero to 30 time point and then from the 30 to 120

2    time point?

3    A.    I will try to move my pointer, get it a little steady

4    here.

5              So this jump from this line to this line,

6    whether the shear rate is rapidly --

7              THE COURT:  You say this line to this line,

8    Doctor.  Maybe you could describe it.

9              THE WITNESS:  How about the orange lines, which

10   is the data for Nasacort AQ, just for example here in this

11   diagram.

12             This jump is actually expected to occur for

13   thixotropic fluid even if there is no recovery at all, just

14   because you have dropped the shear rate.  We expect that to

15   happen when there is no recovery.

16             So I don't think -- in fact, this jump is not

17   due to recovery.  This is just due to a phenomenon* for

18   thixotropic materials.

19   BY MS. RURKA:

20   Q.    And you also said this experiment is not being

21   conducted over a sufficient amount of time.  What do you

22   mean by that?

23   A.    Again, we see that the recovery of materials like

24   this, in fact, there is other data from Aventis on the

25   Nasacort AQ, this takes hours to days to recover.  This

Klingenberg - direct

1    isn't nearly long enough to see the ultimate viscosity.  In

2    fact, I would say that it looks like these curves might be

3    increasing with time.  But it's kind of hard to tell, there

4    is such a short window.

5    Q.    You also mentioned that Dr. Lockhead's data supports

6    your opinion.  Dr. Lockhead conducted -- did he conduct

7    testing using the same viscometer as was used here?

8    A.    No.  He measured the setting viscosity and shear

9    viscosity, for that matter, of Nasacort AQ using a

10   Brookfield Viscometer, Brookfield LVT Viscometer.

11   Q.    What would the setting viscosity, if you were to

12   translate Dr. Lockhead's results into the results on this

13   different viscometer, what would the setting viscosity be?

14   A.    Well, I would estimate, based on his results,

15   measuring with the Brookfield at 30 rpm's, that for one

16   inverse second, the setting viscosity should be around 4,000

17   centipoise.

18         I will point out that the units here on this

19   axis, this is pascal-seconds, so this orange curve is

20   sitting here at about .15 pascal-seconds, which is 150

21   centipoise.  And I would estimate, based on Dr. Lockhead's

22   results, the setting of the undisturbed viscosity we measure

23   at one inverse second should be up at around 4,000

24   centipoise.  Much, much higher than that.

25   Q.    If you were to show recovery -- you know about the

Klingenberg - direct

1    setting viscosity of Nasacort AQ.  If you were to show that

2    Nasacort AQ in this graph were to show that Nasacort AQ

3    recovered 90 percent of its setting viscosity within 30

4    seconds, where would the orange line be at 30 seconds to 120

5    seconds?

6    A.    That would be above the ceiling somewhere.

7    Q.    And you got that it should be -- the setting viscosity

8    should be 4,000 centipoise using Dr. Lockhead's data.  Why?

9    A.    Well, that is, again, he used a Brookfield Viscometer

10   operating at 30 revolutions per minute from which I estimate

11   the shear rate was ten inverse seconds.  This is one inverse

12   second.  So I multiply his viscosity by ten to predict the

13   viscosity of these shear fluids.  When you decrease the

14   shear rate down to one and take his number of a little over

15   400 centipoise, and you get 4,000 centipoise at this lower

16   shear rate.

17   Q.    So you multiply the 400 by ten?

18   A.    That's correct.

19   Q.    Dr. Prud'homme also relied on the FMC report.

20          Could we first pull up PX-380 at Page 1.

21          Did you hear Dr. Prud'homme testify about the

22   FMC report?

23   A.    Yes.

24   Q.    And what was your understanding of what he was saying

25   about this report?

Klingenberg - direct

1    A.    My understanding was that he agreed with the

2    highlighted sentence, that the high level of thixotropy* in

3    the case in structure will go quickly after spraying.

4    Q.    Does this sentence give you sufficient information to

5    conclude that a product like Nasacort AQ would recover its

6    setting viscosity in a short period of time.

7    A.    No, it doesn't.

8    Q.    Why not?

9    A.    If you look at the data in this report, the data

10   clearly is thixotropic.  But they show little or no

11   recovery.  Furthermore they don't give you any indication of

12   how long the experiments were performed.  So even if there

13   was recovery, you wouldn't be able to estimate a recovery

14   time.

15   Q.    You also mentioned that you had conducted -- so I

16   guess in your opinion, do these materials recover their

17   setting viscosity in about -- did they recover 90 percent of

18   their setting viscosity within about 30 seconds?

19   A.    No.  They take hours to days to recover 90 percent of

20   their setting viscosity.

21   Q.    You also mentioned that you conducted some viscosity

22   measurements on Flonase?

23   A.    I did, yes.

24   Q.    What were the results -- what were you asked to do on

25   the viscosity measurements?

Klingenberg - direct

1    A.    I was asked to measure the setting and shear

2    viscosities of Flonase, as described in the patent, and to

3    see if they fell within the ranges.  And I was also asked to

4    determine whether or not Flonase eventually recovered its

5    setting viscosity after being shaken.

6    Q.    What were the results of your testing on Flonase?

7    A.    For Flonase, the setting viscosity was measured

8    between 530 and 589 centipoise.  The shear viscosity was

9    determined to be 165 and 206 centipoise.

10   Q.    So does the setting viscosity of Flonase fall within

11   the claimed range of about 400 to about 800 centipoise?

12   A.    Yes, it does.

13   Q.    Does the shear viscosity fall within the claimed range

14   of about 50 to about 200 centipoise?

15   A.    Yes, it does.

16   Q.    Dr. Lockhead criticized -- did you read Dr. Lockhead's

17   rebuttal report in this case?

18   A.    Yes, I did.

19   Q.    Did he criticize your results in this case?

20   A.    Yes.

21   Q.    Did you review those criticisms?

22   A.    Yes, I did.

23   Q.    Are those criticisms, are they valid?

24   A.    I don't believe so.

25   Q.    Do you and Dr. Lockhead agree on any of the results in

Klingenberg - direct

1    this case?

2    A.    Yeah.  I think we agree on the setting viscosities.  I

3    think we both got the same -- that we both agree that the

4    setting viscosities are in the range specified in the

5    patent.

6    Q.    Did he agree with you on your conclusions on the shear

7    viscosities falling within the range?

8    A.    No.  He measured larger shear viscosities than I did.

9    His were outside the range.  Mine was inside the range.

10   Q.    Have you ever worked with nasal spray products like

11   this before?

12   A.    No.

13   Q.    Do you have a general approach to measuring,

14   conducting viscosity measurements on unfamiliar materials?

15   A.    Well, when you get a material you haven't studied

16   before, you need to examine it.  You need to do some

17   experiments, just to figure out what operating conditions,

18   what parameters need to be set on the rheometer.  So you

19   need to do a little bit of investigation first.

20   Q.    Did you do some investigation with Flonase when you

21   were received it?

22   A.    I did, yes.

23   Q.    When you received it, how did you go about measuring

24   the shear viscosity of Flonase?

25   A.    Well, I started by trying to follow the description of

Klingenberg - direct

1      the measurements in the patent.

2      Q.    Could we please pull up PTX-1 at Page 7.

3            Is this the description you read?

4      A.    That's correct.

5      Q.    Did this tell you -- did this give you sufficient

6      information to measure the shear viscosity of Flonase?

7      A.    No, it didn't.  I believe there is information missing

8      in this description.

9      Q.    What information is missing?

10     A.    There is quite a few things.  I think most importantly

11     for this case, for the shear viscosity, are the conditions

12     for the shaking step.

13     Q.    What sentence are you looking at for how to conduct

14     the shear viscosity?

15     A.    I am looking at the last sentence, where it says the

16     shear viscosity is measured by mixing at 30 rpm for 30

17     seconds after mixing in a Burrell wrist-action shaker at

18     full speed for five minutes.

19     Q.    The Burrell wrist-action shaker, the mention of the

20     Burrell wrist-action shaker didn't tell you how to conduct

21     the shaking for the viscosity testing?

22     A.    No.  I think there is information missing, most

23     notably, how full the containers need to be on the Burrell

24     wrist-action shaker.

25     Q.    Why is that important?

Klingenberg - direct

1   A.    Well, as a rheologist, I interpret this passage of

2   this person trying to teach us how to characterize the

3   viscosity or the thixotropy* of the formulations.  For

4   example, the setting viscosity characterizes the behavior of

5   the material when it's been disturbed as little as

6   reasonably possible.  And the shear viscosity is

7   characterizing the material when it's been deformed or

8   shaken, as much as reasonably possible, with the equipment

9   available.

10          Now, how much deformation goes on during the

11  shaking will depend on how full the container is that you

12  are shaking.

13  Q.    Did you hear Dr. Prud'homme's testimony about ketchup

14  up being thixotropic?

15  A.    Yes.  That was a good example.  We have all had the

16  experience with a full bottle of ketchup.  It is very hard

17  to shake that up and get the ketchup to pour out.  It is

18  much easier to shake up and then pour a half-filled bottle

19  of ketchup.

20  Q.    How did you determine how full to make the container

21  that you were shaking?

22  A.    Well, I started by taking 500 milliliter Erwin Myer*

23  flasks and filling them halfway up.  So 50-percent full, and

24  putting those on the shaker for five minutes.

25          Unfortunately, that turned my sample of Flonase

Klingenberg - direct

1    into foam Flonase.  So I no longer had the material I

2    wanted.  I had a different material than regular Flonase.

3    Q.    What sort of numbers did you get when you measured the

4    viscosity of the foam?

5    A.    Those viscosities were significantly higher, as

6    expected, than what we ultimately determined to be the shear

7    viscosity of those materials.

8    Q.    How full did you determine that the container should

9    be ultimately?

10    A.    By doing some experiments, we found that filling these

11    containers, these Erwin Myer flasks, 80-percent full, would

12    allow significant deformation of the material when it was

13    shaken.  But it didn't produce too much foam so that we

14    couldn't make the measurements.

15    Q.    Okay.  And after shaking it, did you conduct the shear

16    viscosity measurements?

17    A.    Yes, we did.

18    Q.    Did you conduct the shear viscosity measurements in

19    accordance with what is stated in the patent?

20    A.    I believe so.

21    Q.    Did you use the Brookfield Synchro-Lectric Viscometer?

22    A.    I used a Brookfield LVT Viscometer.

23    Q.    And you say LVT.  Does that make a difference?

24    A.    No, it's the same viscometer essentially.  The only

25    difference is the readout isn't an LED, a digital readout as

Klingenberg - direct

1    opposed to a dial readout but it's the same spring, same

2    inner-workings, same thimbles.

3    Q.    Did you get the same measurements?

4    A.    You get the same measurements, yes.

5    Q.    Did you measure the viscosity at 20 degrees Celsius?

6    A.    Yes, plus or minus half a degree C.

7    Q.    Did you shake the sample on a Burrell wrist action

8    shaker at full speed for five minutes?

9    A.    Yes.

10   Q.    And did you measure the shear viscosity by making at

11   30 RPMs for 30 seconds on the Brookfield?

12   A.    Yes.

13   Q.    Dr. Lochhead criticized some aspects of your shear

14   viscosity testing.  Did you read it that he criticized you

15   for not using a 600 milliliter beaker to conduct the

16   viscosity testing with the Brookfield?

17   A.    Yes.  That was my fault.  I described in my reports

18   that I used a 500 milliliter beaker.  But it's actually a

19   600 milliliter beaker.  I just referred to it as a 500

20   milliliter beaker because 500 milliliters is the largest

21   labeled gradation on the side of the beaker so I called that

22   a 500 milliliter beaker but the capacity is actually 600

23   milliliters.  It's a 600 milliliter low foam beaker.

24   Q.    And he also says you didn't use sufficient sample to

25   actually measure -- the Flonase, the prior art product, the

Klingenberg - direct

1    Flonase sample to measure the viscosity.  Did you use the

2    sufficient sample to measure the viscosity?

3    A.    Yes, there was no problem immersing the spindles to

4    the indentation in the shaft.

5    Q.    He also criticizes you for pouring sample after you

6    shook it from an Erlenmeyer flask into the beaker where you

7    were using the Brookfield viscometer.  Did pouring it have

8    any effect on the results in your shear viscosity

9    measurements?

10   A.    We did a few experiments to show that pouring had

11   negative effect on the shear viscosity measurements.

12   Q.    Did you put those experiments in your lab notebook?

13   A.    Yeah.

14   Q.    And were they produced to the other side, the lab

15   notebook?

16   A.    Yes.

17   Q.    So whose results do you think are a better

18   characterization of the shear viscosity of the prior art

19   product?

20   A.    With all due respect to Dr. Lochhead, I think this

21   volume is an important parameter, and I think I did the

22   experiments to determine what volumes are reasonable.  And

23   so I think our experiments for the shear viscosity are more

24   reliable.

25   Q.    What do you think explains the difference in your

Klingenberg - direct

1    results?

2    A.    I don't know.  I wasn't there when he did those

3    measurements.  Two possible explanations were that he didn't

4    have sufficient air above the sample; the volume, containers

5    were too full and therefore didn't get enough deformation

6    perhaps.  Perhaps there was foam that would lead to high her

7    viscosity values.  I don't know.  Those are two possible

8    explanations.

9    Q.    Finally, you have seen Dr. Lochhead's viscosity test.

10   Have you seen Dr. Lochhead's viscosity testing on Nasacort

11   AQ and Barr's ANDA product?

12   A.    Yes, I have.

13            MS. RURKA:  Could you please pull up Plaintiffs'

14   Demonstrative 65?

15   BY MS. RURKA:

16   Q.    Do you know how much of a difference between shear

17   viscosity numbers for Nasacort AQ and Barr's ANDA product?

18   Do you know what the percentage difference is between the

19   two?

20   A.    So the average here is around 65.  The average here is

21   around 100.  And so these, these numbers here on average

22   appear to be about 50 percent larger than the shear

23   viscosity of Nasacort AQ.

24   Q.    Could a difference like this make a difference in how

25   the product perform?

Klingenberg - cross

1    A.    It could, I suppose.

2    Q.    Have you seen any testing in this proceeding on Barr's

3    ANDA product that showed how this difference would affect

4    whether the product hits the frontal sinus?

5    A.    No.

6              MS. RURKA:  I have no further questions.

7              THE COURT:  All right.  Counsel.

8              Mr. Berghoff.  You may cross-examine.

9                      CROSS-EXAMINATION

10   BY MR. BERGHOFF:

11   Q.    Good morning, Dr. Klingenberg.  I'm Paul Berghoff.

12   A.    Nice to meet you.

13   Q.    Nice to meet you as well.  I'll ask you some questions

14   about your testimony.  And perhaps about your expert reports

15   that you filed in this case.

16   A.    Okay.

17   Q.    Now, you testified a bit this morning about some

18   viscosity testing done by Aventis, not by Dr. Lochhead but

19   by Aventis on Nasacort AQ.  Do you recall your testimony?

20   A.    Yes.

21   Q.    And you're aware that that testimony was done using a

22   Brookfield viscometer at a rotation speed of 6 RPM?

23              THE COURT:  Testing was done.

24              MR. BERGHOFF:  The testing was done.  I must

25   have misspoke.  That's what I meant to say.

Klingenberg - cross

```
1              THE COURT:  Okay.

2    BY MR. BERGHOFF:

3    Q.    The Brookfield testing was done at a spindle speed of

4    6 RPM?

5    A.    Yes.

6    Q.    And the patent specifies that the testing speeds for

7    both setting and for shear viscosity should be done at

8    30 RPM.  Is that correct?

9    A.    That's correct.

10   Q.    Now, you were here when Dr. Prud'homme testified

11   yesterday?

12   A.    Yes.

13   Q.    And do you recall or understand that Dr. Prud'homme

14   testified that Brookfield, it has been called tabletop

15   testing, is not the appropriate way to measure the recovery

16   of the sheared Barr ANDA product or Nasacort with respect to

17   its deposited form in the nose?

18   A.    Yes, I heard that testimony.

19   Q.    And that was just my question.

20              And I get the impression from your testimony

21   this morning that you believe that the so-called tabletop

22   method, just seeing if the material sitting in a beaker

23   recovers and how fast it recovers its viscosity is the

24   appropriate test?

25   A.    I believe with current technology, that is the only
```

Klingenberg - cross

1    choice we have to try to characterize the recovery.

2    Q.    And you are testifying here on behalf of the defendant

3    Barr?

4    A.    That's correct.

5    Q.    And so it goes without saying that you had full access

6    to samples of Barr's ANDA product for testing?

7    A.    (Shrugs shoulders.)

8    Q.    You understand all you had to do was ask,

9    Dr. Klingenberg, and they would give you samples of their

10   product?

11   A.    I suppose that is true.  I don't know.

12   Q.    And yet, believing that this tabletop methodology is

13   the best way to determine recovery of viscosity, you never

14   did that test on Barr's ANDA product, did you?

15   A.    I did not, but the compositions are very similar so I

16   expect to see the same recovery for the Barr's product.

17   Q.    But the best proof of the pudding would have been

18   actually doing the test on Barr's ANDA product, would it

19   not?

20   A.    Yes, I wouldn't expect anything different.

21   Q.    Now, you testified about the Hydan report.  And we've

22   heard a bit about that in court from several witnesses?

23   A.    Uh-huh.

24   Q.    And you understand that that was a report prepared for

25   Agis, the developer of Barr's product?

Klingenberg - cross

1    A.    Yes.

2              MR. BERGHOFF:  Could we put up on the screen,

3    DTX-76?

4              And I believe, I believe that is in your binder,

5    Dr. Klingenberg, but if not, I'll try and get you a copy.

6              And let's go to the second page.

7              Do you see the second, the second paragraph --

8    and perhaps we could blow that up -- Controlled Stress

9    Rheometer, Viscosity Recovery, (Figure 2).

10   BY MR. HURST:

11   Q.    Do you recognize that this Figure 2 is the same figure

12   from the Hydan Report that you were testifying to  this

13   morning?

14   A.    Yes.

15             MR. BERGHOFF:  And let's just see what the Hydan

16   report says about the recovery of viscosity.  Could we

17   highlight the sentence, third sentence that says the graph

18   shows that?  A little further up.  We're getting there.

19   Okay.  Thank you, Eric.

20   BY MR. BERGHOFF:

21   Q.    I'm correct, am I not, that the Hydan report states

22   that the graph -- refers to figure 2 -- shows that the

23   viscosity recovers almost immediately to a constant

24   viscosity in samples AZ2A, AZ3A and AZ4A.  Do you see that?

25   A.    I do see that.

Klingenberg - cross

1    Q.    And sample AZ3A, could you confirm for me, that that

2    is in fact Nasacort AQ?

3    A.    I believe that is Nasacort AQ.

4    Q.    So the contemporaneous evaluation in the Hydan report,

5    this report for Agis, was that viscosity of Nasacort AQ

6    recovers almost immediately to a constant viscosity.

7    Correct?

8    A.    I agree that the plot shows it's almost constant but I

9    don't think it is the setting viscosity that it's recovering

10   to and it's not recovery, it just has increased only so much

11   during that period.

12   Q.    So you disagree with Dr. Prud'homme's evaluation and

13   with this statement in the Hydan report?

14   A.    To the extent that this constant viscosity is the

15   setting viscosity, yes, I disagree with the statement.

16   Q.    Let's talk about your testing now, testing that you

17   actually did.  And all of that testing, as I understood it,

18   was on Flonase?

19   A.    That's correct.

20             MR. BERGHOFF:  May I approach, Your Honor?

21             THE COURT:  Yes, you may.

22   BY MR. BERGHOFF:

23   Q.    I'm going to hand you, Dr. Klingenberg, what we have

24   marked as Plaintiffs' Trial Exhibit 1057.

25             (Exhibit passed forward.)

Klingenberg - cross

1    Q.    Do you recognize this document, Dr. Klingenberg?

2    A.    Yes.

3    Q.    And could you tell us what it is?

4    A.    So counsel contacted me to see if I would be willing

5    to act as a consultant expert witness in this case.  And I

6    prepared this document, trying to prove I could measure the

7    viscosities in question in this patent so that they would

8    hire me, basically.

9    Q.    And it worked.

10   A.    Yes.

11   Q.    They did hire you.

12   A.    Be careful what you wish for.

13   Q.    Truer words were never said.

14            What is the date of this document,

15   Dr. Klingenberg?

16   A.    It says November 28th, 2007.

17   Q.    And so at this point, you hadn't done any testing on

18   viscosity of any samples for this case.

19   A.    That's correct.

20   Q.    I read through this document, and tell me if my

21   characterization is fair or not.  That this is a description

22   at least in part of the protocol that you intended to use

23   should you be used to test materials for this case?

24   A.    Yes, I would say that in this document, I outline some

25   shortcomings in the description of the patent and this is

1    how I would proceed to overcome those deficiencies in the

2    description of the patent to measure the viscosity in

3    question.

4                 MR. BERGHOFF:  Let's go to the second page.

5                 And I don't think we need to highlight anything.

6    BY MR. BERGHOFF:

7    Q.    This refers to, in your document, the protocol using a

8    Brookfield viscometer?

9    A.    Yes.

10   Q.    And then we have a section immediately beneath it that

11   discusses the protocol for measuring the setting viscosity

12   using the Brookfield viscometer.  Is that correct?

13   A.    Uh-huh.

14   Q.    And then if we turn the page, so now page three of

15   this exhibit, we get to the section on how to measure shear

16   viscosity using the Brookfield viscometer?

17   A.    That's correct.

18                 MR. BERGHOFF:  And if we could pull up the

19   section, Eric -- yes, that's fine.  And starting with the

20   second paragraph.

21   BY MR. BERGHOFF:

22   Q.    This document describes a method for determining the

23   shear viscosity as follows:

24                 Am I correct so far, Dr. Klingenberg?

25   A.    Yes, it's almost what the phrase is.

Klingenberg - cross

1    Q.    I think I left and "as" out just for grammar.  And

2    there are three steps that follow.  Is that correct?

3    A.    That's correct.

4    Q.    And the first step is the shaking step on the Burrell

5    wrist action shaker?

6    A.    Correct.

7    Q.    And you propose shaking it as full speed for

8    5 minutes?

9    A.    That's correct.

10   Q.    And the second step is to immediately transfer a

11   sufficient amount of this material.  Is that the material

12   you just shook?

13   A.    That's correct.

14   Q.    To immediately transfer a sufficient amount of this

15   material to the container described above for the viscosity

16   measurement?

17             And maybe you can save us some time.  What is

18   the container described above in the document?

19   A.    That's a 500 milliliter beaker or, rather, an 600

20   milliliter low foam beaker.

21   Q.    You called it a 500 milliliter beaker but it's really

22   600?

23   A.    That's correct.

24   Q.    Fair enough.  And then the third step in your stated

25   protocol here is to measure the viscosity using the

Klingenberg - cross

1    Brookfield digital viscometer using a rotation speed of

2    30 RPM.  Is that a correct reading and understanding of the

3    third step?

4    A.    Yes.

5    Q.    And you will allow the spindle to rotate for

6    30 seconds before recording the viscosity?  Again, is that a

7    correct understanding?

8    A.    Yes.

9              MR. BERGHOFF:  And then the last sentence, if we

10   could highlight that.

11   BY MR. BERGHOFF:

12   Q.    It says:  Following Kim -- and then there are two

13   citations -- this viscosity is the shear viscosity.

14              That's what you stated in this document;

15   correct?

16   A.    Correct.

17   Q.    And without going to the footnotes in the back, the

18   "Kim" you are referring to are the two patents in suit?

19   A.    That's correct.

20   Q.    So this states that these, this protocol is going to

21   be the stated Kim shear viscosity protocol from the patents?

22   A.    I think the next paragraph explains that you need to

23   do some work to figure out what volume to put in the Burrell

24   wrist action shaker step.

25   Q.    Let's turn to your work.  That's a good segue.

Klingenberg - cross

```
 1              I believe you have Plaintiffs' Trial Exhibit 447

 2    in your book, or a copy of it?  It's your handwritten notes

 3    reflecting your work.

 4    A.    I'm sorry.  What was the number again?

 5    Q.    My apologies.  I will approach.

 6    A.    It might be here.

 7    Q.    It's easier for me to just hand it to you.  I was

 8    wrong in assuming that you had it.

 9              Now, you have before you Plaintiffs' Trial

10    Exhibit 447.

11              Could you confirm for us what this is?

12    A.    Yes.  This is a photocopy of my lab notes from this

13    project.

14    Q.    Was this actually recorded in a laboratory notebook,

15    Dr. Klingenberg?

16    A.    This was recorded on a pad of paper.

17    Q.    I believe in your testimony this morning you referred

18    to recording your test results in a laboratory notebook?

19    A.    It's a pad of paper, yes.

20    Q.    You misspoke this morning?

21    A.    Yes, I suppose so.

22    Q.    And, indeed, you instruct your students to always

23    record their experimental results in laboratory notebooks,

24    don't you?

25    A.    I wouldn't say I instruct them to always record in a
```

Klingenberg - cross

1    laboratory notebook.  But I do encourage them to do that and

2    I tell them if they are going to go out in industry, this is

3    important for them.  But this has worked fine for me until

4    this case.

5    Q.    So it is the best practice to record in a laboratory

6    notebook your test results?

7    A.    It certainly can't hurt.

8    Q.    And this is your handwriting throughout on this

9    document?

10   A.    No.  I was taking this opportunity to train a graduate

11   student in measuring viscosities.  And he actually wrote a

12   few lines in here, in this document.

13   Q.    There is a substantial portion of the document that is

14   in your handwriting?

15   A.    Yes.

16   Q.    Please, if significant, feel free to point out where

17   it's not in your handwriting.  I am not trying to confuse

18   that issue.

19              Let's look on the first page.  There is

20   reference to two dates there, December 10 and December 11.

21   That is of last year, I assume?

22   A.    That's correct.

23   Q.    And am I right that there is some reference to doing

24   some setting viscosity measurements on this first page?

25   A.    Yes.  I would view the first several pages of this as

Klingenberg - cross

1     doing the exploratory work to figure out how to conduct the

2     setting and the shear viscosity measurements.

3     Q.     Let's see what you did.  The first page is setting

4     viscosity?

5     A.     Yes.

6     Q.     Let's go to the second page.  The top two-thirds of

7     this page is still setting viscosity measurements?

8     A.     They are viscosity measurements, yes.

9     Q.     Well, let me -- let's blow up the bottom third.  Is

10     that the first, from the word shear viscosity down, is that

11     the first shear viscosity test you conducted, Dr.

12     Klingenberg, in this case?

13     A.     Yes, that is the first failed attempt, first attempt,

14     the first failed attempt at measuring shear viscosity.

15     Q.     And you shook that sample on a Burrell wrist-action

16     shaker for five minutes at full speed?

17     A.     That's correct.

18     Q.     You measured its viscosity using a Brookfield

19     Viscometer with a spindle speed of 30 rpm?

20     A.     Yes.  Technically, that's not Flonase anymore.  That's

21     Flonase plus air measuring.

22     Q.     The spindle rotated for 30 seconds?

23     A.     That's correct.

24     Q.     And the viscosity measurement you got was 366

25     centipoise?

1    A.    That's the correct viscosity of Flonase plus air, yes.

2    Q.    And you are aware that Dr. Lockhead has measured the

3    shear viscosity of Flonase in this case?

4    A.    Yes.

5    Q.    You have reviewed his expert report that reports his

6    results?

7    A.    Yes.

8    Q.    And he reports results for the shear viscosity of

9    Flonase between 307 and 375 centipoise?

10    A.    That sounds accurate.

11    Q.    And so this viscosity, shear viscosity measurement

12    that you obtained for Flonase is right in the range that Dr.

13    Lockhead found?

14    A.    This is viscosity for foam Flonase.  This is Flonase

15    plus air.

16    Q.    And at the time you were doing this testing for Barr,

17    you were aware that the range for shear viscosity stated in

18    the patents in suit was 50 to 200 centipoise.  Correct?

19    A.    Yes.

20    Q.    Let's go onto the next page, Dr. Klingenberg, of this

21    exhibit, which is PTX-447.  I need to be on Page 3.  Yes.

22          We are on a different day now.  This is now

23    December 12th of last year?

24    A.    Yes.

25    Q.    And we have a report here of three setting viscosity

Klingenberg - cross

1    measurements on this page?

2    A.    On this page, we have -- no, that's not accurate.

3    Q.    Let's go through them.

4    A.    Okay.

5    Q.    Let's just pull up, if we could, Eric, the first box

6    down to that first measurement there.

7          You emptied 37 bottles, this is of Flonase?

8    A.    That's correct.

9    Q.    Into a 500-milliliter flask.  There was some foam on

10   the top, you placed a stopper, no air, shook it for five

11   minutes in a Burrell wrist-action shaker?

12   A.    Correct.

13   Q.    Was that at full speed?

14   A.    Yes.

15   Q.    You transferred it to a 500-millileter beaker.

16   Correct?

17   A.    Yeah.

18   Q.    And then you measured the viscosity according to the

19   protocol in the patent, Brookfield Viscometer, spindle

20   speed.  Correct?

21   A.    We moved the spindle speed, at 36.9 at 30 seconds.

22   And 36.5 at 60 seconds.

23   Q.    You recorded a viscosity of 369 centipoise?

24   A.    That's correct.

25   Q.    And that's within the range that Dr. Lockhead found

Klingenberg - cross

1     for this same material, Flonase?

2     A.     I believe you started this by saying this was the

3     setting viscosity.

4     Q.     Then I misspoke.  This is the shear viscosity?

5     A.     Right, this is the exploratory work to try to figure

6     out how to measure shear viscosity.

7     Q.     This is shear viscosity because you shook it on the

8     Burrell wrist-action shaker?

9     A.     I would say I am still trying to figure out how to

10    perform the experiments described in the patent at this

11    point.

12    Q.     And the result you got for shear viscosity here, 369

13    centipoise, is within the range that Dr. Lockhead found for

14    Flonase.  Correct?

15    A.     Except that I wouldn't call this the shear viscosity

16    as defined in the patent.  This is a viscosity measurement.

17    Q.     And it's above the 200 top limit of the range

18    described in the patent for shear viscosity?

19    A.     Yes.  This viscosity, which is not shear viscosity, is

20    above the 200-centipoise limit.

21    Q.     Let's go to the second experiment reported on this

22    page this says you shake another five minutes in flask?

23    A.     Yes.

24    Q.     Am I correct in understanding that now you have taken

25    the same sample that you shook for five minutes at full

Klingenberg - cross

```
 1    speed on a Burrell wrist-action shaker.  And you now shake

 2    it another five minutes on a Burrell wrist-action shaker?

 3    A.    That's correct.  Trying to figure out -- trying to

 4    understand how this material behaves, yes.

 5    Q.    So now we have a total of ten minutes of shaking of

 6    this sample?

 7    A.    That's correct.

 8    Q.    And the viscosity, as you recorded it, using the

 9    protocol in the patent, Brookfield Viscometer, 30 rpm, 30

10    seconds, is 30031 centipoise.  Correct?

11    A.    I would disagree that -- I am still trying to figure

12    out how to carry out the protocol at this point.

13    Q.    In fact, this isn't the protocol in the patent because

14    you have shaken the sample for ten minutes?

15    A.    Yeah.  As I have said, this is exploratory work,

16    trying to understand the sample.  This is not attempting to

17    follow the protocol at this point.  I am trying to figure

18    out how this material behaves.

19    Q.    Let's look at the next experiment on this page.  I

20    believe it's at the bottom now.  It's the third measurement

21    you have taken on this day.

22          You shake the flask for another 15 minutes.  So

23    am I correct that we are now up to 15 minutes of shaking for

24    this sample on a Burrell wrist-action shaker at full speed?

25    A.    This is another five minutes, so a total of 15, yes.
```

Klingenberg - cross

1    For this exploratory part of the project, yes.

2    Q.    Thank you for correcting me.

3          And the viscosity of this sample was 280

4    centipoise?

5    A.    That's correct.

6    Q.    And that's above the patent range stated of 50 to 200

7    centipoise.  Correct?

8    A.    That number is above 200, I agree.

9    Q.    And let's turn to the next page, and highlight the top

10   third, if we could.  Am I right in assuming that this is the

11   fourth experiment on the day that was recorded, on the last

12   page, December 12.

13   A.    Yes.

14   Q.    And you shake again the same flask, if I understand

15   your notations.  But you will correct me if I am wrong, you

16   shake the same flask again for another five minutes.  So we

17   are now up to a total of 20 minutes at full speed on a

18   Burrell wrist-action shaker.  And the viscosity you record

19   is 273 centipoise.  Am I correct?

20   A.    That's correct, yes.

21   Q.    And that, even with 20 minutes of shaking on the

22   Burrell wrist-action shaker at full speed is still well

23   above the patent range of 50 to 200.  Correct?

24   A.    I am sorry, I didn't hear the question.

25   Q.    I didn't add the "correct" at the end.

Klingenberg - cross

1    A.    Yes.  Again, I am is still exploring how to fill in

2    the blanks in the patent.

3    Q.    Dr. Klingenberg, your counsel will come back on

4    redirect, I am sure, on this point.

5              Now, starting at the bottom two-thirds of this

6    page, on December 14 -- I don't think we need it blown up --

7    but am I correct that you start a series of what I will call

8    impeller tests?

9    A.    Yes.

10   Q.    And what is an impeller?  What were you doing here?

11   A.    So, again, I am trying to figure out how this material

12   behaves.  So I am having trouble shaking the material

13   without getting foam.  So I am trying to see if I can deform

14   the material some other way.  I am trying myself.  I am not

15   trying to follow the protocol.  I am trying to fill in the

16   blanks in the protocol.

17             I think you asked what is an impeller.  That is

18   just a long shaft with basically a propeller-looking thing

19   on the bottom.

20             You connect that to a motor.  And you can stir

21   the sample, just a stirring device.

22   Q.    And that -- I think you already answered this, but I

23   just want to be sure -- use of an impeller to stir the

24   material before testing its viscosity is not what's

25   contemplated by the patents in suit?

Klingenberg - cross

1    A.    Yes.  Again, I am trying to learn about the material

2    at this point.

3    Q.    And your goal with this impeller testing was to try

4    and determine what should be expected out of the shaker, the

5    Burrell wrist-action shaker, because so far you haven't been

6    able to obtain a sample that you could use.  Is that

7    correct?

8    A.    Could you please say that again?

9    Q.    I will be happy to.  Your goal, Dr. Klingenberg, with

10   the impeller testing, was to try and determine what should

11   be expected out of the shaker, because so far you hadn't

12   been able to obtain a sample that you could use?

13   A.    I think that is fairly accurate, yes.  I am trying to

14   figure out if it's even possible to shear this material

15   without producing foam.

16   Q.    And you couldn't use any of the results you had so

17   far, Dr. Klingenberg, because they were all above the patent

18   range of 50 to 200.  Correct?

19   A.    Well, I know for a fact that the volume of air space

20   above the sample in an Erlenmyer flask, when you shake it,

21   is going to dramatically affect how much deformation the

22   material gets.  And so I know that I can vary the amount of

23   deformation in the material by changing that volume.  What I

24   don't know is can I do it without foam.

25   Q.    Let's look at, let's have you look at Page, at the

1    page from December 18 in your handwritten lab notes here.

2    That's on Page 6.

3                 It looks like the results from that day run on

4    for about four or five pages in this exhibit.  Is that

5    correct?

6    A.    Yes, that sounds about right.

7    Q.    And is it fair to say you were varying the amount of

8    material in the container you were shaking, and then

9    measuring the shear viscosity afterwards, on this day's

10   work?

11   A.    That's correct.

12   Q.    Let's put up a demonstrative exhibit.  I believe it's

13   KG-1.

14                 This is, just for simplistic purposes and speed

15   of cross-examination, rather than walking you through each

16   one of these, I would like you to confirm for me, or point

17   out where there is a problem, that this graph accurately

18   summarizes the shear viscosity numbers that you measured on

19   December 18.

20   A.    Again, I would not call these shear viscosity

21   measurements.  I would call these viscosity measurements,

22   mainly because, for example, as you go from 232 to 206, et

23   cetera, that's the same sample that's being shaken

24   approximate multiple times.  So this is not the shear

25   viscosity.

Klingenberg - cross

```
 1              THE COURT:  We are going need to clear counsel
 2    table at this point.  We will resume your testimony in a
 3    bit.
 4              (Recess taken.)
 5              THE COURT:  Please be seated.
 6              All right.  We'll continue.  Doctor, wherever
 7    you are.
 8              I apologize we had to clear the courtroom but
 9    apparently we needed to seal that proceeding.
10              Okay.  Mr. Berghoff.
11              MR. BERGHOFF:  Thank you, Your Honor.
12              Let's put up Demonstrative Exhibit KG-1 again.
13    BY MR. BERGHOFF:
14    Q.    And just to reorient ourselves, Dr. Klingenberg, we're
15    speaking about your testing reflected in PTX-447 on
16    December 18th.  It seems to run from Pages 6 to 10.
17              And does our demonstrative exhibit that we've
18    put up accurately reflect the viscosity values that you
19    obtained on this day with different percentage capacities of
20    material in the flask you were shaking?
21    A.    Yes.  These are viscosity measurements of the sample I
22    shook, different volumes in the container.  That's true.
23    Q.    And just so the record is clear, when the flask was
24    about 100 percent full, you got a reading of 268 centipoise.
25    Correct?
```

1    A.    Yes.

2    Q.    At 95 percent full, you got a reading of 232

3    centipoise.  Correct?

4    A.    That is correct.

5    Q.    At 90 percent capacity, you got a reading of 206

6    centipoise?

7    A.    That is correct.

8    Q.    At 85 percent, now for the first time you are under

9    200 centipoise at 191 centipoise?

10    A.    That is correct.

11    Q.    And at 80 percent, you recorded a measurement on this

12    date in your lab notes of 188 centipoise?

13    A.    That is correct.

14    Q.    And just so we're clear on the methodology, the first

15    sample at 100 percent was shaken for a total of 5 minutes?

16    A.    That's correct.

17    Q.    The 95 percent sample was shaken for a total of 10

18    minutes?

19    A.    That's correct.

20    Q.    Fifteen minutes for the 90 percent sample?

21    A.    My math has just left me but, yes, a five-minute

22    progression.  Sure.

23    Q.    15 for 90 percent, 20 for 85 percent, 25 total minutes

24    on the Burrell wrist action lake for the 80 percent sample

25    in this experiment.

Klingenberg - cross

1    A.    In this exploratory experiment, yes.

2    Q.    And based on this work on December 18th,

3    Dr. Klingenberg, you decided that the 80 percent full

4    method, if I can refer to it as that, was the one that you

5    were going to use?

6    A.    I disagree with that.  You go to the next -- to

7    continue in going through the notebook.

8    Q.    So you disagree.  That's fine.

9    A.    Yes.

10    Q.    Thank you.  The results that you reported in your

11    expert report and testifying about this morning were based

12    on shaking for shear viscosity, were based on shaking on a

13    80 percent full Erlenmeyer flask?

14    A.    That's correct, shaking 80 percent full.

15    Q.    And so that, that is the capacity of the flask that

16    you used for the tests that you reported in your expert

17    report and here in court and wanted the Court to rely on?

18    A.    Eighty percent full, yes, for shear viscosity.

19    Q.    Now, did you ever test the shear viscosity of Nasacort

20    AQ?

21    A.    No, I did not.

22    Q.    You know that the Kim patents sets out the exact

23    formulation for Nasacort AQ, do you not?

24    A.    I do.

25    Q.    And you also recognize that the Kim patents, patents

Klingenberg - redirect

1    in suit, state that the recommended shear viscosity for the

2    preferred compounds, compositions in the patent is about 50

3    to about 200 centipoise?

4    A.    Yes.

5    Q.    And so you agree that testing Nasacort AQ would have

6    provided a good control to be sure that your method, your

7    80 percent full method actually gave the results stated in

8    the patent, wouldn't it have?

9    A.    I suppose, yes, that would -- that could have been

10   done.  Yes.

11   Q.    So you could have tested Nasacort AQ by exactly the

12   same method that you used to produce the test results that

13   you reported here in court this morning but you did not?

14   A.    I did not measure the shear viscosity of Nasacort AQ.

15   Q.    And you know that all you had to do was simply ask

16   counsel for Barr for samples of Nasacort AQ and they would

17   have given them to you?

18   A.    Sure.  I don't think that was necessary here.

19               MR. BERGHOFF:  No further questions.

20               THE COURT:  All right Mr. Berghoff.

21               Redirect.

22               MS. RURKA:  Could you please pull up DX-23 at

23   Page 97.

24                    REDIRECT EXAMINATION

25   BY MS. RURKA:

Klingenberg - redirect

1    Q.    Dr. Klingenberg, this is the lab notebook we discussed

2    earlier and you were asked about on cross-examination?

3    A.    That's correct.

4    Q.    You were asked about the testing of the recovery of

5    Nasacort AQ over five days -- Correct? -- on

6    cross-examination.

7    A.    That is correct.

8    Q.    And I think counsel asked you to confirm that this

9    testing was done at six RPMs rather than 30 RPMs?

10   A.    That is correct.

11   Q.    Would that make any difference to your analysis of

12   whether or not this shows that Nasacort AQ takes five days,

13   at least five days to recover its setting viscosity?

14   A.    No, I think that the recovery time to get to the

15   setting viscosity will be largely independent of the

16   rotation rate that you use in this viscometer.

17   Q.    I'm also going to put up on the Elmo, this is

18   Plaintiffs' Trial Exhibit 1057 which we just looked at

19   earlier?

20   A.    Yes.

21   Q.    And when you performed or when you created this

22   protocol, you did not know, you had not conducted any

23   viscosity testing on Flonase.   Correct?

24   A.    I had not conducted any testing on any nasal

25   formulation.

Klingenberg - redirect

1    Q.    Did you know how to conduct the shear viscosity

2    measurements when you created this protocol?

3    A.    No, I didn't.  It wasn't described in the patents.

4    Q.    Is there anywhere in the protocol that tells you that?

5    A.    Excuse me?

6    Q.    Is there any protocol that says that you didn't know

7    how to conduct the shear viscosity?

8    A.    Why, right here in the protocol, item three, it says

9    it's not clear which Burrell wrist action shaker is

10   employed, which position on the shaker, what container

11   volume should be, how full the container is when it's

12   shaken.  None of this was specified in the patent so I had

13   to do exploratory experiments trying to figure that out.

14   Q.    What did you mean by what container volume is

15   employed?

16   A.    It wasn't clear what container or what volume

17   container, should it be a beaker, should it be an Erlenmeyer

18   flask, what it should be and what the volume of that should

19   be or how full that thing should be, full of material.

20   Q.    Okay.  And that is the last part, how full the

21   container is when shaken?

22   A.    That's right.

23              MS. RURKA:  Would you please pull up Plaintiffs'

24   Exhibit 447?

25   BY MS. RURKA:

Klingenberg - redirect

1    Q.    And I think counsel asked you on cross-examination

2    about this page of your lab notes.  Is that correct?

3    A.    That's correct.

4              MS. RURKA:  And the bottom measurement for shear

5    viscosity, could you pull that up?

6    BY MS. RURKA:

7    Q.    I think you testified that that matches, the 366

8    centipoise you measured when you first did -- you did your

9    first measurement for shear viscosity matched up with

10   Dr. Lochhead's results on Flonase?

11   A.    That is no longer Flonase at that point.  But ...

12   Q.    What is it?

13   A.    It's Flonase plus air, foam.

14   Q.    Is that an accurate shear viscosity measurement of

15   Flonase?

16   A.    No.

17   Q.    If you could pull to Page 3, please.

18              You were also asked about these experiments.

19   There is three here and there is one on the next page.  Were

20   these flasks full when you shook them?

21   A.    Yes.  They were full with the exception of the little

22   bit of foam that was at the top of the flask.

23   Q.    I believe you testified that these also matched up

24   with Dr. Lockhead's data.  Is that right?

25   A.    I believe these viscosities, which I would say are not

Klingenberg - redirect

1    shear viscosities, matched, were of similar magnitude to Dr.

2    Lockhead's.

3    Q.    Were these samples sufficiently deformed, in your

4    opinion?

5    A.    No.  I don't think this follows the protocol, what

6    there is of a protocol in the patent.  These are not

7    deformed significantly.

8    Q.    Actually, you were the one who originally said

9    deformed.  What did you mean by deformed?

10   A.    Deformed, I mean shaken, shared within the flask.

11   Q.    Is this like the ketchup example where if the bottle

12   is too full you can't get it shaken up enough?

13   A.    Yes, it is.  That's right.

14   Q.    And then if you could turn to Page 6, what were you

15   attempting to do with these experiments that you discussed

16   with counsel?

17   A.    I was attempting to determine how, for various

18   percentages of full, how did those different samples deform

19   if shaken and how much foam is created.  Are you creating

20   too much foam while you are trying to deform these samples?

21   Q.    So was this the actual shear viscosity measurements

22   you were taking here?

23   A.    No.  These are still exploratory measurements.  I am

24   still trying to figure out how this material behaves at this

25   point.

Boghigian - direct

1                    MS. RURKA:  Thank you.  Nothing further.

2                    THE COURT:  Thank you, Doctor.

3                    (Witness excused.)

4                    MR. HURST:  Our next witness, Your Honor, will

5      be Harry Boghigian, and Renee Sotos from our office is going

6      to handle the examination.

7                    THE COURT:  Okay.

8                    MS. SOTO:  Your Honor, we would like to call Mr.

9      Harry Boghigian.

10                   ... HARRY CHARLES BOGHIGIAN, having been duly

11     sworn as a witness, was examined and testified as.

12     follows ...

13                   THE WITNESS:  Your Honor.

14                   THE COURT:  Good morning.

15                   THE WITNESS:  Good morning.

16                   MS. SOTO:  May I approach, Your Honor?

17                   THE COURT:  You may.

18                        DIRECT EXAMINATION

19     BY MS. SOTO:

20     Q.   Good morning, Mr. Boghigian.

21     A.   Good morning.

22     Q.   Will you please state your full name for the record?

23     A.   My name is Harry Charles Boghigian.

24     Q.   Have you come to Court today to testify about your

25     opinion as to whether Nasacort AQ is a commercial success?

Boghigian - direct

1   A.    Yes.

2   Q.    What qualifies you to give an opinion on that issue in

3   this case today?

4   A.    Well, I spent over 35 years in the marketing and

5   commercialization of pharmaceutical products.  So I think I

6   am well-equipped to speak on the subject.

7   Q.    Can you briefly describe your experience in the

8   pharmaceutical industry?

9   A.    Certainly.  Be happy to.  I started my career with

10  Hoffman-La Roche as a sales representative in 1971, and had

11  the good fortune of receiving a number of promotions over

12  that period of time with increasing responsibilities, that

13  led to a number of senior as well as executive management

14  positions.

15         For example, I was appointed to head up all of

16  U.S. marketing for Hoffman-La Roche.  I had a portfolio of

17  products on an annual basis that generated 2.3 billion

18  dollars worth of sales in the United States.  I had a

19  promotional budget on an annual basis that exceeded 350

20  million dollars.  I had multiple people reporting to me,

21  multiple departments, I should say, reporting to me.

22         I had a staff of over 270 people.

23         And, in addition to that, I also was appointed

24  to work with the restructuring of the entire U.S.

25  organization.  We turned it into 20 decentralized business

Boghigian - direct

1    units, with profit-and-loss responsibilities, as well as

2    advertising and marketing responsibilities on a more

3    decentralized basis.

4          I was appointed senior vice president and

5    general manager for our Canadian operation for Roche Canada.

6    I had the responsibility for revitalizing that organization,

7    turning products around, launching additional new products.

8          My last position at Hoffman-La Roche was as

9    operations vice president, where I had responsibility with

10   one other colleague for the entire day-to-day operations,

11   profit-and-loss responsibility, and pretty much seeing the

12   continuous success of the organization.

13         Now, over that entire 30 years of experience

14   with Hoffman-La Roche, I had experiences and disciplines

15   that included licensing, strategic planning, portfolio

16   planning, developed a brand management plan, marketing

17   plans, co-promotion agreements, co-marketing agreements.

18         I really covered all of the facets and

19   parameters involved in the commercialization and marketing

20   of pharmaceutical products.

21   Q.   Okay.  How many pharmaceutical products did you market

22   and commercialize while you were at Hoffman-La Roche?

23   A.   I had experience with over 40 products during that

24   30-year stint.

25   Q.   Is Hoffman-La Roche considered a generic company?

Boghigian - direct

1    A.    No.   Hoffman-La Roche is one of the top ten research

2    and development companies, brand companies, in the world.

3    Q.    What did you do after you left Hoffman-La Roche?

4    A.    I left Hoffman-La Roche in June of 2001, and I started

5    in the fall of that year my own consulting company, called

6    Pharma Consultants, which exists today.

7             I consult with small- to medium-sized

8    pharmaceutical companies on strategic issues, developmental

9    issues, licensing issues, as well as health care agencies

10   that are looking to work with pharmaceutical companies.

11            In addition to that, in 2003, I started my own,

12   with two other colleagues, actually, research and

13   development company called PBN Pharma, which is

14   headquartered in Chicago.  We have currently 12 patents that

15   we have in different therapeutic areas.

16   Q.    Okay.  And have you been retained in other cases as an

17   expert witness on the issue of whether a pharmaceutical

18   product is a commercial success?

19   A.    Yes, I have.

20   Q.    About how many times?

21   A.    Seven or eight times.

22   Q.    Did you testify as to the issue of commercial success

23   in any of those cases?

24   A.    Yes, I believe three or four times.

25   Q.    Do you consider yourself an expert in the marketing

Boghigian - direct

1    and commercialization of pharmaceutical drug markets?

2    A.    Yes, I do.

3            MS. SOTOS:  Your Honor, at this time I would

4    like to offer Mr. Boghigian as an expert in pharmaceutical

5    sales and marketing.

6            MR. NOE:  No objections, Your Honor.

7            THE COURT:  Is it Mr. or Dr.?

8            MS. SOTOS:  Mr.

9            THE COURT:  It says Dr.  Mr.  Okay.  He is

10    accepted.

11    BY MS. SOTOS:

12    Q.    Mr. Boghigian, what is your understanding as to how to

13    evaluate the commercial success of a pharmaceutical product

14    in the context of nonobviousness?

15    A.    Well, it's my understanding when it comes to

16    commercial success that you need to determine if there is a

17    nexus between the sales and the prescriptions of the product

18    and the claimed patented invention.  If there is no nexus

19    between the sales and the patented invention and it's really

20    due to some other external stimuli or extraneous factors,

21    then, obviously, there is no nexus.

22    Q.    And what did you conclude with regard to Nasacort AQ?

23    A.    I determined that there was no nexus.

24    Q.    Before we discuss the details of your opinion, can we

25    summarize the types of documents that you reviewed in

Boghigian - direct

1    forming your opinion?

2    A.    Certainly.

3              I personally reviewed thousands of pages of

4    documents.  And they focus primarily on the

5    commercialization and marketing of the Nasacort franchise.

6    They were marketing plans, they were strategic plans, they

7    were market research documents.  They were budgets.

8              There was just a host of documents that focused

9    on the marketing and commercialization of Nasacort.

10   Q.    Okay.  Did you review the report of Aventis's expert,

11   Dr. Gregory Bell?

12   A.    Yes, I did.  In fact, my report is really a rebuttal

13   to Dr. Gregory Bell.

14   Q.    Let's now turn to your opinion about Nasacort AQ.  Can

15   you briefly summarize the reasons that you concluded that

16   Nasacort AQ sales are not due to the claimed invention?

17   A.    Yes.  In reviewing those numerous documents, it became

18   obvious that, first of all, there was a substantial

19   under-performance of Nasacort AQ versus the competition.  In

20   addition, it was very clear that the product was

21   undifferentiated, that Aventis was not able to differentiate

22   the product in the marketplace.

23             Also, that the sales were really due to

24   advertising and promotion and really due to the fact that

25   this was just triamcinolone acetonide.

Boghigian - direct

```
 1              Last but not least, there was no evidence that

 2     appeared to indicate that this product was profitable on a

 3     cumulative basis.

 4              Those were basically the four reasons that I

 5     found brought me to my conclusion.

 6     Q.    Let's first talk about the reason that Nasacort AQ

 7     under-performed compared to the competition.  Against what

 8     products did you compare the performance of Nasacort AQ?

 9     A.    Well, I looked at the entire intranasal steroid

10     market, the products in that particular class.  They were

11     the same products that Aventis looked at.  I focused in on

12     the products that were the dominant products, which again

13     were the products that Aventis focused on, which were

14     basically Flonase and Nasonex.

15     Q.    What measure of performance did you look at to compare

16     Nasacort AQ's performance to those?

17     A.    I focused primarily on prescriptions, on dollars, and

18     the market share of prescriptions and dollars in that

19     therapeutic area.

20     Q.    Why don't we first talk about prescriptions.  How did

21     Nasacort AQ compare to Flonase and Nasonex in terms of total

22     prescriptions?

23     A.    There was no question that Flonase and Nasonex were

24     dominant in the class, and that Nasacort AQ trailed in

25     comparison.  In fact, Flonase was, in several years, three
```

Boghigian - direct

1    prescriptions to every one of Nasacort AQ, and Nasonex had

2    very similar results of two to one.

3    Q.      Okay.  Did you prepare a chart showing this

4    prescriptions analysis that you did?

5    A.      Yes, I did.

6            MS. SOTOS:  Mr. Young, could you please put up

7    Demonstrative 74.

8    BY MS. SOTOS:

9    Q.      Mr. Boghigian, is this the chart you prepared?

10   A.      Yes, it is a chart of total prescriptions.

11   Q.      And can you please explain what each color represents?

12   A.      Certainly.  This again includes new and refills for

13   total prescriptions for each of the three products.  Flonase

14   in green, Nasacort AQ in the red and Nasonex in the yellow.

15   Q.      And how does this chart inform your view that the

16   claimed invention did not leave the Nasacort AQ

17   prescriptions?

18   A.      Well, I think it's pretty obvious.  You can see there

19   is significant growth.  You can see that Flonase had a very

20   steep incline, just continued to grow year after year after

21   year.  Nasonex was also introduced after Nasacort and you

22   can see in the yellow that it indeed paralleled Flonase 's

23   growth curve in terms of total prescriptions and both

24   products literally were dominant in the class and Nasacort

25   AQ ended up trailing considerably.  It launched in 1996 as

Boghigian - direct

1    you can see in the red.  It had a very short shallow growth

2    curve and then levelled off in 2002-2003 and then began to

3    decline.

4    Q.    All right.  You just mentioned that Nasacort AQ

5    launched in 1996, but your chart starts in 1994.  Can you

6    explain why you started in 1994?

7    A.    Well, the pharmaceutical industry, it's extremely

8    important to look at a product's introduction, the launch

9    phase.  It's important because in our industry, physicians

10   will relatively quickly establish a perception of a product

11   and a concept and they'll cement that perception of the

12   product.  So I like to look at the product to see exactly

13   what the adoption rate was, what the uptake was with

14   physicians and see how rapid and steep the growth curves

15   are.

16   Q.    Okay.  And so what product are we looking at from

17   1994?

18   A.    Well, in 1994, the data indicates that Flonase was

19   approved in December but for all practical purposes,

20   prescriptions were captured in 1995.  And you can see that

21   in their first year they exceed the 2 million total

22   prescriptions.

23   Q.    And you, as a pharmaceutical executive, that has been

24   in the industry for 35 years, how do you evaluate that

25   performance?

Boghigian - direct

1    A.    I think that is tremendous.  That is just a rocket

2    performance.  And that's the type of performance you want to

3    see when launch a product:  very steep growth curves, very

4    quick acceleration of a product.  It indicates great

5    satisfaction with physicians and certainly adoption and

6    uptake.

7    Q.    And how does Nasacort AQ compare?

8    A.    It trails.  You can see very significantly the product

9    was introduced in 1996, was a very shallow uptake, and then

10   quickly leveled off.  It was really, really flat.  It really

11   trails Flonase and Nasonex.

12   Q.    And did you look at the cumulative total prescriptions

13   of these products over the course of their lifecycles?

14   A.    Yes, I did.

15   Q.    Did you also prepare a chart with that information?

16   A.    Yes, I did.

17         MS. SOTOS:  Mr. Young, can you please put up

18   Demonstrative 73?

19   BY MS. SOTOS:

20   Q.    Mr. Boghigian, is this the chart that you prepared?

21   A.    Yes.

22   Q.    Okay.  And how does this chart inform your view that

23   Nasacort AQ prescriptions did not stem from the claimed

24   invention?

25   A.    I think it's pretty on use when you look at this.  You

Boghigian - direct

1    can see Flonase is 17.8 million prescriptions.  This is

2    cumulative from 1994-2007.  This is the time frame.  Those

3    three products were introduced into the market and actually

4    goes to July of 2007.  That's the date, the last month that

5    I had IMS prescription data for.  And you can see very

6    clearly Flonase accumulated over that period of time

7    dispensed a total of 117.8 million prescriptions, three to

8    one, four to one.  You can see with Nasonex again a very

9    similar performance, two to one in terms of prescriptions.

10   I mean it literally dwarves Nasacort AQ.

11   Q.    And you have been sitting in this courtroom from the

12   beginning of the trial.  Is that right?

13   A.    That's right.

14   Q.    And you heard some testimony that Nasacort AQ is

15   preferred two to one over Flonase?

16   A.    Well, that's what I heard.  And that was certainly

17   promotional messages that Aventis had that indicated that.

18   However, when you look at this, actually in prescriptions

19   it's really the reverse.  The opposite.  Flonase is really

20   preferred two or even three to one versus Nasacort.

21   Q.    Mr. Boghigian, why don't we turn to the dollar sales

22   comparison you did.  How did Nasacort AQ compare to Flonase

23   an Nasacort in that regard?

24   A.    It parallels the prescription data we just reviewed.

25   And then you will see very similar trends and patterns as it

Boghigian - direct

1    relates to dollar sales of Flonase, Nasonex and Nasacort AQ.

2    Q.    Did you prepare a chart comparing those trends and

3    patterns?

4    A.    Yes, I did.

5            MS. SOTOS:  Mr.  Young, can you please put up

6    Demonstrative Exhibit 75.

7    BY MS. SOTOS:

8    Q.    Mr. Boghigian, is this the chart that you prepared?

9    A.    Yes.

10    Q.    And how does this dollar sales data inform your view

11    that the Nasacort AQ sales are not tied to the claimed

12    invention?

13    A.    Well, again, you can see that the competitors grew

14    very, very quickly.  You can see from 1995 through the

15    period 2005 that there was significant growth with Flonase,

16    paralleled with Nasonex, and again Nasacort AQ is trailing

17    behind in terms of dollar sales.

18    Q.    And, again, you began this analysis in 1994 as well?

19    A.    Yes.  Again, it's important to look, especially in our

20    industry.  It's a high risk industry.  We are very

21    interested obviously to see how quickly we can capture

22    dollar sales to cover and recoup our cost of investment, our

23    cost of development.  We like to do that within the first

24    three-to-five years to break even so it's important to look

25    at dollar sales to see exactly what that trend and that

Boghigian - direct

1  pattern is going to be and hopefully continue to build on.

2  Q.    In looking at this chart, if you look at Flonase, it's

3  just going, it's rising up and up and up.  And then for 2005

4  to 2006, you see a decrease.  Do you, based on your years of

5  experience in the pharmaceutical industry, have an

6  understanding as to why that decrease occurred?

7  A.    Well, it's my understanding and recollection in 2005

8  the Flonase patent expired.  They stopped promotion of the

9  product; and I think that is why you see a big decline in

10 prescriptions in 2006.

11            MS. SOTOS:  And why don't we turn to the market

12 share comparison that you did.

13 BY MS. SOTOS:

14 Q.    Did you prepare a chart comparing the products market

15 share as well?

16 A.    Yes, I did.

17            MS. SOTOS:  Mr. Young, can you please put up --

18 I'm sorry.  Mr. Young, can you please put up Demonstrative

19 Number 71?

20 BY MS. SOTOS:

21 Q.    Is this a chart that you prepared, Mr. Boghigian?

22 A.    Yes.

23 Q.    And how did this market share data inform your view

24 that Nasacort AQ's prescriptions were not due to the claimed

25 invention?

Boghigian - direct

1    A.    Well, again, you can see the significant market share

2    achieved by Flonase, the type of curve that we ideally like

3    to see in the industry:  very steep.  And by 2005, it

4    captured 45 percent of the market.  Similarly, you see with

5    Nasonex a very similar curve.  And yet you see with Nasacort

6    AQ, we have a very shallow growth curve leveling off at

7    about 14, I think it's about 14 and-a-half percent market

8    share in 2006.

9    Q.    Okay.  And did you calculate or assess at all

10    generally what Nasacort AQ's market share was over the

11    course of this life-span?

12    A.    It averaged about 10 percent, 10-11 percent.  In 2005

13    actually, if you looked at the two dominant products,

14    Flonase and Nasonex, they actually had over 70 percent,

15    almost 76 percent of the total prescriptions that were

16    written on this particular class.  So there is no question

17    they were the two dominant products, the two that physicians

18    wrote the most for.

19    Q.    And how would you evaluate general 10-to-11 percent

20    range of prescription market share?

21    A.    Well, with the length of time that this product has

22    been on the market and the fact that triamcinolone has been

23    around, had been available as an intranasal corticosteroid,

24    I would classify this as a failure, extremely disappointing.

25    Q.    And did Nasacort AQ displace any of the products in

Boghigian - direct

1    the INS class?  And when I use the term INS class, just to

2    clarify for the record, it's intranasal corticosteroid?

3    A.    Yes.  If I recall correctly, Nasacort AQ really

4    displaced its precursor which was Nasacort aerosol.  The

5    inhaler form is what it really displaced.

6    Q.    When you say "precursor," do you mean a prior Aventis

7    product?

8    A.    That's correct.  Aventis had on the market, and

9    launched in 1991, Nasacort aerosol or inhaler and it's my

10   opinion that they displaced the inhaler form.

11   Q.    What again led you to make that conclusion?

12   A.    I looked at the market share data.  I looked at the

13   trends.  I looked at obviously the marketing plans and so

14   forth.  And it was pretty obvious that that is what

15   transpired.

16   Q.    And did you prepare a chart showing those market share

17   trends?

18   A.    Yes, I did.

19         MS. SOTOS:  Mr. Young, can you please put up

20   Demonstrative No. 8?

21   BY MS. SOTOS:

22   Q.    Mr. Boghigian, is this the chart that you prepared?

23   A.    Yes, this is the chart I prepared.

24   Q.    Is that -- what is the blue?

25   A.    The blue is the Nasacort inhaler, which is the aerosol

Boghigian - direct

1    form.

2    Q.    And is that the claimed invention in this case?

3    A.    I'm sorry.

4    Q.    Is that the claimed invention in this case?

5    A.    No, it's not.

6    Q.    And red, that is Nasacort AQ?

7    A.    That is correct.

8    Q.    And that is the claimed invention?

9    A.    Yes.

10    Q.    And what does this chart tell you about whether there

11    is a nexus between the Nasacort AQ sales and the patented

12    invention?

13    A.    It tells me there is really no nexus.  In fact, what

14    it really portrays, they're interchangeable to a great

15    extent.  I mean this is a relative -- the scale is only to

16    18 percent.  It pretty much shows that the inhaler form

17    Nasacort AQ peaked at about 16-percent market share in 1994,

18    only about two to three years after it was introduced and

19    then declined.  And from what you can see there, as the

20    aqueous form was introduced, it really captured a

21    significant share of the aerosol business as it declined.

22    And then it peaked at about 14 and-a-half percent market

23    share, never even meeting or exceeding the previous market

24    share of the aerosol form.

25    Q.    Okay.  And it looks from your chart that the Nasacort

Boghigian - direct

1    AQ begins to decline in 2004.  Do you have an opinion as to

2    why that occurred?

3    A.    Yes.  If you look at the environment at that time, the

4    FDA had mandated that by July of 2003, all aerosol forms

5    that had chlorofluorocarbons as the aerosol delivery system

6    had to be removed from the marketplace.  I think it was

7    referred to here earlier this week in the courtroom.

8          From the Aventis documents that I reviewed,

9    there was a strategy and a tactic to move that franchise to

10   the aqueous form.  And I believe what you are seeing from

11   2003 to 2004, that increase is the switching of the aerosol

12   business to aqueous business.

13         And then what happened is after all that

14   transpired and there was no more aerosol to transfer, what

15   you see happening is the continuation of the market

16   environment, the competitive products continuing to grow at

17   the expense of Nasacort AQ.  And that is why you see the

18   decline.

19   Q.    You mentioned some discussion about this switching

20   from the inhaler in the Aventis documents, and I'd like to

21   take a look at some of those documents.

22   A.    Certainly.

23         MS. SOTOS:  Mr. Young, would you please put up

24   Defendant's Exhibit 246?

25   BY MS. SOTOS:

Boghigian - direct

1    Q.    Okay.  Mr. Boghigian, do you recognize this document?

2    A.    Yes.

3    Q.    And what is this document?

4    A.    This is a document that was created for delivery to

5    pharmacists.  As you can see, it says "dear pharmacist" and

6    it identifies Nasacort nasal inhaler at the top and Nasacort

7    nasal spray, the AQ form.

8              And if you go down to the second paragraph where

9    it starts with:  If a patient presents a prescription for

10   Nasacort nasal inhaler (or asking for a refill ) on or after

11   July 24th, 2003, we ask that you assist the patient in the

12   following ways:

13             Inform the patient that Nasacort nasal inhaler

14   is no longer available.

15             Inform the patient of Nasacort AQ and the

16   potential for different insurance coverage.

17             What they're asking the pharmacist to do is

18   assist them in moving the franchise to move from the inhaler

19   form to the aqueous form.  And, frankly, it makes good

20   business sense.  Since you no longer can market the inhaler

21   form, it makes good business sense as a strategy to try to

22   move that franchise over to the aqueous form; and that's

23   what they did.

24             MS. SOTOS:  All right.  Why don't we look at

25   another document.  Mr. Young, can you please put up

Boghigian - direct

1    Defendant's Exhibit 247?

2    BY MS. SOTOS:

3    Q.    Mr. Boghigian, do you recognize this document?

4    A.    Yes.  This is another document that was created.  And

5    I believe this one was directed to physicians.  And you can

6    see right at the very, very top, it says:  Switch your

7    patients to Nasacort AQ -- which is the aqueous form.

8             And then further down, I think several

9    paragraphs down, it states:  All you have to do is switch

10   them to Nasacort AQ.  It contains the same active medication

11   as Nasacort nasal inhaler, in an aqueous formulation.  And

12   it provides the same fast, effective relieve from seasonal,

13   and perennial allergies.

14            So, again, this was a communication, a strategy

15   to assist physicians in transferring the business.

16   Q.    Okay.  We just looked at documents directed to

17   pharmacists and physicians.  Were there any documents

18   directed from Aventis to consumers about switching from the

19   inhaler to the AQ?

20   A.    Yes, there were.

21            MS. SOTOS:  Mr. Young, can you put up DX-328,

22   please?

23   BY MS. SOTOS:

24   Q.    Do you recognize this document, Mr. Boghigian?

25   A.    Yes.

Boghigian - direct

1    Q.    What is this document?

2    A.    Well, this was a document that was designed to

3    incentivize consumers or patients of record actually who

4    were on Nasacort inhaler.  And they were going to

5    incentivize them by encouraging them to go and switch their

6    prescription to the aqueous.  As you can see, it says in the

7    bottom left, which is blown up here on the screen:

8            Get the same relief from Nasacort AQ.

9            If you having using Nasacort nasal inhaler, you

10   can get the same relief with Nasacort AQ.  It contains the

11   same active medication, triamcinolone acetonide, the same

12   dose per spray, and the same once-a-day dosing.  The only

13   difference is the medication is delivered by a water-based

14   formula instead of aerosol.

15           Again, save up to $15 worth of triamcinolone.

16           So again trying to incentivize the consumer or

17   the patient to request prescription for the AQ and they'll

18   discount it by $15.

19   Q.    And did you consider the Nasacort nasal inhalers'

20   market share in the INS market prior to its removal from the

21   market?

22   A.    Yes, I did.  I looked at the performance of the

23   aerosol as well.

24   Q.    Did you prepare a demonstrative showing that

25   comparison?

562

Boghigian - direct

1    A.    Yes, I did.

2    Q.    Why don't we take a look at that.

3          Mr. Young, can you put up Demonstrative No. 72.

4          Mr. Boghigian, is this the demonstrative that

5    you prepared?

6    A.    Yes, it is.

7    Q.    How does this support your conclusion that there is no

8    nexus between the claimed convention and the Nasacort AQ

9    sales?

10   A.    Basically, this is the positions for the different

11   time frames.  They are pretty much the same.  Nasacort

12   inhaler, which is in the left-hand graph, you can see is in

13   the dark blue, it's the time frame '92 that goes through

14   2005.  You can see that it was No. 3.

15         At that time, Beconase AQ and Vancenase AQ were

16   the two dominant products in the class.  They controlled

17   about 66 percent of the market.

18         So Nasacort AQ in positioning was No. 3.

19         If we move over to the slide we just saw

20   earlier, which was duplicated here, you can see again, with

21   Flonase and Nasonex entering into the market in '94 and '96,

22   they not only captured a significant share or greater share

23   of prescriptions, but they expanded the market as well.

24   There were many more prescriptions during this period of

25   time.  Flonase really drove that market, as even identified

Boghigian - direct

1    in the Aventis documents.

2            Again, Nasacort AQ is No. 3.  The positioning is

3    saying they are really interchangeable in terms of products.

4    Q.    Given your conclusion that Nasacort AQ cannibalized

5    the Nasacort nasal inhaler, in your view is there a nexus

6    between the Nasacort AQ sales and the claimed invention?

7    A.    No.

8    Q.    Let's move on.  You mentioned that you looked at

9    profitability.  Why was profitability a factor in your

10   analysis?

11   A.    Well, profitability is important.  As I mentioned

12   earlier, I mean, our industry is a very high-risk industry.

13   We have significant cost of capital.  We need to be able to

14   recoup our investments relatively quickly.  Three to five

15   years is kind of the break-even point we look for.

16           We need to cover the cost of failures.  Again,

17   as a high-risk industry, we have a lot of failures.  And the

18   cost, based on a number of sources, indicates that the cost

19   to bring a product to market now runs about 800 million to

20   1.7 billion dollars.

21           So as a result of that, there is significant

22   need to recoup that investment, to be able to support the

23   infrastructure of the organization, and to continue to

24   re-invest in additional new product innovations.

25   Q.    Is the timing of when the recoupment of the investment

Boghigian - direct

1    takes place important to you?

2    A.    Absolutely.  I mean, I think that's probably one of

3    the most important elements to look at.

4    Q.    And in your opinion, has Nasacort AQ been cumulatively

5    profitable?

6    A.    No, in my opinion, it has not been cumulatively

7    profitable.

8    Q.    Why did you conclude that it had not been profitable?

9    A.    Well, I looked at, there was one financial document

10   that showed some what was listed as product contribution.

11   It was in the fifth year after introduction of Nasacort AQ.

12   It was only, I believe, 18 million dollars, which a product

13   that's been on the market, being heavily invested in, for

14   five years, four or five years, with a reported product

15   contribution of 18 million dollars, in my opinion, indicates

16   that previous to that you have really been losing money.

17   Q.    And, Mr. Boghigian, I believe we have that document

18   here.

19              Mr. Young, can you please put up DX-102.  Is

20   this the document you were just referencing?

21   A.    Yes.  This document actually goes from the year 2000

22   in actual sales to 2006 in actual sales, and 2007 is a

23   budget number.  But this is the first four years of that

24   document.  You can see sales at the top, and these are

25   aerosol sales and inhaler sales, net sales.  You can see the

Boghigian - direct

1   reductions that were taken.  And then you can see the

2   marketing costs beginning in 2000 at 106 million dollars.

3   Then when you deduct the 106, the 152, and the 139, et

4   cetera, you can see the product contribution at the bottom.

5           Product contribution in our industry is

6   sometimes synonymous with profit, net profit.  Again, this

7   is before GS&A, before taxes, et cetera.

8   Q.    I think you pointed out that this data begins in the

9   year 2000, but Nasacort AQ launched in 1996?

10  A.    Exactly.  It launched in 1996, there would have been

11  marketing expenses, launch expenses, for not only 1996, the

12  year of introduction, but obviously for the subsequent

13  years.  Looking at this, since there were no other

14  documents, my conclusion is this product has not been

15  profitable on a cumulative basis.

16  Q.    Mr. Boghigian, it looks like the product contribution

17  number actually begins to increase.  Doesn't that mean that

18  Nasacort AQ starts to get profitable?

19  A.    Well, it does start to generate some profitability.

20  But there is also, as you can see in the marketing line, a

21  decrease in terms of expenditures.  You can see a leveling

22  off of the sales.  They are not growing to any significant

23  extent.

24          It is my feeling what management began to

25  realize at this point, after having a product on the market

Boghigian - direct

1    since 1996, and if you even go back to the aerosol in 1991,

2    that they weren't going to be able to drive this market

3    without expending additional money, and started to cut back

4    on the financial support resources for it.

5    Q.    Do you think there might have been anything else that

6    caused that increase as well?

7    A.    Well, it's also true, when you look at the pricing,

8    that, indeed, they were increasing price, also, which I

9    think contributed to the net sales line as well over this

10   period of time, actually increasing the price of the

11   product.

12   Q.    An increase in the price of the product and increase

13   in sales?

14   A.    Sales, absolutely.

15   Q.    You mentioned that another reason that you concluded

16   that Nasacort AQ is not a commercial success is that it was

17   undifferentiated.

18   A.    Correct.

19   Q.    Can you please explain for the Court what you mean by

20   the term undifferentiated?

21   A.    Undifferentiated in our industry means really the

22   products in that competitive search is very interchangeable.

23   It's almost like a "me, too" product.  There is nothing that

24   distinguishes the product and any of its attributes from any

25   of its competitive products.  There is no ability to

Boghigian - direct

1    differentiate, no ability to identify or distinguish any

2    characteristics.

3    Q.    Do pharmaceutical companies generally want to

4    differentiate their products?

5    A.    Certainly.  Every good product director, brand

6    manager, that is the first thing he looks for, is how can I

7    differentiate this product.  How can I identify a value

8    proposition?  In other words, what can I offer the physician

9    and consumer that's superior?  Whether it be clinical

10    outcome, safety, whatever.  How can I give them something to

11    help differentiate something from the competition.

12    Q.    And did Aventis differentiate Nasacort AQ?

13    A.    They tried.  I give them credit.  They had multiple

14    marketing messages that attempted to differentiate the

15    product from the competition.  In my opinion, I think they

16    failed in their attempt to do that.

17    Q.    Mr. Boghigian, you mentioned the term marketing

18    messages.  Can you just explain what that means?

19    A.    Well, in our industry, obviously, our marketing

20    people, brand managers, will identify messages that they

21    will communicate to physicians as part of their visitations

22    to physicians, as well as the same messages go into the

23    advertising piece, and if you are going direct to consumers

24    the same thing, so that you have continuity.  That the

25    personality of the product is the same.

Boghigian - direct

1          When I looked at the Aventis documents, they had

2   multiple messages.  And they kept changing those messages as

3   well.

4   Q.    Well, we will get to the messages in a minute.  You

5   mentioned that they kept changing the methods.  What does

6   that indicate to you as a pharmaceutical executive in

7   marketing?

8   A.    It was my opinion in reviewing those documents that

9   they were struggling.  They couldn't find the particular

10  message that they could hold onto that would appear to

11  motivate physicians to use Nasacort AQ versus the

12  competition.

13          So they kept trying, in my opinion, different

14  types of messages to try and do that.

15  Q.    What were some of those messages?

16  A.    Well, they had the umbrella message, which was a

17  choice message.  You know, we have the aerosol, which is the

18  dry formulation, we have the wet formulation, which is the

19  aqueous, so we can allow the consumer or the physician to

20  choose one formulation versus the other.

21          They had this Nasal comfort campaign that they

22  had for a period of time.

23          They had first-day relief, was another message

24  they tried to communicate.

25          They had the patient preference message

Boghigian - direct

1    indicating that patients preferred their product.  In

2    addition to that, they had taste-free and odorless, was a

3    message that was intertwined over the years.  They also had

4    stays or it sprays, was a message that was communicated very

5    frequently as well.

6    Q.    These are some of the messages that you saw in the

7    many Aventis documents that you reviewed?

8    A.    I am sorry?

9    Q.    These are some of the messages that you saw?

10   A.    Correct.  There were many, many messages that they

11   created and developed.

12   Q.    In all of the Aventis documents that you reviewed, did

13   you see any evidence at all that Aventis marketed Nasacort

14   AQ on the basis that it deposits on the frontal sinus?

15   A.    No, I didn't.

16   Q.    Did you see any evidence at all that Nasacort AQ

17   marketed -- Aventis marketed Nasacort AQ on the basis that

18   Nasacort AQ treats infections in the frontal sinus?

19   A.    Absolutely not.  I didn't see anything like that.

20   Q.    I would like to take a look at some of those documents

21   that you considered.  Why don't we put up Defendants'

22   Exhibit 334.

23             Mr. Boghigian, what is this document?

24   A.    This is actually an Aventis sales training document

25   from their sales training group.  And it is a document that

Boghigian - direct

1    was used or outlined the training for new representatives,

2    as well as in my opinion for existing reserves on how to

3    sell Nasacort.

4    Q.    Is this a document that you considered in forming your

5    opinion?

6    A.    Yes.

7    BY MS. SOTOS:

8    Q.    Mr. Boghigian, are these just some of the messages

9    that you were talking about earlier?

10    A.    These are some of the messages I mentioned.  And

11    obviously there are additional messages here which I didn't

12    mention that they used.

13            MS. SOTOS:  Mr. Young, can you go to Page 29,

14    please?

15    BY MS. SOTOS:

16    Q.    And, Mr. Boghigian, how does this page inform your

17    view there is no connection between the Nasacort AQ sales

18    and the patented invention?

19    A.    I mean, they basically identified that physicians see

20    them all the same, these products are all the same and that

21    Nasacort AQ is really no different than any other products.

22    Q.    Did you see any discussion in the Aventis documents

23    about a particular term that was used to describe the INS

24    product class?

25    A.    Yes.  In fact, in their own documents they identified

Boghigian - direct

1    these as really commodity market, commodity products.  That

2    indeed they could be switched from one product to another.

3    That they're all the same.  In several of the documents,

4    they identified this whole market including Nasacort as a

5    commodity market because they couldn't be differentiated.

6         MS. SOTOS:  Let's look at another document.  Can

7    you put up DX-120, Mr. Young?

8    BY MS. SOTOS:

9    Q.    Mr. Boghigian, is this the document that you

10   considered?

11   A.    Yes.

12   Q.    And what is this document?

13   A.    Well, this is a document from Steve Talbert.

14   Q.    And who is Steve Talbert?

15   A.    Steve Talbert is the senior analyst in market research

16   for Aventis.  He was assigned to the Nasacort team.  And he

17   is basically questioning, as you can see, and this is -- by

18   the way, this is April 5th, 2004.

19   Q.    So that is how many years after Nasacort was launched?

20   A.    Nasacort AQ launched in 1996, so you have almost eight

21   years here in terms of the span.  And you can see that in

22   the bulleted point, the paragraph that we have highlighted,

23   he is basically saying:  I question this patient preference

24   direction.  You know, is this compelling enough to change

25   prescribing habits?  The preference issue has existed for

Boghigian - direct

1    some time, and this is not exactly certain exactly how long.

2    And if it's not driving us in the right direction, then

3    perhaps it's time to try another.

4              HFA could become a compelling differentiation

5    feature and thus message.  "Doc, now you have a choice."

6              He is referring to HFA which is the new aerosol

7    form that was to replace Nasacort aerosol.  In other words,

8    we took out the chlorofluorocarbons.  And instead of CFCs,

9    it was going to be HFA was going to be the new aerosol in

10   the new dry form they were going to introduce.  He was

11   basically saying maybe that will help us differentiate the

12   product.

13             He goes on to say in a paragraph further on in

14   this document that, sure, there is going to be some

15   cannibalization from Nasacort AQ.  He is not sure what the

16   financial implications are going to be due to cost of goods.

17   But this is a formulation that can help us take from our

18   competitors that we have not been proven able to do what the

19   status quo.  In other words, this may help us do what we

20   have not been able to do what to date, and that is capture

21   market share from our competitors.

22   Q.   In fact, you mentioned this document was drafted in

23   2004.  Right?

24   A.   That's correct.

25   Q.   When we were looking before at your analysis of the

Boghigian - direct

1    market share of the inhaler versus the Nasacort AQ, you

2    described in 2004 something began to happen to the share of

3    the Nasacort AQ?

4    A.    The Nasacort AQ peaked at that point, 2004 as a result

5    of moving the aerosol over.

6    Q.    And then?

7    A.    And then began to decline.  Market forces, competitive

8    forces caused the product to decline.  I think in 2005, it

9    ended up at 10.3 or 11 percent, somewhere in that ballpark.

10   Q.    So what is Mr. Talbert, the senior analyst, of

11   marketing research at Aventis Pharmaceuticals.  What does

12   this e-mail say to you as a pharmaceutical marketing

13   executive Aventis's ability to differentiate Nasacort AQ?

14   A.    He is saying we've not been successful doing that and

15   that, hopefully, this other formulation will help.

16   Q.    We spoke earlier about your conclusion there was

17   switching from the Nasacort nasal inhaler and to the

18   Nasacort AQ and that was responsible for sales of Nasacort

19   AQ.  Is there anything else that was responsible for

20   Nasacort AQ sales?

21   A.    Well, I think it's certainly the advertising and

22   promotion was a big factor and the fact that it's

23   triamcinolone acetonide.  I mean it's really the same

24   steroid just in another formulation.  So I think those are

25   really some of the reasons why.

Boghigian - direct

1    Q.    Okay.  We talked about that, the steroid impact.  Why

2    don't we talk a little bit about the marketing promotion

3    that you just mentioned.

4              What led you to conclusion that the level of

5    marketing and promotion that Aventis put behind Nasacort AQ

6    was a reason for its sales?

7    A.    Well, when you looked at that chart, that financial

8    statement from earlier, when you looked at that from

9    2000-2007, they were spending over 50 percent of net sales

10   to attempt to generate the top line.

11             MS. SOTOS:  All right.  Why don't we take

12   another look at that document.  Mr. Young, could you please

13   put up DX-102?

14   BY MS. SOTOS:

15   Q.    And, Mr. Boghigian, did you attempt to calculate -- I

16   think you mentioned about 50 percent.  So you attempted to

17   calculate the amount that Aventis spent on marketing and

18   promotion.  Is that right?

19   A.    That's correct.

20   Q.    Okay.  And can you run us through that calculation?

21   A.    Certainly.  I took the actual sales which are net

22   sales for the period 2000 through to 2007, recognizing that

23   that was a budget number, $296.  And then I added that up

24   and I believe it comes out to $1 billion, 899 million

25   dollars.  Then I took the marketing line and added that up

Boghigian - direct

1    and it comes to almost a billion dollars, I think $966

2    million.  And when you look at that, I mean here is a

3    product that was introduced in 1996.  And yet for the period

4    2000 and 2006, you have a percentage of over 50 percent of

5    your net sales being committed to continuing to try and

6    drive the product without any real significant uptake in

7    terms of sales.  If you look at the years 2005-2006, they're

8    flat at $266 million and yet you are spending $114 million

9    in one year and $87 million in another year.  You are not

10   getting any movement on the sales.

11   Q.    Did you try to calculate Aventis's return on its

12   Nasacort AQ marketing expenditures?

13   A.    I did.  I looked at actual sales and then I looked the

14   actual marketing and I did a ratio.  It ranged anywhere from

15   I think it was a dollar twenty-four was the return in sales

16   for every dollar of marketing that was consumed to I believe

17   it was a high of three dollars and five cents as a range.

18   Q.    And did you use this document to calculate that ratio?

19   A.    I used that document.  And if you average it, it was

20   about a dollar ninety-four in terms of net sales for every

21   dollar spent, which frankly is not very good.  I would

22   consider that to be extremely high in terms of a cost of

23   marketing.

24   Q.    Okay.  And this is an Aventis document?

25   A.    That's correct.

1    Q.    And did Dr. Bell attempt to calculate the amount of

2    promotional dollars Aventis spent on Nasacort AQ?

3    A.    Yes, he did.

4    Q.    Did he attempt to calculate a return on the

5    promotional dollars Aventis spent on Nasacort AQ?

6    A.    Yes, he did.

7    Q.    And what was his result?

8    A.    Well, Dr. Bell had a result of $5.55 on everything for

9    every dollar marketing that was spent.

10   Q.    Mr. Boghigian, that sounds quite a bit different from

11   the numbers that you just described.  Why?

12   A.    Well, Dr. Bell used the industry number from IMS,

13   which is an estimate.  IMS is a company that provides dollar

14   sales.  And IMS calculates it on wholesale price.  So you

15   have a price in terms of dollars of sales which is 16 to

16   20 percent higher than the wholesale acquisition price, so

17   you have an inflated dollar sale number.  Then he also used

18   the IMS numbers from the promotional audits which we know in

19   the industry is understated.  So when you have inflated

20   sales number and understated expense number and you do the

21   ratio, the calculation, you are providing one into the

22   other, you come up with a much higher ratio and that is how

23   he achieved a $5.55 average.

24   Q.    Did Dr. Bell have access to this document, DX-102?

25   A.    Yes.  Yes, he did.

Boghigian - cross

1    Q.    Can you think of any reason why Dr. Bell did not in

2    his report calculate Aventis's return on Nasacort AQ with

3    the numbers in this document rather than IMS data?

4    A.    No.

5    Q.    Would you, as a pharmaceutical executive that has been

6    in the industry for 35 years, have used the IMS data to

7    calculate that ratio?

8    A.    Not for that purpose, no.  I wouldn't do it to

9    determine what the ratio is using IMS data.  No.

10             MS. SOTOS:  Okay.  That's all I have on direct,

11   Your Honor.

12             THE COURT:  All right.  Counsel, about how long

13   do you anticipate your cross will be?

14             MR. NOE:  Perhaps 10-15 minutes.

15             THE COURT:  Okay.  Let's do cross.  Then we'll

16   do lunch.

17             MR. NOE:  Good morning, Mr. Boghigian.

18             THE COURT:  We'll take lunch after redirect.

19   I'm sorry.  We'll let her redirect and then we'll take

20   lunch.  Okay.  Go ahead.

21                       CROSS-EXAMINATION

22   BY MR. NOE:

23   Q.    Good morning, Mr. Boghigian.  We have not met.  My

24   name is Jeremy Noe, one of the counsel for Sanofi-Aventis in

25   this litigation.

Boghigian - cross

1    A.    Nice meeting you.

2    Q.    Nice meeting you.  Mr. Boghigian, just a few

3    questions.

4              First, on the issue of your testimony regarding

5    I believe you referred to it as cannibalization of market

6    share between the Nasacort AQ and the Nasacort inhaler.

7              MR. NOE:  Mr. Young, if you'd could call up

8    DX-8, please?

9    BY MR. NOE:

10   Q.    This demonstrative that you have discussed here this

11   morning.

12             I apologize.  One moment, Your Honor.

13             THE COURT:  Yes.

14             (Pause.)

15             MR. NOE:  I apologize.  This is the wrong

16   demonstrative.  I apologize.

17             THE COURT:  No problem.

18   BY MR. NOE:

19   Q.    Mr. Boghigian, this chart that you prepared is based

20   on market share, not sales or units.  Is that correct?

21   A.    That's correct.  It's the percent market share of

22   prescriptions.

23   Q.    And, in fact, the market was growing, was it not?

24   A.    Yes.

25   Q.    So, indeed, the growth rate of Nasacort AQ compared to

Boghigian - cross

1   what was actually more than twice that of the market.  Is

2   that not right?

3   A.    In terms of percentages, it was growing.  In absolute

4   numbers, it was significantly trailing the competition.

5   Q.    But the percentage growth weight of Nasacort AQ was

6   more than twice that of the market.  Is that right?

7   A.    If I recall correctly, in some of the years it was.  I

8   don't believe in every single year.

9   Q.    And with this chart, based on market share, not sales

10  or units, it really doesn't shed much light on the question

11  of whether the decline in units or sales of Nasacort aerosol

12  matched the rise in units or sales terms for the Nasacort

13  AQ.  Isn't that right?

14  A.    I'm not sure I understand your question.

15  Q.    This chart that you prepared is based on market share

16  and I believe that you testified that there is virtually a

17  one-to-one correspondence and that Nasacort AQ cannibalized

18  market share from Nasacort aerosol.  Is that correct?

19  A.    I believe my statement, my comment was that there was

20  interchange, that there was switching that went on and that

21  there was indeed a significant portion of possibly these

22  patients who went to the AQ form.

23  Q.    You also testified that Flonase and Nasonex were

24  dominant in the marketplace.  Is that right?

25  A.    That's correct.  In terms of prescriptions and

Boghigian - cross

1    dollars, yes.

2    Q.    Isn't it true Nasacort and Flonase were spending more

3    on marketing than Nasacort AQ?

4    A.    Well, again, I don't have that.  I don't have that

5    data to be able to determine that.  All I have is IMS data

6    and that is understated or that's an estimate.

7    Q.    But I believe you testified that it would be

8    understated by about 20 percent.  Is that right?

9    A.    No, that's not correct.

10    Q.    How is IMS data understated?

11    A.    I don't know what the percentage of promotional

12    dollars in terms of what that actual percentage is.  I know

13    that IMS gathers that from panels of physicians but it's

14    based on the type of input that they get, but indeed when

15    you compare some of the IMS promotional dollars in terms of

16    marketing expenditures to what you see in the actual Aventis

17    marketing, they're significantly understated.  In fact, in

18    one year, the Aventis marketing expenditures is $106 million

19    and yet the marketing expenditures of IMS were $40 million

20    so they're not reliable numbers.

21    Q.    But you would agree with me IMS data indicates that

22    Flonase and Nasacort were spending more than Nasacort AQ?

23    A.    It appeared as an order of magnitude that they were

24    probably spending more but I don't have again the actual

25    numbers.  That's really what you need to look at.

Boghigian - cross

1    Q.    On the issue of nexus and your testimony today, that

2    you did not see evidence of sales linked to patented

3    attributes of Nasacort AQ?

4              MR. NOE:  If I could call up DX-74.  I'd like to

5    revisit this exhibit.

6    BY MR. NOE:

7    Q.    Mr. Boghigian, are you aware that odorlessness is one

8    of the patented attributes of Nasacort AQ?

9    A.    I'm not sure what specifically are in the claimed

10   invention in terms of patented features.  I looked at all of

11   the features of Nasacort AQ.

12   Q.    You said that you are not sure what the patented

13   attributes of the product at issue in this litigation are?

14   A.    Oh, no.  I understand that it's thixotropic and it's

15   taste-free, or thixotropic and odorless.  I understand that.

16   Q.    You agree that odorlessness is one of the patented

17   attributes?

18   A.    It is one claimed, I guess, from what I understand.

19   Q.    And looking at this demonstrative, are you aware that

20   Nasonex reformulated their product in about the 2004-2005

21   time frame to eliminate phenyl ethyl alcohol, the

22   rose-scented material?

23   A.    Yes, I do recall that.

24   Q.    Looking at your own demonstrative here, for the

25   Nasonex sales, which are shown in yellow, from the 2004 time

Boghigian - cross

1    frame, there is a rise in prescriptions, is there not?

2    A.    Yes.

3    Q.    Isn't that an indication that there is a demand in the

4    marketplace for an odorless product?

5    A.    No, I don't think you can draw that conclusion from

6    that.  There are many other factors that go into marketing

7    in terms of the promotional mix that, indeed, could account

8    for that.  Not just that one attribute.

9    Q.    And again, Nasonex was outspending promotionally

10   compared to Nasacort AQ.  Is that correct?

11   A.    I don't know that for a fact.  I have not seen their

12   actual marketing expenditures from the company.  All I have

13   as a guide is the IMS data.

14   Q.    Moving on to DX Demo 75, Mr. Boghigian, this

15   demonstrative that you discussed, we have dollar sales on

16   the y axis.  Right?

17   A.    Yes.

18   Q.    Dollar sales are really IMS data, aren't they?

19   A.    That's correct.  In this particular slide they are IMS

20   dollars.

21   Q.    Indeed, when you worked at Hoffman-La Roche you used

22   IMS data to track the performance of products.  Is that not

23   right?

24   A.    We looked at that as an estimate.  Since IMS is a

25   third party audit, an independent audit company, we looked

Boghigian - cross

1    at IMS data to provide some insight in terms of what the

2    growth curves look like, how quickly the adoption rates

3    were.  We looked at that, but we focused more on

4    prescriptions.

5    Q.    Indeed, you used IMS data in preparing your own expert

6    reports submitted in this litigation, did you not?

7    A.    Correct.

8    Q.    And so you consider IMS data for prescription products

9    to be reliable?

10    A.    Yes.  I think the industry and my colleagues would

11    agree that there is a degree of reliability with the

12    prescription data.

13    Q.    And that reliability would extend to determining the

14    relative ranking of products in the marketplace.  Correct?

15    A.    When you look at prescriptions as it relates to market

16    share, yes.

17    Q.    And relating to your comment a few minutes ago about

18    the understating, I believe you called it, of IMS data,

19    isn't it true that there is no way to determine actual sales

20    data of competitors because companies do not regularly

21    publish that kind of information?

22    A.    That's correct.

23    Q.    So in comparing product sales within a market, isn't

24    IMS data similar audit data?  Isn't that the only

25    alternative available?

Boghigian - redirect

1   A.    Dollar sales.  If you are looking into a comparison of

2   products, in a particular therapeutic area, then you would

3   look at IMS or Verispan, which were the two major companies.

4   You would look at dollars to get some idea of order of

5   magnitude.  But I think most of my colleagues would first

6   look at prescription data, because that's not affected by

7   pricing actions or AWP, et cetera.

8           MR. NOE:  Thank you, Mr. Boghigian.  No further

9   questions.

10          THE COURT:  Any redirect?

11                  REDIRECT EXAMINATION

12  BY MS. SOTOS:

13  Q.    Hello again, Mr. Boghigian.

14  A.    Hello.

15  Q.    Opposing counsel asked you about some numbers, about

16  the growth rate of Nasacort AQ, and asked you about the

17  growth rate of Nasacort AQ being doubled out of the IMS

18  market.  Right?

19  A.    That's correct.

20  Q.    Do you recall that?  In your opinion, based on all the

21  analysis you did and your 35 years of experience, was the

22  growth rate of Flonase and Nasonex -- is Flonase and Nasonex

23  growing at a faster rate than Nasacort AQ?

24  A.    Yes, it was.

25  Q.    He also asked you some questions about Nasonex, and he

Boghigian - redirect

1  showed you your charts and showed you that Nasonex seemed to

2  increase a little bit in 2004 prescriptions.  Is that

3  correct?

4  A.    Correct.

5  Q.    And he asked you if you thought that was due to the

6  fact that they removed the alcohol from Nasonex in 2004?  Do

7  you remember that?

8  A.    Yes.

9  Q.    How many -- when did Nasonex launch?

10  A.    I believe they launched in 1996-'97, that time frame.

11  Q.    That is about the same time frame that Nasacort AQ

12  launched.  Right?

13  A.    Correct.

14  Q.    So Nasacort AQ didn't have any alcohol from 1996 and

15  still doesn't?

16  A.    Correct.

17  Q.    Nasonex had it from the time that it launched, and yet

18  according to what you said earlier Nasonex was doubling the

19  performance of Nasacort AQ?

20  A.    That's correct.

21        THE COURT:  Are you going to testify, counsel,

22  or are you going to ask a question?

23  BY MS. SOTOS:

24  Q.    Was Nasonex doubling the performance of Nasacort AQ?

25  A.    Yes.  Nasonex was running at a rate in terms of

1    dollars and prescriptions of two to one.

2    Q.    Why don't we put up -- it's already up there, thank

3    you, Mr. Young.

4          Opposing counsel asked you some questions about

5    this demonstrative that you prepared.  I just want to ask

6    you this question.  If you actually had Flonase and Nasonex

7    actual dollar sales data from the companies that own those

8    products, would you have used IMS data to create this

9    comparison?

10   A.    Absolutely not.  I would have used the actual data

11   because I can't spend the IMS dollars.  I can only spend

12   what I can generate in actual dollars.

13               MS. SOTOS:  Thank you, Mr. Boghigian.

14               THE COURT:  Mr. Boghigian.  Thank you, you are

15   excused.

16               THE WITNESS:  Thank you.  Pleasure, Your Honor.

17               THE COURT:  We will come back at 1:30.

18               (Witness excused.)

19               (Luncheon recess taken.)

20               THE COURT:  All right.  Please be seated.

21               MR. HURST:  Your Honor, our next witness is

22   Dr. Thomas Needham.

23               And while he walks his way up, I would like to

24   officially put into evidence -- I know all the evidence is

25   in -- the interrogatory response confirming Aventis's

Needham - direct

1    reduction to practice, May 1st, 1992, with respect to the

2    public use defense and, in particular, the experimental use

3    exception to inapplicability as Defendant's Exhibit 284.

4    Pages 3 and 4 identified the reduction to practice dates.

5              THE COURT:  I'm assuming there is no objection.

6              MR. BERGHOFF:  I'm simply reserving our

7    objection that was the subject of the motion in limine, Your

8    Honor.

9              THE COURT:  Same ruling.

10                            - - -

11                      DEFENDANT'S TESTIMONY

12         ... DR. THOMAS EDWARD NEEDHAM, having been placed

13             under oath at 1:35 p.m. as a witness, was

14               examined and testified as follows ....

15                            - - -

16              MR. HURST:  Before we get started, may I?

17              THE COURT:  You may.

18              (Binders passed forward.)

19                     DIRECT EXAMINATION

20    BY MR. HURST:

21    Q.    Dr. Needham, starting off, how are you currently

22    employed?

23    A.    I'm a Professor of Pharmaceutics in the College of

24    Pharmacy at the University of Rhode Island.

25    Q.    And how long have you been there?

Needham - direct

1    A.    I've been there since 1989.

2    Q.    For background purposes, can you explain to Judge

3    Sleet your educational background, please?

4    A.    Yes.  I have a bachelor's degree in Pharmacy, and I'm

5    a registered pharmacist.  I also have two graduate degrees:

6    a master's degree and a Ph.D. in Pharmaceutics.

7    Q.    And when did you get each of your degrees?

8    A.    The master's in 1967.  And the Ph.D. in 1970.

9    Q.    From?  All from?

10   A.    Everything was from the University of Rhode Island.

11   Q.    Which is where you are now?

12   A.    Yes.

13   Q.    So how long have you been in the field of

14   pharmaceutical formulations?

15   A.    Since 1970, so almost 40 years.

16   Q.    So you got your Ph.D. from the University of Rhode

17   Island in 1970.  What did you do then?

18   A.    I went to the University of Georgia School of Pharmacy

19   and taught there.  The usual:  taught classes, set up a

20   research program.  What faculty usually do.

21   Q.    What kind of professor were you also there?

22   A.    I also was a Professor of Pharmaceutics there, too.

23   Q.    Generally, what subject matter did you teach?

24   A.    Well, to undergraduates, I taught about dosage forms

25   and their characteristics and how they would use them, the

Needham - direct

1    stability, just the basic knowledge that a pharmacist uses.

2    And to graduate students, it becomes a little more

3    complicated.  I taught pharmaceutical formulations, physical

4    pharmacy for regular and drug-delivery-type-based dosage

5    forms.  I taught a little bit about manufacturing,

6    regulatory affairs, that type of thing.

7    Q.    So forgive me if you said.  1979 was the year you left

8    the University of Georgia?

9    A.    Correct.

10   Q.    Have you been in academia your entire career?

11   A.    No.  I left the University of Georgia as we said in

12   1979 and went to work for, at the time it was called Baxter

13   Travenol.  It's now called Baxter healthcare.

14   Q.    Okay.  What did you do at Baxter?

15   A.    I was in their central research area.  I was associate

16   director of what they called pharmaceutical development.  So

17   basically I had responsibility for product development,

18   formulations, manufacturing, scaleup, interfacing with the

19   manufacturing groups.  And then later on, I had more

20   responsibility for like technology, evaluation and searching

21   in the drug delivery area.

22   Q.    And you remained at Baxter until when?

23   A.    I was there until 1986, and then I went to work for

24   Searle Monsanto, mostly in the Searle portion of it in

25   Illinois in their research area.

Needham - direct

1    Q.    Okay.  So you stayed at Searle until when?

2    A.    1989.

3    Q.    What did you do then?

4    A.    Then I went back to the University of Rhode Island as

5    faculty member.

6    Q.    And are you still at the University of Rhode Island?

7    A.    Yes.

8    Q.    So how long have you been there?  I can probably do

9    the math for you.  20 years?

10   A.    Almost 20 years.

11   Q.    20 years.  And what do you do there?  What is your

12   occupation there?

13   A.    I'm a Professor of Pharmaceutics.  And as to what I

14   do, again I teach undergraduate students about the dosage

15   forms.  It's a professional school so you teach the

16   pharmacists, future pharmacists.  And we also have a

17   graduate program for master's level and Ph.D. level.  And I

18   teach them about formulations, drug delivery, manufacturing,

19   regulatory affairs, that type of thing.

20   Q.    Have you held any positions of leadership at the

21   University of Rhode Island?

22   A.    Yes.  I was Chair of the Department of Pharmaceutics

23   for 12 years.  I've since given that up.

24   Q.    Have you done research since your time, since you

25   began at the University of Rhode Island?

Needham - direct

1    A.    Yes.  We set up our research, drug delivery research

2    laboratory and we did a lot of work for different companies

3    as well as got grants and such.

4    Q.    Do you have any patents?

5    A.    I have five patents.

6    Q.    Okay.  How about publications?

7    A.    I have 75 peer-reviewed publications.

8    Q.    How many times during your career have you personally,

9    by yourself, actually made a physical pharmaceutical

10   formulation with an active ingredient in it?

11   A.    Dozens of times.

12   Q.    Yesterday, we heard some testimony suggesting that a

13   pharmaceutical formulator doesn't do this by themselves.

14   It's always a large, large team.  Has that been your

15   experience?

16   A.    No.  Even in industry, ultimately there is one person

17   responsible for the formulations.  I mean the product

18   development may have a team with people from different areas

19   but there is a pharmaceutical pharmaceutics guy essentially

20   who has responsible for the formulation.

21   Q.    You know this case is about nasal sprays.  Right?

22   A.    Yes.

23   Q.    Have you ever formulated a nasal spray?

24   A.    Yes, many of them.

25   Q.    Of your 75 articles, how many of your articles relate

Needham - direct

1    to nasal sprays or nasal products?

2    A.    About 12 or 13 of them.

3    Q.    How about of your five patents?  Did any of them

4    relate to nasal sprays?

5    A.    Yes, two are in the area of nasal drug delivery.

6    Q.    Are any universities in the United States considered

7    to be leaders in terms of research and experience with nasal

8    sprays?

9    A.    Yes, there are several.  And I'd like to think that

10   the University of Rhode Island is right near the top of that

11   list.  Obviously, Dr. Donovan's program at the University of

12   Iowa is there; and the University of Kentucky; maybe

13   University of Missouri, Kansas City.  There are five or six

14   groups that do a little bit in the nasal area.

15            MR. HURST:  Your Honor, I'd like to proffer

16   Dr. Needham as an expert in the formulation of

17   pharmaceutical products, including nasal sprays.

18            MR. BERGHOFF:  No objection.

19            THE COURT:  The doctor is accepted as an expert

20   in that area.

21            THE WITNESS:  Thank you.

22   BY MR. HURST:

23   Q.    Now, doctor, we asked you to conduct an analysis in

24   this case.  Correct?

25   A.    Yes.

Needham - direct

1    Q.    What analysis did we ask you to conduct?

2    A.    You asked me to look at the patents and to really

3    evaluate if there was a potential for a person of ordinary

4    skill in the art to look at those patents and consider them

5    to be obvious.

6    Q.    And for this proceeding, I asked you to focus on Claim

7    6 of the '573 patent and Claim 26 of the '329 patent.

8    Correct?

9    A.    Correct.

10   Q.    Do you have an opinion on whether or not those claims

11   in 1996 would have been obvious to one of ordinary skill in

12   the art?

13   A.    Yes, I think they are.

14   Q.    All right.  Do you have -- okay.  Let's move on.

15   Claims in this case are aqueous formulations of nasal

16   sprays.  Correct?

17   A.    Correct.

18   Q.    And was Aventis the first to develop an aqueous

19   formulation of a nasal spray?

20   A.    No.

21   Q.    Before Aventis made any formulation in this case, were

22   other aqueous formulations available?

23   A.    Yes, there was Beconase AQ sprays, there was Vancenase

24   AQ sprays and there was a Flonase.  All of these were on the

25   market before that '95 time frame.

Needham - direct

1    Q.    Are all these prior art products?

2    A.    Yes.

3    Q.    Do these prior art products in your mind in summary

4    support your opinion that the claimed invention is obvious?

5    A.    Yes.

6    Q.    Did anything prompt the development of aqueous nasal

7    spray formulations as of the 1980s, before Aventis came

8    along with Nasacort AQ?

9    A.    Yes.  We've heard the talk about the impending CFC ban

10   and the issues around the environment with that.  And it was

11   well known that the use of CFCs was going to be banned and

12   withdrawn sooner or later.

13   Q.    How did that impact the pharmaceutical industry?

14   A.    Well, you have the nasal aerosol products which were

15   propelled by CFCs.  So if they were banned, they would have

16   to replace those products.

17            MR. HURST:  Let me take a look at Defendant's

18   Exhibit 297.  Just blow up the first part to identify this.

19   BY MR. HURST:

20   Q.    Do you see the date there?

21            MR. RICH:  Your Honor, if I might object.

22            THE COURT:  Basis.

23            MR. RICH:  This is a document that this expert

24   did not --

25            THE COURT:  Speak up, please.

1          MR. RICH:  I'm sorry.  This is a document that

2    this witness did not consider in relation to the formation

3    of his opinions.  And we believe it is inappropriate to

4    allow it in with his testimony.

5          THE COURT:  Mr. Hurst, your reaction.

6          MR. HURST:  Yes.  This is a document in

7    evidence.  I'm not actually going to ask him to do anything.

8          THE COURT:  Did he consider it?

9          MR. HURST:  He did not.

10         THE COURT:  Take it down.

11         MR. HURST:  All right.

12         THE COURT:  Objection sustained.

13         MR. RICH:  Thank you, Your Honor.

14   BY MR. HURST:

15   Q.    The CFC ban that you referred to, is that something

16   that was known to those of ordinary skill in the art in the

17   late 1980s?

18   A.    Yes.  Because of its impending impact, a person of

19   ordinary skill in the art would be well aware of the issues

20   around the ban.

21   Q.    Thank you.

22         MR. HURST:  Why don't we go to Demonstrative

23   Exhibit 29.  Defendant's Demonstrative Exhibit 29.

24   BY MR. HURST:

25   Q.    So how did the issue with CFCs impact in particular

Needham - direct

1    nasal spray development?  And we prepared a demonstrative

2    exhibit to help us walk through this?

3    A.    Yes.

4    Q.    So can you explain what we're looking at to Judge

5    Sleet, please?

6    A.    Well, we're looking at, firstly, the Vancenase

7    CFC-based aerosol.  Essentially, what is important is all of

8    these glucocorticosteroids were for the most part originally

9    formulated as aerosols using CFCs to propel them, if you

10   will, or administer them.  And you can see that the

11   Vancenase was approved in 1981.  And what they did, as part

12   of the impending ban, was to develop a Vancenase AQ

13   suspension which was approved in 1987.

14          SmithKline likewise with the same drug,

15   basically had the Beconase CFC, again approved in 1981.

16   That was then switched or reformulated to the Beconase AQ,

17   approved in 1987.

18          And then Flonase, which is an aqueous

19   suspension, never -- it came out its first time as an

20   aqueous suspension I think because of the fact that they

21   knew of the CFC impending ban and didn't even bother with

22   the aerosol product.

23   Q.    Okay.  So then Aventis comes along later in time, at

24   least with respect to Beconase and Vancenase, and what

25   happened with respect to Aventis?

Needham - direct

1    A.     Well, Aventis had the Nasacort CFC-based aerosol

2    approved in '91.  And they, as I think we can see from some

3    of their documents, realized that they had to switch out of

4    the CFC and reformulate to an aqueous product.

5    Q.     Okay.  Now, in addition to these prior art products,

6    are you aware of any published patent applications prior to

7    Aventis's work that also referred to this switch from a

8    CFC-based product to an aqueous based nasal spray?

9    A.     Yes, there was.

10             MR. HURST:  Why don't we take a look at

11   Defendant's Exhibit 13.  If you can just highlight the top

12   right-hand corner.

13   BY MR. HURST:

14   Q.     Can you tell us what we're looking at here?

15   A.     Well, you can see this is international patent

16   application that was filed on September 3rd, 1992.

17   Q.     Okay.  And what does it relate to?

18             MR. HURST:  It might help if we highlight the

19   abstract.

20   A.     So you can see it's an aqueous suspension formulation.

21   The active ingredient is the glucocorticosteroid tipredane

22   and it's used for treating allergic, or as it says immune

23   reactions.

24   BY MR. HURST:

25   Q.     Okay.  Why don't we take a look at, there is a part in

Needham - direct

```
 1    here that refers to the issue we were talking about before?

 2    A.    Yes.

 3              MR. HURST:  It is Page 3, last paragraph.

 4    BY MR. HURST:

 5    Q.    What does this relate to?

 6    A.    Well, basically they're talking about the fact that

 7    the CFC driven formulations are unsatisfactory from an

 8    environmental perspective and that the HFC propellants are

 9    difficult to formulate.  So they're well aware of the fact,

10    the issues around the CFC.

11    Q.    So what did this patent, published patent application

12    say with respect to the solution for avoiding the CFC

13    problem for nasal sprays?

14    A.    Well, essentially they're going to have to develop

15    another drug.  They're going to have to stop using the CFCs.

16    Q.    And what in particular does this patent application

17    recommend doing?  Or what do they do?  What kind of nasal

18    spray did they come up with?

19    A.    They came up with an aqueous suspension.

20    Q.    Now, you reviewed Aventis documents in this case.

21    Correct?

22    A.    Yes.

23    Q.    Development documents and so forth?

24    A.    Correct.

25    Q.    Do you have an understanding of what prompted Aventis
```

Needham - direct

1     itself to convert from a CFC-based based aerosol to an

2     aqueous-based formulation?

3     A.     Yes, I do.

4     Q.     What is that?

5     A.     Well, basically, they are in the same boat as

6     everybody else.   They are seeing the impending need to

7     change.   And they are looking at the environmental issues

8     around.   I think there is a memo.   But basically, they look

9     at the fact they are going to have to look at an aqueous

10    suspension.

11    Q.     Let me take a look at the memo I know you are

12    referring to, Defendant's Exhibit 33.   If you can highlight

13    the top there, so we can explain what we are looking at

14    here?

15    A.     Yes.   This is an internal interoffice memo from March

16    1st, 1991, that basically defines their rationale in

17    developing the Nasacort AQ products.

18    Q.     Why don't we -- this is a 1991 memo.   You did say

19    that.

20             -- take the fourth paragraph and blow that one

21    up.

22             What does this paragraph refer to in terms of

23    explaining why Aventis decided to develop Nasacort AQ?

24    A.     Well, basically they are saying if and when this ban

25    becomes effective, they are going to have to replace the

Needham - direct

1    Nasacort aerosol, is what they are talking about.

2                  The other issue, basically, is the lost

3    business.  If an AQ formulation is not developed, they are

4    going to lose about a hundred million in annual sales.

5    Q.    In your mind, is it innovative thinking as of March of

6    1991 to convert CFC-based aerosol nasal spray to an aqueous

7    nasal spray?

8    A.    Not at all.  There are already two products on the

9    market that have done this, the Beconase that I talked and

10   Vancenase, they are the same class of drugs, glutamine

11   corticosteroids.  And they were converted successfully and

12   passed all FDA testing and clinical efficacy.

13   Q.    Why don't we take a look at the second paragraph.  We

14   will take it a line at a time.  To what does this first line

15   refer?  Does this refer to what we were just talking about?

16   A.    Yes.  This talks about the current intranasal steroid

17   market is predominantly aqueous.  That refers back directly

18   to the two products, the Beconase and the Vancenase AQ that

19   were on the market.  And they had 60.7 percent of the share.

20                  So the other issue that they mention is that

21   physicians currently perceive the aqueous preparations are

22   more comfortable than the aerosols.

23   Q.    This reference to physicians believing that aqueous

24   preparations are more comfortable, that is an internal

25   Aventis document.  Right?

Needham - direct

1    A.    Yes, it is.

2    Q.    Well, are you aware of published prior art that says

3    the same thing?

4    A.    Yes.  I can think of three articles.  There is an

5    Orgel article.  Then there is the Setipane and Kobiashi

6    articles that make note of this fact.

7    Q.    Why don't we look at the Setipane article.  That is

8    Defendant's Exhibit 10.  Blow up the top so we can put a

9    date on it.

10   A.    So you can see, this is published in Clinical

11   Therapeutics in 1995.  It talks about triamcinolone aqueous

12   nasal spray, studies to evaluate in a double-blind study

13   patients with seasonal ragweed, allergic rhinitis.

14   Q.    You understand, it is your understanding this is a

15   prior art document?

16   A.    Correct.

17   Q.    Take a look at Page 1, we will stay in the abstract.

18   Why don't we blow up the first five or six lines of the

19   abstract.  I guess the first thing I wanted to ask you about

20   is, is this a published reference talking about that

21   preference that you were discussing?

22   A.    Yes.  Basically, it says right in the first line,

23   because some patients may prefer aqueous sprays, so it talks

24   about -- then it follows with once-a-day dosing.  A new

25   aqueous formation of triamcinolone acetonide TAA aqueous was

Needham - direct

1    developed.

2    Q.    What drug is this published article about?

3    A.    Nasacort AQ.

4    Q.    The drug that's claimed in the patents at issue?

5    A.    Yes, exactly.

6    Q.    What does this article disclose about Nasacort AQ in

7    the prior art?

8    A.    Basically, it discloses the drug as an aqueous

9    formulation.  Also, a person of ordinary skill in the art

10   would know that we are talking about a suspension, because

11   this drug notoriously has a low solubility in water, so the

12   only way to deliver a full dose would be with a suspension

13   product.

14            We know the vehicle is water.  It says right

15   there.

16            Later it talks about the fact that the product

17   is a thixotropic product.

18   Q.    Does it disclose anything about the dosing for

19   Nasacort AQ?

20   A.    Yes, it also does.  It gives the dosing, and shows,

21   because it's a clinical study, shows that it's an effective

22   dosing.

23   Q.    So what's your understanding of Aventis's argument

24   related to why the claimed inventions are sustainable even

25   though the Nasacort AQ is published in the prior art?

Needham - direct

1    A.    Well, I guess they feel that the formulation wasn't

2    disclosed in this particular article.

3    Q.    And when you say the formulation --

4    A.    I mean all the other ingredients.  You have the drug,

5    you have water.  What else is in this product, if you will.

6    Q.    So let's take it from the perspective of one of

7    ordinary skill in the art.

8          What's the first thing your average formulator

9    would do after seeing this article if they wanted to make

10   their own aqueous-based nasal spray for TAA?

11   A.    I would go, or a person would go to the Physician's

12   Desk Reference, and look up aqueous suspensions of

13   glucocorticosteroid drugs and see if there were any.  And

14   obviously we know there was Beconase and there was

15   Vancenase.

16         So I would go there.  And from looking up into

17   this reference, I could see at least a qualitative list of

18   the ingredients in such a product.

19   Q.    So if you, just to make sure I understand, if you look

20   up Beconase in the PDR in the prior art, you will get --

21   what's a qualitative list of the ingredients?  What does

22   that mean?

23   A.    I am going to see the drug Beconase.  I am going to

24   see its dose.  And I am going to see a list of the other

25   ingredients.  They don't have to put in the quantity.  In

Needham - direct

```
 1    other words, the percentage amount.  Sometimes you will get

 2    one or two with the percentage in there.  But they don't

 3    have to put that.

 4              They do have to put the ingredients, though.

 5    Q.    From your review of Aventis's development documents,

 6    how did they, themselves, create the formulation for

 7    Nasacort AQ?

 8    A.    Amazingly enough, there is a memo that says that's

 9    exactly what they did.  They looked at the Beconase

10    formulation.

11    Q.    Why don't we take a look at Defendant's Exhibit 37.

12    Let's make sure we know what we are looking at here at the

13    top.  Can you explain that, Doctor?

14    A.    Yes.  This is another internal memo, the date was May

15    17, 1991.  And it was written by Drs. Alcorn and Kim.  And

16    Kim is the inventor on the patent.  And the subject was

17    Nasacort AQ.

18    Q.    Is Dr. Kim the only inventor listed on the patent?

19    A.    Yes.

20    Q.    Does this memo indicate how Dr. Kim developed the

21    ingredient list for Nasacort AQ?

22    A.    I think it does.

23    Q.    Why don't we take a look.  As a starting point, you

24    see the second paragraph, all the way down to the ingredient

25    list there?
```

Needham - direct

1   A.    So basically you can see that the memo says that as a

2   starting point the qualitative formulation for Beconase AQ

3   was used.

4   Q.    How would one -- this goes back to the Physician's

5   Desk Reference?

6   A.    Yes.

7   Q.    Is there -- that's good.

8            What else does it show?

9   A.    Well, what they did is they prepared several different

10  formulations.  They weren't sure, as I said, how much of the

11  suspending agent, for example, was there.  What the specific

12  quantitative amounts were.  So they prepared several

13  different formulations of different weights.

14  Q.    So in terms of just the list of ingredients, how

15  closely did Nasacort AQ end up matching Beconase?

16  A.    Essentially the same list of are ingredients.

17  Q.    Why don't we take a look at Defendant's Exhibit 32.

18  This is something we used in opening.

19            You are familiar with this list?

20  A.    Yes.

21  Q.    Explain -- we will get to the details and the

22  ingredients in a second.  But explain in general what we are

23  looking at here?

24  A.    You can see, we start on the left with essentially the

25  example, which is Nasacort AQ out of the patent.  Then we

1    have the Beconase AQ, the Vancenase AQ, and the flow

2    Nasacort.  So we have three prior art products, and the

3    example from the patent.

4    Q.    Is the ingredient list for these products available in

5    the prior art PDR?

6    A.    Yes, it is.

7    Q.    What is the first line -- I am sorry, the first row

8    underneath the titles?

9    A.    The first row lists or shows the specific drugs.  They

10   are all glucocorticosteroids.

11   Q.    The fact that they are all glucocorticosteroids, is

12   that something that has significance to your average

13   pharmaceutical formulator?

14   A.    Well, it tells -- the formulator knows what the

15   physical and chemical properties are from that.  Formulators

16   would also know that they behaved similarly, because they

17   are from the same class of drugs.  And from looking at the

18   other ingredients, especially the three prior art products,

19   the formulator would know that a successful product has been

20   developed with the glucocorticosteroid and these other

21   ingredients.

22         He is sitting there saying, boy, I have a high

23   probability of being pretty successful with this.

24   Q.    Now, I want to talk about in a little bit the mixture

25   of MCC and CMC.  But just real briefly, what function does

Needham - direct

1    that have in the formulation?

2    A.    It's the suspending agent.

3    Q.    Now, we will move down.  benzalkonium chloride?

4    A.    Yes.

5    Q.    What is benzalkonium chloride?

6    A.    That is a preservative.  Basically, these are

7    multiple-use sprays.  In other words, the patient would get

8    them, I have forgotten how many doses.  But they are

9    multiple use.  The preservative is in there to essentially

10   kill any microbes that the patient may introduce into the

11   product.

12   Q.    As we go down we see a different -- DETA refers to

13   phenyl ethyl alcohol in the second-to-last row?

14   A.    Yes.

15   Q.    Let's start with phenyl ethyl alcohol.  Can you tell

16   me what that is and what it does?

17   A.    That is also another preservative.  It is very common

18   when formulating to add a couple of preservative, just to,

19   if you will, enhance your prospects of making sure you kill

20   the microbes.

21   Q.    The combination of benzalkonium chloride and phenyl

22   ethyl alcohol, is that an unusual combination?

23   A.    No, it's a very well-known combination.

24   Q.    So Aventis switched out phenyl ethyl alcohol for EDTA.

25   What is the function of EDTA in the formulation for Nasacort

Needham - direct

1    AQ?

2    A.    Its major function is also as an additional

3    preservative.

4    Q.    Any of different of phenyl ethyl alcohol?

5    A.    No.  They both work as a preservative.

6    Q.    Now, was Aventis the first company to discover that

7    EDTA and benzalkonium chloride could act together as a

8    preservative system?

9    A.    No, not at all.

10   Q.    Why do you say that?  How do you know they are not the

11   first?

12   A.    If you would look in the handbook of Pharmaceutical

13   Excipients, every formulator -- there are so many

14   excipients, there is a handbook that lists all the

15   excipients and all of their properties, if you will.

16         If you were to look in that handbook, under

17   benzalkonium chloride or phenyl ethyl alcohol you will see

18   that they are used in that way.

19   Q.    Let's take a look at Defendant's Exhibit 44.  And just

20   to put at date on the handbook here?

21   A.    This is the 1994 edition.

22   Q.    Do you have one of these in your office?

23   A.    Yes, I do.

24   Q.    Does your average, ordinarily skilled pharmaceutical

25   formulator have one of these available to them?

Needham - direct

1    A.    Absolutely.  There is so many excipients that you

2    can't memorize them all.  So you just keep this neat little

3    book to look things up.

4    Q.    How long have you had one in your office?

5    A.    Years.

6    Q.    So now why don't we take a look at the entry for

7    benzalkonium chloride.  It is Page 4 in this exhibit.  We

8    don't have the whole book in evidence here.  Can you pull

9    back so we can see what the ingredient is.

10   A.    This is what you would see as the listing for

11   benzalkonium chloride, if you looked it up in that handbook.

12   Q.    So this is the preservative in the, one of the

13   preservatives in the prior art products?

14   A.    Correct.

15   Q.    Does it tell you anything about whether you can

16   combine that preservative with phenyl ethyl alcohol and/or

17   EDTA?

18   A.    Yes, it does.

19   Q.    Why don't we take a look at the right-hand side.

20   A.    So you can see from the highlighted area that you can

21   combine disodium EDTA turbinate, which is EDTA, with benzyl

22   alcohol, or phenyl ethanol or phenyl propanol, to serve as

23   preservatives with the benzalkonium chloride against pseud

24   monastery genosa.

25   Q.    Let's break it down just a little bit.  I don't see

1    phenyl ethyl alcohol listed here as something that can be

2    used in combination with benzalkonium chloride?

3    A.    I went over it too fast.

4          What you say here is, phenyl ethyl in all is

5    phenyl ethyl alcohol, so you have all of these synonyms, it

6    depends on who is writing it what is being called.

7    Q.    That's the same thing?

8    A.    Yes.

9    Q.    Literally one line away, the disodium EDTA?

10   A.    That is EDTA, yes.

11   Q.    I think you did say that?

12   A.    Yes.

13   Q.    What happens if the pharmaceutical formulator looks up

14   EDTA in the handbook, will that tell them anything about

15   whether it can be combined with benzalkonium chloride?

16   A.    Definitely.

17   Q.    Why don't we do that.  Defendant's Exhibit 44.  What

18   is this?

19   A.    This is edetic acid, which is the acid form of EDTA,

20   sodium edetate, what we called it before, which is the salt

21   form.  The difference is, sodium is a salt, so it's soluble.

22   Q.    This is Page 11 for the record.

23          Why don't we take a look at the area and typical

24   properties that we decided to highlight here.  What is this

25   telling us?

Needham - direct

1    A.    You can see here it says, however, when used with

2    other antimicrobial preservatives, edetate acid or EDTA

3    demonstrates a marked synergistic effect.  As you go down it

4    says the edec acids or the edetates are therefore frequently

5    used in combination with such preservatives as benzalkonium

6    chloride.

7    Q.    That is the first on the list there?

8    A.    Exactly.  There is a number of others that you could

9    also see that it is used with.

10   Q.    There is reference there of a synergistic effect

11   between EDTA and benzalkonium chloride.  Can you tell us

12   what that means, a synergistic effect?

13   A.    Yes.  That means you are getting a more marked

14   preservative activity than you would expect if you added the

15   two items together.  So you get better activity than you

16   would expect.

17   Q.    Now, in your review of Aventis's documents, is there

18   anything that talks about whether Aventis itself relied on

19   this synergistic effect disclosed in the handbook?

20   A.    Yes.  They have a memorandum that basically describes

21   that.

22   Q.    Why don't we take a look at Defendant's Exhibit 34?

23   A.    Excuse me.  It wasn't a memo.  It was part of the

24   development report.

25              So basically, what the development report is,

1    the FDA requires that you provide them with information on

2    how you developed your product, what your rationale is, why

3    you put certain things in, why you had certain

4    concentrations.  And you put it together in a development

5    report.  So they know you understand your product.

6    Q.    Okay.  Is there a particular page here, 16, that talks

7    about the issue I had raised?

8    A.    Correct.

9    Q.    Here we go.  So what is this showing us?

10   A.    So this is the paragraph where they're talking about

11   their preservatives, so they mention the benzalkonium

12   chloride and the edetate sodium, and then they talked about

13   what we said where you need multiple dosing products

14   requires protection from microbial contamination and growth

15   and they add they used the benzalkonium chloride, which is a

16   GRAS excipient and it's effective, does not have any odor

17   and then they use the EDTA because it had been shown to have

18   a synergistic effect.

19   Q.    What does a GRAS excipient mean?

20   A.    GRAS means it's kind of a designation meaning

21   generally regarded as safe.  In other words, the FDA knows

22   it's okay.  And if you are going to use any ingredients,

23   usually I try to use GRAS excipients because you know you

24   won't have to argue with the FDA about.

25   Q.    Okay.  Well, maybe Aventis was the first company to

Needham - direct

1    use this combination of benzalkonium chloride and EDTA in a

2    nasal product.

3    A.    No, not at all.

4    Q.    How do you know that?

5    A.    Because we looked in the PDR and basically there are a

6    number of products with the combination of benzalkonium

7    chloride and EDTA.

8            MR. HURST:  And we prepared a demonstrative

9    exhibit is to help us with this.  Can we pull up No. 30?

10   BY MR. HURST:

11   Q.    So what are we looking at here?

12   A.    You can see here there are eight products.  And these

13   eight products have the combination of EDTA with

14   benzalkonium chloride.  We looked in the PDR, as I said, and

15   found these products.

16   Q.    And what kinds of product are these?  Are they nasal

17   products?

18   A.    Yes, they're nasal products.

19   Q.    Nasal products.  Okay.  You understand Aventis's

20   argument with respect to these products, that these are

21   solutions and the claimed invention is a suspension?  You

22   understand that?

23   A.    Yes, we discussed that some.

24   Q.    Okay.  Here is my question for you.  First, it's

25   probably not necessary but, very quickly, what is the

1    difference between a suspension and a solution?

2    A.    In a suspension, the drug is not completely soluble to

3    give the dose that is necessary to be therapeutic so you

4    have essentially to get the whole dose in.  You have to

5    suspend some of the drug as powder.  So you have dissolved

6    the dose drug as much it can dissolve and then you have the

7    drug suspended.  The rest of the dose is suspended.

8    Q.    All right.

9    A.    Contrast it to a solution where it's all dissolved.

10   All the drug is solubilized.

11                THE COURT:  I expect that is the last time he is

12   going to ask that.  We'll see.

13                MR. HURST:  I'm sorry, Your Honor.  I rethought

14   that as soon as I asked it.

15   BY MR. HURST:

16   Q.    Now, does it make any difference with respect to the

17   usefulness of EDTA and benzalkonium chloride that these

18   nasal products or are solutions and the claimed nasal spray

19   is a suspension?  Does it make any difference?

20   A.    No, the designation of the dosage form as a suspension

21   or a solution refers to the drug.  The EDTA and benzalkonium

22   chloride are soluble in the water.  That is essentially the

23   vehicle.  And for them to work, they have to be dissolved in

24   that water.  Whether it's dissolved in the water that

25   ultimately is a surfactant or dissolved in water that is a

Needham - direct

1    solution, it doesn't matter.  They work.

2    Q.    You have heard discussion about or at least the

3    suggestion that choosing EDTA was nevertheless an invention

4    because it doesn't have a scent.  I want to ask you a few

5    questions about that.  Was it known in the prior art that

6    EDTA had no scent?

7    A.    Yes.

8    Q.    How was it known?

9    A.    I think you could look at the Handbook For Excipients.

10   I think it's defined in there.

11          MR. HURST:  So why don't we pull that back up,

12   Defendant's Exhibit 44, Page 12.

13   BY MR. HURST:

14   Q.    So just for the record, this is the Handbook of

15   Pharmaceutical Excipients?

16   A.    Yes.  This is the same page that we saw the title page

17   before.

18   Q.    And?

19   A.    This is the EDTA, disodium edetate.  And with

20   reference, it describes the appearance as being an odorless

21   white crystalline powder.

22   Q.    How about you, yourself, as a person working in this

23   field?  When were you aware that EDTA didn't have a

24   detectable scent before Aventis started its work in 1991 or

25   1992?

1          MR. RICH:  Your Honor, this is beyond the scope

2     of the expert report, the scented or scentless nature of

3     EDTA.

4          MR. HURST:  I believe that is in the expert

5     report.  Yes.

6          I apologize.  I hadn't prepared for this because

7     I thought it was in there for sure.

8          (Pause.)

9          MR. HURST:  Paragraphs 86 through 89 all talk

10    about the odorless requirement.

11         MR. RICH:  Your Honor, they talk about whether

12    phenylethyl alcohol in a product is odorless.  They don't

13    talk about EDTA in any way in terms of odor.

14         MR. HURST:  That's the --

15         MR. RICH:  And if I could -- well --

16         THE COURT:  Do you want to talk about it?

17         MR. HURST:  Yes.

18         (The following took place at sidebar.)

19         THE COURT:  Let me ask a question.  Aren't we

20    talking about equivalent agents?

21         MR. RICH:  No, Your Honor, we're not.  And that

22    is something we are going to establish.

23         THE COURT:  You say that, but he says they are.

24    He is the expert.

25         MR. RICH:  Well, Your Honor, I took his

Needham - direct

1    deposition.  I think we'll hear him say on cross-examination

2    that the primary use of EDTA is as a chelating agent, not as

3    a preservative.  In fact, this is incorporated into this

4    product as a chelating agent.  Furthermore, this is a

5    product in which EDTA that was never used, to his knowledge,

6    in a nasal suspension.  And we do submit that that is an

7    important issue.

8                 THE COURT:  It sounds like you can do a good job

9    of cross-examining the doctor.

10               MR. RICH:  Thank you, Your Honor.

11               THE COURT:  Overruled.

12               (End of sidebar conference.)

13   BY MR. HURST:

14   Q.    Did you, yourself know that EDTA was odorless before

15   Aventis came along in 1991 and 1992 with its Nasacort AQ?

16   A.    Yes, I did.  I used it a number of times.

17   Q.    All right.

18   A.    And mostly in injectable type preparations.

19   Q.    EDTA also has a second function in the formulation.

20   Is that true, doctor?

21   A.    That's true, yes.

22   Q.    What else does it do?

23   A.    EDTA really works by being a chelating agent.  And

24   what that means is if there are any stray ions left over, it

25   scoffs them up, it takes them out of play.  And by doing

Needham - direct

1    that, it has the ability to stop oxidation reaction.  So it

2    enhances the stability of, say, a drug that degrades by

3    oxidation.

4                    THE COURT:  Just dissolving into the air, or

5    what is oxidation?

6                    THE WITNESS:  No.  Oxidation means simply if

7    there are oxygen molecules in the formulation, in other

8    words, there would be water, oxygen, the drug could oxidize

9    and degrade.  You know, the drug would break down and would

10   lose its concentration.

11                   THE COURT:  Okay.

12                   THE WITNESS:  So it just stops this happening.

13   BY MR. HURST:

14   Q.    Well, was it known in the prior art that EDTA could

15   act both as a preservative and as an antioxidant?

16   A.    Yes.  As a matter of fact, it was probably used more

17   as an antioxidant than as a preservative.

18   Q.    Is that disclosed anywhere in any common reference

19   books?

20   A.    Again, in the handbook, yes.

21                   MR. HURST:  Why don't we take a look at that.

22   Defendant's Exhibit 44, Page 11.

23   BY MR. HURST:

24   Q.    This is the entry for EDTA?

25   A.    Correct.

Needham - direct

```
 1              MR. HURST:  All right.  Why don't we take a look
 2     at the column under technology, second paragraph.  If you
 3     highlight, let's say, the first six lines or so, so we can
 4     read it.
 5     BY MR. HURST:
 6     Q.    What does this tell you, Dr. Needham?
 7     A.    Well, basically what I just explained.  And that is
 8     the fact that it is often used as an antioxidant because it
 9     sequesters trace amounts of metal ions that will catalyze
10     autoxidation reactions.
11     Q.    Okay.  So let's return to the scent issue again.  And
12     particularly I want to ask you about phenylethyl alcohol.
13     Phenylethyl alcohol, you understand it has a scent?
14     A.    Yes.
15     Q.    What is that?
16     A.    It's a rose scent.
17     Q.    And was is your understanding about whether
18     phenylethyl alcohol is an ingredient that qualifies as an
19     odorless ingredient under the Court's claim construction?
20     Actually, it's the parties-agreed-to claim construction.
21     A.    Well, I think as I said, or as you just said, it's the
22     agreed-to claim construction says that it would be
23     acceptable if it didn't cause discomfort to the patient.
24              MR. HURST:  Let's take a look at Defendant's
25     Demonstrative Exhibit 68.  I hope I have the right number.
```

Needham - direct

1                    Demonstrative exhibit.  There we go.

2       BY MR. HURST:

3       Q.    All right.  So you don't have to memorize it.  We have

4       the agreed claim construction up there.

5       A.    Correct.

6       Q.    Now, what is your understanding under that claim

7       construction as you understand these ingredients as a person

8       who has been in this industry for awhile?  Are EDTA and

9       phenylethyl alcohol odorless?

10      A.    By the criteria of the agreed claim construction,

11      definitely.

12      Q.    How do you know phenylethyl alcohol is odorless?  It

13      has a rose scent.  Isn't it possible that causes users

14      discomfort?

15      A.    Well, if you look at the patent, the patent basically

16      says that the construction or the composition will have to

17      be something that would not cause discomfort to the patient.

18      So I think if you bring --

19                    MR. HURST:  Why don't we do that?  Why don't we

20      pull the patent up.  It's Defendant's Exhibit 7.  And we'll

21      take a look.  You have already done it.

22                    THE WITNESS:  There you go.

23      BY MR. HURST:

24      Q.    So this is what you are referring to?

25      A.    Yes.

Needham - direct

1    Q.    Why don't you explain to Judge Sleet, this is Column 1

2    from Defendant's Exhibit 7.  Right?

3    A.    Yes.  So this is from the '573 patent and it says,

4    other desired characteristics of the pharmaceutical

5    composition are that it not contain ingredients which cause

6    the user discomfort.

7    Q.    And does the patent anywhere else, given this

8    statement, indicate whether phenylethyl alcohol is an

9    acceptable ingredient?

10    A.    Yes.  Later in the specification, it defines or it

11    lists some acceptable ingredients of which phenylethyl

12    alcohol has to be an acceptable ingredient.

13            MR. HURST:  Let's take a look at Column 6.

14    A.    So, here, you can see that examples of

15    pharmaceutically acceptable antimicrobial agents that can be

16    used in a composition include, benzalkonium chloride, a

17    whole series of others, and then we finally get down to,

18    chlorobutanol and phenylethyl alcohol.

19    Q.    So just in summary, as a person of ordinary skill in

20    the art -- and obviously you are above one of ordinary skill

21    in the art but I want to ask you to take the perspective of

22    one of ordinary skill in the art.  Is it inventive in the

23    context of these nasal sprays to use a benzalkonium chloride

24    EDTA combination rather than a benzalkonium

25    chloride/phenylethyl alcohol combination?

Needham - direct

1    A.    Not at all.

2    Q.    And just briefly, what is your reaction to the

3    suggestion that it is inventive?

4    A.    I don't think it is inventive at all.  We've seen the

5    evidence that was known and easily attainable knowledge to

6    somebody of ordinary skill in the art.  All they had to do

7    was look in the handbook.

8            MR. HURST:  Okay.  Let's take a look back at

9    Defendant's Demonstrative Exhibit 32.

10   BY MR. HURST:

11   Q.    We looked at this before.  And now I want to turn to,

12   in particular, the mixture of MCC and CMC.  We've heard

13   discussion in the proceedings about these two ingredients.

14   Correct?

15   A.    Correct.

16   Q.    And all the prior art formulations have it?

17   A.    Yes.

18   Q.    Now, here is my question.  What is the function of

19   these ingredients in the context of these thixotropic nasal

20   sprays?

21   A.    Okay.  What you want in this type of nasal spray is

22   something that is going to be thick enough to hold the

23   suspension suspended and homogenously suspended so, you

24   know, within a unit volume of liquid, you have to the same

25   dose every time.  Okay?

Needham - direct

```
 1              The other piece of the equation, if you will, or
 2    requirement is you want it to be able to be sprayed out of
 3    the spray pump into distinct droplets.  So that is really
 4    what you want from your suspending agent.
 5    Q.    So it is thick enough to suspend --
 6    A.    Thin enough to spread.
 7    Q.    Was this known in the prior art, that MCC and CMC
 8    could provide nasal sprays with this quality, being thick
 9    enough to spread and thin enough to spray?
10    A.    Definitely, because it's used in Beconase, it's used
11    in Vancenase and it's used in Flonase.  Those are successful
12    nasal suspensions.
13    Q.    Now, without going through the time of pulling out the
14    claims, you understand this patent, however, has a
15    particular ratio, with a ratio of MCC 85-to-95 percent of
16    the mix of the two; right?
17    A.    Correct.
18    Q.    Here is my question for you.  Is there anything unique
19    or novel about having a mixture of MCC and CMC where MCC is
20    85-to-95 percent of that mixture?
21    A.    No.  As a matter of fact, you can go to FMC.  If you
22    combine the two products, it's called Avicel, as you have
23    heard.  You go to FMC and they sell the Avicel within those
24    concentration ranges defined in the patent.
25    Q.    What is FMC?
```

Needham - direct

1    A.    It's a company that is one of the major suppliers of

2    excipients to the pharmaceutical industry.

3              MR. HURST:  All right.  So let's take a look at

4    a FMC brochure.  Defendant's Exhibit 42.

5    BY MR. HURST:

6    Q.    What are we looking at?

7    A.    This is one of their advertising pieces, if you will.

8    All of the excipients manufacturers provide these to help

9    the formulator; and it defines for the formulator the

10   characteristics of what they're trying to sell.

11   Q.    What is the date of this product brochure?

12   A.    I believe it's 1993.

13   Q.    And that's on Page 11?

14   A.    Yes.

15             MR. HURST:  Let's take a look at the chart on

16   Page 3.  Just so we can see it, can you blow up two Avicels

17   591 and 611 on that top chart?

18   BY MR. HURST:

19   Q.    Can you explain what this product brochure is telling

20   folks about Avicel?

21   A.    Yes.  You can see Avicel 591F and CL-611 and the

22   percent MCC is 88 in the 591 and 85 in the 611.  So it fits

23   within the defined range.

24   Q.    Was Aventis the first to actually buy this commercial

25   product, Avicel and put it into a nasal spray?

Needham - direct

1   A.     No.  As a matter of fact, if you go to the Flonase

2   list of ingredients, it shows that they're using the 591.

3          MR. HURST:  Why don't we go do Defendant's

4   Exhibit 18, Page 2.

5   A.     So you can see here, they talk about the

6   microcrystalline cellulose and the carboxymethylcellulose,

7   and underneath they call it Avicel 591.  It's the product we

8   just talked about.

9   Q.     And does that active ingredient help you identify what

10  product we're talking about?

11  A.     Yes, the fluticasone which is the Flonase.

12  Q.     Now, it looks like obviously Flonase uses 591 but

13  Aventis uses a different off-the-shelf product, 611; right?

14  A.     Correct.

15  Q.     Is that significant to one of ordinary skill in the

16  art?

17  A.     No.

18  Q.     Why not?

19  A.     Basically what the person is going to do is given the

20  requirements that I have described before, you know, the

21  thick enough to suspend and thin enough to spray, they're

22  going to try different combinations to see how they're going

23  to mix them, what percentages, if you will, of the

24  microcrystalline cellulose and the carboxymethylcellulose

25  will give them the best to fit those characteristics.

Needham - direct

1    Q.    And do you happen to know what Beconase and Vancenase

2    uses?  Do they use the commercial off-the-shelf products or

3    do they actually use their own CMC and MCC?

4    A.    I don't know.  I've never been able to discover, if

5    you will, which they use but given the difficulty of mixing

6    the two and getting them to be a reproducible product, I'm

7    sure they just buy it.  That way, they can just buy it and

8    put it into the mix when they're making it in the factory.

9    So it's too much in a pain in the neck to get them right.

10   Q.    So how about Aventis, do you know what they did?  Did

11   they mix it themselves or did they buy it off of the shelf?

12   A.    There is a memo that describes it but basically they

13   started mixing it themselves.

14              MR. HURST:  Let's take a look at Defense

15   Exhibit 34.

16   BY MR. HURST:

17   Q.    Okay.  We're looking at the --

18   A.    Yes, we're back to the development report,

19   essentially.

20              MR. HURST:  Why don't we take a look at Page 15

21   of the development report.  Can we highlight the third?  You

22   got it.  That is what we need.

23   BY MR. HURST:

24   Q.    Can you explain what we're looking at here,

25   Dr. Needham?

Needham - direct

1    A.    This is the paragraph that basically talk about the

2    they did with the microcrystalline cellulose and the

3    carboxymethylcellulose.  The highlighted portion basically

4    says that they found that certain combinations of the

5    microcrystalline cellulose and the carboxymethylcellulose

6    were acceptable but they stopped or abandoned making those

7    combinations because they had, it took too long to make a

8    consistent suspension.  When you make these pharmaceutical

9    products, you are always on a time constraint and so, you

10   know, time is money.  You got to get it done and you can't

11   have any variability.  So you just buy Avicel.

12              THE COURT:  So like ANDA litigation.

13              THE WITNESS:  Pardon?

14              THE COURT:  Sort of like ANDA litigation.

15              THE WITNESS:  Yes.

16   BY MR. HURST:

17   Q.    So what do they do then?

18   A.    So basically they got themselves some Avicel 591 and

19   some Avicel 611 and said, okay, now we're going to make some

20   of these and see what we can do to find something that fits

21   our criteria.

22   Q.    And so when they examined those two different products

23   that they bought from FMC, what did they determine about

24   whether or not that would produce acceptable nasal sprays?

25   A.    They found that both of them worked.

Needham - direct

1    Q.    And where do we see that?

2            MR. HURST:  If we take a look at -- there we go.

3    Bottom of the Page 15, top of Page 16.

4    BY MR. HURST:

5    Q.    What are we looking at here?

6    A.    So again they're just describing essentially what they

7    found out when they tried different concentrations    of the

8    591 and the 611 and they finally settled on a concentration

9    of each.  And it said basically that the setting viscosity

10   was high enough to hold the particles suspended in the

11   bottle.  And later, they said the shaken viscosity was low

12   enough to deliver the target amount out of the pump as a

13   fine mist, which is essentially what they're objective was,

14   if you will, that we described earlier.

15           MR. HURST:  Why don't we highlight on Page 16.

16   Can we go to Page 16?

17   BY MR. HURST:

18   Q.    Did they make a determination, Dr. Needham, about

19   whether or not both of those Avicel product would produce a

20   nasal spray that fit the viscosity claims in the patents at

21   issue?

22   A.    I believe they did, yes.

23           MR. HURST:  Okay.  Why don't we take a look at,

24   why don't we highlight the top paragraph and see if it's

25   good enough, if it's big enough to read.

Needham - direct

1    BY MR. HURST:

2    Q.    Is there something in this paragraph that shows that

3    they determined that both Avicel 591 and 611 met the

4    viscosity requirements?

5    A.    Yes.  Let's see.  We talked about the 591 ranging from

6    one to 1.3 percent.  And then the Avicel about 2.3 percent.

7    And that gave --

8    Q.    Next sentence.

9    A.    It was determined that the viscosity of these

10   suspensions was 100 to 200 centipoises after the suspension

11   and 500 to 1,000 centipoises when the suspension was not

12   shaken.  So that is essentially the range that we have in

13   the patent.

14            MR. HURST:  So why don't we take a look now at

15   -- and why don't we take a look at Claim 5 of the patent, of

16   the '573 patent.  DX-7.  Got it?

17   BY MR. HURST:

18   Q.    Now, I'm going to focus on the unsheared and sheared

19   viscosity measurements here.  Is there any magic to these

20   numbers to one of ordinary skill in the art with the ability

21   to make up a nasal spray?

22   A.    No.  As a matter of fact, if you look at what actually

23   happened with the formulator, they did, in the last

24   paragraph, determine those concentrations.  They determined

25   that it worked.  In other words, it suspended properly,

Needham - direct

1  sprayed properly.  And what it actually says in all that

2  verbiage, then we determine what the viscosity was.  So they

3  kind of worked backwards.

4  Q.    Did you see anything in the development report that

5  you read or in any of the other Aventis documents that you

6  read that they were attempting to pick viscosity profiles

7  that would enable a nasal spray to reach the frontal sinus?

8  A.    No.

9  Q.    Did you see any reference in the development documents

10  to the nasal spray reaching the frontal sinus?

11  A.    No.

12  Q.    Now, on this third point here, it talks about the

13  viscosity of the nasal spray in the deposited form; right?

14  A.    Yes.

15  Q.    And we had Dr. Donovan talk about that and I'm not

16  going to repeat that.  I just have one question for you.

17  Given your knowledge of the Beconase formulation, the

18  Flonase formulation, the Vancenase formulation, and the

19  Nasacort formulation, would you expect them to behave any

20  differently in the nose?

21  A.    No.  Essentially, they have the same type of drug.

22  They have the type ingredients in the same pretty much

23  composition.  They are sprayed out of a spray pump that is

24  very similar.  I would expect them to all behave just about

25  exactly the same.

Needham - cross

1    Q.    All right.  So now, just to sum up, Dr. Needham.  With

2    respect to Claim 6 of the '573 patent, and Claim 26 of the

3    '329 patent, what is your opinion with respect to whether or

4    not those claims are obvious over the available prior art?

5    A.    They would be obvious, I think, to someone skilled in

6    the art.  I think basically as I said, you have the similar

7    type drugs.  You have the ingredients.  You have the same

8    spray pump.  You see products that have been converted from

9    aerosol to aqueous suspensions.  And you have seen that

10   they're successful from a clinical or therapeutic point of

11   view.  So as you are sitting there, if you were me at that

12   point in time, you would know that you could do this.

13             MR. HURST:  Thank you, Dr. Needham.

14             THE COURT:  Thank you.  You may cross-examine,

15   counsel.

16             MR. RICH:  Thank you, Your Honor.

17                       CROSS-EXAMINATION

18   BY MR. RICH:

19   Q.    Hello again, Dr. Needham.

20   A.    Hello.

21   Q.    How are you?

22   A.    I'm doing fine.  I'll let you know in a little while.

23   Q.    Well, hopefully you can let me know right up front.

24             MR. RICH:  If I could approach, Your Honor?

25             THE COURT:  You may approach.

Needham - cross

1                 THE WITNESS:  I'm certainly not rushing to make

2       a plane this time.  We had that issue in my deposition, Your

3       Honor.

4                 (Documents passed forward.)

5       BY MR. RICH:

6       Q.    I've just handed you an article entitled In Vivo

7       Evaluation of Sprayed Formulations of Human Insulin For

8       Nasal Delivery.  Correct?

9       A.    Correct.

10      Q.    And you are one of the named authors.

11                MR. RICH:  If we could bring it up on the

12      screen, please.

13      A.    That is true.

14      Q.    And this was, this article was received, was written

15      as of November 30th, 1994; right?

16      A.    Correct.

17      Q.    And then it was published in 1995?

18      A.    Yes.  Some time after the 1st of February.

19      Q.    Some time after the 1st of February.  And if you could

20      turn to page 92 of that article for me.  And look in the

21      right-hand column, there is a paragraph there in the middle

22      of the page, that says:

23                It was reported earlier that by increasing the

24      viscosity of nasal formulation, one can significantly

25      increase the residence time of drug at the site of

Needham - cross

1    deposition.

2              Do you see that?

3    A.    Yes.

4    Q.    And you cite seven different articles for that point.

5    Right?

6    A.    Several, yes.

7    Q.    Seven?

8    A.    Several?  Are there seven?

9    Q.    Two Morimoto, a Pennington?

10   A.    I see four.

11   Q.    Two Morimoto, Pennington, Harris three times and Lin?

12   A.    Okay.  Six of one-half dozen of the other.

13   Q.    Well, seven of one in this case?

14   A.    Sorry about that.

15   Q.    Then you say visco-bioadhesive formations having

16   suitable requirements can be formulated but such systems

17   would not be easily administered to the nasal cavity with

18   the existing drug delivery devices.  Right?

19   A.    That's true.

20   Q.    And those two sentences reflect your then current

21   thinking as of the publication of this article in 1995?

22   A.    Yes.

23   Q.    And supported by the seven articles you cite.  Right?

24   A.    Well, no.  I think the seven articles talk about the

25   deposition.

1   Q.    Fair enough.  Not the second point.  It's the first

2   point?

3   A.    Correct.  I am glad to see you have been reading all

4   of my publications.

5   Q.    I am a big fan.

6         This is an article entitled Bioadhesive and

7   Formation Parameters Affecting Nasal Absorption.  Correct?

8   A.    Yes.

9   Q.    This is a review article.  And you are one of the

10  authors on this review article?

11  A.    Correct.

12  Q.    Now, as a review article, you were attempting to set

13  forth with the greatest accuracy what was known in the art

14  at the time it was written.  Right?

15  A.    Yes.

16  Q.    And this article was revised and accepted in May 1995?

17  A.    Yes.

18  Q.    So it's pretty closely an approximation of what was

19  thought by formulators as of the critical date of July 1995.

20  Right?

21  A.    Correct.

22  Q.    Now, if you turn to Page 118, one of the formulation

23  parameters you discuss on the section bridging 118 to 119 is

24  viscosity.  Correct?

25  A.    Yes.

Needham - cross

1    Q.    And after reviewing several articles, you reached the

2    ultimate conclusion on Page 119, it says, Thus, increased

3    viscosity prolongs the retention time of drug in the nasal

4    cavity, but whether this will result in improved absorption

5    of drugs or not remains unclear.

6            Right?

7    A.    Yes.

8    Q.    So in general, a person of ordinary skill in the art

9    in 1995 might have thought that increased viscosity would

10   prolong retention time of drugs in the nasal cavity but

11   would have understood that you cannot predict the

12   bioavailability of a drug based on the viscosity of a

13   formulation that uses methylcellulose as the viscosity

14   enhancing agent.  Right?

15   A.    I don't see -- well, a number of -- we talked about a

16   number of different excipients that enhance viscosity, sure.

17   Q.    My question is whether, in general, a person of

18   ordinary skill in the art in 1995 might have thought that

19   increased viscosity would prolong retention time of drugs in

20   the nasal cavity but would have understood that you cannot

21   predict the bioavailability of a drug based on the viscosity

22   of a formulation that uses methylcellulose as the viscosity

23   enhancing agent?

24           THE COURT:  I think, counsel, you could break

25   that down.  That's more than one question.  There is more

1    than one question in there, at least as I hear it.  I think

2    the questions are appropriate.  I would suggest you

3    reformulate your question.

4             MR. RICH:  We would contest that reformulation

5    is really important in this case.

6             (Laughter.)

7    BY MR. RICH:

8    Q.    A person of ordinary skill in the art in 1995, that is

9    the shoes you are in, they might have thought that increased

10   viscosity would prolong retention time.  But they would have

11   understood that that is not predictable.  Right?

12   A.    That's true.

13   Q.    And you have been here in the courtroom listening to

14   some of the testimony.  Correct?

15   A.    Yes.

16   Q.    And you have heard about the viscosities of Nasacort

17   AQ and Barr's ANDA product and Flonase.  Right?

18   A.    Yes.

19   Q.    And Flonase is higher than Nasacort AQ or Barr's ANDA

20   product?

21   A.    I have seen some numbers, yes.

22   Q.    You know, I would like to talk for just a little bit

23   about the approach you took --

24             THE COURT:  I didn't mean to throw you off the

25   MCCs.

Needham - cross

1              MR. RICH:  I will go back to the MCCs.  Thank

2      you very much, Your Honor.

3              THE WITNESS:  Appreciate that, Your Honor.

4      BY MR. RICH:

5      Q.    We are talking about a methylcellulose-based system

6      here with Nasacort AQ.  Right?

7      A.    It's a combination system.  Methylcellulose and

8      carboxy methylcellulose.

9      Q.    And in that sort of system, the person of ordinary

10     skill in the art in 1995 would have thought this increased

11     viscosity might prolong retention time, but would understand

12     that you can't predict it?

13     A.    That's true.

14             MR. RICH:  Thank you, Your Honor.

15     BY MR. RICH:

16     Q.    Now turning to the approach that you took in the

17     obviousness analysis.  The definition of thixotropic, the

18     claim element thixotropic that you used in forming your

19     obviousness opinion, that's what I want to focus on.  Now,

20     that definition of thixotropic that you used in the

21     obviousness analysis was a liquid or a liquid system that

22     has a high viscosity at rest, when shear is applied to it,

23     it has a decrease in viscosity, and then, as a function of

24     time, it returns to the original high viscosity.  That's

25     correct.  Right?

Needham - cross

1   A.   Correct.

2   Q.   And in your definition that you used in your

3   obviousness determination, your definition of thixotropic,

4   there is definitely not immediate recovery.  Right?

5   A.   That's true.

6   Q.   But the lawyers, Barr's lawyers in this case, provided

7   you an appendix of claim terms.  Right?

8   A.   Yes.

9   Q.   For use in this case.  And they represented to you

10  that these were the Judge's construction of claim terms.

11  Right?

12  A.   Correct.

13  Q.   And that was appended to your report as Appendix A.

14       Could I get a verbal answer?

15  A.   I said yes.  I thought I did.  Okay.

16  Q.   I apologize if you said yes and I missed it.

17       Now, there were details in the definition that

18  was in Appendix A.  What the lawyers told you was the

19  Court's definition that was not in the definition that you

20  applied in determination obviousness.  Is that correct?

21  A.   I don't believe so.  But we could look at it.

22  Q.   Well, let's first look at it.  I believe it's on the

23  second page.  This is the definition you were provided by

24  counsel.  Right?  On the second page?

25  A.   Correct.

Needham - cross

1    Q.    And there were details in this definition, what the

2    lawyers told you was the Court's definition of thixotropic

3    that were not in the definition that you applied in

4    determining obviousness.  Is that correct?

5    A.    Let me look at this, please?

6    Q.    Sure.

7          (Pause.)

8    A.    I don't know if I agree with you there.

9    Q.    Okay.  Well, let me show you, as soon as I can make

10   another round trip with my workout for the day, let me have

11   you turn to Page 176 of this transcript.  And you were

12   asked, maybe you can even try to play it.  We paid all this

13   money.  We might as well see if it works.

14         "Question:  And there are things in the

15   definition that you applied in terms of thixotropic that

16   were not in that general definition.  Is that fair to say?

17         "Answer:  No.  I guess I probably misspoke

18   before.  I think I would have gone with the more simple

19   definition of thixotropic, the second one I just gave you,

20   where it's thick at resting.  When you add shear, it

21   decreases.  And then, when you let it rest, it goes back to

22   being the same viscosity as a function of time.

23         "Question:  I think I understand that you're

24   saying that a previous answer may have been unclear, so

25   I'm -- I'm, you know --

Needham - cross

1          "Answer:  Okay.

2          "Question:  -- unclear in understanding.  So if

3     you could tell me in your obviousness analysis what the

4     definition of thixotropic you used was?

5          "Answer:  Okay.  The short form of what I think

6     has been used as thixotropic was a liquid or a liquid system

7     that has a high viscosity at rest.  When shear is applied to

8     it, it has a decrease in viscosity.  And then, as a function

9     of time, it returns to the original high viscosity.

10         "Question:  And you said that was the short form

11    of what you used.  Were there any other details?

12         "Answer:  No.

13         "Question:  And there are details in the

14    definition of Appendix A that weren't in the definition that

15    you applied in determining obviousness?

16         "Answer:  That's right.

17         "Question:  Dr. Needham, before the break, we

18    were talking about thixotropic" --

19         MR. RICH:  That's enough.

20    BY MR. RICH:

21    Q.    If you could just look, I think we confirmed again, if

22    you turn to Page 177 -- I am sorry, turn to Page 176, your

23    answer continued, "I used a general, what I call a general

24    definition of thixotropic as opposed -- this is a -- the

25    definition as my understanding, it's the definition approved

Needham - cross

1    by the Court that's specific to the factors and parameters

2    and issues involved in this patent suit.

3                 "Question:  But you didn't use that in the

4    obviousness analysis.

5                 "Answer:  That's correct."

6                 So your testimony was that you did not use the

7    Court's definition of thixotropic in your obviousness

8    analysis.  Is that a correct summary of your testimony?

9    A.    I think the --

10   Q.    Was that your testimony?

11   A.    That was my testimony.

12   Q.    Okay.  The asserted claims, the two asserted claims --

13                THE COURT:  Did you want to explain that?

14                THE WITNESS:  I would like to.  But I didn't

15   know that I could.

16                THE COURT:  I would like you to as well, yes.

17                THE WITNESS:  Okay.

18                Basically, my testimony, as I understood it when

19   I was giving it, was the fact that I was looking at the

20   requirements using the definition of thixotropic as the

21   requirements that a formulator would use, a person of skill

22   in the art would use, when they were formulating that

23   product.  In other words, the thick viscosity, being sheared

24   to be thin enough to spray, and then returning in vitro

25   back.

Needham - cross

```
 1            Now, I wasn't focusing on it having the exact
 2    numbers that are provided in there.  Actually, you know, the
 3    400 to a thousand when it's at rest, and then the 50 to 200
 4    when it was sheared.  I think, as we saw from the
 5    development report, neither did the formulator for Aventis.
 6    After the fact they determined what those viscosities were.
 7            THE COURT:  Go ahead.
 8    BY MR. RICH:
 9    Q.    I heard you just tell His Honor this.  But you did not
10    in your obviousness analysis pay attention to the exact
11    viscosity numbers required by the claims.  Correct?
12    A.    That is correct.
13    Q.    So you didn't look to see whether the unsheared
14    viscosity was between 400 and 800 centipoise.  Right?
15    A.    Unsheared viscosity where?
16    Q.    I am sorry.  You did not look to see whether prior art
17    references had unsheared viscosities between 400 and 800
18    centipoise in your obviousness analysis.  Right?
19    A.    Well, I certainly reviewed the prior art references
20    and didn't see any reference to unsheared viscosity or
21    sheared viscosity.  It just wasn't presented in that way.
22    Q.    You just didn't pay attention to what the specific
23    numbers associated with any viscosities were?
24    A.    I think I read the references.  If I had seen that
25    they had provided specific numbers, I would have paid
```

Needham - cross

1    attention, if you will.  I would have noted that.  It was

2    never presented in that way.  It's just not a way that a

3    pharmaceutical formulator considers or presents it.  You are

4    developing a product that has to have certain outcomes to

5    become an acceptable product to the FDA, and for therapy.

6    The numbers are incidental, if you will.

7              I realize we have made a big deal of them in

8    this case.  But they are not -- you know, they sort of are

9    related to the fact that the product must behave in a

10   certain plan.  But they are not the primary thing that's in

11   the mind of a formulator when they are making this product

12   or formulating this product.

13   Q.    And you saw no testing results that you used in the

14   obviousness analysis to say, this has a viscosity of 400 to

15   800 centipoise in unsheared form.  Right?

16   A.    That I used or that I read?

17   Q.    That you used in your obviousness determination.

18   A.    I didn't use any.  I read things and analyzed them.

19   Q.    But none of that set forth whether there was a

20   viscosity between 400 and 800 centipoise?

21   A.    No, nowhere was there defined the viscosity in that

22   manner.

23   Q.    Nowhere was there defined the viscosity in the sheared

24   form between about 50 and about 200 centipoise?

25   A.    No.  They just talked about it being thick enough to

1    suspend it and thin enough to shear.

2    Q.    Again, in terms of deposited form on the nasal mucosa,

3    nothing about the prior art products that you read said that

4    they would have a viscosity between about 400 and about 800

5    centipoises.  Right?

6    A.    No.

7    Q.    Now, in your testimony on direct, you relied upon

8    Defendant's Exhibit No. 34, the PPIS statement.

9    A.    Yes.

10   Q.    This isn't a prior art document, is it?

11   A.    No.

12   Q.    And this isn't information that would have been

13   available to a person of ordinary skill in the art, would

14   it?

15   A.    Definitely not.

16   Q.    And when you talked about the experiments that, I

17   believe it was Rhone-Poulenc Rorer at the time, did in

18   relation to after-cell suspensions, that was something that

19   they had kept confidential to your knowledge.  Right?

20   A.    What experiments?

21   Q.    If we can turn to Page 16.  If you go to the top

22   paragraph before dextrose, you had some testimony about the

23   experimental work that was done at Rhone-Poulenc Rorer with

24   regard to Avicel RC 591 and Avicel CL 611.  Do you remember

25   that testimony from direct?

Needham - cross

1    A.    Yes.

2    Q.    But this information was not available to a person of

3    ordinary skill in the art in 1995.  Correct?

4    A.    That's true.  However --

5    Q.    Well, I have got limited time.

6    A.    Okay.

7    Q.    I am sure you will be asked a bunch of questions on a

8    bunch of these.

9              One of the other documents that you consulted

10   pretty heavily was Defendant's Exhibit 33.  This was a March

11   1st, 1991 memo?

12   A.    Yes, the rationale.

13   Q.    And this isn't something that a person of ordinary

14   skill in the art would have had.  Right?

15   A.    No.  It was an internal document.

16   Q.    And they wouldn't have known what was set forth in

17   this internal document?

18   A.    Pardon?

19   Q.    They would not have known what was set forth in this

20   internal document.  Right?

21   A.    No.

22   Q.    Another document that you relied upon was Defendant's

23   Exhibit 37.  And this is the Nasacort AQ memo from Dr.

24   Alcorn and Dr. Kim.  Again, this was an internal RPR

25   document.  Right?

Needham - cross

1    A.    Correct.

2    Q.    And people outside of RPR, people of ordinary skill in

3    the art, would not have known about this document.  Right?

4    A.    Well, this was just shown.

5    Q.    Would they have known about this document?

6    A.    No.

7    Q.    Would they have known what was in this document?

8    A.    No.

9    Q.    So this information was not available to a person of

10   ordinary skill in the art?

11   A.    Well, there is where I disagree.  The information

12   about the formulation was available, and this was just given

13   as a backup.

14   Q.    The information about what RPR scientists were trying

15   internally, confidentially, was available to a person --

16   A.    The qualitative list of ingredients was.

17   Q.    The qualitative list of ingredients that those people

18   were using experimentally, your testimony is that was

19   available to a person of ordinary skill in the art?

20   A.    Yes, it says, as a starting point the qualitative

21   formulation for Beconase AQ was used.  That's in the PDR.

22   That's what they used.

23   Q.    I apologize.  I wasn't suggesting the qualitative

24   formulation of Beconase AQ.  You also testified about a

25   qualitative list of ingredients that was used in early

Needham - cross

```
 1   development at RPR.  Right?

 2   A.    Well, I thought they were one and the same.

 3   Q.    Well, Beconase AQ didn't use triamcinolone acetonide,

 4   did it?

 5   A.    Well, that's true.

 6   Q.    To your knowledge, you don't know one way or the other

 7   whether it uses Avicel RC, mixture of CMC and MCC.  Right?

 8   A.    Other than my own experience that tells me it had to.

 9   Q.    It had to have been?

10   A.    Yes.  It had to have been used.  I would think simply

11   because of the same problems that were defined in other

12   issues, and that's the fact that it's such a pain in the

13   neck to mix these two together to get reproducible

14   suspension that, you know, you are going to buy something,

15   that you can do it as a no-brainer.

16   Q.    But they didn't have to do that.  Right?

17   A.    No, they didn't have to.

18   Q.    And there is nothing in their product information that

19   says they did that.  Right?

20   A.    In whose product information?

21   Q.    In the Beconase AQ product information?

22   A.    No.

23   Q.    You testified earlier about who would be making

24   inventions in this area, whether it would be an individual

25   formulator or a group of people.  Right?
```

Needham - cross

1    A.    Yes.

2    Q.    And you said that one person would ultimately be

3    responsible for the formulation.  I believe that was your

4    testimony.  I was trying to madly scribble it down, so I

5    don't know if I got it correctly.  Is that basically the

6    gist of your testimony?

7    A.    Yeah, by responsible I meant that there would be one

8    person who would be formulating it.

9    Q.    But they would be part of a project team in the

10   formulation process, wouldn't they?

11   A.    They would be part of a project team that was used to

12   develop the product.

13   Q.    And that project team that was used to develop the

14   product would be making decisions jointly as to whether the

15   product was an appropriate product or not.  Right?

16   A.    But they wouldn't be telling the formulator --

17   Q.    Is that --

18          THE COURT:  Let him answer the question.

19          THE WITNESS:  They wouldn't be telling the

20   formulator what he was supposed to put into the formulation.

21   BY MR. RICH:

22   Q.    Is that your testimony today, that the project team

23   would not direct what the formulation would be?

24   A.    Specifically, they would not direct the exact details

25   of the formulation, no.

Needham - cross

1    Q.    But they might very well impact whether, for example,

2    a solution were developed for a suspension.  Right?

3    A.    Well, it would be impossible to develop an aqueous

4    solution of this drug.

5    Q.    It would be impossible to develop an aqueous solution

6    of this drug?

7    A.    Correct.

8    Q.    Are you familiar with the drug Nasalide?

9    A.    That's not an aqueous.  It's a co-solvent.

10   Q.    What is the ultimate base, what is the largest

11   recipient in Nasalide?

12            THE COURT:  I guess my question is, is that

13   relevant, this line of inquiry relevant to my

14   considerations?

15            MR. RICH:  Your Honor, I believe it is.

16   BY MR. RICH:

17   Q.    What is the basis --

18   A.    Well, there is water in it.  I don't know the

19   percentages of all of the co-solvents off the top of my

20   head.

21   Q.    And Nasalide was in existence in 1995.  Right?

22   A.    Certainly.

23   Q.    And that's a development route that a formulator could

24   have followed, creating a -- is a co-solvent system a better

25   description?

Needham - cross

1  A.    Yes.  I think the formulator would have known that a

2  co-solvent system, with the solvents necessary to dissolve

3  that drug, would have been irritating and it was generally

4  known in the art that it was irritating to the patients and

5  would have not gone down that road.

6  Q.    So a formulator in your mind would not have developed

7  a products, would not have followed down a road towards a

8  drug that causes irritation.  Is that your testimony?

9  A.    They would try their best not to.

10  Q.    If I could get the Beconase package insert.  I believe

11  you have the Beconase package insert in your --

12  A.    In my book?

13  Q.    We have got an NDA excerpt.  We don't have the package

14  insert.

15           Were you here earlier during Dr. MacKay's

16  testimony?

17  A.    Yes.

18  Q.    And did you hear him testify that according to the

19  package insert the primary side effect of Beconase AQ in 24

20  percent of patients was nasal irritation?

21  A.    I will have to defer to you on that.  I wasn't noting

22  that it was 24 or that it was...

23  Q.    Here we go.  Here is the language in Beconase AQ.  So

24  your testimony is that you wouldn't have followed the

25  Nasalide path because of nasal irritation.  But it's correct

Needham - cross

```
 1    that Beconase AQ has a side effect of mild nasopharyngeal
 2    irritation, in up to 24 percent of patients treated.  Right?
 3    A.    I mean, with all due respect, I think, basically, if
 4    you look at any of these, there are people in the population
 5    who would show irritation.
 6            You know, so, is the 24 percent, it says mild
 7    pharyngeal irritation, you know, is that a significant
 8    number?  I mean, I am not a physician.  I am a formulator.
 9    Q.    But your testimony was -- and correct me if I am
10    wrong -- that a formulator or a project team would not go
11    down the route of Nasalide because of irritation.  Right?
12    A.    That's right.  The Nasalide had major irritation
13    issues.
14    Q.    And Beconase has irritation issues as well.  Right?
15    A.    Every one of these products have irritation issues.
16    Q.    Well, could we look at the Nasacort AQ package insert.
17    A.    While we are waiting, I can give you a testimonial on
18    Nasacort AQ.  My wife is very allergic.  When I was
19    discussing the case with her, she mentioned the physician
20    had to take her off Nasacort AQ because she had irritation
21    issues.  It's just a little testimonial to fill in the time.
22            MR. RICH:  Your Honor, I would ask that be
23    stricken from the record.
24            THE COURT:  It is stricken.
25    BY MR. RICH:
```

Needham - cross

1    Q.    While we are waiting for the Nasacort AQ package

2    insert, your testimony, your opinion, earlier on, that

3    someone would not go down the nasal irritation route of

4    Nasalide, was based on the project team rejecting Nasalide

5    as an option.  Right?

6    A.    Well, I think the formulator, you know, of ordinary

7    skill in the art, would be aware of the fact that the

8    co-solvent system, Nasalide product, had caused irritation

9    issues.

10    Q.    Why don't we focus on your testimony in your

11    deposition then.  And turn to Page 127 of your deposition.

12          Looking at Page 127, you were asked:

13          "And in your mind, a person of ordinary skill in

14    the art in 1995 would go so far as to reject the approach of

15    a solution based on irritation or burning demonstrated by

16    Nasalide?"

17          You said, "I would say the project team would,

18    but it would get rejected."

19          And the question was, "Well, when you say a

20    project team, I am trying to figure out the obviousness

21    determination that you did.  In doing the obviousness

22    determination, did you look from the point of view of an

23    individual or a project team?

24          "The individual, but I guess I'm caught in my

25    corporate persona because no individual makes a single

Needham - cross

```
 1    decision on that level.  They would -- it would be the
 2    responsibility of the person of ordinary skill in the art
 3    who had responsibility to formulate, to bring to the project
 4    team, here's what I found in the literature.  And, you know,
 5    it's a no-brainer.  The marketing guy would sure as heck
 6    knock you, if not everybody in the room."
 7                Right?
 8    A.    Yes.
 9    Q.    And that's the reason that you rejected the pathway of
10    Nasalide.
11                The next question was:  "And the person of
12    ordinary skill in the art in 1995, therefore, would not have
13    pursued the path of a product that caused irritation or
14    burning?"
15                And your answer was:  "Correct."
16    A.    Yes.
17    Q.    Were you here in the courtroom when Dr. MacKay was
18    testifying, to hear that Flonase also causes nasal
19    irritation?
20    A.    I believe he said that, yes.
21    Q.    And he also testified that Flonase causes burning?
22    A.    Okay.
23    Q.    Now we have the Nasacort AQ package insert.  And we
24    can look at the adverse effects here.
25                Among the adverse effects, we have, to the
```

Needham - cross

1    right, the little table, increasing cough, epistaxis and

2    pharyngitis.  Irritation is not one of the reported adverse

3    effects.  Correct?

4    A.    Let me read it, please.

5          It doesn't seem to be listed, no.

6    Q.    Thank you.  So it is not one of the reported adverse

7    effects in the package insert?

8    A.    In the package insert, that's true.

9    Q.    Now, you testified some about the Setipane article in

10   relation to your obviousness determination, and said that it

11   didn't have a list of the ingredients, but it might lead

12   someone of ordinary skill in the art in a certain direction.

13         But the Setipane article would not enable a

14   person of ordinary skill in the art in 1995 to make the TAA

15   aqueous nasal spray.  Correct?

16   A.    Not completely by itself, no.

17   Q.    And the Kobiyashi article, the other one that you

18   read, would not enable a person of ordinary skill in the art

19   in 1995 to make the TAA aqueous nasal spray.  Correct?

20   A.    Same answer, yes.

21   Q.    You testified that the issue of CFCs was well-known to

22   people of ordinary skill in the art.  Right?

23   A.    Yes.

24   Q.    And one of the things you relied upon was Defendant's

25   Exhibit 33, which we have already established was an

Needham - cross

1    internal RPR document that a person of ordinary skill in the

2    art would not have known about?

3    A.    Which one was that?

4    Q.    I am sorry?  That was the rationale document.

5    A.    Okay.

6    Q.    Correct.  It would not have been known to a person of

7    ordinary skill in the art?

8    A.    That's true.

9    Q.    And the other document that you specifically relied

10   upon was a patent application, WO9214473.  It is Defendant's

11   Exhibit 13.  Right?

12   A.    Yes.

13   Q.    But that was a patent application from Switzerland.

14   Right?

15   A.    Yes.  I believe it was.

16   Q.    And --

17   A.    Yes.

18   Q.    -- CFC's were something that were being phased out in

19   other parts of the world, but there wasn't a big push to

20   phase out CFC's in the eighties an nineties, at least up to

21   1996, in the United States, was there?

22   A.    As someone who was formulating in that time frame, it

23   was known that CFCs were going to be removed from the

24   market.  And the issue here really from a corporate

25   formulator's point of view, I should say from a corporate

Needham - cross

1    development point of view, is you have to anticipate what's

2    going to happen in the market.  You know, you can't say,

3    okay, I am going to -- CFCs are going off the market

4    tomorrow and I am going to have a -- you have to have a

5    product ready to go and switch your people or your patients

6    over to that product.

7             You know, for example, you saw the rationale

8    memos internally were 1991.  The patent got filed in, what,

9    '95, and I have forgotten the date where the product, you

10   know --

11   Q.    Was there a big push in the 80s and early 90s to get

12   rid of CFCs in pharmaceuticals in the United States?

13   A.    It depends on how you define "big push."

14   Q.    Well, as you define "big push."

15   A.    Well, I said it.  Therefore, I must mean it.

16   Q.    Well, if I could have you turn to your deposition

17   again.

18             In fact, was there any push to do it in the

19   United States?  You know what, I won't define it as "big

20   push."  Was there any push to formulate outside CFCs in the

21   United States in the 1980s and early 1990s?

22   A.    Well, I think the witness that there was a push or

23   there was a knowledge that there was going to be a necessity

24   to go from aerosols was the fact that Beconase and Vancenase

25   had done it and actually reformulated their products as an

Needham - cross

1    aqueous suspension and had taken over 60 percent of the

2    market.

3    Q.    Now, that is not something you put in your report,

4    that Beconase and Vancenase had done it so other people

5    would want to do it.  Right?

6    A.    No, I think you can't take -- what you are doing is

7    you are taking little bits of pieces of knowledge and trying

8    to -- you know, a person of ordinary skill in the art has

9    lots of knowledge and lots of information from many

10   different places, his education, his experience, the

11   literature that he reads every day.  All of that goes into

12   the decisions that a person would make and all of the

13   knowledge that would be used when they're looking at

14   formulating a product.

15   Q.    So that is something that might have been known to a

16   person of ordinary skill in the art but it wouldn't be

17   something you put in your report as part of your opinion?

18   A.    I guess it was assumed something.  I was easily knew

19   that and I easily read it.

20   Q.    You talked about EDTA to some degree here and you

21   talked about it as part of a preservative system but really

22   the primary application of EDTA in pharmaceutical

23   formulations like this one is as a chelating agent.  Is that

24   correct?

25   A.    That's true.

Needham - cross

1   Q.    And you have no reason to believe that phenylethyl

2   alcohol performing the function of a chelating agent?

3   A.    No.

4   Q.    And I believe you said this on direct but I just want

5   to make it absolutely clear.  Every nasal preparation that

6   you cited uses EDTA in a solution, not a suspension?

7   A.    That's true.

8   Q.    In fact, to your knowledge, Nasacort AQ was the first

9   nasal spray suspension that used a chelating agent?

10  A.    Well, I can't say that.  It used the -- yes, let's use

11  the EDTA.

12  Q.    Let's use the chelating agent.  To your knowledge, at

13  the time you formed your opinions, was there any nasal

14  suspension preparation, as of July 1995, that used a

15  chelating agent?

16  A.    No, I think you're right.  I stand corrected.

17  Q.    I want to switch back to phenylethyl alcohol.  And

18  phenylethyl alcohol is in Beconase AQ and Vancenase AQ and

19  Flonase?

20  A.    Right.

21  Q.    Now, a person of ordinary skill in the art in 1995, he

22  or she or they would have reason to believe that the

23  preservative system of benzalkonium chloride and phenylethyl

24  alcohol would potentially increase drug absorption over the

25  same formulation without that preservative system?

Needham - cross

1    A.    Yes, I think, I believe that was in the literature.

2    Q.    In fact, it was in your literature.  You wrote that.

3    A.    True.

4    Q.    And if you would turn, in the In Vivo Evaluation of

5    Spray Formulation of Human Insulin For Nasal Delivery

6    article, to page 102.

7                And as part of what you did in relation to this

8    article, you studied the effect of the phenylethyl alcohol,

9    benzalkonium chloride preservative system on nasal

10   absorption of insulin.  Right?

11   A.    Yes.

12   Q.    And it was in an MCC spray formulation; right?

13   A.    Yes.

14   Q.    And in that formulation, the preservatives provided a

15   higher absorption of insulin when compared to the same

16   formulation without the preservatives.  Right?

17   A.    Correct.

18   Q.    And you suggested that the greater absorption of

19   insulin seen with these preservatives may be due to their

20   surfactant nature as well as their ciliotoxicity, which

21   allows insulin longer residence in the nasal cavity due to

22   reduced mucociliary clearance.  Do you see that?

23   A.    Yes.

24   Q.    I want to focus for a second on the ciliotoxicity.

25   That means it kills or harms cilia; right?

Needham - cross

1    A.    What it actually does is it reduces the peak

2    frequency.

3    Q.    Kind of narcotizes?

4    A.    Yes, I guess that is a way to put it.

5    Q.    And that is something you see with phenylethyl alcohol

6    and benzalkonium chloride together but you don't see it with

7    EDTA and benzalkonium chloride.  Right?

8    A.    I don't know.

9    Q.    You have no knowledge on the benzalkonium

10    chloride/EDTA combination?

11    A.    I know you would see it with benzalkonium chloride by

12    itself.  It was well known.  I don't know if you would know,

13    if you would see it with the combination of EDTA plus

14    benzalkonium chloride.

15    Q.    So that is just something you don't know?

16    A.    That is right, I have never see the data.

17    Q.    And a person of ordinary skill in the art wouldn't

18    know it either?

19    A.    Well, not because I don't know.  Maybe they would look

20    in the literature.

21    Q.    You know of no literature and, in forming your

22    obviousness opinion, you found no literature that would

23    suggest that the combination of EDTA and benzalkonium

24    chloride led to this narcotization of the cilia?

25    A.    That's true.

Needham - cross

1    Q.    It's also possible that the ciliotoxicity is due to

2    the benefits of phenylethyl alcohol, isn't it?

3    A.    I don't know.  It's possible that it contributed but,

4    again, we didn't partition up the two compounds.

5    Q.    If I could have you look back at the Handbook of

6    Pharmaceutical Excipients.

7               THE COURT:  Counsel, how much more do you have?

8    Because we probably should do a break at some time.

9               MR. RICH:  Well, it depends on how he answers.

10   Probably five to ten minutes, Your Honor.

11              THE COURT:  Let's take a break.

12              (Recess taken.)

13              THE COURT:  Please be seated.

14              We'll resume with counsel's cross.

15              MR. RICH:  Just a few more questions.

16              THE COURT:  All right.

17   BY MR. RICH:

18   Q.    We were talking about the preservative system of

19   phenylethyl alcohol and benzalkonium chloride and the

20   ciliotoxicity effect of that combination.  Right?

21   A.    Yes.

22   Q.    And I asked you whether it was likely that phenylethyl

23   alcohol is the primary ciliotoxic ingredient?

24   A.    Correct.

25   Q.    Do you believe that phenylethyl alcohol is the primary

Needham - cross

1    ciliotoxic ingredient?

2    A.    I don't know, to be honest with you.  I know

3    benzalkonium chloride is traditionally on the list of

4    ciliotoxic and, just, it's possible but I, to be perfectly

5    honest, I really don't know.

6    Q.    We looked at this before.  The Handbook of

7    Pharmaceutical Excipients.

8    A.    Yes.

9    Q.    Let's look at the entry for phenylethyl alcohol in the

10    description section which says, it has a burning taste which

11    irritates and then anesthetizes mucous membranes.  Do you

12    see that?

13    A.    Yes.

14    Q.    And that could be the ciliotoxic effect?

15    A.    Possibly, I guess.

16    Q.    And you have no reason to believe that the Handbook of

17    Pharmaceutical Excipients is wrong on this point, do you?

18    A.    No, I don't think I want to say anything about the

19    Handbook of Pharmaceutical Excipients.

20    Q.    And you are not qualified to make the decision whether

21    Flonase would be odorless if it caused a burning sensation?

22    A.    True.

23            MR. RICH:  Thank you.

24            Your Honor, I have nothing further.

25            THE COURT:  Mr. Hurst, you may redirect.

1      MR. HURST:  Very briefly, Your Honor.

2                      REDIRECT EXAMINATION

3  BY MR. HURST:

4  Q.    Dr. Needham, when conducting your analysis about what

5  the prior art disclosed and taught to one of ordinary skill

6  in the art, you said during cross-examination that you

7  didn't focus on the specific viscosity values in the Court's

8  Markman ruling.  Do you remember saying that?

9  A.    Yes.

10  Q.    Did we, at Barr Laboratories, have a different expert

11  determine experimentally whether the prior art Flonase

12  solution matched those viscosity values?

13  A.    Yes.

14  Q.    Who would that be?

15  A.    Dr. Klingenberg.

16      MR. HURST:  Thank you.  I have no further

17  questions.

18      THE COURT:  All right.  Thank you, doctor.  You

19  are excused.

20      THE WITNESS:  Thank you, sir.

21      THE COURT:  All right.  Mr. Hurst, your next

22  witness.

23      MR. HURST:  We are resting our case subject to

24  the admission of dep. designations that I understand by

25  agreement we're giving you at the end the case.  So we're

1    resting our case.

2              THE COURT:  All right.

3              MR. HURST:  Thank you.

4              THE COURT:  Is there going to be a rebuttal

5    case?

6              MR. BERGHOFF:  Yes, there will be a rebuttal

7    case.  First, Your Honor -- and this is at your pleasure.

8    Would you like a brief oral Rule 52 motion?

9              THE COURT:  You can go right ahead.

10             MR. BERGHOFF:  I'm going to ask my partner,

11   Aaron Barkoff to deliver that to Your Honor.  Thank you.

12             THE COURT:  Okay.

13             MR. BARKOFF:  Good afternoon, Your Honor.

14             THE COURT:  Good afternoon.

15             MR. BARKOFF:  Plaintiffs request a judgment

16   under Rule 52 that Barr has failed to prove invalidity by

17   clear and convincing evidence.  I have three brief points.

18             THE COURT:  Okay.

19             MR. BARKOFF:  First, Barr has failed to prove

20   that the Phase III clinical trials were a public use.  The

21   parties agree that a public use is a use of the claimed

22   invention by a person other than the inventor who's under no

23   limitation, restriction or obligation of secrecy to the

24   inventor.

25             Barr has not offered any evidence that either

1    the principal investigators or the patients who participated

2    in the clinical trials were under no limitation, restriction

3    or obligation of secrecy, much less clear and convincing

4    evidence of that.

5         Barr has focused its arguments on the patients

6    who enrolled in the clinical trials; arguing that because

7    they did not sign a confidentiality agreement, that made

8    their use of the claimed invention a public use.  But the

9    case law clearly establishes that that fact is not

10   dispositive of public use because patients may be under

11   other limitations or restrictions.  Barr has simply failed

12   to show there was any use of the invention by a person who

13   was under no limitation or restriction.

14        Second, Barr's failed to prove that the claims

15   are not enabled.  Barr has not shown, by clear and

16   convincing evidence, that the specification of the patents

17   in suit does not enable one of ordinary skill in the art to

18   make and use the claimed invention.  Dr. Donovan, yesterday,

19   admitted if Dr. Berridge's PET results are true, then the

20   claims are enabled.  Barr has failed to prove by clear and

21   convincing evidence that Nasacort AQ does not deposit in the

22   frontal sinus.  In fact, the weight of the evidence shows

23   the opposite.

24        Third, Barr has failed to prove that the

25   invention would not have been obvious.  Here, all the prior

1    art products that Barr relies on for obviousness lack at

2    least two key features recited in the asserted claims.  One,

3    odorlessness and, two, a particular viscosity profile.  None

4    of the prior art products are odorless.  None have the

5    specific velocity profile of Nasacort AQ.  In addition, Barr

6    has not shown there was a reason to combine the prior art

7    products and create a product that has those properties.

8    Therefore, Barr has failed to establish obviousness by clear

9    and convincing evidence.

10         For those reasons, Your Honor, plaintiffs move

11    for a judgment under Rule 52 that Barr has failed to prove

12    invalidity.

13         THE COURT:  Thank you, counsel.

14         Are you going to respond?

15         MR. HURST:  If you would like me to, yes.

16         THE COURT:  Yes.

17         MR. HURST:  Under public use, Your Honor, the

18    law is pretty clear.  If there is a nonconfidential use of

19    the claimed invention, it is in fact a prior public use.  In

20    the record, Settipane, Kobayashi demonstrate that 600 people

21    used the claimed invention in the prior art, the exact

22    claimed invention, Nasacort AQ.

23         In the record, that they did it with no

24    confidentiality agreement, is DX-316, Paragraph 63.  The

25    Simpson deposition transcript where this is admitted -- it's

1    not even a contested fact, Your Honor -- at 182, 9 through

2    22, which is one of the deposition designations.

3           With respect to enablement, you heard from

4    Dr. Donovan who has been in this business for 20 years who

5    said that reading this patent application, it is Nasal Spray

6    101.  It doesn't teach you anything more than the prior art

7    with respect to how to get to the frontal sinus.

8           Counsel argued that the weight of the evidence

9    shows that the nasal spray does in fact get to the frontal

10   sinus.  The point I would like to focus on is Dr. MacKay's

11   graphic of an actual frontal sinus, that long thin tube.

12   The notion that a spray would get up that long thin tube

13   without touching a wall, that alone seems to us to prove the

14   opposite fairly definitively in our view.

15          And with respect to obviousness, you have just

16   heard from Dr. Needham who has been in this business for

17   40 years.  And what he has demonstrated is that not only was

18   this Nasacort formulation obvious, it was in fact a copy of

19   the prior art; not only one prior art formulation but three

20   prior art formulations.

21          And so for those reasons, Your Honor, we would

22   oppose the motion.  Thank you.

23          THE COURT:  The Court will deny the motion for

24   at least a number of the reasons just articulated by

25   Mr. Hurst.  There are many others.  I have no difficulty

1    denying the motion, with respect, counsel.

2          MR. BERGHOFF:  Before we call our first rebuttal

3    witness.

4          THE COURT:  Yes.

5          MR. BERGHOFF:  I just wanted to review with Your

6    Honor scheduling.  It would be my preference to call

7    Mr. Simpson first -- it would make the most logical sense.

8    He is a brief witness -- followed by Dr. Kaliner.

9    Dr. Kaliner has to be walking out the door at 5:30.  I know

10   Your Honor can't help me with the times.  I think it's going

11   to work out but if Your Honor were unable to hold court in

12   session until 5:30, then that would make my decision for me.

13         THE COURT:  It's a long day, counsel,

14   particularly for my court reporters.  It's a long day and

15   you have to be sensitive to the fact there is only so much

16   the jurist can absorb at any given time.  So I would suggest

17   that you make sure you can get us out here at a reasonable

18   time.  That is the guideline I'm going to give you.

19         MR. BERGHOFF:  My call is clear.  We will be

20   calling Dr. Kaliner as our first rebuttal witness.

21         THE COURT:  Okay.

22         (DR. MICHAEL A. KALINER, previously sworn,

23   retakes the witness stand.)

24                        - - -

25         THE DEPUTY CLERK:  Dr. Kaliner, you are reminded

1     that you are still under oath.

2              MR. GRACEY:  Your Honor, there is one issue

3     before we get started with Dr. Kaliner.  Plaintiffs informed

4     us this morning that they wanted to introduce a new exhibit

5     that hadn't been disclosed in the pretrial order.  It hadn't

6     been on any exhibit list.  We think it's inappropriate and

7     hereby object to the exhibit; and I believe they want to use

8     it with this witness.

9              THE COURT:  With this witness?

10             MR. RICH:  That is correct.

11             THE COURT:  Do you want to tell me what it is,

12    the reasons that you have just announced that you are

13    objecting?

14             MR. GRACEY:  Would you like me to explain what

15    it is?

16             THE COURT:  Well, it's your objection, so ...

17             MR. GRACEY:  Yes.  Okay.  What it is, Your

18    Honor, is it appears to be a nebulizer, some kind of

19    document related to a nebulizer, not a nasal spray.  And

20    it's a printout from a -- it looks to be like a website of

21    some sort or a press release dated June 4th, 2007.  So it's

22    been around almost a year.  Plaintiffs have known about our

23    case.  We've known about each other's cases for years.  If

24    they wanted to use it, they clearly had a year to put it on

25    the exhibit list.

1                    THE COURT:  What is your response?

2                    MR. RICH:  Your Honor, if I might approach and

3      give the Court a copy?

4                    THE COURT:  Yes.

5                    (Document passed forward.)

6                    MR. RICH:  Your Honor, this is an issue prompted

7      entirely by the testimony yesterday of Dr. Donovan.  And it

8      will show the Court -- hopefully assist the Court, I should

9      say -- that the weight of the evidence shows that products

10     can get to the frontal sinus.

11                   Dr. Donovan testified to a question:  Now, in

12     all your years of experience, in this area of study, have

13     you ever heard, have you ever heard of a nasal spray that

14     reliably reached any of sinuses, much less the frontal

15     sinus?

16                   And Dr. Donovan responded:  No, I haven't.

17                   Now, if permitted to testify, Dr. Kaliner will

18     testify that this is an accepted therapy.  It's a nasal

19     spray.  In fact, an intranasal --

20                   THE COURT:  But this whole new area of inquiry,

21     counsel, and this has been an issue in this case from Day

22     One.

23                   MR. RICH:  Your Honor, it's a different question

24     from what was has been in the case from Day One.  It has

25     been a question whether Nasacort would reach it, but the

Kaliner - direct

1    credibility of Dr. Donovan I would submit is diminished by

2    the fact that there are nasal sprays that do reach the

3    frontal sinus and are used as treatments for sinusitis.

4              THE COURT:  I might let you make those inquiries

5    but I don't believe it fair or kosher to permit the use of

6    this document to do that.

7              MR. RICH:  Fair enough.

8              THE COURT:  Your reaction.

9              MR. GRACEY:  Yes.  My reaction, judge, is he is

10   mischaracterizing the document.  It's not a nasal spray and

11   you will not see the words "frontal sinus."

12             THE COURT:  Anywhere on the document.  I'm going

13   to give this back to you.  Okay?

14             MR. RICH:  Sure.

15             (Document passed back.)

16             MR. RICH:  Thank you, Your Honor.

17             THE COURT:  Okay.  So I'm going to, for the

18   record, sustain that objection.

19             MR. GRACEY:  Thank you.

20             MR. RICH:  Thank you, Your Honor.

21             Your Honor, if I might approach?

22             THE COURT:  You may.

23             (Binders passed forward.)

24                        DIRECT EXAMINATION

25   BY MR. RICH:

Kaliner - direct

1    Q.    Dr. Kaliner, I'd like to start by talking about

2    clinical trials.  Can you refresh our memories about your

3    experience with clinical trials?

4    A.    The Institute for Asthma and Allergy of which I'm the

5    founder is heavily invested in clinical trials.  And we do

6    somewhere between 15 and 30 per year.  We've probably done

7    500.

8    Q.    And have you been involved in those clinical trials?

9    A.    I have been involved in the trials.  I've done, I've

10   administered the trials.  I have designed trials.  I've

11   critiqued trials.  I've reviewed the results of trials.  I

12   mean I have done everything you can do at trials.

13   Q.    What phase trials are those that you are speaking of?

14   A.    We predominantly do Phase III trials and occasionally

15   Phase IV trials.

16   Q.    Can you tell me what Phase III trials are?

17   A.    Phase III trials are mandated by the FDA to bring a

18   product to licensure in the United States.  So the FDA

19   requires that companies take a product that they're

20   interested in and do a placebo-controlled, balanced trial

21   over a certain period of time with a certain number of

22   patients and have a set end point that is predetermined that

23   shows clinical significance and also demonstrates safety.

24   So these are FDA required trials before any product can be

25   licensed in the United States.

Kaliner - direct

1    Q.    And when you say "can be licensed in the United

2    States," what effect does that have on the distribution of

3    the drug in the United States?

4    A.    Well, a product cannot be legally sold in the United

5    States as an ethical pharmaceutical without FDA approval.

6    So it is an absolute prerequisite before any product can be

7    sold.

8    Q.    Are there any ethical requirements regarding what

9    information must be given to patients in Phase III trials?

10   A.    Yes.  There is a detailed quite lengthy informed

11   consent document that is constructed, reviewed and approved

12   by the FDA that has to have all the essential ingredients of

13   the trial outlined in very simple language, because most of

14   our volunteers are not well educated.  And so in very simple

15   language, we have to spell out:  What is the active

16   ingredient?  What are the possible risks?  What are the

17   possible benefits?  All the details of the trial itself.

18   And we need to go over that with the patient; and they have

19   to sign it prior to any inclusion in the trial.

20   Q.    And are there any ethical requirements regarding how

21   patients can use information they receive in a clinical

22   trial in relation to their treatment by other caregivers?

23   A.    Well, I mean patients have to know what they're on in

24   the trial.  We do do things in some of our experiments that

25   involve unusual experiments.  The exposure to medicines that

Kaliner - direct

1    could conceivably have side effects or, God forbid, one of

2    the patients got sick and they have to go and be signed in

3    an emergency room or what have you.  They have to know what

4    they're on.  They have been to be informed what they're

5    taking, and why, and what are the possible risks they're

6    entailing.

7    Q.    Now, you testified that most of your volunteers are

8    not especially well educated; and we heard in the opening,

9    as far as Aventis knew, these were pharmaceutical

10   formulators or their brothers or sisters or parents were

11   pharmaceutical formulators.  Who are the participants in

12   clinical trials for allergies?

13   A.    In a setting like mine, where we take care of

14   literally tense of thousands of patients, we recruit largely

15   within our patient population.  And so we have paints that

16   we know, with whom we have a very long relationship.  We

17   take care of them clinically.  We invite them to participate

18   in a trial into which they fit because they have certain

19   prerequisites.  They then do the trial; and we continue to

20   take care of those patients.  So we have a very long and,

21   you know, knowledgeable relationship of these patients

22   before we involve them in a trial.  So it would be difficult

23   for me to imagine that we have very much pharmacists or

24   formulators that come to our trials.

25   Q.    And in these allergy trials, how much of a drug do the

Kaliner - direct

1    patients receive at a time?

2    A.    Well, if it's a spray like what is in question here,

3    the patients get just enough spray to last them for the

4    weeks of the trial.  So depending on the two trials we're

5    talking about, either two weeks or three weeks, and they are

6    seen -- in the three-week trial, they are seen in the

7    interim.  And so you are giving them a milliliter or two

8    milliliters.  Each spray is 100 microliters, and you are

9    giving them just enough spray to last during the duration of

10   the trial.  So it's a few milliliters.  So a teaspoon is

11   five milliliters.  So that puts it in perspective.  It's a

12   few milliliters less than a teaspoonful of a reagent in most

13   of these trials.

14   Q.    And you said these are placebo-controlled trials, the

15   Phase III trials.  What does that mean in terms of what a

16   patient would know regarding what they would receive?

17   A.    Well, the patient would be informed that they could be

18   either getting an active product or placebo but they would

19   not know which one they were getting.  And, in fact, we do

20   not know which one they're getting.  These are called double

21   blinds.  So we're blinded, the patient is blinded, and only

22   the contract research organization that regulates the trial

23   has any idea who is getting what.  And so there is a

24   50 percent chance the patient will be getting a matched

25   placebo.

Kaliner - direct

1    Q.    Do all drugs succeed in proving safety and efficacy in

2    Phase III trials?

3    A.    By no means do all drugs succeed in Phase III trials.

4    That is why you do trials.  You formulate a product, and you

5    hope that it will do what you want it to do.  But there is

6    only one way in the United States to find out whether it

7    does it, and that is it has to be a Phase III clinical

8    trial.

9    Q.    Do you have any perception -- actually, if you could

10   turn in your binder to Exhibit 420.  And I believe we have

11   represented some of the information.  Can you tell me what

12   this article deals with?

13   A.    This is an analysis of a clinical trials.  They took

14   280 trials and looked at the breakdown of trials that have

15   succeeded and those that have failed, trying to analyze why

16   a substantial number of the trials failed.

17   Q.    And I think if we turn to the last -- oh, there we go.

18            MR. GRACEY:  Your Honor?

19            THE COURT:  Yes, sir.

20            MR. GRACEY:  Just briefly, I'm not sure where

21   counsel is going with this but in the entirety of

22   Dr. Kaliner's report, there is no discussion of any

23   failures.  So if he going into secondary consideration, I

24   would object for the record.

25            THE COURT:  Okay.

Kaliner - direct

1           MR. RICH:  Your Honor, if I could just beg the

2    Court's indulgence to get the paragraph number?

3           THE COURT:  Sure.

4           MR. RICH:  This specific document is referenced

5    in his report at Paragraph 40, Page 19.  I could hand it up,

6    Your Honor, if you would like.

7           MR. GRACEY:  I just wanted to make sure to note

8    if he goes into failures of others, that that is not

9    disclosed.  To talk about this, I don't have any problem.

10          MR. RICH:  Your Honor, I think we'll go to the

11   same -- first, I do believe that I will be talking about

12   failure of others.  And I do believe that that is addressed

13   expressly in his report in Paragraph 40.  There are specific

14   failures of Phase III trials in intranasal sprays that are

15   addressed in that paragraph.

16          THE COURT:  Counsel.

17          MR. GRACEY:  Your Honor, I believe, like I said,

18   I have no problem with Dr. Kaliner talking about Phase III

19   trials in general, but if he is going to translate that into

20   secondary considerations as it regards Nasacort AQ, I would

21   object.

22          THE COURT:  Do you understand the objection?

23          MR. RICH:  I do understand the distinction.  And

24   I'm suggesting that this is discussing the nature of Phase

25   III trials and, in fact, they are experimental.

Kaliner - direct

```
 1              THE COURT:  Sure.  Okay.  That's fine.  I don't
 2    think there is an objection to that.
 3              MR. GRACEY:  I have no problem.
 4              MR. RICH:  I apologize for my misunderstanding.
 5              THE COURT:  No problem.
 6    BY MR. RICH:
 7    Q.    Turning back to the article.  It says here that only
 8    58 percent of the trials are successful, which means that
 9    about 42 percent, if I got my math right, failed.  Is this
10    consistent with your understanding of Phase III clinical
11    trials?
12    A.    Yes.  More or less, right.  That there are a
13    substantial risk of failure; and I have seen many.
14    Q.    Can you tell me some specific examples of failure that
15    you saw?
16    A.    I think it was mentioned earlier.  We talked about, I
17    think it came up, this tipredane, a steroid that was being
18    brought along as what was called a soft steroid; that is, a
19    steroid that could be used for asthma and rhinitis but have
20    fewer side effects.  And, in fact, it just simply failed,
21    had no efficacy above placebo.  This is work that was done,
22    it was by a company that made a good asthma medication and
23    they were trying to find a successor.  And the product
24    simply failed.  It did not work at all despite everything in
25    Phase I and II, and all the information would have suggested
```

Kaliner - direct

1    it would have been effective.

2    Q.    We're looking at now Plaintiffs' Trial Exhibit 421.

3    And this is a press release.  Is that what you are talking

4    about where it says that the tipredane had simply not been

5    effective in clinical trials?

6    A.    Correct.

7    Q.    And you said tipredane had been mentioned.  Are you

8    talking about Dr. Needham's discussion of a patent

9    application that he relied upon in relation to his

10    obviousness opinion?

11    A.    That is correct.  That was surprising, too.

12    Q.    Do you know of any other nasal sprays that have failed

13    in Phase III trials?

14    A.    Let me give you three examples.  One is -- the first

15    two are products that I actually developed the protocol for

16    and studied with a small company that -- and it was doxepin

17    nasal spray.  So there was every reason to think doxepin

18    would work.  It's an antihistamine known as Sinequan in the

19    80s as a tranquilizer.  It's a very, very good

20    antihistamine.  And it's on the market as a salve which you

21    put on the skin for itching and it's very effective.  It's

22    very good.  It's good orally.  It's good as a topical.  It's

23    a very potent product; and we thought for sure it would work

24    as a nasal spray antihistamine.  In fact, it had no activity

25    whatsoever above placebo.

Kaliner - direct

1              So then there was work that was being done in

2     Europe on a product called Capsaicin.  Capsaicin is the

3     essence of hot pepper.  That is what makes hot pepper tasty

4     and spicy.  It was thought in Europe that if you sprayed it

5     in the nose, it could be useful for nonallergic rhinitis.

6     And so we did that project in our office, in our lab; again

7     with another company; and it was unacceptable in that, as

8     you might imagine, it hurt too much.  We could not formulate

9     a product that the patients could tolerate so side effects

10    limited that product.

11             And the third is totally surprising.  And that

12    is that epinastine, which is sold as Elestat.  It's on the

13    market.  We have a sizeable number of patients using it as

14    an eyedrop antihistamine.  Eyedrops should work in the nose.

15    There are continuous mucus membrane, as has been pointed out

16    in my other testimony this week.  That the nose and the eyes

17    are very similar to each other.  So one would fully

18    anticipate that an eyedrop antihistamine would work and it

19    failed.  It was withdrawn from market about a month or six

20    weeks ago because of total failure at trial.  This is very

21    current.

22             Nonetheless, you can never assume that a product

23    is going to work until you do clinical trials and it works.

24    Q.    I'd like to turn specifically then to the clinical

25    trials that Rhone Poulenc Rorer ran that have been

Kaliner - direct

1    discussed, the phase III clinical trial.  And you reached an

2    opinion, didn't you, as to whether these clinical trials

3    were experimental or public use?

4    A.    Well, they were experimental.

5    Q.    If we could look at the factors?  That I think we

6    prepared a slide of factors.  Were these the considerations

7    that you applied in determining whether it was experimental

8    use?

9    A.    Yes.

10   Q.    And I guess I can read them just as well as you can

11   but:

12              The necessity for public testing.

13              The amount of control over the experiment

14   retained by the inventor.

15              The nature of the invention.

16              The length of the test period.

17              Whether payment was made.

18              Whether there was a secrecy obligation.

19              Whether records of the experiment were kept.

20              Who conducted the experiment.

21              The degree of commercial exploitation during

22   testing.

23              Whether the invention reasonably required

24   evaluation under actual conditions of use.

25              Whether testing was systematically performed.

Kaliner - direct

1          Whether the inventor continually monitored the

2     invention during testing.

3          And the nature of the contacts made with

4     potential customers.

5          MR. GRACEY:  Your Honor, if I may.  I will

6     object on relevance grounds.  The reduction to practice date

7     has been set by plaintiffs as of 1992.  So as a matter of

8     black-letter law, experimental use is not in the case.

9          MR. RICH:  Having done further research from the

10    last time we were before Your Honor, first of all, we

11    believe that the black-letter law is not so black.  It's

12    gray at best.  And we believe, we are hoping that Your Honor

13    finds that it's experimental use.

14          Second, we believe it certainly is still

15    relevant to the issues in this case.

16          THE COURT:  Go ahead.

17    BY MR. RICH:

18    Q.    If we could start with the first one.  The necessity

19    for public testing.  Actually, before we get into the

20    necessity for public testing...

21          Was there something unusual about the way this

22    study was designed in your mind with regard to a Phase 3

23    clinical trial for a nasal allergy product?

24    A.    No.

25    Q.    What was the interaction between Rhone-Poulenc Rorer

1    and the doctors?

2    A.    Well, what happens with these clinical trials is that

3    Rhone-Poulenc Rorer will approach physicians, and ask them,

4    are they able to do the study.  Are they interested in the

5    study and are they capable of recruiting patients adequately

6    into the trial?  And can they follow the rules and law that

7    regulate clinical trials?

8    Q.    What happens next, if they agree that they can follow

9    the rules and laws that govern the clinical trials?

10   A.    There is generally a meeting where we get together,

11   all the investigators get together, and discuss the details

12   of the trial.  It's usually a one- or two- or three-day

13   meeting, where all the details are reviewed and hashed out

14   to make sure that there is no defects in the design.  So

15   it's a very interactive time.  Then the clinical trial is

16   finalized and has to be approved by the FDA and then put in

17   place.

18             Rhone-Poulenc Rorer has something to do with it,

19   but they also have a CRO that is usually involved.  So there

20   is a contract research organization that plays a role

21   between RPR and the physicians.  So there is direct contact

22   with RPR.  Once the product is started, it's done by a CRO.

23   Q.    When you say the clinical trial is finalized, is there

24   a protocol developed?

25   A.    Yes, there is a very detailed protocol that has every

Kaliner - direct

1   detail of the study.  And there is also the creation of a

2   series of papers, what we call source documents.  They go

3   through every single step of the study, it's documented, so

4   that there is a checklist in a required form that gets

5   filled out for every single detail of the study for every

6   patient.

7   Q.    Does a doctor undertake any obligations towards

8   Rhone-Poulenc Rorer -- did the doctors in this case

9   undertake any obligations with regard to Rhone-Poulenc Rorer

10  in these clinical trials?

11  A.    I don't know what you mean.

12  Q.    In terms of confidentiality?

13  A.    Absolutely.  Yes.  What happens is that we are sworn

14  to a confidentiality agreement, so we cannot talk about

15  anything to do with this trial during the trial or

16  thereafter.  You have to be free from that obligation.

17  That's generally when the product comes on the market.

18  Q.    If I could have you turn to Plaintiffs' Exhibit 425,

19  that same book in front of you.

20          Especially the second-to-last page, Page 31,

21  there is a signature line, where you were the principal

22  investigator.  What does a signature on that line represent?

23  A.    It means that the investigator has read and agreed to

24  everything in the document and has sworn that he will not

25  diverge information about the study.

Kaliner - direct

1    Q.    Turning back to Page 29 of this document, the use of

2    information and publication, is this the confidentiality

3    obligation that the investigator undertakes?

4    A.    It is.

5    Q.    And undertook in these clinical trials?

6    A.    Yes.   I have seen documentation of the signed informed

7    consent of confidentiality agreements with each of the

8    investigators.

9    Q.    Do the subjects of the clinical trials, did the

10   patients in this case receive any information?

11   A.    Yes, they have an informed consent.  As I said before,

12   that's quite detailed and so they knew the name of the

13   active ingredient, they knew that a similar -- that another

14   product was on the market, with the same ingredient.

15   Q.    Did they know any of the excipients in the product?

16   A.    No, of course not.

17   Q.    And what was done with the samples after they were

18   given to the patients for use?

19   A.    Well, the patients were instructed in their use.  It

20   was two sprays each nostril once a day, depending on the

21   study, and some of them went back to one spray each nostril

22   once a day in one of the studies.

23           The bottles were collected periodically through

24   the study in order to account for the volume of spray to be

25   sure that patients were being compliant with the study.

Kaliner - direct

1        So the drugs were given out and then collected

2   as we always do and returned to the company and measured.

3   Q.    Is that something required by federal law, that you

4   collect the bottles?

5   A.    It's done in every study.

6   Q.    From Page 23:  All disposition of clinical supplies

7   must be recorded and accounted for as required by federal

8   law at the completion of the study.

9        Did the patients keep any records of their use

10  of this drug?

11  A.    Well, they had a diary.  There are diaries that they

12  fill out that record symptoms.  So they had diaries that

13  they were recording.  Those diaries were collected as well

14  during the course of the study.

15  Q.    When you say they are collected, who collected the

16  diaries from them?

17  A.    The physician or his designate.  We have a number of

18  clinical study coordinators with whom we work.  And they are

19  actually directly in contact with the studies, the patients

20  who are studied.

21  Q.    There is a line for the signature of the clinical

22  trial coordinator in the investigator's brochures?

23  A.    Correct.

24  Q.    So they undertake the same confidentiality

25  application?

Kaliner - direct

1    A.    They do.  They are well-trained.  They have to pass a

2    test.  So they are well-regulated.

3    Q.    After the doctors collect the data, what is done with

4    the data?

5    A.    Well, during the course of the study, we are very,

6    very, very carefully regulated.  So the CRO visits our

7    office on a periodic basis, sometimes depending on the

8    studies many more times than you want them to, but they are

9    there frequently, at least every week or so.  They review

10   all the documents.  It's not like you are ever left on your

11   own.  You are never left on your own.  The clinical study

12   coordinators are supervising every step of the way to make

13   sure all the documentation is accurate and filled in

14   correctly and interacts with our study coordinators and with

15   the physician.  So there is a very, very close interaction

16   going on on a constant basis with the CRO.

17   Q.    To be clear, the doctors in these studies, did they

18   ever know which samples had active ingredients and which had

19   placebo?

20   A.    No.  These are double-blind placebo controls, so

21   nobody knows, nobody actively involved in the experiment

22   except for the CRO might know.  But we don't know.

23   Q.    And that would include patients, too?

24   A.    That's correct.  It involves the physician, the study

25   coordinator, and the patient would not know.

Kaliner - direct

1    Q.    Now, in these trials, were the patients kept confined?

2    A.    No.   The FDA actually requires us in these studies to

3    let the patients be exposed to the same conditions that

4    cause the disease.   So if you had patients quarantined or

5    someplace, they wouldn't be exposed to the allergins to

6    which they are being studied.

7              So the studies are done seasonally, so that

8    patients are exposed to an allergin that is in the air and

9    they are asked to do their usual life except for taking part

10    in the study.

11              It is an ambient study under natural conditions.

12    That is required by the FDA.

13    Q.    After the CRO collected all the data, what did it do

14    with that data?

15    A.    It analyzes it, puts it together, and goes, interacts

16    with Rhone-Poulenc Rorer at the time.   We have nothing to do

17    with it.   Once the data has been collected, our job is over,

18    except for final reports that take place, to make sure all

19    the paperwork is accurate.

20    Q.    Now, in your binder you have Plaintiffs' Trial Exhibit

21    192, which looks to be 350 pages.

22    A.    Right.

23    Q.    I apologize to the environment.

24              Can you tell me what that is?

25    A.    This is the protocol.   And, so, you are looking at the

Kaliner - direct

1   details of the protocol.  It's the background and the

2   details of what we have to do.

3   Q.    Going back to the factors that we were talking about,

4   in terms of experimental use, the first one is the necessity

5   of public testing.  But if you could tell me, just to

6   clarify, whether you think that public testing was necessary

7   in this situation?

8   A.    Well, it is the only way to get a drug on the market

9   in the United States.  So it's absolutely 100-percent

10  required.

11  Q.    And in terms of determining the efficacy or safety of

12  the drug, was public testing necessary?

13  A.    Absolutely.  It's the only way you can determine

14  safety and efficacy.

15  Q.    The second factor is the amount of control over the

16  experiment retained by the inventor.  What control did RPR

17  maintain over this trial?

18  A.    Well, they were intensely involved in the creation of

19  the protocol.  That is their protocol.  But once the

20  protocol is in place, it is then done by -- it's automatic.

21  The CRO and myself and the coordinator do everything as

22  prescribed.

23            So we had no contact with RPR whatsoever at that

24  point.

25  Q.    But after the experiment was over, at the conclusion

Kaliner - direct

1    of the experiment, who maintained control of the data?

2    A.    RPR and the CRO would work with the data together.

3    But we would not.

4    Q.    Who selected the CRO?

5    A.    RPR would select the CRO.

6    Q.    The third factor is the nature of the invention.  How

7    do you believe the nature of the invention affected whether

8    this was experimental use or public use?

9    A.    I am not sure I understand the question.

10   Q.    Was there anything about the nature of this invention,

11   the TAA nasal spray, that would affect whether you would

12   perform an experiment that required interaction with the

13   public?

14   A.    Well, you could not tell that the nasal aqueous

15   preparation of TAA would work.  I mean, as I said before, I

16   would have bet anything that Elestat would have worked as a

17   nasal spray.  There is absolutely no reason why Elestat

18   given into the nose shouldn't have been quite effective.

19   But it wasn't.

20              So by nature of the way that studies have to be

21   done, TAA had to be studied.

22   Q.    The next factor is the length of the test period.  How

23   long were these trials?

24   A.    That's really prescribed.  At the time of these

25   studies, seasonal allergic rhinitis was a two-week study,

1    one-week run, that's a total of three.  The PAR studies,

2    perennial allergic rhinitis by requirement of the FDA, was a

3    four-week study.  That is just laid out by the FDA.

4    Q.    The fifth factor is whether payments were made.  Do

5    you know if there were any payments made at these trials?

6    A.    I can tell you what we had at our center.  We

7    reimburse patients on the basis of time involved.  We give

8    them a basis, it's about 20 to 25 dollars an hour for time

9    involved in the experiment.  But I do not believe that all

10   the sites in this particular study paid their volunteers.

11   Some of them were purely volunteer participants who got no

12   payment whatsoever.  But I think that the majority probably

13   got some payment.  But these -- you are talking about a few

14   hundred dollars maximum.

15   Q.    Did the patients pay anything for the drug that they

16   were getting?

17   A.    Oh, of course, not.

18   Q.    Whether there was a secrecy obligation, now, I believe

19   you talked about something related to that?

20   A.    Yes.  I mean, there was a requirement for

21   confidentiality.

22   Q.    Were the records of experiments kept?

23   A.    Hundreds of pages per patient.

24   Q.    Who conducted the experiment?

25   A.    Well, as I said before, it's regulated by a CRO, but

Kaliner - direct

1    conducted by the physician and his coordinator on site.

2    Q.    The degree of commercial exploitation during testing.

3    Was there commercial exploitation during testing?

4    A.    Tell me what you mean by commercial exploitation.

5    Q.    Did they sell the drug?

6    A.    Of course not.  First of all, the drug is not for

7    sale.  The patients only knew the active ingredient.  There

8    was no contact with the company whatsoever.

9    Q.    Was Rhone-Poulenc Rorer marketing the drug during this

10   time?

11   A.    To the patients?

12   Q.    To anyone.

13   A.    Well, they were marketing the aerosol product.  But

14   not this particular product.  So the Nasacort AQ was

15   certainly not commercially available.

16   Q.    Do you believe the invention reasonably required

17   evaluation under actual conditions of use?

18   A.    It was the only way you can tell whether the product

19   would work or not, and it's required by the FDA.

20   Q.    Do you believe the testing was systematically

21   performed?

22   A.    Yes, it was absolutely rigorously performed in a

23   systematic fashion.

24   Q.    Was the test continually monitored, the invention

25   continually monitored during testing?

Kaliner - direct

1    A.    As I said, each of these studies is scrupulously

2    supervised.

3    Q.    And what contacts did RPR, if any, have with potential

4    customers, the subjects in the trials?

5    A.    I can say absolutely none.

6    Q.    So do you have -- I know I asked you before.  But your

7    conclusion with regard to whether there was public use or

8    experimental use was?

9    A.    Well, there is no question it was experimental use.

10   Q.    I would like to change topics to --

11              MR. GRACEY:  Your Honor, I move to strike.

12              THE COURT:  It seems to me that is a question of

13   law.

14              MR. RICH:  It's based on facts.

15              THE COURT:  It's a question of law.

16              MR. RICH:  I will defer to Your Honor.

17              THE COURT:  There may be facts that underpin my

18   ultimate determination.  But I get to decide whether it's

19   public or experimental use.  That's the point.

20              MR. RICH:  You get to decide everything.

21   BY MR. RICH:

22   Q.    I would like to move to the topic of certain potency

23   issues, and ask you, are you familiar with something called

24   the MacKenzie Skin Blanching Test?

25              MR. GRACEY:  Your Honor, may we approach?

Kaliner - direct

1          THE COURT:  Yes.

2          (The following took place at sidebar.)

3          MR. GRACEY:  You may recall that Dr. Meltzer was

4   up, during the case-in-chief he began talking about potency.

5   I raised an objection saying I was concerned whether there

6   was going to be their obviousness case.  I also recall

7   during the pretrial conference, actually, about the overlap

8   of experts.  We have Dr. Meltzer and Dr. Kaliner.  The exact

9   same demonstratives that they gave us last night from Dr.

10  Kaliner they gave it for Meltzer.  My supposition is they

11  are going to do it with Meltzer tomorrow.

12          MR. RICH:  We will not do it with Meltzer

13  tomorrow.

14          MR. GRACEY:  While we are here, it is the same

15  issue with regard to patient preference studies.  I don't

16  mind one of them.  I just don't like a lot.

17          THE COURT:  I don't, either.

18          MR. RICH:  Your Honor, we are not going into

19  patient preference studies with Dr. Kaliner.

20          (End of sidebar conference.)

21  BY MR. RICH:

22  Q.    Are you familiar with the MacKenzie Skin Blanching

23  test?

24  A.    Yes, I am.

25  Q.    How does that work?

Kaliner - direct

1    A.    One of the properties of corticosteroids is they are

2    vasoconstrictors, and that is a direct and immediate

3    response.  It turns out if you put a steroid on your scan,

4    it blanches the blood vessels in the skin, so it's a

5    blanching assay.  It turns out, by luck, that there is a

6    relationship between the strength of skin blanching and the

7    potency of steroids.  So this is an easy screening procedure

8    to get an idea of how potent the steroid is.  It is done as

9    a routine for all steroids.

10   Q.    Do you know whether all steroids have the same potency

11   in the MacKenzie Skin Blanching test?

12   A.    Well, no, they don't.  And that's where there is a

13   hierarchy, if you will, of steroids.  By just convention, I

14   think, I think that they used Decadron as a factor of a

15   hundred, and then compared every other steroid to your

16   Decadron's potency, the natural steroid, by the way,

17   hydrocortisone would be about 25.  So it's about four times

18   more potent than the natural steroid.

19           So triamcinolone, as you can see on this table,

20   is two or three times more potent than is Decadron.  But the

21   other steroids we talked about today, including fluticasone,

22   Flonase, is 18 times more potent.

23           This, by the way, is a receptor binding assay.

24   This is not the MacKenzie Skin Blanching assay.  The numbers

25   are close to this, but not quite the same on the MacKenzie

Kaliner - direct

1    assay.

2    Q.    Are there any other potency-related factors that would

3    determine the usefulness of a corticosteroid?

4    A.    There are a lot of ways steroids work.  And so they --

5    what happens is the steroid has to get into the cell and

6    bind to its receptor, which activates the process.

7              The longer it binds to its receptor, the more it

8    stimulates it.

9              So here is the binding half-lives.  You can see

10   that most of the steroids are relatively similar one to the

11   other, but that fluticasone, Flonase, is substantially more

12   firmly bound to the receptor.

13   Q.    Do you know the relative dosing of Flonase and

14   Nasacort AQ?

15   A.    It is, to me, a surprise that triamcinolone acetonide

16   is equally potent to Flonase, fluticasone, as a nasal spray.

17   I have always found that surprising.  But it is surprising

18   that even though everything would say Flonase should be

19   seven, eight times better, it is not.  They are equally

20   potent.

21   Q.    You said they were equally opponent.  Is there other

22   evidence of efficacy in the body, in the nose, that leads

23   you to that conclusion?

24   A.    Well, there have been a number of studies.  This is

25   one of a number of studies that looks at symptom scores.

Kaliner - direct

1    What you can see is, in the capability of both Flonase and

2    Nasacort, triamcinolone acetonide and fluticasone, to reduce

3    symptoms, they are both identical.  Despite the fact one is

4    much more potent than the other.  On a microgram per

5    microgram basis, they are equal efficacy.

6    Q.    Is there any difference between the two in terms of

7    their ability to affect the inhalation process?

8    A.    In terms of congestion, this is a study that was done

9    by Eli Meltzer here.  He is looking at peak, nasal

10   respiratory primary flows.  Once again, it's another

11   demonstration.  But that first one was symptoms scores.

12   This is an objective measurement of nasal air flow.  You can

13   see again that triamcinolone is just as good or in this case

14   better than fluticasone, surprisingly.

15   Q.    Are you certain in the two Phase 3 clinical trials

16   whether there was a CRO involved or whether Rhone-Poulenc

17   Rorer maintained direct control over these tests?

18   A.    You know, I was not a study participant in either of

19   the trials.  So I really can't answer that question.

20   Usually, a CRO is involved.

21   Q.    But you don't have a clear recollection?

22   A.    I was not in the trial.

23   Q.    But you did review the material --

24   A.    I reviewed all the protocols.

25   Q.    Approximately how many boxes of materials did you

1   review in that process?

2   A.    Well, you mean -- I have received a cubic meter of

3   paper from you, which I have looked at.  It's occupying a

4   lot of my study.

5   Q.    I apologize, both to you an the environment again.

6         I would like to change the topic quickly to some

7   of the testimony that we heard yesterday.  And you heard Dr.

8   Donovan talking about, she stood up here and she made a

9   drawing, and I know she focuses mainly on pharmaceutical

10  formulations, what's in the bottle, not the bottle or the

11  pump, but she stated in her testimony that Nasacort AQ might

12  get trapped in the nasal valve, might not make it beyond

13  that point as any sort of plume, any sort of mist.  Is that

14  consistent with your experience?

15  A.    No.  We instruct -- I did it yesterday.  We instruct

16  patients to put the nozzle of the spray inside the

17  vestibule, so it's past the entrance to the nasal valve and

18  sprayed up toward the eye and slightly laterally, which is

19  where the largest space is in the nose.  I use these sprays,

20  somebody mentioned about their wife, I use these sprays

21  personally.  I test all the sprays myself.  I have hay

22  fever, and I use these sprays every single day.  And you can

23  feel the spray on top of your nose.  It sprays throughout

24  the nose.

25  Q.    Dr. Donovan also testified, as you heard in the

1    discussion between the lawyers and the Judge, that in all

2    her years of experience in their area of study, she had

3    never heard of a nasal spray that reliably reached any of

4    the sinuses, much less the frontal sinus.  Is that

5    consistent with your knowledge of treatments for sinus

6    disease, including frontal disease?

7    A.    Well, a spray is an atomized dispersion of a liquid

8    into air that is sprayed into the nose.  And these sprays

9    are a hundred microliters apiece.  A hundred microliters is

10   the volume.  A thousand microliters is a milliliter.  And

11   there would be five milliliters in a teaspoonful.

12          So a hundred microliters is a small amount of

13   spray.  And that's why, I mean, you would not consider using

14   these products or studying these products for sinusitis.

15   The sinuses require a different approach.

16          So what's been done recently has been to

17   nebulize products into the nose.  So a nebulization is

18   what -- you take a milliliter or two, so half a teaspoonful,

19   and you oscillate it or spin it, and break it up into fine

20   particles and it's put in a prong in the nose and you

21   breathe it.  You are just breathing an aerosol of a spray.

22   But instead of a hundred microliters you are breathing in

23   two milliliters.  And instead of using triamcinolone they

24   are using mometasone which is another steroid, it is

25   Nasonex.  And that's what's being done with thousands of

Kaliner - direct

1    patients today for the treatment of sinusitis.  And it is

2    being used because these nebulized products get into the

3    sinuses.

4            When I heard her say that no product is on the

5    market today so that you could breathe in for the sinuses,

6    that is just absolutely wrong.

7    Q.    You said that it was an aerosol.  By saying that did

8    you mean that this was a CFC or HFA-propelled product?

9    A.    Well, I mean, the nasal aqueous spray is an aerosol.

10   You are making a dispersion of small particles, usually

11   between 5 and 20 microns.  And that's exactly what you do

12   with the nebulizer.  You have reduced this nebulized

13   product, which is a milliliter or two versus a hundred

14   microliters, it is the same exact process of breathing.  You

15   are breathing it in.  And because breathing communicates,

16   ventilates the sinuses, it gets into the sinuses and in many

17   cases it treats the sinusitis.

18   Q.    Now, you are saying treating sinusitis.  Do you have

19   to treat sinusitis to treat rhinitis?

20   A.    No, no, no.  I mean, they are very different diseases.

21   I think Eli said, rhinitis is inflammation of the nose and

22   sinusitis is inflammation of the sinuses.  You may recall,

23   there are sinuses around the eyes, the frontal sinus is the

24   one, of course, everyone is focused on here, and that is

25   above the eyes and somewhat between the eyes as well.

Kaliner - direct

1              So they are a very different disease.  They are

2     a much different disease.

3              You often have rhinitis as a cause for

4     sinusitis, but you certainly have sinusitis without

5     rhinitis.

6     Q.    I would like to put up what has probably been the most

7     common slide in this trial.  I just wanted to get an idea,

8     it says the lateral wall of the nose without turbinates.

9     A.    Right.

10    Q.    Does that give you the complete picture of the size

11    and shape of the frontal sinus?

12    A.    Well, yes.  In the plane that this picture is taken,

13    it is a lovely depiction.  What it looks like is the frontal

14    sinuses an inch or two above the opening into the frontal

15    sinus.

16              But, remember, this is a plane.  This is a

17    picture of a certain cut.

18              Could I draw?  I am not a good artist but...

19              THE COURT:  That's fine.

20              (Witness steps down from stand.)

21    A.    First of all, you have to understand that frontal

22    sinuses are by far the most variable sinuses.  So many of

23    us, some people in this room have no frontal sinuses.  Those

24    sinuses, even though they are variable, usually have an

25    indentation like that, let me put this in perspective, so

Kaliner - direct

1    the eyebrow and the eye would be here and the nose here.

2    And there is a dip into the center.

3              What that plane was, was taking a picture right

4    here, whereas if you had taken a picture here, it would have

5    dipped much further down into the nose.

6              Here is the eyeball.  And this is the frontal

7    sinus.  And in the picture that we have all been using is a

8    cut right here.  And if you took a cut about a quarter of an

9    inch over, it would dip much further down.

10             So if you looked at the side picture of the

11   nose, the frontal sinus would come down a little bit toward

12   the ethmoid sinuses which they share a wall with.

13             So it's much closer to the area where the sinus

14   drains than it looked like in that particular picture that

15   all of us have been using.

16             I found an x-ray.

17             (Witness resumes stand.)

18             This is an x-ray.  These x-rays are actually

19   quite simple to understand, I think.

20             What you are looking at here is the inferior

21   turbinate.  This is the maxillary sinus, the big sinus in

22   your cheeks.  This is the middle turbinate, here and here.

23   And this would be the dip-down that I was talking about of

24   the frontal sinus.  And this is the sinus outthrow tract

25   right here.

Kaliner - direct

1          It is not anywhere near as complex as the

2     drawings made it look like.  Actually, it's just right here,

3     you are breathing in.  Air is going around this middle

4     meatus.  All it has to do is go right there.  That is the

5     entrance.

6               I don't know, it's pretty straightforward to me.

7               So I have no problem at all perceiving of air

8     going in here.  And I know the nebulized treatment I use for

9     my patients gets into the sinuses.  And I know when I fly in

10    airplanes I never have a problem with my frontal sinuses,

11    but I have problems with my ears.  So I am pretty confident

12    that this open space communicates with the air.

13    Q.    Now, Dr. MacKay testified he is familiar with nasal

14    anatomy from being an ear, nose and throat surgeon and

15    having visualized the inside of a nose many times.  Have you

16    ever looked inside the nose?

17    A.    Well, I am one of the allergists who do rhinoscopy

18    every single day.  So I am into people's noses as much as I

19    possibly can be.  But I am not a surgeon, and I have never

20    dissected the frontal sinus.  We did have an interesting

21    dissection of one, which I would like to get back to if we

22    could.

23               This is a very complicated drawing.  I know

24    everybody in this room is looking at this saying what in the

25    heck is this.

Kaliner - direct

1          I am not -- I never saw this until yesterday.

2          But what you are looking at here are a honeycomb

3    of ethmoid air cells.  There are four of them on either side

4    of the nose.  Dr. MacKay pointed out this very torturous

5    track.  I think it's called the semi-linear hiatus into

6    which the frontal sinus drains right down here, then there

7    is a stream that goes back down your throat.

8          This particular dissection is interesting in

9    that this patient has a few abnormalities.  One is he has

10   two openings into the maxillary sinuses, which we see three

11   or four or five percent of the time but not very frequently.

12   And this tract, this is a recess.  This is not a duct.  It's

13   not closed.  This is an open recess.  What you are missing,

14   this cut right here is the middle turbinate that has been

15   dissected away.  But there is no closure on this.  This is

16   an open roof.  And this is the front of your nose.

17          If your finger was long enough, you would reach

18   this spot with your little finger if you put it in.  This is

19   where the vestibule is down here.  You are not very far

20   from -- when we spray a spray, we direct patients right at

21   this spot.

22          Well, this looks kind of torturous right here,

23   and that's because this particular section has an extra air

24   cell in it.

25          This cell, it's got a bunch of -- you see it in

Kaliner - direct

1    about 20 percent of people, and it predisposes towards

2    sinusitis.  But this is an abnormality, as is the extra

3    maxillary ostea.  This space which looks tight and closed is

4    artificially closed because this is an abnormal patient.

5    This patient has an extra air cell here that you and I don't

6    have.  So this is a peculiar demonstration.  Here is the

7    frontal sinus, though.  And here is this recess.

8                 That's where the product has to go.  Ordinarily,

9    that is an open space.  And as I showed on the last picture,

10   that's widely open.

11                Now, the outflow goes this way.  But breathing

12   would go this way.  And that's nothing.  I don't see

13   left-hand turns and loop de loops.  I see a direct spray

14   going to this area quite readily, especially the way we

15   direct nasal sprays in our patients.

16   Q.   What do you mean especially the way we direct nasal

17   sprays?

18   A.   You tell patients to aim up at the inner corner of the

19   eye and sniff in.  The sniff, as I said yesterday, if you

20   all sniff (indicating), it goes right to the top of the your

21   nose, which is directly where this is.

22   Q.   Now, let me get this straight.  Let me see if I

23   understand.  Does the inflow, the way into the frontal sinus

24   have to go through this long tube-looking feature?

25   A.   I don't think so.  Why would it?  I mean air flows

Kaliner - cross

1    under the middle turbinate and would be right here and go

2    down.  This is close because of this bone here, this extra

3    air cell, but it would go right there.  That is all it has

4    to go.

5    Q.    So it's like an indoor and an outdoor?

6    A.    The outflow tract is absolutely down the semilunar

7    hiatus and it goes here.  And there is a well prescribed

8    exit flow that you can see in patients when they have

9    perennial drainage.  But the inflow is just right here.

10                MR. RICH:  Thank you, Dr. Kaliner.

11                Your Honor, I have no further questions.

12                THE COURT:  Counsel, you may cross-examine.

13                        CROSS-EXAMINATION

14   BY MR. GRACEY:

15   Q.    Hi, Dr. Kaliner, again.  It always seems when you have

16   a flight to catch, I'm in your way, Just like from your

17   deposition the last time.  But let me try to be brief so you

18   can try and catch your plane.

19                Just kind of picking up on where Aventis's

20   counsel left off.  Are you saying that the frontal ethmoidal

21   recess is the frontal sinus?

22   A.    No.

23   Q.    Okay.  And just so we're clear for the Court,

24   Dr. MacKay operated on the frontal sinus, I think it was

25   thousands of times; right?

Kaliner - cross

1    A.    I think he said a thousand.

2    Q.    Okay.  And you have never operated on the frontal

3    sinus, yourself.  Right?

4    A.    No, I haven't.

5    Q.    Okay.  And, in fact, as far as the nasal anatomy goes,

6    you would agree with me that Dr. MacKay has far more

7    experience in the nasal anatomy due to his operating on the

8    nasal anatomy.  Isn't that true?

9    A.    Well, I wouldn't agree with that, no.  I mean I take

10   care of patients.  I probably have seen, in terms of doing

11   nasal examinations, I bet I've seen more patients than

12   anyone in this room, including Dr. MacKay.  I mean I'm a

13   very careful examiner.

14   Q.    And I believe you are.  But when you do your

15   examinations, you don't look into the frontal sinus, do you?

16   A.    No.  You can see the anterior aspect of the middle

17   turbinate in nearly every patient.  And I, because so many

18   patients come to me because of difficult to manage sinus

19   disease, it's an area of prime interest for me.  I look

20   carefully at every patient; and I do a number of

21   rhinoscopies which pulls me right to that space.

22   Q.    Dr. Kaliner, I wanted to talk to you just for one

23   minute.

24              MR. GRACEY:  If we could pull up -- actually,

25   since it was one of your demonstratives, I'll use the Elmo.

Kaliner - cross

1    I'll have to take your pretty picture away.

2              THE COMPUTER TECHNICIAN:  I have the image.

3              MR. GRACEY:  Oh, you have the image?  Great.

4    BY MR. GRACEY:

5    Q.    I believe it's the same image you were looking at.

6    A.    Right.

7    Q.    I think you testified that this here and here was the

8    frontal sinus.  Was that what you said?

9    A.    It's the bottom part.  It's the most central part of

10   the frontal sinus.

11   Q.    Okay.  Let's be clear about a couple things.  First,

12   this is a CT scan.  Right?

13   A.    This is a CT scan.

14   Q.    It's not an actual picture like we were looking at,

15   that you were looking at?

16   A.    A dissection.

17   Q.    Correct.

18   A.    No, it's not a dissection.

19   Q.    Isn't it true, doctor, that this is the ethmoidal

20   sinuses right here?

21   A.    The ethmoid sinuses are here.  This is the frontal.

22   Q.    Okay.  Dr. Kaliner, you had testified a little bit

23   about public use, and I wanted to ask you some questions

24   about that.

25              MR. GRACEY:  You can take that down.

Kaliner - cross

1    BY MR. GRACEY:

2    Q.    You're aware that the Kobayashi study occurred,

3    started about December 1992?  It was the 305 study.

4    A.    I'm going to take the word for you.  The answer is I

5    don't know that.

6    Q.    And it continued until about March '93.

7    A.    Okay.

8    Q.    About three or four months later.  There was 178

9    patients enrolled in that study.  Right?

10   A.    Yes.

11   Q.    Now, I think you testified that the patients knew the

12   drug that they were taking.  Right?

13   A.    They knew the active ingredient, right.

14   Q.    In fact, they knew they were taking an aqueous version

15   of Nasacort, didn't they?

16   A.    They knew it was a triamcinolone aqueous spray and

17   there was an analogous product on the market.

18   Q.    In fact, that analogous product was identified for

19   them as Nasacort, wasn't it?

20   A.    (Nodding yes.)

21   Q.    Okay.  Now, none of the investigators were employees

22   of RPR, were they?

23   A.    No.

24   Q.    And Dr. Kim, the inventor of the patents at issue, was

25   not an investigator, was he?

Kaliner - cross

1    A.    No, he was not.

2    Q.    Indeed, Dr. Kim, the inventor, did not run these

3    studies, did he?

4    A.    I don't think he had anything to do with them.

5    Q.    Right.  He didn't have anything to do with them.  He

6    didn't control them either, did he?

7    A.    No.

8    Q.    Now, these studies were conducted at -- I'm speaking

9    specifically with regard to the 305 study, which is the

10   DX-158 for the record.  These studies were conducted by six

11   investigators from six independent centers from RPR.  Isn't

12   that right?

13   A.    Yes, that is correct.

14   Q.    Now, the patients, they weren't required to stay at

15   the study centers, were they?

16   A.    No, no.

17   Q.    And there are study centers that are set on campuses,

18   aren't there?

19   A.    For Phase I and Phase II trials, there are.  But in

20   allergy, no.

21   Q.    These patients didn't have to take the Nasacort AQ

22   there at the center.  Right?  They left the center and took

23   it wherever they wanted.  Isn't that right?

24   A.    Yes.  The way we do it, usually we start off the

25   patients on the first day showing them how to use the

Kaliner - cross

1    products in the office; but then they're on their own,

2    having been trained, and they take it on schedule at home.

3    Q.    No restrictions about where they could take it.  They

4    weren't told to go hide in a closet, take your Nasacort and

5    come back out?

6    A.    They're told to take it the same time every day.

7    Q.    And that could be anywhere.  It could be in their

8    home?  Could be their office?

9    A.    (Nodding head yes.)

10   Q.    Is that is a yes?

11   A.    Yes, that's correct.

12   Q.    It could be in their car?  It could be at a Phillies

13   game?

14   A.    There is no restrictions.

15   Q.    None whatsoever.  Right.

16          Now, you testified you didn't think the

17   educational level of the people that were participants in

18   the study was particularly high.  That is what you'd said.

19   A.    I said, by and large, the people who volunteer for

20   studies are not the most well educated people that we have.

21   Q.    But you're not claiming to have looked into the

22   educational background of every single volunteer that took

23   part in the study.  Right?

24   A.    No, I have interacted with thousands of volunteers but

25   I was not a study site for this particular study.

Kaliner - cross

1    Q.    In fact, any of these participants could have been a

2    chemist or married to a chemist.  Right?

3    A.    (Nodding head yes.)

4    Q.    You are nodding your head.

5    A.    The answer is yes, they could have been.  It could

6    have been anybody.

7    Q.    They could have been a formulator?

8    A.    That's correct.

9    Q.    They could have been married to a formulator?

10   A.    They could have been.

11   Q.    They could have taken this at work?

12   A.    They could have.

13   Q.    And their coworkers could have been formulators?

14   A.    They could have.

15   Q.    They could have been Ph.D.s?

16   A.    You can take this dream anyplace you want to.

17   Q.    Okay.  Thank you.  In the interest of getting on your

18   flight, that is far enough for me.

19            Now, I think you stated, but I just want to make

20   sure the record is clear, these participants were under

21   absolutely no obligation of secrecy.  Isn't that right?

22   A.    I mean they knew what they were -- they knew the

23   active ingredient and they were not restricted.  Matter of

24   fact, they have to know that, by law, to know what they're

25   taking.

Kaliner - cross

1    Q.    I appreciate that.  I was asking a slightly different

2    question but I appreciate that answer.  My question actually

3    was these volunteers, these participants taking the Nasacort

4    AQ were under absolutely no obligation of secrecy?

5    A.    Right.  They were not.

6    Q.    Right.  They could tell the world that they were

7    taking Nasacort AQ?

8    A.    Correct.

9    Q.    They didn't sign any confidentiality agreement, did

10   they?

11   A.    They signed an informed consent.

12   Q.    They signed an informed consent.  And that actually

13   told them they were taking triamcinolone acetonide.  Right?

14   A.    Right.

15   Q.    They told them it was an aqueous form of triamcinolone

16   acetonide?

17   A.    Right.  That's the experiment.  Correct.

18   Q.    Now, just quickly, there was also the 309 study, which

19   is DX-155 for the record.  And in that study, I believe

20   there was about 429 patients that took part in that study.

21   Does that sound right to you?

22   A.    Sounds about right.

23   Q.    All right.  And that study started in August of 1993

24   and ended in about October of 1993.  Does that sound right?

25   A.    That sounds about right.

Kaliner - cross

1    Q.    All right.  So in that study, there was likewise no

2    restrictions on where the participants could take the drug.

3    Right?

4    A.    Yes, that's correct.

5    Q.    And there was likewise no obligation that they keep

6    their use of Nasacort AQ secret.  Right?

7    A.    That's correct.

8    Q.    And I won't ask you the questions but it could have

9    been anybody that was involved in that study.  Right?

10    A.    That's correct.

11    Q.    All right.  So combined between the 305 study and the

12    309 study, you had about 600 participants taking Nasacort

13    AQ.  Correct?

14    A.    That's correct.

15    Q.    All right.  Now, you had testified that Dr. Donovan

16    referred to nasal sprays.  Actually, I don't know that you

17    testified.  I think plaintiffs' counsel represented what

18    Dr. Donovan stated, but --

19    A.    Right.

20    Q.    -- you recall the questions and answers.  Right?

21    A.    Yes, I do.

22    Q.    All right.  And there is actually a difference between

23    a nasal spray and a nebulizer, isn't there?

24    A.    Yes, there is a difference.  Right, there is a

25    difference.

Kaliner - cross

1    Q.    Okay.  A nebulizer is something that you actually

2    breath into your nose for several minutes.  Isn't that

3    right?

4    A.    That's correct.  That's the big difference.

5    Q.    Right.  And a nasal spray, it's just one puff?

6    A.    One or two puffs.  That's correct.

7    Q.    Okay.  Now, you know, don't you, based on your

8    experience that you have on the use of nebulizers, that a

9    nebulizer can create an ultrafine mist of particles as much

10   as 50 times smaller than a nasal spray such as Nasacort AQ.

11   Isn't that right?

12   A.    These are not ultrasonic nebulizations.  There are

13   ultrasonic nebulizers, but the products that we're talking

14   about here, dispensing mometasone in a nasal nebulizer uses

15   a device that puts out a 5-to-15-or-20 micron particle.

16   Q.    Smaller than the nasal spray such as Nasacort AQ.

17   Right?

18   A.    Nasacort is 5-to-15, 5-to-20 microns.

19   Q.    Dr. Kaliner, I want to jump gears a little bit

20   somewhat related those to the two studies we were talking

21   about.  You believe that if you demonstrate that a nasal

22   spray is safe and effective -- okay? -- safe and effective

23   for the treatment of perennial allergic rhinitis, you would

24   anticipate that the same product would work to treat

25   seasonal allergic rhinitis.  Isn't that right?

Kaliner - redirect

```
 1    A.      You would anticipate.
 2            MR. GRACEY:  You're going to make your flight.
 3    Thank you so much for coming in.
 4            THE COURT:  Thank you, counsel.
 5            Redirect.
 6            MR. RICH:  Very short, Your Honor.  Thank you
 7    very much.
 8                    REDIRECT EXAMINATION
 9    BY MR. RICH:
10    Q.      Now, he just asked about whether you would anticipate
11    if something worked for seasonal allergic rhinitis, if it
12    would work for perennial allergic rhinitis.  Would the FDA
13    accept something for perennial allergic rhinitis if you had
14    shown that it was effective for seasonal allergic rhinitis?
15    A.      Absolutely not.  They require well-controlled,
16    placebo-controlled trials to demonstrate effectiveness in
17    PAR, just like they do in SM.  So there is no extension.
18    Q.      And there was some questions about these specific
19    trials whether someone was taking Nasacort AQ.  In the
20    materials that you read, was anything described as Nasacort
21    AQ?
22    A.      I don't think so.  I think it was called, it was
23    triamcinolone acetonide.
24    Q.      And just very quickly, if I could bring the x-ray up,
25    I was reminded that I had you point places and not describe
```

Kaliner - redirect

1    where they were.

2    A.    Right.

3    Q.    If you could tell me where on this picture, in words,

4    the frontal sinuses are?

5    A.    So as I outline the space here, this is the ethmoid,

6    anterior ethmoid air cell.  And this is the most deepest

7    penetration of the frontal sinus into the nose.  And it's

8    inside the middle turbinate above the ethmoid air cell and

9    lateral to the eyeball, which would be right here.

10              This space, what is called the ostiomeatal

11   complex, this opening that is below this ethmoid air sell is

12   the entrance to the maxillary sinus.  So you can see how

13   close things are when you dissect them apart by x-ray.

14   Q.    So looking to the right side of this CT scan, the top

15   dark space is the frontal sinus?

16   A.    It's the lowest part of the frontal sinus.

17   Q.    Just below that, there is an enclosed dark space.

18   That is the ethmoidal sinus?

19   A.    Yes, that air cell right there.

20   Q.    And at the bottom right, there is a dark space.  That

21   is the maxillary sinus?

22   A.    That is correct.

23   Q.    Among the lighter areas on the figure, there is kind

24   of a fishhook shape.

25   A.    So the light areas actually are bones.  This is the

Kaliner - redirect

1    middle turbinate.  This is the middle meatus space between

2    the turbinate and the entrance to the frontal sinus,

3    maxillary sinus and ethmoid.  This is the inferior

4    turbinate.  This is the nasal septum.

5            So you seeing the nasal septum in the middle.

6    And the two lateral bones, or these compo bones, this

7    happens to be inverted shape, they're usually bent the other

8    way.  Nevertheless, that's the way this one is.  And they

9    outline the entrances to the sinuses.  And the air space,

10   when you breathe through the back of the nose, is the space

11   between the turbinates and the septum that I'm outlining

12   right now.

13   Q.    So just describing, trying to describe them in words,

14   the J-shaped, fishhook-shaped feature, light feature from

15   the top going down to the bottom, is the middle turbinate?

16   A.    Middle turbinate at the top part of the nose and

17   inferior turbinate at the bottom half of the nose.

18           MR. RICH:  And if we could look at the other

19   feature the histological slide.

20           MR. GRACEY:  I'll just object.  It's beyond the

21   scope, Your Honor.

22           THE COURT:  I'm sorry?

23           MR. GRACEY:  Object.  Beyond the scope of my

24   cross.

25           MR. RICH:  I'm just trying --

1                MR. GRACEY:  He is just repeating.

2                MR. RICH:  All I'm trying to do is describe what

3      he said with the laser pointer in words.

4                THE COURT:  Go ahead.

5      BY MR. RICH:

6      Q.    At the top left, there is an opening.  And that is the

7      frontal?

8      A.    This would be the frontal sinus at the top left part

9      of the screen.  This is analogous parts of the frontal sinus

10     that is coming down the most deepest part of the frontal

11     sinus.

12                This is the ostia.

13                This space at the top part of the picture that

14     is quite narrowed in this particular dissection is the

15     opening into the frontal sinus.

16                THE COURT:  You don't recall him testifying

17     about this?

18                MR. RICH:  Your Honor, I wasn't trying to have

19     him testify.

20                THE COURT:  I mean he described it just the way

21     he is doing it now.  I think the record is clear.

22                MR. RICH:  Okay.  Thank you, Your Honor.  Then I

23     have nothing further.

24                I appreciate Your Honor's indulgence.

25                And thank you very much to the court reporters

1   for their time.

2                   THE COURT:  All right.  Thank you, doctor.  You

3   may go to your flight.

4                   THE WITNESS:  Thank you.

5                   THE COURT:  Counsel, how many more witness does

6   you have on rebuttal?

7                   MR. BERGHOFF:  I want to confer with colleagues.

8   I think we will be trimming down our list.  And I will

9   confidently represent -- and I rarely do this -- that we

10  will be finishing early tomorrow.  We will not be going

11  until 4:30 or 5:00.

12                  THE COURT:  Oh, I didn't anticipate we would.

13                  MR. BERGHOFF:  I was hoping that was correct;

14  and that is going to be the fact.

15                  THE COURT:  Yes, I'm just trying to get a handle

16  on how many, roughly, ballpark.

17                  MR. BERGHOFF:  Three or four witnesses.  And we

18  don't have any that are going to be extended marathons.

19                  THE COURT:  You can sit down.

20                  MR. BERGHOFF:  Thank you, Your Honor.

21                  THE COURT:  I'll preview something for both

22  sides that I'm contemplating doing.  And that is I'm

23  considering having the parties simultaneously submit

24  proposed findings and conclusions by May 30th of no greater

25  length than 15 pages a piece.  I'll leave myself some wiggle

1    room on this, but it seems to me that this case is coming

2    down to the fact finder's impressions largely of expert

3    testimony.  And, ultimately, this is going to be determined

4    as much as a matter of fact in this case as a matter of law.

5    And I would rather visit that issue or those issues while

6    things are relatively fresh in my mind; just as a jury would

7    have the opportunity to immediately upon receiving

8    instructions and hearing your closing speeches on that

9    subject.

10           I may or may not entertain closings on June the

11   9th, which is when we're going to meet.  I'm thinking about

12   having you back at 9:00 o'clock.  I'll be on a patent trial

13   at that time so my time is going to be short.

14           MR. DAY:  I'll be with you.

15           THE COURT:  You're involved, yes.

16           So that is what I'm thinking about.  You can

17   prepare your minds.  I'm pretty sure that that is the course

18   I'm going to take.

19           If, over the course of the evening, in thinking

20   about what I'm saying, you determine that or you think that

21   you can demonstrate good cause as to why I should give you

22   more than 15 pages, I'll give you a chance to convince me,

23   but it seems to me that 15 pages should be enough.  Okay?

24           All right.  Counsel, see you in the morning.

25           (Trial adjourned at 4:55 p.m.)